UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAY BRADSHAW,

                              Plaintiff,

v.

UHLER, Superintendent Upstate Corr. Facility;
FENNESSY, Superintendent, Mid-State Corr.
Facility; S. DOMINIC, Upstate Corr. Facility;          9:21-CV-0901
R. CANTWELL, Comm'r Hearing Officer,                   (DNH/ML)
Upstate Corr. Facility; J. TATRO, Lieutenant,
Upstate Corr. Facility; WOODRUFF,
Superintendent for Security, Upstate Corr.
Facility; R. BARBOSA, CHO, Mid-State Corr.
Facility; HOLLENBECK, Upstate Corr. Facility;
LAMICA, Upstate Corr. Facility; GRAVELL,
Mental Health Therapist, Upstate Corr. Facility,
formerly known as Gravlin; VENETTOZZI,
Director of Special Housing Unit; JENNIFER
WALDRON, Mental Health Unit Chief, Upstate
Corr. Facility; and BRIAN LOWNSBURY,
Corrections Officer, Upstate Corr. Facility,

                              Defendants.
_____

APPEARANCES:                                           OF COUNSEL:

JAY BRADSHAW
   *Pro Se* Plaintiff
Great Meadow Correctional Facility
Post Office Box 51
Comstock, New York 12821

LETITIA A. JAMES                                       MARK MITCHELL, ESQ.
Attorney General for the State of New York             Assistant Attorney General
   Counsel for Defendant
The Capitol
Albany, New York 12224

MIROSLAV LOVRIC, United States Magistrate Judge

## REPORT and RECOMMENDATION

Currently before the Court, in this civil rights action filed by Jay Bradshaw ("Plaintiff") against Uhler, Fennessy, S. Dominic, R. Cantwell, J. Tatro, Woodruff, R. Barbosa, Hollenbeck, Lamica, Gravell, Venettozzi, Jennifer Waldron, and Brian Lownsbury (collectively "Defendants"), is (1) Plaintiff's motion for partial summary judgment, and (2) Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 and to revoke Plaintiff's IFP status. (Dkt. Nos. 119, 120.)  For the reasons set forth below, I recommend that (1) Plaintiff's motion be denied, and (2) Defendants' motion be granted in part and denied in part.

## I.    RELEVANT BACKGROUND

### A.    Overview

On or about August 11, 2021, Plaintiff Jay Bradshaw ("Plaintiff") commenced this *pro se* action by filing a civil rights complaint against numerous state employees at various correctional facilities pursuant to 42 U.S.C. § 1983, together with an application to proceed *in forma pauperis* ("IFP") and a motion for preliminary injunctive relief.  (Dkt. Nos. 1, 2, 3.)  By order dated September 27, 2021, United States District Judge David N. Hurd granted Plaintiff's IFP application in accordance with 28 U.S.C. § 1915(g), and, following a review of the Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), dismissed some of Plaintiff's claims, transferred some of Plaintiff's claims to the Western District of New York, terminated some of the defendants, and directed service and a response to the claims against the named defendants that survived *sua sponte* review.  (Dkt. No. 5.)

#### 1.    Initial Determination of Imminent Danger

Prior to commencing this action, Plaintiff had filed at least twenty-two other civil actions in the district courts in the Second Circuit since 2008.  (Dkt. No. 5 at 3.)  In at least four of those

actions, Plaintiff acquired "strikes" as defined in 28 U.S.C. § 1915(g).  (*Id.* at 4 n.5.)

Notwithstanding this determination, Plaintiff's IFP application was granted because the Court

found that the allegations in the Complaint were sufficient to plausibly suggest that Plaintiff

"was 'under imminent danger of serious physical injury' when he signed his complaint on

August 1, 2021."  (*Id.* at 7.)  The Court, however, noted that "this is a preliminary finding which

defendants are entitled to challenge or refute in future filings."  (*Id.* [stating further that

"plaintiff's IFP status will be revoked if, as the case progresses, it is determined that he did not

face 'imminent danger' when he commenced this action or is otherwise not entitled to proceed

IFP"].)

## 2.    Amended Complaint

On March 2, 2022, Plaintiff filed an amended complaint.  (Dkt. No. 43.)

Generally, Plaintiff's Amended Complaint alleges that various corrections officials at

Upstate Correctional Facility ("Upstate") and Mid-State Correctional Facility ("Mid-State")

violated Plaintiff's civil rights related primarily to misbehavior reports and corresponding

disciplinary determinations issued between August 2018 and December 2021.  (*See generally*

Dkt. No. 43, Dkt. No. 48 at 6-13.)  More specifically, the Amended Complaint alleges that

between August 2, 2018, and December 22, 2021, Plaintiff was issued thirty-seven misbehavior

reports during his incarceration at Upstate and Mid-State.  (*See generally* Dkt. No. 43, Dkt. No.

48 at 6-13.)  When Plaintiff received the first misbehavior report at issue in this action, he had

been confined in a Special Housing Unit ("SHU") cell for almost three-hundred consecutive days

as a result of disciplinary determinations at another DOCCS facility.  (*See generally* Dkt. No. 43,

Dkt. No. 48 at 6-13.)  As a result of guilty determinations at disciplinary hearings related to some

of the misbehavior reports at issue in this action, Plaintiff is scheduled to remain in the SHU until

at least September 14, 2023.  (*See generally* Dkt. No. 43, Dkt. No. 48 at 6-13.)  In addition, following Plaintiff's release from the SHU, he is scheduled to serve more than four years of keeplock confinement as a result of several other of the misbehavior reports at issue in this action.  (*See generally* Dkt. No. 43, Dkt. No. 48 at 6-13.)

By order dated April 20, 2022, following a review of the Amended Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Judge Hurd dismissed some of Plaintiff's claims, directed the Clerk of the Court to add certain new defendants to the docket, directed that defendant "Jane Doe" be terminated, directed service of the Amended Complaint on the new defendants, and directed that a response be filed for the claims against the named defendants that survived *sua sponte* review.  (Dkt. No. 48.)  More specifically, Judge Hurd ordered that the following six claims survived *sua sponte* review: (1) Plaintiff's First Amendment retaliation claim against Defendant Lamica; (2) Plaintiff's Eighth Amendment excessive force claims against Defendants Hollenbeck and Lamica; (3) Plaintiff's Eighth Amendment conditions-of-confinement claim based on the denial of meals against Defendant Hollenbeck; (4) Plaintiff's Eighth Amendment medical indifference claims against Defendants Gravell and Waldron; (5) Plaintiff's Eighth Amendment excessive SHU confinement claims against Defendants Dominic, Uhler, Cantwell, Tatro, Woodruff, Barbosa, Fennessy, and Venettozzi; and (6) Plaintiff's Fourteenth Amendment disciplinary due process claims against Defendants Uhler, Lownsbury, Cantwell, Tatro, and Venettozzi arising out of the disciplinary determinations associated with the

September 2018 Disciplinary Hearing,[1] the January 2019 Disciplinary Hearing,[2] and/or the May 2021 Disciplinary Hearing.[3]  (*Id.*)

### 3.      Recent Procedural History

On January 24, 2022, Judge Hurd denied Plaintiff's motion for a preliminary injunction. (Dkt. No. 31.)

On January 23, 2023, Plaintiff filed a partial motion for summary judgment on his excessive SHU confinement and due process claims.  (Dkt. No. 119.)  On January 27, 2023, Defendants filed a motion for summary judgment and to revoke Plaintiff's IFP status.  (Dkt. No. 120.)  Defendants opposed Plaintiff's partial motion for summary judgment.  (Dkt. No. 131.) Plaintiff opposed Defendants' motion for summary judgment and to revoke his IFP status.  (Dkt. No. 137.)

### B.      Parties' Briefing on Their Cross-Motions for Summary Judgment

### 1.      Plaintiff's Motion for Partial Summary Judgment

Generally, in support of his motion for partial summary judgment, Plaintiff asserts the following two arguments: (1) he was denied due process at his disciplinary hearings; and (2) his continuous confinement in the SHU violated his Eighth Amendment right.  (*See generally* Dkt. No. 119.)

---

[1]      The undersigned adopted the definition of this term from the Decision and Order of Judge Hurd dated September 27, 2021.  (Dkt. No. 5 at 13.)

[2]      The undersigned adopted the definition of this term from the Decision and Order of Judge Hurd dated September 27, 2021.  (Dkt. No. 5 at 15.)

[3]      The undersigned adopted the definition of this term from the Decision and Order of Judge Hurd dated September 27, 2021.  (Dkt. No. 5 at 25.)

More specifically, with respect to his first argument, Plaintiff argues that at his October 2018 disciplinary hearing (1) Defendant Lownsbury failed to (a) provide Plaintiff with the DOCCS directive for preserving evidence and for testing a substance for urine, (b) submit Plaintiff's request for video of the incident, and (c) assist Plaintiff in securing the testimony of C.O. Jeffrey as a witness, (2) Defendant Cantwell conducted the disciplinary hearing in Plaintiff's absence without justification and imposed a 250 day SHU penalty despite his knowledge that Plaintiff was already serving a 120 day SHU sanction, and (3) Defendants Woodruff and Venettozzi failed to correct the due process violations and instead, affirmed the 250 day SHU sanction.  (Dkt. No. 119 at 5.)  In addition, Plaintiff argues that with respect to the January 2019 Disciplinary Hearing, Defendant Trato allegedly relied on the officers' report and video of the incident, but the video squarely contradicts the officers' report and thus, there was no evidence to properly rely on when imposing a sentence of 265 days in the SHU.  (*Id*.)  With respect to the May 2021 Disciplinary Hearing, Plaintiff argues that (1) Defendant Cantwell improperly conduced the hearing without Plaintiff present and imposed a SHU sanction for offenses that were not punishable by a SHU sanction, and (2) Defendants Uhler and Rodriguez affirmed Defendant Cantwell's improper SHU sanction.  (*Id*. at 6.)

With respect to his second argument, Plaintiff asserts that he has been confined to the SHU since January 10, 2018, and none of the offenses for which he received a SHU sanction posed an unreasonable and ongoing threat to security and safety and thus were grossly disproportionate to the reason for isolation.  (*Id*. at 6-7.)

### 2.    Defendants' Motion for Summary Judgment

Generally, in support of their motion for summary judgment and to revoke Plaintiff's IFP status, Defendants assert the following six arguments: (1) Plaintiff's IFP status should be

revoked because he did not face imminent danger when he filed the complaint; (2) Plaintiff's medical indifference claims should be dismissed; (3) Plaintiff's due process claims should be dismissed; (4) Plaintiff's excessive force and retaliation claims should be dismissed; (5) Plaintiff's conditions-of-confinement claim should be dismissed; and (6) Plaintiff's excessive SHU confinement claim should be dismissed.  (*See generally* Dkt. No. 120, Attach. 8 at 5-27.)

More specifically, with respect to their argument that Plaintiff's IFP status should be revoked, Defendants adduced record evidence, including sworn statements, Plaintiff's deposition testimony, and Plaintiff's medical records, which, they contend, show that Plaintiff was seen by mental health providers on numerous occasions during the time period before and after commencement of this action and there was not an indication that Plaintiff was in imminent danger of harming himself.  (Dkt. No. 120, Attach. 8 at 6-7 [citing Dkt. No. 121 at 3-34; Dkt. No. 121, Attach. 3].)  Thus, Defendants argue that Plaintiff obtained IFP status based on misrepresentations about his mental health treatment and condition at the time that he commenced this action.  (Dkt. No. 120, Attach. 8 at 7.)  Moreover, Defendants argue that revocation of Plaintiff's IFP status is justified based on other determinations in the Northern District concerning Plaintiff's condition during the time period in question, which found that (1) on May 31, 2021, Plaintiff did not face an imminent danger of serious physical injury and had access to medical treatment; and (2) on July 4, 2021, Plaintiff did not face an imminent danger of serious physical injury and had access to medical treatment.  (*Id*. at 8.)  Defendants argue that there is no factual basis to believe that Plaintiff's condition changed from not being in imminent danger in May and July 2021, to being in imminent danger on August 11, 2021, when he commenced this action.  (*Id*. at 8-9.)

Defendants argue that with respect to Plaintiff's medical indifference claims, Plaintiff's mental health records demonstrate that he was seen by mental health providers on numerous occasions during the time of May 3, 2021 (when he was transferred to Upstate Correctional Facility), and when he commenced this action on August 11, 2021.  (Dkt. No. 120, Attach. 8 at 11.)  Moreover, Defendant Gravell submitted a sworn statement confirming that she made rounds twice per week and incarcerated individuals were permitted to verbally request a mental health interview.  (*Id*.)  Defendants argue that Plaintiff may not manufacture a medical indifference claim by refusing treatment and the proof demonstrates that Plaintiff's mental health providers showed concern for his well-being.  (*Id.* at 11-12.)

With respect to Plaintiff's due process claims, Defendants argue that during the September 2018 Disciplinary Hearing, (1) Defendant Cantwell properly concluded that Plaintiff refused to attend the hearing and was advised of his rights, and (2) Defendant Cantwell properly concluded that Plaintiff's request for urinalysis procedures were irrelevant to the proceeding.  (Dkt. No. 120, Attach. 8 at 14-15.)  Moreover, Defendants argue that the January 2019 Disciplinary Hearing resulted in a sanction of fourteen-days in the SHU, which does not implicate a liberty interest protected by the Fourteenth Amendment.  (*Id*. at 16-17.)  Defendants also argue that, in any event, the Amended Complaint is devoid of specific factual allegations regarding how Plaintiff's due process rights were violated during the January 2019 Disciplinary Hearing and the record is clear that his due process rights were not violated.  (*Id*.)  Further, Defendants argue that the May 2021 Disciplinary Hearing resulted in a sanction of ninety-days in the SHU, which does not implicate a liberty interest protected by the Fourteenth Amendment.  (*Id*. at 17-18.)  Defendants argue that, in any event, the record demonstrates that Plaintiff's due process rights were not violated by the May 2021 Disciplinary Hearing.  (*Id*.)

Defendants argue that Plaintiff's excessive force claims against (1) Defendant Hollenbeck should be dismissed because the alleged force used was *de minimis* such that Plaintiff did not seek medical treatment or sustain any diagnosed injuries; and (2) Defendant Lamica should be dismissed because the alleged force used was *de minimis* such that Plaintiff did not seek medical treatment, the alleged injury healed on its own, and bruises and short-term pain are insufficient to support an excessive force claim.  (Dkt. No. 120, Attach. 8 at 19-21.) Defendants argue that Plaintiff's retaliation claim against Defendant Lamica should be dismissed because (1) the allegedly tight waist chains were too *de minimis* to constitute an adverse action supporting a retaliation claim; (2) Plaintiff cannot raise a triable issue of fact that Defendant Lamica's conduct was causally related to Plaintiff's protected speech in light of Plaintiff's disciplinary convictions on the misbehavior report and Plaintiff's lengthy disciplinary history predating the alleged retaliatory behavior.  (*Id*. at 21-23.)

Defendants argue that Plaintiff's conditions-of-confinement claim should be dismissed because the record demonstrates that Plaintiff engaged in a calculated practice of refusing to comply with feed-up procedures and, in any event, cannot raise an issue of fact for trial that any alleged denial of meals by Defendant Hollenbeck presented an immediate danger to his health or well-being.  (Dkt. No. 120, Attach. 8 at 23-25.)

Defendants argue that Plaintiff's Eighth Amendment excessive SHU confinement claim should be dismissed because (1) it is well established that SHU conditions, although restrictive, do not rise to the level of an Eighth Amendment violation, (2) Plaintiff cannot raise a triable issue of fact that Defendants were aware of, and disregarded, a substantial risk of serious harm to Plaintiff in imposing SHU confinement, and (3) in the alternative, Defendants are entitled to qualified immunity.  (*Id*. at 25-27.)

### 3.      Defendants' Opposition to Plaintiff's Partial Motion for Summary Judgment

Generally, in opposition to Plaintiff's motion for partial summary judgment, Defendants argue that (1) Plaintiff's claim of excessive SHU confinement pursuant to the Eighth Amendment should be dismissed and his motion for summary judgment should be denied, and (2) Plaintiff's due process claims should be dismissed and his motion for partial summary judgment should be denied.  (*See generally* Dkt. No. 131, Attach. 4.)

More specifically, Defendants argue that with respect to Plaintiff's excessive SHU confinement claim, it is unclear what standards should be used to evaluate this "potential" claim and it is well established that although SHU conditions are restrictive, they do not rise to the level of an Eighth Amendment violation.  (Dkt. No. 131, Attach. 4 at 6-15.)  Further, Defendants argue that Plaintiff cannot raise a triable issue of fact that Defendants knew of and disregarded an excessive risk to his health or safety because Plaintiff was seen by mental health providers on a regular basis during his SHU confinement.  (*Id*.)  In addition, Defendants argue that the record demonstrates that the sanctions were properly imposed for Plaintiff's numerous and egregious disciplinary violations that threatened the health, safety, and security of staff, incarcerated individuals, and the facilities.  (*Id*.)  In the alternative, Defendants argue that Plaintiff's excessive SHU claim should be dismissed based on the doctrine of qualified immunity.  (*Id*.)

With respect to Plaintiff's due process claims, Defendants argue that for the reasons set forth in their memorandum of law filed on January 27, 2023, the disciplinary hearings of September 2018, January 2019, and May 2021, satisfied the requirements of due process and Plaintiff cannot raise a triable issue of fact.  (Dkt. No. 131, Attach. 4 at 15-16.)

**4.**      **Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment**

Generally, in opposition to Defendants' motion for summary judgment and to revoke Plaintiff's IFP status, Plaintiff argues that (1) his IFP status should not be revoked; (2) there is a genuine issue of material fact that precludes summary judgment on his medical indifference claim; (3) there are genuine issues of material fact that preclude summary judgment on his due process claims; (4) there are genuine issues of material fact that preclude summary judgment on his excessive force and retaliation claims; (5) there are genuine issues of material fact that preclude summary judgment on his conditions-of-confinement claim; and (6) there are genuine issues of material fact that preclude summary judgment on his excessive SHU confinement claim.  (*See generally* Dkt. No. 137 at 19-31.)

More specifically, with respect to Defendants' motion to revoke his IFP status, Plaintiff submitted a sworn statement wherein he refutes certain factual information contained in Defendants' documentary evidence, including evidence showing that he refused a private interview, expressed having no concerns during various meetings with mental health providers, and that he did not suffer from depression and anxiety.  (Dkt No. 137 at 10-16.)  Plaintiff argues that between May 3, 2021, and the signing of the complaint on August 1, 2021, he was placed on a callout for a private interview to discuss his mental health issues on a single occasion—May 24, 2021—despite DOCCS officials' mental health referrals and Plaintiff's request for mental health services due to the impact that Plaintiff's prolonged confinement in the SHU had on his mental health.  (Dkt. No. 137 at 19-21.)  Plaintiff argues that mental health issues are not discussed cell-side because of the lack of privacy.  (*Id.*)

With respect to Plaintiff's medical indifference claims, Plaintiff argues that his claims against Defendants Gravell and Waldron should not be dismissed because he had a history of

serious mental illness that included self-harm, his mental health history was known to medical providers, substantial periods of time in the SHU is a risk factor for mental health, and despite several referrals and Plaintiff's letters and grievance seeking mental health services, Defendant Gravell denied Plaintiff private call-outs to discuss his mental health issues and misrepresented that Plaintiff refused private interviews. (*Id.* at 21-22.)

With respect to Plaintiff's due process claims, Plaintiff argues that (1) his September 2018 Disciplinary Hearing did not comply with due process because (a) Defendant Lownsbury did not request the video or note that Plaintiff sought Correction Officer Jeffery as a witness, (b) Defendant Lownsbury[4] incorrectly stated that Plaintiff sought the DOCCS directive about preserving evidence and urinalysis testing when, in fact, Plaintiff sought the standard operating procedures for preserving evidence and to determine the presence of urine in a substance, (c) Plaintiff was threatened by Sergeant Fletcher and requested a lieutenant be present for his escort to the hearing but was denied the ability to attend the hearing, and (d) Defendants Cantwell, Uhler, and Venettozzi were aware that Plaintiff was already serving a 120-day SHU sanction before imposing a 250-day SHU sanction; (2) his January 2019 Disciplinary Hearing did not comply with due process because (a) the determination of guilt was not supported by reliable evidence in that, the video evidence showed Plaintiff complaining about the chain around his ribs and Defendant Lamica harassing Plaintiff, (b) while serving his 14-day SHU sanction, Plaintiff was sleep deprived because officers would "bang on his cell" every thirty-minutes to keep him awake, which amounted to an atypical and significant hardship for purposes of implicating a liberty interest, and (c) in any event, Plaintiff was already serving a 250-day SHU sanction which

---

[4]     Based on the undersigned's reading of Plaintiff's opposition, it appears that Plaintiff intended to argue that Defendant Cantwell incorrectly interpreted the document sought by Plaintiff via Defendant Lownsbury.

can be aggregated for purposes of determining whether a liberty interest was implicated by the additional SHU sanction; and (3) his May 2021 Disciplinary Hearing did not comply with due process because (a) Defendants Cantwell, Uhler, and Rodriguez do not dispute that the charges Plaintiff was deemed guilty of do not permit a sanction of SHU confinement, (b) Defendants Cantwell, Uhler, and Rodriguez were aware that Plaintiff was already serving a 525-day SHU sanction before imposing an additional 90-day SHU sanction, which can be aggregated for purposes of determining whether a liberty interest was implicated, and (c) the officer transporting Plaintiff to the hearing directed Plaintiff to come out of his cell in socks and when Plaintiff objected to that direction, he was denied access to his disciplinary hearing. (Dkt. No. 137 at 23-25.)

With respect to his excessive force and retaliation claims, Plaintiff argues that (1) Defendant Hollenbeck maliciously pushed him in the back causing Plaintiff to hit the wall and the fact that Plaintiff did not seek medical treatment is irrelevant; (2) Defendant Lamica squeezed the waist restraints and aggravated Plaintiff's bruised ribs causing extreme pain, and (3) on December 21, 2018, Plaintiff filed a grievance against Defendant Lamica, and on January 14, 2019, Defendant Lamica referenced Plaintiff's grievance against him then squeezed the waist restraint around Plaintiff's ribs causing Plaintiff extreme pain and aggravating his rib injury. (*Id.* at 25-27.)

With respect to his conditions-of-confinement claim, Plaintiff argues that Defendant Hollenbeck deprived him of breakfast and lunch on approximately seven occasions between November 26, 2018, and January 1, 2019, and deprived Plaintiff of breakfast and lunch on January 4, 7, and 8, 2019. (*Id.* at 27.) Plaintiff argues that as a result of being denied meals, he suffered substantial pain and developed GERD. (*Id.*) Plaintiff also argues that Defendant

Hollenbeck issued him three misbehavior reports on January 1, 2019, but the reports were all dismissed after the hearing officer reviewed the video, which showed Defendant Hollenbeck depriving Plaintiff meals.  (*Id.*)

With respect to Plaintiff's excessive SHU confinement claims, he argues that (1) Defendants Dominic, Woodruff, and Venettozzi knew that Plaintiff was already serving a 213-day SHU sanction when he was sentenced to an additional 60-days in the SHU and the 60-day SHU sanction was grossly disproportionate to the non-violent offense that Plaintiff was found guilty of; (2) Defendants Cantwell, Uhler, and Venettozzi knew that Plaintiff was already serving a 120-day SHU sanction when he was sentenced to an additional 250-days in the SHU and the 250-day SHU sanction was grossly disproportionate to the offenses that Plaintiff was found guilty of; (3) Defendants Tatro and Venettozzi knew that Plaintiff was already serving a 250-day SHU sanction when he was sentenced to an additional 14-days in the SHU, the determination of guilt was not supported by some reliable evidence, and the 14-day SHU sanction was grossly disproportionate to the non-violent offense that Plaintiff was found guilty of; (4) Defendants Woodruff, Uhler, and Venettozzi knew that Plaintiff was already serving a 264-day SHU sanction when he was sentenced to an additional 250-days in the SHU and the 250-day SHU sanction was grossly disproportionate to the offenses that Plaintiff was found guilty of; (5) Defendants Barbosa, Fennessy, and Venettozzi knew that Plaintiff was already serving a 514-day SHU sanction when he was sentenced to an additional 300-days and 150-days in the SHU and the additional SHU sanctions were grossly disproportionate to the offenses that Plaintiff was found guilty of; and (6) Defendants Cantwell, Uhler, and Venettozzi knew that Plaintiff was already serving a 525-day SHU sanction when he was sentenced to an additional 90-days in the SHU, the offenses that Plaintiff was deemed guilty of did not permit the imposition of a SHU

14

sanction, and the 90-day SHU sanction was grossly disproportionate to the non-violent offense

that Plaintiff was found guilty of.  (Dkt. No. 137 at 28-31.)  Plaintiff argues that based on the

hearings of August 2018, September 2018, January 2019, February 2019, August 2019, and May

2021, he was sanctioned to a total of 864 days in the SHU, which could be considered "atypical

and significant" and grossly disproportionate to the underlying offenses that he was found guilty

of.  (*Id*. at 31.)  Moreover, Plaintiff argues that Defendants are not entitled to qualified immunity

under the circumstances.  (*Id*.)

### 5.    Defendants' Reply in Further Support of Their Motion for Summary Judgment and to Revoke Plaintiff's IFP Status

In further support of their motion, Defendants assert the following two arguments: (1)

Plaintiff's IFP status should be revoked, and (2) Plaintiff's medical indifference, due process,

excessive force, retaliation, conditions-of-confinement, and excessive SHU confinement claims

should be dismissed.  (*See generally* Dkt. No. 138, Attach. 2.)

More specifically, with respect to their motion to revoke Plaintiff's IFP status,

Defendants argue that (1) their motion should be granted for the reasons stated in their moving

memorandum of law because Plaintiff was not in imminent danger at the time he commenced

this action, and (2) Plaintiff's financial condition improved based on a $2,000.00 settlement he

received in another action.  (Dkt. No. 138, Attach. 2 at 3-4.)

Defendants argue that with respect to Plaintiff's medical indifference claims, Plaintiff

conceded that he was seen by mental health providers on the dates documented in his mental

health records and that mental health providers make rounds at Upstate Correctional Facility.

(Dkt. No. 138, Attach. 2 at 4.)  Moreover, Defendants argue that Plaintiff's assertion that the

mental health interviews were not as private as he would have preferred is insufficient to raise a

triable issue of fact and he cannot manufacture a medical indifference claim by refusing treatment.  (*Id*.)

Defendants argue that Plaintiff failed to submit evidence raising a triable issue of fact regarding his due process claims.  (*Id*. at 4-5.)

Defendants argue that the videos they submitted of Defendant Lamica's escort of Plaintiff on January 22, 2019, demonstrate that the escort was appropriate and Defendant Lamica's conduct was too *de minimis* to support an excessive force or retaliation claim.  (Dkt. No. 138, Attach. 2 at 5.)

Defendants argue that for the reasons set forth in their moving memorandum of law, Plaintiff's conditions-of-confinement claim against Defendant Hollenbeck should be dismissed. (*Id*. at 6.)

Defendants argue that Plaintiff's excessive SHU confinement claim should be dismissed because he cannot raise a triable issue of fact and, in any event, his claim should be dismissed based on the doctrine of qualified immunity.  (*Id*.)  Moreover, Defendants argue that Plaintiff does not challenge the adequacy of the mental health treatment he received before his transfer to Upstate Correctional Facility in May 2021, and his claims concerning his confinement at Southport Correctional Facility from October 2019 to May 2021, were severed and transferred and thus, not at issue in this action.  (*Id*.)

### 6.      Plaintiff's Reply in Further Support of His Motion for Partial Summary Judgment

In further support of his motion for partial summary judgment, Plaintiff argues that (1) an issue of fact remains for trial regarding his excessive SHU confinement claim; (2) his due process claims and motion for partial summary judgment should be granted.  (Dkt. No. 141.)

More specifically, Plaintiff argues that his excessive SHU sanction claim should survive because (1) with respect to the August 2018 hearing (a) Plaintiff was always handcuffed and placed in waist restraints for all out of cell movement and thus, his mockery of an officer and impractical threat to beat the officer up at 3:00 p.m., in the parking lot could not be considered a serious or credible threat to warrant a SHU sanction that exceeds 30-days, (b) Defendants Dominic, Uhler, and Venettozzi knew that the 60-day SHU sanction was grossly disproportionate to the offenses that Plaintiff allegedly committed, (c) Defendants Dominic, Uhler, and Venettozzi knew that Plaintiff was already serving a 231-day SHU sanction when the 60-day SHU sanction was imposed, and (d) while serving the 60-day SHU sanction, Plaintiff was assaulted on November 25, 2018, and deprived several meals between November 26, 2018, and January 4, 2019; (2) with respect to the January 2019 Disciplinary Hearing, (a) the determination of guilt was not supported by some reliable evidence because the video evidence does not show that Plaintiff committed any of the offenses alleged in the misbehavior report by Defendant Lamica, (b) the 14-day SHU sanction was grossly disproportionate, (c) Defendants Tatro and Venettozzi knew that Plaintiff was already serving a 250-day SHU sanction when the additional 14-day SHU sanction was imposed, and (d) while serving the 14-day SHU sanction, Plaintiff was sleep deprived by officers who banged on his cell during rounds to keep him awake; (3) with respect to the August 2019 hearing, (a) Defendants Barbosa, Fennessy, and Venettozzi knew that the SHU sanctions of 300-days and 150-days were grossly disproportionate to the offenses that Plaintiff was alleged to have committed, and (b) Defendants Barbosa, Fennessy, and Venettozzi knew that Plaintiff was already serving a 514-day SHU sanction before the additional 300-day and 150-day SHU sanctions were imposed; (4) with respect to the February 2019 hearing, (a) the 250-day SHU sanction was grossly disproportionate to the offenses that Plaintiff was alleged to

have committed, and (b) Defendants Woodruff, Uhler, and Venettozzi knew that Plaintiff was already serving a 264-day SHU sanction before imposing the additional 250-day SHU sanction; (5) with respect to the September 2018 Disciplinary Hearing, (a) the allegations in the misbehavior report were untrue, (b) Defendants Cantwell, Uhler, and Venettozzi knew that the 250-day SHU sanction was grossly disproportionate to the offenses that Plaintiff was alleged to have committed, and (c) Defendants Cantwell, Uhler, and Venettozzi knew that Plaintiff was already serving a 120-day SHU sanction before imposing the additional 250-day SHU sanction; and (6) with respect to the May 2021 Disciplinary Hearing, (a) Plaintiff did not refuse to attend the disciplinary hearing but merely stated that the direction to walk out of his cell in socks was ridiculous, (b) Defendants Cantwell, Uhler, and Venettozzi knew that SHU confinement could not be imposed for the offenses that Plaintiff was found guilty of committing, and (c) Defendants Cantwell, Uhler, and Venettozzi knew that Plaintiff was already serving a 525-day SHU sanction before imposing the additional 90-day SHU sanction.  (Dkt. No. 141 at 8-11.)  Moreover, Plaintiff argues that he served more than three and one-half years in the SHU (from January 10, 2018, through August 1, 2021, when he signed the Complaint in this action), which could be considered "atypical and significant" especially in light of his documented history of mental illness and Defendants' failed to provide adequate mental health treatment and ensure that his condition had not deteriorated to the point of constituting cruel and unusual punishment.  (*Id.* at 11-12.)

Plaintiff argues that he should be granted summary judgment on his due process claims because (1) with respect to the September 2018 Disciplinary Hearing, (a) on October 9, 2018, a sergeant threatened Plaintiff which resulted in his absence from the hearing, and (b) Defendant Lownsbury did not (i) provide Plaintiff with the Standard Operating Procedures for preserving

evidence and for determining the presence of urine in a substance, (ii) request video of the

incident, or (iii) assist in securing the testimony of C.O. Jeffery as a witness; (2) with respect to

the January 2019 Disciplinary Hearing, Defendant Tatro's finding of guilt was not supported by

some reliable evidence in that, the video did not show Plaintiff committed any of the offenses

alleged in the misbehavior report; and (3) with respect to the May 2021 Disciplinary Hearing, (a)

SHU confinement was not a proper sanction for the alleged offenses that he was found guilty of

committing, and (b) Plaintiff was prohibited from attending the disciplinary hearing because he

stated that the direction to exit his cell in socks, was ridiculous.  (*Id*. at 13-14.)

### 7.    Plaintiff's Surreply in Further Opposition to Defendants' Motion for Summary Judgment

Plaintiff simultaneously submitted a request to submit a surreply and a surruply.[5]  In his

letter surreply, Plaintiff argues that (1) his IFP status should not be revoked because (a) he was in

imminent danger at the time his complaint was filed in that, (i) prolonged confinement in the

SHU puts him at risk of self-harm, and (ii) Defendants effectively deprived of him mental health

services by not providing private mental health interviews, and (b) he has not yet received the

$2,000.00 settlement amount and his surcharges exceed $2,000.00, so his financial position has

not substantially changed; (2) with respect to his medical indifference claim genuine issues of

material fact remain for trial because Defendants denied Plaintiff private interviews and Plaintiff

did not refuse private interviews; (3) for the reasons set forth in Plaintiff's opposition papers

genuine issues of material fact remain for trial regarding his due process claims and,

alternatively, the Court should grant Plaintiff's motion for partial summary judgment of his due

process claims; (4) with respect to the excessive force and retaliation claims genuine issues of

---

[5]      Plaintiff is cautioned that in the future he should seek advance leave to file a surreply. N.D.N.Y. L.R. 7.1(a)(1).

material fact remain for trial because (a) the videos submitted by Defendants were altered in that the audio does not include Plaintiff's complaints that Defendant Lamica was shoving him, (b) the video does not show Plaintiff engage in the conduct that Defendant Lamica alleged in the misbehavior report, and (c) the application of force was malicious; (5) genuine issues of fact remain for trial regarding the conditions-of-confinement claim for the reasons set forth in Plaintiff's opposition papers; and (6) with respect to his excessive SHU confinement claims, his time at Southport Correctional Facility is relevant for determining whether there was a liberty interest and while confined in the SHU, Plaintiff was subject to inadequate mental health care, assaulted by other prisoners, deprived of meals, deprived adequate medical care, assaulted by officers, sleep deprived, and deprived of phone calls and family visits during the pandemic. (Dkt. No. 142 at 1-4.)

### C.     Plaintiff's Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Plaintiff in his Statement of Material Facts and not denied by Defendants in their response.  (*Compare* Dkt. No. 119 at 8-13 [Pl.'s Statement of Material Facts], *with* Dkt. No. 131, Attach. 5 [Defs.' Resp.].)

<u>August 2018 Disciplinary Hearing</u>

1.      At the time of rendering his decision, Defendant Dominic knew—from the disciplinary hearing record—that Plaintiff was already serving a 231-day SHU sanction, which was to be followed by 210 days keeplock confinement.[6]

2.      Defendant Dominic imposed a penalty of 60 days SHU.

---

[6]     The undersigned deems Defendants' response—referring the Court to the record and failing to admit or deny the fact asserted, which relates to Defendant Dominic's knowledge and thus, cannot be found in the disciplinary history—an admission.  First, Defendants fail to include a specific citation to the record to support a denial.  Fed. R. Civ. P. 56(c)(1)(A) (requiring a citation to "*particular* parts of materials in the record") (emphasis added); *N.Y. Teamsters v.*

3.      In his appeal, Plaintiff requested that the 60-day SHU sanction to be modified or dismissed arguing that SHU confinement has a detrimental impact on prisoners' mental health.[7]

4.      Defendant Woodruff, the Deputy Superintendent of Security, reviewed the disposition and made no change to the penalty.

5.      At the time of rendering his decision, Defendant Woodruff knew—from the disciplinary hearing record—that Plaintiff was already serving a 231-day SHU sanction.[8]

6.      Defendant Venettozzi reviewed the disciplinary hearing record and affirmed the 60-day SHU sanction.

7.      At the time of rendering his decision, Defendant Venettozzi knew—from the disciplinary hearing record—that Plaintiff was already serving a 231-day SHU sanction.[9]

---

*Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Rizzo v. Health Research, Inc.*, 12-CV-1397, 2016 WL 632546, at *2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."). Second, Defendants fail to indicate with specificity what is disputed. *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's response shall mirror the movant's Statement of Material Facts by *admitting and/or denying* each of the movant's assertions in matching numbered paragraphs.") (emphasis added); *Willis v. Cnty. of Onondaga*, 14-CV-1306, 2016 WL 7116126, at *5 n.10 (N.D.N.Y. Dec. 6, 2016) ("This partial denial is ineffective . . . [because] it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3)."); *In re Horowitz*, No. 14-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("[A] response contending to neither admit or deny an allegation does not create a genuine issue of fact.").

[7]      *See*, *supra*, note 6.  The Court notes that Defendants appear to cite to the same document as Plaintiff, albeit, in a different location of the record.  (*Compare* Dkt. No. 119 at 8, ¶ 3 [citing Dkt. No. 119, Attach. 1 at 3], *with* Dkt. No. 131, Attach. 5 at ¶ 3 [citing Dkt. No. 131, Attach. 1 at 3].)

[8]      *See*, *supra*, note 6.

[9]      *See*, *supra*, note 6.

8.      Plaintiff served the 60-day SHU sanction from November 5, 2018, to January 4, 2019.

## September 2018 Disciplinary Hearing[10]

9.      On September 28, 2018, Plaintiff informed Defendant Cantwell at the hearing that he would like to be assigned an Employee Assistant.

10.      On October 3, 2018, Defendant Lownsbury, who was assigned as Plaintiff's Employee Assistant, initially met with Plaintiff.

11.      Plaintiff requested that Defendant Lownsbury obtain DOCCS procedures for preserving evidence and testing a substance to determine the presence of urine.[11]

12.      Defendant Lownsbury did not provide Plaintiff any information for preserving evidence or testing a substance to determine the presence of urine.[12]

13.      Defendant Lownsbury did not mark on the Employee Assistant Form that Plaintiff requested video of the incident.[13]

---

[10]      Referred to as the "October 2018 Disciplinary Hearing" by Plaintiff.  (Dkt. No. 5 at 9.)

[11]      *See*, *supra*, note 6.

[12]      Defendants failed to properly respond to this asserted fact by admitting, denying, or objecting.  Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ."); N.D.N.Y. L.R. 7.1(a)(3) ("The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs."); *In re Horowitz*, No. 14-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("[A] response contending to neither admit or deny an allegation does not create a genuine issue of fact.").

[13]      *See*, *supra*, note 12.

14.     Defendant Lownsbury did not mark on the Employee Assistant Form that Plaintiff requested a witness.[14]

15.     On October 9, 2018, Defendant Cantwell conducted the hearing in Plaintiff's absence.

16.     Defendant Cantwell noted in his decision that the standard operating procedures for urinalysis were inappropriate or unwarranted under the circumstances.[15]

17.     Defendant Cantwell imposed a penalty of 250 days confinement in the SHU.

18.     At the time of rendering his decision, Defendant Cantwell knew—from the disciplinary hearing record—that Plaintiff was already serving a 120-day SHU sanction.[16]

19.     Defendant Uhler failed to review the hearing record as required by DOCCS' policy when the SHU sanction exceed 30 days.[17]

20.     In his appeal, Plaintiff argued he was denied an Employee Assistant, the right to be present at the hearing, and the right to present evidence including a witness.[18]

21.     In his supplemental appeal, Plaintiff mentioned (a) his grievance dated October 12, 2018, which related to the incident that occurred on October 9, 2018, and resulted in his absence from the disciplinary hearing, and (b) the video depicting the incident.[19]

---

[14]     *See*, *supra*, note 12.

[15]     *See*, *supra*, note 12.

[16]     *See*, *supra*, note 6.

[17]     Defendants deny this fact and cite to Dkt. No. 120, Attach. 6 at 12-13 in support of their denial. However, the undersigned cannot locate support to dispute Plaintiff's asserted fact at Dkt. No. 120, Attach. 6 at 12-13.

[18]     *See*, *supra*, note 12

[19]     Plaintiff's supplemental appeal dated October 29, 2018, is located in the record at Dkt. No. 119, Attach. 1 at 37. Plaintiff incorrectly refers to it as "Exh. 4" however, it is located in a

22.     On November 28, 2018, Defendant Venettozzi reviewed the disciplinary hearing record and affirmed the 250-day SHU sanction.

23.      At the time of rendering his decision, Defendant Venettozzi knew—from the disciplinary hearing record—that Plaintiff was already serving a 120-day SHU sanction.[20]

24.     Defendant Venettozzi affirmed the 250-day SHU sanction.

25.     Plaintiff served the 250-day SHU sanction from on or about January 4, 2019, to on or about September 12, 2019.

### January 2019 Disciplinary Hearing

26.     Video of the incident shows Plaintiff complaining about the waist shackles.

27.     At the time of rendering his decision, Defendant Tatro knew—from the disciplinary hearing record—that Plaintiff was already serving a 250-day SHU sanction.[21]

28.     Defendant Tatro imposed a penalty of 14 days SHU.

29.     At the time of rendering his decision, Defendant Venettozzi knew—from the disciplinary hearing record—that Plaintiff was already serving a 250-day SHU sanction.[22]

30.     Plaintiff served the 14-day SHU sanction from September 11, 2019, to September 25, 2019.

---

series of pages immediately following a page that he titled "Exhibit 3."  (*Compare* Dkt. No. 119, Attach. 1 at 36-37, *with* Dkt. No. 119, Attach. 1 at 38.)

[20]     *See*, *supra*, note 6.

[21]     *See*, *supra*, note 6.

[22]     *See*, *supra*, note 6.

**February 2019 Disciplinary Hearing**

31.     At the time of rendering his decision, Defendant Woodruff knew—from the disciplinary hearing record—that Plaintiff was already serving a 264-day SHU sanction.[23]

32.     Defendant Woodruff imposed a 250-day SHU sanction.

33.     Defendant Venettozzi affirmed the 250-day SHU sanction on appeal.

34.     Plaintiff served the 250-day SHU sanction from September 25, 2019, to June 1, 2020.

35.     At the time of rendering his decision, Defendant Venettozzi knew—from the disciplinary hearing record—that Plaintiff was already serving a 265-day SHU sanction.[24]

**July 2019 Disciplinary Hearing[25]**

36.     At the time of rendering his decision, Defendant Barbosa knew—from the disciplinary hearing record—that Plaintiff was consecutively confined in SHU since January 10, 2018.[26]

37.     At the time of rendering his decision, Defendant Barbosa knew—from the disciplinary hearing record—that Plaintiff was already serving a 514-day SHU sanction.[27]

38.     Defendant Barbosa imposed a penalty of 300-days in the SHU based on the misbehavior report issued by Sergeant Roth.[28]

---

[23]     *See*, *supra*, note 6.

[24]     *See*, *supra*, note 6.

[25]     Referred to as the "August 2019 Disciplinary Hearing" by Plaintiff.  (Dkt. No. 119 at 11.)

[26]     *See*, *supra*, note 6.

[27]     *See*, *supra*, note 6.

[28]     *See*, *supra*, note 12.

39.     Defendant Barbosa imposed a penalty of 150-days in the SHU for the misbehavior reports issued by non-parties Huntley and Chandler.[29]

40.     In his appeal, Plaintiff requested that the 300-day SHU sanction and 150-day SHU sanction to be reduced because they were disproportionate to the alleged offenses.

41.     Defendant Fennessy reviewed the disposition and made no change to the 300-day SHU sanction.

42.     At the time of rendering his decision, Defendant Fennessy knew—from the disciplinary hearing record—that Plaintiff was already serving a 514-day SHU sanction.[30]

43.     Defendant Venettozzi affirmed the 300-day SHU sanction on appeal.

44.     At the time of rendering his decision, Defendant Venettozzi knew—from the disciplinary hearing record—that Plaintiff was confined in SHU consecutively since January 10, 2018.[31]

45.     At the time of rendering his decision, Defendant Venettozzi knew—from the disciplinary hearing record—Plaintiff was already serving a 514-day SHU sanction.[32]

46.     Plaintiff served the 300-day SHU sanction and the 150-day SHU sanction, respectively.

### May 2021 Disciplinary Hearing

47.     Defendant Cantwell imposed a 90-day SHU sanction.

---

[29]     *See*, *supra*, note 12.

[30]     *See*, *supra*, note 6.

[31]     *See*, *supra*, note 6.

[32]     *See*, *supra*, note 6.

48.    At the time of rendering his decision, Defendant Cantwell knew—from the disciplinary hearing record—Plaintiff was already serving a 525-day SHU sanction.[33]

49.    Defendant Uhler reviewed the hearing disposition and made no change to the 90-day SHU sanction penalty.

50.    At the time of rendering his decision, Defendant Uhler knew—from the disciplinary hearing record—Plaintiff was already serving a 525-day SHU sanction.[34]

51.    Acting Director of Special Housing/Inmate Disciplinary Program A. Rodriguez affirmed the 90-day SHU sanction on appeal.

52.    At the time of rendering his decision, Acting Director of Special Housing/Inmate Disciplinary Program A. Rodriguez knew—from the disciplinary hearing record—that Plaintiff was already serving a 525-day SHU sanction.[35]

53.    In his appeal, Plaintiff argued that (a) he was improperly excluded from the disciplinary hearing,(b) SHU confinement should not have been imposed for the offenses, (c) he had been confined in SHU for more than three consecutive years, is expected to remain confined until 2025, and isolated confinement has a long-term physical and psychological consequences, and (d) the penalty of 90-days in the SHU was disproportionate to the alleged offenses.[36]

---

[33]    *See*, *supra*, note 6.

[34]    *See*, *supra*, note 6.

[35]    *See*, *supra*, note 6.

[36]    *See*, *supra*, note 6.

**D.     Defendants' Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Statement of Material Facts and not denied by Plaintiff in a response.  (*Compare* Dkt. No. 120, Attach. 7 [Defs.' Statement of Material Facts], *with* Dkt. No. 137 [Pl.'s Resp.].)

1.      Plaintiff is in the midst of serving a prison sentence based on his convictions for rape in the first degree, criminal sexual act in the first degree, burglary in the first degree, robbery in the first degree, and sexual abuse in the first degree.

2.      Plaintiff commenced the present action by the filing of a Complaint on August 11, 2021.

3.      Defendant Jennifer Gravell is employed by the New York State Office of Mental Health ("OMH") as a Rehabilitation Counselor.[37]

4.      Defendant Gravell has been employed by OMH since 2015.[38]

5.      Defendant Gravell works at the Central New York Psychiatric Center mental health unit located at Upstate Correctional Facility.[39]

---

[37]     Although Plaintiff responds that he lacks "sufficient knowledge to admit or deny this fact," the undersigned deems this fact admitted.  *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute."); *In re Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("On a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact . . . . Similarly, a response contending to neither admit or deny an allegation does not create a genuine issue of fact.").

[38]     *See*, *supra*, note 37.

[39]     *See*, supra, note 37.

6.      As a Rehabilitation Counselor, Defendant Gravell's duties include conducting rounds, providing mental health counseling, and assessing risk factors.[40]

7.      With respect to Special Housing Unit/Long Term Keep Lock, incarcerated individuals receive an intake evaluation, a 30-day evaluation, and an evaluation every 90 days. In addition, mental health interviews are done in response to referrals and if an incarcerated individual requests one.

8.      Defendant Gravell also makes rounds twice a week and incarcerated individuals can verbally request a mental health interview.[41]

9.      Defendants contend that incarcerated individuals are offered the opportunity for a private OMH interview in a private interview room; if an incarcerated individual refuses a private interview, OMH staff will follow up about why the incarcerated individual did not want a private interview.

10.      The procedure for a mental health interview includes filling out a mental status examination report covering such categories as appearance and attitude, orientation, attention

---

[40]      *See*, *supra*, note 37.

[41]      Although Plaintiff attempts to place this asserted fact in context, the Local Rules direct that "[t]he opposing party['s] response shall . . . admit[] and/or deny[] each of the movant's *assertions* . . . in matching numbered paragraphs."  N.D.N.Y. L.R. 56.1(b).  Thus, the undersigned deems this fact admitted.  *Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

and memory impairment, mood, speech, affect, thought, perception, suicidal/homicidal ideations, prison-specific risk factors, warning signs of imminent suicide risk, insight/judgment, psychiatric history, inmate/patient participation in the evaluation process, and disposition.[42]

11.     Plaintiff was seen by mental health providers for mental health interviews on: April 16, 2021; May 4, 2021; May 24, 2021; July 15, 2021; August 9, 2021; August 19, 2021; September 1, 2021; September 8, 2021; September 30, 2021; October 28, 2021; December 14, 2021; December 21, 2021; and January 13, 2022.[43]

12.     Defendant Gravell performed an intake evaluation of Plaintiff on May 4, 2021. According to Defendant Gravell (a) Plaintiff refused a private interview and indicated that he had no concerns, and (b) there were no warning signs of imminent suicide risk, and no indication for active mental health services.

13.     On May 24, 2021, Defendant Gravell conducted a private interview with Plaintiff. According to Defendant Gravell, Plaintiff reported no mental health symptoms, there were no warning signs of imminent suicide risk, and no indication for active mental health services.

14.     The record from Plaintiff's mental health interview on July 15, 2021, reflects that Plaintiff refused a private interview, there were no warning signs of suicide risk, and Plaintiff "denies any mental health concerns."[44]

---

[42]     *See*, *supra*, note 37.

[43]     *See*, *supra*, note 41.

[44]     *See*, *supra*, note 41.

15.     The record from Plaintiff's mental health interview on August 9, 2021, also states that there were no warning signs of imminent suicide risk, and that Plaintiff "did not elaborate regarding any concerns and said he has no mental health concerns."[45]

16.     The record from Plaintiff's mental health interview on August 19, 2021, states that Plaintiff refused a private interview, that he had "no concerns," that there were no warning signs of imminent suicide risk, and that there was "[n]o indication for active mental health services."[46]

17.     The record from Plaintiff's mental health interview on September 1, 2021, states that Plaintiff refused a private interview, refused to speak to Defendant Gravell, there were no warning signs of imminent suicide risk, and there was no indication for active mental health services.[47]

18.     The record from Plaintiff's mental health interview on September 8, 2021, states that Plaintiff refused a private interview, indicated that he had no concerns, there were no warning signs of imminent suicide risk, and no indication for active mental health services.[48]

19.     Plaintiff was seen by Defendant Gravell for a private OMH interview on September 30, 2021.  The Mental Health Interview report states that Plaintiff was unable to describe any mental health symptoms, did not appear to be in any acute distress, did not present

---

[45]     *See*, *supra*, note 41.

[46]     *See*, *supra*, note 41.

[47]     *See*, *supra*, note 41.

[48]     *See*, *supra*, note 41.

as anxious or with low mood, remained future oriented and denied any suicidal ideations, and there were no warning signs of imminent suicide risk.[49]

20.      The record from Plaintiff's mental health interview on October 28, 2021, states that Plaintiff refused a private interview, stated that he was doing fine and had no mental health symptoms at that time, he was future oriented and denied any suicidal ideation, there were no warning signs of imminent suicide risk, and there was no indication for active mental health services.[50]

21.      The record from Plaintiff's mental health interview on December 21, 2021, states that Plaintiff refused a private interview, indicated that he had no concerns, there were no warning signs of imminent suicide risk, and no indication for active mental health services.[51]

22.      The record from Plaintiff's mental health interview on January 13, 2022, states that Plaintiff refused a private interview, and indicated that he had no concerns.

23.      Based on her clinical judgment, training, and interviews with Plaintiff, Defendant Gravell determined that there were no warning signs that Plaintiff was in imminent danger of harming himself.

24.      Plaintiff testified that he is not a clinician so he cannot diagnose whether his mental health condition changed between July 2021 and August 2021, but that "different environments, different people, different stresses" affected him.

---

[49]      *See*, *supra*, note 41.

[50]      *See*, *supra*, note 41.

[51]      *See*, *supra*, note 41.

## September 2018 Disciplinary Hearing

25.     On September 21, 2018, Plaintiff received a written misbehavior report by Correction Officer Russell which charged Plaintiff with unhygienic act, interference with an employee, and threats.

26.     According to the misbehavior report, while Correction Officer Russell was collecting feed-up trays, Plaintiff "slid his unopened tray that was filled with a yellow liquid that looked and smelled like urine, forcefully into the hatch causing the liquid to slosh and spill onto the floor."

27.     According to the misbehavior report, Plaintiff also stated "I'm gonna knock you out and send you home."

28.     Plaintiff attended the first day of the disciplinary hearing, on September 28, 2018.

29.     When the hearing resumed on October 9, 2018, Plaintiff did not attend.

30.     Defendant Cantwell—the Hearing Officer—determined that Plaintiff was properly advised of his right to appear and participate in the hearing, but that Plaintiff chose not to appear.[52]

31.     Based on the misbehavior report, Plaintiff was found guilty of unhygienic act, interference with an employee, and threats.[53]

32.     Defendant Cantwell executed a written disposition setting forth the evidence that he relied on and the reasons for the disciplinary action.[54]

---

[52]     *See*, *supra*, note 41.

[53]     *See*, *supra*, note 41.

[54]     *See*, *supra*, note 41.

33.    Plaintiff met with his assigned employee assistant, Defendant Lownsbury, on or about October 3, 2018.

34.    Plaintiff requested the Standard Operating Procedures for preservation of evidence and for urine testing.

35.    Defendant Cantwell determined that Plaintiff's request related to urinalysis procedures was "inappropriate and unwarranted under the circumstances."

**<u>January 2019 Disciplinary Hearing</u>**

36.    On January 23, 2019, Plaintiff received a misbehavior report dated January 22, 2019, by Defendant Lamica, that charged Plaintiff with harassment, refusing a direct order, interference with an employee, threats, movement violation, and creating a disturbance.

37.    Plaintiff participated at the disciplinary hearing.

38.    As a result of the disciplinary hearing conducted by Defendant Tatro, Plaintiff was convicted of the charges of harassment, refusing a direct order, interference with employee, and threats, and a penalty of 14 days of SHU confinement was imposed.[55]

39.    Plaintiff received a written statement from Defendant Tatro about the evidence relied on and the reasons for the disciplinary action.[56]

40.    The charges of interference with employee (107.10) and threats (102.10) were dismissed on administrative appeal.[57]

---

[55]    *See*, *supra*, note 41.

[56]    *See*, *supra*, note 41.

[57]    *See*, *supra*, note 41.

## **May 2021 Disciplinary Hearing**

41.     Plaintiff received advance written notice of the charges in the form of a misbehavior report that charged Plaintiff with refusing a direct order, interference, and a movement violation.

42.     At the disciplinary hearing, Correction Officer ("C.O.") Healy testified that when he attempted to transport Plaintiff to the hearing, Plaintiff refused to comply with directions, and Plaintiff told C.O. Healy to "eat a dick."

43.     Defendant Cantwell—the Hearing Officer—found that the hearing should proceed in Plaintiff's absence, because Plaintiff's conduct posed a risk to safety and security, and C.O. Healy testified that Plaintiff was advised that the hearing would proceed in Plaintiff's absence and a sanction could be imposed.[58]

44.     Based on the hearing, Plaintiff was found guilty of refusing a direct order, interference, and a movement violation.[59]

45.     Plaintiff received a written statement from Defendant Cantwell about the evidence relied on and the reasons for the disciplinary action.[60]

46.     Although Plaintiff alleges that he was pushed into a wall by Defendant Hollenbeck on November 25, 2018, Plaintiff concedes that he was not diagnosed with any injuries as a result of allegedly being pushed into the wall.[61]

---

[58]     *See*, *supra*, note 41.

[59]     *See*, *supra*, note 41.

[60]     *See*, *supra*, note 41

[61]     *See*, *supra*, note 41.

47.     Plaintiff's medical records reflect that Plaintiff did not seek any medical treatment related to the alleged incident with Defendant Hollenbeck.[62]

48.     Although Plaintiff alleges that on January 22, 2019, Defendant Lamica placed a waist chain on Plaintiff that was too tight, Plaintiff alleges only that it caused a bruise, that the bruise did not require medical treatment, and that the bruise "heal[ed] on its own."[63]

49.     Defendant Lamica did not strike Plaintiff.[64]

50.     Documents from Upstate Correctional Facility indicate that Plaintiff engaged in a practice of refusing to comply with feed-up procedures by, among other things, refusing to collect his tray, standing with his back pressed to the door covering his window and feed up hatch, blocking the hatch with his hands, and appearing as though he was going to throw something onto the officer feeding the gallery.

51.     Plaintiff's medical records are devoid of any indication that Plaintiff suffered from health problems due to a lack of food during the time period that he alleges he was denied some meals by Defendant Hollenbeck.[65]

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing "Three Strikes" Rule and the Imminent Danger Exception

Where a plaintiff seeks leave to proceed IFP, the Court must determine whether the plaintiff has demonstrated sufficient economic need to proceed without prepaying, in full, the

---

[62]     *See*, *supra*, note 41.

[63]     *See*, *supra*, note 41.

[64]     *See*, *supra*, note 41.

[65]     *See*, *supra*, note 41.

Court's filing fee of four hundred and two dollars ($402.00).[66]  The Court must also determine whether the "three strikes" provision of Section 1915(g) bars the plaintiff from proceeding IFP and without prepayment of the filing fee.[67]  More specifically, Section 1915(g) provides as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

The "imminent danger" exception protects a prison inmate exposed to potential "serious physical injury" from the consequences of his earlier mistakes in filing frivolous litigation. Congress enacted the imminent danger exception contained in the final phrase of § 1915(g) as a "safety valve" to prevent impending harms to prisoners otherwise barred from proceeding in forma pauperis.  *Malik v. McGinnis*, 293 F.3d 559, 563 (2d Cir. 2002).  "[F]or a prisoner to qualify for the imminent danger exception, the danger must be present when he files his complaint—in other words, a three-strikes litigant is not excepted from the filing fee if he alleges

---

[66]     "28 U.S.C. § 1915 permits an indigent litigant to commence an action in federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).  "Although an indigent, incarcerated individual need not prepay the filing fee . . . at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash*, 2010 WL 5185047, at *1 (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

[67]     The manifest intent of Congress in enacting Section 1915(g) was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates. *Tafari v. Hues*, 473 F.3d 440, 443-44 (2d Cir. 2007).  The question of whether a prior dismissal is a "strike" is a matter of statutory interpretation and, as such, is a question for the court to determine as a matter of law. *Tafari*, 473 F.3d at 442-43.

a danger that has dissipated by the time a complaint is filed." *Pettus v. Morgenthau*, 554 F.3d 293, 296 (2d Cir. 2009) (citation omitted); *see also Polanco v. Hopkins*, 510 F.3d 152 (2d Cir. 2007) (imminent danger claims must be evaluated at the time the complaint is filed, rather than at the time of the events alleged).   In addition, "§ 1915(g) allows a three-strikes litigant to proceed [in forma pauperis] only when there exists an adequate nexus between the claims he seeks to pursue and the imminent danger he alleges." *Pettus*, 554 F.3d at 296.   In deciding whether such a nexus exists, the Second Circuit instructs the courts to consider "(1) whether the imminent danger of serious physical injury that a three-strikes litigant alleges is fairly traceable to unlawful conduct asserted in the complaint, and (2) whether a favorable judicial outcome would redress that injury." *Id.* at 298-99.   Both requirements must be met in order for the three strikes litigant to proceed in forma pauperis.  *Id.*

Generally speaking, the allegations relevant to the imminent danger inquiry "are those in which [plaintiff] describes physical injury, threats of violence, and deprivation of medical treatment." *Chavis v. Chappius*, 618 F.3d 162, 165 (2d Cir. 2010).   Although the Second Circuit has cautioned against "an overly detailed inquiry into whether the allegations qualify for the exception," *id.* at 169-70 (quoting *Andrews v. Cervantes*, 493 F.3d 1047, 1055 (9th Cir. 2007)), when a defendant challenges a prisoner's claim of imminent danger, a district court may "reexamine" its provisional determination of imminent danger and "conduct a narrow evidentiary inquiry into the prisoner-litigant's fear of imminent danger" at the time of filing. *Shepherd v. Annucci*, 921 F.3d 89, 94-95 (2d Cir. 2019).   If the evidentiary submissions show the plaintiff's explanation for why he was in imminent danger to be "ridiculous," "conclusory," or "without foundation[,]" the district court may revoke the plaintiff's previously granted IFP status.  *Sheperd*, 921 F.3d at 95, 97; *see also Chavis*, 618 F.3d at 170 (quoting *Ciarpaglini v.*

*Saini*, 352 F.3d 328, 331 (7th Cir. 2003)) ("A court may find that a complaint does not satisfy the 'imminent danger' exception if the complainant's 'claims of imminent danger are conclusory or ridiculous.'"); *Nelson v. Nesmith*, 06-CV-1177, 2008 WL 3836387, at *5 (N.D.N.Y. Aug. 13, 2008) (McAvoy, J.) ("The imminent danger claimed by the inmate . . . must be real, and not merely speculative or hypothetical."); *accord, Welch v. Selsky*, 06-CV-0812, 2008 WL 238553, at *5 (N.D.N.Y. Jan 28, 2008) (Kahn, J.); *Gamble v. Maynard*, 06-CV-1543, 2008 WL 150364, at *4 (N.D.N.Y. Jan. 14, 2008) (Hurd, J.).

### B.    Standard Governing A Motion For Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[68] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S.

---

[68]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[69]  (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[70]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[71]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1.  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

---

[69]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[70]     *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[71]     *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[72]–even when the non-movant was proceeding *pro se*.[73]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[74]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be

---

[72]     Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1.

[73]     *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

[74]     *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

deemed as consent to the granting or denial of the motion . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

After carefully considering the matter, I recommend that Plaintiff's motion for partial summary judgment be denied, Defendants' motion to revoke Plaintiff's IFP status be denied, and Defendants' motion for summary judgment be granted in part and denied in part.

### A.   Motion to Revoke IFP Status

Although the Court initially found that the allegations in the Complaint were sufficient to plausibly suggest that Plaintiff was under imminent danger of physical injury when he signed his Complaint on August 1, 2021, there appears to be an issue of fact before the Court now about the veracity of several of Plaintiff's allegations.

More specifically, Defendants presented medical records and a sworn statement from Defendant Gravell indicating that Plaintiff (1) refused private interviews, and (2) stated that he had no mental health concerns on multiple occasions. (Dkt. No. 121 at 3-34; Dkt. No. 121, Attach. 3 at ¶¶ 8, 10-15.) However, Plaintiff presented sworn statements that he did not refuse private interviews or express that he had no concerns. (Dkt. No. 137 at 10-16.) Instead, Plaintiff swore under penalty of perjury that he informed Defendant Gravell that he was not alright, she assured him that he would be placed on a callout to conduct an interview, but that he was never placed on a callout for a private interview. (*Id*. at 12.)

The determination of whether Plaintiff was denied mental health treatment between May 2021 and the filing of his Complaint in August 2021, is integral to the determination of whether

he was in imminent danger of serious physical injury at the time he filed the Complaint.

Moreover, there appears to be a dispute of fact whether Plaintiff's financial status has

substantially changed since the IFP determination.

As a result, I recommend that Defendants' motion for revocation of Plaintiff's IFP status

be denied pending "a narrow evidentiary inquiry into [Plaintiff]'s fear of imminent danger" at the

time of filing, pursuant to *Shepherd v. Annucci*, 921 F.3d 89, 94-95 (2d Cir. 2019).  *See*

*Bradshaw v. Phillip*, 21-CV-0776, 2022 WL 504976, at *3 (N.D.N.Y. Feb. 18, 2022) (Suddaby,

C.J.) (holding an evidentiary hearing on the defendants' motion to revoke the plaintiff's IFP

status); *Bradshaw v. Gordon*, 21-CV-0645, 2022 WL 504974, at *3 (N.D.N.Y. Feb. 18, 2022)

(Suddaby, C.J.) (same).

### B.      Motions for Summary Judgment

#### 1.      Retaliation Claim Against Defendant Lamica

"To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the

speech or conduct at issue was protected, (2) that the defendant took adverse action against the

plaintiff, and (3) that there was a causal connection between the protected conduct and the

adverse action."  *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (cleaned up).  As the

Second Circuit has repeatedly cautioned, "[c]ourts properly approach prisoner retaliation claims

'with skepticism and particular care,' because 'virtually any adverse action taken against a

prisoner by a prison official—even those otherwise not rising to the level of a constitutional

violation—can be characterized as a constitutionally proscribed retaliatory act.'"  *Davis v.*

*Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir.

2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)); *see*

*also Phelps v. Kapnolas*, 308 F.3d 180, 187 n. 6 (2d Cir. 2002).

"[A]dverse action" for the purposes of a retaliation claim has been defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights . . . [o]therwise the retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection."  *Davis*, 320 F.3d at 353 (citing *Dawes*, 239 F.3d at 493).

To establish a causal connection between protected activities and the adverse action, the court may consider a number of factors, including "(1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and[] (4) the temporal proximity between the protected activity and the defendant's adverse action."  *Williams v. Muller*, 98-CV-5204, 2001 WL 936297, at *3 (S.D.N.Y. Aug. 17, 2001) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) *abrogated, in part, on other grounds by Tangreti v. Bachmann*, 983 F.3d 609 (2d 2020)).  However, with respect to temporal proximity at the summary judgment stage, the Second Circuit has "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim."  *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017).

Here, Defendants only challenge the second and third elements of Plaintiff's retaliation claim.  (Dkt. No. 120, Attach. 8 at 22-23.)  However, the undersigned notes that Plaintiff's use of the prison grievance system constituted protected speech for purposes of his retaliation claim. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[T]he use of the prison grievance system" is constitutionally protected conduct under the First Amendment.); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (holding that "retaliation against a prisoner for pursuing a grievance violates the right to petition the government for redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.").

44

I find that a genuine issue of fact remains for trial regarding whether Defendant Lamica took an adverse action against Plaintiff during the escort incident of January 22, 2019.  It is well-settled that excessive force constitutes an adverse action for the purposes of a retaliation analysis. *Baskervill v. Blot*, 224 F. Supp. 2d 723, 731-32 (S.D.N.Y. 2022) ("[The plaintiff's] claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights."); *see Flemming v. King*, 14-CV-0316, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) (Hummel, M.J.) ("[T]he alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis."), *report and recommendation adopted by*, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016) (Hurd, J.).

Defendants submitted video of the escort during which, Plaintiff can be heard complaining about the waist-chain.  (Dkt. No. 134.)  In addition, Plaintiff testified that Defendant Lamica put handcuffs on Plaintiff, wrapped the waist chain around Plaintiff's ribs, squeezed the chain, when Plaintiff complained of the squeeze, Defendant Lamica squeezed more, which made the chain tighter, and twisted the chain as they were walking, which caused Plaintiff pain.  (Dkt. No. 120, Attach. 2 at 43-44.)  Plaintiff testified that this incident aggravated a rib injury that he previously sustained and caused him pain.  (*Id*. at 45-46.)

Plaintiff testified that Defendant Lamica referenced Plaintiff's grievance during the escort on January 22, 2019.  (Dkt. No. 120, Attach. 2 at 45-46.)  More specifically, Plaintiff's verified Amended Complaint alleged that Defendant Lamica instructed Plaintiff that the next time he writes a grievance about Defendant Lamica, to make sure that Plaintiff files the grievance against "R. Lamica" because there are other officers with the last name Lamica.  (Dkt. No. 43 at ¶ 137.)

A reasonable jury could credit Plaintiff's testimony and find that (1) Defendant Lamica took an adverse action against Plaintiff, and (2) a causal connection between Plaintiff's protected speech and the allegedly adverse action.  As a result, I recommend that Defendants' motion for summary judgment on Plaintiff's retaliation claim against Defendant Lamica be denied.

### 2.    Excessive Force Claims Against Defendants Hollenbeck and Lamica

Inmates enjoy Eighth Amendment protection against the use of excessive force and may recover damages for its violation under 42 U.S.C. § 1983.  *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain."  *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.  *See Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).  The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection."  *Hudson*, 503 U.S. at 8 (internal quotation marks and citation omitted); *Blyden*, 186 F.3d at 262.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."  *Sims*, 230 F.3d at 22 (internal quotation marks, alteration, and citation omitted).  However, "the malicious use of force to cause harm[ ] constitute[s] [an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries.  *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9).  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9-10 (internal quotation

marks and citations omitted).  "The absence of serious injury is therefore relevant to the Eighth

Amendment inquiry, but does not end it."  *Id*. at 7.

The subjective element requires a plaintiff to demonstrate the "necessary level of

culpability, shown by actions characterized by wantonness."  *Sims*, 230 F.3d at 21 (internal

quotation marks and citations omitted).  Thus, the key inquiry into a claim of excessive force is

"whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously

and sadistically [to] cause[ ] harm."  *Hudson*, 503 U.S. at 7 (internal quotation marks and

citations omitted); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (Observing

that the Supreme Court has emphasized that the nature of the force applied is the "core judicial

inquiry" in excessive force cases—"not whether a certain quantum of injury was sustained.")

(internal quotation marks and citation omitted).  In determining whether defendants acted in a

malicious or wanton manner, the Second Circuit has identified five factors to consider:

> the extent of the injury and the mental state of the defendant[;] . . . the
> need for the application of force; the correlation between that need and the
> amount of force used; the threat reasonably perceived by the defendants;
> and any efforts made by the defendants to temper the severity of a forceful
> response

*Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations

omitted).

### a.      **Defendant Hollenbeck**

Viewing the evidence in the light most favorable to Plaintiff, the undersigned declines to

recommend dismissal of Plaintiff's excessive force claim against Defendant Hollenbeck because

genuine issues of material fact remain for trial.  I reject Defendants' argument that the force used

was inherently *de minimis* based on Plaintiff's minimal injury and failure to obtain a medical

diagnosis or treatment.  (Dkt. No. 120, Attach. 8 at 20.)  As set forth above, "[t]he absence of

serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it." *Hudson*, 503 U.S. at 7.

Plaintiff testified that on November 25, 2018, Defendant Hollenbeck pushed into Plaintiff's back causing Plaintiff's upper torso to hit the wall. (Dkt. No. 120, Attach. 2 at 53-54.) Plaintiff testified that his upper torso hitting the wall was very painful. (*Id*. at 55.) Defendants do not appear to contest any component of Plaintiff's excessive force claim other than that the force was too *de minimis* to support an excessive force claim. (Dkt. No. 120, Attach. 8 at 19-20; Dkt. No. 138, Attach. 2 at 5.) A reasonable jury could credit Plaintiff's testimony that the push caused him significant pain. *See also Abascal v. Fleckenstein*, 06-CV-349S, 2012 WL 638977, at *6 (W.D.N.Y. Feb. 27, 2012) ("Plaintiff's purported bruise is certainly 'slight,' and his allegation of a single elbow blow to his side is also 'weak.' Crediting Plaintiff's version of events, however, as the Court must in considering Defendants' motion for summary judgment, [the Defendant]'s brief assault was completely unprovoked and unrelated to any effort to maintain or restore discipline.") (internal citations omitted); *Felder v. Steck*, 10-CV-0578, 2013 WL 144945, at *3-4 (W.D.N.Y. Jan. 11, 2013) (denying summary judgment where the plaintiff alleged that he was punched repeatedly about the head without provocation resulting in bruising and swelling that he did not report until two weeks later).

As a result, I recommend that Defendants' motion for summary judgment of Plaintiff's excessive force claim against Defendant Hollenbeck be denied.[75]

---

[75]    While I express no view on the ultimate merits of Plaintiff's excessive force claims, if successful, "the relatively modest nature of his alleged injuries will no doubt limit the damages he may recover." *Wilkins v. Gaddy*, 559 U.S. 34, 40 (2010).

###### b.       Defendant Lamica

"While handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force." *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (Hurd, J.) (internal quotation marks and citation omitted).  For example, in *Davidson*, the plaintiff alleged that correction officers "placed . . . handcuffs and leg irons and waist chain on [him] so tight as to cut into [his] flesh[,] reduce circulation[,] and cause swelling," which left a scar on his right ankle and numbness in the area, and caused his "wrists [to be] numb for several months afterwards." *Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994).  Further, the plaintiff alleged that the defendants purposefully placed the handcuffs and chains too tightly in retaliation for filing lawsuits, and that they refused his requests to loosen the restraints.  *Davidson*, 32 F.3d at 29, 30.  The Second Circuit concluded that the plaintiff's complaint in *Davidson*

> plainly allege[d] both the objective and subjective components of a cause of action for an Eighth Amendment violation: the handcuffs were allegedly placed on the plaintiff too tightly, leading to serious and permanent physical injury (the objective component), and such excessive force was applied to the plaintiff wantonly and maliciously in retaliation for being a litigious inmate (the subjective component).

*Id*. at 30 (internal quotation marks and brackets omitted).

"By contrast, courts routinely dismiss claims of excessive force based on tight handcuffing where an inmate asserts only a *de minimis* injury without plausible allegations of wantonness or maliciousness." *Livingston v. Hoffnagle*, 19-CV-0353, 2019 WL 7500501, at *4-5 (N.D.N.Y. Nov. 8, 2019) (Hummel, M.J.), *report and recommendation adopted by*, 2020 WL 95431 (N.D.N.Y. Jan. 8, 2020) (Sharpe, J.).  For example, in *Wilson v. Woodbourne Corr. Facility*, the *pro se* inmate alleged only that the defendants used excessive force by applying "handcuffs . . . too tightly when escorting [him]." *Wilson v. Woodbourne Corr. Facility*, 11-CV-1088, 2012 WL 1377615, at *4 (N.D.N.Y. Mar. 21, 2012) (Baxter, M.J.), *report and*

*recommendation adopted by*, 2012 WL 1366590 (N.D.N.Y. Apr. 19, 2012) (Hurd, J.).  The court there noted the absence of any facts in the complaint alleging that the defendant correction officers were aware that the restraints were causing pain or that the plaintiff requested the restraints to be loosened.  *Wilson*, 2012 WL 1377615, at *4.

Here, although the evidence presently before the Court indicates that the injury that Plaintiff sustained as a result of Defendant Lamica's alleged twisting of the waist chain was *de minimis*, that does not end the inquiry.  *Livingston*, 2019 WL 7500501, at *5 (citing *Warren v. Purcell*, 03-CV-8736, 2004 WL 1970642, at *8 (holding that temporary pain, numbness, and swelling as a result of tight handcuffing was "more than likely to prove *de minimis*"); *Ruggiero v. Fisher*, 15-CV-0962, 2018 WL 7892966, at *7 (W.D.N.Y. Sept. 27, 2018) (temporary discomfort resulting from tight restraints held to be *de minimis*); *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)) (holding that the plaintiff's allegations that the "tight" handcuffs and chain caused "soreness" was *de minimis* but did not end the Eighth Amendment inquiry).

Plaintiff testified that Defendant Lamica squeezed Plaintiff with the chain, when Plaintiff complained, Defendant Lamica squeezed further, which made the chain even tighter; then Defendant Lamica wrapped the chain around Plaintiff's ribs, put his hand in between the chain, twisted it, and kept twisting it as they walked.  (Dkt. No. 120, Attach. 2 at 44.)  Plaintiff testified that the twisting caused him pain, which caused him to complain that it was hurting him, but that Defendant Lamica "kept on and insisted."  (*Id*.)  Plaintiff testified that he told Defendant Lamica the chain was too tight around his waist.  (*Id*. at 45.)

In addition, the videos submitted by Defendants show Plaintiff complaining about the chains being too tight.  (Dkt. No. 134.)

Based on this evidence, the undersigned finds that a genuine issue of material fact remains for trial regarding whether the use of force was malicious and done for the purpose to cause harm. *Livingston*, 2019 WL 7500501, at *5 (citing *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999) ("[T]he malicious use of force to cause harm constitutes an 'Eighth Amendment violation *per se* . . . whether or not significant injury is evident.'")) (finding that, at the motion to dismiss stage, allegations that the plaintiff asked the defendants to loosen the chains and handcuffs over 10 times, complained about the tightness and soreness, and that the defendants ignored his pleas and cries to loosen the chains and handcuffs, sufficiently alleged facts plausibly suggesting that the use of force was malicious and done for the purpose to cause harm). As a result, I recommend that Defendants' motion for summary judgment of Plaintiff's excessive force claim against Defendant Lamica be denied.[76]

### 3. Conditions-of-Confinement Claim Against Defendant Hollenbeck

"[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension.'" *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983); *see also Jackson v. Marks*, 722 F. App'x 106, 107 (2d Cir. 2018) (summary order) ("[A] substantial deprivation of food can cause serious physical harm sufficient to find cruel and unusual punishment in violation of the Eighth Amendment."). "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test." *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). "To satisfy the objective element, the plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs." *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 272 (N.D.N.Y. 2018) (quotations marks and citation omitted). "[T]he inmate must

---

[76]      *See*, *supra*, note 75.

show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).  As to the subjective prong, "the plaintiff must demonstrate that the defendants imposed those conditions with 'deliberate indifference.'" *Jolly*, 76 F.3d at 480 (citation omitted).  "To constitute deliberate indifference, '[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.'" *Walker*, 717 F.3d at 125 (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

The undersigned rejects Defendants' argument suggesting that Plaintiff deserved to be denied meals because of his prior "calculated practice of refusing to comply with feed-up procedures."  (Dkt. No. 120, Attach. 8 at 24.)  Plaintiff testified under penalty of perjury that he did not refuse to comply with feed up procedures.  (Dkt. No. 120, Attach. 2 at 58-59.)  As a result, I find that a genuine dispute of material fact remains for trial whether Plaintiff's actions constituted a refusal of meals.

Moreover, I reject Defendants' argument that no genuine dispute of material fact exists with respect to the objective element of Plaintiff's conditions-of-confinement claim.

Defendants presented Plaintiff's medical records to support their argument that the alleged missed meals did not present an immediate danger to Plaintiff's health or well-being. (Dkt. No. 120, Attach. 8 at 24 [citing Dkt. No. 121, Attach. 1 at 245-250].)[77]  Plaintiff swore under penalty of perjury in his verified Amended Complaint that the missed meals caused his "symptoms and stomach condition . . . to worsen."  (Dkt. No. 43 at 4, ¶ 29; Dkt. No. 43 at 6 ¶

---

[77]     The Court notes that the handwriting in the cited medical records is largely indecipherable.

45.)[78]  "A condition is serious for constitutional purposes if it presents 'a condition of urgency that may result in degeneration or extreme pain.'"  *Lewis v. Zon*, 920 F. Supp. 2d 379, 387 (W.D.N.Y. 2013) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1988)).  Although it is unclear whether Plaintiff's conclusory assertions would be sufficient at this juncture, for the reasons set forth below, I recommend that Defendants' motion for summary judgment of Plaintiff's conditions-of-confinement claim be denied.  *C.f. Sankara v. Montgomery*, 16-CV-0885, 2018 WL 4610686, at *9 (N.D.N.Y. June 25, 2018) (Dancks, M.J.) (finding that the plaintiff's testimony that he was "hungry and emotionally frustrated" as a result of the missed meals was insufficient to sustain an Eighth Amendment conditions-of-confinement claim), *report and recommendation adopted by*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018) (Scullin, J.).

Although, "being denied a single meal does not give rise to a constitutional deprivation," *Rush v. Fischer*, 923 F. Supp. 2d 545, 555-56 (S.D.N.Y. 2013), *aff'd sub nom. Rush v. Canfield*, 649 F. App'x 70 (2d Cir. 2016) (summary order) (collecting cases) (citations omitted), "[w]hen a prison guard deprives a prisoner of two of the regularly three meals served each day, the objective prong of the Eighth Amendment may be met if the defendants do not satisfy their burden of showing that the one meal is nutritionally adequate."  *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) (Kahn, J.) (citing *Cunningham v. Jones*, 567 F.2d 653, 660 (6th Cir. 1977) (deprivation of two meals a day establishes "substantial deprivation of . . . food

---

[78]      In his opposition, Plaintiff asserted that he developed GERD as a result of the missed meals.  (Dkt. No. 137 at 27 [citing "Dkt. No. 121: Exh 3 at Bates No. 459-568"].)  However, the undersigned's review of the medical records that Plaintiff appears to cite does not reveal support for a GERD diagnosis.  (Dkt. No. 121, Attach. 1 at 460-487 [note that "Exhibit 3" contained in Dkt. No. 121 includes documents bates stamped 001 through 486].)  In addition, the undersigned could not independently locate admissible evidentiary support in the record for Plaintiff's contention that he was diagnosed with GERD as a result of the missed meals.

normally served," shifting burden to defendants to establish that one meal was nutritionally adequate)).

Plaintiff set forth in his verified Amended Complaint that Defendant Hollenbeck deprived him of breakfast and lunch on the following ten dates: (1) November 26, 2018, (2) December 2, 2018, (3) December 7, 2018, (4) December 8, 2018, (5) December 13, 2018, (6) December 26, 2018, (7) December 31, 2018, (8) January 4, 2019, (9) January 7, 2019, and (10) January 8, 2019.  (Dkt. No. 43 at 4, ¶ 28; Dkt. No. 43 at 5, ¶ 42.)  Plaintiff swore under penalty of perjury that, as a result, he ate once during the twenty-four hour periods of those dates.  (Dkt. No. 43 at 4, ¶ 28.)

 "Defendants have offered no evidence as to 'whether the [allegedly] one meal actually provided [to P]laintiff was sufficient to maintain normal health," therefore there is a material question of fact whether Plaintiff was substantially deprived food in violation of the Eighth Amendment."  *Abascal*, 2012 WL 638977, at *3 (quoting *Cunningham v. Jones*, 567 F.2d 653, 660 (6th Cir. 1977); citing *Williams v. Coughlin*, 875 F. Supp. 1004, 1008 (W.D.N.Y. 1995)); *see Benitez v. Salotti*, 16-CV-6219, 2020 WL 1703208, at *10 (W.D.N.Y. Apr. 8, 2020) (denying the defendants' motion for summary judgment where the record contained evidence that the plaintiff "was deprived of two out of three meals over a three day period"); *Simmons v. Kelly*, 06-CV-6183, 2009 WL 857410, at *8 (S.D.N.Y. Mar. 31, 2009) (citing *Tavarez-Guerrero v. Toledo-Davila*, 573 F. Supp. 2d 507, 512-13 (D. P.R. 2008)) (denying the defendants' motion to dismiss the plaintiff's claim that he was deprived food for approximately thirty hours because "courts have held that a deprivation of as little as seventeen hours has constitutional implications."); *Beckford v. Portuondo*, 151 F. Supp. 2d at 213 (finding that a claim of deprivation of two of three meals per day for a period of eight days survived a motion for

summary judgment).  The parties have not yet developed the record on this issue, and I cannot conclude, at this time, that no rational jury could find in favor of Plaintiff on the issue of the seriousness of the deprivation.

Moreover, assuming the allegations contained in Plaintiff's verified Amended Complaint to be true, as the Court must, the number of denied meals in the approximately six-week period, is sufficient to raise an inference that Defendant Hollenbeck was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] from the denial of those meals and that he drew such an inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As a result, I recommend that Defendants' motion for summary judgment of Plaintiff's conditions-of-confinement claim be denied.

### 4.    Medical Indifference Claims Against Defendants Gravell and Waldron

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104).  This standard contains objective and subjective components.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

"First, the alleged deprivation must be, in objective terms, sufficiently serious."  *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted).  Determining whether a deprivation qualifies as objectively serious entails two inquiries: (1) "whether the prisoner was actually deprived of adequate medical care" and (2) "whether the inadequacy in medical care is

sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

"Second, the defendant must act with a sufficiently culpable state of mind." *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted).  That is, the plaintiff must demonstrate the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 832, 844 (1994); *see also Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (With respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'").  "Deliberate indifference is a mental state equivalent to subjective recklessness." *Salahuddin*, 467 F.3d at 279 (internal citation omitted). "[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent." *Id.*

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001).  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds*, 151 F. Supp. 2d at 311 (citations omitted).  An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citation omitted). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.*  Thus, any claims

of malpractice, negligence, or disagreement with treatment are not actionable under Section 1983.

Here, Defendants presented voluminous mental health records covering the period of May 3, 2021, through August 2021, and beyond, while Plaintiff was confined to Upstate.  (Dkt. No. 121 at 5-14.)  Although those records indicate that Plaintiff refused private interviews and/or treatment on several occasions, Plaintiff submitted a declaration signed under penalty of perjury contesting the accuracy of those medical records.  (Dkt. No. 137 at 10-16.)  For example, a "Special Housing Unit (SHU)/Long Term Keep Lock (LTKL) Mental Health Interview" form (hereinafter "Mental Health Interview Form") dated May 4, 2021, states that (1) Plaintiff refused a private interview, (2) Plaintiff stated he refused the private interview because he did not have any concerns, and (3) Plaintiff did not have depression or anxiety.  (Dkt. No. 121 at 5.)  However, Plaintiff denies that he (1) refused a private interview, (2) indicated that he had no concerns, and (3) did not suffer from depression and anxiety.  (Dkt. No. 137 at 10, ¶ 23.)  Moreover, a Mental Health Interview Form dated July 15, 2021, states that (1) Plaintiff refused a private interview, (2) Plaintiff stated that he refused the private interview because he had no issues, and (3) Plaintiff did not have depression or anxiety.  (Dkt. No. 121 at 9.)  However, Plaintiff denies that he (1) refused a private interview, (2) indicated that he had no concerns, and (3) did not suffer from depression and anxiety.  (Dkt. No. 137 at 11, ¶ 32.)  More specifically, Plaintiff alleges that during this interaction, Ms. Rogerson (a mental health staff employee) shouted to Plaintiff "I have referral for PREA," Plaintiff responded that "PREA complaints are confidential and are to be discussed in private," Ms. Rogerson said nothing further and walked away.  (*Id*. at 11, ¶ 30.)

Further, Plaintiff acknowledged that Defendant Gravell made rounds in the facility, however Plaintiff attested that the rounds were completed while he was at recreation and were not announced so that he could not utilize this avenue to access mental health treatment.  (Dkt. No. 137 at 16, ¶ 63.)  In addition, Plaintiff testified that Defendant Waldron was supposed to conduct rounds at the facility once per week but that she did not.  (Dkt. No. 121, Attach. 2 at 78-79.)

Thus, I find that genuine disputes of material facts exist regarding the mental health treatment, if any, that was offered and available to Plaintiff during the relevant time of May 3, 2021, to August 2021.  As a result, I recommend that Defendants' motion for summary judgment on Plaintiff's medical indifference claims be denied.

### 5.   Excessive SHU Confinement Claims Against Defendants Dominic, Uhler, Cantwell, Tatro, Woodruff, Barbosa, Fennessy, and Venettozzi

Generally, confining an inmate in the SHU, without more, and notwithstanding the restrictions that such confinement imposes on inmate life, does not constitute cruel and unusual punishment.  *See Bowens v. Smith*, 11-CV-0784, 2013 WL 103575, at *10 (N.D.N.Y. Jan. 8, 2013) (Baxter, M.J.) ("Confinement in SHU, in itself, notwithstanding its additional restrictions on inmates, has not been held to constitute cruel and unusual punishment."), *report and recommendation adopted by* 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013) (Shape, J.); *Hamilton v. Fisher*, 10-CV-1066, 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) (Treece, M.J.) ("'[N]ormal' conditions of SHU confinement do not constitute an Eighth Amendment violation." (citations omitted)), *report and recommendation adopted by* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012) (D'Agostino, J.).  "However, courts are also cognizant that 'the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented,' including the fact that prolonged solitary confinement

'can and does lead to significant psychological harm.'"  *Smith v. Annucci*, 18-CV-6261, 2019 WL 539935, at *6 (W.D.N.Y. Feb. 11, 2019) (quoting *Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016)).  "Accordingly, courts have found Eighth Amendment violations where inmates are held in solitary confinement for extended periods of time, such that the effects are 'grossly disproportionate' to the reasons for the isolation."  *Smith*, 2019 WL 539935, at *6 (citing, *inter alia, Peoples v. Fischer*, 898 F. Supp. 2d 618, 621 (S.D.N.Y. 2012)).

The confines of an excessive SHU confinement claim are not clearly defined.  *Johnson v. Miller*, 20-CV-0622, 2020 WL 4346896, at *8 n.6 (N.D.N.Y. July 29, 2020) (Kahn, J.) (citing *Peoples v. Annucci*, 11-CV-2694, 2012 WL 1575302, at *9 (S.D.N.Y. May 2, 2012) ("[S]ome courts have recognized a potential Eighth Amendment claim based on alleged excessive SHU confinement.") (emphasis added).  However, based on the undersigned's review of the current state of the law, there appears to be a requirement that the defendant knew or should have known that sentencing the plaintiff to the SHU confinement presented a substantial risk of serious harm. (Dkt. No. 5 at 49; *Johnson v. Miller*, 2020 WL 4346896, at *8 n.6 (dismissing the plaintiff's Eighth Amendment excessive SHU confinement claim where, *inter alia*, the complaint was "devoid of any allegations which plausibly suggest that either of these Defendants refused to reduce Plaintiff's SHU confinement period out of deliberate indifference to his health or safety."); *Animashaun v. Fischer*, 19-CV-0820, 2020 WL 374578, at *12 (N.D.N.Y. Jan. 23, 2020) (Kahn, J.) (dismissing the plaintiff's Eighth Amendment excessive SHU confinement claim where, *inter alia*, the complaint "lack[ed] any allegations which plausibly suggest that any of the hearing officers who imposed disciplinary sentences that resulted in plaintiff's SHU confinement . . . were aware that plaintiff was suffering from any mental health problems likely to be impacted by SHU confinement.").

Moreover, "[n]umerous cases in this circuit have upheld long SHU sentences that were challenged only based on the amount of time prisoners were held in segregation." *Jay v. Venetozzi*, 15-CV-0147S, 2020 WL 4382001, at *9 (W.D.N.Y. July 30, 2020) (citing *Sostre v. McGinnis*, 442 F.2d 178, 193 (2d Cir. 1971) (declining to hold that the plaintiff's confinement in punitive segregation for more than twelve months violated the Eighth Amendment), *overruled on other grounds by Davidson v. Scully*, 114 F.3d 12 (2d Cir. 1997); *Bunting v. Fischer*, 14-CV-0578, 2016 WL 4939389, at *4 (W.D.N.Y. Aug. 4, 2016) (dismissing a claim of excessive punishment where the plaintiff was confined to the SHU for approximately four years), *report and recommendation adopted by*, 2016 WL 4804099 (W.D.N.Y. Sept. 14, 2016); *Gulley v. Roach*, 02-CV-0908S, 2004 WL 2331922 (W.D.N.Y. Oct. 15, 2004) (holding that seven-month "duration of Plaintiff's confinement alone does not rise to the level of a constitutional violation")).

Here, as set forth in Defendants' memorandum of law, the record lacks any evidence that Defendants Dominic, Uhler, Cantwell, Tatro, Woodruff, Barbosa, Fennessy, and Venettozzi, were aware of any mental health problems Plaintiff was experiencing that were likely to be impacted by additional SHU confinement.  (Dkt. No. 120, Attach. 8 at 25-27.)  Further, Plaintiff's mental health records were largely benign, and indicated that Plaintiff was not exhibiting warning signs of imminent suicide risk and did not have thoughts or intent of suicide or self-harm. (Dkt. No. 121 at 3-34.)  As set forth in Defendants' memorandum of law, Defendants Dominic, Uhler, Cantwell, Tatro, Woodruff, Barbosa, Fennessy, and Venettozzi— who were not medical providers—were permitted to defer to the determinations of medical staff regarding Plaintiff's conditions.  (Dkt. No. 120, Attach. 8 at 26.)

As a result, I recommend that Plaintiff's Eighth Amendment excessive SHU confinement claim be dismissed.

In the alternative, I recommend that Plaintiff's Eighth Amendment excessive SHU confinement claim against Defendants Dominic, Uhler, Cantwell, Tatro, Woodruff, Barbosa, Fennessy, and Venettozzi be dismissed based on the doctrine of qualified immunity for the reasons set forth in Defendants' memorandum of law.  (Dkt. No. 120, Attach. 8 at 27.)

### 6.   Due Process Claims Against Defendants Uhler, Lownsbury, Cantwell, Tatro, and Venettozzi

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Due Process Clause thus "bars arbitrary, wrongful government actions, and guarantees procedural fairness when a state action deprives a citizen of a protected interest in life, liberty, or property." *Wiesner v. Rosenberger*, 98-CV-1512, 1998 WL 695927, at *3 (S.D.N.Y. Oct. 6, 1998) (citing *Daniels v. Williams*, 474 U.S. 327, 330–32 (1986)).  "The fundamental requirement of the Due Process Clause is that an individual be given the opportunity to be heard at 'a meaningful time and in a meaningful manner.'" *Patterson v. City of Utica*, 370 F.3d 322, 336 (2d Cir. 2004) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)).

 Thus, to establish a violation of due process rights, a plaintiff must show "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001).  As to the second element, when an inmate's liberty interest is implicated, "[b]ecause prison disciplinary proceedings are not part of a criminal prosecution, . . . the full panoply of rights due a defendant in such proceedings does not apply." *Williams v. Menifee*, 331 F. App'x 59, 60 (2d Cir. 2009) (summary order) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 556, (1974)).

When a prison disciplinary proceeding may impose a punishment sufficient to trigger due process protections, "the Fourteenth Amendment requires inmates receive certain protections including: (1) at least twenty-four hours written notice of the disciplinary charges; (2) the inmate be permitted to call witnesses and present evidence 'when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals';" "(3) the inmate be judged by a fair and impartial hearing officer; (4) the disciplinary conviction be supported by some evidence; and (5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken." *Tubbs v. Venettozzi*, 19-CV-0126, 2022 WL 7274397, at *4 (N.D.N.Y. July 20, 2022) (Stewart, M.J.) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-66 (1974)), *report and recommendation adopted*, 2022 WL 4545542 (N.D.N.Y. Sept. 29, 2022) (Kahn, J.).  Nonetheless, "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses." *Wolff v. McDonnell*, 418 U.S. at 566.

Further, it is well established that inmates confined in the SHU have a due process right to "substantive assistance" in disciplinary hearings.  *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir. 1988).  The assistance provided "certainly should include gathering evidence, obtaining documents . . . and interviewing witnesses.  At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself."  *Eng*, 858 F.2d at 898.  However, "an inmate's right to assistance is limited"; the assistant is not equivalent to legal counsel and is obligated only to act as the inmate's "*surrogate*—to do what the inmate would have done were he able."  *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) (emphasis in original).  Moreover, "[t]he assistant is not obliged to go beyond the specific instructions of the inmate," *Silva*, 992 F.2d at 22, and as with all other procedural rights in this context, "any violations of

this qualified right are reviewed for 'harmless error,'" *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009) (quoting *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)).

### a.      September 2018 Disciplinary Hearing

I recommend that Defendants' motion for summary judgment and Plaintiff's partial motion for summary judgment regarding Plaintiff's due process claim related to the September 2018 Disciplinary Hearing, be denied.

There remain for trial genuine disputes of material fact regarding the circumstances that resulted in a finding of guilt at the September 2018 Disciplinary Hearing.  For example, Plaintiff requested that Defendant Lownsbury obtain the standard operating procedures for testing a substance to determine whether that substance is urine.  (Dkt. No. 120, Attach. 3 at 28; Dkt. No. 119 at 17, ¶ 19.)  Nonetheless, based on the record presently before the Court, Defendant Lownsbury did not obtain that document for Plaintiff.  (Dkt. No. 119 at 9, ¶ 13.)  Further, Defendant Cantwell appeared to misinterpret the document that Plaintiff was seeking, and instead referred to the DOCCS Directive about urinalysis testing procedures used to verify whether or not an incarcerated individual has used illicit drugs and/or alcohol.  (Dkt. No. 120, Attach. 3 at 50 ["I find ah, the SOP or the directive, as I'm interpreting that to mean, ah for a Urine test, for urinalysis is to inappropriate and unwarranted under the circumstances . . . no testing was done to determine with the suspected substance was indeed urine."]; *see* Dkt. No. 120, Attach. 8 at 15.)  It is unclear what relevance testing urine for alcohol or drug use would have been to Plaintiff given the charges he was facing.  However, if the substance that Plaintiff allegedly put on the tray was tested and deemed to not contain urine, that could have impacted Defendant Cantwell's finding that Plaintiff was guilty of the charge "unhygienic act" in violation of 118.22.  (Dkt. No. 120, Attach. 3 at 7.)  In addition, to the extent that no standard operating

procedure existed related to testing a substance to determine whether that substance contained urine, that information would have been relevant to Plaintiff as he sought to build a defense strategy.  Moreover, that information could have been relevant to Defendant Cantwell when deciding how much weight to assign the misbehavior report and Correction Officer Russell's statement that the unopened tray was "filled with a yellow liquid that looked and smelled like urine."  (Dkt. No. 120, Attach. 3 at 16.)

Plaintiff swore under penalty of perjury that he also requested Defendant Lownsbury obtain video of the incident and assist with securing the testimony of Correction Officer Jeffrey, who was present during the incident.  (Dkt. No. 119 at 17, ¶ 19.)  Notwithstanding these requests, the record does not indicate that Defendant Lownsbury assisted in securing them or that Defendant Cantwell considered them and deemed them irrelevant during the disciplinary hearing.

It is unclear whether these evidentiary requests, if they had been secured, would have changed the outcome of the September 2018 Disciplinary Hearing, and thus, whether Defendant Lownsbury's failure to assist with these requests was any harmless error.[79]  As a result, I recommend that Plaintiff's motion for summary judgment and Defendants' motion for summary judgment on Plaintiff's due process claim with respect to the September 2018 Disciplinary Hearing be denied because genuine disputes of material fact exist for trial.

---

[79]    Moreover, although Defendants' version of events appears to be far more likely, an issue of fact exists regarding whether Plaintiff refused to attend the hearing.  Defendants assert that Plaintiff refused to attend the hearing after informing the escorting officers that he feared someone would beat him up.  (Dkt. No. 120, Attach. 3 at 45.)  Plaintiff asserts that Sergeant Fletcher threatened him, he requested a lieutenant escort to his hearing, the lieutenant said he would remain present during the escort, but an hour later Plaintiff received a copy of Defendant Cantwell's disposition.  (Dkt. No. 119 at 17, ¶¶ 20-23.)  A reasonable jury could conclude that Plaintiff's constitutional rights were violated by the continuation of the hearing in his absence if the jury credits his version of events.

b.      **January 2019 Disciplinary Hearing**

Although the Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights, general guidelines have been defined.  *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).  The Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under *Sandin v. Connor*, 515 U.S. 472, 484 (1995).  *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)).  "And while confinements for less than 101 days 'under normal SHU conditions may not implicate a prisoner's liberty interest,' such confinements nevertheless 'could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical.'"  *Rasheen v. Adner*, 356 F. Supp. 3d 222, 237 (N.D.N.Y. Jan. 28, 2019) (Hurd, J.) (quoting *Palmer*, 364 F.3d at 65-66).

Moreover, "separate SHU sentences 'should be aggregated for purposes of the *Sandin* inquiry' when they constitute a sustained period of confinement."  *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (quoting *Sims v. Artuz*, 230 F.3d 14, 23-24 (2d Cir. 2000); *see also Sealey v. Giltner*, 197 F.3d 578, 587-88 (2d Cir. 1999) (aggregating two periods of SHU segregation)).  "Generally, it appears from Second Circuit decisions that separate SHU sentences constitute a 'sustained' period of confinement when (1) they are contiguous, and (2) they either (a) were imposed by the same disciplinary officer or (b) were based on the same administrative rationale and are executed under the same conditions."  *Taylor v. Artus*, 05-CV-0271, 2007 WL 4555932, at *8 (N.D.N.Y. Dec. 19, 2007) (Kahn, J.)

Here, although Plaintiff was sentenced to fourteen-days in the SHU as a result of the January 2019 Disciplinary Hearing, Plaintiff had been serving a 250-day SHU sentence at the time of the January 2019 Disciplinary Hearing, and had been continuously confined to the SHU—for various infractions—for approximately 405 days.[80]  (Dkt. No. 120, Attach. 6 at 11-13.)

I find that aggregation in this case is inappropriate.

Plaintiff's SHU sanctions at Upstate, although appended to the existing SHU sentences imposed from Attica, arose from unrelated events that occurred at separate correctional facilities. Thus, the Attica sentences should not be aggregated to the Upstate SHU sentences.

Before Defendant Tatro imposed a sanction of 14-days SHU confinement in the January 2019 Disciplinary Hearing, Plaintiff had received the following two other SHU confinement sanctions at Upstate: (1) 60-days in SHU confinement imposed by Defendant Dominic from an incident that occurred on August 10, 2018, which was served from November 5, 2018, through January 4, 2019 ("August 2018 Disciplinary Hearing"); and (2) 250-days in SHU confinement by Defendant Cantwell from the September 2018 Disciplinary Hearing, which was served from January 4, 2019, until September 11, 2019.  (Dkt. No. 120, Attach. 6 at 12-13.)  Thus, the sentences were not imposed by the same disciplinary officer.

Moreover, although the Court lacks the records related to the August 2018 Disciplinary Hearing, it is clear that the September 2018 Disciplinary Hearing sanction was not (1) based on the same administrative rationale, and (2) executed under the same conditions as the January 2019 Disciplinary Hearing sanction.  (*Compare* Dkt. No. 120, Attach. 3 at 7-14, *with* Dkt. No.

---

[80]     Plaintiff entered the SHU at Attica on January 10, 2018, and appears to have remained there based on various infractions until some time in the fall of 2018, when he transferred to Upstate.

120, Attach. 4 at 6-13.)  Hence, I find that aggregation of the sanctions imposed from the January

2019 Disciplinary Hearing and the September 2018 Disciplinary Hearing inappropriate.

It would likewise be inappropriate to aggregate the sanctions imposed from the January

2019 Disciplinary Hearing and August 2018 Disciplinary Hearing, because the August 2018

Disciplinary Hearing sanction was imposed and served before imposition of the September 2018

Disciplinary Hearing sanction.  Accordingly, the September 2018 Disciplinary Hearing

sanction—which should not be aggregated with the January 2019 Disciplinary Hearing

sanction—disrupted any aggregation between the sanctions imposed before it because there was

no longer continuity between the January 2019 Disciplinary Hearing sanction and those earlier

imposed sanctions.

Because I find that Plaintiff cannot aggregate his subsequent penalties, he is left with a

14-day period of confinement resulting from the disciplinary hearing conducted by Defendant

Tatro.  As stated previously, an inmate generally does not establish an atypical and significant

hardship based on a confinement lasting less than 101 days, absent a showing that the conditions

of his confinement rise to the level of an atypical and severe hardship.  *Thousand v. Annucci*, 17-

CV-0940, 2018 WL 882053, at *2 (N.D.N.Y. Feb. 13, 2018) (Suddaby. C.J.) ("the Second

Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a

period of up to 101 days will generally not constitute an atypical hardship.")  Accepting as true

Plaintiff's assertions in the verified Amended Complaint that he was sleep deprived "[d]uring

this period of [SHU] confinement . . . [because] the officers banged on [P]laintiff's cell . . . every

half hour round to keep [P]laintiff awake at night, in addition to the fact that [P]laintiff was

compelled to sleep under constant illumination (light) that interfered with his sleep" (Dkt. No. 43

at 17, ¶ 148), he fails to state an atypical and significant hardship.  *See Sealey*, 197 F.3d at 587,

589-90 (affirming the district court's conclusion that the plaintiff's 101-day confinement in the facility's special housing unit did not constitute atypical hardship, even where the plaintiff was confined to his cell for twenty-three hours per day, permitted one hour for recreation, limited to three showers per week, subject to noisy neighboring cells, lost various privileges, and had feces thrown at him "a few times"); *Jabot v. Corr. Officer Minor*, 13-CV-1407, 2016 WL 5322113, at *8 (N.D.N.Y. July 15, 2016) (Dancks, M.J.) (holding that 200 days of disciplinary confinement in the SHU at a county correctional facility, along with loss of privileges such as telephone and visitation, was insufficient to warrant constitutional protections even though the plaintiff also experienced a lack of sleep, difficulty eating, and being shackled during facility transport); *but see White v. Marinelli*, 17-CV-1094, 2019 WL 1090802, at *12 (N.D.N.Y. Mar. 8, 2019) (Kahn, J.) ("Plaintiff's allegation that he was held in the SHU for 270 days, especially coupled with the sleep-depriving conditions he allegedly experienced there, implicate a liberty interest."); *DuPonte v. Wall*, 288 F. Supp. 3d 504, 510 (D.R.I. 2018) (concluding that a liberty interest was implicated where the plaintiff was in solitary confinement for one year and alleged, *inter alia*, that he was deprived of sleep because correction officers banged on door and shone a bright "count light").

As a result, I recommend that Plaintiff's due process claim related to the January 2019 Disciplinary Hearing be dismissed because it did not implicate a liberty interest protected by the Fourteenth Amendment.[81]

---

[81]    Generally, where there is no due process violation at the disciplinary hearing level, there is no basis for a claim regarding the administrative review of the disciplinary proceedings. *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432, 438 (W.D.N.Y. 2010) (citing *Eleby v. Selsky*, 682 F. Supp. 2d 289, 293 (W.D.N.Y. 2010); *Black v. Selsky*, 15 F. Supp. 2d 311, 318 (W.D.N.Y. 1998)).

In the alternative, I recommend that Plaintiff's due process claim regarding the January 2019 Disciplinary Hearing be dismissed because his due process rights were not violated at the hearing.

Due process in the prison disciplinary hearing context requires only that the hearing officer's decision not be "arbitrary." *Wolff,* 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir. 2004) (emphasis in original) (quoting *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir. 2000)).

Here, there was some evidence to support Defendant Tatro's finding of guilt. Although the videos show Plaintiff complaining about the waist chain during the escort, the videos also show Plaintiff refusing to comply with officers' directives to pull his hands into his cell, which required Defendant Lamica to notify an area supervisor. (Dkt. No. 134.) This video, and the report of Defendant Lamica supported Defendant Tatro's January 2019 Disciplinary Hearing findings. Defendant Tatro clearly set forth the support for his finding and noted in his written decision that he considered the written report of Defendant Lamica and video of the incident. (Dkt. No. 120, Attach. 4 at 7, 63-64.)

Therefore, in the alternative, I recommend that Plaintiff's due process claim related to the January 2019 Disciplinary Hearing be dismissed because, as set forth in Defendants' memorandum of law (Dkt. No. 120, Attach. 9 at 17), Plaintiff's due process rights were not violated.

### c.    May 2021 Disciplinary Hearing

I find that aggregation of Plaintiff's SHU sanctions leading up to the May 2021 Disciplinary Hearing sanction, inappropriate.

Plaintiff's SHU sanctions at Midstate and Southport Correctional Facilities, although appended to the SHU sentence imposed at Upstate from the May 2021 Disciplinary Hearing, arose from unrelated events that occurred at separate correctional facilities.  Thus, the Midstate and Southport sentences should not be aggregated to the Upstate SHU sentence.  (Dkt. No. 120, Attach. 6 at 6-9); *Bernier*, 2018 WL 1047103, at *4 (declining to aggregate the plaintiff's SHU sanctions where the sanctions "arose from unrelated events that occurred at a separate correctional facility.").

Because I find that Plaintiff's SHU sanctions should not be aggregated, he is left with a 90-day period of confinement resulting from the disciplinary hearing conducted by Defendant Cantwell.  (Dkt. No. 120, Attach. 6 at 6.)  As set forth above, an inmate generally does not establish an atypical and significant hardship based on a confinement lasting less than 101 days, absent a showing that the conditions of his confinement rise to the level of an atypical and severe hardship. *Thousand*, 2018 WL 882053, at *2.  Plaintiff does not set forth any assertions that his confinement to the SHU included any unusual conditions that would constitute an atypical and significant hardship.

As a result, I recommend that Plaintiff's due process claim related to the May 2021 Disciplinary Hearing be dismissed because it did not implicate a liberty interest protected by the Fourteenth Amendment.

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Defendants' motion for summary judgment and to revoke Plaintiff's IFP status (Dkt. No. 120) be **GRANTED** to the extent that it sought dismissal of the following two claims: (1) an Eighth Amendment claim asserting excessive SHU confinement, and (2) a Fourteenth Amendment procedural due process claim related to (a) the January 2019 Disciplinary Hearing, and (b) the May 2021 Disciplinary Hearing; and **DENIED** to the extent that sought (1) to revoke Plaintiff's IFP status,[82] and (2) dismissal of the following five claims (a) medical indifference, (b) due process related to the September 2018 Disciplinary Hearing, (c) excessive force, (d) retaliation, and (e) conditions-of-confinement;[83] and it is further respectfully

**RECOMMENDED** that Plaintiff's partial motion for summary judgment (Dkt. No. 119) seeking judgment on claims pursuant to (1) the Eighth Amendment alleging excessive SHU confinement, and (2) the Fourteenth Amendment alleging due process violations, be **DENIED**; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[84]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[85]  Such objections shall be

---

[82]     As set forth above in Part III.A. of this Order and Report-Recommendation, the undersigned recommends that the Court conduct a narrow fact-finding inquiry with respect to Plaintiff's IFP status.

[83]     To the extent that the Court adopts the undersigned's Report and Recommendation in its entirety, it is recommended that the Clerk of the Court be directed to terminate Defendants Dominic, Tatro, Woodruff, Barbosa, and Fennessy from this action.

[84]     The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[85]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to

filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984

F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir.

1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: July  20, 2023
      Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a
Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2008 WL 3836387

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Dennis NELSON, Plaintiff,

v.

Ted NESMITH, et al., Defendants.

No. 9:06–CV–1177.

|

Aug. 13, 2008.

**Attorneys and Law Firms**

Dennis Nelson, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Adele Taylor–Scott, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This matter, brought pursuant to 42 U.S.C. § 1983, was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).

No objections to the July 2, 2008 Report–Recommendation have been raised. After examining the record, this Court has determined that the Report–Recommendation is not subject to attack for plain error or manifest injustice. Accordingly, this Court adopts the Report–Recommendation for the reasons stated therein and DISMISSES the petition.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Dennis Nelson, a New York State prison inmate who is proceeding *pro se* and has been granted *in forma pauperis* ("IFP") status, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. The plaintiff, a prolific litigant who has initiated a series of actions in this and other courts challenging the medical care which he has received from prison medical personnel for a lower left leg condition, in this action once again alleges deliberate indifference to his serious medical needs based upon defendants' alleged failure to properly treat that condition. As relief, plaintiff's complaint seeks recovery of $22.5 million in compensatory and punitive damages. [1]

Defendants have moved for revocation of plaintiff's IFP status and dismissal of his complaint, based upon the "three strikes" provision embodied in 28 U.S.C. § 1915(g). Defendants' motion is predicated upon the dismissal of more than three prior civil rights actions previously brought by the plaintiff, and found to be without merit. Because I conclude that plaintiff is subject to section 1915(g), and has not established a basis to invoke the limited "imminent danger" exception to that rule, I recommend that defendants' motion be granted, and the plaintiff be divested of his IFP status.

I. *BACKGROUND* [2]

Plaintiff is a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"); although not expressly so stated, it appears that at the times relevant to his claims in this action Nelson was designated to the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. Amended Complaint (Dkt. No. 5) ¶¶ 2–6; *see also* Dkt. Nos. 8–9 (acknowledgments of service upon defendants Nesmith and Whalen, both bearing mailing addresses for Great Meadow). Liberally construed, plaintiff's amended complaint seemingly alleges that while confined at Great Meadow he was denied adequate medical treatment for a serious gangrenous condition to his lower left leg which, he asserts, will spread to other parts of his body if not properly treated. Amended Complaint (Dkt. No. 5) § 2 at ¶ ¶ 9–12. Plaintiff further notes, however, that he is "scheduled for surgery [sic] for the [doctor and physician's assistant] to have [his] leg cut off .... " *Id.* at ¶ 11.

**\*2** The alleged failure of medical personnel within the DOCS to properly treat plaintiff's lower left leg condition has been a common theme of many actions brought by him in this and other courts. An action filed by Nelson in the Western District of New York on January 7, 2004, asserting similar claims, was dismissed under 28 U.S.C. § 1915(g),

based upon the finding that four previously filed actions were previously dismissed by that court and IFP status was denied in six other matters. *See Nelson v. Conway,* No. 04–CV–6005 CJS (Fe) (W.D.N.Y., filed 2004). The Western District rejected plaintiff's claim that by virtue of his condition he faced imminent danger of serious physical injury, noting in passing that plaintiff had filed at least two prior actions claiming denial of adequate treatment and alleging potential amputation of his left leg. *See id.*

In August of 2005, plaintiff commenced another suit in this court asserting a medical indifference claim strikingly similar to that now before the court in this action, with the exception that as defendants the suit names various personnel at the Clinton Correctional Facility. [3] *Nelson v. Lee,* No. 9:05–CV–1096 (NAM/DEP) (N.D.N.Y., filed 2005). In that action, as was the case with respect to Nelson's earlier Western District suit, his IFP status was revoked and the complaint was dismissed based upon 28 U.S.C. § 1915(g) and plaintiff's failure to file the requisite filing fee, in accordance with a report and recommendation issued by me on November 2, 2007 and subsequently adopted by Chief Judge Norman A. Mordue on December 5, 2007. [4] *Nelson v. Lee,* No. 9:05–CV–1096, 2007 WL 4333776 (N.D.N.Y., Dec. 5, 2007). Significantly, in his decision rejecting objections lodged by the plaintiff to my report and recommendation Chief Judge Mordue noted that according to Nelson, amputation surgery by an outside specialist had been scheduled to address his leg condition. *Id.* at *1.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on September 26, 2006, additionally requesting permission to proceed *in forma pauperis.* Dkt. Nos. 1, 2. While IFP status was granted, in a decision and order issued by Senior District Judge Thomas J. McAvoy on October 18, 2006, it was determined that plaintiff's complaint failed to satisfy the governing pleading requirements; Nelson was therefore directed to file a compliant, amended pleading within thirty days. Dkt. No. 4. Plaintiff subsequently filed an amended complaint on October 27, 2006 naming Ted Nesmith, P.A., Mr. Vanguilder, D.S.S., Dr. Whalen, Ph.D., Richard Potter, and Dept. Gillis as defendants, though later on in that pleading requesting that Vanguilder, Potter, and Gillis be dismissed from the action. Amended Complaint (Dkt. No. 5).

On November 7, 2007 the remaining two defendants moved for revocation of plaintiff's IFP status and dismissal of

plaintiff's action pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1915(g). *See* Dkt. No. 23–2. Defendants' motion, which plaintiff has opposed, *see* Dkt. No. 30, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Judgment on the Pleadings*

**\*3** Defendants' motion is brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, which governs the entry of judgment on the pleadings. [5] When analyzing a Rule 12(c) motion, I must apply the same standard as that applicable to a motion under Rule 12(b)(6). *See, e.g., Sheppard v. Baerman,* 18 F.3d 147, 150 (2d Cir.1994); *Wynn v. Uhler,* 941 F.Supp. 28, 29 (N.D.N.Y.1996) (Pooler, J.).

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which is particularly unexacting in its requirements. Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Absent applicability of a heightened pleading requirement such as that imposed under Rule 9, a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* —— U.S. ——, 127 S.Ct. 2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1964 (2007) (other quotations omitted)); *cf.* Iqbal v. Hasty, 490 F.3d 143, 157–58 (2d Cir.2007) (acknowledging that a plaintiff may properly be required to illuminate a claim with some factual allegations in those contexts where amplification is necessary to establish that the claim is "plausible"). Once the claim has been stated adequately, a plaintiff may present any set of facts consistent with the allegations contained in the complaint to support his or her claim. *Twombly,* 127 S.Ct. at 1969 (observing that the Court's prior decision in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99 (1957), "described the

breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1722, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (other quotations omitted)). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974; *see also Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly*). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (3d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974).

**\*4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation

omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

### B. *Three Strikes Provision Generally*

In their motion defendants invoke 28 U.S.C. § 1915(g), arguing that under that section plaintiff's litigation history, which includes at least three merit-based dismissals, warrants revocation of his IFP status.

Section 1915(g), which was enacted as part of sweeping inmate litigation reform brought about by adoption of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), though engendering far less litigation than some of its PLRA counterparts including, notably, the exhaustion of remedies requirement of 42 U.S.C. § 1997e(a), provides that

> [i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The manifest intent of Congress in enacting this "three strikes" provision was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates. *Tafari v. Hues,* 473 F.3d 440, 443–44 (2d Cir.2007); *Gill v. Pidlychak,* No. 9:02–CV–1460, 2006 WL 3751340, at \*2 (N.D.N.Y. Dec.

19, 2006) (Scullin, S.J. & Treece, M.J.). The prophylactic effect envisioned under ⚑ section 1915(g) is accomplished by requiring a prisoner who has had three previous strikes to engage in the same cost-benefit analysis that other civil litigants must make before deciding whether to commence suit, accompanied by the filing of the full fee—that is, to assess whether the result to be achieved justifies the filing fee expenditure. ⚑ *Tafari,* 473 F.3d at 444; ⚑ *Ibrahim v. District of Columbia,* 463 F.3d 3, 6 (D.C.Cir.2006). As the Second Circuit has noted, in the context of PLRA amendments requiring inmates to authorize prison officials to make deductions from inmate accounts to be applied as partial payments of appellate filing fees for prisoners granted *in forma pauperis* status,

> **\*5** [p]rior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to filing law suits. Indeed, the very nature of incarceration—prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to file actions and appeals, such as paper, pens, envelopes and legal materials—has fostered a " 'nothing to lose and everything to gain' " environment which allows inmates indiscriminately to file suit at taxpayers' expense.

⚑ *Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir.1997), *cert. denied sub nom., Nicholas v. Miller,* 523 U.S. 1126, 118 S.Ct. 1812 (1998) (internal citations omitted); *see also Gill,* 2006 WL 3751340, at \*2.

The question of whether the dismissal of a prior action qualifies as a strike, for purposes of ⚑ section 1915(g), is a matter of statutory interpretation, and as such a question for the court.[6] ⚑ *Tafari,* 473 F.3d at 442–43. In determining whether a dismissal satisfies the failure to state a claim prong of the statute, implicated in this case, courts have drawn upon the provisions of Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance, particularly in light of the similarity in phrasing utilized in the two provisions. ⚑ *Tafari,* 473 F.3d at 442 (citing ⚑⚠ *Andrews v. King,* 398 F.3d 1113, 1121 (9th Cir.2005)).

### C. *Application of* ⚑ *Section 1915(g)*

Defendants' motion fails to include citation to any specific suits which would constitute "strikes" for purposes of ⚑ section 1915(g). A detailed analysis of plaintiff's prior litigation history, however, is unnecessary given prior findings by both the Western District of New York and this court, to the effect that while confined as a New York State prison inmate plaintiff has filed at least three prior civil rights complaints dismissed for lack of merit. *Nelson,* 6:04–CV–6005 (CJS/JWF), Dkt. No. 4, Slip.op. at 2; ⚑ *Nelson,* 2007 WL 4333776, at \*5. In light of these findings, which are not cast in doubt by plaintiff's responsive submission, I conclude that plaintiff has had three prior actions dismissed under circumstances which would qualify as strikes for purposes of ⚑ section 1915(g). Accordingly, plaintiff's IFP status in this case is subject to recision absent a finding that he qualifies for the narrow, imminent danger exception found in ⚑ section 1915(g).

### D. *Imminent Danger Exception*

As a safety valve, obviously intended to protect a prison inmate exposed to potential danger from the harsh consequences of his or her earlier folly, ⚑ section 1915(g) provides that a prisoner who is in "imminent danger of serious physical injury" may avoid application of the three strikes rule of ⚑ section 1915(g). *See* ⚑ 28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 562–63 (2d Cir.2002). In accordance with this exception, an inmate who has had three prior "strikes" but nonetheless wishes to commence a new action *in forma pauperis* must show that he or she was under imminent danger at the time of filing; the exception does not provide a basis to avoid application of the three strikes on the basis of past harm. *Malik,* 293 F.3d at 562–63. An inmate who claims the benefit of this exception must also show that the danger faced rises to the level of exposure to a "serious physical injury." ⚑ 28 U.S.C. § 1915(g). The imminent danger claimed by the inmate, moreover, must be real, and not merely speculative or hypothetical. *Johnson v. Barney,* No. 04 Civ. 10204, 2005 WL 2173950, at \*1–2 (S.D.N.Y. Sept. 6, 2005) (finding that inmate's allegation of danger at facility he was not housed at, but may pass through at infrequent occasions in the future, does not establish imminent danger).

**\*6** The term "serious physical injury," as utilized in ⚑ section 1915(g), is nowhere concretely defined, although it has been construed by various courts as including a "disease that could result in serious harm or even death [.]" ⚑ *Ibrahim,* 463 F.3d at 7. In deciding whether to invoke the exception,

a court must examine the available pleadings, construed in a light most favorable to the plaintiff, to determine whether the plaintiff has alleged a serious physical injury. *McAlphin v. Toney,* 281 F.3d 709, 710 (8th Cir.2002). Conditions which have been held to rise to a sufficient threshold level include denial of treatment for infected gums, resulting in damages of infection, *McAlphin,* 281 F.3d at 710; denial of adequate treatment for Hepatitis C, a "chronic and potentially fatal disease," *Ibrahim,* 463 F.3d at 6–7; and patterns of harassment from corrections officers, heart palpitations, chest pains and labored breathing, *Ciarpaglini v. Saini,* 352 F.3d 328, 330–31 (7th Cir.2003) (finding upon reaching the merits, however, that plaintiff's complaint did not state an Eighth Amendment claim).

As is the case with regard to the question of whether plaintiff has had three prior "strikes," this court has similarly ruled in the past on the question of whether plaintiff's leg injury arises to a level to establish imminent danger of serious physical injury. *See Nelson,* 2007 WL 4333776, at *6. Noting District Judge Siragusa's earlier conclusion to the same effect in *Nelson v. Conway,* as well as indicating that the desired amputation appears to have been scheduled, in that prior action Chief Judge Mordue concluded that imminent danger had not been demonstrated. *Id.*

After carefully reviewing the facts now presented, including those both disclosed in plaintiff's amended complaint and as set forth in his opposition to the instant motion, I discern no basis to distinguish those prior rulings, and find that in this case plaintiff has not demonstrated the existence of an imminent danger to the extent contemplated by Congress when enacting section 1915(g). Accordingly, plaintiff does not qualify for relief from the application of the three strikes provision.

IV. *SUMMARY AND RECOMMENDATION*

The record now before the court firmly establishes that three prior civil rights actions brought by the plaintiff during his time as a prison inmate have been dismissed on their merits for failure to state claims upon which relief may be granted. Since the evidence presented also fails to reveal any basis to conclude that plaintiff is in imminent danger of serious physical injury, plaintiff is therefore not entitled to an exemption from the effects of the three strikes provision of 28 U.S.C. § 1915(g) in this action. Accordingly, recognizing that the net result of these findings is not denial altogether of plaintiff's access to the courts, but rather only the requirement that he conclude that pursuit of his civil rights claims justifies the expenditure in advance of the full applicable filing fee, it is hereby

**\*7** RECOMMENDED that:

1) The order granting the plaintiff IFP status (Dkt. No. 4) be VACATED.

2) Defendants' motion to dismiss plaintiff's amended complaint (Dkt. No. 23) be GRANTED as to all defendants and all claims unless plaintiff pays the full required filing fee of $350.00 within thirty days after the entry of a final order by the district court addressing this recommendation.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 3836387

**Footnotes**

1    Plaintiff's initial complaint, which was rejected by the court, sought recovery of $2.5 million in damages. Dkt. No. 1. In his more recent response to defendants' motion to vacate his IFP status, plaintiff states that he is now requesting a total of $225.5 million in relief. *See* Dkt. No. 30 at p. 2.

2    The allegations set forth in plaintiff's amended complaint, the operative pleading in this action, are scant, and notably bereft of specifics regarding the involvement of the defendants in the alleged failure to treat his leg condition.

3    Plaintiff's complaint in that action also alleged that Nelson was not provided with adequate pain medication to address his condition.

4    In my report in that action it was noted that according to a search of relevant indices plaintiff has filed at least fifty separate actions within the districts comprising the Second Circuit since November of 1996. *Nelson,* 2007 WL 433776, at *2, n. 1 *Nelson, 2007 WL 433776, at *2, n. 1.*

5    Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Rule 12(d) further mandates that:

     [i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

     Fed.R.Civ.P. 12(d).

6    The Second Circuit has expressed its view that the time for determination of "strikes" is only when the section 1915(g) issue is ripe for adjudication, and that because of the potentially significant consequences flowing from such a finding, a court should not, when dismissing an inmate complaint, contemporaneously signal whether the dismissal should count as a "strike" for the purposes of that section. *DeLeon v. Doe,* 361 F.3d 93, 95 (2d Cir.2004); *see also Snider v. Melindez,* 199 F.3d 108, 115 (2d Cir.1999) ("We ... doubt whether the entry of a strike is properly considered at the time an action is dismissed").

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by  Dillon v. Adams,   N.D.N.Y.,  March 10, 2016

2008 WL 238553

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Elbert WELCH, Plaintiff,

v.

Donald SELSKY, et al., Defendants.

Civil Action No. 9:06-CV-00812 (LEK/DEP).

|

Jan. 28, 2008.

**Attorneys and Law Firms**

Elbert Welch, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Charles J. Quackenbush, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

## *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

 **\*1**  This matter comes before the Court following a Report-
Recommendation filed on December 14, 2007, by the
Honorable David E. Peebles, United States Magistrate Judge,
pursuant to  28 U.S .C. § 636(b) and L.R. 72.3 of the
Northern District of New York. Report-Rec. (Dkt. No. 49).
After ten days from the service thereof, the Clerk has sent
the entire file to the undersigned, including the objections by
Plaintiff, which were filed on December 21, 2007. Objections
(Dkt. No. 50).

It is the duty of this Court to "make a de novo determination of
those portions of the report or specified proposed findings or
recommendations to which objection is made."  28 U.S.C.
§ 636(b). "A [district] judge ... may accept, reject, or modify,
in whole or in part, the findings or recommendations made
by the magistrate judge." *Id.* This Court has considered the
objections and has undertaken a de novo review of the record
and has determined that the Report-Recommendation should
be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 49)
is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it
is further

**ORDERED,** that the Order granting Plaintiff *in forma
pauperis* status (Dkt. No. 6) is **VACATED;** and it is further

**ORDERED,** that Defendants' Motion seeking dismissal of
Plaintiff's Complaint (Dkt. No. 41) is **GRANTED** as to
all Defendants and all claims unless Plaintiff pays the full
required filing fee of $350.00 within thirty days after entry of
this Order; and it is further

**ORDERED,** that Plaintiff's Motion seeking the imposition
of sanctions against Defendants pursuant to  Rule 11 of the
Federal Rules of Civil Procedure (Dkt. No. 46) is **DENIED;**
and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all
parties.

**IT IS SO ORDERED.**

## *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Elbert Welch, a New York State prison inmate who is
proceeding *pro se* and *in forma pauperis,* has commenced this
action pursuant to  42 U.S.C. § 1983 alleging deprivation
of his civil rights. In his complaint the plaintiff, an active
litigator who is no stranger to this and other federal courts,
having initiated a myriad of legal proceedings since the
onset of his incarceration, asserts numerous claims related
to his confinement at three different correctional facilities
alleging, *inter alia,* that various prison officials have failed
to protect him from known dangers, conspired to issue false
misbehavior reports against him, and placed him in cells
with individuals who posed a threat to his safety. Plaintiff
additionally contends that several television broadcasting
corporations have actively participated in or furthered the
unlawful actions of prison officials by regularly discussing
his circumstances on television principally through news
outlets, utilizing various newscasters and other television
personalities. In his complaint, in addition to requesting

injunctive relief, plaintiff seeks recovery of $10 million in compensatory and punitive damages against each state defendant, as well as $1 billion in compensatory and punitive damages against each corporate defendant individually, or $20 billion on a joint and several basis.

**\*2** Currently pending before the court is a motion by the defendants seeking revocation of plaintiff's *in forma pauperis* ("IFP") status and conditional dismissal of his complaint under 28 U.S.C. § 1915(g), absent his prepayment in full of the applicable filing fee. Defendants' motion is predicated upon the dismissal of three or more such inmate civil rights actions previously brought by the plaintiff, but found to be lacking in palpable merit. Plaintiff has opposed defendants' motion by invoking the imminent danger exception to section 1915(g), contending that despite the dismissal of three or more civil rights cases previously brought by him, he should be permitted to proceed with this action because he faces imminent danger of serious physical injury based on the new facts and events recited in his complaint. Plaintiff also has cross-moved for the imposition of sanctions against defendants under Rule 11 of the Federal Rules of Civil Procedure for what he perceives to be the filing of a frivolous motion to dismiss.

Because I agree that plaintiff is subject to the three strikes provision of section 1915(g), and has not established a basis to invoke the limited, imminent danger exception to that rule, I recommend that defendants' motion be granted. Accordingly, I also recommend that plaintiff's motion for sanctions be denied as moot.

## I. *BACKGROUND*

Plaintiff is a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"); at the various times relevant to his constitutional claims, plaintiff was confined within either the Auburn Correctional Facility ("Auburn") located in Auburn, New York, where he was confined when this action was commenced; the Clinton Correctional Facility ("Clinton") located in Dannemora, New York; or the Gouverneur Correctional Facility ("Gouverneur") located in Gouverneur, New York. *See generally* Complaint (Dkt. No. 1). In his complaint, plaintiff alleges that while confined at Auburn he was subject to assorted acts of a conspiratorial nature, including prison officials forcing him to house in double-bunked cells in order to provoke him into engaging in conduct

that would result in disciplinary action, as well as attempting to place him in disciplinary keeplock confinement. *Id.* at ¶¶ 1-3, 27. Plaintiff claims that while at Clinton, several defendants perpetuated this conspiracy by lodging false misbehavior reports against him. *Id.* at ¶ 5. At Gouverneur, this conspiracy continued in the nature of corrections officials again forcing plaintiff to double-bunk with inmates who attempted to injure him and to provoke him into engaging in physical altercations. *Id.* at ¶ 6. Plaintiff further maintains that he was forced to house with inmates who were inflicted with contagious diseases which threatened his own physical well-being. *Id.* at ¶ 12. According to plaintiff, the defendants have used these housing conditions to place him in imminent danger of serious physical injury, including danger of disease, food poisoning, and physical assault. *Id.* at ¶ 16. Plaintiff also accuses defendants Stone, Sorrell, and Taylor, among others at Gouverneur, of retaliating against him in furtherance of the conspiracy by withholding his personal property upon learning that he had obtained administrative modification of his six-month term of confinement in a prison special housing unit ("SHU"). *Id.* at ¶ 25. Plaintiff alleges that the Federal Bureau of Investigations ("FBI") has infiltrated this conspiracy, which has existed for many years. *Id.* at ¶ 16.

**\*3** In addition to these assertions, plaintiff contends that several television corporations, news broadcasters, television personalities, and professional athletes have participated in this conspiracy by discussing it on the air on a regular basis. *Id.* at ¶¶ 18-22, 28-32.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on June 29, 2006. Dkt. No. 1. Named as defendants in plaintiff's complaint are the State of New York; Eliot Spitzer, the former New York State Attorney General; Donald Selsky, the DOCS Director of Special Housing/Inmate Discipline; Glenn Goord, the former DOCS Commissioner; Dale Artus, the superintendent at Clinton; Captain Brown, allegedly employed at Clinton; Corrections Officers T. Charland, R. Lincoln, T.M. Stone, and Sorrell; Hearing Officer Eggleston, Correctional Counselor Logan; individuals identified only as Lieutenants Quimette and Sawyer, and Captain Coryer; and Superintendents Justin Taylor, Graham, Bellnier, and Rourke (collectively, "the state defendants"). *Id.* Also named as defendants are seventy-some television corporations, newscasters, television personalities and professional athletes (collectively, "the broadcast defendants"). *Id.*

By order issued by Senior District Judge Lawrence E. Kahn on November 30, 2006, the broadcast defendants were dismissed from this civil rights action, *sua sponte,* based upon the plaintiff's failure to allege that they were acting under color of state law, and his presentment of only vague allegations of the existence of a conspiracy between the broadcast defendants and the state defendants. Dkt. No. 6 at 3-4. Judge Kahn also reasoned that Welch should not be permitted to proceed *in forma pauperis* against the broadcast defendants because his allegations against them were clearly baseless and factually frivolous. *Id.* at 4-5. In that order, Judge Kahn additionally dismissed the State of New York from the action on the ground that suits against the state are barred by the Eleventh Amendment to the United States Constitution. *Id.* at 5. Confronted with plaintiff's claim of imminent danger as articulated in his complaint, Judge Kahn preliminarily granted Welch's application to proceed *in forma pauperis;* he cautioned, however, that his IFP status could be revoked in the event of a later finding, after the filing of a response from the remaining state defendants, that plaintiff is not in imminent danger or not otherwise entitled to proceed *in forma pauperis. Id.* at 6.

On March 12, 2007, plaintiff sought to amend his complaint to add to his action the broadcast defendants previously dismissed by the court, also requesting inclusion of several new defendants and additional allegations in support of his claims against the broadcast defendants. Dkt. No. 38. That request was denied by me in an order dated June 4, 2007. Dkt. No. 44.

In lieu of filing an answer, the state defendants moved to revoke plaintiff's IFP status on May 3, 2007, pursuant to the three strikes provision of 28 U.S.C. § 1915(g), and to dismiss his complaint conditionally. Dkt. No. 41. Plaintiff has opposed defendants' motion, and cross-moved for the imposition of sanctions on the ground that the motion is frivolous. Dkt. Nos. 43, 46. These motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U .S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [1] *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Three Strikes Provision Generally*

**\*4** In their motion defendants invoke 28 U.S.C. § 1915(g), arguing that under that section plaintiff's litigation history, which includes at least three merit-based dismissals, warrants revocation of his IFP status. Section 1915(g), which was enacted as part of sweeping inmate litigation reform brought about by adoption of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), though engendering far less litigation than some of its PLRA counterparts including, notably, the exhaustion of remedies requirement of 42 U.S.C. § 1997e(a), provides that

> [i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g); *see also Polanco v. Hopkins,* 510 F.3d 152, 2007 WL 4258724, at *1 n. 1 (2d Cir. Dec. 6, 2007). The manifest intent of Congress enacting this "three strikes" provision was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates. *Tafari v. Hues,* 473 F.3d 440, 443-44 (2d Cir.2007); *Gill v. Pidlypchak,* No. 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, S.J. & Treece, M.J.). The prophylactic effect envisioned under section 1915(g) is accomplished by requiring a prisoner who has had three previous strikes to engage in a cost-benefit analysis in some ways similar to that which other civil litigants must make before deciding whether to commence suit, accompanied by the filing of the full fee-that is, to assess whether the result to be achieved justifies the filing fee expenditure in advance, rather than in installments.

*See Ibrahim v. District of Columbia,* 463 F.3d 3, 6 (D.C.Cir.2006). As the Second Circuit has noted, in the

context of PLRA amendments requiring inmates to authorize prison officials to make deductions from inmate accounts to be applied as partial payments of appellate filing fees for prisoners granted *in forma pauperis* status,

> [p]rior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to filing lawsuits. Indeed, the very nature of incarceration-prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to file actions and appeals, such as paper, pens, envelopes and legal materials-has fostered a " 'nothing to lose and everything to gain' " environment which allows inmates indiscriminately to file suit at taxpayers' expense.

*Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir.1997), *cert. denied sub nom., Nicholas v. Miller,* 523 U.S. 1126, 118 S.Ct. 1812 (1998) (citations omitted); *see also Gill,* 2006 WL 3751340, at *2.

**\*5** The question of whether the dismissal of a prior action qualifies as a strike, for purposes of section 1915(g), is a matter of statutory interpretation, and as such a question for the court. [2] *Tafari,* 473 F.3d at 442-43. In determining whether a dismissal satisfies the failure to state a claim prong of the statute, implicated in this case, courts have drawn upon the provisions of Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance, particularly in light of the similarity in phrasing utilized in the two provisions. *Tafari,* 473 F.3d at 442 (citing Andrews v. King, 398 F.3d 1113, 1121 (9th Cir.2005)).

### B. Application of Section 1915(g)

Defendants have offered the specifics of previously dismissed actions in support of their section 1915(g) motion, persuasively demonstrating the existence of at least three prior "strikes" in this instance, and the court thus need not linger in addressing the issue. Defendants' Memorandum (Dkt. No. 41-2) at 3. Indeed, Welch does not dispute that he has garnered at least three strikes prior to his filing the current action in this court. *See* Dkt. No. 43. On March 16, 2000-well before the filing of this suit-a decision of District Judge Thomas J. McAvoy, dismissing plaintiff's complaint in another action based on the fact that he had accumulated three strikes because at least three of his prior

federal suits had been dismissed as frivolous, was affirmed by the Second Circuit. [3] *Welch v. Galie,* 207 F.3d 130, 131-32 (2d Cir.2000) (affirming *Welch v. Galie,* No. 97-CV-1369, Dkt. Nos. 119, 131 (N.D.N.Y.) (TJM/DRH)); *see also Welch v. Fisher,* No. 07-CV-929, Dkt. No. 8 at 2-3 (N.D.N.Y.) (TJM/DEP) (acknowledging that plaintiff earned three strikes seven years ago as determined in *Welch v. Galie,* 207 F.3d 130 (2d Cir.2000)). That finding is entitled to preclusive effect in this action, *see* Marvel Characters, Inc. v. Simon, 310 F.3d 280, 288-89 (2d Cir.2002), thus eliminating defendants' need to independently establish the existence of three strikes for purposes of this action.

Since defendants have established the filing by plaintiff of at least three meritless civil rights complaints while confined as a New York State prison inmate, absent applicability of the imminent danger exception set out in the relevant statute, plaintiff is subject to the provisions of 28 U.S.C. § 1915(g), and may properly be required to prepay in full the applicable filing fee in order to pursue his claims notwithstanding that IFP status was previously conferred. *See McFadden v. Parpan,* 16 F.Supp.2d 246, 247-48 (E.D.N.Y.1998).

### C. Imminent Danger Exception

As a safety valve, obviously intended to protect a prison inmate exposed to potential danger from the harsh consequences of his or her earlier folly, section 1915(g) provides that a prisoner who is in "imminent danger of serious physical injury" may avoid application of the three strikes rule of section 1915(g). *See* 28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 562-63 (2d Cir.2002). This exception requires a showing that the prisoner was under such imminent danger at the time of filing; the exception does not provide a basis to avoid application of the three strikes provision on the basis of past harm. *Malik,* 293 F.3d at 562-63. An inmate who claims the benefit of this exception must also show that the danger faced rises to the level of a "serious physical injury." 28 U.S.C. § 1915(g). The imminent danger an inmate faces, moreover, must be real, and not merely speculative or hypothetical. *Johnson v. Barney,* No. 04 Civ. 10204, 2005 WL 2173950, at *1-2 (S.D.N.Y. Sept. 6, 2005) (finding that inmate's allegation of danger at facility he was not housed at, but may pass through at infrequent occasions in the future, did not establish imminent danger).

**\*6** The term "serious physical injury", as utilized in section 1915(g), is nowhere concretely defined, although it has been construed by various courts as including a "disease that could result in serious harm or even death [.]" *Ibrahim,* 463 F.3d at 7. In deciding whether to invoke the exception, a court must examine the available pleadings, construed in a light most favorable to the plaintiff, to determine whether the plaintiff has alleged a serious physical injury. *McAlphin v. Toney,* 281 F.3d 709, 710 (8th Cir.2002). Conditions which have been held to rise to a sufficient threshold level include denial of treatment for infected gums, resulting in damages of infection, *McAlphin,* 281 F.3d at 710; denial of adequate treatment for Hepatitis C, a "chronic and potentially fatal disease," *Ibrahim,* 463 F.3d at 6-7; and heart palpitations, chest pains and labored breathing, *Ciarpaglini v. Saini,* 352 F.3d 328, 330-31 (7th Cir.2003) (finding upon reaching the merits, however, that plaintiff's complaint did not state an Eighth Amendment claim).

Plaintiff's claims in this action stem chiefly from his belief that he is the subject of an elaborate conspiracy by DOCS officials, in conjunction with the FBI, to fabricate his mental illness, to falsify misbehavior reports against him, to poison his food, to keep him in disciplinary confinement, and to injure and/or kill him. Welch further insists that he confronts imminent danger of serious physical injury because he has been diagnosed with Hepatitis C, which derived from the conspirators' contamination of his food and insistence that he share cells with diseased individuals, and had been denied treatment for this condition while at Clinton, only recently receiving care for the disease since his relocation to Coxsackie Correctional Facility.

Plaintiff filed his complaint while he was housed at Auburn Correctional Facility, although it addresses circumstances which occurred during the course of his confinement at Auburn, Clinton and Gouverneur. Since the imminent danger exception only applies to danger existing at the time the complaint was filed, *Malik* 293 F .3d at 563, to the extent that Welch's allegations concern events that occurred at the Clinton and Gouverneur facilities, prior to his confinement at Auburn and the filing of his complaint, these claims do not provide any grounds for me to find that plaintiff faces imminent danger of serious physical injury. *See also* *Abdul-Akbar v. McKelvie,* 239 F.3d 307, 315 (3d Cir.2001) ("By using the term 'imminent', Congress indicated that it wanted to include a safety valve for the 'three strikes' rule to prevent impending harms, not those harms that had already occurred."); *McFadden,* 16 F.Supp.2d at 247 (specifying that imminent danger must occur at the time the plaintiff seeks to file the suit, and not at the time of the alleged incidents). Likewise, in his opposition to defendants' motion to dismiss, plaintiff has attempted to interject a previously unasserted claim that he confronts imminent danger of serious physical injury based on the failure of prison officials to treat his Hepatitis C condition while he was confined at Clinton. Plaintiff, however, did not propound this claim in his complaint now before the court. Based on the pleadings before me, it is apparent that this allegation also does not relate to circumstances in existence at the time he filed this lawsuit, and therefore does not provide a basis for me to find that plaintiff is under imminent danger of serious physical injury. [4]

**\*7** Moreover, the question of whether claims strikingly similar to those now advanced by plaintiff Welch, regarding the alleged conspiracy against him, meet the imminent danger exception under section 1915(g) was previously addressed in *Welch v. Samuels,* No. 02-CV-1077 (N.D.N.Y.2002) (TJM/GLS) (Defendants' Motion (Dkt. No. 41) Exh. 1) and *Welch v. Fisher,* 07-CV-929 (N.D.N.Y.2007) (TJM/DEP), two of the many other civil rights actions brought by him in the Northern District of New York. In his decision in *Welch v. Samuels,* District Judge McAvoy noted that the claim being raised, to the effect that the plaintiff was the target of a conspiracy by DOCS employees to kill him, was not new but instead was similar to claims raised in previously-filed actions and dismissed as "patently frivolous", and did not establish the existence of imminent danger. [5] *See Samuels,* No. 02-CV-1077, Dkt. No. 9 at 3. Five years later, in his recent decision in *Welch v. Fisher,* Judge McAvoy determined that plaintiff's allegations of "a long-standing conspiracy" consisting of efforts by DOCS officials to confine him to cells, to contaminate his food, and to poison him were factually unsupported and did not demonstrate that he was under imminent danger of serious physical injury. [6] *Fisher,* No. 07-CV-929, Dkt. No. 8 at 4-5.

Finding nothing in plaintiff's complaint in this action to distinguish the present circumstances from the aforementioned cases previously decided by District Judge McAvoy, I likewise conclude, and therefore recommend a finding to the effect, that plaintiff has failed to demonstrate the existence of imminent danger of serious physical injury of the

extent contemplated by Congress when enacting 🔖 section 1915(g).

D. *Motion for Sanctions*

In response to defendants' motion to dismiss, plaintiff has cross-moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure on the ground that the motion is frivolous, specifically seeking an order striking defendants' motion papers.[7],[8] *See* Dkt. Nos. 43, 46.

Rule 11 of the Federal Rules of Civil Procedure authorizes sanctions under various circumstances, including where 1) an attorney has certified groundless and frivolous papers; 2) a document has been presented for an improper purpose, such as to harass or cause unnecessary delay or expense; 3) the claims or defenses are not supported by law; and/or 4) the allegations and other factual contentions lack evidentiary support. Fed.R.Civ.P. 11. The imposition of sanctions is purely discretionary, and that discretion should be exercised only when improper conduct is clear. *Ehrich v. Binghamton City Sch. Dist.,* 210 F.R.D. 17, 26 (N.D.N.Y.2002) (Sharpe, M.J.). A test of objective unreasonableness is employed to assess whether conduct is sanctionable; that is, the conduct must be "totally without merit or utterly lacking in support." *Id.* The alleged improper conduct should be assessed based on the following factors: 1) whether the conduct was willful or negligent; 2) whether the conduct reflected a pattern of behavior or an isolated event; 3) whether the conduct infected the entire proceeding; 4) whether the individual engaged in similar conduct in the past; and 5) the effect on the litigation in time or expense. *See id.*

**\*8** As evidenced by the sound basis on which defendants have grounded their motion, plaintiff is wholly unable to demonstrate that defendants engaged in any improper conduct under Rule 11. In light of my determination that defendants' motion to dismiss indeed has merit and should be granted, I recommend that plaintiff's motion for Rule 11 sanctions be denied as academic.

IV. *SUMMARY AND RECOMMENDATION*

The record now before the court firmly establishes that at least three prior civil rights actions-and by all accounts a substantially greater number-brought by the plaintiff while a prison inmate have been dismissed on their merits for failure to state claims upon which relief may be granted. The record also fails to reveal any basis to conclude that the

plaintiff is in imminent danger of serious physical injury, and thus entitled to exemption from the three strikes provision of 🔖 28 U.S.C. § 1915(g). Given the meritorious nature of defendants' motion, plaintiff is not entitled to any of the sanctions available under Rule 11. Accordingly, particularly in light of the fact that the net result of these findings is not denial altogether of plaintiff's access to the courts, but instead only the requirement that he conclude that pursuit of his civil rights claims in this action justifies expenditure of the full applicable filing fee, it is hereby

RECOMMENDED that:

1) The order granting the plaintiff IFP status (Dkt. No. 6) be VACATED;

2) Defendants' motion seeking dismissal of plaintiff's complaint (Dkt. No. 41) be GRANTED as to all defendants and all claims unless Welch pays the full required filing fee of $350.00 within thirty days after the entry of a final order by the district judge addressing this recommendation;

3) Plaintiff's cross-motion seeking the imposition of sanctions against defendants pursuant to Rule 11 of the Federal Rules of Civil Procedure (Dkt. No. 46) be DENIED; and it is further

ORDERED that pending final determination with respect to this report and recommendation and, if approved, the payment by plaintiff of the required filing fee, all discovery in this action be and is hereby STAYED.

Pursuant to 🔖 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; 🔖 *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 238553

# Footnotes

1    Plaintiff's motion for sanctions would ordinarily fall within my non-consensual jurisdiction under 28 U.S.C. § 636(b). *See Robinson v. Eng,* 148 F.R.D. 635, 639 (D.Neb.1993) ("[A] magistrate judge has the authority to issue orders resolving Rule 11 issues.") (citing, *inter alia,* 28 U.S.C. § 636(b)(1)(A) (indicating that a magistrate judge can "hear and determine any pretrial matter pending before the court")). This authority is not without exception, however, in that a magistrate judge cannot issue sanctions which "fall within the eight so-called dispositive motions excepted by Section 636(b)(1)(A)." *DePalma v. Nike, Inc.,* No. 95CV1428, 1998 WL 690880, at *6 n. 4 (N.D.N.Y. Sept. 30, 1998) (Pooler, D.J.) (citing, *inter alia, Robinson* ). Because plaintiff's motion for sanctions is intertwined with, and hinges on, my determination regarding defendants' dispositive motion to dismiss this action, I have chosen to format my response to that motion as a recommendation to Judge Kahn.

2    The Second Circuit has expressed its view that the time for determination of "strikes" is only when the section 1915(g) issue is ripe for adjudication, and that because of the potentially significant consequences flowing from such a finding, a court should not, when dismissing an inmate complaint, contemporaneously signal whether the dismissal should count as a "strike" for the purposes of that section. *DeLeon v. Doe,* 361 F.3d 93, 95 (2d Cir.2004); *see also Snider v. Melindez,* 199 F.3d 108, 115 (2d Cir.1999) ("We ... doubt whether the entry of a strike is properly considered at the time an action is dismissed.").

3    In that decision, the Second Circuit went so far as to determine that one of those dismissals, which occurred before the enactment of section 1915(g), nonetheless constituted a "strike" under the statute. *Galie,* 207 F.3d at 132.

4    While plaintiff's complaint alleges in wholly conclusory terms that defendants' conspiracy against him is both systemic and ongoing, it is arguable that he can no longer satisfy the imminent danger exception requirement in light of his transfer, after commencement of the action, to the Orleans Correctional Facility, where he is currently housed. *Cf. Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006) (indicating that the transfer of an inmate plaintiff complaining of civil rights violations out of the prison facility in which those violations are alleged to have occurred moots any claim for injunctive relief against prison officials of the transferring facility).

5    Judge McAvoy reiterated this determination in his denial of plaintiff's subsequent motion for reconsideration, *Samuels,* No. 02-CV-1077, Dkt. No. 12, which was affirmed by the Second Circuit on appeal, *id.* at Dkt. Nos. 15, 19.

6    Welch has appealed this ruling to the Second Circuit, and awaits a determination from that court. *Fisher,* No. 07-CV-929, Dkt. No. 13.

7    Plaintiff also faults defendants for failing to file any affidavit in conjunction with their motion to dismiss as required by Northern District of New York Local Rule 7.1(a)(2). *See* Dkt. No. 43. Contrary to plaintiff's assertion, the lack of an affidavit provides no basis for the imposition of Rule 11 sanctions in this matter. While under a literal interpretation of the court's local rules an affidavit could arguably have been required to support defendants' motion, *see* N.D.N.Y.L.R. 7.1(a)(2), the motion is in the nature of a dismissal motion; such motions are generally exempted from the affidavit requirement, *see id.* In any event, the court is authorized, and in this instance does, overlook this potential, technical shortcoming under the court's local rules. *See*

*Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

8    Plaintiff further contends that defendants utilized their motion as a dilatory tactic to "stall time" for the court to rule on plaintiff's request to file an amended complaint. *See* Dkt. No. 43. This prong of plaintiff's cross-motion also lacks merit, particularly in light of the fact that the court issued a ruling denying plaintiff's request to amend approximately one month after defendants filed their motion. *See* Dkt. No. 44.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 150364
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kevin GAMBLE, Plaintiff,

v.

Patrick MAYNARD, Prison Guard; Sergeant
Silver; Donah, Prison Guard; A. Babbie, Prison
Guard, and S. Miller, Prison guard, each of
Clinton Correctional Facility, Defendants.

No. 9:06-CV-1543.
|
Jan. 14, 2008.

**Attorneys and Law Firms**

Kevin Gamble, Pine City, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Christopher W. Hall, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

### *ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Kevin Gamble, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated November 2, 2007, the Honorable
David E. Peebles, United States Magistrate Judge,
recommended that the order granting the plaintiff IFP status
be vacated; and that defendants' motion to dismiss plaintiff's
complaint be granted as to all defendants and all claims unless
plaintiff pays the full required filing fee of $350.00 within
thirty days after entry of the final order by the district judge
addressing the recommendation. Objections to the Report
Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the Report-
Recommendation to which the plaintiff has objected, the
Report-Recommendation is accepted and adopted. *See* 28
U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The order (Docket No. 4) granting the plaintiff IFP status
is VACATED;

2. Defendants' motion to dismiss plaintiff's complaint is
GRANTED as to all defendants and all claims unless the
plaintiff pays the required filing fee of $350.00, in full, within
thirty days after entry of this order;

2. In the event the plaintiff fails to pay the necessary filing fee
of $350.00 within the required time period, the complaint will
be DISMISSED in all respects without further order; and

3. The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Kevin Gamble, a New York State prison inmate
who is no stranger to this court, has commenced this
action pursuant to 42 U.S .C. § 1983, alleging that
through their actions the defendants have deprived him of
his civil rights. In his complaint, plaintiff contends that
he was assaulted by various prison officials, in violation
of the Eighth Amendment's prohibition against cruel and
unusual punishment. As relief, plaintiff seeks recovery of
compensatory and punitive damages.

Currently pending before the court is a motion by the
defendants seeking revocation of the *in forma pauperis*
("IFP") status previously conferred and conditionally
dismissing plaintiff's complaint absent prepayment in full of
the required filing fee. In light of a prior finding by another
judge of this court, to the effect that by the time this complaint
was filed three prior civil rights actions commenced by the
plaintiff while a prison inmate had been dismissed as frivolous
or for failure to state a claim upon which relief may be
granted, and discerning no basis to conclude, based upon
plaintiff's complaint, that he is under imminent danger of
serious physical injury, I recommend that defendants' motion
be granted.

I. *BACKGROUND* [1]

At the times relevant to his claims, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services (the "DOCS"), and designated to the Clinton Correctional Facility ("Clinton"), located in Dannemora New York. *See generally* Complaint (Dkt. No. 1). Early on the morning of September 22, 2006, apparently in preparation for a transfer, plaintiff was instructed by a corrections officer to prepare his cell and to place his sheet and blankets in a pillow case. As plaintiff was preparing to exit the E Block area of Clinton, where his cell was located, he was struck by defendant Patrick Maynard in the face with a closed fist. The assault continued, with Corrections Officers A. Babbie and S. Miller assisting and forcing the plaintiff to the floor where additional physical force was administered, and with defendants striking him in the rib cage and twisting his body and legs. Following the encounter, plaintiff was placed in mechanical restraints and taken to the prison infirmary, where he was examined to determine the extent of his injuries, if any. [2]

## II. *PROCEDURAL HISTORY*

**\*2** Plaintiff commenced this action on December 26, 2006. Dkt. No. 1. Named as defendants in Gamble's complaint are Patrick Maynard, A. Babbie, S. Miller, and M. Donah, all corrections officers assigned to work at Clinton, and a Mr. Silver, identified by the plaintiff as a corrections sergeant at the facility. *Id.* With the filing of his complaint, plaintiff also submitted an application for permission to proceed *in forma pauperis.* Dkt. No. 2. That application was granted by order issued by me on January 10, 2007. Dkt. No. 4.

On March 8, 2007 issue was joined by the filing of an answer on behalf of the defendants generally denying the material allegations of plaintiff's complaint and asserting various affirmative defenses. Dkt. No. 14. Defendants subsequently filed a moved on May 29, 2007 seeking revocation of plaintiff's IFP status and dismissal of plaintiff's complaint, absent prepayment in full of the required filing fee, based upon the fact that at least three of his prior inmate civil rights actions have been dismissed as either frivolous or for failure to state a claim upon which relief may be granted. Dkt. No. 20. On July 9, 2007 an affirmation from the plaintiff in opposition to defendants' motion was filed with the court. Dkt. No. 22. That affirmation, however, speaks to the merits of plaintiff's claims and does not address defendant's argument that his complaint is subject to conditional dismissal under 28 U.S.C. § 1915(g). [3] *See id.*

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

In his complaint in this action, when responding to the question of whether he had "ever filed any other law suits in any state in federal court relating to [his] imprisonment," plaintiff stated that he had not. Complaint (Dkt. No. 1) § 5. Oddly, plaintiff followed that answer with reference to a single action, identified as *Gamble v. Monette, et al.,* 9:06-CV-0979 (N.D.N.Y., 2006), filed in this court, but did not list any others. In point of fact, however, it appears from publically available records that Gamble is a frequent litigator, having commenced at least ten cases in this district alone, seven of which are now closed and with at least five having been dismissed as either frivolous or for failure to state a cognizable claim. *See Gamble v. Kelsh,* No. 9:07-CV-00474 (N.D.N .Y.) (TJM/RFT) (dismissed on May 30, 2007); *Gamble v. Kelsh,* No. 9:07-CV-00093 (N.D.N.Y.) (LEK/DRH) (dismissed on January 24, 2007); *Gamble v. Cox,* No. 9:05-CV-1093 (N.D.N.Y.) (FJS/RFT) (dismissed on February 13, 2006); *Gamble v. Loran,* No. 9:05-CV-01088 (N.D.N .Y.) (LEK/RFT) (dismissed on December 20, 2005); *Gamble v. Monette,* No. 9:05-CV-1095 (N.D.N.Y.) (DNH/GJD) (dismissed on December 15, 2005).

**\*3** Defendants now seek conditional dismissal of plaintiff's complaint on the basis of those prior dispositions. In their motion, defendants invoke 28 U.S.C. § 1915(g), arguing that under that section, plaintiff's litigation history, which includes at least three merit-based dismissals, warrants revocation of his IFP status.

Section 1915(g), which was enacted as part of sweeping inmate litigation reform brought about by adoption of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), though engendering far less litigation than some of its PLRA counterparts including, notably, the exhaustion of remedies requirement of 42 U.S.C. § 1997e(a), provides that

> [i]n no event shall a prisoner bring a civil action or appeal a judgment

in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The manifest intent of Congress enacting this "three strikes" provision was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates. *Tafari v. Hues,* 473 F.3d 440, 443-44 (2d Cir.2007); *Gill v. Pidlypchak,* No. 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, S.J. & Treece, M.J.). The prophylactic effect envisioned under section 1915(g) is accomplished by requiring a prisoner who has had three previous strikes to engage in the same cost-benefit analysis that other civil litigants must make before deciding whether to commence suit, accompanied by the filing of the full fee-that is, to assess whether the result to be achieved justifies the filing fee expenditure. *See Ibrahim v. District of Columbia,* 463 F.3d 3, 6 (D.C.Cir.2006). As the Second Circuit has noted, in the context of PLRA amendments requiring inmates to authorize prison officials to make deductions from inmate accounts to be applied as partial payments of appellate filing fees for prisoners granted *in forma pauperis* status,

> [p]rior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to filing law suits. Indeed, the very nature of incarceration-prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to file actions and appeals, such as paper, pens, envelopes and legal materials-has fostered a " 'nothing to lose and everything to gain' " environment which allows inmates discriminately to file suit at taxpayers' expense.

*Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir.1997), *cert. denied sub nom., Nicholas v. Miller,* 523 U.S. 1126, 118

S.Ct. 1812 (1998) (citations omitted); *see also Gill,* 2006 WL 3751340, at *2.

**\*4** The question of whether the dismissal of a prior action qualifies as a strike, for purposes of section 1915(g), is a matter of statutory interpretation, and as such a question for the court.[4] *Tafari,* 473 F.3d at 442-43. In determining whether a dismissal satisfies the failure to state a claim prong of the statute, implicated in this case, courts have drawn upon the provisions of Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance, particularly in light of the similarity in phrasing utilized in the two provisions. *Tafari,* 473 F.3d at 442 (citing *Andrews v. King,* 398 F.3d 1113, 1121 (9th Cir.2005)).

In a report and recommendation issued in another of plaintiff's actions by Chief United States Magistrate Gustave J. DiBianco on May 25, 2007, a finding was made that plaintiff has in fact had three prior "strikes", qualifying under section 1915(g), and that the dismissals of the prior actions all occurred prior to the filing of plaintiff's complaint in this matter on December 26, 2006. *See Gamble v. Monette,* No. 9:06-CV-136 (N.D.N.Y. May 25, 2007) (adopted in full by decision and order issued by District Judge Lawrence E. Kahn on July 20, 2007). This finding is entitled to preclusive effect, *see Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 288-89 (2d Cir.2002), and thus establishes the existence of three prior "strikes" qualifying under section 1915(g) as a potential basis for revocation of plaintiff's *in forma pauperis* status, absent a finding that the imminent danger set forth in the governing statute applies.

As a safety valve, obviously intended to protect a prison inmate exposed to potential danger from the harsh consequences of his or her earlier folly, section 1915(g) provides that a prisoner who is in "imminent danger of serious physical injury" may avoid application of the three strikes rule of section 1915(g). *See* 28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 562-63 (2d Cir.2002). This exception requires a showing that the prisoner was under such imminent danger at the time of filing; the exception does not provide a basis to avoid application of the three strikes on the basis of past harm. *Malik,* 293 F.3d at 562-63. An inmate who claims the benefit of this exception must also show that the danger faced rises to the level of a "serious physical injury."

28 U.S.C. § 1915(g). The imminent danger an inmate faces, moreover, must be real, and not merely speculative or hypothetical. *Johnson v. Barney,* No. 04 Civ. 10204, 2005 WL 2173950, at *1-*2 (S.D.N.Y. Sept. 6, 2005) (finding that inmate's allegation of danger at facility he was not housed at, but may pass through at infrequent occasions in the future, did not establish imminent danger)

The term "serious physical injury", as utilized in section 1915(g), is nowhere concretely defined, although it has been construed by various courts as including a "disease that could result in serious harm or even death [.]" *Ibrahim,* 463 F.3d at 7. In deciding whether to invoke the exception, a court must examine the available pleadings, construed in a light most favorable to the plaintiff, to determine whether the plaintiff has alleged a serious physical injury. *McAlphin v. Toney,* 281 F.3d 709, 710 (8th Cir.2002). Conditions which have been held to rise to a sufficient threshold level include denial of treatment for infected gums, resulting in damages of infection, *McAlphin,* 281 F.3d at 710; denial of adequate treatment for Hepatitis C, a "chronic and potentially fatal disease," *Ibrahim,* 463 F.3d at 6-7; and heart palpitations, chest pains and labored breathing, *Ciarpaglini v. Saini,* 352 F.3d 328, 330-31 (7th Cir.2003) (finding upon reaching the merits, however, that plaintiff's complaint did not state an Eighth Amendment claim).

**\*5** Plaintiff's complaint addresses an assault which occurred on September 22, 2006, while he was confined at Clinton. While plaintiff's complaint intimates that the matter was not an isolated incident, there is nothing in his complaint, particularly in view of the fact that he is no longer incarcerated at the facility at which the alleged assaults occurred, having since been transferred to the Southport Correctional Facility, to demonstrate that he is in imminent danger of serious physical injury. Accordingly, I find no basis not to invoke three strikes provision of section 1915(g).

IV. *SUMMARY AND RECOMMENDATION*

The plaintiff, a prodigious litigator, has commenced this action and been granted IFP status. Because it appears, based upon the fact that three of his prior actions have been dismissed as either frivolous or for failure to state a claim upon which relief may be granted, that the decision to grant him IFP status was improvident, and finding no basis to conclude the plaintiff qualifies under the imminent danger exception to 28 U.S.C. § 1915(g), it is hereby

RECOMMENDED that:

1) The order granting the plaintiff IFP status (Dkt. No. 4) be VACATED;

2) Defendants' motion to dismiss plaintiff's complaint (Dkt. No. 20) be GRANTED as to all defendants and all claims unless Gamble pays the full required filing fee of $350.00 within thirty days after the entry of a final order by the district judge addressing this recommendation; and it is further

ORDERED that pending final determination with respect to this report and recommendation and, if it is approved, the payment by plaintiff of the required filing fee, all discovery in this action be and is hereby STAYED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 150364

**Footnotes**

1    In light of the procedural posture in this case, the allegations set forth in plaintiff's complaint, though undoubtedly contested by the defendants, have been accepted as true for purposes of the instant motion. *See* ⚑ *Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200 (2007) (citing ⚑ *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1965 (2007)); *see also* ⚑ *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).

2    An inmate injury report, which is included as an exhibit to plaintiff's complaint, presumably generated as a result of that examination, reveals that no injuries were apparent to the medical official who examined Gamble.

3    The deadline for submission by the plaintiff of papers in opposition to defendants' motion passed on June 25, 2007 and has not been extended by the court.

4    The Second Circuit has expressed its view that the time for determination of "strikes" is only when the ⚑ section 1915(g) issue is ripe for adjudication, and that because of the potentially significant consequences flowing from such a finding, a court should not, when dismissing an inmate complaint, contemporaneously signal whether the dismissal should count as a "strike" for the purposes of that section. ⚑ *DeLeon v. Doe,* 361 F.3d 93, 95 (2d Cir.2004); *see also* ⚑ *Snider v. Melindez,* 199 F.3d 108, 115 (2d Cir.1999) ("We ... doubt whether the entry of a strike is properly considered at the time an action is dismissed.").

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,
v.
Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq.,
Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for
Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel,
Syracuse, NY, for Defendants Gunilla De Montaigu and
Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of
Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

### *MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-
captioned action is a motion by Defendants containing two
alternative requests for relief: (1) a request for reconsideration
of Part III.D.5 of the Court's Decision and Order of May
5, 2009, denying Defendants' request for dismissal of all of
Plaintiffs' claims due to the doctrine of *forum non conveniens;*
and (2) a request for dismissal of the First Cause of Action
of Plaintiffs' Third Amended Complaint (asserting a claim of
violation of Panama law) as barred by the three-year statute of
limitations set forth in the certified translation of Article 1652
of the Panamanian Code. (Dkt. No. 61.) For the reasons set
forth below, Defendants' motion is granted in part, and denied
in part.

### I. REQUEST FOR RECONSIDERATION
To the extent that Defendants' motion requests
reconsideration of the Court's decision to denying their

request for dismissal of all of Plaintiffs' claims due to the
doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No.
61.) The Order of which reconsideration was sought was
entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y.
L.R. 7.1(g) (setting ten-day deadline for motions for
reconsideration). Defendants' attempt to characterize the
Order of which reconsideration is sought as being the Court's
Text Order of May 29, 2009, is unconvincing. That Text
Order merely indicates the extent to which Plaintiffs' signed
Third Amended Complaint fails to comport with the Court's
Decision and Order of May 5, 2009 (and was issued in
response to Plaintiffs' request for guidance). Even liberally
construed, Defendants' motion for reconsideration expressly
and repeatedly challenges the substance of the Court's Order
of May 5, 2009 (specifically, Part III.D.5. thereof), and only
that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61,
Part 4, Points II and III.)

In any event, even if the Court were to consider the
merits of Defendants' motion for reconsideration, the Court
would deny that motion as without cause: there has been
no intervening change of controlling law, no previously
unavailable evidence, and there exists no clear error of law or
manifest injustice with regard to the relevant portion of the
prior decision in question.

For these reasons, Defendants' request for reconsideration is
denied.

### II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF
ACTION
To the extent that Defendants' motion alternatively requests
the dismissal of the First Cause of Action of Plaintiffs'
Third Amended Complaint (asserting a claim of violation of
Panama law) as barred by the three-year statute of limitations
set forth in the certified translation of Article 1652 of the
Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response
papers, to oppose this request. (*See* Dkt. No. 63.) The closest
that Plaintiffs come to opposing this request is when, in a
supplemental letter request, they (correctly) point out that
Defendants have improperly broadened the target of their
Panamanian-statute-of-limitations argument from Plaintiffs'
First Cause of Action to all of Plaintiffs' causes of action.
(Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a
result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

**\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also* 🔖 *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is **GRANTED in part,** and **DENIED in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is **DENIED,** however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is **DISMISSED** as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

## Footnotes

1    *See* *Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at \*7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); 🔖 *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at \*9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

1    **Social Security** 🔑 Exhaustion of other
     remedies

     Representative for a social security payee
     failed to exhaust her administrative remedies
     before filing her claim since there was no
     final decision after a hearing. The Social
     Security Administration (SSA) garnished the
     representative's wages after attempting to work
     out a repayment plan since the representative
     was overpaid on behalf of the payee. The
     representative contacted the SSA to complain
     about the garnishment and shortly thereafter, the
     representative filed the action with the Small
     Claims Court, without having a hearing or final
     order from the Commissioner of Social Security.

     Social Security Act, § 205(g), 🔖 42 U.S.C.A. §
     405(g).

     27 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the
Northern District of New York, William H. Pease, Esq.,
Assistant U.S. Attorney, of Counsel, Syracuse, NY.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

 **\*1**  Currently before the Court, in this *pro se* action filed
by Donna Este–Green ("Plaintiff") to recover funds allegedly
owed to her by the Social Security Administration, is a motion
by Michael J. Astrue, Commissioner of Social Security
("Defendant") to dismiss the action pursuant to Fed.R.Civ.P.
12(b)(1) for lack of subject matter jurisdiction due to
Plaintiff's failure to exhaust her administrative remedies
before filing suit. (Dkt. No. 3.) Plaintiff has not opposed the
motion. For the reasons set forth below, Defendant's motion
is granted, and Plaintiff's Complaint is dismissed.

**I. BACKGROUND**

**A. Procedural History**

On or around May 27, 2009, Plaintiff brought this
action in Small Claims Court, City of Ithaca, County
of Tompkins ("Small Claims Court"), naming the Social
Security Administration ("SSA") as Defendant. (Dkt. No. 1,
Part 3.) Liberally construed, Plaintiff's Complaint alleges that
the SSA wrongfully garnished her wages in the amount of
five hundred seventy-one dollars ($571.00). (*Id.*) On June 24,
2009, the United States Attorney's Office for the Northern
District of New York removed this case from the Small
Claims Court, pursuant to the exclusive original jurisdiction
of the District Court under 🔖 42 U.S.C. §§ 405(g)–(h)
and 🔖 1383(c)(3), "because Plaintiff's claim appeared to
relate to the payment of Social Security benefits to her as
representative payee for the account of Albertina King." (Dkt.
No. 3.)

**B. Relevant Facts**

In 1999, Plaintiff had been acting as representative payee
for Albertina King, who had been receiving Social Security
benefits under Title II of the Act. (Dkt. No. 3.) In October
1999, the SSA issued an overpayment to Plaintiff on Albertina
King's account. (*Id.*) In March 2001, the SSA and Plaintiff
arranged a repayment plan pursuant to which Plaintiff agreed
to repay the amount due the SSA in fifty-dollar installments
beginning on April 15, 2001. (*Id.*) In October 2007, the
SSA sent a letter to Plaintiff, in which the SSA stated the
following: (1) Plaintiff had been overpaid as representative
payee; (2) Plaintiff had the right to question the decision

about her overpayment and to ask that the SSA not recover the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security

Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy." *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

**\*3** After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing

this action.[4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is **DISMISSED.** The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

## Footnotes

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 504976
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jay BRADSHAW, Plaintiff,

v.

C.O. PHILLIP; Malette; Hanna; Gaiser;
Daniel; and John Does, Defendants.

9:21-CV-0776 (GTS/ML)
|
Signed 02/18/2022

**Attorneys and Law Firms**

DANIEL R. LeCOURS, ESQ, ELLIOT A. HALLAK,
ESQ., HARRIS BEACH, PLLC, Counsel for Plaintiff, 677
Broadway, Suite 1101, Albany, NY 12207.

DAVID C. WHITE, ESQ., Ass't Attorney General, HON.
LETITIA JAMES, Attorney General for the State of New
York, Attorney for Defendants, The Capitol, Albany, NY
12224.

**DECISION AND ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**I. INTRODUCTION**

**\*1** On or about July 4, 2021, Plaintiff Jay Bradshaw
commenced this action pro se by filing a civil rights complaint
against numerous state employees of Upstate Correctional
Facility pursuant to 42 U.S.C. § 1983 ("Section 1983"),
together with an application to proceed in forma pauperis
("IFP"), and a motion for preliminary injunctive relief. Dkt.
No. 1 ("Compl."); Dkt. No. 2 ("IFP Application"); Dkt. No.
4 ("First Preliminary Injunction Motion"). By Decision and
Order entered on September 3, 2021, this Court granted
plaintiff's IFP Application in accordance with 28 U.S.C. §
1915(g) ("Section 1915(g)"), and, following review of the
complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28
U.S.C. § 1915A(b), dismissed some of plaintiff's claims (and
terminated some of the defendants), and directed service and
a response for the claims against the named defendants that
survived sua sponte review, as well as the First Preliminary
Injunction Motion. Dkt. No. 6 ("September 2021 Order").[1]

Thereafter, and prior to the completion of service, plaintiff
filed an amended complaint, a second motion for preliminary
injunctive relief, and a supplemental complaint. Dkt. No.
9 ("Am. Compl."); Dkt. No. 10 ("Second Preliminary
Injunction Motion"); Dkt. No. 11 ("Supp. Compl.").[2] On
November 1, 2021, counsel for the defendants filed an
opposition to the preliminary injunction motions and cross-
motion to revoke plaintiff's IFP status, which plaintiff
subsequently opposed. Dkt. No. 22 ("Opposition to Injunction
Motions and Cross-Motion to Revoke Plaintiff's IFP Status");
Dkt. No. 28 ("Response to Cross-Motion to Revoke IFP
Status"). At the time, a cross-motion to revoke plaintiff's IFP
status was pending in *Bradshaw v. Gordon*. *See Bradshaw v.
Gordon*, Dkt. No. 16.

**\*2** On November 4, 2021, the Court determined that an
evidentiary hearing on defendants' cross-motions to revoke
plaintiff's IFP status in this case and *Bradshaw v. Gordon* was
necessary. As a result, the Court issued an Order in both cases
scheduling a consolidated evidentiary hearing. *See* Dkt. No.
25; *Bradshaw v. Gordon*, Dkt. No. 23.

Following these Orders, counsel was appointed for, and
appeared on behalf of, plaintiff. Dkt. Nos. 29, 30, 31; *see also
Bradshaw v. Gordon*, Dkt. Nos. 25, 26, 27. On December 15,
2021, the Court held the consolidated evidentiary hearing.

Currently before the Court are the following: (1) plaintiff's
preliminary injunction motions; and (2) defendants' Cross-
Motion to Revoke Plaintiff's IFP Status.

**II. BACKGROUND**

**A. Overview of the Complaint**
Generally speaking, plaintiff's complaint alleges that various
corrections officials from Upstate Correctional Facility
denied him ten out of eleven meals over a three-and-a-half-
day period between July 1 and July 4, 2021. Compl. at 3-5.
The amended complaint also alleges that two nurses passed
plaintiff's cell on July 4 and July 5, 2021, and refused his
requests for medical treatment. Am. Compl. at 4.

The complaint further alleges that between June 11 and July
4, 2021, plaintiff was confined in a "filthy dirty" cell that
"smell[s] of urine and feces" and denied cleaning supplies,
toothpaste, a toothbrush, and a pen, and on June 18, June 24,
and July 1, 2021, plaintiff was subjected to an excessive use
of force. Compl. at 2-5. The amended complaint alleges that

plaintiff was provided with cleaning supplies on July 6, 2021, and a toothbrush and toothpaste on July 11, 2021. Am. Compl. at 3.

According to plaintiff, as a result of not having toothpaste or a toothbrush, one of his teeth has begun "eroding [and] decaying[,]" which "has caused [him] extreme and constant pain[,]" and as a result of being deprived of food, he experienced "severe stomach pains, physical weakness, headaches, nuasea [sic], and mental anguish[.]" Compl. at 2, 4.

### B. Initial Determination of Imminent Danger

Prior to commencing this action, plaintiff had filed at least twenty other civil actions in the district courts in the Second Circuit since 2008. September 2021 Order at 3-4. In at least four of those actions, plaintiff acquired "strikes" as defined in 28 U.S.C. § 1915(g) ("Section 1915(g)").[3] *Id.* at 4 n.5. Notwithstanding this determination, plaintiff's IFP Application was granted because the Court found that the allegations in the complaint were sufficient, albeit barely, "to plausibly suggest that [plaintiff] was 'under imminent danger of serious physical injury' when he signed his complaint on July 4, 2021." *Id.* at 6. The Court, however, noted that "this is a preliminary finding which defendants are entitled to challenge or refute in future filings." *Id.* (stating further that "plaintiff's IFP status will be revoked if, as the case progresses, it is determined that he did not face 'imminent danger' when he commenced this action or is otherwise not entitled to proceed IFP").

### C. Overview of Plaintiff's First and Second Preliminary Injunction Motions

**\*3**  Plaintiff's First Preliminary Injunction Motion relates to alleged use-of-force incidents and meal and hygiene deprivations, and seeks an order directing defendants to provide him with "all meals[, and] ... cease from using food as a means of punishment[,]" as well as reformation of use-of-force policies at Upstate Correctional Facility. *See* First Preliminary Injunction Motion at 1, 3. Plaintiff's Second Preliminary Injunction Motion relates to the use-of-force incident that allegedly occurred on July 1, 2021, and seeks an order directing defendants to "cease from all efforts to orchestrate an attack against [him,] [and] refrain from any and all forms of retaliation against [him,]" as well as an order that he be transferred to another facility. *See* Second Preliminary Injunction Motion at 1.

### D. Overview of Defendants' Opposition and Cross-Motion, and Plaintiff's Response

Defendants argue that plaintiff's request for injunctive relief should be denied because he has failed to establish that he will suffer irreparable harm in the absence of the preliminary injunctive relief that he seeks. Dkt. No. 22 at 7-9. In support of this argument, defendants have adduced record evidence showing that (1) plaintiff has never been denied meals at any point, (2) plaintiff accepted all of his meals between September 23 and 30, 2021, and (3) plaintiff's medical records do not contain any indication that his health is at risk due to missed meals, and (4) plaintiff was not subjected to an unnecessary use-of-force by defendant Phillips on July 1, 2021. Dkt. No. 22-2; Dkt. No. 22-3; Dkt. No. 22-4; Dkt. No. 22-5; Dkt. No. 22-6; Dkt. No. 23.

Defendants separately argue that plaintiff's IFP status should be revoked because he did not face imminent danger when he filed the complaint. Dkt. No. 22 at 9-10. In support of this position, defendants have adduced record evidence, including sworn statements, cell block log books, the New York State Department of Corrections and Community Supervision ("DOCCS") Directive on Inmate Hunger Strikes, and plaintiff's medical records, which show, among other things, that (1) plaintiff was offered meals between July 1 and July 4, 2021, which he refused, (2) plaintiff received dinner on July 1, breakfast on July 2, and breakfast and lunch on July 4, 2021, and (3) plaintiff never complained to medical staff about malnourishment despite bringing other complaints to staff during this time period. Dkt. No. 22-2; Dkt. No. 22-3; Dkt. No. 22-4; Dkt. No. 22-6; Dkt. No. 23.

In his response to defendants' cross-motion to revoke his IFP status, plaintiff has submitted a sworn statement wherein he attempts to refute certain factual information contained in defendants' documentary evidence, including the evidence showing that he received certain meals between July 2 and July 4, 2021, and refused all meals he missed between July 1 and July 4, 2021. Dkt. No. 28. Plaintiff also submitted certain exhibits with his response. Dkt. No. 28 at 13-39. In addition, plaintiff's complaint is verified. Compl. at 5.

### E. Evidentiary Hearing

The Court held an evidentiary hearing on defendants' motion to revoke plaintiff's IFP status on December 15, 2021. (Text Minute Entry filed Dec. 15, 2021.) At the hearing, the following four witnesses testified (and were cross-examined):

(1) plaintiff; (2) Corrections Officer Michael Phillips; (3) Corrections Sergeant Eric Marshall; and (4) Nurse Brenda Holcombe. (*Id.*; Dkt. Nos. 47, 48.) In addition, the following eight exhibits were marked for identification: (1) Exhibit P-3 (Upstate Correctional Facility's SHU Incarcerated Individual Orientation Manual); (2) Exhibit P-4 (Declaration of Michael Phillips, dated October 6, 2021, and exhibits thereto); (3) Exhibit P-5 (Log Books for May 28-31, 2021, and July 1-5, 2021, Bates Stamped 000034-68); (4) Exhibit P-9 (Plaintiff's Supplemental Complaint, Case No. 21-CV-0776, dated September 18, 2021, and exhibits thereto); (5) Exhibit D-1 (Plaintiff's ambulatory health record); (6) Exhibit D-2 (Upstate Correctional Facility Cell Block 10 Logbooks); (7) Exhibit D-6 (Plaintiff's Complaint, Case No. 21-CV-0776); and (8) Exhibit D-9 (Plaintiff's Complaint, Case No. 21-CV-0645. (Text Minute Entry filed Dec. 15, 2021; Dkt. Nos. 47, 48.) The hearing lasted approximately two-and-a-half hours. (Text Minute Entry filed Dec. 15, 2021.)

## III. RELEVANT LEGAL STANDARDS

### A. Motions for Injunctive Relief

**\*4** Preliminary injunctive relief " 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, 38 (2d Cir. 2010). To prevail on a motion for preliminary injunctive relief, a plaintiff must demonstrate irreparable harm and either a substantial likelihood of success on the merits of the claim, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *Id.* at 35; *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011). However, when the moving party seeks a mandatory injunction that alters the status quo by commanding a positive act, the burden is "even higher." *Cacchillo*, 638 F.3d at 405-06; *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Citigroup*

*Global Markets*, 598 F.3d at 35 n.4 (internal quotation marks omitted).

" 'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.' " *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). Generally an alleged violation of a constitutional right creates a presumption of irreparable harm. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). However, speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983). Rather, a plaintiff seeking to satisfy the irreparable harm requirement must demonstrate that "absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Bisnews AFE (Thailand)*, 437 Fed. App'x at 58 (quoting *Faiveley*, 559 F.3d at 118); *Garcia v. Arevalo*, No. 93-CV-8147, 1994 WL 383238, at \*2 (S.D.N.Y. June 27, 1994) ("It is well settled that an allegation of the mere possibility of irreparable harm is insufficient to justify the drastic remedy of preliminary injunction.... A party who seeks the extraordinary remedy of a preliminary injunction must show the alleged irreparable harm to be imminent, not remote or speculative, and the alleged injury to constitute one that is incapable of being fully remedied by monetary damages." (citations omitted)). A finding of irreparable harm cannot be based solely on past conduct. *Haden v. Hellinger*, No. 9:14-CV-0318, 2016 WL 589703, at \*1 (N.D.N.Y. Feb. 11, 2016).

The district court has wide discretion in determining whether to grant preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 511 (2d Cir. 2005). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994)) (other citations omitted).

### B. The "Three Strikes" Rule and Imminent Danger Exception

Where a plaintiff seeks leave to proceed IFP, the Court must determine whether the plaintiff has demonstrated sufficient economic need to proceed without prepaying, in full, the Court's filing fee of four hundred and two dollars ($402.00).[4] The Court must also determine whether the "three strikes" provision of ⚑Section 1915(g) bars the plaintiff from proceeding IFP and without prepayment of the filing fee.[5] More specifically, ⚑Section 1915(g) provides as follows:

> **\*5** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

⚑28 U.S.C. § 1915(g).

The "imminent danger" exception protects a prison inmate exposed to potential "serious physical injury" from the consequences of his earlier mistakes in filing frivolous litigation. Congress enacted the imminent danger exception contained in the final phrase of ⚑§ 1915(g) as a "safety valve" to prevent impending harms to prisoners otherwise barred from proceeding in forma pauperis. *Malik v. McGinnis*, 293 F.3d 559, 563 (2d Cir. 2002). "[F]or a prisoner to qualify for the imminent danger exception, the danger must be present when he files his complaint–in other words, a three-strikes litigant is not excepted from the filing fee if he alleges a danger that has dissipated by the time a complaint is filed." *Pettus v. Morgenthau*, 554 F.3d 293, 296 (2d Cir. 2009) (citation omitted); *see also* ⚑*Polanco v. Hopkins*, 510 F.3d 152 (2d Cir. 2007) (imminent danger claims must be evaluated at the time the complaint is filed, rather than at the time of the events alleged). In addition, "⚑§ 1915(g) allows a three-strikes litigant to proceed [in forma pauperis]

only when there exists an adequate nexus between the claims he seeks to pursue and the imminent danger he alleges." ⚑*Pettus*, 554 F.3d at 296. In deciding whether such a nexus exists, the Second Circuit instructs the courts to consider "(1) whether the imminent danger of serious physical injury that a three-strikes litigant alleges is *fairly traceable* to unlawful conduct asserted in the complaint, and (2) whether a favorable judicial outcome would *redress* that injury." ⚑*Id.* at 298-99. Both requirements must be met in order for the three-strikes litigant to proceed in forma pauperis. *Id.*

Generally speaking, the allegations relevant to the imminent danger inquiry "are those in which [plaintiff] describes physical injury, threats of violence, and deprivation of medical treatment." ⚑*Chavis v. Chappius*, 618 F.3d 162, 165 (2d Cir. 2010). Although the Second Circuit has cautioned against "an overly detailed inquiry into whether the allegations qualify for the exception," ⚑*id.* at 169-70 (*quoting* ⚑*Andrews v. Cervantes*, 493 F.3d 1047, 1055 (9th Cir. 2007)), when a defendant challenges a prisoner's claim of imminent danger, a district court may "reexamine" its provisional determination of imminent danger and "conduct a narrow evidentiary inquiry into the prisoner-litigant's fear of imminent danger" at the time of filing. *Shepherd v. Annucci*, 921 F.3d 89, 94-95 (2d Cir. 2019). If the evidentiary submissions show the plaintiff's explanation for why he was in imminent danger to be "ridiculous," "conclusory," or "without foundation[,]" the district court may revoke the plaintiff's previously granted IFP status. *Id.* at 95, 97; *see also* ⚑*Chavis*, 618 F.3d at 170 ("A court may find that a complaint does not satisfy the 'imminent danger' exception if the complainant's 'claims of imminent danger are conclusory or ridiculous.' ") (quoting ⚑*Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003)); *Nelson v. Nesmith*, No. 9:06-CV-1177 (TJM/DEP), 2008 WL 3836387, at *5 (N.D.N.Y. Aug. 13, 2008) ("The imminent danger claimed by the inmate ... must be real, and not merely speculative or hypothetical."); *accord,* ⚑*Welch v. Selsky*, No. 9:06-CV-0812 (LEK/DEP), 2008 WL 238553, at *5 (N.D.N.Y. Jan 28, 2008); *Gamble v. Maynard*, No. 9:06-CV-1543 (DNH/DEP), 2008 WL 150364, at *4 (N.D.N.Y. Jan. 14, 2008).

## IV. ANALYSIS

### A. Plaintiff's Preliminary Injunction Motion

**\*6** As noted, plaintiff seeks preliminary injunctive relief based on alleged meal and hygiene deprivations, as well as unwanted force used against him. Upon review, the Court finds that plaintiff has failed to meet the heavy burden for a mandatory injunction.

As an initial matter, insofar as plaintiff seeks injunctive relief based on the deprivation of hygiene supplies and conditions of his cell, plaintiff's underlying Eighth Amendment claim against defendants Woody and Uhler based on the alleged denial of cleaning and personal hygiene supplies was previously dismissed. *See* September 2021 Order at 15-17. Thus, there is no possibility that plaintiff can establish a likelihood of success on the merits of this claim. [6]

Insofar as plaintiff seeks injunctive relief based on an alleged use-of-force incident that occurred on July 1, 2021, the law is well-settled that a finding of irreparable harm cannot be based solely on past conduct. *See Haden*, 2016 WL 589703, at \*1; *McKenna v. Wright*, No. 01-CV-6571, 2002 WL 338375, \*4 (S.D.N.Y. Mar. 4, 2002) ("[S]ince the movant must show that the alleged irreparable harm is imminent, and not remote or speculative, ... a finding of irreparable harm [cannot be based] solely on past conduct...."). Moreover, plaintiff has failed to offer any evidence showing that he is likely to suffer imminent irreparable harm in the absence of injunctive relief imposed against any of the defendants who remain in this case. Indeed, plaintiff has not offered any evidence showing that any of the defendants named in the complaint were involved in any alleged use-of-force incidents after July 1, 2021. [7]

**\*7** Finally, insofar as plaintiff seeks injunctive relief based on alleged meal deprivations, he has failed to make a clear showing that he is entitled to the relief requested, or that extreme or very serious damage will result from a denial of the relief he seeks. In reaching this conclusion, the Court rejects as incredible plaintiff's representation that he did not receive breakfast on July 2 and breakfast and lunch on July 4, 2021, and therefore missed nine consecutive meals between July 2 and July 4, 2021, which caused him physical harm. [8] Instead, the Court finds that plaintiff received breakfast on July 2 and breakfast and lunch on July 4, 2021, which is supported by (1) the log book entries made contemporaneously with meal rounds, which do not reflect that plaintiff missed breakfast on July 2 and breakfast and lunch on July 4, 2021, (2) the testimony of Eric Marshall that the absence of a notation regarding a missed meal means that the meal was delivered

and accepted, (3) the absence of any credible explanation for why only these three meals would not be recorded as refused, (4) the video recordings produced by plaintiff, and (5) plaintiff's medical records, which show that he failed to comply with visitation requirements when a medical professional attempted to meet with him on July 5, 2021. *See* Dkt. No. 22-4 at 13, 21; Dkt. No. 23 at 11; Hrg. T; Dkt. No. 58. [9]

The Court also rejects as incredible plaintiff's representation that all of the meals he missed were a result of officials refusing him food. First, plaintiff was provided with forty-three (43) video recordings of activity outside of his cell, including recordings from July 3 and July 4, 2021. *See* Dkt. No. 50. Although plaintiff states that he missed breakfast, lunch, and dinner on July 4, 2021, the only video recording presented to the Court for that day shows plaintiff being extracted from his cell. *See* Dkt. No. 58, Exhibit F. If the video recordings from that day supported plaintiff's version of events, he certainly would have produced them. Second, one of the two video recordings presented to the Court for July 3, 2021, shows an official standing outside of plaintiff's cell with a food tray, and walking away only after plaintiff refused to turn on the lights in his cell. *See* Dkt. No. 58, Exhibit D. [10] Third, as noted, the video footage from the exterior of plaintiff's cell on June 6 and July 7, 2021 – dates when plaintiff testified that he was denied meals – clearly shows that corrections officials offered him meals, which he refused. See Dkt. No. 58, Exhibits A, G.

**\*8** Additionally, by plaintiff's own account, during the six-week period between October 1 and November 15, 2021, when he submitted his response for filing, he missed a total of only six meals. Dkt. No. 28 at 6. Furthermore, plaintiff's medical records, which cover a time period through August 17, 2021, are devoid of any evidence showing that plaintiff suffered any significant adverse health effects from missed meals. Dkt. No. 23.

In light of the foregoing, plaintiff's First and Second Preliminary Injunction Motions are denied. [11]

### B. Defendants' Cross-Motion to Revoke Plaintiff's IFP Status

The Court initially found that the allegations in the complaint were sufficient to plausibly suggest that plaintiff was under imminent danger of physical injury when he signed his complaint on July 4, 2021. In reaching this determination, the

Court highlighted three key allegations. First, the complaint alleged that plaintiff was denied ten out of eleven meals between July 1 and July 4, 2021, and confined in an unsanitary cell without cleaning supplies, toothpaste, or a toothbrush for weeks leading up to, and through, this time period. *See* September 2021 Order at 5-6 (citing Compl. at 2, 5). [12] Second, the complaint alleged that plaintiff has experienced "severe stomach pains, physical weakness, headaches, nuasea [sic], and mental anguish" as a result of missed meals, and "extreme and constant pain" as a result of tooth decay. *Id.* at 6 (citing Compl. at 2, 4). Third, the complaint in *Bradshaw v. Gordon*, of which the Court took judicial notice, alleged that plaintiff "suffers from a pre-existing stomach condition" and has been "instructed by medical staff to eat [unleavened] bread with [his] prescribed medication to help reduce pains and the symptoms[.]" *Id.* at 6 n.4. Taken together, these allegations plausibly suggested that (1) plaintiff faced a unique risk of serious physical harm if he missed multiple consecutive meals, based on his stomach condition and need to take his prescribed medication with food, (2) this unique risk had not dissipated at the time the complaint was filed, (3) a potential existed for plaintiff to experience a prolonged denial of meals, and (4) plaintiff separately faced a risk of serious physical harm from tooth decay.

As discussed more fully below, the record now before the Court makes clear that (1) plaintiff did not face a unique risk of serious physical harm from missing multiple consecutive meals between July 1 and July 4, 2021, (2) there was no effort to cover up plaintiff's missed meals, (3) plaintiff had access to medical treatment during the relevant time period, which he never pursued for either withheld meals or tooth decay, (4) plaintiff was never at risk of missing more than nine consecutive meals without receiving mandatory medical treatment, and (5) the alleged harm had dissipated by the time plaintiff submitted his complaint for filing.

### 1. Imminent Danger

**\*9** As noted, "for a prisoner to qualify for the imminent danger exception, the danger must be present when he *files* his complaint–in other words, a three-strikes litigant is not excepted from the filing fee if he alleges a danger that has dissipated by the time a complaint is filed." *Pettus v. Morgenthau*, 554 F.3d 293, 296 (2d Cir. 2009) (emphasis added); *see also Polanco v. Hopkins*, 510 F.3d 152 (2d Cir. 2007) (finding that imminent danger claims must be evaluated

at the time the complaint is filed, rather than at the time of the events alleged). "Under the 'prison mailbox rule,' the date of filing is deemed to be the date that the prisoner–plaintiff delivered his complaint to a prison guard for mailing." *Chavis v. McCulloch*, No. 9:20-CV-0435 (DNH/CFH), 2020 WL 5051571, at \*1 (N.D.N.Y. Aug. 27, 2020). Ordinarily, the date of delivery to a prison guard is presumed to be the date that the complaint was signed. *Id.* (citing *Houston v. Lack*, 487 U.S. 266, 276 (1988)).

Insofar as the complaint alleges that plaintiff faced an ongoing risk of harm at the time of filing as a result of meal deprivations, as discussed above, the credible evidence now before this Court shows that (1) plaintiff missed only five consecutive meals, and a total of seven out of twelve meals between July 1 and July 4, 2021, and (2) on the day the complaint was signed, plaintiff received both breakfast and lunch. In other words, at the time of filing, plaintiff was aware that he did not face an imminent risk of serious physical harm. However, plaintiff nevertheless submitted a misleading sworn complaint to the Court suggesting that he remained at risk of harm. *See* Compl., ¶ 40.

While such allegations present Rule 11 issues, more importantly for purposes of defendants' motion to revoke, there can be no doubt that plaintiff did not face an *imminent risk* of serious physical harm due to a continuous deprivation of food over a three-and-a-half-day period when he submitted his complaint to a corrections officer (and thus "filed" it with the Court) on the morning of July 5, 2021. Instead, plaintiff experienced only past harm, which had dissipated by the time he delivered his complaint for filing.

Insofar as plaintiff seeks to base his "imminent danger" claim on allegations that he was deprived of dental hygiene supplies, the log entries for the period July 1 to July 5, 2021, show that toothpaste and toothbrushes were distributed to inmates in plaintiff's cell block area on July 4, 2021. Dkt. No. 22-4 at 22. Moreover, the medical records adduced by defendants do not reflect that plaintiff ever complained about tooth decay or other harm associated with his teeth. *See* Dkt. No. 23. In addition, plaintiff has not offered any documentary evidence in support of his allegations that (1) he was denied a toothbrush and toothpaste between June 11 and July 4, 2021, and (2) his teeth began to decay as a result. Indeed, plaintiff failed to address this issue in either his response to defendants' cross-motion to revoke his IFP status or testimony during the evidentiary hearing. Thus, the Court also has no basis to conclude that plaintiff faced an *imminent*

*risk* of serious physical harm due to a continuous deprivation of dental hygiene supplies in the weeks leading up to when he submitted his complaint to a corrections officer (and thus "filed" it with the Court) on the morning of July 5, 2021. [13]

**\*10**  Lastly, insofar as plaintiff seeks to base his "imminent danger" claim on allegations that he was assaulted on July 1, 2021, the allegations in the complaint do not plausibly suggest that at the time of filing, plaintiff faced a continued risk of harm from the officials allegedly involved in the use-of-force events. Rather, plaintiff's allegations of harm associated with the alleged use-of-force incident are entirely backward-looking. [14] Thus, the Court also has no basis to conclude that plaintiff faced an *imminent risk* of serious physical harm at the time of filing due to the alleged use-of-force event that occurred three days earlier. *See Malik*, 293 F.3d at 562-63 ("Because § 1915(g) uses the present tense in setting forth the imminent danger exception, it is clear from the face of the statute that the danger must exist at the time the complaint is filed[,]" and that the exception does not apply to "those harms that had already occurred." (internal quotation marks and citations omitted)); *Lewis v. Sullivan*, 279 F.3d 526, 531 (7th Cir. 2002) (The imminent danger exception is available "for genuine emergencies," where "time is pressing" and "a threat ... is real and proximate."); *Martin v. Shelton*, 319 F.3d 1048, 1050 (8th Cir. 2003) ("[T]he exception focuses on the risk that the conduct complained of threatens continuing or future injury, not on whether the inmate deserves a remedy for past misconduct."); *see also Randolph v. New York State Corr. Facility*, No. 9:19-CV-1547 (BKS/CFH), 2020 WL 132273, at \*3 (N.D.N.Y. Jan. 13, 2020) (finding that corrections officer's alleged assault on the plaintiff on December 2, 2019, failed to plausibly suggest that plaintiff was in "imminent danger" when he filed his complaint on December 16, 2019, because the complaint did not allege that plaintiff "feared 'physical injury' from anyone when he signed his Complaint"); *Burgess v. Conway*, 631 F. Supp. 2d 280, 283 (W.D.N.Y. 2009) ("[The] [p]laintiff has not made a sufficient showing of imminent physical danger to qualify for the exception. He simply alleges that he has been assaulted in the past, and there are no allegations in the complaint indicating that another attack is imminent."); *Robinson v. Mawer*, No. 08-CV-0353, 2008 WL 1986239, at \*2 (W.D. Mich. May 2, 2008) (allegation that plaintiff had been assaulted by prison guards on April 8, 2008, coupled with allegation that plaintiff was not able to "defend himself" from the prospect of future such assaults, did not constitute

an allegation that plaintiff was in "imminent danger" as of the date of filing of plaintiff's complaint, which occurred when complaint was signed three days later, on April 11, 2008).

In short, the record now before the Court makes clear that plaintiff did not face an ongoing risk of future harm at the time he filed his complaint in this action. For this reason alone, plaintiff's IFP status must be, and is, revoked. [15]

### 2. Serious Physical Injury

Even if the Court were to assume that plaintiff suffered discomfort at the time of filing because of the meals he missed, as noted, a three strikes prisoner must show that he faced "an imminent danger of serious physical injury" at the time he submitted his complaint for filing in order to proceed IFP. 42 U.S.C. § 1915(g). Although the term "serious physical injury" is not expressly defined in Section 1915(g), several courts have made clear that something more than temporary discomfort associated with a limited number of missed meals is necessary to satisfy the requirement. *See, e.g., Daker v. Bryson*, 784 Fed. App'x 690, 693 (11th Cir. Aug. 8, 2019) (per curiam) (finding that a plaintiff alleging denial of nutritionally adequate food and weight loss did not establish imminent danger); *Sims v. Caruso*, No. 11-CV-92, 2011 WL 672232, at \*2 (W.D. Mich. Feb. 18, 2011) ("The fact that Plaintiff has lost some weight, standing alone, falls short or establishing serious physical injury"); *Hernandez v. Ventura County*, No. 09-CV-7838, 2010 WL 3603491 (C.D. Cal. July 27, 2010) (finding that a claim that food practices at jail caused inmate to lose a significant amount of weight was insufficient to demonstrate "serious physical injury" under § 1915(g) where the inmate did not allege that such practices caused or threaten to cause him to go hungry, to suffer malnutrition, or to suffer any negative health consequences), *report and recommendation adopted by* 2010 WL 3603485 (C.D. Cal. Sept. 6, 2010); *Sayre v. Waid*, No. 08-CV-142, 2009 WL 249982, at \*2 (N.D. W.V. Feb. 2, 2009) ("[W]eight loss, in and of itself, is not indicative of a serious physical injury...."); *Mateo v. Vosbrink*, No. 06-CV-115, 2006 WL 2038499, at \*2 (N.D. Fla. July 18, 2006) ("The fact that Plaintiff is constantly hungry and suffers hunger pangs does not constitute a serious physical injury...."); *cf. Jackson v. Marks*, 722 Fed. App'x 106, 107 (2d Cir. 2018) (concluding that inmate-plaintiff's allegations of "missing approximately half of his weekly meals" over a period of approximately one year, which "caused him to suffer weight loss, stress, and

hunger[,]" were sufficient to "meet the exception to the three-strikes rule because the allegations of deprivations of food were prolonged and substantial" (emphasis added)); *Taylor v. Walker*, No. 07-CV-706, 2007 WL 4365718, at *2 (S.D. Ill. Dec. 11, 2007) ("Because Plaintiff may not create the 'imminent danger' required by § 1915(g) by commencing a hunger strike and because there is no indication that Plaintiff's hunger strike causes 'serious physical injury'-due to the timely intervention of prison officials and Plaintiff's voluntary cessation of said strikes-Plaintiff has not satisfied the requirements of § 1915(g) so as to proceed in forma pauperis in this action.").

**\*11** In support of their cross-motion, defendants have adduced record evidence showing the following: (1) plaintiff refused each of the meals that he did not receive between July 1 and July 4, 2021; (2) nurses made rounds in plaintiff's cell block area between July 1 and July 5, 2021; and (3) DOCCS requires that any inmate who misses nine consecutive undergo a medical evaluation. Dkt. No. 22-2; Dkt. No. 22-3; Dkt. No. 22-4; Dkt. No. 22-6; Dkt. No. 23.

In response, plaintiff attempts to refute some of these facts, and minimize the significance of others. For example, plaintiff states that the named defendants falsely recorded in the log books that he refused meals when in actuality these officials refused to provide those meals to him, and failed to properly document that he missed certain meals. Dkt. No. 28 at 4-5. Plaintiff also states that, although nurses made rounds through his cell block area, when medical staff walked the gallery to distribute medication and collect sick call slips on July 4, 2021, he "shouted" that he had not eaten for three consecutive days, but was prevented by unidentified "officers" from communicating with medical staff. *Id.* at 5. In addition, plaintiff states that on July 5, 2021, the nurse that walked the gallery did not stop at his cell for sick call or to check on his well-being. *Id.*

As noted, the Court finds plaintiff's claim that the log entries were falsified to be entirely incredible. In addition, insofar as plaintiff has attempted to create a factual dispute regarding an inability to report missed meals to medical staff and/or obtain medical care, the Court declines to accept plaintiff's statement that he was prevented from communicating with medical staff between July 1 and July 5, 2021, for at least two reasons.

First, the log book entries expressly state that nurses made rounds between July 1 and July 5, 2021. Dkt. No. 22-4 at 8-26 (noting morning and evening "nurse on rounds", "meds on

rounds", "med run", and "Jackson ... refuse meds"). It strains credulity to believe that corrections officers would have inconsistently prevented nurses from speaking to inmates during rounds, and then falsely logged successful medication "runs" and an inmate's refusal of medication.

Second, the ambulatory health records submitted by defendants show that plaintiff received medical treatment on July 1 and July 2, 2021, and a medical professional attempted to visit plaintiff at his cell in response to a sick call request on the morning of July 5, 2021. Dkt. No. 23 at 11-12. The latter record also notes that plaintiff was "non-compliant" with visitation procedures. *Id.* at 11. In other words, plaintiff was undoubtedly able to communicate with medical staff between July 1 and July 5, 2021.

Similarly, insofar as plaintiff has attempted to create a factual dispute regarding medical staff's willingness to treat him, the Court declines to accept plaintiff's statement that nurses ignored his requests for treatment on July 4 and July 5, 2021, for several reasons.

First, plaintiff's testimony that a nurse ignored his verbal complaints on July 4, 2021, was entirely incredible. [16] Second, the Court can conceive of no logical explanation why medical staff would have been willing to render treatment to plaintiff on July 1 and July 2, 2021, as documented, yet decided to ignore his requests for treatment two days later. Third, and relatedly, the Court can conceive of no logical explanation why a medical professional would have documented that plaintiff refused to comply with visitation protocol on July 5, 2021, if that person truly sought to deny plaintiff medical treatment. Fourth, the documentation regarding the visit on that day indicates that plaintiff refused to turn on the lights in his cell. *See* Dkt. No. 23 at 11. This statement is consistent with video evidence submitted by plaintiff, which shows that he did not turn on the lights in his cell when requested on July 3, 2021. *See* Dkt. No. 58, Exhibit D.

**\*12** In light of the foregoing, even assuming that plaintiff was denied meals between July 1 and July 4, 2021, [17] the Court has no reasonable basis to conclude from the pleadings and record evidence adduced by the parties that he was unable to communicate any adverse health effects associated with missed meals to medical staff. Moreover, Nurse Brenda Holcombe, who worked at Upstate Correctional Facility during the relevant time period, testified that, if an inmate advises a nurse that he is in danger, the nurse is required

to report the inmate's concern "up the chain[.]" Hrg. T. Nurse Holcombe further testified that, if an inmate expresses concern for their safety to a nurse, or advises a nurse that he is not eating or being fed, the matter is documented in the inmate's medical records. *Id.* Thus, according to Nurse Holcombe (whose testimony the Court finds credible), had plaintiff expressed concerns for his health or safety, or complained about not being fed, the issue would have been documented and addressed.

Plaintiff's decision not to express concerns to medical staff regarding his health – or to comply with visitation procedures on July 5, 2021 – is therefore telling as to his state of mind at the time, as is his medical file and hearing testimony, which, together show that he voluntarily stopped taking his prescribed stomach medication on June 4, 2021–after it was ordered for him the previous day–based on his belief that the medication was "not helping[.]" Dkt. No. 23 at 13; Hrg. T. [18] These facts make clear that plaintiff (1) did not need food to take his prescribed medication and/or did not need his prescribed medication to alleviate a serious stomach condition when he missed meals between July 1 and July 4, 2021, (2) did not believe that his missed meals presented a condition of urgency worthy of reporting to medical staff and/or serious enough to comply with visitation protocols, and (3) had not suffered any serious adverse health consequences as a result of the meals he missed. In other words, it is now clear to the Court that plaintiff did not face a unique risk of *serious physical harm* at the time he commenced this action, regardless of the number of meals he missed or the reason for missing them.

 **\*13**  Moreover, the DOCCS Directive on Inmate Hunger Strikes indicates that an inmate who voluntarily refuses to eat nine consecutive meals is deemed to be "on a hunger strike." Dkt. No. 22-4 at 30. The Directive further indicates that an inmate on a hunger strike is "referred to Health Services and to the [Office of Mental Health] staff for counseling and clinical assessment to determine the cause of the inmate's refusal to eat." *Id.* at 31. [19]

Because defendants logged plaintiff's missed meals, he was never at risk of missing more than nine consecutive meals before receiving mandatory medical treatment. [20] Thus, it is also now clear to the Court that this is not a case of a potential cover up of meal deprivations that could have continued for a prolonged period of time, as the allegations in the complaint suggest.

For all of these reasons, based on the record evidence presented by the parties, the Court finds that, at the time plaintiff filed his complaint (and even at the time he signed it), he did not face an imminent risk of serious physical injury. As a result, revocation of plaintiff's IFP status is appropriate. Accordingly, defendants' cross-motion to revoke plaintiff's IFP status is granted.

## V. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's First Preliminary Injunction Motion (Dkt. No. 4) and Second Preliminary Injunction Motion (Dkt. No. 10) are **DENIED** for the reasons stated above; and it is further

**ORDERED** that defendants' Cross-Motion to Revoke plaintiff's IFP status (Dkt. No. 22) is **GRANTED** for the reasons stated above; and it is further

**ORDERED** that plaintiff's IFP status is **REVOKED**; and it is further

**ORDERED** that, if plaintiff wishes to proceed with this action, he must pay the Court's filing fee of four hundred and two dollars ($402.00) in full within **THIRTY (30) DAYS** of the date of this Decision and Order; and it is further

**ORDERED** that, if plaintiff timely pays the filing fee in full, the Clerk of the Court shall return the file to this Court for review; and it is further

**ORDERED** that, if plaintiff fails to timely pay the filing fee in full, the Clerk shall enter judgment **DISMISSING** this action without prejudice, without further order of this Court; and it is further

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 504976

**Footnotes**

1    Roughly five weeks before this action, plaintiff commenced a prior action in this District. *Bradshaw v. Gordon*, No. 21-CV-0645 (N.D.N.Y. filed June 3, 2021) ("*Bradshaw v. Gordon*"). Initially, this action was assigned to United States District Judge David N. Hurd and United States Magistrate Judge Therese Wiley Dancks. However, by Order entered on July 27, 2021, it was reassigned to the undersigned and United States Magistrate Judge Miroslav Lovric based on a determination that it is related to *Bradshaw v. Gordon* under the District's General Order 12. *See* Dkt. No. 5.

2    Even assuming plaintiff was permitted to file the amended complaint as of right, even the most liberal constructions of the amended complaint does not yield factual allegations plausibly suggesting an imminent danger of serious physical injury at the time of the filing of this action (on July 4, 2021) that are substantively different from those alleged in his original complaint. (Compare Dkt. No. 1 with Dkt. No. 9.) For this reason, when summarizing his allegations and claims below in Part II.A. of this Decision and Order, the Court does not treat the factual allegations of plaintiff's amended complaint as substantively different from those of his original complaint. The Court does, however, acknowledge certain new allegations contained in the amended complaint.

3    The actions in which plaintiff acquired strikes are as follows: (1) *Bradshaw v. McQueen*, No. 08-CV-5518, Dkt. No. 32 (S.D.N.Y. Feb. 11, 2010) (dismissing complaint for failure to state a claim upon which relief may be granted); (2) *Bradshaw v. Brown*, No. 13-CV-4308, Dkt. No. 52 (E.D.N.Y. May 18, 2017) (Mandate dismissing appeal of dismissal order on grounds that it lacked "an arguable basis either in law or in fact"); (3) *Bradshaw v. The City of New York*, No. 15-CV-2166, Dkt. No. 58 (E.D.N.Y. Aug. 22, 2017) (dismissing complaint for failure to state a claim upon which relief may be granted); and (4) *Bradshaw v. The City of New York*, No. 15-CV-2166, Dkt. No. 62 (E.D.N.Y. Nov. 16. 2018) (Mandate dismissing appeal on grounds that it lacked "an arguable basis either in law or in fact").

4    "28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010). "Although an indigent, incarcerated individual need not prepay the filing fee ... at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

5    The manifest intent of Congress in enacting Section 1915(g) was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates. *Tafari v. Hues*, 473 F.3d 440, 443-44 (2d Cir. 2007). The question of whether a prior dismissal is a "strike" is a matter of statutory interpretation and, as such, is a question for the court to determine as a matter of law. *Tafari*, 473 F.3d at 442-43.

6    Plaintiff's statements related to being denied hygiene supplies and confined in an unsanitary cell are also generic and unsupported by any documentary evidence. Indeed, despite filing numerous grievances between June and November, 2021, where plaintiff complained about a host of issues, not one of them mentions that he was denied hygiene supplies or confined in an unsanitary cell. *See* Dkt. No. 28 at 22-24, 29-38. Additionally, plaintiff's allegation in his amended complaint that he was not provided with dental hygiene supplies until July 11, 2021, is contradicted by the log book entries filed by defendants, which show that on July 4, 2021, toothpaste and toothbrushes were provided to all the inmates in plaintiff's cell block area. *See* Dkt. No. 22-4 at 22. Furthermore, despite representing in his motion papers that the denial of toothpaste and a toothbrush has resulted in tooth decay and tooth aches, plaintiff has failed to offer any documentary

evidence showing complaints about his teeth, and the medical records adduced by the defendants do not show that any such complaints were made. *See* Dkt. No. 23. Thus, plaintiff has also failed to establish that he is likely to suffer irreparable harm associated with his hygiene in the absence of injunctive relief.

7   Plaintiff asserts that he was assaulted on July 12, 2021, and on occasions thereafter, through October 31, 2021. *See* Dkt. No. 28 at 3. However, plaintiff has not offered any proof that any of the individuals allegedly involved in the use-of-force incident on July 1 were involved in any of these subsequent use-of-force incidents. Additionally, plaintiff acknowledges that these use-of-force incidents are the subject of another one of his pending actions. *See* Dkt. No. 28 at 3; *Bradshaw v. Marshall*, No. 21-CV-0826 (N.D.N.Y. filed July 21, 2021). In that action, plaintiff previously requested injunctive relief based on these use-of-force incidents, and that request was denied by the Honorable Mae A. D'Agostino. *See Bradshaw v. Marshall*, No. 21-CV-0826, Dkt. No. 44.

8   In finding plaintiff's hearing testimony on this issue lacking in credibility, the Court relies on the following: (1) plaintiff's unconvincing mannerisms and body language (including, but not limited to, his demeanor, tone of voice, facial expressions, and eye contact or lack thereof) during the relevant portions of his testimony; (2) the inconsistency if not contradiction between plaintiff's testimony that being deprived of the nine meals in question caused him dangerous weight loss and his testimony or sworn representation that (a) currently he weighs 151 pounds, more than 20 pounds less than he weighed during the time in question, and (b) in July of 2020, he went on (and survived) a "hunger strike" (*see Bradshaw v. Annucci*, No. 21-CV-901, Dkt. No. 1 at 13, ¶ 115 (N.D.N.Y. Aug. 11, 2021)); (3) the fact that defendants adduced documentary evidence (e.g., Dkt. Nos. 22-2, 22-3, 22-4, 22-6, Exhibit D-1) and/or witness testimony (i.e., the testimony of Nurse Brenda Holcombe) that credibly undermined the relevant portions of plaintiff's hearing testimony; (4) the inconsistency if not contradiction between plaintiff's testimony that he never once refused a meal and the video footage of the exterior of plaintiff's cell on June 6 (Dkt. No. 58, Exhibit A) and July 7, 2021 (Dkt. No. 58, Exhibit G), which clearly shows that corrections officials offered him meals, which he refused; and (5) the fact that plaintiff was provided with video recordings of the exterior of his cell on July 4, 2021, which is a date he claims he did not receive any meals, yet he produced only one video from that day (Dkt. No. 58, Exhibit F), which does not show even one, let alone more than one, meal deprivation.

9   Video recordings of two meal deliveries in plaintiff's cell block area on July 3, 2021, are consistent with the log book entries for this date, which indicate that plaintiff was not provided with meals. *Compare* Dkt. No. 22-4 at 17 *with* Dkt. No. 58, Exhibits D and E. The consistency between the entries and the recording, as well as the reality that corrections officers know that meal deliveries are recorded, solidifies the Court's finding that the log entries are reliable. Moreover, defendant Hanna provided a sworn statement indicating that she was responsible for delivering breakfast and lunch meals to plaintiff's cell block area on July 2 and July 3, 2021. Dkt. No. 22-4, ¶¶ 7, 10, 25-26. The Court can conceive of no logical explanation why this official would accurately record that plaintiff did not receive breakfast and lunch on July 3, 2021, as confirmed by video evidence, yet falsely indicate that he received breakfast on July 2, 2021, particularly when this official was undoubtedly aware that these meal deliveries are recorded on video.

10   The other recording from that day appears to show the same female official who asked plaintiff to turn on the light in his cell earlier in the day pass plaintiff's cell when delivering meals. *See* Dkt. No. 58, Exhibit E.

11   In reaching this determination, the Court is mindful that plaintiff has filed several letters since responding to defendants' cross-motion wherein he repeatedly complains of meal deprivations and tampering. Dkt. Nos. 52, 53, 60, 62, 64. These unsworn submissions (and unauthenticated exhibits), however, cannot be considered record evidence in support of the requested relief, nor do they make it "more or less probable" (for purposes of Fed. R. Evid. 401) that plaintiff suffered a deprivation of meals *at the time of the filing of this action* (the relevant time period).

12    The complaint also alleged that the named defendants "intend to continue to deprive plaintiff food in complete disregard for the substantial risk of harm to [his] physical and mental health." Compl., ¶ 40.

13    Of course, plaintiff also cannot base his imminent danger claim on allegations related to the denial of dental hygiene supplies because his underlying Eighth Amendment claim, which was brought against only defendants Woody and Uhler, was dismissed in the September 2021 Order. *See* 🔖 *Pettus v. Morgenthau,* 554 F.3d 293, 296, 298-99 (2d Cir. 2009) ("🔖 § 1915(g) allows a three-strikes litigant to proceed [in forma pauperis] only when there exists an adequate nexus between the claims he seeks to pursue and the imminent danger he alleges.... In deciding whether such a nexus exists, [courts must] consider (1) whether the imminent danger of serious physical injury that a three-strikes litigant alleges is fairly traceable to unlawful conduct asserted in the complaint and (2) whether a favorable judicial outcome would *redress* that injury." (emphasis in original)).

14    The amended complaint alleges that one of the "Doe" officials involved in the use-of-force event on July 1, 2021, stated, while subjecting plaintiff to unwanted force, "You been f**cked in this jail before. It's more to come." Am. Compl. at 4. Setting aside the generic nature of this purported threat, plaintiff does not allege that this official, or anyone else, threatened or attempted to harm him physically in the days between this incident and the filing of the complaint. Moreover, defendant Phillips, who was allegedly involved in this use-of-force incident, testified that he had never previously encountered plaintiff. *See* Hrg. T.

15    As discussed below, there is also no credible evidence in the record showing that plaintiff continued to suffer from injuries based on the aforementioned past harm, for which he sought and was refused treatment at the time of filing.

16    In finding plaintiff's hearing testimony on this issue lacking in credibility, the Court relies on the following: (1) plaintiff's unconvincing mannerisms and body language (including, but not limited to, his demeanor, tone of voice, facial expressions, and eye contact or lack thereof) during the relevant portions of his testimony; (2) the inconsistency if not contradiction between plaintiff's testimony that he wished to speak to a medical professional on July 4, 2021, and plaintiff's medical records showing that he refused to comply with visitation protocol when a medical professional attempted to visit him on the morning of July 5, 2021 (Dkt. No. 23 at 11); (3) the fact that plaintiff was provided with video recordings of the exterior of his cell on July 4, 2021, which is a date a nurse allegedly ignored his verbal complaints, yet he produced only one video from that day (Dkt. No. 58, Exhibit F), which does not show any such event.

17    The Court notes that Plaintiff has persistently argued that proof exists that he was denied meals between July 1 and July 4, 2021, in the form of proof that he was denied meals at times *after* those dates. However, generally, subsequent conduct is of little if any relevance (under Fed. R. Evid. 401) in proving prior conduct. *See* Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."); Fed. R. Evid. 404(b) (1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.."); *cf.* Fed. R. Evid. 407 (treating subsequent remedial measures as not admissible to prove culpable conduct).

18    The recording of plaintiff's belief that his medication was "not helping" is consistent with his allegations made in a complaint filed after this action was commenced. More specifically, in plaintiff's pursuit of claims unrelated to the claims asserted in this action, he swears (in a verified complaint) that he engaged (apparently voluntarily) in a hunger strike over a period of five days in July of 2020 at Mid-State Correctional Facility. *Bradshaw v. Annucci*, No. 21-CV-901, Dkt. No. 1 at 13, ¶ 115 (N.D.N.Y. Aug. 11, 2021). During this time, by his own admission, he had been prescribed the same medication that he claims needed to be taken with food to "reduce pains and the symptoms." Compl., ¶ 17; Dkt. No. 21 at 13, ¶ 73. The Court notes that this

KeyCite Blue Flag – Appeal Notification

Appeal Filed by   BRADSHAW v. GORDON,   2nd Cir.,   March 1, 2022

2022 WL 504974

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Jay BRADSHAW, Plaintiff,

v.

M. GORDON; Rondo; Mattias; McCartter;

J. Scott; and Orbegozo, Defendants.

9:21-CV-0645 (GTS/ML)

|

Signed 02/18/2022

**Attorneys and Law Firms**

DANIEL R. LeCOURS, ESQ., ELLIOT A. HALLAK, ESQ., HARRIS BEACH, PLLC, Counsel for Plaintiff, 677 Broadway, Suite 1101, Albany, NY 12207.

DAVID C. WHITE, ESQ., Ass't Attorney General, HON. LETITIA JAMES, Attorney General for the State of New York, Attorney for Defendants, The Capitol, Albany, NY 12224.

## DECISION AND ORDER

GLENN T. SUDDABY, Chief United States District Judge

## I. INTRODUCTION

**\*1**  On or about May 31, 2021, Plaintiff Jay Bradshaw commenced this action pro se by filing a civil rights complaint against numerous state employees of Upstate Correctional Facility pursuant to  42 U.S.C. § 1983 ("Section 1983"), together with an application to proceed in forma pauperis ("IFP"), and a motion for preliminary injunctive relief. Dkt. No. 1 ("Compl."); Dkt. No. 4 ("IFP Application"); Dkt. No. 2 ("Preliminary Injunction Motion"). By Decision and Order entered on July 23, 2021, this Court granted plaintiff's IFP Application in accordance with  28 U.S.C. § 1915(g) ("Section 1915(g)"), and, following review of the complaint pursuant to  28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), dismissed some of plaintiff's claims (and terminated some of the defendants), and directed service

and a response for the claims against the named defendants that survived sua sponte review, as well as the Preliminary Injunction Motion. Dkt. No. 7 ("July 2021 Order"). [1]

Thereafter, on September 12, 2021, plaintiff filed an amended complaint; [2] and counsel for the defendants filed an opposition to the Preliminary Injunction Motion and cross-motion to revoke plaintiff's IFP status, which plaintiff subsequently opposed. Dkt. No. 15 ("Am. Compl."); Dkt. No. 16 ("Opposition to Preliminary Injunction Motion and Cross-Motion to Revoke Plaintiff's IFP Status"); Dkt. No. 21 ("Response to Cross-Motion to Revoke IFP Status"). By Order entered on November 4, 2021, the Court determined that an evidentiary hearing on defendants' cross-motion to revoke plaintiff's IFP status was necessary to decide certain issues raised (and/or not addressed) by the parties in their submissions. Dkt. No. 23. At the time of the Court's ruling, a cross-motion to revoke plaintiff's IFP status was also pending in *Bradshaw v. Uhler. Bradshaw v. Uhler*, Dkt. No. 22. As a result, the Court also issued an Order in that case on November 4, 2021, scheduling an evidentiary hearing, consolidated with the evidentiary hearing in this case. *Id.*, Dkt. No. 25.

**\*2**  Following these Orders, counsel was appointed for, and appeared on behalf of, plaintiff. Dkt. Nos. 25, 26, 27; *see also Bradshaw v. Uhler*, Dkt. Nos. 29, 30, 31. On December 15, 2021, the Court held the consolidated evidentiary hearing.

Currently before the Court are the following: (1) plaintiff's Preliminary Injunction Motion; and (2) defendants' Cross-Motion to Revoke Plaintiff's IFP Status.

## II. BACKGROUND

### A. Overview of the Complaint

Generally speaking, plaintiff's complaint alleges that various corrections officials from Upstate Correctional Facility denied him nine out of ten meals over a three-and-a-half-day period between May 28 and May 31, 2021, in retaliation for him filing a grievance against certain of these officials on May 20, 2021. Compl. at 1-3. The complaint further alleges that plaintiff "suffers from a pre-existing stomach condition" for which he has been "instructed by medical staff to eat [unleavened] bread with the prescribed medication to help reduce pains and the symptoms[,]" and has experienced "severe aggravated and unusual stomach pains, headaches, physical weakness, [and] mental pain and suffering as a result

of being deprived food." *Id.* at 2. Finally, the complaint vaguely alleges that defendant Corrections Officer Gordon "implied that plaintiff will eat at the officers discretion[,]" and that all of the named defendants "intend to continue to deprive plaintiff [of] meals in complete disregard for the substantial risk of harm to [his] health." *Id.*

### B. Initial Determination of Imminent Danger

Prior to commencing this action, plaintiff had filed at least nineteen other civil actions in the district courts in the Second Circuit since 2008. July 2021 Order at 3. In at least four of those actions, plaintiff acquired "strikes" as defined in 28 U.S.C. § 1915(g) (" Section 1915(g)"). [3] *Id.* at 4 n.5. Notwithstanding this determination, plaintiff's IFP Application was granted because the Court found that the allegations in the complaint were sufficient, albeit barely, to plausibly suggest that [plaintiff] was 'under imminent danger of serious physical injury' when he signed his complaint on May 31, 2021." *Id.* at 6. The Court, however, noted that "this is a preliminary finding which defendants are entitled to challenge or refute in future filings." *Id.* (stating further that "plaintiff's IFP status will be revoked if, as the case progresses, it is determined that he did not face 'imminent danger' when he commenced this action or is otherwise not entitled to proceed IFP").

### C. Overview of Defendants' Opposition and Cross-Motion, and Plaintiff's Response

**\*3** Defendants argue that plaintiff's Preliminary Injunction Motion should be denied because he has failed to establish that he will suffer irreparable harm in the absence of the preliminary injunctive relief that he seeks. Dkt. No. 16 at 7-8. In support of this argument, defendants have adduced record evidence showing that (1) plaintiff has never been denied meals at any point, (2) plaintiff was moved from cell 48 in C gallery to cell 18 in A gallery on June 11, 2021, (3) plaintiff has accepted all but two meals since August 23, 2021, and (4) plaintiff's medical records do not contain any indication that his health is at risk due to missed meals. Dkt. No. 16-2; Dkt. No. 16-3; Dkt. No. 16-4; Dkt. No. 16-5; Dkt. No. 16-6; Dkt. No. 16-7; Dkt. No. 17.

Defendants separately argue that plaintiff's IFP status should be revoked because he did not face imminent danger when he filed the complaint. Dkt. No. 16 at 8-9. In support of this position, defendants have adduced record evidence, including sworn statements, cell block log books, the New York State Department of Corrections and Community Supervision ("DOCCS") Directive on Inmate Hunger Strikes, and plaintiff's medical records, which show, among other things, that (1) plaintiff was offered meals between May 28 and May 31, 2021, which he refused, and (2) plaintiff received lunch and dinner meals on May 31, 2021. Dkt. No. 16-2; Dkt. No. 16-3; Dkt. No. 16-4; Dkt. No. 16-5; Dkt. No. 16-6; Dkt. No. 16-7; Dkt. No. 17.

In his response to defendants' cross-motion to revoke his IFP status, plaintiff has submitted a sworn statement wherein he attempts to refute certain factual information contained in defendants' documentary evidence, including the evidence showing that he refused meals between May 28 and May 31, 2021. Dkt. No. 21. Plaintiff also submitted certain exhibits with his response. Dkt. No. 21-1; Dkt. No. 22. In addition, plaintiff's complaint is verified. Compl. at 3.

### D. Evidentiary Hearing

The Court held an evidentiary hearing on defendants' motion to revoke plaintiff's IFP status on December 15, 2021. (Text Minute Entry filed Dec. 15, 2021.) At the hearing, the following four witnesses testified (and were cross-examined): (1) plaintiff; (2) Corrections Officer Michael Phillips; (3) Corrections Sergeant Eric Marshall; and (4) Nurse Brenda Holcombe. (*Id.*; Dkt. Nos. 37, 39.) In addition, the following eight exhibits were marked for identification: (1) Exhibit P-3 (Upstate Correctional Facility's SHU Incarcerated Individual Orientation Manual); (2) Exhibit P-4 (Declaration of Michael Phillips, dated October 6, 2021, and exhibits thereto); (3) Exhibit P-5 (Log Books for May 28-31, 2021, and July 1-5, 2021, Bates Stamped 000034-68); (4) Exhibit P-9 (Plaintiff's Supplemental Complaint, Case No. 21-CV-0776, dated September 18, 2021, and exhibits thereto); (5) Exhibit D-1 (Plaintiff's ambulatory health record); (6) Exhibit D-2 (Upstate Correctional Facility Cell Block 10 Logbooks); (7) Exhibit D-6 (Plaintiff's Complaint, Case No. 21-CV-0776); and (8) Exhibit D-9 (Plaintiff's Complaint, Case No. 21-CV-0645). (Text Minute Entry filed Dec. 15, 2021; Dkt. Nos. 41-42.) The hearing lasted approximately two-and-a-half hours. (Text Minute Entry filed Dec. 15, 2021.)

## III. RELEVANT LEGAL STANDARDS

### A. Motions for Injunctive Relief

Preliminary injunctive relief " 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore*

*v. Consolidated Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, 38 (2d Cir. 2010). To prevail on a motion for preliminary injunctive relief, a plaintiff must demonstrate irreparable harm and either a substantial likelihood of success on the merits of the claim, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *Id.* at 35; *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011). However, when the moving party seeks a mandatory injunction that alters the status quo by commanding a positive act, the burden is "even higher." *Cacchillo*, 638 F.3d at 405-06; *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Markets*, 598 F.3d at 35 n.4 (internal quotation marks omitted).

**\*4** " 'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.' " *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). Generally an alleged violation of a constitutional right creates a presumption of irreparable harm. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). However, speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983). Rather, a plaintiff seeking to satisfy the irreparable harm requirement must demonstrate that "absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Bisnews AFE (Thailand)*, 437 Fed. App'x at 58 (quoting *Faiveley*, 559 F.3d at 118); *Garcia v. Arevalo*, No. 93-CV-8147, 1994 WL 383238, at \*2 (S.D.N.Y. June 27, 1994) ("It is well settled that an allegation of the mere possibility of irreparable harm is insufficient to justify the drastic remedy of preliminary injunction.... A party who seeks the extraordinary remedy of a preliminary injunction

must show the alleged irreparable harm to be imminent, not remote or speculative, and the alleged injury to constitute one that is incapable of being fully remedied by monetary damages." (citations omitted)). A finding of irreparable harm cannot be based solely on past conduct. *Haden v. Hellinger*, No. 9:14-CV-0318, 2016 WL 589703, at \*1 (N.D.N.Y. Feb. 11, 2016).

The district court has wide discretion in determining whether to grant preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 511 (2d Cir. 2005). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994)) (other citations omitted).

## B. The "Three Strikes" Rule and Imminent Danger Exception

Where a plaintiff seeks leave to proceed IFP, the Court must determine whether the plaintiff has demonstrated sufficient economic need to proceed without prepaying, in full, the Court's filing fee of four hundred and two dollars ($402.00). [4] The Court must also determine whether the "three strikes" provision of Section 1915(g) bars the plaintiff from proceeding IFP and without prepayment of the filing fee. [5] More specifically, Section 1915(g) provides as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

The "imminent danger" exception protects a prison inmate exposed to potential "serious physical injury" from the consequences of his earlier mistakes in filing frivolous litigation. Congress enacted the imminent danger exception contained in the final phrase of § 1915(g) as a "safety valve" to prevent impending harms to prisoners otherwise barred from proceeding in forma pauperis. *Malik v. McGinnis*, 293 F.3d 559, 563 (2d Cir. 2002). "[F]or a prisoner to qualify for the imminent danger exception, the danger must be present when he files his complaint–in other words, a three-strikes litigant is not excepted from the filing fee if he alleges a danger that has dissipated by the time a complaint is filed." *Pettus v. Morgenthau*, 554 F.3d 293, 296 (2d Cir. 2009) (citation omitted); *see also Polanco v. Hopkins*, 510 F.3d 152 (2d Cir. 2007) (imminent danger claims must be evaluated at the time the complaint is filed, rather than at the time of the events alleged). In addition, " § 1915(g) allows a three-strikes litigant to proceed [in forma pauperis] only when there exists an adequate nexus between the claims he seeks to pursue and the imminent danger he alleges." *Pettus*, 554 F.3d at 296. In deciding whether such a nexus exists, the Second Circuit instructs the courts to consider "(1) whether the imminent danger of serious physical injury that a three-strikes litigant alleges is *fairly traceable* to unlawful conduct asserted in the complaint, and (2) whether a favorable judicial outcome would *redress* that injury." *Id.* at 298-99. Both requirements must be met in order for the three-strikes litigant to proceed in forma pauperis. *Id.*

**\*5** Generally speaking, the allegations relevant to the imminent danger inquiry "are those in which [plaintiff] describes physical injury, threats of violence, and deprivation of medical treatment." *Chavis v. Chappius*, 618 F.3d 162, 165 (2d Cir. 2010). Although the Second Circuit has cautioned against "an overly detailed inquiry into whether the allegations qualify for the exception," *id.* at 169-70 (quoting *Andrews v. Cervantes*, 493 F.3d 1047, 1055 (9th Cir. 2007)), when a defendant challenges a prisoner's claim of imminent danger, a district court may "reexamine" its provisional determination of imminent danger and "conduct a narrow evidentiary inquiry into the prisoner-litigant's fear of imminent danger" at the time of filing. *Shepherd v.*

*Annucci*, 921 F.3d 89, 94-95 (2d Cir. 2019). If the evidentiary submissions show the plaintiff's explanation for why he was in imminent danger to be "ridiculous," "conclusory," or "without foundation[,]" the district court may revoke the plaintiff's previously granted IFP status. *Id.* at 95, 97; *see also Chavis*, 618 F.3d at 170 ("A court may find that a complaint does not satisfy the 'imminent danger' exception if the complainant's 'claims of imminent danger are conclusory or ridiculous.' ") (quoting *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003)); *Nelson v. Nesmith*, No. 9:06-CV-1177 (TJM/DEP), 2008 WL 3836387, at \*5 (N.D.N.Y. Aug. 13, 2008) ("The imminent danger claimed by the inmate ... must be real, and not merely speculative or hypothetical."); *accord, Welch v. Selsky*, No. 9:06-CV-0812 (LEK/DEP), 2008 WL 238553, at \*5 (N.D.N.Y. Jan 28, 2008); *Gamble v. Maynard*, No. 9:06-CV-1543 (DNH/DEP), 2008 WL 150364, at \*4 (N.D.N.Y. Jan. 14, 2008).

## IV. ANALYSIS

### A. Plaintiff's Preliminary Injunction Motion

As noted in the July 2021 Order, plaintiff seeks a preliminary injunction directing defendants to "provide [him] meals and ... cease from all forms of retaliation against [him]." July 2021 Order at 19.

Upon review, the Court finds that plaintiff has failed to meet the heavy burden for a mandatory injunction.

As an initial matter, plaintiff admits that he was provided with lunch and dinner meals on the day he signed his complaint, Dkt. No. 21, ¶ 78, and the past allegations of misconduct stated in plaintiff's complaint, standing alone, are insufficient to support a finding of irreparable harm. *Haden*, 2016 WL 589703, at \*1. Moreover, defendants have introduced record evidence showing that plaintiff missed only two meals between August 23 and September 2, 2021, which plaintiff does not refute. Dkt. No. 16-7 at 40-82; Dkt. No. 21, ¶¶ 67-71. In fact, by plaintiff's own account, during the six-week period between August 24 and October 5, 2021, when plaintiff submitted his response for filing, he missed a total of only four meals, and that was because on each of these four occasions he refused the meal after it was delivered to him on an "unwrapped" tray. Dkt. No. 21, ¶¶ 66-71. Furthermore, plaintiff's medical records, which cover a time period through August 20, 2021, are devoid of any evidence showing that plaintiff suffered any significant adverse health effects from missed meals. Dkt. No. 17.

Simply put, plaintiff has not made a sufficient showing that he will suffer an injury that is neither remote nor speculative should his request for injunctive relief be denied. Accordingly, plaintiff's Preliminary Injunction Motion is denied. [6]

## B. Defendants' Cross-Motion to Revoke Plaintiff's IFP Status

The Court initially found that the allegations in the complaint were sufficient to plausibly suggest that plaintiff was under imminent danger of physical injury when he signed his complaint on May 31, 2021. In reaching this determination, the Court highlighted three key allegations. First, the complaint alleged that plaintiff "suffers from a pre-existing stomach condition" and has been "instructed by medical staff to eat [unleavened] bread with [his] prescribed medication to help reduce pains and the symptoms[.]" July 2021 Order at 5 (citing Compl. at 2). Second, the complaint alleged that plaintiff has experienced "severe aggravated and unusual stomach pains, headaches, physical weakness, [and] mental pain and suffering as a result of being deprived food." *Id.* at 5-6 (citing Compl. at 2). Third, the complaint alleged that defendant Gordon "implied that plaintiff will eat at the officers discretion[,]" and that all of the named defendants "intend[ed] to continue to deprive plaintiff [of] meals in complete disregard for the substantial risk of harm to [his] health." *Id.* Taken together, these allegations plausibly suggested that (1) plaintiff faced a unique risk of serious physical harm if he missed multiple consecutive meals, based on his stomach condition and need to take his prescribed medication with food, (2) this unique risk had not dissipated at the time the complaint was filed, and (3) a potential existed for plaintiff to experience a prolonged denial of meals.

**\*6** As discussed more fully below, the record now before the Court makes clear that (1) plaintiff did not face a unique risk of serious physical harm from missing multiple consecutive meals, (2) there was no effort to cover up plaintiff's missed meals, (3) plaintiff had access to medical treatment during the relevant time period, which he never sought, (4) plaintiff was never at risk of missing more than two additional meals without receiving mandatory medical treatment, and (5) the alleged harm had dissipated by the time plaintiff submitted his complaint for filing. In other words, plaintiff did not face an imminent danger of serious physical injury at the time he submitted his complaint for filing.

### 1. Imminent Danger

As noted, "for a prisoner to qualify for the imminent danger exception, the danger must be present when he *files* his complaint–in other words, a three-strikes litigant is not excepted from the filing fee if he alleges a danger that has dissipated by the time a complaint is filed." *Pettus v. Morgenthau*, 554 F.3d 293, 296 (2d Cir. 2009) (emphasis added); *see also Polanco v. Hopkins*, 510 F.3d 152 (2d Cir. 2007) (finding that imminent danger claims must be evaluated at the time the complaint is filed, rather than at the time of the events alleged). "Under the 'prison mailbox rule,' the date of filing is deemed to be the date that the prisoner–plaintiff delivered his complaint to a prison guard for mailing." *Chavis v. McCulloch*, No. 9:20-CV-0435 (DNH/CFH), 2020 WL 5051571, at *1 (N.D.N.Y. Aug. 27, 2020). Ordinarily, the date of delivery to a prison guard is presumed to be the date that the complaint was signed. *Id.* (citing *Houston v. Lack*, 487 U.S. 266, 276 (1988)).

In the July 2021 Order, the Court assumed that plaintiff's complaint was filed on the same date that it was signed, and at a time when plaintiff remained at risk of continued physical harm due to not being fed. This assumption was based on plaintiff's express allegations that he had been denied seven consecutive meals as a means of punishment for filing a prior grievance, and feared that defendants "intend[ed] to continue to deprive [him] [of] meals in complete disregard for the substantial risk of harm to [his] health." Compl. at 2.

It is now clear from the evidence before this Court–including evidence submitted by plaintiff–that plaintiff's complaint was provided to a corrections official for filing on the morning of June 1, 2021. *See* Dkt. No. 21, ¶ 14 (stating that mail was collected from plaintiff on May 28, 2021, at approximately 6:00 a.m., "prior to breakfast"); Dkt. No. 21, ¶ 31 (stating that mail was collected from plaintiff on June 1, 2021, at approximately 6:00 a.m., "prior to breakfast"); Dkt. No. 21 at 17 (stating that "prior to breakfast" on each day between May 28 and May 31, 2021, "the defendants would open the ... hatch [to plaintiff's cell] to collect [his] mails and ... provide [his] supplies"). By this time, plaintiff was aware that he had received lunch and dinner meals the previous day. However, plaintiff nevertheless submitted a misleading sworn complaint to the Court suggesting that he remained at risk of harm. *See* Compl. at 2, ¶¶ 17-19 (emphasis added). [7]

While such allegations present Rule 11 issues, more importantly for purposes of defendants' motion to revoke, there can be no doubt that plaintiff did not face an *imminent risk* of serious physical harm due to a continuous deprivation of food over a four-day period when he submitted his complaint to a corrections officer (and thus "filed" it with the Court) on the morning of June 1, 2021. Instead, plaintiff experienced only past harm, which had dissipated by the time he delivered his complaint for filing. [8]

**\*7** Insofar as plaintiff seeks to base his "imminent danger" claim on allegations that corrections officials "collided with" him in an effort to provoke him or cause him harm, the result is no different. However, plaintiff is also respectfully advised that being repeatedly bumped or even "collided with" in the hallway by one or more corrections officers, while unprofessional (and conceivably sufficient to give rise to an Eighth Amendment claim, depending on the frequency, duration and severity of the alleged conduct, and the existence of exacerbating factual allegations), does not constitute being "under imminent danger of serious physical injury" under 28 U.S.C. § 1915(g). *Cf. Canady v. Roesler*, 668 F. App'x 642 (5th Cir. 2016) ("His allegations that ... an officer pushed him in the chest and insulted him on one occasion almost two years before the filing of the civil rights complaint, and that a disciplinary officer yelled at him and threatened him two months prior to the filing of the complaint are insufficient to establish that he was in imminent danger of serious physical injury at the relevant times....").

For this reason alone, plaintiff's IFP status must be, and is, revoked. [9]

### 2. Serious Physical Injury

As noted, a three strikes prisoner must show that he faced "an imminent danger of serious physical injury" at the time he submitted his complaint for filing in order to proceed IFP. 42 U.S.C. § 1915(g). Although the term "serious physical injury" is not expressly defined in Section 1915(g), several courts have made clear that something more than temporary discomfort associated with a limited number of missed meals is necessary to satisfy the requirement. *See, e.g., Daker v. Bryson*, 784 Fed. App'x 690, 693 (11th Cir. Aug. 8, 2019) (per curiam) (finding that a plaintiff alleging denial of nutritionally adequate food and weight loss did not establish imminent danger); *Sims v. Caruso*, No. 11-CV-92, 2011 WL

672232, at \*2 (W.D. Mich. Feb. 18, 2011) ("The fact that Plaintiff has lost some weight, standing alone, falls short of establishing serious physical injury"); *Hernandez v. Ventura County*, No. 09-CV-7838, 2010 WL 3603491 (C.D. Cal. July 27, 2010) (finding that a claim that food practices at jail caused inmate to lose a significant amount of weight was insufficient to demonstrate "serious physical injury" under § 1915(g) where the inmate did not allege that such practices caused or threaten to cause him to go hungry, to suffer malnutrition, or to suffer any negative health consequences), *report and recommendation adopted by* 2010 WL 3603485 (C.D. Cal. Sept. 6, 2010); *Sayre v. Waid*, No. 08-CV-142, 2009 WL 249982, at \*2 (N.D. W.V. Feb. 2, 2009) ("[W]eight loss, in and of itself, is not indicative of a serious physical injury...."); *Mateo v. Vosbrink*, No. 06-CV-115, 2006 WL 2038499, at \*2 (N.D. Fla. July 18, 2006) ("The fact that Plaintiff is constantly hungry and suffers hunger pangs does not constitute a serious physical injury...."); *cf. Jackson v. Marks*, 722 Fed. App'x 106, 107 (2d Cir. 2018) (concluding that inmate-plaintiff's allegations of "missing approximately half his weekly meals" over a period of approximately one year, which "caused him to suffer weight loss, stress, and hunger[,]" were sufficient to "meet the exception to the three-strikes rule because the allegations of deprivations of food were prolonged and substantial" (emphasis added)); *Taylor v. Walker*, No. 07-CV-706, 2007 WL 4365718, at \*2 (S.D. Ill. Dec. 11, 2007) ("Because Plaintiff may not create the 'imminent danger' required by § 1915(g) by commencing a hunger strike and because there is no indication that Plaintiff's hunger strike causes 'serious physical injury'-due to the timely intervention of prison officials and Plaintiff's voluntary cessation of said strikes-Plaintiff has not satisfied the requirements of § 1915(g) so as to proceed in forma pauperis in this action.").

**\*8** In support of their cross-motion, defendants have adduced record evidence showing the following: (1) plaintiff refused each of the meals that he did not receive between May 28 and the morning of May 31, 2021; (2) nurses made rounds in plaintiff's cell block area between May 28 and May 31, 2021; (3) plaintiff received lunch and dinner meals on May 31, 2021; and (4) DOCCS requires that any inmate who misses nine consecutive undergo a medical evaluation. Dkt. No. 16-2; Dkt. No. 16-3; Dkt. No. 16-4; Dkt. No. 16-5; Dkt. No. 16-6; Dkt. No. 16-7; Dkt. No. 17.

In response, plaintiff attempts to refute some of these facts, and minimize the significance of others. For example,

plaintiff states that the named defendants falsely recorded in the log books that he refused meals when in actuality these officials refused to provide those meals to him. Dkt. No. 21, ¶¶ 14-28. Plaintiff also states that, although nurses made rounds through his cell block area, he and the other inmates were prevented by unidentified "officers" from communicating with medical staff between May 28 and June 3, 2021. *Id.*, ¶¶ 27-28, 31-34, 74. In addition, plaintiff states that he was denied several meals after May 31, 2021, and told by a nurse on June 4, 2021, that he could no longer receive his stomach medication because it was not meant for long-term use. *Id.* at 13, ¶ 76.

Insofar as plaintiff claims that he did not refuse the meals that he was denied, defendants Gibson, Matthie, McCarger, Orbegozo, Rondo, and Scott have each provided sworn statements that they never denied plaintiff a meal between May 28 and May 31, 2021, that he wished to accept. Dkt. Nos. 16-2, 16-3, 16-4, 16-5, 16-6, 16-7. In addition to testifying that these statements are not true, plaintiff provided the Court with video footage of the exterior of his cell on June 6 (Dkt. No. 53, Exhibit A), July 3 (Dkt. No. 53, Exhibits D, E), and July 7, 2021 (Dkt. No. 53, Exhibit G), which are dates plaintiff testified that he did not receive meals. Hrg. T. [10] The recordings from June 6 and July 7 clearly show that corrections officials offered plaintiff his meals, which he refused; and one of the recordings from July 3 shows that plaintiff was asked to turn on the light in his cell, and was denied a meal after refusing to do so. *See* Dkt. No. 53, Exhibit D. [11] In light of these recordings, as well as the other issues with plaintiff's testimony discussed above, the Court finds that the sworn statements from the defendants indicating that meals were offered to plaintiff between May 28 and May 31, 2021, are more credible than plaintiff's testimony that he was intentionally deprived of seven consecutive meals during this time.

In any event, the Court declines to accept plaintiff's statement that he and all other inmates in his cell block area were entirely prevented from communicating with medical staff between May 28 and May 31, 2021, for at least three reasons.

First, the complaint is devoid of any allegations which plausibly suggest that plaintiff did not have access to medical treatment, or an ability to communicate with medical staff, between May 28 and May 31, 2021. Rather, plaintiff's statement was made for the first time in response to defendants' cross-motion to revoke his IFP status.

**\*9** Second, the log book entries expressly state that nurses made rounds, and communicated with certain inmates about medical issues, between May 28 and May 31, 2021. Dkt. No. 16-7 at 11-26 (noting morning and evening "med run[s]" and "nurse on rounds"); Dkt. No. 16-7 at 15 (noting inmate request for emergency medical treatment at 10:32 p.m. and nurse on the block at 10:37 p.m.). It strains credulity to believe that corrections officers would have inconsistently prevented nurses from speaking to inmates during rounds, and then falsely logged successful medication "runs" and the receipt of an inmate medical complaint.

Third, the ambulatory health records submitted by defendants show that plaintiff consulted nurses regarding Omeprazole, his prescribed stomach medication, on June 3 and June 4, 2021. Dkt. No. 17 at 13. It is difficult for the Court to believe that nurses would have been prevented from speaking to inmates during rounds made between May 28 and June 3, 2021, which coincidentally overlaps with a period that plaintiff was allegedly deprived of meals, and yet suddenly been allowed to speak with at least plaintiff regarding his stomach medication on June 3 and June 4, 2021. [12]

In light of the foregoing, even assuming that plaintiff was denied meals that he wished to receive between May 28 and May 31, 2021, [13] the Court has no reasonable basis to conclude from the complaint and record evidence adduced by the parties that he was unable to communicate any adverse health effects associated with missed meals to medical staff. Moreover, Nurse Brenda Holcombe, who worked at Upstate Correctional Facility during the relevant time period, testified that, if an inmate advises a nurse that he is in danger, the nurse is required to report the inmate's concern "up the chain[.]" Hrg. T. Nurse Holcombe further testified that, if an inmate expresses concern for their safety to a nurse, or advises a nurse that he is not eating or being fed, the matter is documented in the inmate's medical records. *Id.* Thus, according to Nurse Holcombe (whose testimony the Court finds credible), had plaintiff expressed concerns for his health or safety, or complained about not being fed, the issue would have been documented and addressed.

Plaintiff's decision not to express concerns to medical staff regarding his health is therefore telling as to his state of mind at the time, as is his medical file, which shows that he refused his prescribed stomach medication on June 4, 2021–after it was ordered for him the previous day–based on his belief that the medication was "not helping[.]" Dkt. No. 17 at 13. [14] These facts make clear that plaintiff (1) did not need food

to take his prescribed medication and/or did not need his prescribed medication to alleviate a serious stomach condition when he missed meals between May 28 and May 31, 2021, (2) did not believe that his missed meals presented a condition of urgency worthy of reporting to medical staff, and (3) had not suffered any serious adverse health consequences as a result of the meals he missed. In other words, it is now clear to the Court that, at the time of filing, plaintiff did not face a unique risk of *serious physical harm* based on the meals that he had missed, or the potential that he may miss a few more, regardless of the reason.

**\*10** Moreover, the DOCCS Directive on Inmate Hunger Strikes indicates that an inmate who voluntarily refuses to eat nine consecutive meals is deemed to be "on a hunger strike." Dkt. No. 16-3 at 30. The Directive further indicates that an inmate on a hunger strike is "referred to Health Services and to the [Office of Mental Health] staff for counseling and clinical assessment to determine the cause of the inmate's refusal to eat." *Id.* at 31. [15]

Because defendants logged plaintiff's missed meals, he was never at risk of missing more than two additional meals before receiving mandatory medical treatment. Thus, it is also now clear to the Court that this is not a case of a potential cover up of meal deprivations that could have continued for a prolonged period of time, as the allegations in the complaint suggest. [16]

For all of these reasons, based on the record evidence presented by the parties, the Court finds that, at the time plaintiff filed his complaint (and even at the time he signed it), he did not face an imminent risk of serious physical injury. As a result, revocation of plaintiff's IFP status is appropriate. Accordingly, defendants' cross-motion to revoke plaintiff's IFP status is granted.

## V. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's Preliminary Injunction Motion (Dkt. No. 2) is **DENIED** for the reasons stated above; and it is further

**ORDERED** that defendants' Cross-Motion to Revoke plaintiff's IFP status (Dkt. No. 16) is **GRANTED** for the reasons stated above; and it is further

**\*11 ORDERED** that plaintiff's IFP status is **REVOKED**; and it is further

**ORDERED** that, if plaintiff wishes to proceed with this action, he must pay the Court's filing fee of four hundred and two dollars ($402.00) in full within **THIRTY (30) DAYS** of the date of this Decision and Order; and it is further

**ORDERED** that, if plaintiff timely pays the filing fee in full, the Clerk of the Court shall return the file to this Court for review; and it is further

**ORDERED** that, if plaintiff fails to timely pay the filing fee in full, the Clerk shall enter judgment **DISMISSING** this action without prejudice, without further order of this Court; and it is further

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 504974

## Footnotes

1    Roughly two weeks before the July 2021 Order, plaintiff commenced a new action in this District. *Bradshaw v. Uhler*, No. 21-CV-0776 (N.D.N.Y. filed July 8, 2021) ("*Bradshaw v. Uhler*"). Initially, that new action was assigned to United States District Judge David N. Hurd and United States Magistrate Judge Therese Wiley Dancks. However, by Order entered on July 27, 2021, that new action was reassigned to the undersigned

and United States Magistrate Judge Miroslav Lovric based on a determination that it is related to this action under the District's General Order 12. *Bradshaw v. Uhler*, Dkt. No. 5.

2    It is not entirely clear when the complaint in this case was effectively served, or whether, pursuant to Fed. R. Civ. P. 15(a), plaintiff was required to seek leave of the Court before filing his amended complaint on September 12, 2021. *Compare Morris v. New York State Gaming Comm'n*, 18-CV-0384, 2019 WL 2423716, at *4 (W.D.N.Y. March 14, 2019) ("Because Plaintiff never served the original Complaint, the 21-day time limit to file an amended complaint under Rule 15(a)(1)(A) *never commenced*.") (emphasis added) *with Henderson v. Wells Fargo Bank, NA*, 13-CV-0378, 2015 WL 630438, at *2 (D. Conn. Feb. 13, 2015) ("Fed. R. Civ. P. 15(a) provides that a 'party may amend its pleading once as a matter of course within ... 21 days after serving it.' Because Plaintiff has not yet served Defendant with the complaint, her motion is granted although unnecessary because leave of the Court is not required."); *see also Ramos v. Poore*, 15-CV-518, ⚑2017 WL 1362017, at *2 (D. Conn. Apr. 11, 2017) ("The case law interpreting the[ ] two sections of Rule 15(a)(1) is unsettled as to whether a plaintiff may amend a complaint as of right more than twenty-one days after service of the complaint under Rule 15(a)(1)(B) when the defendants fail to file a responsive pleading or Rule 12 motion." (collecting cases)). In any event, even the most liberal constructions of plaintiff's amended complaint does not yield factual allegations plausibly suggesting an imminent danger of serious physical injury at the time of the filing of this action (on May 31, 2021) that are substantively different from those alleged in his original complaint. (Compare Dkt. No. 1 with Dkt. No. 15.) For this reason, when summarizing his allegations and claims below in Part II.A. of this Decision and Order, the Court does not treat the factual allegations of plaintiff's amended complaint as substantively different from those of his original complaint.

3    The actions in which plaintiff acquired strikes are as follows: (1) *Bradshaw v. McQueen*, No. 08-CV-5518, Dkt. No. 32 (S.D.N.Y. Feb. 11, 2010) (dismissing complaint for failure to state a claim upon which relief may be granted); (2) *Bradshaw v. Brown*, No. 13-CV-4308, Dkt. No. 52 (E.D.N.Y. May 18, 2017) (Mandate dismissing appeal of dismissal order on grounds that it lacked "an arguable basis either in law or in fact"); (3) *Bradshaw v. The City of New York*, No. 15-CV-2166, Dkt. No. 58 (E.D.N.Y. Aug. 22, 2017) (dismissing complaint for failure to state a claim upon which relief may be granted); (4) *Bradshaw v. The City of New York*, No. 15-CV-2166, Dkt. No. 62 (E.D.N.Y. Nov. 16. 2018) (Mandate dismissing appeal on grounds that it lacked "an arguable basis either in law or in fact").

4    "⚑28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010). "Although an indigent, incarcerated individual need not prepay the filing fee ... at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing ⚑28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

5    The manifest intent of Congress in enacting ⚑Section 1915(g) was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates. ⚑*Tafari v. Hues*, 473 F.3d 440, 443-44 (2d Cir. 2007). The question of whether a prior dismissal is a "strike" is a matter of statutory interpretation and, as such, is a question for the court to determine as a matter of law. ⚑*Tafari*, 473 F.3d at 442-43.

6    In reaching this determination, the Court is mindful that plaintiff has filed several letters since responding to defendants' cross-motion wherein he repeatedly complains of meal deprivations and tampering. Dkt. Nos. 47, 48, 49, 55, 57, 59, 60. These unsworn submissions (and unauthenticated exhibits), however, cannot be considered record evidence in support of the requested relief, nor do they make it "more or less probable" (for

purposes of Fed. R. Evid. 401) that plaintiff suffered a deprivation of meals *at the time of the filing of this action* (the relevant time period).

7    Perhaps realizing this timing issue, plaintiff testified during the evidentiary hearing that he submitted his complaint for filing on May 31, 2021. Hrg. T. Of course, this testimony is wholly inconsistent with plaintiff's own motion papers. *See* Dkt. No. 21 at 17.

8    In finding that plaintiff's hearing testimony on this issue lacking in credibility, the Court generally relies on the following: (1) plaintiff's unconvincing mannerisms and body language (including, but not limited to, his demeanor, tone of voice, facial expressions, and eye contact or lack thereof) during the relevant portions of his testimony; (2) the inconsistency if not contradiction between plaintiff's testimony that he was provided with only breakfast on May 31, 2021, and would "continue to [be] deprive[d] [of] meals" after breakfast on May 31, 2021, and the evidence that (a) plaintiff refused seven consecutive meals either expressly or through his non-compliant behavior between May 28 and May 31, 2021, and (b) plaintiff received lunch and dinner meals on May 31, 2021; and (3) the fact that defendants adduced documentary evidence (e.g., Exhibit D-2) and/ or witness testimony (e.g., the testimony of Corrections Officer Michael Phillips, and/or Corrections Sergeant Eric Marshall) that credibly undermined the relevant portions of plaintiff's hearing testimony.

9    As discussed below, there is also no credible evidence in the record showing that at the time of filing plaintiff continued to suffer from injuries based on the aforementioned past harm, for which he sought and was refused treatment.

10   The Court is mindful that the video footage from July 7, 2021, is not relevant to either this action or *Bradshaw v. Uhler*, which was filed on July 4, 2021. The Court is also mindful that plaintiff was provided with forty-three (43) video recordings showing activity outside of his cell on different dates, *see* Dkt. No. 46, yet chose to provide the Court with only a limited number of these recordings.

11   It was undoubtedly known to corrections officials that their activity outside of the cell block area was being recorded.

12   In one of his post-hearing submissions, plaintiff also attached a copy of a sick call slip that is dated June 2, 2021, wherein he complains about stomach pain. Dkt. No. 47. The document is further proof that plaintiff had access to sick call during the relevant time period.

13   The Court notes that plaintiff has persistently argued that proof exists that he was denied meals between May 28 and May 31, 2021, in the form of proof that he was denied meals at times *after* those dates. However, generally, subsequent conduct is of little if any relevance (under Fed. R. Evid. 401) in proving prior conduct. *See* Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."); Fed. R. Evid. 404(b) (1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character .."); *cf.* Fed. R. Evid. 407 (treating subsequent remedial measures as not admissible to prove culpable conduct). Furthermore, as discussed below, at least with respect to the video recordings provided by plaintiff of events after May 31, 2021, the Court does not agree with plaintiff's interpretation.

14   Plaintiff states that the nurse's recording in his medical file is incorrect, and that it was the nurse who actually refused to provide him with his prescribed medication. Dkt. No. 21, ¶ 76. The Court declines to accept the truth of this statement for several reasons. First, the ambulatory health record from June 3, 2021, shows that a refill of plaintiff's prescription for Omeprazole was ordered on this date. Dkt. No. 17 at 13. Thus, plaintiff's statement requires this Court to accept the allegation that the nurse who met with him on June 4, 2021, refused to provide him with Omeprazole, despite knowing that it had been ordered for him the previous day

by a different medical provider, and then falsely noted that the medication was refused by plaintiff. While this is certainly a difficult proposition to accept, if the statement were true, it is inconceivable to the Court that plaintiff would not have filed a grievance regarding the denial, or at least requested the medication on a subsequent day (assuming he believed that he had a medical need for it). Yet there is no evidence in the record before this Court that either of these things occurred. Furthermore, the recording of plaintiff's belief that his medication was "not helping" is consistent with his allegations made in a different complaint filed after this action was commenced. More specifically, in plaintiff's pursuit of claims unrelated to the claims asserted in this action, he swears (in a verified complaint) that he engaged (apparently voluntarily) in a hunger strike over a period of five days in July of 2020 at Mid-State Correctional Facility. *Bradshaw v. Annucci*, No. 21-CV-901, Dkt. No. 1 at 13, ¶ 115 (N.D.N.Y. Aug. 11, 2021). During this time, by his own admission, he had been prescribed the same medication that he claims needed to be taken with food to "reduce pains and the symptoms." Compl., ¶ 17; Dkt. No. 21 at 13, ¶ 73. The Court notes that this hunger strike undermines plaintiff's allegation that, when he filed his complaint in this action less than a year later, he suffered from a pre-existing stomach condition that required him to take medication *with food.*

15    Nurse Holcombe testified that, at Upstate Correctional Facility, when an inmate misses nine consecutive meals, he receives "a full assessment", which includes checking vital signs, skin, blood sugar, and weight, as well as "a mental health referral to try to assess why this is going on." Hrg. T. Nurse Holcombe further testified that the purpose of the extensive evaluation is "to make sure [the inmate is] not in danger of being sick from not eating." *Id.*

16    In finding that plaintiff's hearing testimony on this issue lacking in credibility, the Court generally relies on the following: (1) plaintiff's unconvincing mannerisms and body language (including, but not limited to, his demeanor, tone of voice, facial expressions, and eye contact or lack thereof) during the relevant portions of his testimony; (2) the inconsistency if not contradiction between plaintiff's testimony that his stomach condition requires that he take Omeprazole (the generic version of Prilosec) with food and his testimony or sworn representation that (a) his stomach condition was "never diagnosed," (b) during his missed meals, he did not submit a sick call request, (c) he currently no longer even takes Omeprazole, and (d) while taking Omeprazole in July of 2020, he went on (and survived) a "hunger strike"; (3) the inconsistency if not contradiction between plaintiff's testimony that being deprived of the seven meals in question caused him dangerous weight loss and his testimony or sworn representation that (a) currently he weighs 151 pounds, more than 20 pounds less than he weighed during the time in question, and (b) in July of 2020, he went on (and survived) a "hunger strike"; and (4) the fact that defendants adduced documentary evidence (e.g., Exhibit D-1) and/or witness testimony (i.e., the testimony of Nurse Brenda Holcombe) that credibly undermined the relevant portions of plaintiff's hearing testimony.

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

hunger strike undermines plaintiff's allegation that, when he filed his complaint in this action less than a year later, he suffered from a pre-existing stomach condition that required him to take medication *with food.*

19   Nurse Holcombe testified that, at Upstate Correctional Facility, when an inmate misses nine consecutive meals, he receives "a full assessment", which includes checking vital signs, skin, blood sugar, and weight, as well as "a mental health referral to try to assess why this is going on." Hrg. T. Nurse Holcombe further testified that the purpose of the extensive evaluation is "to make sure [the inmate is] not in danger of being sick from not eating." *Id.*

20   As noted above, plaintiff's statement that he was denied nine consecutive meals between July 2 and July 4, 2021, and that only certain of the deprivations were logged, is completely incredible.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   13

2001 WL 936297

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Ulysses WILLIAMS, Plaintiff,

v.

Robert MULLER, Defendant,

No. 98 CIV. 5204(BSJ).

|

Aug. 17, 2001.

**Attorneys and Law Firms**

Ulysses Williams, Pro Se, Orleans Correctional Facility, Albion, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, Of Counsel: Susan H. Odessky, New York, for Defendant.

MEMORANDUM AND ORDER

DUFFY, D.J.

**\*1** Plaintiff, Ulysses Williams ("Williams" or "plaintiff"), proceeding *pro se,* is currently an inmate at Orleans Correctional Facility in Albion, New York. From late 1997 until early 1998, the time period relevant for this lawsuit, plaintiff was incarcerated at Fishkill Correctional Facility ("Fishkill"). On December 12, 1997, plaintiff filed a grievance alleging that Officer C. Madura ("Madura") and Officer Robert Muller ("Muller" or "defendant") "spread malicious rumors to the inmate population that [plaintiff] was illegally selling Inmate Liaison Committee ("ILC") supplies" in retaliation against prior grievances that plaintiff had allegedly filed against the officers. *See* Ex. A. On January 15, 1998, the Superintendent of the Inmate Grievance Program denied plaintiff's grievance seeking suspension of the two officers.

Plaintiff's complaint in this action, dated February 20, 1998, reasserts his December 12, 1997 retaliation claim against Muller, pursuant to 🚩 42 U.S.C. § 1983. In addition, plaintiff complains of a second act of retaliation under 🚩 § 1983 by Muller, allegedly made in response to plaintiff's filing of the December 12, 1997 grievance. On January 9, 2001, Muller moved for summary judgment pursuant to Rule 56(c) of the

Federal Rules of Civil Procedure. Because plaintiff has failed to establish either of his retaliation claims, defendant's motion for summary judgment is granted in its entirety. [1]

*FACTS*

On December 12, 1997, plaintiff filed a grievance against correction officers Madura and Muller, alleging that they had spread rumors that plaintiff had been illegally selling supplies from the ILC—an inmate organization within the facility—to other inmates. *See* Ex. A. Furthermore, plaintiff claims that he "encountered several confrontations with other inmates due to such rumors; in which could have ended in physical conflict." *See* Pl.'s Aff. at 7. Plaintiff alleges that defendant spread such rumors with the intention of provoking such "confrontations." *Id.* Plaintiff does not deny that he was found in possession of ILC supplies, but he alleges that he was in charge of issuing such supplies and that therefore his possession was lawful.

On January 15, 1998, the Superintendent of Fishkill ruled that plaintiff's grievance was baseless. *See* Ex. A. The Superintendent stated that prison officials had found "excessive ILC supplies" in plaintiff's locker. *Id.* Plaintiff appealed the Superintendent's findings, and on January 28, 1998, the New York State Department of Correctional Services ("DOCS") Central Office Review Committee ("CORC") upheld the Superintendent's denial of the grievance.

Plaintiff alleges that a little over a month after he filed the December 12, 1997 grievance, Muller retaliated against him by filing a meritless Inmate Misbehavior Report. *See* Ex. F. Muller contends that on January 14, 1998, while stationed on the stairwell of Fishkill's A–Floor monitoring inmate traffic, he questioned plaintiff as to the contents of the bag which plaintiff was carrying. Allegedly, plaintiff refused to answer his questions. Furthermore, Muller contends that plaintiff yelled at him. According to defendant, this confrontation blocked inmate traffic in the hallway for fifteen minutes. *See* Ex. G. Muller alleges that he gave plaintiff a direct order to step to the side and to stop yelling. Plaintiff allegedly refused to do so and demanded to see a sergeant "right now." A sergeant was notified and plaintiff was escorted to the Special Housing Unit ("SHU"). *Id.*

**\*2** In his deposition, plaintiff denied all allegations that he behaved inappropriately. As a result of plaintiff's alleged conduct, however, Muller filed an Inmate Misbehavior Report against plaintiff, charging him with failure to comply with

search procedures, disobeying a direct order, threatening an officer, and creating a disturbance. *Id.* Plaintiff plead "not guilty" to these charges, and a hearing was held on January 19, 1998. At the conclusion of the hearing, plaintiff was found guilty of all charges and sentenced to thirty days of keeplock, under which he lost his right to receive packages, his commissary privileges, and his telephone privileges. *See* Ex. E.

On January 20, 1998, plaintiff appealed from this disciplinary action. According to defendant, plaintiff appealed on the grounds that the thirty day period of loss of privileges should have begun on the date of his confinement on January 14, 1998, rather than on the date of the hearing on January 19, 1998. *See* Ex. F. Although evidence exists that plaintiff wrote in his appeal that he was not challenging the merits of the disciplinary report itself, plaintiff disputes this finding and claims he appealed the merits of the misbehavior report as well as the length of his confinement. *See* Ex. F. Plaintiff's appeal was denied. *See* Ex. A.

One month later, on February 20, 1998, plaintiff filed the instant complaint. On July 22, 1998, Chief Judge Thomas P. Griesa, U .S.D.J., partially dismissed the complaint filed *in forma pauperis* under 🔖 28 U.S.C.1915(a) as to defendants Commissioner Glenn S. Goord and Superintendent Wayne L. Strack, and under 🔖 28 U.S.C.1915(d) as to defendant Lieutenant Officer Iacovino.

Muller moved to dismiss the remaining claims and on April 25, 2000, Judge Barbara S. Jones, U.S.D.J., dismissed the first five of plaintiff's claims because plaintiff had failed to exhaust administrative remedies within the prison grievance system before filing suit in a federal court, as required by the Prisoner Litigation Reform Act, 🚩 42 U.S.C. § 1997e(a). *See Williams v. Muller,* 2000 WL 487954 at *3 (S.D.N.Y. Apr. 25, 2000).* Judge Jones denied defendant's motion to dismiss with respect to claims six and seven stating 🔖 § 1983 claims for retaliation because plaintiff had succeeded in exhausting the administrative remedies for these claims. Muller now moves for summary judgment as to both retaliation claims. For the reasons set forth below, his motion is granted in its entirety.

*LEGAL STANDARD*

*A. Summary Judgment* [2]

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the moving party has the burden of showing "that there is an absence of evidence to support the nonmoving party's case." 🔖 *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If satisfied, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); 🔖 *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). While the court must construe all evidence and inferences in favor of the nonmoving party, to sustain its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." 🔖 *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "Mere conclusory allegations or denials will not suffice." [3] 🔖 *Williams,* 781 F.2d at 323.

*B. Standard for Retaliation Claims*

**\*3** Prisoners have a constitutional right to "petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." 🚩 *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Nonetheless, courts recognize that retaliation claims may be easily fabricated and that some prisoners file such claims with frequency. Thus, courts must examine prisoner retaliation claims with "scepticism and particular care." *Id.*

To prevail on a retaliation claim, a plaintiff must demonstrate that he 1) engaged in constitutionally protected conduct and that 2) such conduct was a "substantial or motivating factor" behind the prison official's allegedly retaliatory acts. 🔖 *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). Constitutionally protected conduct has been broadly defined, and may include not only the filing of prison grievances, but even the wearing of religious headgear.

*See* 🔖 *Nicholas v. Tucker,* 89 F.Supp.2d 475, 477 (2d Cir.2000). Retaliatory acts have been defined as "otherwise routine administrative decisions [that] are made in retaliation for the exercise of constitutionally protected rights." *Smith v. Deckelbaum,* 2000 WL 1855128 at *3 (S.D.N.Y. Dec. 19, 2000) (citations omitted). While courts have broadly defined actionable retaliation in a prison setting, not every response

to a prisoner's exercise of a constitutional right is actionable. *See* 🚩 *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions: (1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and, (4) the temporal proximity between the protected activity and the defendant's adverse action. *See* 🚩 *Colon,* 58 F.3d at 872–73. Finally, even if a prison official acts with retaliatory intent, as long as his act is motivated by both "proper and improper reasons," a plaintiff's retaliation claim will fail. 🚩 *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

### DISCUSSION

*A. Plaintiff's Retaliation Claim for "Spreading Rumors"*
Plaintiff has failed to establish his first retaliation claim. According to this claim, Muller violated plaintiff's constitutional rights when he spread rumors about plaintiff in retaliation for grievances that plaintiff had filed previously against Muller. *See* Ex. D. Plaintiff further alleges that such rumors incited his fellow prisoners to "confront" him. *See* Pl.'s Aff. at 7. Although plaintiff has not specifically identified or produced copies of any such prior grievances, Muller admits that plaintiff had filed the "same complaint" against him twice before. *See* Ex. A. Because I must construe all inferences in favor of the nonmoving party, I posit for the purpose of this discussion that plaintiff has established that he engaged in "protected activity."

**\*4** However, even accepting that plaintiff did in fact file a prior grievance which motivated Muller to spread rumors about him, plaintiff's retaliation claim still must fail as the spreading of rumors alone does not amount to a constitutional violation.

As indicated above, courts treat prisoners' claims of retaliation with great skepticism, and such claims typically must include an administrative action against a prisoner that is improperly motivated. *See* 🚩 *Dawes,* 239 F.3d at 492; *see also* 🚩 *Graham,* 89 F .3d at 80. The retaliatory action must be sufficient to "deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional right." 🚩 *Dawes,* 239 F.3d at 493.

If the alleged retaliatory act does not inhibit or punish an inmate's right of free speech it is considered *de minimis. Id.* "Many verbal responses by officials of resentment or even ridicule" are not actionable. *Id.* at 493 (citing 🔶 *Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D.Mich.1997)). In the instant case, the alleged spreading of rumors constitutes just such a "verbal response." Although plaintiff claims the rumors were intended to incite the inmates to harm plaintiff, no physical harm occurred. Therefore, even if Muller did indeed spread rumors about plaintiff, such actions on his part do not give rise to a retaliation claim.

For the reasons set forth above, plaintiff has failed to establish the second element of his first retaliation claim. This claim, therefore, is dismissed.

*B. Plaintiff's Retaliation Claim for the a "False" Misbehavior Report*
Plaintiff's second claim asserts that Muller filed a "false" misbehavior report against him in retaliation for plaintiff's December 12, 1997 grievance. *See* Ex. E. Plaintiff succeeds in establishing the first prong of this retaliation claim, in that the filing of his December 12, 1997 grievance was indeed protected activity. However, a retaliation claim must also establish a causal link between the protected activity and the alleged retaliatory act. Plaintiff has failed to prove such a connection exists.

According to Muller, he issued the misbehavior report against plaintiff because plaintiff violated prison disciplinary rules. Muller alleges that plaintiff failed to obey his direct orders, threatened him, and failed to comply with search procedures. *See* Exs. F, G. Plaintiff contends that he complied with Muller's search of his person and of his bag, that he did not yell or threaten Muller, and that Muller issued a report against him solely as an act of retaliation. [4] *See* Ex. H at 127–28.

As discussed above, a court can consider four factors in determining whether a causal connection exists between a plaintiff's protected activity and a prison official's action. The first factor a court can examine is the outcome of any hearing concerning the allegedly retaliatory charges. *See* 🚩 *Colon,* 58 F.3d 865 at 872. In the instant case, plaintiff faced a disciplinary hearing on January 15, 1998 where he

was charged with creating a disturbance, refusing a direct order, making threats, and refusing to be searched. *See* Ex. E. Plaintiff was found guilty of all charges and sentenced to thirty days of keeplock. Plaintiff then appealed the length of his confinement and, as he alleges, the merits of the report as well. [5] *See* Ex. F, H at 138–40. Plaintiff's appeal was denied. *See* Ex. A. This outcome strongly suggests the existence of proper reasons for Muller's actions, and raises an inference of non-retaliation.

**\*5** The second factor that a court can look to is an inmate's prior disciplinary record. In the instant case, plaintiff had been disciplined previously at Fishkill for making illegal copies, for smuggling, and for stealing. [6] *Id.* at 58–62. Plaintiff's disciplinary record further weakens his retaliation claim.

The third factor a court can evaluate is any statement made by the defendant concerning his motivation for his allegedly retaliatory acts. In the instant case, plaintiff has offered no evidence, besides conclusory allegations, of statements made by Muller concerning his motivation for filing the report. The final factor a court can review is the temporal proximity between the protected activity and the retaliatory action. Muller issued his report four weeks after plaintiff filed his grievance. Although such a time period could conceivably be considered as evidence of temporal proximity, such evidence is merely circumstantial and, standing alone, is not enough for a retaliation claim to survive summary judgment. *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000).

Thus, even if temporal proximity is established, plaintiff's second retaliation claim cannot survive Muller's motion for summary judgment. *See Crawford v. Braun,* 2001 WL 127306 at \*6 (S.D.N.Y. Feb. 9, 2001). Plaintiff's second retaliation claim, therefore is dismissed.

*CONCLUSION*

For the foregoing reasons, Williams has failed to factually support either of his retaliation claims pursuant to 42 U.S.C. § 1983. Therefore, Muller's motion for summary judgment is granted. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 936297

## Footnotes

1    Because plaintiff's retaliation claims are dismissed on the merits, I find it unnecessary to address defendant's allegations that plaintiff failed to show physical injury to support his claim of emotional damages pursuant to 42 U.S.C. § 1997e(e) or that defendant is shielded from liability under the Eleventh Amendment.

2    When a party proceeds *pro se,* he is entitled to some form of notice of the requirements necessary to oppose summary judgment. *See McPherson v. Coombe,* 174 F.3d 276, 280–82 (2d Cir.1999). In the instant case, defendant's filing of his "Notice to Pro Se Litigant" adequately informed plaintiff of his pleading requirements.

3    Because Williams is proceeding *pro se,* however, I have given the allegations in his pleadings a particularly liberal construction. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972).

4    Plaintiff originally claimed that a corrections officer and an inmate, "Barnet," witnessed this incident. However, in his deposition, plaintiff alleged that he forgot the name of the officer and he reaffirmed his withdrawal of Barnet as a witness. *See* Ex. H at 133–37.

5    As indicated *supra,* there is some dispute as to whether plaintiff actually appealed the merits of the misbehavior report. *See* Pl.'s Aff. at 8. However, a determination as to whether he did, or did not, appeal the merits of the report has no bearing on this decision.

6    Plaintiff's disciplinary record includes behavior prior to his arrival at Fishkill. Notably, plaintiff was disciplined for a "movement violation" and for disobeying a direct order at Coxsackie Correctional Facility. *See* Ex. H at 56–57. Furthermore, plaintiff was disciplined for fighting with another inmate at Auburn Correctional Facility. *Id.* at 63. Finally, at Orleans Correctional Facility, plaintiff was disciplined for giving an officer "the birdie." *Id.* at 64.

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 126 of 482

Flemming v. King, Not Reported in Fed. Supp. (2016)

2016 WL 5219995
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Woodrow FLEMMING, Plaintiff,

v.

Matthew J. KING; David Bilow, Defendants.

No. 14-CV-316 (DNH/CFH)
|
Signed 06/20/2016

**Attorneys and Law Firms**

WOODROW FLEMMING, P.O. Box 146 New York, New
York 10039, Plaintiff Pro Se.

HON. ERIC T. SCHNEIDERMAN Attorney General for the
State of New York The Capitol, OF COUNSEL: ORIANA
CARRAVETTA, ESQ. Assistant Attorney General, Albany,
New York 12224-0341 Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Woodrow Flemming ("Flemming"),
formerly an inmate in the custody of the New York State
Department of Corrections and Community Supervision
("DOCCS"), brings this action pursuant to 🚩 42 U.S.C.
§ 1983 alleging that defendants King and Bilow: (1)
used excessive force on him in violation of the Eighth
Amendment; and (2) assaulted him in retaliation for his filing
grievances against correction staff, in violation of the First
Amendment. [2] See Dkt. No. 1 ("Compl.") at 5. Although no
longer incarcerated, Flemming was incarcerated at Upstate
Correctional Facility ("Upstate C.F.") at all relevant times.

Presently pending before the Court is defendants' motion
to dismiss Flemming's claims pursuant to Federal Rule of
Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) for failure to
state a claim upon which relief may be granted. Dkt. No.
32. Flemming filed a response in opposition to defendants'
motion. Dkt. No. 34. For the following reasons, it is
recommended that defendants' motion be granted in part, and
denied in part.

**I. Background**

The facts are reviewed in the light most favorable to
Flemming as the non-moving party. See subsection III(A)
infra. Because a portion of Flemming's claims were dismissed
upon initial review of the complaint, Flemming's allegations
are summarized below only to the extent that they are relevant
to the pending motion.

**A. Flemming's Recitation of the Facts**

Flemming alleges that, on March 24, 2011, defendant King
assaulted him, and defendant Bilow pushed him to the ground.
Compl. at 5. Both incidents occurred outside the draft room
at Upstate C.F. Id. Flemming also alleges that, on this same
date, he was threatened by "officers" [3] and told not to file any
more grievances. Id.

**II. Discussion** [4]

**A. Legal Standard**

Under Fed. R. Civ. P. 12(b)(6), a defendant may move
to dismiss a complaint for a plaintiff's "failure to state a
claim upon which relief can be granted." When considering
such a motion, a court must "construe plaintiff['s] complaint
liberally, accepting all factual allegations in the complaint
as true, and drawing all reasonable inferences in plaintiff['s]
favor." 🚩 Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d
Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 326, 335
(2d Cir. 2009)) (internal quotation marks omitted). However,
this "tenet is inapplicable to legal conclusions, and threadbare
recitals of the elements of a cause of action, supported by mere
conclusory statements, do not suffice." 🚩 Harris v. Mills,
572 F.3d 66, 72 (2d Cir. 2009) (quoting 🚩 Ashcroft v. Iqbal,
556 U.S. 662, 664 (2009)) (internal quotation marks and
alterations omitted).

**\*2** Accordingly, to survive a motion to dismiss, a complaint
must state a claim for relief that is " 'plausible on its
face.' " Iqbal, 556 U.S. at 678 (quoting 🚩 Bell Atlantic
Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining
that the plausibility test "does not impose a probability

requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (internal citations omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

### B. Special Solicitude

Ordinarily, where a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.

See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too num erous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally." (internal citations omitted)). However, "there are circumstances where an overly litigious inmate,

who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude' or status that is normally afforded pro se litigants." Standley v. Dennison, No. 9:05-CV-1033 (GLS/GHL), 2007 WL 2406909, at *7 (N.D.N.Y. Aug. 21, 2007) (quoting Smith v. Burge, No. 03-CV-0955, 2006 WL 2805242, at *3 & n.3 (N.D.N.Y. Sept. 28, 2005) (Kahn, J., adopting report-recommendation of Lowe, M.J.) (citations omitted)).

This Court has already diminished the special solicitude afforded to Flemming. In a Memorandum-Decision and Order entered July 16, 2015, this Court reviewed Flemming's extensive litigation history within the Second Circuit. See Dkt. 22 at 7-8. At that time, Flemming had filed nearly sixty civil rights in the Second Circuit. Id. at 7. Based on Flemming's lengthy history of filing complaints in the Second Circuit, this Court diminished the special solicitude that would normally be afforded to him as a pro se litigant at the pleading stage of this action. [5] Id. at 9. Thus, the Court will decide defendants' motion to dismiss bearing in mind Flemming's diminished status as a pro se litigant.

### C. Excessive Force

**\*3** A prisoner plaintiff seeking to demonstrate a claim of excessive force must satisfy both objective and subjective components. The subjective component determines whether the defendants acted "with a sufficiently culpable state of mind." Hudson v. McMillian, 503 U.S. 1, 21 (1992) (citation omitted). This component requires a showing that the defendants "had the necessary level of culpability, showing by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999) (quoting Wilson v. Seiter, 501 U.S. 294, 299 (1991)); see, e.g., Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000); Davidson v. Flynn, 32 F.3d 27, 30 n.2 (2d Cir. 1994). T he objective component is demonstrated where the alleged conduct is " 'sufficiently serious' by objective standards.' " Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)) (additional citation omitted). "The objective component of the Eighth Amendment test is also context specific, turning upon 'contemporary standards of decency.' " Blyden, 186 F.3d

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 128 of 482

Flemming v. King, Not Reported in Fed. Supp. (2016)

at 263 (quoting Hudson, 503 U.S. at 8) (additional citation omitted).

Here, Flemming claims that he was "assaulted" by defendant King and "push [sic] down by [ ] Bilow to the ground." Compl. at 5. Defendants allege that Flemming's complaint fails to meet the pleading standard articulated in *Iqbal*. Dkt. No. 32-1 at 8. Defendants further argue that, even assuming that the allegations are true, the use of force alleged by Flemming is de minimis. Id. at 8-9.

As to the objective element of Flemming's excessive force claims, he has failed to allege he suffered an injury. "The Second Circuit has noted its agreement with other circuits that 'some degree of injury is ordinarily required to state a claim [of excessive force.]' " *Benjamin v. Flores*, No.11-CV-4216 (ARR), 2012 WL 5289513, at *3 (E.D.N.Y. Oct. 23, 2012) (quoting United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999)). Although the objective element may be satisfied even if the prisoner does not show a "serious" injury, Flemming's failure to allege any injury at all falls short of satisfying pleading requirements. See Hudson, 503 U.S. at 7 ("The absence of serious injury is ... relevant to the Eighth Amendment inquiry, but does not end it."). Thus, Flemming has failed to plausibly allege the objective element of his Eighth Amendment claim. See Benjamin, 2012 WL 5289513, at *3 (finding that the plaintiff failed to meet the objective element of his excessive force claim where he failed to allege any injury).

As to the subjective element of his excessive force claim, Flemming's allegations against defendants King and Bilow fail to provide the context of the alleged incident. Although the Second Circuit has previously allowed a prisoner's Eighth Amendment excessive force claim to proceed despite that the "claim [was] weak and [the] evidence extremely thin," Griffin, 193 F.3d at 91, Flemming has lost the full benefit of the special solicitude normally afforded to pro se litigants in this Court, due to his lengthy and sometimes abusive litigation history. See Dkt. No. 22. Given that Flemming has failed to plead against King and Bilow both the context by which the alleged force was used or any injuries sustained, he has failed to state a claim upon which relief may be granted. See Iqbal, 556 U.S. at 678 ("A pleading that offers labels and conclusions ... a formulaic recitation of the elements of a cause of action ... [or] naked assertions devoid

of further factual enhancement" does not suffice.) (internal quotation marks and citations omitted). Flemming has failed to meet the subjective element of the analysis because he does not allege facts to show that either defendant acted "maliciously" or "wantonly" as required to adequately state a claim of excessive force. See Boddie v. Schneider, 105 F.3d 857, 862 (2d Cir. 1997) (dismissing excessive force claim where the plaintiff failed to allege any facts to show that the defendants had "used force maliciously and sadistically to cause harm") (internal quotation marks and citation omitted). Indeed, a complaint does not suffice "where the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct[.]"[6] Id. at 679. Thus, Flemming has failed to plausibly allege the subjective element of his excessive force claim.

**\*4** Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. First Amendment Retaliation

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98, 110 (2d Cir. 2009). " To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. 506 (2002)). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence

2012 WL 638977
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Isidro ABASCAL, Plaintiff,
v.
Dennis FLECKENSTEIN, William
Kump, Chester Kosmowski, James T.
Conway, and Thomas Eagen, Defendants.

No. 06–CV–349S.
|
Feb. 27, 2012.

**Attorneys and Law Firms**

Lisa A. Coppola, Rupp, Baase, Pfalzgraf, Cunningham &
Coppola LLC, Buffalo, NY, for Plaintiff.

David J. Sleight, Office of the Attorney General, Buffalo, NY,
for Defendants.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, Chief Judge.

**I. INTRODUCTION**

**\*1** Plaintiff Isidro Abascal, proceeding *pro se* and *in forma
pauperis,* commenced this action pursuant to 42 U.S.C.
§ 1983, alleging that while he was incarcerated at Attica
Correctional Facility, Defendants subjected him to cruel and
unusual punishment and failed to protect him in violation
of the Eighth Amendment. Pending before this Court are
the Summary Judgment Motions of Plaintiff and Defendants.
For the reasons discussed below, this Court finds the matter
fully briefed and oral argument unnecessary, and concludes
that Plaintiff's motion should be denied in its entirety, and
Defendants' crossmotion should be granted in part and denied
in part.

**II. BACKGROUND**

At all times relevant to his Complaint, Plaintiff was an inmate
in the custody of the New York Department of Correctional

Services at Attica Correctional Facility. (Complaint, Docket
No. 1, at 1–2). Defendants Dennis Fleckenstein, William
Kump, and Chester Kosmowski were correctional officers
("COs") during Plaintiff's period of incarceration. (Complaint
at 1–2). Plaintiff alleged in his Complaint that these COs
subjected him to cruel and unusual punishment in violation
of the Eighth Amendment by depriving him of meals, depriving
him of electricity in his cell, confiscating and reading his legal
documents, physically assaulting and conspiring to physically
assault him, and verbally threatening him. (Complaint at 7–
8). Plaintiff further alleged that Defendants James T. Conway,
Attica Correctional Facility Superintendent, and Thomas G.
Eagen, Director of DOCS Inmate Grievance Program, failed
to protect Plaintiff from the cruel and unusual treatment by
the COs. (Complaint at 2, 8).

Defendants initially moved pursuant to Rule 12(b)(6) to
dismiss all causes of action except Plaintiff's claim of
excessive force against Defendant Fleckenstein for failure
to state a claim. (Docket Nos. 15, 16). This Court granted
that motion in part and denied the motion in part. (Docket
No. 26 at 17). Plaintiff's claims based on deprivation of
electricity, verbal threats, and conspiracy were dismissed,
although this Court liberally construed Plaintiff's pro se
complaint as alleging a failure to intervene claim against
Defendant Kosmowski. (Docket No. 26, at 12, 14–15). It was
further concluded that Plaintiff failed to state a claim of failure
to protect, therefore Defendants Conway and Eagen were
dismissed from the case. (Docket No. 26). All claims were
dismissed insofar as they were asserted against Defendants in
their official, rather than individual, capacities. (Docket No.
26, at 17).

Plaintiff's remaining claims are against Defendants
Fleckenstein and Kosmowski for the deprivation of
food, against Defendants Fleckenstein and Kump for the
confiscation and reading of legal documents, [1] against
Fleckenstein for excessive force, and against Kosmowski for
the failure to intervene in the assault by Fleckenstein. The
parties each now move for summary judgment in their favor. [2]

**III. DISCUSSION**

**\*2** Summary judgment is appropriate where the materials
in the record, including depositions, documents, affidavits or
declarations, and stipulations, show that there are no genuine
issues regarding any material fact and that the movant is
entitled to judgment as a matter of law. *see* FED.R.CIV.P.

56(a), (c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court's function on a summary judgment motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."

*Kaytor v. Electric Boat Corp.,* 609 F.3d 537, 545 (2d Cir.2010). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When making that determination, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003).

Further, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they *suggest.*' " *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (emphasis in original), *quoting Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006). Nonetheless, "proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment." *Castro v. 32BJ Union,* 800 F.Supp.2d 586, 591 (S.D.N.Y.2011) (internal quotation marks omitted).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which provides that persons who, acting under the color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and other laws are subject to civil liability. This provision does not itself provide a source of substantive rights, but instead provides the mechanism by which a plaintiff may seek vindication of federal rights conferred elsewhere. *Graham v. Connor,* 490 U.S. 386, 393–394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To that end, "[i]n addition to prohibiting punishments that involve the unnecessary and wanton infliction of pain, the Eighth Amendment imposes certain duties on prison officials, who 'must ensure that inmates receive adequate food, clothing, shelter and medical care, and must take reasonable measures to guarantee the safety of the inmates.' " *Williams v. Coughlin,* 875 F.Supp. 1004, 1009 (W.D.N.Y.1995), *quoting Farmer v. Brennan,*

511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotation marks omitted). A prisoner may establish an Eighth Amendment violation based upon the conditions of his confinement "only where he proves both an objective element-that the prison officials' transgression was 'sufficiently serious'-and a subjective element-that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.,* with 'deliberate indifference to inmate health or safety.' " *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002), *quoting Farmer,* 511 U.S. at 834.

**A. Deprivation of Food**

**\*3** Plaintiff alleges that he was deprived of meals by Fleckenstein on 13 different occasions between December 10, 2004 and March 6, 2005, with seven of those meals being denied in a four day period. Complaint ¶¶ 17–18, 22–23, 27–32, 34, 36–38; Affidavit of Plaintiff Isidro Abascal, Docket No. 85–2, ¶¶ 7–8, 11, 15–16, 18–21, 23, 25–27. Plaintiff alleges that Kosmoswski participated in five of those denials. Complaint ¶¶ 28–29, 32, 34, 36; Pl's Aff. ¶¶ 16, 18, 21, 23, 25. Defendants deny that Plaintiff was intentionally deprived of any meals, and assert that on the one occasion he was not given the proper amount of food by an inmate porter, Plaintiff was offered a double meal at the next feeding. Declaration of Defendant Dennis Fleckenstein, Docket No. 88, ¶ 9; Declaration of Defendant Chester Kosmowski, Docket No. 90, ¶ 4; Def's Mem. of Law, Docket No. 86–1 at 8. This stark dispute over whether Plaintiff was in fact deprived of any meals requires denial of Plaintiff's motion for summary judgment on this claim.

Defendants argue that they are nonetheless entitled to summary judgment because Plaintiff has admitted "that the cells were controlled by a lock box, which he could not see from his cell, and he therefore can not say who neglected to open his cell." Def's Mem. of Law at 9. Defendants correctly argue that in order to recover under § 1983, Plaintiff must establish the personal involvement of each defendant in the alleged constitutional deprivations. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert denied* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The record does not support the assertion, however, that Plaintiff admitted he could not identify the correctional officer who failed to open his cell on each of the occasions alleged. Plaintiff testified at his deposition that he was placed in the next-to-last cell in his

company, apparently some distance from where the lock box was located behind a secured gate. Pl's Dep. at 20–22, 42. He further testified, and Defendants do not dispute, that just prior to meal time, one of the two correctional officers assigned to the company would walk down the company and take note of which prisoners were requesting to go to the mess hall. Pl's Dep at 20, 22–24; *see* Fleckenstein Decl. ¶ 11; Kosmowski Decl. ¶ 6. Accordingly, even if Plaintiff could not see the officer who operated the lock box, he could identify the officer involved in taking and reporting his allegedly unfulfilled meal request.

Defendants further argue that the deprivation of fourteen meals over four months, even if true, is not sufficiently serious to establish an Eighth Amendment violation. "[U]nder certain circumstances a *substantial* deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (emphasis added). If the instances of denied meals were in fact dispersed throughout the four month time frame alleged, this issue would be quickly resolved. *See Benitez v. Locastro,* No. 04–CV–423, 2008 WL 4767439, *7 (N.D.N.Y. Oct. 29, 2008) (allegation of one missed meal a day insufficient to establish Eight Amendment claim); *McLeod v. Scully,* No. 81 Civ. 3139, 1984 WL 692, *2 (S.D.N.Y. July 30, 1984) (same). Here, however, Plaintiff alleges that he was deprived of seven meals in a four day period. Complaint ¶¶ 30–32, 34, 36–38; Pl's Aff. ¶¶ 19–21, 23, 25–27 (March 3–6, 2005); *see Williams,* 875 F.Supp. at 1008, 1013 (defendant's motion for summary judgment denied because deprivation of five meals in two days, following which the plaintiff passed out, "may state a claim under the Eighth Amendment"). Although Plaintiff received at least one meal a day during this period, "[w]hen a prison guard deprives a prisoner of two of the regularly three meals served each day, the objective prong of the Eighth Amendment may be met if the defendants do not satisfy their burden of showing that the one meal served is nutritionally adequate." *Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001), *citing Cunningham v. Jones,* 567 F.2d 653, 660 (6th Cir.1977) (deprivation of two meals a day establishes "substantial deprivation of jail food normally served," shifting burden to defendants to establish that one meal was nutritionally adequate). Defendants have offered no evidence as to "whether the one meal actually provided [P]laintiff was sufficient to maintain normal health," therefore there is a material question of fact whether Plaintiff was substantially deprived of food in violation of the Eighth

Amendment. *Cunningham,* 567 F.2d at 660; *Williams,* 875 F.Supp. at 1008, 1013.

**\*4** Further, assuming Plaintiff's allegations to be true, as this Court must, the number of denied meals in a short amount of time is sufficient to raise an inference that Defendants Fleckenstein and Kosmowski were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" from the denial of those meals and that they in fact drew such an inference. *Farmer,* 511 U.S. at 837. Defendants' crossmotion for summary judgment is therefore denied with respect to the claim that Plaintiff was deprived of food in violation of the Eighth Amendment.

## B. Confiscation of Legal Documents

Plaintiff alleges that on two separate occasions correctional officers took and read his legal papers without his permission. On the first occasion, Plaintiff was on his way to the law library when Defendants Kump and Fleckenstein stopped him and searched his legal folder. Complaint ¶ 16; Pl's Aff. ¶ 6. On the second occasion approximately two months later, Plaintiff saw his legal documents that had been taken from his cell and placed on the correctional officer's desk. Complaint ¶ 20; Pl's Aff. ¶ 9. His cell had been the subject of a search, and approximately five minutes later his legal documents were returned to him by Defendant Kump. Complaint ¶ 20; Pl's Aff. ¶ 9.

Initially, this is the only claim remaining against Defendant Kump, and Defendants argue that the claim should be dismissed as against him due to Plaintiff's failure to move for substitution of Kump's estate as defendant after Kump's death in April 2007. Where a party dies and a claim against him is not extinguished by his death, a motion for substitution may be made by any party. FED. R. CIV. P. 25(a)(1). "If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent *must* be dismissed." *Id.* (emphasis added). Presuming that this § 1983 claim survives Kump's death, see generally *Graham v. Henderson,* 224 F.R.D. 59, 62–63 (N.D.N.Y.2004), Defendants filed a formal written statement of fact of death on February 2, 2009 (Docket No. 32). Plaintiff failed to move for substitution, or even address this issue in his motion papers. *See* Docket No. 35 at 12 (Plaintiff concedes that Kump is deceased). This claim against Kump must therefore dismissed pursuant to Fed.R.Civ.P. 25(a)(1).

In any event, dismissal against both Kump and Fleckenstein is also warranted on the merits. Plaintiff expressly denies any claim that the COs' actions constituted a denial of access to the courts, Pl's Reply Mem. of Law, Docket No. 98 at 8. Instead, he grounds his argument in part on attorney-client privilege, asserting that he never consented to the taking and reading of his legal documents or intended to share the same with any third party. Pl's Reply Mem. of Law, at 8–9. Notably, the case on which Plaintiff relies, *United States v. DeFonte,* dealt with the admissibility of purported privileged communications between a prisoner and her attorney at a trial of a corrections officer, a situation not relevant to the instant § 1983 claim. *441 F.3d 92, 94 (2d Cir.2006)* (prisoner does not "waive an attorney-client privilege with respect to documents retained in her cell simply because there is no reasonable expectation of privacy in those documents for Fourth Amendment purposes"). Here, Plaintiff does not allege that his legal papers contained confidential *communications* to an attorney. *See DeFonte,* 441 F.3d at 95–96. Further, interference with legal documents, particularly with legal mail involving attorney-client communications, "implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003); *see Washington v. James,* 782 F.2d 1134, 1138–1139 (2d Cir.1986) (plaintiff's allegation that correction officer opened his mail without permission reasonably interpreted as allegation of intentional interference with plaintiff's right to access the court); *Hiney v. Wilson,* 520 F.2d 589, 591 (2d Cir.1975) (confiscation of legal papers may constitute a denial of access to the courts); *see generally Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (recognizing that the right of access to the courts is protected by prohibiting prison officials from actively interfering with the preparation or filing of legal documents).

*5 Defendants correctly argue that Plaintiff cannot establish a claim for interference with access to the courts. "To establish a constitutional violation based on denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in an actual injury to the plaintiff." *Bellezza v. Holland,* 730 F.Supp.2d 311, 314 (S.D.N.Y.2010) (internal quotation marks omitted). According to Plaintiff, he was deprived of his documents for no more than five minutes on either occasion, and there is no evidence that his legal papers were otherwise altered or damaged. Complaint ¶¶

16, 20; Pl's Aff. ¶¶ 6, 9. Thus, there is no evidence of actual harm. *Davis,* 320 F.3d at 352 (two instances of interference with legal mail insufficient to state denial of access claim in absence of actual harm); *Gagot v. Rodriguez,* No. 08–CV–361, 2011 WL 1201822, *4 (March 23, 2011) (24 hour deprivation of legal documents was de minimus and did not result in actual impairment of a legal claim). For the same reason, Plaintiff was not deprived of his property. *Cf. Alexanian v. New York State Urban Dev. Corp.,* 554 F.2d 15, 17 (2d Cir.1977) (violation of § 1983 stated when plaintiff's money and possession, confiscated upon his incarceration, were not returned to him upon his release).

Finally, as Defendants argue, a brief interruption in Plaintiff's access to his papers is not unconstitutional where, as here, the brief searches were reasonably related to legitimate penological objectives. *See Crawford–El v. Britton,* 951 F.2d 1314, 1318 (D.C.Cir.1991), *cert denied* 506 U.S. 818, 113 S.Ct. 62, 121 L.Ed.2d 29 (1992), *citing Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Here, Plaintiff acknowledges that certain written materials are considered contraband, such as documents related to gangs, and that there are times when a document must be read to determine whether or not it is contraband. Pl's Dep. at 66–67. Defendants cross-motion for summary judgment on this claim is therefore granted.

## C. Excessive Force and Failure to Intervene

Plaintiff alleges that on February 22, 2005, while Plaintiff was on his way to a sick call, Defendant Fleckenstein "approached him, and hit [P]laintiff without provocation on the right-hand side of his rib cage area with his elbow." Pl's Aff. ¶ 12; Complaint ¶ 24. Plaintiff asserts that he "did not resist or threaten ... Fleckenstein in any fashion or [break] any prison rules" prior to the assault, and that he suffered a bruise and soreness for several days as a result. Pl's Aff. ¶ 12; Complaint ¶ 24; Pl's Mem. of Law in Opp'n, Docket No. 95–2 at 14; Pl's Dep. at 90–91. Fleckenstein purportedly told Plaintiff shortly thereafter "The next time, I'm going to wrap you up in a bag!" Pl's Aff. ¶ 13; Complaint ¶ 25. Plaintiff further alleges that Defendant Kosmowski subsequently "asked [P]laintiff why he bumped his partner," and that Kosmowski "saw [P]laintiff doing the bumping." Pl's Aff. ¶ 14; Complaint ¶ 26. Fleckenstein denies this version of events, instead describing the incident as one where Plaintiff attempted to push past him without permission while Fleckenstein was at the gate by the officers' desk. Fleckenstein Decl. ¶¶ 6, 21–

22. Kosmowski acknowledges that he asked Plaintiff why he bumped Fleckenstein, but asserts that this was because he observed Plaintiff attempt to push past Fleckenstein while that officer was controlling inmate traffic at the gate. Kosmowski Decl. ¶¶ 11–13.

**\*6** "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). The core judicial inquiry is to be made is not the extent of the injury, if any, but whether the nature of the force used was nontrivial and applied maliciously and sadistically for the purpose of causing harm. *Wilkins v. Gaddy,* —— U.S. ——, 130 S.Ct. 1175, 1179, 175 L.Ed.2d 995 (2010); *see Wright v. Goord,* 554 F.3d at 268–269. Nonetheless, not "every malevolent touch by a prison guard gives rise to a federal cause of action," and de minimis uses of physical force do not fall within the scope of the Eighth Amendment prohibition against cruel and unusual punishments. *Hudson,* 503 U.S. at 9. Where, however, "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically," summary judgment is improper "even where the plaintiff's evidence of injury [is] slight and the proof of excessive force [is] weak." *Wright,* 554 F.3d at 269.

Here, Plaintiff's purported bruise is certainly "slight," and his allegation of a single elbow blow to his side is also "weak." *Wright,* 554 F.3d at 269. Crediting Plaintiff's version of events, however, as this Court must in considering Defendants' motion for summary judgment, *Dallas Aerospace, Inc.,* 352 F.3d at 780, Fleckenstein's brief assault was completely unprovoked and unrelated to any effort to maintain or restore discipline. If construed as a threat, Fleckenstein's alleged subsequent statement that "next time, I'm going to wrap you up in a bag," provides sufficient evidence when combined with the absence of provocation or need to raise a material question of fact whether Fleckenstein acted with malicious intent. *See Wilkins,* 130 S.Ct. At 1179 (district court's focus on de minimus nature of injuries improper where plaintiff alleged he was punched and kicked without any provocation). In so concluding, this Court expresses no view on the underlying merits of this excessive force claim, but notes only that, if successful, "the relatively modest nature of his alleged injuries will no doubt

limit the damages he may recover." *Wilkins,* 130 S.Ct. at 1180. Both Plaintiff's motion and Defendants' cross-motion for summary judgment are therefore denied with respect to Plaintiff's claim of excessive force against Fleckenstein.

The same conclusion is not reached with respect to Plaintiff's claim against Defendant Kosmowski for failure to intervene. A law enforcement official has an affirmative duty to intervene on behalf of a citizen whose constitutional rights are being violated in his presence by other officers. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001). As noted, however, Plaintiff describes the alleged assault as a single, unprovoked blow. Accordingly, Kosmowski did not have a realistic opportunity to intervene. *O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (no reasonable opportunity to intervene where three blows struck in rapid succession); *see Lewis v. Downey,* 581 F.3d 467, 472 (7th Cir.2009) (no realistic opportunity to prevent fellow officer from using taser), *cert. denied* —— U.S. ——, 130 S.Ct. 1936, 176 L.Ed.2d 366 (2010). This claim against Kosmowski is therefore dismissed.

## IV. CONCLUSION

**\*7** Inasmuch as there are material differences between Plaintiff's and Defendants' versions of events, Plaintiff's Motion for Summary Judgment is denied in its entirety. Nonetheless, Defendants have established their entitlement to summary judgment with respect to Plaintiff's claim that his legal documents were improperly confiscated and read, as well as his claim that Defendant Kosmowski failed to intervene in the alleged assault. Defendants' Cross–Motion for Summary Judgment is therefore granted with respect to those claims, and denied with respect to Plaintiff's remaining deprivation of food and excessive force claims.

## V. ORDERS

IT HEREBY IS ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 85) is DENIED;

FURTHER, that Defendants' Cross–Motion for Summary Judgment (Docket No. 86) is GRANTED IN PART and DENIED IN PART;

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 638977

## Footnotes

1     Although the cause of action alleging interference with legal documents is directed only at Kump, Plaintiff's factual allegations indicate that Fleckenstein was allegedly involved in one instance. Complaint ¶ 20, Docket No. 1 at 7.

2     In support of his Motion for Summary Judgment (Docket No. 85), Plaintiff submitted his Statement of Undisputed Facts (Docket No. 85–1), the Affidavit of Plaintiff Isidro Abascal (Docket No. 85–2), a supporting Memorandum of Law (Docket No. 85–3), and an Appendix of Exhibits A1–A5 (Docket No. 85–4).

    Defendants submitted in support of their Cross–Motion for Summary Judgment (Docket No. 86) a supporting Memorandum of Law (Docket No. 86–1), Statement of Undisputed Facts (Docket No. 86–2), Declaration of P. Corcoran (Docket No. 87), Declaration of Defendant Dennis Fleckenstein (Docket No. 88), Declaration of George Zimmermann, Esq., with Exhibits A & B (Docket No. 89), and Declaration of Defendant Chester Kosmowski (Docket No. 90).

    Plaintiff further submitted a Statement of Disputed Factual Issues (Docket No. 93), an Affidavit in Opposition to Defendant's Cross–Motion (Docket No. 94), an opposing Memorandum of Law (Docket No. 95–2), an opposing Appendix with Exhibits A1–A8 (Docket No. 95–1). Defendants responded to Plaintiff's motion with an opposing Memorandum of Law (Docket No. 97), to which Plaintiff filed a Reply

---

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5173282
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Woodrow FLEMMING, Plaintiff,

v.

Matthew J. KING; David Bilow, Defendants.

9:14-CV-0316 (DNH/DEP)

|

Signed 09/21/2016

**Attorneys and Law Firms**

WOODROW FLEMMING, P.O. Box 146, New York, NY 10039, Plaintiff pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, The Capital, OF COUNSEL: ORIANNA CARRAVETTA, ESQ., Assistant Attorney General, Albany, NY 12224-0341.

## DECISION and ORDER

DAVID N. HURD, United States District Judge

**\*1** *Pro se* plaintiff Woodrow Flemming brought this civil rights action pursuant to 42 U.S.C. § 1983. On June 20, 2016, the Honorable Christian F. Hummel, United States Magistrate Judge, advised by Report-Recommendation that

defendants' motion for summary judgment be granted in part and denied in part. See ECF No. 37. Defendants have filed timely objections and plaintiff has filed a response. See ECF Nos. 39, 40.

Based upon a de novo review of the Report-Recommendation, the Report-Recommendation is accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Defendants Matthew J. King and David Bilow's motion for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 32) of plaintiff Woodrow Flemming's complaint (ECF No. 1) is:

   (a) **GRANTED** as to the Eighth Amendment excessive force claims against defendants King and Bilow; and

   (b) **DENIED** as to the First Amendment retaliation claims against defendants King and Bilow; and

2. The Clerk serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5173282

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

of the protected conduct." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." See Barclay v. New York, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). In order to prove an adverse action, a plaintiff must show that the defendant's " 'retaliatory conduct ... would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights .... Otherwise, the retaliatory act is simply de minimis, and therefore outside the ambit of constitutional protection.' " Roseboro v. Gillespie, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting Dawes, 239 F.3d at 292-93).

Here, Flemming alleges in his second cause of action that he was threatened by defendants King and Bilow. Compl. at 5. He also states that he told King and Bilow that he would file a lawsuit against them. Id. He then states, in a separate cause of action, that King and Bilow assaulted him. Id.

To satisfy the first element of a retaliation claim, Flemming must show that he engaged in a protected activity. Flemming states that he threatened to file a lawsuit against defendants King and Bilow. Compl. at 5. Courts in this Circuit have routinely found that a prisoner's threat of filing a grievance or lawsuit constitutes protected activity. See Gibson v. Fischer, No. 9:10-cv-0968 (LEK/TWD), 2014 WL 7178346, at *15 (N.D.N.Y. Dec. 15, 2014) (denying summary judgment as to retaliation claim where the plaintiff threatened to file a grievance); Sprau v. Coughlin, 997 F. Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint sufficient to establish protected activity); but see Henry v. Dinelle, No. 9:10-CV-0456 (GTS/DEP), 2011 WL 5975027, at *7 (N.D.N.Y. Nov. 29, 2011) (finding that a prisoner's statement implying that he would be consulting an attorney about whether to file a grievance was not protected activity).

**\*5** As to the second prong, although Flemming states that he was assaulted by defendant King, and pushed down by defendant Bilow, the Court has stated above in section III.C, supra, that Flemming has failed to state an excessive force claim against defendants Kind and Bilow. However, for the purposes of First Amendment retaliation analysis, the Court notes that a physical assault constitutes adverse action.

See Baskerville v. Blot, 224 F. Supp. 2d 723, 731-32 (S.D.N.Y. 2002) (finding that a retaliatory assault constitutes adverse action). Indeed, the alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis. The alleged adverse action need only be " 'capable of deterring a person of ordinary firmness' from exercising the constitutional right in question." Nelson v. McGrain, No. 6:12-CV-6292(MAT), 2015 WL 7571911, at *2 (W.D.N.Y. Nov. 24, 2015) (quoting Hill v. Lappin, 630 F.3d 468, 472 (6th Cir. 2010)) (emphasis in original) (citation omitted). Thus, at this stage of the pleadings, Flemming has satisfied the second prong. See id. (concluding that retaliatory acts were more than de minimis acts of harassment). [7]

Lastly, as to the third prong, plaintiff states that on March 24, 2011, he was threatened by King and Bilow to not file any more grievances. Compl. at 5. He then states that he threatened to file a lawsuit against defendants King and Bilow. Id. That same day, he was allegedly assaulted by King, and pushed down by Bilow. Id. Claims of retaliation "must be 'supported by specific and detailed factual allegations,' 'not stated in wholly conclusory terms.' " Friedl v. City of New York, 210 F.3d 79, 86 (2d Cir. 2000) (quoting Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)). The only circumstantial evidence supporting the finding of a causal connection is Flemming's assertions that the alleged assaults committed by both defendants happened on the same day that he threatened to file a lawsuit against those same defendants. See Compl. at 5. However, this temporal proximity, coupled with the common identity between the officers who Flemming verbalized his threat to, and the officers who allegedly assaulted him, are sufficient to establish the third prong of Flemming's First Amendment retaliation claim. See Vogelfang v. Capra, 889 F. Supp. 2d 489, 518 (S.D.N.Y. 2012) (denying motion to dismiss retaliation claim where the plaintiff alleged temporal proximity, coupled with a common identity between the subject of the plaintiff's grievance and the officer who issued a false misbehavior report).

Although Flemming's pleadings lack specificity, the Court finds that at this stage in the proceedings, he has alleged sufficient facts to state a plausible claim. While this Court diminished the special solicitude afforded to Flemming at the pleading stage of the proceedings, it did not completely abolish the leniency with which his pleadings are to be

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 137 of 482

Flemming v. King, Not Reported in Fed. Supp. (2016)

construed. See [flag] Sealed Plaintiff, 537 F.3d at 191. Thus, the Court finds that Flemming has stated a plausible First Amendment retaliation claim to overcome defendants' motion.

Accordingly, it is recommended that defendants' motion on this ground be denied.

### III. Conclusion

**\*6** For the reasons stated above, it is hereby:

**RECOMMENDED** that defendants Matthew J. King and David Bilow's motion for dismissal under Rule 12(b)(6) (Dkt. No. 32) of plaintiff Woodrow Flemming's complaint (Dkt. No. 1) be

1. **GRANTED** as to the Eighth Amendment excessive force claims against defendants King and Bilow.

2. **DENIED** as to the First Amendment retaliation claims against defendants King and Bilow; and it is further

**ORDERED** that the Clerk serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

Pursuant to [flag] 28 U.S.C. § 636(b)(1), the parties m ay lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. [flag] Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); [flag] Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also [flag] 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

DATED: June 20, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5219995

### Footnotes

1     This matter was referred to the undersigned for report and recommendation pursuant to [flag] 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2     Following initial review of the complaint filed in this action, District Judge David N. Hurd dismissed Flemming's Eighth Amendment medical indifference claims against defendants Adams, Smith, and Rock. Dkt. No. 5 at 10. Defendants Adams, Smith, and Rock were also dismissed from this action. Id.

3     Although not identified in his complaint, Flemming identifies the officers who threatened him as defendants King and Bilow in his opposition papers. See Dkt. No. 34 at 3, ¶ 13.

4     All unpublished opinions cited to by the Court in this Report-Recommendation and Order are, unless otherwise noted, attached to this Report-Recommendation and Order.

5     The Court also notes that, in a separate action brought by Flemming on January 12, 2015, District Judge Hurd determined that Flemming is not entitled to the special solicitude normally afforded to a pro se litigant, based on Flemming's history as an "experienced and vexatious pro se plaintiff." Flemming v. Rock, No. 9:15-CV-30, 2016 WL 632248, at \*2 (N.D.N.Y. Feb. 16, 2016).

6     The Court further notes that District Judge Hurd dismissed Flemming's excessive force claims in Flemming v. Rock, 2016 WL 632248, at \*3, and noted that the dismissed claims were nearly identical to excessive force claims asserted by Flemming in a prior action—Flemming v. Santamore, No. 9:15-CV-29 (DNH/CFH). Judge Hurd further noted that those claims were nearly identical to the excessive force claims asserted in two other

**Flemming v. King, Not Reported in Fed. Supp. (2016)**

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 138 of 482

complaints filed by Flemming in the Northern District of New York. Flemming v. Rock, 2016 WL 632248, at *2 n.4. Upon review of the complaint in Flemming v. Rock, the Court notes that Flemming's excessive force claims—which were dismissed for failure to state a claim upon which relief may be granted—are very similar to the excessive claims asserted in this case, albeit against different defendants. See Flemming v. Rock, No. 9:15-CV-30, Dkt. No. 1.

7    Defendants assert in their Memorandum of Law in support of their motion that the adverse action prong of Flemming's retaliation claim consists only of a claim that officers threatened him to cease his filing grievances. Dkt. No. 32-1 at 6-7. They base this argument on Flemming's use of the form civil rights complaint, stating that because he alleges threats in the section labeled "second cause of action" and a physical assault in the section labeled "third cause of action," he has failed to satisfy the second prong of First Amendment retaliation analysis. Id. at 7. The Court rejects this argument. Upon initial review, District Judge Hurd interpreted Flemming's complaint as stating that Flemming was assaulted for threatening to initiate a lawsuit. Dkt. No. 3 at 5-6. The undersigned will do the same.

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    6

2013 WL 144945
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Joe FELDER, Plaintiff,
v.
Correction Officer Adam STECK, and Correction
Officer Matthew P. Rademacher, Defendants.

No. 10–CV–578.
|
Jan. 11, 2013.

**Attorneys and Law Firms**

Joe Felder, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, (Stephanie Joy Calhoun, Assistant Attorney
General, of Counsel), Buffalo, NY, for Defendants.

### INTRODUCTION

H. KENNETH SCHROEDER, JR., United States Magistrate
Judge.

**\*1** Pursuant to 🚩 28 U.S.C. § 636(c), the parties have
consented to the assignment of this case to the undersigned
to conduct all proceedings in this case, including the entry of
final judgment. Dkt. # 12.

Plaintiff, proceeding *pro se,* brought this action pursuant to
🚩 42 U.S.C. § 1983 seeking compensatory and punitive
damages for the alleged violation of his rights under the
Eighth Amendment. Specifically, plaintiff has alleged that he
was subjected to the excessive use of force. Currently pending
before the court is the defendants' motion for summary
judgment. Dkt. # 33.

### BACKGROUND

Plaintiff commenced this action on July 14, 2010 with the
filing of a *pro se* complaint pursuant to 🚩 Title 42 U.S.C.
§ 1983.[1] Dkt # 1. Plaintiff, at the time an inmate at Attica
Correctional Facility, alleges that on February 24, 2010 he

was punched about the head and face by defendant Steck
while being held against a wall by defendant Rademacher. In
an order filed July 26, 2010, plaintiff was granted permission
to proceed *in forma pauperis.* Dkt. # 3.

Answers to the complaint were filed by defendant
Rademacher on December 10, 2010 (Dkt.# 4), and by
defendant Steck on January 6, 2012. Dkt. # 26. Following
the parties' exchange of discovery materials, on April 26,
2012, the defendants moved for summary judgment. Dkt.
# 33. Plaintiff filed a response to the motion on May 30,
2012. Dkt. # 35. The court has determined that oral argument
is unnecessary. For the reasons that follow, the defendants'
motion for summary judgment is denied.

### FACTS [2]

Plaintiff testified that on February 24, 2010, while returning
from the mess hall, he was called out of the line of inmates
and told by defendant Steck to stand on the wall. Dkt. # 33, att.
3, Exh. A, p. 12. After the rest of the inmates went upstairs,
defendant Steck approached the plaintiff and conducted a
pat-down search for weapons. *Id.,* p. 25. Defendant Steck
then instructed plaintiff to turn around, asked plaintiff who
he thought he was talking to, and started to punch him.
*Id.,* pp. 12, 26. Defendant Rademacher put his forearm into
plaintiff's neck to hold him against the wall while defendant
Steck continued to punch plaintiff on the side of the head.
*Id.* Following this attack, the left side of plaintiff's head
was swollen. *Id.,* p. 20. He spent a night in the infirmary
because his blood pressure was elevated. *Id.* Plaintiff filed a
grievance regarding this incident on February 25, 2010. The
grievance was denied, as was the appeal of the denial. *Id.,* p.
21. Plaintiff stated that he did not experience any long-term
physical symptoms or psychological problems as a result of
the alleged assault. *Id.,* p. 26.

Defendant Steck denied that this incident occurred. Dkt. #
33, att. 5. He denied pulling plaintiff out of the line of
inmates, searching him, or striking or punching him. *Id.,*
¶ 5. He denied seeing defendant Rademacher or any other
Corrections Officer ("CO") holding plaintiff against the wall
or using any force whatsoever. *Id.,* ¶¶ 5–6. While plaintiff
filed a grievance regarding the alleged incident, no Use of
Force report was filed. *Id.,* ¶¶ 7, 10.

**\*2** Likewise, defendant Rademacher denied that the incident
occurred. Dkt. # 33, att. 4. He denied holding plaintiff against

the wall, striking the plaintiff, or witnessing any use of force by defendant Steck or any other CO. *Id.,* ¶ 5.

In her declaration, RN Rita Pawlak stated that, upon reviewing plaintiff's medical records, she found that plaintiff did not complain of any injuries on February 24, 2010, but reported the alleged assault approximately two weeks later on March 8, 2010. Dkt. # 33, att. 6, Exh. A. On March 8, 2010, Nurse Pawlak examined plaintiff and found no evidence of trauma or injury to his head or neck. *Id.,* ¶¶ 6–10. Plaintiff's Ambulatory Health Record ("AHR") indicates that on March 2, 2010, plaintiff was admitted to the infirmary for observation related to high blood pressure. *Id.,* ¶ 12. There is no indication that plaintiff made any complaint of injury to his head or neck at that time. *Id.,* Exh. B.

In opposition to the motion, plaintiff reiterated that on February 24, 2010, he was pulled out of line by defendant Steck, searched, and assaulted without warning, while being held against the wall by defendant Rademacher. Dkt. # 35, ¶ 4. Plaintiff stated that he complained of his injuries when he was admitted to the infirmary on March 2, 2010, but that it was not noted in the AHR. *Id.,* ¶ 5. He also stated that he had bruises from the alleged assault on March 8, 2010, but that Nurse Pawlak privately conferred with a sergeant and later reported no visible injuries. *Id.*

## DISCUSSION

### Summary Judgment Standard

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Although the language of this Rule has been amended in recent years, the well-settled standards for considering a motion for summary judgment remain unchanged. *See, e.g., Faulkner v. Arista Records LLC,* 797 F.Supp.2d 299, 311 n. 7 (S.D.N.Y.2011). Under those standards, the party seeking summary judgment bears the initial burden of establishing that no genuine issue of material fact exists. *Rockland Exposition, Inc. v. Great American Assur. Co.,* 746 F.Supp.2d 528, 532 (S.D.N.Y.2010), *aff'd,* 445 Fed. Appx. 387 (2d Cir.2011). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law ...." *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial is needed ...." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotation marks and citation omitted) (quoted in *Kaminski v. Anderson,* 792 F.Supp.2d 657, 662 (W.D.N.Y.2011)). In considering whether these respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (internal quotation marks and citation omitted).

**\*3** The court recognizes its duty to "extend extra consideration" to *pro se* plaintiffs and that *"pro se* parties are to be given special latitude on summary judgment motions." *Bennett v. Goord,* 2006 WL 2794421, at \*3 (W.D.N.Y. August 1, 2006), *aff'd,* 2008 WL 5083122 (2d Cir.2008) (quoting *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998)); *see also McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (*pro se* party's pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest"). "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 1999 WL 983876, at \*3 (S.D.N.Y. October 28, 1999) (citing cases).

### Excessive Force

The Eighth Amendment to the U.S. Constitution provides that "cruel and unusual punishments [shall not be] inflicted." U.S. Const. amend. VIII. That rule, applicable to the states through the Fourteenth Amendment, *see Estelle v. Gamble,* 429 U.S. 97, 101–02 (1976), is violated by the unnecessary and wanton infliction of pain and suffering. *See Whitley v. Albers,* 475 U.S. 312, 320 (1986). In assessing an inmate's claims that prison officials subjected him to cruel and unusual punishment by using excessive force, courts must determine

2019 WL 7500501
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Richard H. LIVINGSTON, Plaintiff,

v.

William HOFFNAGLE, et al., Defendants.

No. 9:19-CV-0353 (GLS/CFH)
|
Signed 11/08/2019

**Attorneys and Law Firms**

Richard H. Livingston, 326 N. Beech Street, Syracuse, New
York 13207, Plaintiff pro se.

OF COUNSEL: CHRISTOPHER J. HUMMEL, ESQ. [1],
Assistant Attorney General, Attorney General for the State of
New York, The Capitol, Albany, New York 12224, Attorney
for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [2]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

\*1 Plaintiff pro se Richard H. Livingston ("Plaintiff"), an
inmate who was, at all relevant times, in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"), brings this action pursuant to 42
U.S.C. § 1983, alleging that defendants Correctional Sergeant
("Sgt.") William Hoffnagle, Correction Officer ("C.O.")
Dustin Hollenbeck and C.O. Chris King—who, at all
relevant times were employed at Upstate Correctional Facility
("Upstate")—violated his constitutional rights under the First
and Eight Amendments. See Dkt. No. 1 ("Compl."). [3]

Presently pending before the Court is defendants' motion to
dismiss pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 12. Plaintiff
did not file a response. [4] For the reasons that follow, it is
recommended that defendants' motion be granted in part and
denied in part.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to
plaintiff as the non-moving party. See section II.A. infra. At
all times relevant to this complaint, plaintiff was incarcerated
at Great Meadow Correctional Facility ("Great Meadow").
See generally Compl. On August 1, 2017, plaintiff was
transferred from Clinton Correctional Facility ("Clinton") to
Upstate, [5] where he was to be housed in solitary confinement
for six months as a result of his involvement in an altercation
with another inmate at Clinton. See Compl. at 5 ¶ 8; Dkt. No.
1-1 at 2. Upon his arrival to Upstate, plaintiff requested that
Sgt. Hoffnagle, the area supervisor, place him in protective
custody because "he was in fear for his life and safety" as
a result of the prior altercation, which he characterized as a
"gang attack." Compl. at 5 ¶ 8. According to plaintiff, the
inmate with whom he had engaged in an altercation at Clinton
was a gang member and had initiated the fight with plaintiff.
See id. However, plaintiff "had gotten the best of" him,
which plaintiff believed became widely known throughout
DOCCS. Id. Therefore, plaintiff asserts, he was worried that
a gang member at Upstate would retaliate against him. See id.
Plaintiff alleges that, in response to his request for protective
custody, Sgt. Hoffnagle directed his two subordinates, C.O.
Hollenbeck and C.O. King, "to dissuade" plaintiff from
requesting protective custody. Id. at 12 ¶ 45.

\*2 Plaintiff states that defendants "tortured" him by locking
him in a holding cell, "chained and handcuffed tightly," with
no food, water, or bathroom access between 1:00 P.M. and
6:30 P.M. Id. at 9 ¶ 39, 5 ¶ 12. He asked defendants "over
10 times" to loosen his chains and handcuffs, for water, and
to use the bathroom "for relief," but defendants ignored his
requests. Id. at 6 ¶ 13, 10 ¶ 40. Between 5:30 P.M. and 6:30
P.M., plaintiff "threaten[ed] to file grievances and lawsuits"
against defendants based on "constitutional violations." Id. at
6 ¶ 15. In response, C.O. King told plaintiff that "the Sgt.
wants to write plaintiff a ticket" and that "he was instructed
to write a misbehavior report" based on plaintiff's "refus[al]
of a direct order to lock into a cell," which plaintiff denies,
stating that "this was not the case." Id. at 6 ¶¶ 17, 18.
Sometime between 6:00 p.m. and 6:30 p.m., plaintiff was
placed in a cell with a "violent gang banger," purportedly in
contravention of DOCCS Directive No. 4003B, and given a
tray of food that was "freezer cold." Id. at 6 ¶ 20. Plaintiff
states that he was housed with this inmate as "punishment"
for requesting protective custody. Id. at 6 ¶ 20, 7 ¶ 22. Plaintiff
alleges that being housed with this "gang member" caused

him "psychological pain" and loss of "sleep for days in fear of his life." Id. at 11 ¶ 43.

On August 3 and August 7, 2017, plaintiff filed two nearly identical grievances concerning the events that occurred on August 1, 2017. See id. at 7; Dkt. No. 1-1 at 4, 5. On September 25, 2017, plaintiff's grievance was denied. See Dkt. No. 1-1 at 10-11. Plaintiff appealed the denial to Central Office Review Committee (CORC). See id. at 12. On December 12, 2018, CORC denied plaintiff's appeal as without merit. See id. at 16.

## II. Discussion [6]

### A. Legal Standard for Motions Pursuant to Fed. R. Civ. P. 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009)) (internal quotation marks omitted). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is " 'plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible....") (internal quotation marks and citation omitted). Determining whether plausibility exists is

"a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law....

**\*3** Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds pro se, ... a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

### B. Eighth Amendment

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. Hudson v. McMillian, 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and

wanton infliction of pain." 🚩 Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000) (quoting 🚩 Gregg v. Georgia, 428 U.S. 153, 173 (1976)).

### 1. Excessive Force

Plaintiff alleges that defendants used excessive force in violation of his Eighth Amendment rights by applying his chains and handcuffs too tightly. Compl. at 10 ¶¶ 12, 41. Plaintiff states that the tightness of the chains and handcuffs caused "soreness." Id. at 10 ¶ 41. He further contends that he "asked over 10 times" for his handcuffs and chains to be loosened and "continued to complain about the tightness and soreness for [six] hours," but defendants refused to loosen the chains and handcuffs. See id. at 6 ¶ 14. He alleges that the chains and handcuffs were applied tightly in order to make him "break[ ] down and forget about wanting protective custody." Compl. at 9 ¶ 37. Defendants argue that plaintiff has failed to state a claim for excessive force because plaintiff's alleged injury is de minimis for constitutional purposes. See Dkt. No. 12-1 at 5.

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. See 🚩 Davidson v. Flynn, 32 F.3d 27, 30 (2d Cir. 1994). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See 🚩 Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection." 🚩 Hudson, 503 U.S. at 8 (internal quotation marks and citation omitted); 🚩 Blyden, 186 F.3d at 262. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." 🚩 Sims, 230 F.3d at 22 (internal quotation marks, alteration, and citation omitted). However, "the malicious use of force to cause harm[ ] constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. 🚩 Blyden, 186 F.3d at 263 (citing 🚩 Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant

to the conscience of mankind." 🚩 Hudson, 503 U.S. at 9-10 (internal quotation marks and citations omitted). "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." 🚩 Id. at 7.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." 🚩 Sims, 230 F.3d at 21 (internal quotation marks and citations omitted). Thus, the key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause[ ] harm." 🚩 Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted); see also 🚩 Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (Observing that the Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—"not whether a certain quantum of injury was sustained.") (internal quotation marks and citation omitted). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:

> *4 the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response

🚩 Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

"While handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force." 🚩 Burroughs v Petrone, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (internal quotation marks and citation omitted). For example, in Davidson, the plaintiff alleged that correction officers "placed ... handcuffs and leg irons and waist chain on [him] so tight as to cut into [his] flesh[,] reduce circulation[,] and cause swelling," which left a scar on his right ankle and numbness in the area, and caused his "wrists [to be] numb

for several months afterwards." 🚩 Davidson, 32 F.3d at 29. Further, the plaintiff alleged that the defendants purposefully placed the handcuffs and chains too tightly in retaliation for filing lawsuits, and that they refused his requests to loosen the restraints. See 🚩 id. at 29, 30. The Second Circuit concluded that the plaintiff's complaint in Davidson

> plainly allege[d] both the objective and subjective components of a cause of action for an Eighth Amendment violation: the handcuffs were allegedly placed on the plaintiff too tightly, leading to serious and permanent physical injury (the objective component), and such excessive force was applied to the plaintiff wantonly and maliciously in retaliation for being a litigious inmate (the subjective component).

Id. at 30 (internal quotation marks and brackets omitted).

By contrast, courts routinely dismiss claims of excessive force based on tight handcuffing where an inmate asserts only a *de minimis* injury without plausible allegations of wantonness or maliciousness. [7] For instance, in Burroughs v. Mitchell, the Court dismissed a *pro se* inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist." 🚩 Burroughs v. Mitchell, 325 F. Supp.3d 249, 265 (N.D.N.Y. 2018) (internal quotation marks omitted). Similarly, in Burroughs v. Petrone, the Court dismissed the *pro se* inmate's excessive force claim based on tight handcuffing where the complaint alleged, without more, that the handcuffs caused "pain, swelling, and bruising." 🚩 Burroughs v. Petrone, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (internal quotation marks and brackets omitted).

 **\*5** Further, where a *pro se* inmate's complaint alleged that overly tight handcuffing caused "pain in his wrists and pain, numbness[,] and swelling in his foot and ankle," the court concluded that the alleged injuries were "more than likely to prove *de minimis*." 🚩 Warren v. Purcell, No. 03-CV-8736 (GEL), 2004 WL 1970642, at *8 (S.D.N.Y. Sept. 3, 2004). However, the court in Warren declined to determine whether such injuries were sufficiently serious for purposes of the

Eighth Amendment because it concluded that the complaint failed to satisfy the subjective element, reasoning that the complaint did not "attribute[ ] any improper or retaliatory motive to the defendant officers, either in attaching the cuffs in ... the first instance, or in failing to loosen them once he complained." Id.

Moreover, in Wilson v. Woodbourne Corr. Facility, the *pro se* inmate alleged only that the defendants used excessive force by applying "handcuffs ... too tightly when escorting [him]." 🚩 Wilson v. Woodbourne Corr. Facility, No. 9:11-CV-1088 (DNH/ATB), 2012 WL 1377615, at *4 (N.D.N.Y. Mar. 21, 2012), report and recommendation adopted sub nom. Wilson v. Depolo, No. 9:11-CV-1088, 2012 WL 1366590 (N.D.N.Y. Apr. 19, 2012). Noting the absence of any facts in the complaint alleging that the defendant correction officers were aware that the restrains were causing pain or that the plaintiff requested the restraints to be loosened, the Court concluded that the "[p]laintiff's allegation, without more, ... [wa]s clearly *de minimis*, and ... certainly not repugnant to the conscience of mankind." Id. (internal quotation marks omitted).

Here, the undersigned finds that plaintiff has sufficiently pleaded a *per se* claim for excessive force because he has alleged facts which plausibly suggest that the force asserted was done maliciously for the purpose of causing harm. See 🚩 Hudson, 503 U.S. at 9-10. Although, as defendants correctly contend, plaintiff's alleged injury resulting from the "tight" handcuffs and chain—"soreness"—is *de minimis*, Compl. at 10 ¶¶ 12, 41; see 🚩 Warren, 2004 WL 1970642, at *8 (holding that temporary pain, numbness and swelling as a result of tight handcuffing was "more than likely to prove *de minimis*"); Ruggiero v Fisher, No. 15-CV-00962 (RJA/JJM), 2018 WL 7892966, at *7 (W.D.N.Y. Sept. 27, 2018), report and recommendation adopted sub nom. Ruggiero v. Fisher, No. 15-CV-962-A, 2019 WL 1438810 (W.D.N.Y. Apr. 1, 2019 (temporary discomfort resulting from tight restraints held to be *de minimis*), "[t]he absence of serious injury [while] relevant to the Eighth Amendment inquiry, ... does not end it." 🚩 Hudson, 503 U.S. at 7.

Plaintiff alleges that he asked defendants to "loosen the chains and [handcuffs] over ... 10 times," "complain[ed] about the tightness and soreness for [six] hours," that defendants ignored his "constant pleas and cries to loosen the chains and [hand]cuffs" and tightly chained and handcuffed him in order to make him "break[ ] down and forget about wanting

protective custody." Compl. at 6 ¶ 13, 9 ¶ 37. Based on these allegations, the undersigned finds that the complaint sufficiently pleads facts plausibly suggesting that the use of force was malicious and done for the purpose to cause harm. See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) ("[T]he malicious use of force to cause harm constitutes an 'Eighth Amendment violation *per se* ... whether or not significant injury is evident.' ") (quoting Blyden, 186 F.3d at 263) (alteration omitted)). Thus, although plaintiff does not allege that he suffered any significant or permanent injury as a result of the tight handcuffs and chains, "any or even ... no injuries resulting from the events plaintiff described could amount to a *per se* constitutional violation." Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at *9 (N.D.N.Y. June 16, 2017) (citing Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005)); Cf. Warren, 2004 WL 1970642, at *8 (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness, and swelling, and no improper or wanton motive was alleged for the officers' actions).

**\*6** Accordingly, it is recommended that defendants' motion to dismiss on this ground be denied.

## 2. Failure to Protect

Plaintiff next alleges that defendants failed to protect him in violation of his Eighth Amendment rights by placing him in a holding cell with a "violent gang member" despite his numerous requests to be placed in protective custody. Compl. at 11 ¶ 42. He further alleges that as a result of being housed with this other inmate, he was unable "to sleep for days in fear of his life" and experienced "psychological pain." Id. at 11 ¶ 43. Defendants argue that plaintiff's claim fails to state a cause of action for failure to protect because plaintiff "does not allege that the inmate he was housed with assaulted him[ ] or caused any other injury whatsoever." Dkt. No. 12-1 at 6.

"The Eighth Amendment requires prison officials to take 'reasonable measures to guarantee the safety of inmates' in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 832-33 (1994)). "[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983." Morales v.

New York State Dep't of Corr., 842 F.2d 27, 30 (2d Cir. 1988). To state a claim for failure to protect under the Eighth Amendment, a plaintiff must demonstrate that (1) he or she was "incarcerated under conditions posing a substantial risk of serious harm" (objective prong); and (2) prison officials acted with deliberate indifference to that risk and the inmate's safety (subjective prong). Farmer, 511 U.S. at 834.

As to the objective prong, the deprivation must be "sufficiently serious," Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation marks omitted)), and "contemplate[ ] 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " Id. (quoting Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting)). "A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." Gilmore v. Rivera, No. 13-CV-6955 (RWS), 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014); see Rivers v. Spinnella, No. 9:09-CV-309 (FJS/RFT), 2010 WL 6428486, at *5 (N.D.N.Y. Nov. 4, 2010) (granting the defendants' motion for summary judgment where "there [were] no specific facts, nor even allegations, that indicate the [the d]efendant was aware that [the p]laintiff faced a substantial risk of serious harm until the altercation had already started.").

As to the subjective prong, the plaintiff must demonstrate that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. See Farmer, 511 U.S. at 837. The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. The plaintiff must "show that the defendants actually inferred that disclosure that a substantial risk of serious harm existed." Murray v. Goord, 668 F. Supp. 2d 344, 359 (N.D.N.Y. 2009). Negligence by a prison official is insufficient to amount to a constitutional violation. See Hathaway, 37 F.3d at 66.

**\*7** As to the objective prong, plaintiff does not allege facts plausibly suggesting that he faced a substantial risk of serious harm from his cellmate. As urged by defendants, plaintiff does not claim that the inmate with whom he was housed on August 1, 2017, threatened or assaulted him in any way.

Rather, plaintiff alleges only that he could not sleep for some uncertain amount of time and that he experienced unspecified "psychological pain" as a result of being housed with this inmate. Compl. at 11 ¶ 43. Such conclusory and speculative fears certainly do not " 'contemplate[ ] 'a condition of urgency, ... that may produce death, degeneration, or extreme pain.' " Hathaway, 37 F.3d at 66 (quoting Nance, 912 F.2d at 607). Further, given the absence of allegations of actual physical injury, plaintiff has failed to satisfy the objective element of the test. See Dzwonczyk v. Syracuse City Police Dep't, 710 F. Supp. 2d 248, 267 (N.D.N.Y. 2008) ("where, as here, the plaintiff does not allege that he was assaulted or threatened by other inmates, or where plaintiff only alleges that he was in fear of an assault, a claim for failure to protect must be dismissed"); Johnson v. Lynn-Caron, No. 9:11-CV-386 (GLS/CFH), 2013 WL 5465594, *5 (N.D.N.Y. Sept. 30, 2013) (dismissing the plaintiff's failure to protect claim where the plaintiff did not demonstrate actual physical harm); Jamison v. Hayden, No. 9:03-CV9-13 (FJS/DRH), 2008 WL 907316, at *3 (N.D.N.Y. Mar. 31, 2008) (dismissing an inmate's failure to protect claim where the only injury alleged was "severe stress" in the absence of allegations of actual physical injury); Dolberry v. Levine, 567 F. Supp. 2d 413, 418 (W.D.N.Y. 2008) (dismissing a failure to protect claim where the plaintiff failed to proffer evidence showing he was subjected to any physical harm); see also Garcia v. Rodriguez, No. 05-CV-5915 (JSR), 2007 WL 2456631, at *2 (S.D.N.Y. Aug. 24, 2007) (holding that even an isolated threat from one inmate to another that an inmate would "get hurt," without any other present or past violent indications between the two inmates, does not demonstrate a substantial risk of serious harm).

As to the subjective prong, plaintiff fails to contend that defendants actually knew of and disregarded an excessive risk to his safety. Although plaintiff alleges that he explained to defendants "his reason for requesting [protective custody]"—that he had a general fear of retaliation for the altercation at Clinton—the complaint is devoid of any factual allegations that he informed defendants that the particular inmate with whom he was housed at Upstate had a connection to the inmate involved in the altercation at Clinton, knew of that incident, posed any specific risk to his safety as a result thereof, or engaged in any threatening or assaultive behavior toward plaintiff. Compl. at 11 ¶ 42. Therefore, the complaint fails to allege sufficient factual allegations that defendants could have "actually inferred from that

disclosure that a substantial risk of serious harm existed" as a result of plaintiff's placement with his cellmate. Murray, 668 F. Supp. 2d at 359. Indeed, it is well settled that a defendant's knowledge of a plaintiff's generalized fear of harm is an insufficient basis upon which to establish a failure to protect claim. See Burns v. Martuscello, No. 9:13-CV-0486 (LEK/CFH), 2015 WL 541293, at *13 (N.D.N.Y. Feb. 10, 2015) (internal quotation marks omitted) ("Eighth Amendment failure to protect claims are not to be based on a defendant's knowledge of a general risk of harm to an inmate.") (internal quotation marks omitted); see also Hogan v. Fischer, No. 09-CV-6225, 2012 WL 4845609, at *6 (W.D.N.Y. Oct. 10, 2012) (holding the failure to protect the plaintiff against a general threat of harm is insufficient to raise a failure to protect claim under the Eighth Amendment), vacated in part on other grounds, 738 F.3d 509 (2d Cir. 2013). Thus, the complaint does not sufficiently state a claim for failure to protect against defendants. [8]

**\*8** Accordingly, it is recommended that plaintiff's failure to protect claim be dismissed.

### 3. Conditions of Confinement

Reading plaintiff's allegations to raise the strongest arguments they suggest, the complaint alleges that defendants subjected him to unconstitutional conditions of confinement in violation of his Eighth Amendment rights by placing him in a holding cell for a maximum period of five and one-half hours, during which time he was handcuffed, denied access to a bathroom, deprived of food and water, and housed with a "violent gang member." Compl. at 10 ¶ 40, 11 ¶ 43. Defendants argue that the alleged conditions of plaintiff's confinement do not rise to the level of an Eighth Amendment violation. See Dkt. No. 12-1 at 4-6.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer, 511 U.S. at 832 (internal quotation marks and citations omitted); see Blyden, 186 F.3d at 263 ("society does not expect or intend prison conditions to be comfortable, [and] only extreme deprivations" of basic human needs "are sufficient

to sustain a [conditions of confinement] claim.") (internal quotation marks omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Objectively, the deprivation must be "sufficiently serious [such] that [the inmate] was denied the minimal civilized measure of life's necessities." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted). The objective prong can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the inmate's] health." Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). There is no "static test" to determine whether or not an alleged deprivation is sufficiently serious to satisfy the objective prong. Id. (internal quotation marks omitted). Rather, courts must determine whether the conditions violate "contemporary standards of decency." Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)) (additional citation omitted). To satisfy the subjective test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind ... such as deliberate indifference to [the inmate's] health or safety." Id. (internal quotation marks and citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002).

Unconstitutional conditions of confinement have generally been found when the duration of the deprivation is sufficiently long, or when the deprivation is an ongoing condition of an inmate's confinement, rather than the result of a single, isolated incident. See Hutto v. Finney, 437 U.S. 678, 686-87 (1978) ("A filthy, overcrowded cell and a diet of grue might be tolerable for a few days and intolerably cruel for weeks or months.") (internal quotation marks omitted); Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996) ("[T]he length of time a prisoner is subjected to harsh conditions is a critical factor in [an Eighth Amendment] analysis. Conditions such as a filthy cell that may be tolerable for a few days are intolerably cruel for weeks or months." (citations omitted)); Walker v. Schriro, No. 11-CV-9299 (JPO), 2013 WL 1234930, at *13 (S.D.N.Y. 2013) (allegations that the plaintiff was temporarily deprived of food, shower, linens, running water or bathroom were insufficient to state a claim "[g]iven that none of the[ ] deprivations rose to an acute and conscience-shocking level, either alone or in combination, the relative brevity of

the [p]laintiff's mistreatment precludes a finding that [the p]laintiff can satisfy the requirement of an objectively serious deprivation").

**i. Handcuffing/Denial of Bathroom Access**

**\*9**  "Individuals in custody do not have a constitutional right to use the bathroom ... whenever they please." Treat v. Cent. New York Psychiatric Ctr., No. 9:12-CV-062, 2013 WL 6169746, at *2 (N.D.N.Y. Nov. 20, 2013). It is well settled held that "[t]he temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation." Whitted v. Lazerson, No. 96-CV-2746 (AGS), 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998); see Odom v. Keane, No. 95-CV-9941 (SS), 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (concluding that, the absence of a working toilet in prison cell for approximately ten hours, without any allegation that the prisoner risked contamination by contact with human waste, did not rise to the level of cruel and unusual punishment). In the absence of allegations of serious physical harm or serious risk of contamination, courts have routinely rejected unconstitutional conditions of confinement claims where plaintiffs have alleged that they experienced pain or discomfort and were forced to relieve themselves in their clothing as a result of waiting to use a bathroom. See Whitted, 1998 WL 259929, at *2 (finding that the inmate failed to establish an objective injury where he was forced to wait one and a half hours to use the bathroom, during which time he "was forced to hold his bowel movement at painful levels, and at times partially urinated and defecated in his clothing."); Gill v. Riddick, No. 9:03-CV-1456, 2005 WL 755745, at *16 (N.D.N.Y. Mar. 31, 2005) (concluding no Eighth Amendment violation in the absence of allegations of serious injury to the inmate's health as a result of being forced to hold his urine for approximately 70 minutes); Bourdon v. Roney, No. 9:99-CV-0769 (LEK/GLS), 2003 WL 21058177, at *30-31 (N.D.N.Y. Mar. 6, 2003) (observing that "[t]he standard for analyzing a pre[-]trial detainee's [conditions of confinement] claim is the same as the Eighth Amendment standard," and holding that the pre-trial detainee's allegations of being deprived of bathroom privileges for a maximum of three hours while locked in a hot police car without water "failed to adequately allege that he was denied minimal necessities

of civilized life for a substantial period of time" in violation of his constitutional rights); see also Qawi v. Howard, No. Civ-A-98-220 (GMS), 2000 WL 1010281, at *3-4 (D. Del. July 7, 2000) (holding that the denial of the use of a bathroom for six hours during which the inmate was forced to urinate in drinking cup and bowl and defecate into a paper bag did not constitute sufficiently serious deprivation because the duration of the condition was brief and the inmate suffered no significant health risk).

On the other hand, courts have, under certain circumstances, found that the denial of bathroom access may give rise to an Eighth Amendment violation. For example, in Hart v. City of New York, the Court refused to dismiss an inmate's Eighth Amendment claim where he alleged that the defendant correction officers ignored his repeated requests to use the bathroom for 12 hours, which forced plaintiff to "repeatedly soil himself and remain[ ] imprisoned in urine-soaked clothing," despite having been informed that the plaintiff suffered from multiple sclerosis which caused the need for frequent urination. Hart v. City of New York, No. 11-CV-4678 (RA), 2013 WL 6139648, at *7 (S.D.N.Y. Nov. 18, 2013). Further, in DeBlasio v. Rock, the Court denied the defendants' motion for summary judgment as to an inmate's Eighth Amendment claim of unconstitutional conditions of confinement where he alleged that the defendant correction officers handcuffed him behind his back and refused to "remove [his] handcuffs so that he could use the bathroom" for five hours, ultimately forcing the inmate to urinate and defecate on himself. DeBlasio v. Rock, No. 9:09-CV-1077 (TJM/GHL), 2011 WL 4478515, at *16 (N.D.N.Y. Sept. 26, 2011).

Here, plaintiff has not alleged any "serious physical harm or a serious risk of contamination" as a result the denial of bathroom access on August 1, 2017. Whitted, 1998 WL 259929, at *2. Rather, plaintiff contends only in conclusory terms that he requested "to use the restroom for relief." Compl. at 6 ¶ 13. The complaint does not allege that plaintiff experienced any pain or significant discomfort, that he was forced to urinate or defecate in his clothing, or that he has suffered any persisting physical injury as a result of his experience. Cf. Whitted, 1998 WL 259929, at *2. Further, unlike in Hart, plaintiff does not allege that he made defendants aware of any medical condition which would necessitate an exceptional need for bathroom access, or that this deprivation extended beyond the single, isolated incident

on August 1, 2017. Cf. Hart, 2013 WL 6139648, at *7; accord Hutto, 437 U.S. at 686–87.

Moreover, although Rock involved a handcuffed inmate who was deprived bathroom access for a comparable period of time to plaintiff, that case appears distinguishable. The plaintiff in Rock specifically alleged that the defendants had applied handcuffs behind his back, which prevented him from using the bathroom in his cell for approximately five hours until he was forced to urinate and defecate on himself. See id. Here, by contrast, plaintiff asserts only that his handcuffs and chains were applied "tight" and that he requested that the handcuffs and chain be loosened but does not state any facts from which the Court can infer that his handcuffs hindered him from relieving himself. Cf. Rock, 2011 WL 4478515, at *16. Thus, the present case appears more analogous to cases in which an inmate has alleged an Eighth Amendment violation based on temporary discomfort due to a fairly brief and isolated denial of bathroom access without any serious physical harm or serious risk of contamination. See Whitted, 1998 WL 259929, at *2.

**\*10** Similarly, concerning the application of "tight" handcuffs and chain, the complaint fails to allege facts demonstrating that the use of these restraints while plaintiff was confined in his cell was sufficiently serious such that it posed "an unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30 (quoting Walker, 717 F.3d at 125). As discussed in detail in part II.B.1 supra, plaintiff alleged only that he suffered temporary "soreness" as a result of the application of the chains and handcuffs and does not allege that he sought or required medical attention, or that he is currently suffering any injury as a result thereof. Compl. at 10 ¶ 41. Such minor discomfort cannot be said to pose an "unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30; see also Hudson, 503 U.S. at 9 ("routine discomfort is part of the penalty that criminal offenders pay for their offenses against society" (internal quotation marks and citation omitted)). Thus, plaintiff's Eighth Amendment claim for unconstitutional conditions of confinement insofar as premised upon the application of tight handcuffs and temporary denial of bathroom access fails to satisfy the objective prong of the Eighth Amendment test. Accordingly, it is unnecessary to reach the subjective prong because "without a constitutional violation, [d]efendants clearly could

not have acted with 'deliberate indifference.' " Gill, 2005 WL 755745, at *16 (quoting Odom, 1997 WL 576088, at *5).

### ii. Denial of Food and Water

Plaintiff asserts that defendants subjected him to unconstitutional conditions of confinement in violation of his Eighth Amendment rights by depriving him of food and water between 1:00 P.M. and sometime between 6:00 P.M. and 6:30 P.M. on August 1, 2017, when he arrived at Upstate. See Compl. at 6 ¶ 20, 11 ¶ 43. He concedes that, "[b]etween 6[:00] p.m. [and] 6:30 p.m., [he] was offered a hot tray of food, which was freezer cold." Id. at 6 ¶ 20. Defendants contend that plaintiff fails to state a claim because the temporary deprivation of food and water "has been routinely found insufficient to state a[n] [Eighth Amendment] conditions[ ]of[ ]confinement claim." Dkt. No. 12-1 at 5.

The deprivation of food, as any other deprivation, must be tested by the same Eighth Amendment analysis. In order to rise to the level of an Eighth Amendment claim, the deprivation must be sufficiently serious, and the defendant must have been deliberately indifferent to the inmate's health or safety. See Farmer, 511 U.S. at 834. As the Second Circuit has noted, courts have not explicitly held that the denial of food is a *per se* violation of a prisoner's Eighth Amendment rights. See Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (citing Moss v. Ward, 450 F. Supp. 591, 596 (W.D.N.Y. 1978)). However, "under certain circumstances[,] a substantial deprivation of food may well be recognized as being of constitutional dimension." Id. For example, depriving a prisoner of all food and water "has been held to have violated the Eighth Amendment." Moss, 450 F. Supp. at 596-97.

On the other hand, "isolated" deprivations of food do not typically rise to the level of an Eighth Amendment violation. Reeder v. Hogan, No. 9:09-CV-520, 2012 WL 4107822, at *18 (N.D.N.Y. July 11, 2012), report and recommendation adopted 2012 WL 4106740 (N.D.N.Y. Sept. 19, 2012). For example, allegations of intermittent deprivations for periods of approximately eight- and one-half hours, twenty-three hours, and during periods of confinement, were held insufficient to state an Eighth Amendment conditions of confinement claim. See Little v. Mun. Corp., 51 F. Supp. 3d 473, 490 (S.D.N.Y. 2014); see also Konovalchuk v. Cerminaro, No. 9:11-CV-01344 (MAD/CFH), 2014 WL 272428, at *21 (N.D.N.Y. Jan. 24, 2014) (holding that an inmate's claim that he missed two consecutive meals while being transported to-and-from the courthouse was "not substantial and d[id] not amount to cruel and unusual punishment."); Zimmerman v. Seyfert, No. 9:03-CV-1389 (TJM), 2007 WL 2080517, at *27 (N.D.N.Y. July 19, 2007) (holding that requiring the plaintiff to go eleven hours without eating did not rise to the level of a constitutional claim). Moreover, courts in this Circuit have held that being denied a single meal does not give rise to a constitutional deprivation. See, e.g., Hankerson v. Nassau Cnty. Corr. Facility, No. 12-CV-5282 (SJF/WDW), 2012 WL 6055019, at *3 (E.D.N.Y. Dec. 4, 2012) ("[The plaintiff's] allegation that he was denied a single meal while incarcerated ... does not give rise to a constitutional deprivation."); Scarbrough v. Evans, No. 11-CV-131 (NAM/DRH), 2012 WL 4364511, at *5 (N.D.N.Y. May 17, 2012) ("[T]he denial of a single meal is insufficient to state a claim for relief.") (citations omitted).

**\*11** Here, it is undisputed that plaintiff did not receive food from 1:00 P.M. until between 6:00 P.M. and 6:30 P.M. on August 1, 2017—a deprivation which lasted, at most, five and one-half hours. See Compl. at 11 ¶ 43. Thus, plaintiff's claim in this regard fails to satisfy the objective prong of the test, as he does not allege a deprivation of "the measure of food necessary to maintain health, but rather ha[s] described the sort of isolated withholding[ ] that do[es] not typically rise to [the] level of constitutional significance." Reeder, 2012 WL 4107822, at *18; see Zimmerman, 2007 WL 2080517, at *27.[9] Further, as defendants argue, the lack of a meal over the course of five and one-half hours is "not an atypical experience for most people over the course of an ordinary day, let alone those ... subjected to the more restrictive ... conditions of a prison setting." Dkt. No. 12-1 at 7. Indeed, this alleged deprivation is less significant than deprivations of food found to be insufficient to state a claim for cruel and unusual punishment. See Konovalchuk, 2014 WL 272428, at *21; Zimmerman, 2007 WL 2080517, at *27. Thus, even affording the complaint the most liberal construction possible, plaintiff does not even assert the denial of a single meal—a legally insufficient basis to support a constitutional claim. See Hankerson, 2012 WL 6055019, at *3; Scarbrough v. Evans, 2012 WL 4364511, at *5.

Plaintiff likewise fails to allege facts sufficient to state a claim for cruel and unusual punishment based on the temporary denial of drinking water. Liberally construing plaintiff's claim, his deprivation of drinking water coincided with his deprivation of food. See Compl. at 5 ¶ 12. Therefore, as plaintiff admits that he was provided a meal sometime between 6:00 P.M. and 6:30 P.M., this claim, too, amounts only to a short, isolated deprivation and, therefore, does not arise to the level of an Eighth Amendment violation. See Mortimer Excell v. Fischer, No. 9:08-CV-945, 2009 WL 3111711, at *5-6 (N.D.N.Y. Sept. 24, 2009) (holding that, to the extent the plaintiff alleged that he was denied water during the same 24-hour period he was denied a meal, he failed to state a constitutional claim); McGee v. Pallito, No. 10-CV-11, 2011 WL 6291954, at *13 (D. Vt. Aug. 3, 2011) ("temporary deprivations of drinking water are not unconstitutional"), report and recommendation adopted, 2011 WL 6294202 (D. Vt. 2011); see also Beckford v. Portuondo, 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."). Thus, plaintiff's Eighth Amendment claim premised on the denial of food and water fails to satisfy the objective element of the Eighth Amendment test. Therefore, as plaintiff has failed to adequately plead a constitutional violation, it is unnecessary to reach the subjective prong. See Gill, 2005 WL 755745, at *16 (quoting Odom, 1997 WL 576088, at *5).

### iii. Plaintiff's Cellmate

**\*12** Liberally construed, the complaint also alleges that plaintiff was subjected to unconstitutional conditions of confinement because he was housed with a "violent gang member." Compl. at 11 ¶ 43, 7 ¶ 22. Plaintiff contends that, as a result of being housed with this inmate, he was unable to "sleep for days" and experienced "psychological pain." Id. at 11 ¶ 43. Defendants posit that plaintiff fails to a claim in this regard because he "does not allege that he suffered any injury or harm as a result." Dkt. No. 12-1 at 8.

Despite plaintiff's conclusory assertion, he has failed to proffer sufficient factual allegations to establish an Eighth Amendment claim based on his placement with his cellmate at Upstate. Iqbal, 556 U.S. at 678. Even viewing the facts in the light most favorable to plaintiff, he does not allege how being placed in the cell with this inmate

"pose[d] an unreasonable risk of serious damage to [his] health." Darnell, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). As discussed in section II.B.2. supra, the complaint does not state any factual allegations which could plausibly suggest that defendants' act of housing him with the purported gang member placed him at risk of harm. Indeed, plaintiff does not allege that his cellmate threatened or harmed him in any way, and plaintiff has not alleged any communication between him and defendants indicating that he informed defendants that his cellmate presented any specific risk to him, or that defendants were aware of, but disregarded, any such risk. See section II.B.2. supra.

Further, plaintiff's vague assertion that he lost sleep for an unspecified number of days as a result of being housed with this inmate fails to assert facts plausibly alleging an objectively serious injury. See generally Phelan v. Durniak, No. 9:10-CV-666 (FJS/RFT), 2014 WL 4759937, at *10 (N.D.N.Y. Sept. 24, 2014) (holding that the plaintiff's allegations that he was unable to sleep and suffered migraines because of the noise of the other inmates' televisions and radios late at night failed to satisfy the objective element of an Eighth Amendment claim); Cf. Mena v. City of New York, No. 13-CV-2430 (RJS), 2014 WL 4652570, at *4 (S.D.N.Y. Sept. 18, 2014) (concluding that the plaintiff plausibly alleged facts to support an inference that he was objectively prevented from sleeping at all for approximately two and one half days from being forced to lie on a cold, wet floor in a cell large enough for only one inmate as opposed to the three inmates who were housed there). Moreover, plaintiff's assertion that he suffered psychological pain is wholly conclusory and, as discussed in section II.B.2, the complaint contains no allegations that plaintiff ever sought therapy or other medical treatment following the alleged placement with his cellmate. See Iqbal, 556 U.S. at 664. Plaintiff has, therefore, failed to state an Eighth Amendment claim against defendants based on the alleged placement in the cell with a purported gang member.

In sum, the complaint fails to allege "conditions [that] either alone or in combination, pose[d] an unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30 (quoting Walker, 717 F.3d at 125). Accordingly, it is recommended plaintiff's Eighth Amendment conditions of confinement claim be dismissed.

### C. First Amendment Retaliation

Plaintiff alleges that defendants retaliated against him by placing him in a cell with a "violent gang member" for threatening to file grievances and a federal civil rights lawsuit based on their denial of plaintiff's requests for protective custody, to loosen his chains and handcuffs, food and water, and bathroom access, in violation of his First Amendment rights. Compl. at 9-10 ¶ 39. The complaint may also be construed as asserting a First Amendment retaliation claim based on C.O. King's alleged threat to file a false misbehavior report against plaintiff. See id. at 6 ¶¶ 17. Defendants contend that plaintiff fails to sufficiently plead a First Amendment retaliation claim because "[p]laintiff's verbal requests for protective custody ... do not constitute protected speech," and even if they did, "the alleged application of tight handcuffs and chains" and the temporary denial of food, water, and bathroom access does not constitute adverse action. Dkt. No. 12-1 at 10, 11.

**\*13**  In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must allege the following: that "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). Because of the potential for abuse and the "ease with which claims of retaliation may be fabricated," courts must examine prisoner retaliation claims with "skepticism and particular care." Johnson v. Eggersdorf, 8 F. App'x 140, 144 (2d Cir. 2001) (summary order) (quoting Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)).

It is well settled that the filing of administrative grievances and lawsuits constitutes protected speech. See Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) ("the filing of prison grievances is a constitutionally protected activity"); Williams v. Ingraham, No. 04-CV-257 (GLS/DRH), 2005 WL 3746222, at *2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue—complaints to judicial officials, filing a lawsuit, and grievances—are clearly constitutionally protected rights") (citing Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)). Further, courts in this Circuit have routinely found that a prisoner's threat of filing a grievance or lawsuit constitutes protected activity. See Flemming v.

King, No. 14-CV-316 (DNH/CFH), 2016 WL 5219995, at *4 (N.D.N.Y. June 20, 2016) (concluding that inmate's threat to file lawsuit sufficient to establish protected activity), report and recommendation adopted, No. 9:14-CV-0316 (DNH/DEP), 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016); Gibson v. Fischer, No. 9:10-CV-0968 (LEK/TWD), 2014 WL 7178346, at *15 (N.D.N.Y. Dec. 15, 2014) (denying summary judgment as to retaliation claim where the plaintiff threatened to file a grievance); Sprau v. Coughlin, 997 F. Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint sufficient to establish protected activity). Here, plaintiff's threat to file grievances and a lawsuit constitutes protected activity; therefore, the complaint satisfies the first prong of the First Amendment retaliation test. See Flemming, 2016 WL 5219995, at *4; Gibson, 2014 WL 7178346, at *15; Sprau v. Coughlin, 997 F. Supp. at 393.

To adequately plead an "adverse action," a plaintiff must allege that he was subject to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill, 389 F.3d at 381 (internal quotation marks and citations omitted). Courts in this Circuit have found that a prison official defendant's "refusal of protective custody" can be an "adverse action" for the purposes of a First Amendment retaliation claim because it could cause a prisoner to "fear[ ] for his safety." Cruz v. Grosso, No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *7 (N.D.N.Y. May 23, 2014); see also Cruz v. Lee, No. 14-CV-4870 (NSR/JCM), 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) ("[p]laintiff alleges that [the d]efendants' denial of protective custody ... constitutes an adverse action because [the p]laintiff feared for his safety without custodial protection. It cannot be said, as a matter of law, that this fear would not deter a similarly situated individual from filing further lawsuits or grievances. Therefore, [the p]laintiff has sufficiently alleged an adverse action.").

Here, plaintiff alleges that he requested protective custody out of fear that a gang member would retaliate against him for his altercation at Clinton and that defendants denied his request. See Compl. at 5 ¶ 8. Thus, accepting plaintiff's allegations as true, defendants' denial of protective custody could be considered adverse action. See Lee, 2016 WL 1060330, at *6; Grosso, 2014 WL 2176256, at *6.

**\*14**  As for the third element,

"[p]roof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant."

🚩 DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 116 (2d Cir. 1987) (internal citations omitted). With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." 🚩 Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted). For example, in Lee, the court concluded that an inmate sufficiently established a causal connection where he alleged facts demonstrating a "close temporal proximity" between the protected activity of filing a lawsuit and the adverse action of defendants denying his requests for protective custody "taken together with [the d]efendants' knowledge of the protected activity and statements tending to demonstrate a retaliatory motive." Lee, 2016 WL 1060330, at *7. Similarly, in Grosso, the inmate alleged that he informed the defendant of his pending lawsuit the same day that the defendant refused him protective custody status and that the defendant stated the

reason for denying protective custody was because the inmate was "go[ing] against [prison] [a]dministration." Grosso, 2014 WL 2176256, at *7. Observing the temporal proximity of the protected activity and adverse action, and noting that the defendant's statement "plausibly suggest[ed] a reason for the refusal of protective custody [that] related to retaliation," the Court concluded that the inmate established the causation prong for a First Amendment retaliation claim. Id.

Here, although close in temporal proximity, as the complaint makes clear, the adverse action of denying plaintiff's request for protective custody occurred prior to plaintiff threatening to file grievances and lawsuits, and well before plaintiff actually filed his two grievances or the present lawsuit. See Compl. at 6 ¶¶ 15, 20. Therefore, as the alleged adverse action preceded plaintiff's threat to file grievances and a lawsuit, plaintiff cannot show that defendants' denial of protective custody was motivated by this conduct. See, e.g., Gustafson v. Vill. of Fairport, 106 F. Supp. 3d 340, 353 (W.D.N.Y. 2015) (holding that the plaintiff failed to establish a causal link to support his First Amendment retaliation claim where the alleged adverse action of defendant police officers beating him preceded his constitutionally-protected expression of requesting an attorney).

**\*15** Additionally, insofar plaintiff's claim can be read to allege that defendants retaliated against him in violation of his First Amendment rights based on his repeated requests for protective custody, the complaint fails to state a claim because such requests do not appear to be constitutionally-protected speech. Rather, plaintiff's request for protective custody, in effect, constitutes a request for transfer to housing of his preference, which is not constitutionally protected speech. See Barrow v. Buren, No. 9:12-CV-01268 (MAD/CFH), 2015 WL 417084, at *13 (N.D.N.Y. Jan. 30, 2015) (concluding that an inmate's transfer requests were not constitutionally-protected speech); see generally McMahon v. Fischer, 446 F. App'x 354, 357 (2d Cir. 2011) (summary order) ("A prisoner has no right to housing in a particular facility"). Plaintiff's position would yield absurd results, as every denial of an oral request for protective custody status would give rise to a First Amendment retaliation claim. Therefore, the undersigned finds that the complaint fails to satisfy the first element for a First Amendment retaliation claim in this regard.

Moreover, to the extent that the complaint may be read as alleging that defendants retaliated against plaintiff for stating his intention to file grievances and lawsuits based on C.O. King's purported threat to file a false misbehavior report, even

2012 WL 1377615
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Booker WILSON, Plaintiff,

v.

WOODBOURNE CORRECTIONAL
FACILITY; Donald Depolo, Defendants.

No. 9:11–CV–1088 (DNH/ATB).
|
March 21, 2012.

**Attorneys and Law Firms**

Booker Wilson, pro se.

James J. Seaman, Asst. Attorney General for Defendants.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendant Depolo violated plaintiff's First Amendment right to practice his religion and subjected him to excessive force in violation of the Eighth Amendment. (Compl.; Dkt. No. 1). Plaintiff claims that defendant Depolo engaged in this conduct because he does not like Muslims. Plaintiff seeks compensation for pain and suffering. (Compl.¶ 8).

Presently before the court is defendant Depolo's [1] motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 14). Plaintiff has responded in opposition to the motion. (Dkt. No. 17). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint in its entirety with prejudice.

### DISCUSSION

**I. *Facts***

In the complaint, plaintiff alleged that defendant Corrections Officer Depolo "misuse[d] his power" when he withheld plaintiff's Ramadan meal for one and one half hours. Plaintiff states that he had been fasting due to the Ramadan Holiday, and the meal that would have broken the fast was delayed from 8:17 p.m. until 9:45 p.m. (Compl.¶ 6). In his response to defendant's motion to dismiss, plaintiff states that this incident occurred on August 2, 2011. [2]

Plaintiff also claims in the complaint that defendant Depolo threw away all plaintiff's "good stuff," including a pair of "medical boots" that were purchased for plaintiff by the State after an operation on plaintiff's feet. [3] Plaintiff alleges that defendant Depolo put handcuffs on plaintiff too tightly when taking him to shower and to recreation. (*Id.*) Plaintiff claims that defendant always gave him "hate looks," made a "gun sign" with his hands, and called plaintiff a "terrorist" because he is Muslim. Plaintiff states that the 23 days he spent in the "Box" was "hell," and that he did not enjoy his Ramadan at all because of defendant's conduct. (*Id.*)

After the complaint was filed, plaintiff sent a letter to the court stating that Woodbourne Correctional Facility ("Woodbourne") returned his property on September 29, 2011. (Dkt. No. 4). Plaintiff states that he did get his medical boots back, but some of his unspecified "stuff" was "still missing." (*Id.*) Plaintiff's response to defendant's motion is unclear. Part of the document is typewritten, and part of the document is written in plaintiff's handwriting, but many of the facts in the typewritten portion are duplicative of the handwritten facts. [4] In the response, plaintiff clarifies that the date defendant allegedly delayed plaintiff's Ramadan meal was August 2, 2011, and the date that plaintiff was denied his medical boots appears to have been August 26, 2011. [5] (Dkt, No. 17 at 3, at) [6] Plaintiff states that defendant Depolo abused his authority, violated the " 'officer & employee manual and (74 of the public health law.) Unlawful exaction of Domination)." (Dkt. No. 17 at 1).

### II. *Motion to Dismiss*

**\*2** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements," do not suffice. *Id.* (citing 🚩 *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " 🚩 *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor.

🚩 *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); 🚩 *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality.

🚩 *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); 🚩 *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference.

🚩 *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); 🚩 *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

### III. *Religion*

The First Amendment guarantees the right to the free exercise of religion. 🚩 *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." 🚩 *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing ❓ *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security."

⚠️ *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at *4, 2007 U.S. Dist. LEXIS 77239 (N.D.N.Y. Oct. 17, 2007). The Free Exercise Clause extends "beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's

diet...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples...." 🚩 *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." 🚩 *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

**\*3** The withholding of a single meal, however, is at most, a *de minimis* burden on plaintiff's religious expression. *See, e.g., Evans v. Albany Cty. Corr. Fac.,* No. 05–CV1400, 2009 WL 1401645, at *8 (N.D.N.Y. May 14, 2009) (receipt of "wrong meals" approximately 18 out of 354 times is *de minimis* and not actionable under First Amendment); *Ward v. Goord,* No. 9:06–CV–1429, 2009 WL 102928, at *9 (N.D.N.Y. Jan. 13, 2009) ("The failure to provide a single meal is insufficient to allege a constitutional violation.");

⚠️ *Odom v. Dixion,* No. 04–CV–0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (failure to provide inmate kosher meals on 7 out of 33 occasions not sufficient under First Amendment or RLUIPA [7] ); *Thomas v. Picio,* No. 04–CV–3174, 2008 WL 820740, at *6 & n. 8 (S.D.N.Y. Mar. 26, 2008) (assuming inmate plaintiff was denied three or four Kosher meals for one or two consecutive days, "such a denial is not a substantial burden" on her free exercise of religion). *See also* 🚩 *Norwood v. Strada,* 249 F. App'x 269, 272 & n. 1 (3d Cir.2007) (denial of religiously certified "halal" meals on seven out of seven occasions, during prison's two-and-one half-day emergency lock-down, was "a mere de minimis intrusion" that failed to substantially burden the inmate's religious beliefs). *Cf.* 🚩 *Ford v. McGinnis,* 352 F.3d 582, 594 n. 12 (2d Cir.2003) (whether an inmate's religious beliefs were burdened by a prisonss refusal to serve a meal for the Eid ul Fitr feast was a question of fact, but noting that the "feast is sufficiently unique in its importance within Islam to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisonerss religious dietary restrictions was found to be a *de minimis* burden").

In this case, plaintiff claims that defendant Depolo does not like Muslims, and as a result, one [8] of plaintiff's Ramadan meals was *delayed* for approximately one and one-half hours. Plaintiff claims that he was scheduled to break his fast by eating at 8:17 p.m., but did not eat until 9:45 p.m. This delay is a *de minimis* burden on plaintiff, and he states

no constitutional or statutory violation as a result. Thus, plaintiff's First Amendment Freedom of Religion claim may be dismissed.

### IV. *Tight Handcuffs*

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

**\*4** In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. at 327 (citation omitted); *Hudson,* 503 U.S. at 9. However, "the malicious use of force to cause harm constitute [s][an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

Plaintiff alleges that defendant Depolo placed handcuffs on plaintiff too tightly when escorting plaintiff to recreation or to the shower. The court need not reach the subjective element of the standard for excessive force. Plaintiff's allegation, without more, that defendant Depolo put handcuffs on too tightly is clearly *de minimis,* and is certainly not "repugnant to the conscience of mankind." Although overly tight handcuffing may constitute excessive force,[9] in order to rise to the constitutional level, it must cause some injury beyond temporary discomfort. *See Schy v. Vermont,* 2 F. App 'x 101, 101–102 (2d Cir.2001) (painful handcuffing for two hours does not violate the Constitution); *Lynch ex rel. Lynch v. City of Mt. Vernon,* 567 F.Supp.2d 459, 468 (S.D.N.Y.2008) (citing cases); *Wang v. Vahldieck,* No. 09–CV–3783, 2012 WL 92423, at \*7 (E.D.N.Y. Jan. 9, 2012) (dismissing excessive force claim where there was no physical injury associated with the tight handcuffs); *Cunningham v. McCluskey,* No. 05 Civ. 10169, 2011 WL 2791336, at \*7 (S.D.N.Y. June 22, 2011) (tight handcuffing was not excessive force where plaintiff suffered no physical injury as a result). Plaintiff in this case does not allege any injury that occurred as a result of these "real tight" handcuffs. (Compl.¶ 6). These allegations do not even approach stating a claim for excessive force, and any such claim may be dismissed.

### V. *Verbal Harassment*

**\*5** Verbal abuse and harassment, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996). In this case, plaintiff alleges that defendant gave him "hate looks" and made a "gun sign." According to plaintiff, he looks like Osama Bin Laden, but he has never had any trouble until being incarcerated at Woodbourne. Even if the defendant did give plaintiff "hate looks" or made a threatening "gun sign," plaintiff alleges no injury as a result, and that form of harassment does not

state a constitutional claim. Plaintiff's allegations of verbal harassment may be dismissed.

## VI. Property

The deprivation of property, whether intentional or unintentional is not actionable under section 1983 as long as the state provides an adequate post-deprivation procedure. *Hudson v. Palmer,* 468 U .S. 517, 533 (1984). New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates. *See Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Love v. Coughlin,* 714 F.2d 207, 209 (2d Cir.1983); *see also* N.Y. Ct. Cl. Act § 10(6) (McKinney 1998).

Plaintiff claimed that defendant Depolo "threw away" plaintiff's good stuff, including his medical boots.[10] However, in a letter dated October 3, 2011, plaintiff stated that his property (including the medical boots) was returned to him, although some was still missing. (Dkt. No. 4). Clearly, based on plaintiff's own letter, defendant Depolo did not "throw away" plaintiff's medical boots, and plaintiff has not articulated what "stuff" was still missing from his property. However, even if some of plaintiff's property were not returned to him, he would have an adequate post-deprivation remedy in the Court of Claims, and any remaining property claims may be dismissed.

## VII. State Law Violations

A violation of state law, even assuming that one existed, does not necessarily rise to the level of a constitutional violation. *See, e.g.,* Soto v. Walker, 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred).

In plaintiff's response to defendant's motion to dismiss, he alleges that the defendant violated the "officer and employee manual" and section 74 of the Public Health Law. (Dkt. No. 17 at 1). It is unclear to which "manual" plaintiff is referring, and there is no section 74 of the New York Public Health Law. Even assuming that the court could decipher plaintiff's allegation, at best, he is claiming that the defendant violated state law without any further explanation. This claim may also be dismissed for failure to state a constitutional claim.

## VIII. Opportunity to Amend

**\*6** The court should not dismiss a *pro se* action without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim may be asserted. *Parrino v. Sun Gard Availability Services, L.P., No. CV 11–3315, 2012 WL 826946, at \*4 (E.D.N.Y. Feb. 16, 2012)* (citing *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999)). In this case, even under a liberal reading of the complaint, there is no way that plaintiff could state a claim regarding his medical boots or any of his other property items, because it is clear by plaintiff's own admission, that his boots were returned to him, and defendant Depolo had nothing to do with the deprivation.[11] Plaintiff's claim of verbal harassment also fails to state a claim, and there is no way a claim could be stated based on the facts that plaintiff alleges. Plaintiff's claim that a religious meal was delayed for one and one half hours may not be the basis for a constitutional claim, regardless of amendment. Plaintiff has not stated any injury as the result of his "real tight" handcuffs, and his claim that defendant violated state law will not rise to the level of a constitutional violation. Thus, this court will recommend dismissal without giving plaintiff the opportunity to amend his complaint.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's motion to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6) (Dkt. No. 14) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1377615

## Footnotes

1   Defendant Depolo is the only remaining defendant. The complaint was dismissed as against Woodbourne
    Correctional Facility by Judge Hurd's Order, dated November 15, 2011. (Dkt. No. 5).

2   Defendant pointed out in his memorandum of law that the complaint did not specify a particular date for the
    alleged conduct. (Dkt. No. 14–1 at 3; CM/ECFassigned pages).

3   In plaintiff's response to the motion to dismiss, he alleges that on August 26, 2011, when plaintiff was being
    moved to another housing area, defendant Depolo forced plaintiff to wear boots that were not his. (Dkt. No. 17
    at 4). In his response, plaintiff further states that when he asked about his medical boots, defendant Depolo
    stated that he did not "know where they were." (*Id.*) From this statement, plaintiff assumed that defendant
    Depolo threw away plaintiff's boots "to be evil." (*Id.* at 5).

4   The court notes that in the typewritten portion of the plaintiff's response, he mentions that when he was
    arguing with defendant Depolo about the medical boots, the defendant stated that "he didn't care about all of
    that this is punishment from Ramadan and snitching on him to the Sgt. which is really his buddy." (Dkt. No.
    17 at 2). This is the first, and only time, that plaintiff mentions anything that approaches a claim of retaliation
    for "snitching." There is absolutely no basis for this claim, and neither the complaint, nor any of plaintiff's
    handwritten documents mention this. Such a conclusory allegation of "retaliation," to the extent that plaintiff
    would have wished to add it to his complaint would be dismissed on the pleadings. *Gill v. Pidlypchak,* 389
    F.3d 378, 380 (2d Cir.2004) (citation omitted). Claims of retaliation are "easily fabricated" and thus, plaintiff
    must set forth non-conclusory allegations. *Id.* (citing 🚩*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001),
    *overruled on other grounds,* 🚩*Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)). Additionally, any claim
    of retaliation is further weakened by the fact that plaintiff's boots were returned to him three days later on
    September 29, 2011. (Dkt. No. 4).

5   Plaintiff alleges that defendant Depolo made plaintiff wear other boots. (Dkt. No. 17 at 5).

6   The court will refer to the pages of documents as assigned by the court's electronic filing system CM/ECF.

7   The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights.
    RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise
    unless the burden is the least restrictive means of furthering a compelling governmental interest. *See* 🚩42
    U.S.C. § 2000cc-l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's
    action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct
    or having a religious experience mandated by his faith. In addition, this interference must be more than an
    inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to
    religious doctrine. 🚩*Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); 🚩*Graham v. Mahmood,*
    No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N .Y. Apr. 22, 2008). In this case, plaintiff never mentions
    RLUIPA, but to the extent that the court could interpret such a claim, it would also be subject to dismissal.
    Delaying plaintiff's meal for one and one half hours is, at worst, an inconvenience, not a substantial burden.

8   Although the typewritten portion of plaintiff's response states that he was "denied" his meal on "two different
    occasions" (Dkt. No. 17 at 1—typewritten portion of plaintiff's response), there is no indication from plaintiff's
    complaint or any other handwritten document that plaintiff was "denied" any meals. It is clear that the
    Ramadan meal was merely delayed (Dkt. No. 1 at ¶ 6; Dkt. No. 17 at 3—handwritten portion of plaintiff's
    response), and there is no indication when, if ever, another meal was denied. In any event, even assuming that

one meal was delayed and another was denied, the deprivation does not rise to the level of a constitutional violation.

9    Courts have considered the following factors in making the determination of whether a "tight handcuff" claim rises to the level of excessive force. *See Ahmad v. Port Authority of New York and New Jersey,* No. 09–CV–3134, 2011 WL 7080691, at \*7 (E.D.N.Y. Dec. 7, 2011). Courts consider whether the handcuffs were unreasonably tight; the defendants ignored the individual's pleas regarding the tightness of the cuffs; and the degree of injury to the wrist. *Id.* (citations omitted). Plaintiff in this case never claims that he requested defendant to loosen the cuffs, and there is no injury asserted.

10    Plaintiff also refers to this claim as "medical negligence" although he does not allege that he suffered any harm as a result of wearing different boots. Because plaintiff's boots were returned to him, and it does not appear as though defendant Depolo was even involved in the deprivation, the court will not address the issue of medical care.

11    The court also notes that plaintiff's response to the defendant's motion to dismiss, dated March 1, 2012 contains some misleading statements. Plaintiff continued to state that defendant threw plaintiff's boots away and adds that he did this to "be evil." (Dkt. No. 17 at 5). However, plaintiff's letter, dated October 3, 2011 states that Woodbourne returned his property to him, including his medical boots. Thus, it is unclear why plaintiff would still be claiming on March 1, 2012 that defendant threw away plaintiff's boots to be "evil" when plaintiff was well aware by that time, that defendant did not throw away plaintiff's property.

---

**End of Document**                                                             © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 95431
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Richard H. LIVINGSTON, Plaintiff,

v.

William HOFFNAGLE et al., Defendants.

9:19-cv-353 (GLS/CFH)
|
Signed 01/07/2020
|
Filed 01/08/2020

**Attorneys and Law Firms**

FOR PLAINTIFF: RICHARD H. LIVINGSTON, 326 N. Beech Street, Syracuse, NY 13207.

FOR DEFENDANTS: HON. LETITIA JAMES, New York State Attorney General, OF COUNSEL: CHRISTOPHER J. HUMMEL, Assistant Attorney General, The Capitol, Albany, NY 12224.

**ORDER**

Gary L. Sharpe, Senior District Judge

**\*1** The above-captioned matter comes to this court following a Report-Recommendation and Order by Magistrate Judge Christian F. Hummel duly filed on November 8, 2019. (Dkt. No. 16.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Report-Recommendation and Order for clear error, it is hereby

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 16) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion to dismiss (Dkt. No. 12) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to the following claims, which are **DISMISSED WITH PREJUDICE**: Eighth Amendment failure to protect claim; Eighth Amendment conditions of confinement claim; conspiracy claim; First Amendment retaliation claim; and supervisory claim against defendant William Hoffnagle insofar as that claim is based upon plaintiff Richard H. Livingston's Eighth Amendment failure to protect, conditions of confinement, conspiracy claims, and First Amendment retaliation claim; and **DENIED** as to Livingston's: Eighth Amendment excessive force claim; and supervisory claim against Hoffnagle insofar as that claim is based upon plaintiff's Eighth Amendment excessive force claim; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 95431

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

assuming arguendo that plaintiff's stated intention could be considered constitutionally-protected speech, plaintiff fails to state a First Amendment retaliation claim. See Compl. at 6 ¶ 16, 17. As articulated in the complaint, C.O. King informed plaintiff that he had been instructed to file a misbehavior report and that "the Sgt. want[ed] to write [him] a ticket" based on plaintiff's refusal to follow a direct order to lock into a cell shortly after stating that he would file grievances and lawsuits. See Compl. at 6 ¶¶ 17, 19. Plaintiff denies that he refused to follow a direct order from defendants. See id. at 6 ¶¶ 18. Therefore, liberally construing the complaint, plaintiff appears to allege that C.O. King threatened to file a false misbehavior report.

As an initial matter, plaintiff does not allege that C.O. King actually wrote a misbehavior report, and no misbehavior report is contained in plaintiff's submissions; rather, plaintiff merely asserts that C.O. King threatened write a misbehavior report. In any event, it is well settled that a correction officer's filing of a false misbehavior report to prevent an inmate from seeking redress does not rise to the level of a constitutional violation in the absence of evidence that the filing of the false report actually hindered or prevented the inmate from exercising his constitutional right to seek redress through either the prison grievance procedure or by filing a lawsuit. See Nelson v. Michalko, 35 F. Supp. 2d 289, 294 (W.D.N.Y. 1999); Husbands v. McClellan, 957 F. Supp. 403, 407 (W.D.N.Y. 1997). Here, plaintiff does not allege that C.O. King's purported threat to file a false misbehavior report in any way hindered or prevented him from exercising his First Amendment right to file grievances and lawsuits. Indeed, it is undisputed that plaintiff, in fact, did file two grievances and this lawsuit subsequent to C.O. King's purported threat. Accordingly, based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim be dismissed in its entirety and that defendants' motion be granted on this ground.

### D. Conspiracy

Plaintiff alleges that defendants "entered into an agreement that if [he] continue[d] to request protective custody status, and make their job extensive by filing extra paperwork[,] they ... [would] ... keep [him] locked in a holding cell, chained and tightly cuffed, without food, water or use of the bathroom, until [he] br[oke] down and forg[ot] about wanting protective custody." Compl. at 9 ¶ 37. Defendants argue that plaintiff's conspiracy claim must be dismissed because the underlying

claims upon which it is based fail to state a claim for relief. See Dkt. No. 12-1 at 10.

**\*16**  In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009). "An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient." McRae v. Fischer, No. 9:17-CV-0146 (BKS/CFH), 2018 WL 3432743, at *6 (N.D.N.Y. June 6, 2018), report and recommendation adopted, No. 9:17-CV-00146 (BKS/CFH), 2018 WL 3432700 (N.D.N.Y. July 16, 2018). Although exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action." Anilao v. Spota, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. See Ciambriello, 292 F.3d at 325.

Here, even construing the facts in the light most favorable to plaintiff, plaintiff has failed to advance anything more than conclusory allegations of a conspiracy. There are no allegations outlining with specificity when, why, or how an alleged conspiracy occurred or the existence of an explicit or implicit agreement between any or all of the defendants. Even though exacting specifics are unnecessary at the pleading stage, the complaint is devoid of factual allegations establishing that defendants had any meeting of the minds in which they contemplated "break[ing] plaintiff down" until he "forgot about wanting protective custody status." Compl. at 9 ¶ 37; see Anilao, 774 F. Supp. 2d at 512-13. Rather, plaintiff merely alleges, in conclusory fashion, that defendants "entered into an agreement" to do so. Compl. at 9 ¶ 37. Likewise, plaintiff conclusorily alleges that defendants wanted to curtail him from requesting protective custody status in order to avoid "filing extra paperwork," but fails to offer any indication as to when, where, or how defendants agreed to execute the purported conspiracy. Compl. at 9 ¶ 37. Beyond stating that C.O. King informed plaintiff that Sgt. Hoffnagle wanted to write him a misbehavior report for failing to follow a direct order to lock into a cell, which plaintiff does not allege was ever filed, the complaint fails to plead a "meeting of the minds between any of the[ ]

[d]efendants to act in concert to inflict a constitutional injury on [p]laintiff." ⚠ Cusamano, 604 F. Supp. 2d at 432.

In any event, although not addressed by the parties, plaintiff's claim also fails as it is likely barred by intracorporate conspiracy doctrine. The intracorporate conspiracy doctrine provides that officers, employees, and agents of a single corporate entity are legally incapable of conspiring together.

See 🚩 Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008). Although the Second Circuit has recognized that the doctrine applies in the Section 1985 context, see id., it has not passed directly on the doctrine's applicability in the 🚩 Section 1983 context. However, district courts within the Circuit have applied the doctrine to such claims. See 🚩 Vega v. Artus, 610 F. Supp. 2d 185, 205-06 (N.D.N.Y. 2009) (dismissing conspiracy claim pursuant to intracorporate conspiracy doctrine where all of the defendants were DOCCS employees acting within the scope of their employment); see also Williams v. Korines, No. 9:16-CV-1157 (FJS/ TWD), 2018 WL 4521204, at *5 n.1 (N.D.N.Y. Sept. 21, 2018) (concluding that the intracorporate conspiracy doctrine applied to an inmate's 🚩 Section 1983 conspiracy claim); Richard v. Dignean, 126 F. Supp. 3d 334, 338-39 (W.D.N.Y. 2015) (finding intracorporate conspiracy doctrine applicable to claim by inmate against prison officials for discrimination against him based on race and religion); Toliver v. Fischer, No. 9:12-CV-00077 (MAD/ATB), 2015 WL 403133, at *22 (N.D.N.Y. Jan. 29, 2015) (dismissing conspiracy claim by inmate against DOCCS personnel under the intracorporate conspiracy doctrine).

 *17  An exception to the intracorporate conspiracy doctrine applies when the individuals are "pursuing personal interests wholly separate and apart from the entity." Ali v. Connick, 136 F. Supp. 3d 270, 282-83 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). However, a plaintiff must show more "than simply alleging that the defendants were motivated by personal bias against the plaintiff." 🚩 Medina v. Hunt, No. 9:05-CV-1460 (DNH), 2008 WL 4426748, at *8 (N.D.N.Y. Sept. 25, 2008); see also 🚩 Vega, 610 F. Supp. 2d at 205 (holding that "in order to allege facts plausibly suggesting that individuals are pursuing personal interests wholly separate and apart from the entity" to overcome the intracorporate conspiracy doctrine "more is required of a plaintiff than simply alleging that the defendants were motivated by personal bias against plaintiff.").

Here, all defendants were DOCCS employees during the period set forth in the Complaint and all were acting within the scope of their employment. Therefore, the intracorporate conspiracy doctrine applies. See 🚩 Vega, 610 F. Supp. 2d at 205-06. Additionally, plaintiff has not alleged facts to plausibly suggest that the exception to the intracorporate conspiracy doctrine applies. Plaintiff's conclusory allegation that defendants conspired to violate his constitutional rights in retaliation for his repeated requests for protective custody, which would have "ma[de] their job extensive by" creating "extra paperwork" for them to file, Compl. at 9 ¶ 37, does not appear to establish that defendants acted out of personal interests wholly separate and apart from Upstate. See, e.g., Richard v. Leclaire, No. 9:15-CV-00006 (BKS/TWD), 2017 WL 9511181, at *13, (N.D.N.Y. July 10, 2017) (concluding that the *pro se* inmate failed to allege facts to establish the personal exception to the intracorporation conspiracy doctrine where he alleged that the defendants conspired to file a false misbehavior report and rig a disciplinary hearing so that he would be found guilty in retaliation for being found not guilty in a prior prison disciplinary proceeding). Indeed, the Complaint specifically alleges that, "[a]t all relevant times[,] defendants acted under color of law," Compl. at 5 ¶ 6, which contradicts any claim that defendants acted out of personal interest wholly distinct from those of Upstate. See Dowd v. DeMarco, 314 F. Supp. 3d 576, 588 (S.D.N.Y. 2018) (holding that the personal interest exception to the intracorporation conspiracy doctrine did not apply where the inmate's complaint alleged that the defendant correction officers' purported acts "were conducted within the scope of their official duties or employment." (internal quotation marks omitted)). Rather, plaintiff appears to allege that defendants acted out of personal bias against him, which is insufficient to defeat the application of the intracorporate conspiracy doctrine. See generally 🚩 Medina, 2008 WL 4426748, at *8.

Accordingly, it is recommended that plaintiff's conspiracy claim be dismissed.

### E. Supervisory Liability

Plaintiff alleges that, after he informed Sgt. Hoffnagle that he desired to be placed on protective custody status, Sgt. Hoffnagle "sent his subordinates[,]" C.O. King and C.O. Hollenbeck, to "dissuade [him from] checking into

[protective custody] by threatening to issue a misbehavior report," after which the alleged First and Eighth Amendment violations occurred. Compl. at 12 ¶ 45. Defendants argue that plaintiff's supervisory claims against Sgt. Hoffnagle must be dismissed because the underlying First and Eighth Amendment claims upon which they are based fail to state claims upon which relief can be granted. See Dkt. No. 12-1 at 8-9.

**\*18** Supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. 🚩 Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). In this Circuit, the " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under 🚩 § 1983.' " 🚩 Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting 🚩 Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (additional citations omitted)). However, supervisory personnel may be considered personally involved in their subordinate's conduct if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

🚩 Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing 🚩 Wright, 21 F.3d at 501 (additional citation omitted)). [10] Absent a subordinate's underlying constitutional violation, there can be no supervisory liability. See 🚩 Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see 🚩 Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability.").

Construing the complaint liberally, plaintiff appears to allege supervisory liability under Colon factor one. See 🚩 Colon, 58 F.3d at 873. As discussed in section II.B.1 supra, plaintiff has plausibly asserted a claim for excessive force. Therefore, it is recommended that defendants' motion to dismiss plaintiff's supervisory liability claim against Sgt. Haffnagle, insofar as it is based upon his excessive force claim, be denied. However, as discussed in sections II.B.2.-D supra, plaintiff has failed to adequately allege the remainder of his constitutional claims and, therefore, cannot state a claim for 🚩 § 1983 supervisory liability based upon those allegations. See 🚩 Elek, 815 F. Supp. 2d at 808.

Accordingly, it is recommended that defendants' motion be granted as to plaintiff's supervisory liability claim against Sgt. Hoffnagle insofar as it is based upon plaintiff's Eighth Amendment failure to protect and conditions of confinement claims and First Amendment retaliation claim. It is further recommended that defendants' motion to dismiss plaintiff's supervisory claim be denied insofar as it is based upon plaintiff's Eighth Amendment excessive force claim.

### III. Conclusion

**\*19 WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion to Dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) be **GRANTED IN PART** and the following of plaintiff's claims be **DISMISSED WITH PREJUDICE**:

(1) Eighth Amendment failure to protect claim;

(2) Eighth Amendment conditions of confinement claim;

(3) Conspiracy claim; and

(4) First Amendment retaliation claim;

(5) Supervisory claim against Sgt. Hoffnagle insofar as that claim is based upon plaintiff's Eighth Amendment failure to protect, conditions of confinement, and conspiracy claims, and First Amendment retaliation claim, and it is further

**RECOMMENDED**, that defendants' motion to dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) be **DENIED** as to plaintiff's:

(1) Eighth Amendment excessive force claim;

(2) Supervisory claim against Sgt. Hoffnagle insofar as that claim is based upon plaintiff's Eighth Amendment excessive force claim; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72. [11]

**All Citations**

Slip Copy, 2019 WL 7500501

## Footnotes

1   The undersigned bears no relation to counsel for defendants.

2   This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3   Following initial review of plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), Senior District Judge Gary L. Sharpe dismissed certain claims with and without prejudice. See Dkt. No. 4. The Court dismissed plaintiff's Fourteenth Amendment Due Process and Equal Protection Claims. See Dkt. Nos. 1, 4. Further, Judge Sharpe's Decision and Order dismissed plaintiff's claims insofar as plaintiff sought monetary damages against defendants in their official capacity pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915(A) as barred by the Eleventh Amendment. See Dkt. No. 4 at 8.

4   In lieu of filing a response, plaintiff submitted a letter stating that he relied "solely" on a previous report and recommendation in a separate case arising out of largely the same facts and circumstances as alleged herein in which Magistrate Judge Peebles recommended granting defendants' motion to dismiss plaintiff's prior complaint on the basis that plaintiff failed to exhaust administrative remedies, but "note[d] that 'the outcome could very well have been different if plaintiff had, in fact, permitted the thirty-day period to elapse prior to commencing [that] suit." Dkt. No. 14 (quoting Livingston v Hoffnagle et al., 9:17-CV-1158 (MAD/DEP), Dkt. No. 28 at 18 n.11).

5   Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. Samuels v. Selsky, No. 01-CV-8235 (AGS), 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

6   All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

7    As defendants observe, some relevant caselaw appears to suggest that, in order to state an Eighth Amendment excessive force claim based on tight restraints, a plaintiff must allege a permanent injury. See Dkt. No. 12-1 (citing, among other cases, Burroughs v. Petrone, 138. F. Supp. 3d 182, 213 (N.D.N.Y. 2015) ("In the absence of any facts alleging any permanent injury as a result of handcuffing, plaintiff's excessive force claims against Weeks, S. King, Melendez, and McKeown fail to state a cause of action under § 1983.")). However, many of those cases assess excessive force claims under the Fourth Amendment. See Bourdon v. Roney, No. 9:99-CV-0769 (LEK/GLS), 2012 WL 21058177, at * 9-10 (N.D.N.Y. Mar. 6, 2003) (assessing an arestee's Fourth Amendment excessive force claim arising out of events that occurred during the course of the plaintiff's arrest); Jackson v. City of New York, 939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013) (same); Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468–69 (S.D.N.Y. 2008) (same); Layou v. Crews, No. 9:11-CV-0114 (LEK/RFT), 2013 WL 5494062, at *7 (N.D.N.Y. Sept. 30, 2013) (same). It is well settled that Fourth Amendment excessive force claims are assessed under the objective reasonableness standard, which does not apply to post-conviction inmates and, unlike the Eighth Amendment standard that includes both objective and subjective elements, is an "exclusively objective analysis" under which the defendant's "intent is irrelevant." Franks v. New Rochelle Police Dep't, No. 13-CV-636 (ER), 2015 WL 4922906, at *10 (S.D.N.Y. Aug. 18, 2015).

Further, the complaint in the Eighth Amendment excessive force case relied on by defendants, which cites to cases assessing Fourth Amendment excessive force claims, lacked allegations of wantonness, which allowed the court to bypass the subjective analysis and dismiss the Eighth Amendment excessive force claim on the objective prong alone. See Petron, 138 F. Supp. 3d at 213 (dismissing the plaintiff's Eighth Amendment excessive force claim where the complaint was devoid of allegations of malicious force and alleged only a *de minimis* injury). As discussed in section II.B.1., "[t]he appropriate test" for assessing an excessive force claim brought "under the Eighth Amendment involves both subjective and objective elements." Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). Accordingly, this Report-Recommendation & Order will apply the test articulated in Blyden.

8    In addition, to the extent that plaintiff also contends that defendants violated DOCCS Directive 4003B by housing him with the alleged gang member, it is well settled that "[f]ailure to follow a DOCCS Directive does not give rise to a § 1983 claim." Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 n.8 (N.D.N.Y. July 14, 2015); see Cabassa v. Gummerson, No. 9:01-CV-1039 (DNH/GHL), 2008 WL 4416411, at *6 n.24 (N.D.N.Y. Sept. 24, 2008) (violation of a DOCCS Directive does not give the plaintiff a claim under 42 U.S.C. § 1983); see also Ahlers v. Nowicki, No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983.").

9    Insofar as the complaint may be construed as alleging an Eighth Amendment violation based on the provision of "freezer cold" food, plaintiff fails to state a claim. Compl. at 6 ¶ 20. It is well established that "[t]he provision of cold food, is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Martin v. Oey, No. 9:16-CV-00717 (TJM/TWD), 2017 WL 6614680, at *6 (N.D.N.Y. Nov. 28, 2017) (internal quotation marks and citation omitted). Here, the complaint is devoid of allegations that the food was prepared or served under conditions presenting an immediate danger to plaintiff's health or wellbeing; therefore, the alleged provision of cold food, without more, fails to state a claim

Warren v. Purcell, Not Reported in F.Supp.2d (2004)

KeyCite Yellow Flag - Negative Treatment
Distinguished by Wilkinson v. Banks, W.D.N.Y., September 10, 2007

2004 WL 1970642
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Vincent WARREN, Plaintiff,
v.
C.O. PURCELL; C.O. Terry; C.O. Vivica; Dr.
Charkrovarty; C.O. Bisanette; C.O. Murfarn;
C.O. Fonree; C.O. McGill, Defendants

No. 03 Civ. 8736(GEL).
|
Sept. 3, 2004.

**Attorneys and Law Firms**

Vincent Warren, pro se.

Eliot Spitzer, Attorney General of the State of New York, by
Benjamin Lee, Assistant Attorney General, for defendants, of
counsel.

OPINION AND ORDER

LYNCH, J.

**\*1** *Pro se* plaintiff Vincent Warren, an inmate at Sing
Sing correctional institution, brings the instant complaint
for monetary relief under 42 U.S.C. § 1983 alleging
deliberate indifference to his medical needs, inadequate
medical care, and unlawful restraint in violation of the Eighth
Amendment. The claims asserted arise out of an incident in
which plaintiff slipped and fell on ice on the walkway of
the prison's recreation yard. Warren brings claims against
corrections officers ("C.O.s") Terry,[1] Steven Purcell and
Dennis McGill for an allegedly deliberate delay in escorting
him to a follow-up medical appointment the day after the
accident, against Officer Nicole Vivican[2] for improperly
chaining him to a stretcher on the way to the hospital and
refusing to loosen his cuffs when they became too tight,
against Dr. Hari Chakravorty for refusing him treatment, and
against Officer Bisanette[3] for interfering with the treatment
eventually provided by another clinic doctor.[4] Plaintiff seeks

monetary relief in the amount of $100,000 in addition to legal
fees and costs. Defendants move to dismiss on grounds of
failure to exhaust administrative remedies under the PLRA,
failure to state a constitutional claim, and qualified immunity.
The motion will be granted in part and denied in part.

PROCEDURAL HISTORY

On March 24, 2003, this Court's Pro Se Office received
plaintiff's original complaint in the above-mentioned matter
seeking monetary relief under 42 U.S.C. § 1983. By
order dated November 5, 2003, the Honorable Michael B.
Mukasey dismissed various claims and "grant[ed] plaintiff
leave to amend his [original] complaint in order to detail his
allegations of unlawful restraint and the denial of medical
attention." *Warren v. Thornton,* No. 03 Civ. 8736, slip
op. at 7 (S.D.N.Y. Nov. 5, 2003). Judge Mukasey also
directed plaintiff to demonstrate that he had exhausted
his administrative remedies for purposes of satisfying the
requirements of the Prison Litigation Reform Act, 42
U.S.C. § 1997e ("PLRA"). *Id.* at 6. Plaintiff timely filed an
Amended Complaint on November 24, 2003, and the case was
reassigned to this Court on December 30, 2003. Several of the
defendants, represented by the Attorney General of the State
of New York, filed the present motion to dismiss on April 30,
2004.[5]

On May 25, 2004, plaintiff filed his opposition brief along
with a proposed Second Amended Complaint. Plaintiff's
proposed Second Amended Complaint, if accepted for filing,
would "ordinarily supersede[ ] the original and render [ ] it
of no legal effect." *International Controls Corp. v. Vesco,*
556 F.2d 665, 668-69 (2d Cir.1977). Although the proposed
Second Amended Complaint was filed after the defendants'
motion to dismiss, and was apparently never served on the
individual defendants who remain *pro se,* the Court accepted
it for filing despite lack of proof of service; a copy was
thereafter mailed to the office of the Attorney General. The
moving defendants had an opportunity to respond to it in their
reply memorandum, and did so, urging the Court to reject
its filing as futile and incorporating the arguments raised in
their original motion by arguing that the Second Amended
Complaint failed to cure the defects they had identified in that
motion. (*See* D. Reply.)

**\*2** The Court, however, finds that the Second Amended
Complaint, which adds various defendants and drops others,

but does not materially alter the central allegations contained in the Amended Complaint, significantly clarifies the scope of plaintiff's claims. Allowing plaintiff to file the Second Amended Complaint would not prejudice moving defendants, on whom it has been served through their attorney, and who have taken the opportunity to respond to its allegations. It is therefore in the interests of justice to permit its filing. Accordingly, the Court will proceed upon the Second Amended Complaint as to the moving defendants, and the facts asserted therein shall be accepted as true for purposes of this motion. [6] *See Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995).

BACKGROUND

On or about January 3, 2003,[7] at approximately 9:15 a.m., Warren slipped and landed "neck first" on an ice-covered walkway inside the yard at Green Haven Correctional Facility. (2d Am.Compl.¶¶ 5-6, 8.) In preparation for his transport to Green Haven's medical clinic, Correctional Officer Murfarn instructed plaintiff to roll onto his front, face down on the stretcher. (*Id.* at ¶ 12.) When plaintiff failed to do so because "he was in so much pain he couldn't move by himself," Murfarn handcuffed Warren "backwards" as he lay on the stretcher, placing "a black box over the cuffs, plac[ing] a chain through it, and wrapping the chain around the [stretcher]." (*Id.* at ¶¶ 9, 13, 14.) Warren then complained to Officer Murfarn that the position he was in was painful to his injured neck; Murfarn then "unlocked the chain and [rolled] plaintiff on top of his hands" and cuffed Warren's left ankle to the roll-out bed under the stretcher. (*Id.* at ¶¶ 15-17.)

On the way to the hospital, Warren claims the EMS van hit a speed bump and his handcuffs then became tight on his wrists "because C.O. Murfarn never locked the cuffs so that they wouldn't get tighter." (*Id.* at ¶ 19.) Warren complained to all three correctional officers that his hand cuffs had become too tight and that his ankle cuffs were so tight that "he couldn't feel his toes on his left foot." (*Id.* at ¶ 20.) Officer Vivican told Warren that the cuffs could not be fixed while in transit, but that they would be fixed at a later point. (*See id.* at ¶ 21.)

When Warren arrived at the hospital at approximately 1:30 or 2:00 p.m., he again asked Officer Vivican to fix his cuffs. (*Id.* at ¶¶ 22-23.) When she denied his request, Warren then asked Officer Fonree to fix the cuffs, to which he replied, "I have to go with my fellow officer." (*Id.* at ¶ 23.) Warren then asked Officer Murfarn the same question, and while the

record is not clear as to his exact response, it is apparent that he did not adjust either Warren's hand or ankle cuffs; Warren remained cuffed in the same manner from 1:30 until 7:00 p.m., even during a CAT Scan. (*See id.* at ¶¶ 23, 25-27.) As a result, "[a]fter hours of complaining, and being [i]gnored, plaintiff[']s left foot became numb and swollen [and his] hands did as well." On the return trip to Green Haven, plaintiff was "cuffed forward with the chain placed around his waist and the shackles properly placed on his ankles." (Id. at ¶ 28.) All told, Warren claims he was in pain for approximately 4-5 hours because of the handcuffing procedures used by these defendants. (*Id.* at ¶ 29.)

**\*3** Upon his return to Green Haven, plaintiff gave a copy of his medical discharge instructions to his block C.O. (*See id.* at ¶ 30-31; Am. Compl. Ex. 1.) This report shows that Warren was to have a follow-up examination by a doctor on the Green Haven Facility Staff "in the a.m.," presumably of the following day. (Am.Compl.Ex. 1.) The next day, at 7:15 a.m., Warren informed Officer Terry that his neck hurt and he needed to see a doctor. (*Id.* at ¶ 32 .) At approximately 9:00 a.m., Officer Terry allegedly told Warren, "C.O. Purcell and C.O. McGill said you are not going anywhere." (*Id.* at ¶ 33.) Warren then showed Officer Terry his medical permit but Officer Terry still refused to take him to the clinic, allegedly saying, "You heard what my partners said, you are not going anywhere. [Y]ou don't like it write a grievance." (*Id.* at ¶ 34.) As Officer Terry walked away, Warren yelled, "I'm in pain. I need a doctor" and "was told 5 to 6 times to shut up or they [the officers] will shut him up." (*Id.* at ¶ 35.) Other inmates began yelling on Warren's behalf and as a result, Officer Purcell turned off the power on Warren's "company." (*Id.* at ¶¶ 36-37.)

At approximately 11:30 a.m. that day, the clinic sent Officer Bisanette to escort Warren to the clinic because he had not reported earlier in the morning. (*Id.* at ¶ 38.) Warren avers that once in the clinic, he entered Dr. Chakravorty's office where the doctor refused to look over his X-ray or hospital report and told him to "get the hell out of his office" because "there was nothing wrong with him." (*Id.* at ¶¶ 39-40.) At some point Warren requested pain medication and Dr. Chakravorty demanded that Officer Bisanette remove Warren from his office. (*Id.* at ¶ 41.) As Warren walked through the clinic "in tears," Dr. Bendheim, another doctor in the clinic, called Warren into his office, looked over the St. Francis Hospital report and issued him a neck brace. (*Id.* at ¶ 43.)

Warren avers Officer Bisanette then barged into Dr. Bendheim's office trying to "snatch the neck brace off" him and that Dr. Bendheim had to step between Bisanette and Warren. (*Id.* at ¶ 44.) Officer Bisanette then gave Warren a direct order to exit and he did so, leaving behind his pain medication. (*Id.* at ¶¶ 44-45.) Warren did not receive pain medication until later that night, totaling over 40 hours that he went without pain medication after his accident. (*Id.* at ¶ 45.)

DISCUSSION

I. Standard on a Motion to Dismiss

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). When adjudicating a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (internal quotation marks and citations omitted). When deciding such a motion, the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference, and such facts as are suitable for judicial notice pursuant to Fed.R.Evid. 201. *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991). All reasonable inferences are to be drawn in the plaintiffs' favor, which often makes it "difficult to resolve [certain questions] as a matter of law." *In re Independent Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 748 (S.D.N.Y.2001).

**\*4** "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds,* 85 F.3d at 53. However, "[a] *pro se* complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers." ' *Estelle v. Gamble,* 429 U.S. 97, 106 (1976), quoting *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972). The Court will not dismiss a *pro se* complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *accord Thomas v. City of New York,* 143 F.3d 31, 36-37 (2d Cir.1998).

II. Abandoned Claims

Defendants argue that plaintiff's claims based on his slip-and-fall should be dismissed for failure to state a constitutional violation. This issue has been mooted. In his opposition brief plaintiff disavows any intention to pursue a claim for negligence regarding his actual fall; he explains, quite sensibly, that as directed by the Court, he merely attempted to explain what happened in "step by step detail," but that he is not seeking damages for the fall, only for the alleged excessively harsh restraint and the alleged denial of medical care that followed. (*See* P. Opp. 3 at ¶ 1.) Equally sensibly, and aware of the rule of liberal construction of *pro se* complaints, defendants interpreted plaintiff's account of the accident as seeking to state a claim. Plaintiff has now cleared up his intentions. Accordingly, to the extent that his complaint could be construed as making any such claim, it is to that extent dismissed on consent.

Similarly, defendants' argument that plaintiff's claims against Thornton, Hann and Henschel should be dismissed is mooted by the plaintiff's having dropped these defendants from the Second Amended Complaint on May 25, 2005. Plaintiff again disavows any intention of seeking damages against individuals who were not personally involved, once again attributing his naming all of these defendants to understandable ignorance of court procedure and a desire to be thorough. (*See id.* at 4, at ¶ 2.) The complaint will be dismissed as against these individuals on consent.

III. Exhaustion Under the PLRA

The threshold question in any suit regarding prison conditions is whether the plaintiff has complied with the exhaustion requirement of the PLRA. The PLRA provides, in relevant part: "No action shall be brought with respect to prison conditions under ... any federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative procedures as are available are exhausted." 42 U.S.C. § 1997e(a). This requirement applies to suits such as this one that grow out of particular incidents, as well as to suits that more generally address the conditions of a prisoner's confinement. *Porter v. Nussle,* 534 U.S. 526, 532 (2002). Although the Second Circuit has clarified that failure to exhaust administrative remedies does not deprive the courts of jurisdiction, exhaustion is still a statutory prerequisite to bringing suit. *Richardson v. Goord,* 347 F.3d 431, 433-34 (2d Cir.2003). Plaintiffs must therefore exhaust all available

administrative appeals prior to filing a complaint, or face its dismissal. 🚩 *Neal v. Goord,* 267 F.3d 116, 121-22 (2d Cir.2001), overruled on other grounds by *Porter,* 534 U.S. at 532 (2002). It is uncontested that the Department of Correctional Services ("DOCS") maintains an internal, three-step grievance procedure for addressing prisoner complaints, and that this system applies to complaints like those brought here. *See* 🚩 N.Y. Correct. Law. § 139 (McKinny's 2004); N.Y. Comp.Codes R. & Regs. Tit. 7 §§ 701.1–🚩 701.16 (2004).

**\*5** Defendants argue that plaintiff's complaint is defective for two related reasons: First, although they concede that plaintiff has exhausted his administrative remedies with respect to the majority of his claims, they assert that plaintiff failed to demonstrate in accordance with Judge Mukasey's November 5 Order that he exhausted his administrative remedies on his claims of inadequate medical treatment against Dr. Chakravorty. [8] (D.Br.6) In support, they offer a sworn statement that after a search of Central Office Review Committee ("CORC") records, they have found "no record that any grievance appeal by plaintiff was received relating to his claim that ... Dr. Chakravorty was deliberately indifference *[sic]* to plaintiff's medical condition." (Eagen Decl. ¶ 6.) Second, they argue that based on this procedural deficiency, plaintiff's complaint must be dismissed in its entirety.

With respect to defendants' second argument, although the question was unsettled at the time this motion was briefed, the Second Circuit has since held that the PLRA does not require a court to dismiss an entire action where the plaintiff has failed to exhaust one or more of the component claims. 🚩 *Ortiz v. McBride,* No. 02-0088, ___ F.3d ___, 2004 WL 1842644, at \*12 (2d Cir. Aug. 18, 2004). Although there may be cases in which the exhausted and unexhausted claims are so intertwined that exhaustion should be required, that is not the case here. Plaintiff's claims against Dr. Chakravorty deal with his alleged failure to provide treatment to the plaintiff for injuries arising from his accident, and are entirely severable from the rest of his exhausted claims. The law is now clear that the fact that a plaintiff failed to exhaust administrative remedies with respect to a particular claim therefore does not require dismissal of his entire complaint. Thus, defendants' argument of failure to exhaust applies, at most, to the claim against Dr. Chakravorty, and cannot justify dismissal of plaintiff's other claims.

In any event, plaintiff argues that even his claim against Dr. Chakravorty should not be dismissed for failure to exhaust. Although failure to exhaust will normally result in dismissal, the Second Circuit has recently made clear in a series of decisions that there are exceptions to this rule, and has outlined a three-part inquiry in determining whether a plaintiff's failure to exhaust should preclude a claim from proceeding:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

**\*6** 🚩 *Hemphill v. New York,* No. 02-0164, ___ F.3d ____, 2004 WL 1842658, at \*5 (2nd Cir. Aug. 18, 2004) (citations and quotations omitted).

In support of his argument that his unexhausted claim should not be dismissed, plaintiff submits an original letter that he avers constitutes the original grievance filed, as well as a "return of grievance" form purporting to reject his grievance. The form begins by stating, "your grievance received on 2/12/03 is being returned to you for one or more of the following reasons. Please feel free to correct the noted problems and to resubmit the grievance." Incredibly, by way

of explanation, the letter states, "Your grievance is medical and needs to be investigated. It will take a minute before a response."

Under the standard recited above, administrative remedies were arguably "available" to the plaintiff, who could have pursued an appeal or reformulated the grievance had he been able to understand the disposition of his complaint. Nonetheless, DOCS's own response to his grievance estops defendants from relying on the defense of failure to exhaust. First, it is impossible to determine from the "return of grievance form" whether plaintiff's grievance had been rejected or accepted: Although the nature of the form suggests that the grievance had not been accepted for filing, the explanation suggests that it had been accepted and that an "investigat[ion]" and "response" were to be expected in due course. It was thus entirely unclear whether an appeal through the administrative process was called for in the first place. Second, even if the plaintiff were to discern that the grievance had in fact been rejected, it is wholly unclear what the plaintiff could have done to "correct" the problem, as the explanation provided indicates that the "problem" was merely that the claim required investigation. How the plaintiff should have proceeded in light of this baffling response is beyond this Court, and was presumably beyond the plaintiff, who does not dispute that he failed to pursue the matter further. It is thus wholly due to DOCS's own failure to provide simple guidance on how appropriately to proceed that the plaintiff failed to exhaust his administrative remedies. Alternatively, even if the communication to the plaintiff did not estop the defendants from raising the defense of exhaustion, the Court finds that the ambiguous message provided to the plaintiff constitutes a "special circumstance" under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified. *See* ⚑ *Giano v. Goord,* No. 02-0105, __ F.3d __, 2004 WL 1842652 (2d Cir. Aug. 18, 2004). The defendants' motion to dismiss the claims against Dr. Chakravorty for failure to comply with the PLRA's exhaustion requirement will therefore be denied.

## IV. Merits of Remaining Claims

A. Legal Standard for Eighth Amendment Claims
Cruel and unusual punishment under the Eighth Amendment constitutes the "unnecessary and wanton infliction of pain."

⚑ *Hope v. Pelzer,* 536 U.S. 730, 737 (2002). To state a claim for cruel and unusual punishment, a plaintiff's allegations must satisfy both an objective and a subjective

test. ⚑ *Farmer v. Brennan,* 511 U.S. 825, 838-39 (1994); *accord* ⚑ *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " ⚑ *Hathaway,* 37 F.3d at 66, quoting ⚑ *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)), and citing with approval *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain") (citations omitted). Second, since the Eighth Amendment bars "only the unnecessary and wanton infliction of pain," the subjective prong requires that the prison official accused have acted with a sufficiently culpable state of mind. ⚑ *Wilson,* 501 U.S. at 297-98. It is therefore necessary that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ⚑ *Farmer,* 511 U.S. at 837.

**\*7** In the case of excessive use of force by prison guards, the objective component does not require any particular "quantity of injury," for "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." ⚑ *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Thus, in cases of deliberate use of force, the subjective standard predominates: the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." ⚑ 503 U.S. at 6-7. Nonetheless, the Eighth Amendment "excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind ." ⚑ *Id.* at 8-9; *accord Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996).

The standard for deliberate indifference to medical needs is more stringent. The Supreme Court has ruled that allegations of indifference to serious medical needs of prisoners may constitute "the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." ⚑ *Estelle,* 429 U.S. at 104-05 (internal citations omitted.) However, in such cases, the objective standard predominates; a plaintiff may state such a constitutional claim only if the injury or illness is objectively serious. ⚑ *Hudson,* 503 U.S. at 9; *see also, e.g.,*

Warren v. Purcell, Not Reported in F.Supp.2d (2004)

*Sonds v. St. Barnabas Hosp. Correctional Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) ("[A] cut finger, even where skin is 'ripped off,' ... does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief."); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (foot condition involving a fracture, bone cyst and arthritis not sufficiently serious); *Evering v. Reilly,* No. 98 Civ. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) (soreness and redness of vaginal area and bruises not sufficiently serious); *Henderson v. Doe,* No. 98 Civ. 5011, 1999 WL 378333, at *2 (S.D.N.Y. Jun. 10, 1999) (broken finger not sufficiently serious).

A prisoner may state an Eighth Amendment claim "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 105. Where the basis of a plaintiff's claim is a delay in providing access to the requisite medical care, the Second Circuit has limited claims establishing Eighth Amendment violations to "cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition ... or delayed major surgery." *Demata v. New York State Correctional Dept. of Health Services,* 198 F.3d 233 (2d Cir. Sept. 17, 1999) (Table of Decisions, text of summary order in WL) (citations and quotations omitted). In addition, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003) (emphasis in original).

B. Officers Vivican, Fonree, and Murfarn
**\*8** Plaintiff alleges that defendants Vivican, Fonree, and Murfarn used excessive force in restraining him on his trip to the hospital. His claim is that his cuffs became too tight when the van in which he was being transported hit a bump, and that the defendant officers failed to adjust his cuffs when he complained of pain both during the trip and upon his arrival at the hospital. Although the use of excessively tight handcuffs

can constitute a violation of the Eighth Amendment, *see, e.g., Davidson v. Flynn,* 32 F.3d 27, 30-31 (2d Cir.1994), the plaintiff's claim here must fail. On the objective front, it appears highly unlikely that the injuries plaintiff alleges to have suffered as a result of the restraints, namely pain in his wrists and pain, numbness and swelling in his foot and ankle, would be considered sufficiently serious to rise to the level of an Eighth Amendment violation. There is no indication that the plaintiff suffered any lasting injury from the use of the restraints, and although the Court would be willing to accept his averments for purposes of this motion to dismiss, his injuries appear more than likely to prove *de minimis.*

However, the Court need not resolve this question, because the complaint does not satisfy the subjective requirement: plaintiff fails to allege any improper or wanton motive for the officers' actions. First, plaintiff's complaint itself makes no allegation that the officers deliberately placed the cuffs on too tightly, alleging only that the cuffs became too tight in transit because the officers "had never locked the cuffs so they wouldn't get tighter." (2d Am.Compl.¶ 19.) Indeed, plaintiff states that when he first complained of discomfort due to the position in which he was initially cuffed prior to transit, Officer Murfarn readjusted his position in response. (*Id.* ¶¶ 12-17.) There is thus no indication that the tightening of the cuffs while in transit was anything but inadvertent. Second, plaintiff has never, in any version of his complaint, attributed any improper or retaliatory motive to the defendant officers, either in attaching the cuffs in this manner in the first instance, or in failing to loosen them once he complained. On the contrary, plaintiff admits that he was told in response to his complaints "that the chain could not be loosen[ed] to fix the cuffs in transit." (*Id.* at ¶ 21.) The complaint itself therefore suggests a legitimate penological justification for the officers' actions. While their refusal to adjust plaintiff's restraints may appear callous, in the absence of any allegation of improper or wanton motive, plaintiff's constitutional claim for use of excessive force must fail.

C. Officers Terry, Purcell, and McGill
Warren claims that by delaying his follow-up clinic appointment for approximately three and a half to four hours Officers Terry, Purcell and McGill were deliberately indifferent to the pain he was suffering from the neck injury that occurred the day before. Even accepting as true plaintiff's allegations that McGill, and Purcill acted deliberately in delaying his treatment, the less than four-hour delay alleged does not rise to the level of an Eighth Amendment violation.

By the time of the claimed delay, the plaintiff had already seen a doctor, and had not been diagnosed with any severe or life-threatening condition. Warren presents no evidence, nor does he claim, that the delay caused by these officers in bringing him to his non-emergency follow-up visit caused or had the ability to cause death, degeneration, or extreme pain. While Warren claims to have suffered pain, it is clear that the interruption in treatment did not sufficiently exacerbate the situation so as to provide grounds for an Eighth Amendment violation.

**\*9** In this case, since Warren's claim does not pass the objective test, it necessarily must fail under the subjective standard. In order for the correctional officers to have a culpable state of mind, they must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Farmer, 511 U.S. at 837.* As previously established, the brief delay in treatment caused by officers Terry, Purcell and McGill posed no "excessive" risk to Warren's health or safety. Here, the correctional officers had no reason to suspect an emergency situation; while plaintiff had received a "permit" from his hospital visit the day before indicating that he needed treatment, there is no allegation that the permit indicated that such treatment needed to be provided on an urgent basis. *See, e.g., Freeman v. Strack,* No. 99 Civ. 9878, 2000 WL 1459782, at \*9 (S.D.N.Y. Sept. 29, 2000) (no Eighth Amendment claim against nurse who scheduled inmate's appendectomy two hours later rather than seeing inmate immediately where "[t]here was nothing in [the inmate]'s medical history which would have put [the nurse] on notice that [plaintiff] was suffering from the onset of appendicitis ... and there is no evidence that [the officer] gave [the nurse] any reason to believe that there was an emergency on hand"). Because these defendants had no reason to suspect such an emergency existed, there was nothing for them to ignore.

Although the Court can make no findings at this stage of the proceedings as to the seriousness of plaintiff's underlying injury, it is clear that the situation was not sufficiently urgent that the brief delay in receiving non-emergency follow-up treatment rises to the level of a constitutional violation. Because Warren's claim satisfy neither the objective nor the subjective prongs of the deliberate indifference test, his claims against Officers Terry, Purcill and McGill must be dismissed.

   D. Dr. Chakravorty

Plaintiff brings claims against Dr. Chakravorty based on his allegation that once he got to the clinic, the doctor "refused to look over [his] x-ray and hospital report," that he "told him to 'get the hell out of his office and there was nothing wrong with him,' " and that he had plaintiff forcibly removed from his office without offering him the treatment or pain medication ordered by the hospital. (2d Am.Compl.¶¶ 39-41.) Unlike the allegations of delay against Terry, Purcell and McGill, these allegations are sufficient to state a claim for a constitutional violation. The complaint does not allege mere delay in access to medical care, but rather, an outright refusal by a physician to provide previously-ordered treatment. Drawing all inferences in favor of the plaintiff, the refusal to conduct a sufficient examination on a patient who had suffered a neck injury due to a slip and fall the day before, or to provide the follow-up treatment ordered by a hospital, could result in both severe pain and serious degeneration of the patient's condition. Plaintiff's assertion that upon the his leaving Dr. Chakravorty's office, Dr. Bendheim examined him, reviewed his hospital report, and issued him the ordered treatment, also lends credence to plaintiff's claims that the injury was sufficiently serious to warrant prompt attention. It is thus reasonable to infer from plaintiff's allegations that doctor Chakravorty, who had full access to these same reports, "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837.

**\*10** Whether the plaintiff's underlying injury was, in fact, serious enough to warrant immediate attention is not for the Court to determine at this phase of the proceedings, but must await further development of the evidentiary record. The matter will almost certainly become clearer once plaintiff has received all relevant medical records and taken the depositions of the appropriate medical personnel, including that of Dr. Bendheim. Should the injury in fact prove slight, the Eighth Amendment would not be implicated. And of course, a finder of fact may or may not accept Warren's account of his encounter with Dr. Chakravorty. For the time being, however, the Court must accept as true plaintiff's averments of extreme pain,[9] and defendants' motion to dismiss plaintiff's claims against Dr. Chakravorty must be denied.

   E. Officer Bisanette

Plaintiff alleges that Bisanette "yank[ed] plaintiff out of the chair" after Dr. Chakravorty ordered plaintiff to leave his office causing plaintiff to "scream from the pain," that once plaintiff was being treated by Dr. Bendheim, Bisanette

"barged into the office and [tried] to snatch the neck brace off plaintiff," and that Bisanette then ordered plaintiff to leave, causing him to leave behind the pain medication that Dr. Bendheim had provided. Assuming again that plaintiff's underlying injury was in fact serious, the behavior alleged would constitute intentional interference with prescribed medical treatment, and could therefore state a claim for deliberate indifference to plaintiff's medical needs.

However, as defendants point out, there is no evidence that defendant Bisanette, who is not represented by the Attorney General's office, has been served with any complaint in this matter, or that plaintiff has even attempted service of the Second Amended Complaint on him (or on any other defendant). Because plaintiff states a colorable claim against Officer Bisanette, the Court will permit plaintiff additional time to perform service on Bisanette in accordance with the terms set forth below; failure to do so will result in dismissal of any claims against him. Because all potential claims against the remaining defendants who have not yet been served are here dismissed as meritless, plaintiff need not perform service on them.

CONCLUSION

Accordingly, the motion to dismiss plaintiffs' section 1983 claims is granted, with the exception of his claims against Dr. Chakravorty. Pursuant to the discretionary authority granted in Fed.R.Civ.P. 4(m), the Court will allow plaintiff an additional month from the date of entry of this Order on the docket to serve defendant Bisanette, the sole additional defendant remaining; failure to do so will result in dismissal of any remaining claims against him.

The Clerk of the Court is respectfully directed to mark defendants' motion (Doc. # 19, dated April 30, 2004) as closed.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1970642

---

### Footnotes

1   Plaintiff does not identify whether Terry is the defendant's first or last name, and provides no further identifying information beyond stating that s/he is a "C.O." (2d Am.Compl.¶ 3.)

2   In the caption and throughout the Second Amended Complaint, Plaintiff refers to this defendant as "Vivica." However, the Attorney General's brief spells her name "Vivican." The Court will assume that the attorney representing her has used the correct spelling of her name, and will refer to her in this opinion as "Vivican."

3   Plaintiff similarly fails to identify the first name of Officer Bisanette.

4   As discussed below, plaintiff disavows any potential claims against defendants Hann, Christine, Henschel, and Thornton, who were named in his First Amended Complaint. *See infra* Part II.

5   These defendants are Deputy Superintendent for Programs Delores Thornton, Officers Dennis McGill, Officer Steven Purcell, C.P. John Henschel, Officer Nicole Vivican, Officer Terry, Sergeant Susan Hann and Dr. Hari Chakravorty. The remaining defendants named in the Amended Complaint, Officers Fonree, Murfarn, and Bisanette and Nurse Christine have not requested representation from the Office of the Attorney General. (*See* D. Br. 1 n. 1.)

6   As further clarified below, although the non-moving defendants have not yet been served with the Second Amended Complaint, with the exception of Officer Bisanette, the claims against each of them are dismissed here as meritless. Permitting the plaintiff to attempt service on those defendants would therefore be futile.

However, because plaintiff asserts a colorable claim against Officer Bisanette, the Court will afford the plaintiff additional time to perform service solely on him. *See infra* Part IV.E.

7    There is some discrepancy between the date cited by plaintiff in his Second Amended Complaint and the date on the hospital report. (*See* Am. Compl. Ex. 1.) However, the Court will accept the dates alleged in plaintiff's complaint for purposes of this motion.

8    It bears emphasis that it is not the plaintiff's burden to plead the elements of exhaustion in the complaint itself, but rather, the defendant's burden to raise and prove failure to exhaust in its answer or motion to dismiss. *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004); *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999) ("[A] defendant in a prisoner § 1983 suit may also assert *as an affirmative defense* the plaintiff's failure to comply with the PLRA's requirements."). However, in this case, plaintiff was specifically directed by Judge Mukasey's November 5, 2003, Order to "show that he has completely exhausted the state's administrative remedies through the highest level for each claim he seeks to present." *Warren,* No. 03 Civ. 8736, slip op. at 7 (S.D .N.Y. Nov. 5, 2003). Dismissal would be appropriate, either on the defendant's motion or by the court *sua sponte,* where the plaintiff has failed to produce evidence rebutting the defense of lack of exhaustion after being afforded the opportunity to do so. *See Snider v. Melindez,* 199 F.3d 108, 112 (2d Cir.1999); *Hucks v. Artuz,* No. 99 Civ. 10420, 2001 WL 210238 (S.D.N.Y. Feb. 27, 2001).

9    Defendants correctly point out that the plaintiff has not identified a diagnosis for his injuries or specified whether it caused any lasting damage. Plaintiff's original Amended Complaint alleged injuries including a "broken nose, nose bleed, neck strain ... pain in legs, lower back[,] neck, pain in feet and severe migraines." (Am.Compl.¶ IV-A.). His Second Amended Complaint omits this list of injuries. However, he alleges that at various times, he was "in so much pain he couldn't move by himself" (2d Am.Compl.¶ 12), that he "screamed from the pain" (*id.* at ¶ 42), and that he was "in complete pain and frustration" (*id.* at ¶ 39). For purposes of the instant motion, the Court construes these allegations liberally to suggest an underlying injury sufficiently serious to implicate a possible constitutional violation.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1366590
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Booker WILSON, Plaintiff,
v.
Donald DEPOLO, Woodbourne
Correctional Facility, Defendant.

No. 9:11–CV–1088.
|
April 19, 2012.

**Attorneys and Law Firms**

Booker Wilson, Sonyea, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, James Seaman, Esq., Ass't Attorney General, of Counsel, Albany, NY, for Defendant.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff brought this action pursuant to 42 U.S.C. § 1983. On March 21, 2012, the Honorable Andrew T. Baxter, United States Magistrate Judge, advised, by Report–Recommendation, that defendant's motion to dismiss be granted and plaintiff's complaint be dismissed in its entirety. No objections to the Report–Recommendation were filed.

Based upon a careful review of the entire file and the recommendations of the Magistrate Judge, the Report–Recommendation is accepted in whole. *See* 28 U.S.C. 636(b)(1).

Therefore it is

ORDERED that

1. Defendant's motion to dismiss is GRANTED; and

2. Plaintiff's complaint is DISMISSED with prejudice.

The Clerk is directed to file a judgment dismissing the complaint and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1366590

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

upon which relief may be granted. See id.; see also ⚠ Brooks v. NYC DOC Comm'r, No. 14-CV-6283 (RRM/CLP), 2016 WL 4530456, at *4-5 (E.D.N.Y. Aug. 29, 2016) (*sua sponte* dismissing cause of action based on the failure to provide hot meals where there was no allegation that the inmate did not receive nutritionally adequate meals).

10    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. 🚩 Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (recognizing that several District Courts in the Second Circuit have debated Iqbal's impact on the five Colon factors), rev'd in part on other grounds sub nom., 🚩 Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); 🚩 D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

11    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

whether the prison officials acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 7 (1992).

To prove an excessive force claim, an inmate must satisfy both an objective test and a subjective test. *Hudson,* 503 U.S. at 7–8. Objectively, a section 1983 plaintiff must establish that the force applied was "sufficiently serious" or harmful to establish a constitutional violation. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (additional citations omitted); *see also Romano v. Howarth,* 998 F.2d 101, 104 (2d Cir.1993). This objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 9. A plaintiff "need not prove 'significant injury to make out an excessive force claim," *Griffin v. Crippen,* 193 F.3d 89, 92 (2d Cir.1999), but "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano,* 998 F.2d at 105. *De minimis* force, even If clearly unpleasant to endure, does not violate the Eighth Amendment where "the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (internal quotation marks and citation omitted). Although "some degree of injury is ordinarily required to state a claim," *United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999), the core judicial inquiry is not the extent of the injury sustained, but rather " 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Wilkins v. Gaddy,* 559 U.S. 34, 130 S.Ct. 1175, 1179 (2010) (quoting *Hudson,* 503 U.S. at 7).

**\*4** The subjective test for an Eighth Amendment excessive force claim requires the inmate to show that the prison officials "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 7). When determining whether the subjective test has been satisfied, courts may consider, "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials' and 'any efforts made to temper the severity of

a forceful response.' " *Hudson,* 503 U.S. at 7 (quoting *Whitley,* 475 U.S. at 321). "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Id.*

Here, plaintiff alleges he was maliciously attacked with excessive force by defendant Steck while being held against the wall by defendant Rademacher. Plaintiff further alleges that he was bruised and swollen about his head and face as a result of the alleged attack. However, no Use of Force report was filed, and plaintiff did not report any injuries until approximately two weeks later, despite being admitted to the infirmary for high blood pressure approximately one week after the alleged assault. On March 8.2010, Nurse Pawlak saw no injury to plaintiff's head and no treatment was administered.

Defendants argue that, even if plaintiff's allegations are true, plaintiff has failed to prove that any force used was more than *de minimis* or that his injuries were constitutionally significant. However, plaintiff has alleged that the defendants attacked him, held him against a wall, and repeatedly punched him about the head. He states that the alleged assault was unprovoked and not in response to any security breach or threat. Plaintiff has thus raised a genuine issue of material fact regarding the subjective element of the Eighth Amendment claim. As the Second Circuit stated, where "prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.... This is true whether or not significant injury is evident.' " *Wright v. Goord,* 554 F.3d 255, 269 (2d Cir.2009) (quoting *Hudson,* 503 U.S. at 9).

The court recognizes that plaintiff's proof, both of his injuries and of the excessive force incident itself, is weak. Nonetheless, if "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically," summary judgment is improper "even where the plaintiff's evidence of injury [is] slight and the proof of excessive force [is] weak." *Wright v. Goord,* 554 F.3d at 269. Crediting plaintiff's version of events, as this court must in considering the defendants' motion for summary judgment, *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003), there is a question of fact whether the use of force was unrelated to any effort to maintain order or discipline. *See Clarke v. Anderson,* 2012 WL 3292879

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 177 of 482

2018 WL 4610686
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ahmadou SANKARA, Plaintiff,

v.

MONTGOMERY, Burgess, Lopez, Defendants.

9:16-CV-00885 (FJS/TWD)
|
Signed 06/25/2018

**Attorneys and Law Firms**

AHMADOU SANKARA, 16-R-0122, Plaintiff pro se, Upstate Correctional Facility, P.O. Box 2001, Malone, New York.

HON. BARBARA D. UNDERWOOD, Attorney General for the State of New York, OF COUNSEL: MATTHEW P. REED, ESQ., The Capitol, Albany, New York 12224, Counsel for Defendants.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1**  The sole remaining claim in *pro se* Plaintiff Ahmadou Sankara's amended complaint (Dkt. No. 19) in this civil rights action brought under 🚩 42 U.S.C. § 1983 is his Eighth Amendment conditions of confinement claim involving the alleged denial of meals against Defendants Keith Montgomery ("Montgomery"), a Department of Corrections and Community Supervision ("DOCCS") Sergeant at Fishkill Correctional Facility ("Fishkill"); Erik Burgess ("Burgess"), a Corrections Officer ("C.O.") at Fishkill; and Jessica Lopez ("Lopez"), a former C.O. at Fishkill. (Dkt. No. 22 at 22. [1]) Montgomery, Burgess, and Lopez now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff has failed to exhaust his administrative remedies and has failed to assert a constitutional violation. (Dkt. Nos. 81 and 81-1.) Plaintiff has filed papers in opposition to Defendants' motion. [2] (Dkt. No. 84.)

For reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted.

**II. FACTUAL BACKGROUND**

Plaintiff, an inmate in the custody of DOCCS, was transferred to Fishkill on August 3, 2016. (Dkt. No. 19 at 11.) In his amended complaint, Plaintiff alleges that his Eighth Amendment conditions of confinement claim is based upon having been deprived of meals by Defendant Burgess on August 3, 2016, and August 4, 2016; by Defendants Lopez and Montgomery on October 10, 2016, and September 24, 2016; and by Montgomery on October 23, 2016, and October 24, 2016. *Id.* At his deposition, Plaintiff testified he was deprived of five meals by the Defendants, which included dinner on August 3 and 4, 2016, and lunch on September 10, 2016, September 23, 2016, and September 24, 2016. (Dkt. No. 81-3 at 19, 21, 26-27.)

**A. Service of Meals in the Fishkill SHU**

Meals are served three times a day in the Special Housing Unit ("SHU") at Fishkill. (Dkt. No. 81-4 at ¶ 7. [3]) Before a meal is served, an announcement is made on the public address system once on each of the two floors notifying inmates of the forthcoming meal, and reminding them to be awake, with their lights on, fully clothed, and with any clothing lines in their cell taken down. *Id.* at ¶¶ 8-9. It is made before meal delivery so that inmates have time to prepare. *Id.* at ¶ 9. The rules for meals are contained in the SHU rulebook given to inmates when they are admitted to the unit. *Id.* at ¶ 10. The rules have a dual purpose: to ensure that food is not contaminated and to meet heightened security concerns in SHU. *Id.* at ¶¶ 11-13. Plaintiff denies having received the rulebook. (Dkt. No. 84 at ¶ 17.)

**\*2**  Anywhere from five to seven officers assist in delivering meals, with Defendant Montgomery either leading or following behind the officers to address any problems when he is on duty. *Id.* at ¶¶ 15-17. Inmates who do not comply with the established procedures do not receive a meal. *Id.* at ¶ 18. Failure to comply with the meal distribution procedures is noted as a refusal of chow and recorded in the SHU logbook. *Id.* at ¶ 14.

**B. August 3 and 4, 2016**

Plaintiff claims that on August 3, 2016, the day he arrived at Fishkill, he was deprived of dinner by Defendant Burgess. (Dkt. No. 81-3 at 19, 27.) Plaintiff testified at his deposition

that he received something like a box lunch with bread while en route to Fishkill and should have been given dinner at Fishkill but was not. *Id.* at 20. According to Plaintiff, dinner is served at 3:00 or 4:00pm. *Id.* at 22. Plaintiff claims that he and his bunk mate in SHU were denied dinner by Burgess on August 3, 2016, because his bunk mate was not properly dressed. *Id.* at 20-23, 27. Plaintiff was properly dressed and did not say anything, but his bunk mate began arguing with Burgess, which he was not supposed to do, so Burgess also deprived them of dinner the following day, August 4, 2016. *Id.* at 21, 27.

Plaintiff was very hungry and emotionally frustrated the night of August 3, 2016, because he had not made himself breakfast that morning, the lunch he was given was too small, and he did not receive dinner. *Id.* at 26. Plaintiff did receive both breakfast and lunch on August 4, 2016, missing only dinner. *Id.* at 21-22.

While Burgess recalls Plaintiff and his behavior in SHU, he does not recall the specific dates on which Plaintiff claims Burgess deprived him of a meal. (Dkt. No. 81-5 at ¶ 5.) There is an entry for August 3, 2016, in the SHU logbook indicating that Plaintiff was not admitted to SHU until 6:48 pm, after dinner would have been served. (Dkt. No. 81-3 at 124.) The logbook appears to note two refusals for dinner on August 4, 2016, but does not list the inmates by name. *Id.* at 131.

### C. September 10, 2016

Plaintiff testified at his deposition that on September 10, 2016, he was denied a haircut by a corrections officer because Plaintiff had allegedly called him a Chinese officer, which Plaintiff denies. (Dkt. No. 81-3 at 32-33.) The officer wrote a misbehavior report on Plaintiff, and when the officer and Montgomery came around serving lunch, Plaintiff, who was standing in front of his door, was told he was not properly dressed and did not receive lunch. *Id.* at 34. Plaintiff did receive dinner on September 10, 2016. *Id.* at 36. Although Montgomery recalls Plaintiff, he does not recall his interactions with Plaintiff on the dates Plaintiff claims not to have received his meals. (Dkt. No. 81-4 at ¶ 20.)

### D. September 23, 2016

On September 23, 2016, recreation ("rec") and lunch were called at the same time. (Dkt. No. 81-3 at 39.) According to Plaintiff, a SHU inmate cannot have rec and chow at the same time. *Id.* Plaintiff was at rec with another inmate. *Id.* 39-40.

When they came in, Plaintiff told the sergeant he had been at rec and needed his lunch. *Id.* at 39. At that time lunch had not yet passed by Plaintiff's door. *Id.* at 39-40. Plaintiff could see the officers and talked to them when the food was next to him, but Plaintiff was not given any. *Id.* at 40. Plaintiff has identified Montgomery as the one who did not give him lunch. *Id.* at 42.

**\*3**  Plaintiff was very hungry so he started to kick the door for them to bring his food. *Id.* They did not want to bring his food so he left it alone. *Id.* Plaintiff did receive dinner on September 23, 2016. *Id.* at 41.

### E. September 24, 2016

Plaintiff testified at his deposition that on September 24, 2016, he stopped the Superintendent at Fishkill and started to speak with him about the food issue going on. (Dkt. No. 81-3 at 42.) Montgomery told Plaintiff to talk fast and Plaintiff said he knew Montgomery's name even though he hid it, and that Montgomery was the one who had denied him food September 10 and 23, 2016. *Id.* After the Superintendent left, Montgomery denied Plaintiff lunch again because he had talked to the Superintendent. *Id.* at 42-43. Defendant Lopez came to speak with Plaintiff when he began kicking his door. Plaintiff was told they had already passed and were not coming back, and they walked away. *Id.* at 43. When Plaintiff started kicking the door because he was really hungry, Lopez wrote a misbehavior report on which she stated he had been sleeping. *Id.* Plaintiff testified that of the Defendants only Montgomery was involved in depriving Plaintiff of lunch on September 23, 2016, and that both Montgomery and Lopez were involved on September 24, 2016. *Id.* at 44.

### III. APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see*

📄 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. 📄 ⚠ *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a

reasonable jury could return a verdict for the nonmoving party." 🚩 *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. 🚩⚠ *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." 🚩 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." ⚠ *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See* 🚩 *Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[4] 🚩 *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

**\*4** In 🚩 *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." 🚩 *Id.* (citation and internal quotation marks omitted). "To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." 🚩 *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with

conclusions, are insufficient to defeat a properly supported motion for summary judgment." 🚩⚠ *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. 🚩 *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." 🚩 *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[5] (citing 🚩 *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

## IV. PLAINTIFF'S FAILURE TO COMPLY FULLY WITH N.D.N.Y. L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." 🚩 *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3) by neglecting to set forth a specific citation to the record in a number of instances where he appears to dispute a statement included in the statement of undisputed facts.[6] (See Dkt. Nos. 81-2 and 84.)

Where a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported by evidence in the record,[7] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[8] *See* 🚩 *Champion, v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to

consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement."

*Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status and the significant degree of effort he has shown in his response to Defendants' material statement of facts (Dkt. No. 84), the Court has opted to review the entire record.

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

### A. Legal Standard

**\*5** Montgomery, Burgess, and Lopez seek summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim against them on the ground that Plaintiff failed to exhaust his administrative remedies under the DOCCS Inmate Grievance Procedure ("IGP") with regard to the claim. Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

42 U.S.C. § 1997e(a); *see also* *Ross v. Blake*, — U.S. —, 136 S.Ct. 1850, 1854-55, 195 L.Ed.2d 117 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ); *see also* *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations

omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Special procedures are used when the grievance involves a claim of staff misconduct. *Id.* § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,' " assuming there is another step

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 181 of 482

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2) ); *see also Smith v. Kelly*, 985 F.Supp.2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can and must be appealed to the next level ... to complete the grievance process."). Exhaustion under the DOCCS IGP is not complete until the grievance has been appealed to CORC and CORC has issued a decision. *See Neal v. Goord*, 267 F.3d 116, 123 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Singh v. Goord*, 520 F.Supp.2d 487, 495 (S.D.N.Y. 2007) (complete exhaustion to CORC, the highest level, is required).

**\*6** While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S.Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S.Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted) ). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S.Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216, 127 S.Ct. 910; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95, 126 S.Ct. 2378. Plaintiff must then establish that the DOCCS IGP was unavailable to him. *See Jones*, 549 U.S. at 216, 127 S.Ct. 910.

### B. Analysis

#### 1. Plaintiff's Failure to Exhaust His Administrative Remedies

Fishkill had a fully functioning inmate grievance procedure during the time Plaintiff was housed at the facility. (Dkt. No. 81-7 at ¶ 12.) Fishkill IGP supervisor, Sally Reams ("Reams"), has submitted a declaration describing the DOCCS IGP procedures followed at Fishkill. (*See generally* Dkt. No. 81-9.) According to Reams, she reviewed the records in the Fishkill grievance office where all documents or copies thereof related to a particular grievance dating back to January 1, 2013, are maintained. *Id.* at ¶¶ 9, 12. Her review revealed that Plaintiff was housed at Fishkill from August 3, 2016, to October 31, 2016, and during that time did not file any grievance related to a denial of six meals at Fishkill between August 3, 2016, and October 24, 2016. [9] *Id.* at ¶ 13.

Joseph Cieslak ("Cieslak"), IGP supervisor at Mohawk Correctional Facility ("Mohawk"), to which Plaintiff was moved on October 31, 2016, has described the manner in which the DOCCS IGP is followed at Mohawk. (*See generally* Dkt. No. 81-8.) Cieslak reviewed the grievance records in the grievance office at Mohawk and determined that Plaintiff had not filed any formal grievances while at Mohawk. *Id.* at ¶¶ 9-12.

**\*7** Rachael Seguin, Assistant Director of the DOCCS IGP, has also submitted a declaration in support of Defendants' motion. (Dkt. No. 81-7.) Seguin is the custodian of records maintained by CORC. *Id.* at ¶ 2. The CORC database contains files on inmate appeals to CORC for the current year and the previous four calendar years. *Id.* at ¶ 7. Seguin reviewed the CORC database for appeals related to Plaintiff's claim in this action and determined that he has never appealed a grievance to CORC. *Id.* at ¶¶ 10-11 and pp. 7-8.

The Court finds that the Reams declaration is deficient in showing that Plaintiff failed to file grievances with regard to any of the missed meals since it indicates only that her review of the grievance office records showed that Plaintiff did not file a grievance related to "a denial of meals on six occasions between August 3, 2016 and October 3, 2016." (Dkt. Nos. 81-3 at 38-39; 81-9 at ¶ 13.) However, inasmuch as the Seguin declaration and attached printouts from the CORC database establish that Plaintiff has never filed any appeals with CORC, the Court finds that Defendants have met their burden of establishing that Plaintiff failed to exhaust his administrative remedies with regard to his Eighth Amendment conditions of confinement claim that he was deprived of five meals by Defendants. *See* 🚩 *Jones, 549 U.S. at 218, 127 S.Ct. 910* (proper exhaustion under the PLRA means using all steps required by the applicable administrative review process).

### 2. Plaintiff's Failure to Sustain His Burden on Availability

The Court also finds that Plaintiff has failed to submit nonconlusory evidence of unavailability under 🚩 *Ross* sufficient to raise a material issue of fact on the question of availability of the DOCCS IGP. In his amended complaint, Plaintiff alleges "... also at Fishkill my SHU appel mail was not go out and my grievance was not go out that I was denied food at Fishkill five times in the SHU...." (Dkt. No. 19 at 9.) Plaintiff further alleges "[o]n August 3, 2016 I was transfer from Green facility to Fishkill facility I don't know if Green facility write note to Fishkill facility because same day on June 3, 2016 [August 3, 3016?] I was denied chow the next day I was denie on June 4, 2016 [August 4, 2016?] I write grievance I never receive my grievance respond...." *Id.* at 11.

At his deposition, Plaintiff testified he filed grievances for "any matter that's not procedure" and "for [his] right"

and never received a response. (Dkt. No. 81-3 at 60.) According to Plaintiff, he filed grievances regarding missed meals at Fishkill. 🚩 *Id. at 73.* Plaintiff described the procedure followed in the Fishkill SHU whereby inmates give grievances to the corrections officer who comes around and drops the grievances in a basket and claims that the officers only send out the mail they want to send out. 🚩 *Id. at 74.* Plaintiff claims to have filed grievances all the time and believes that they probably did not go out because he never received a response. *Id.*

Plaintiff testified he wrote to the superintendent about the food situation because he had not heard back from the I.G.R.C. 🚩 *Id. at 75.* The superintendent wrote back and told him to appeal his decision. 🚩 *Id. at 78.* According to Plaintiff, the superintendent told him to appeal to CORC regarding how many times he was denied food in SHU, so he wrote to CORC and retained a copy as was his practice and never received a response. 🚩 *Id. at 77-78.*

In his declaration in reply to the Reams declaration, Plaintiff states that the Fishkill grievance office failed to respond to his grievance of the Eighth Amendment violation. (Dkt. No. 84-1 at 2.) In his declaration in response to the Cieslak declaration, Plaintiff states that Cieslak never filed or responded to any of Plaintiff's grievances at Mohawk. *Id.* at 4. In his declaration in response to the Seguin declaration, the only grievance referenced is a grievance dated June 21, 2017. *Id.* at 6. Although not admissible evidence, Plaintiff repeats in his response to Defendants' material statement of facts that his grievances regarding being denied meals were taken but not sent to the grievance office. (Dkt. No. 84 at ¶ 54.)

**\*8** Plaintiff has done nothing more than allege in conclusory fashion that he attempted to file one or more grievances concerning the denial of meals. He has provided no evidence that he actually did write grievances; when they were written; the content of the grievances, including the specific denial of meals involved in the grievance; the officers named in the grievance(s) as involved in the denials; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office at Fishkill regarding the grievances. Plaintiff has submitted no documentary evidence whatsoever that supports his conclusory assertion that he submitted grievances regarding the denial of meals or demonstrates any follow up on his part when he allegedly received no response.

The Court concludes that Plaintiff's conclusory accusations that the DOCCS IGP was unavailable to him because his grievances were not sent to the grievance office by the officers who picked them up and because he did not receive a response from CORC, unsupported by evidence, are insufficient to withstand summary judgment. *See Rodriguez v. Cross,* No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Courts in this Circuit have consistently held that mere contentions or speculations of grievances being misplaced by officers do not create a genuine issue of material fact [on the availability of the DOCCS IGP] when there is no evidence to support the allegations"); *Khudan v. Lee,* No. 12-cv-8147 (RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016) ("Plaintiff's accusations [regarding grievances], which 'stand alone' and are 'unsupported', are insufficient to withstand summary judgment") (quoting *Bolton v. City of New York,* No. 13-CV-5749 (RJS), 2015 WL 1822008, at *2 (S.D.N.Y. April 20, 2015) ).

Based upon the foregoing, the Court recommends that all three Defendants be granted summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies with regard to his Eighth Amendment claim.

## VI. Eighth Amendment Claim Regarding Missed Meals

The Court is recommending that Defendants be granted summary judgment on exhaustion grounds. However, if the Court were to consider Defendants claim for entitlement to judgment as a matter of law, it would recommend summary judgment as a matter of law on Plaintiff's Eighth Amendment conditions of confinement claim as well.

### A. Legal Standard for Eighth Amendment Conditions of Confinement Claims for Depriving an Inmate of Meals

The Eighth Amendment "imposes the constitutional limitation upon punishments: they cannot be 'cruel and unusual.' " *Rhodes v. Chapman,* 452 U.S. 337, 345, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The Eighth Amendment prohibits punishments which "involve the unnecessary and wanton infliction of pain." *Id.* at 346, 101 S.Ct. 2392 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without

penological justification.' " *Id.* (quoting *Gregg,* 428 U.S. at 183, 96 S.Ct. 2909).

The Second Circuit has held that the Constitution requires that prisoners be fed nutritionally adequate food and "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir. 1983); *see also Jackson v. Marks,* 722 F. App'x 106, 107 (2d Cir. 2018) (Mem) ("[A] substantial deprivation of food can cause serious physical harm sufficient to find cruel and unusual punishment in violation of the Eighth Amendment.") (citation and internal quotation marks omitted).

In order to establish a claim that the denial of food constitutes an Eighth Amendment violation, a prisoner must establish that a "sufficiently serious condition" resulted from not receiving food. *Evans v. Albany County Correctional Facility,* No. 9:05-CV-1400 (GTS), 2009 WL 1401645, at *9 (N.D.N.Y. May 14, 2009) (citation and internal quotation marks omitted). To prove a conditions of confinement claim, a prisoner must also establish that defendant acted with deliberate indifference that defendant "knows of and disregards an excessive risk to inmate health or safety." *Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir. 2002) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ). "[T]he [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." *Id.* at 186 (quoting *Farmer, id.*). The "deliberate indifference" element is equivalent to standard of "recklessness" as used in criminal law." *Id.*

### B. Analysis

**\*9** Plaintiff claims to have missed a total of five meals over a period of fifty-three days as a result of the actions of the Defendants and never to have missed more than one meal on a given day. (Dkt. No. 81-3 at 19, 21, 26-27, 80.) Plaintiff contends Defendant Burgess denied him dinner on August 3 and August 4, 2016; Montgomery denied him lunch on September 10, 23, and 24, 2016; and Lopez with Montgomery denied him lunch on September 24, 2016. (Dkt. No. 81-3 at 19, 21, 27, 32-33, 42, 44, 55-56.) Neither Burgess nor Montgomery has any recollection of interactions with Plaintiff on the days he was allegedly denied meals. (Dkt. Nos. 81-4 at ¶ 20; 81-5 at ¶ 5.)

**Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 184 of 482**

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

According to Lopez, she only withheld a meal from Lopez on one occasion because he was lying on his bed under a sheet either asleep or pretending to be asleep. (Dkt. No. 81-6 at ¶¶ 11, 16.) Lopez did not deliver his meal because he was not standing at his door fully dressed as required. *Id.* at ¶ 12. A review of the logbook by Lopez revealed that the denial occurred on September 24, 2016. *Id.* at ¶¶ 14-15. Lopez stated in her declaration that it was not uncommon for Plaintiff to pretend to be asleep during meals so that he could then allege he had been denied the meal and use the allegations to be disrespectful to officers and rile up the inmates. *Id.* at ¶ 13.

The Court finds that denying Plaintiff a single meal, as alleged against Lopez, does not rise to the level of a violation of Plaintiff's rights under the Eighth Amendment. *See Cabassa v. Oshier*, No. 9:11-CV-01237 (MAD/CFH), 2015 WL 5094802, at *5 (N.D.N.Y. Aug. 28, 2015) (denial of a single meal fails to plausibly state an Eighth Amendment claim); ⚠ *Pagan v. Quiros*, No. 3:11-cv-1134 (DJS), 2014 WL 1057016, at *6 (D. Conn. Mar. 18, 2014) (holding that allegation of denial food and drink at one meal "does not constitute a substantial or sufficiently serious deprivation of a basic human need"); *Hankerson v. Nassau County Correctional Facility*, No. 12-CV-5282 (SJF) (WDW), 2012 WL 6055019, at *4 (E.D.N.Y. Dec. 4, 2012) (holding that denial of a single meal "falls far short of a 'substantial deprivation of food' and does not give rise to the level of a constitutional deprivation.").

The Court likewise concludes that Burgess's alleged denial of Plaintiff's dinner on August 3 and 4, 2016, and Montgomery's alleged denial of Plaintiff's lunch on September 10, 23, and 24, 2016, did not rise to the level of a violation of Plaintiff's rights under the Eighth Amendment. One missed meal a day has been found insufficient to establish an Eighth Amendment claim. *See Benitez v. Locastro*, No. 04-CV-423, 2008 WL 4767439, at *7 (N.D.N.Y. Oct. 29, 2008) (claim of one missed meal a day insufficient to establish an Eighth Amendment claim); *Johnson v. Merriman*, No. 1:13-cv-00087-MP-GRJ, 2015 WL 1409529, at *4 (N.D. Fl., Gainesville Div. March 26, 2015) (where the most each of three defendants could have personally deprived plaintiff of meals was one meal a day for a period of three days, the denial of the meals was

not sufficiently severe to rise to the level of a constitutional violation).

Moreover, Plaintiff has failed to submit evidence showing that a "sufficiently serious condition" resulted from not receiving food. *See Evans*, 2009 WL 1401645, at *9. Plaintiff testified at his deposition that he was hungry and emotionally frustrated as a result of not having dinner on August 3, 2016, after having failed to make himself breakfast and traveled all day with only a small lunch en route. (Dkt. No. 81-3 at 26.) Plaintiff was hungry and emotionally frustrated after not receiving lunch on September 10, 2016, as well. *Id.* at 37.

**\*10** In sum, the evidence supports a finding by the Court that the claimed denial of meals by each of the three Defendants falls short of that required to support an Eighth Amendment violation, and the evidence does not support a finding that Plaintiff suffered a sufficiently serious condition from any of the three Defendants' denial of a meal or meals.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 81) be **GRANTED**; and it hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in ⚑ *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam* ). Pursuant to ⚑ 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. ⚑ *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing ⚑ *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989) ); ⚑ 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4610686

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

# Footnotes

1    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

2    Plaintiff has filed a cross-notice of motion for summary judgment seeking denial of Defendants' summary judgment motion. (Dkt. No. 84-2). Because Plaintiff is not cross-moving for summary judgment in his favor, the Court is treating his notice of motion as opposition to Defendants' motion.

3    Paragraph numbers are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

4    The Court finds that Plaintiff's amended complaint is properly verified under 28 U.S.C. § 1746. (Dkt. No. 19 at 16.)

5    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

6    L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

7    L.R. 7.1(a)(3) provides that "<u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>." However, *see Vermont Teddy Bear Co., Inc. v. 1 800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

8    Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 81 at 2.)

9    The Court notes that Reams does not indicate in her declaration whether Plaintiff filed any grievances regarding one or more individual missed meal, or a grievance regarding a number other than six missed meals. (*See* Dkt. No. 81-9 at ¶ 13.) Moreover, Reams has used the dates in Plaintiff's amended complaint rather than the corrected dates in his deposition testimony for the time span during which the missed meals occurred used by her in her review. *Id.*

10    If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 186 of 482

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

807 Fed.Appx. 70
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.

United States Court of Appeals, Second Circuit.

Anthony RUGGIERO, Plaintiff-Appellant,

v.

Brian FISCHER, Commissioner of New York
State Department of Corrections and Community
Supervision, H. Hetrick, Jr., Correction Captain,
Albert Prack, Director of Special Housing, Lucien
J. LeClaire, Jr., Deputy Commissioner, Thomas
Griffin, Superintendent, Jamie M. Lamanna, Deputy
Superintendent of Security, William Fennessy, Deputy
Superintendent of Administration, Stanley Sepiol,
Correction Captain, Mark S. Shumaker, Correction
Lieutenant and Hearing Officer, Lieutenant Thomas
Evans, Frederick G. Butler, Correction Sergeant,
Paul W. Emerson, Correction Sergeant, Thomas E.
Hannah, Correction Sergeant, Jefferey L. Dillon,
Correction Officer, Jason J. Drhemer, Correction
Officer, Drew R. Onifer, Correction Officer, David J.
Osborne, Correction Officer, John S. Marshall, John A.
Rogers, Correction Officer, Jeff L. Ripley, Correction
Officer, Louis L. Tillinghast, Correction Officer, Mark
Vandergrift, Correction Officer, Defendants-Appellees.

19-1242
|
April 1, 2020

*** Start Section
...

**Synopsis**

**Background:** Inmate brought § 1983 action against
several prison employees alleging that prison's policy
requiring certain inmates to wear mechanical restraints,
including handcuffs and a waist chain, during their allotted
exercise period, violated inmate's constitutional rights. Prison
employees moved for summary judgment and prisoner
moved to amend his complaint to reassert claims for
declaratory relief. The United States District Court for the
Western District of New York, Richard J. Arcara, Senior
District Judge, 2019 WL 1438810, adopted report and
recommendation of Jeremiah J. McCarthy, United States
Magistrate Judge, 2018 WL **7892966**, granted summary
judgment motion and denied motion to amend. Inmate
appealed.

**Holdings:** The Court of Appeals held that:

[1] restraint policy did not implicate a liberty interest under
due process clause;

[2] inmate failed to show that policy violated his equal
protection rights; and

[3] amendment of inmate's complaint would have been futile.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment; Motion to Amend the Complaint.

West Headnotes (3)

[1]    **Constitutional Law** 👈 Conditions of
confinement in general

**Prisons** 👈 Shackles or other restraints

Prison policy requiring certain inmates to wear
mechanical restraints, including handcuffs and
a waist chain, during their allotted exercise
period did not constitute an atypical hardship
for prisoners, and therefore did not implicate
a liberty interest cognizable under Fourteenth
Amendment's due process clause for purpose of
inmate's § 1983 action against several prison
employees; mechanical restraints were typically

used in prison, particularly in special housing units, which comprised entirety of prison where inmate was incarcerated, Department of Corrections guidelines specified that special housing unit inmates be placed in restraints for movement prior to exiting their cells, and prison orientation manual provided details on when restraints were to be used. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983; N.Y. Comp. Codes R. & Regs. tit. 7, §§ 250.2(h), 305.3(b).

5 Cases that cite this headnote

...

Benitez v. Salotti, Not Reported in Fed. Supp. (2020)

2020 WL 1703208
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Henry BENITEZ, Plaintiff,

v.

K. SALOTTI, Nurse, et al., Defendants.

6:16-CV-06219 EAW
|
Signed 04/08/2020

**Attorneys and Law Firms**

Henry Benitez, Comstock, NY, pro se.

Gary M. Levine, New York State Office of the Attorney
General, Rochester, NY, for Defendants.

### DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

### INTRODUCTION

**\*1** Plaintiff Henry Benitez ("Plaintiff"), proceeding *pro
se*, is an inmate currently housed at the Great Meadow
Correctional Facility. Plaintiff brings the instant action
pursuant to 42 U.S.C. § 1983, alleging that defendants
("Defendants") committed various violations of Plaintiff's
constitutional rights while he was housed at the Five Points
Correctional Facility ("Five Points") between 2014 and
2016. Presently before the Court is Defendants' motion
for partial summary judgment pursuant to Federal Rule of
Civil Procedure 56. (Dkt. 87). For the following reasons,
Defendants' motion is granted in part and denied in part.

### BACKGROUND

**I. Factual Background**

The following facts are taken from Defendants' Local Rule
56 Statement of Undisputed Facts (Dkt. 87-2),[1] Plaintiff's
Statement of Facts (Dkt. 98), and their supporting documents.
Where the parties specifically controvert particular facts, the
Court has noted the disagreement.

**A. October 16, 2014 Hospital Claim**

On October 16, 2014, Plaintiff, who was housed at Five
Points, was taken for treatment to Strong Memorial Hospital
("Strong") by Corrections Officers Jenkins, Schmidt, and
Reynolds. (Dkt. 87-2 at ¶¶ 1, 12, 14; Dkt. 98 at ¶¶ 1, 12,
14). Plaintiff underwent a liver biopsy to determine if he
had cancer. (Dkt. 87-2 at ¶ 15; Dkt. 98 at ¶ 15). During
the biopsy, Plaintiff was in handcuffs and turned on his
side until the biopsy was completed. (Dkt. 87-2 at ¶ 16;
Dkt. 98 at ¶ 16). The medical records from Strong state
that the biopsy was "[s]uccessful," but "[i]nconclusive for
identifying tumor thrombus vs. [hepatocellular carcinoma]
within liver parenchyma." (Dkt. 87-2 at ¶ 19; Dkt. 98 at ¶ 19).
It was recommended that Plaintiff have a repeat biopsy "for
definitive identification." (Dkt. 87-2 at ¶ 19; Dkt. 98 at ¶ 19).

While the evidence of record shows that Plaintiff did file
an initial grievance about the incident with the Inmate
Grievance Resolution Committee ("IGRC") (Dkt. 99 at 18
(Grievance FPT-29548-14)), there is no record of the IGRC's
decision being appealed to the Five Points superintendent or
to the Central Office Review Committee ("CORC"), which
is the body that renders the final administrative decisions
under the DOCCS Inmate Grievance Program ("IGP") (Dkt.
87-9 at 32). Plaintiff contends that he submitted a letter
of appeal to the IGRC asking for his appeal to be sent to
the superintendent, and when he received no response, that
he submitted a letter of appeal to the IGP clerk, but never
received a response from CORC. (Dkt. 99 at ¶¶ 7-8).

**B. October 16, 17, and 18, 2014 Claims**

After the biopsy, Plaintiff was transported back to Five Points.
(Dkt. 87-2 at ¶ 20; Dkt. 98 at ¶ 20). Jenkins drove, with
Reynolds in the front passenger seat and Schmidt behind
Plaintiff in the van. (Dkt. 87-2 at ¶ 21; Dkt. 98 at ¶ 21).
During the ride, Plaintiff was upset that his handcuffs were not
removed at Strong for the procedure, and Plaintiff told Jenkins
he would sue him. (Dkt. 87-2 at ¶ 22; Dkt. 98 at ¶ 22). Jenkins
drove the van to a barn outside the Five Points perimeter,
exited the van, opened the van door, and repeatedly punched
Plaintiff over a two-minute period. (Dkt. 87-2 at ¶¶ 23-24;
Dkt. 98 at ¶¶ 23-24). Defendants contend that the blows to
Plaintiff's arms and chest did not hurt but left red marks and
that the only pain Plaintiff recalls from the injury was the pain
from the biopsy incision site (Dkt. 87-2 at ¶¶ 25, 27), and
Plaintiff does not remember if the blows to his head caused
him pain or left marks (Dkt. 87-2 at ¶ 26; Dkt. 98 at ¶ 26).

Schmidt and Reynolds did not strike Plaintiff, but also did not say or do anything. (Dkt. 87-2 at ¶ 28; Dkt. 98 at ¶ 28).

**\*2** Jenkins drove the van into the Five Points truck trap before escorting Plaintiff back to the infirmary with an unnamed corrections officer. (Dkt. 87-2 at ¶¶ 30-32; Dkt. 98 at ¶¶ 30-32). Once they arrived in an infirmary room, Plaintiff was pushed against a wall, and Jenkins punched Plaintiff all over and removed the Band-Aid on Plaintiff's biopsy incision. (Dkt. 87-2 at ¶ 33; Dkt. 98 at ¶ 33). The unnamed officer punched Plaintiff in his testicles and legs. (Dkt. 87-2 at ¶ 34; Dkt. 98 at ¶ 34). The beating lasted two minutes and ended when Plaintiff's restraints were removed and Plaintiff passed out. (Dkt. 87-2 at ¶ 35; Dkt. 98 at ¶ 35). As a result of the beating by Jenkins, Plaintiff suffered from redness and bruising that quickly healed (Dkt. 87-2 at ¶ 36; Dkt. 98 at ¶ 36), and Plaintiff claims the attack by the unnamed officer left a lump on his testicle and caused him to urinate blood for three weeks (Dkt. 87-2 at ¶ 37; Dkt. 98 at ¶ 37). Plaintiff remained in the infirmary room and saw three unnamed nurses who did not offer to treat Plaintiff for his alleged injuries. (Dkt. 87-2 at ¶ 38; Dkt. 98 at ¶ 38).

On October 17, 2014, Plaintiff was still in the infirmary. (Dkt. 87-2 at ¶ 39; Dkt. 98 at ¶ 39). Sergeant Williams ("Williams") was going into a room across the hall from Plaintiff's room, and Plaintiff called out to him. (Dkt. 87-2 at ¶¶ 40-41; Dkt. 98 at ¶¶ 40-41). They had a conversation about how Plaintiff was beaten and wanted to see a nurse, but Williams stated he did not care and walked off. (Dkt. 87-2 at ¶¶ 41-42; Dkt. 98 at ¶¶ 41-42). Plaintiff wanted the nurses to examine his testicles, paperwork recording his injuries so he could use the records for a lawsuit, and a provide new Band-Aid for the incision site. (Dkt. 87-2 at ¶¶ 43-44; Dkt. 98 at ¶¶ 43-44). Later, Plaintiff stopped Captain Norris ("Norris") during his rounds (Dkt. 87-2 at ¶ 45; Dkt. 98 at ¶ 45), and Defendants contend that Plaintiff complained to Norris who said he would investigate the complaint (Dkt. 87-2 at ¶ 46). Plaintiff dropped his pants and showed Norris his testicles as well as the incision site. (*Id.* at ¶ 47; Dkt. 98 at ¶ 47). Norris gave instructions to Williams, and while Plaintiff did not hear the instructions, he believes Norris directed Williams to investigate the situation but not to photograph Plaintiff's testicles. (Dkt. 87-2 at ¶ 48; Dkt. 98 at ¶ 48).

Williams and Corrections Officer Pierce ("Pierce") escorted Plaintiff to the examination room. (Dkt. 87-2 at ¶ 49; Dkt. 98 at ¶ 49). Pierce photographed Plaintiff, but when Plaintiff asked Williams to photograph his testicles, Williams said no.

(Dkt. 87-2 at ¶¶ 50-51; Dkt. 98 at ¶¶ 50-51). The photographs of Plaintiff reveal a red mark on Plaintiff's abdomen from the biopsy incision site. (Dkt. 87-2 at ¶ 52; Dkt. 98 at ¶ 52). After the photos were taken, Nurse B. Jones approached Plaintiff and questioned him about the alleged assaults. (Dkt. 99 at ¶ 29). Plaintiff told her that he had been beaten and that his testes hurt, and that he was "suing sweetheart." (*Id.*). Nurse B. Jones stated that she ended the encounter because Plaintiff was being uncooperative. (*Id.*). Nurse B. Jones has not been served with the Complaint, and is not presently before the Court. (Dkt. 87-2 at 14 n.2).

Later on that day, Dr. Trabout came into the infirmary room, and Plaintiff told him about the alleged beating. (*Id.* at ¶¶ 53-54; Dkt. 98 at ¶¶ 53-54). Defendants contend that Dr. Trabout visually examined Plaintiff's testicles but did not touch them, and said he did not see anything wrong. (Dkt. 87-2 at ¶ 55). Dr. Trabout inspected the biopsy incision site and said it looked fine, and Plaintiff did not complain to the doctor about his head, chest, or arms. (*Id.* at ¶¶ 56-57; Dkt. 98 at ¶¶ 56-57). The ambulatory health record ("AHR") from Dr. Trabout's medical exam notes that Plaintiff suffered from "[n]o evident injury," and that Plaintiff "was/is being treated from a scrotal infection," but that there was "no evidence of any acute trauma in [Plaintiff]'s groin." (Dkt. 87-2 at ¶ 58; Dkt. 89 at 28). Defendants contend that Nurse Salotti was not in the room with Dr. Trabout to hear the conversation. (Dkt. 87-2 at ¶ 60).

**\*3** At 8:30 p.m. that night, Plaintiff was transferred back to the special housing unit ("SHU"), and Nurse Salotti told Plaintiff that a nurse at the SHU would examine him. (*Id.* at ¶¶ 61-62; Dkt. 98 at ¶¶ 61-62). Nurse Cheasman made medication rounds in the SHU, and Plaintiff called out to her and told her he was in pain and had a lump on his testicles, but she did not stop and talk to him. (Dkt. 87-2 at ¶¶ 63-64; Dkt. 98 at ¶¶ 63-64). The morning of October 18, 2014, Defendants contend Nurse Tracey Jones ("Nurse T. Jones") came to see Plaintiff due to a sick call slip he submitted stating he had blood in his urine, but Plaintiff declined to provide a urine sample. (Dkt. 87-2 at ¶ 66; Dkt. 98 at ¶ 66). A medical record from November 13, 2014, states that Plaintiff's mental health unit counselor informed Nurse T. Jones that there was "a noted 'lump' " in Plaintiff's groin area, that Plaintiff's medical provider was made aware, and that Plaintiff's appointment date was moved up. (Dkt. 99 at 35).

On November 2, 2014, Plaintiff submitted a grievance regarding the events on October 16 and 17 to the IGRC (Dkt.

87-2 at ¶ 9; Dkt. 99 at 26 (Grievance FPT-29575-14)), and appealed the unfavorable decision to the superintendent (Dkt 87-9 at 32). However, CORC has no record of a grievance appeal for this grievance. (Dkt. 87-6 at ¶ 11; Dkt. 87-9 at 32). Plaintiff contends he filed a timely letter of appeal of the superintendent's decision to the IGP clerk, but received no response from CORC. (Dkt. 99 at ¶ 10). Additionally, Plaintiff claims he submitted a grievance about the events on October 18, 2014 (Dkt. 99 at ¶¶ 11-13), but there is no record of this grievance.

### C. November 2014 Claims

On November 5, 2014, Plaintiff underwent another liver biopsy, which revealed the presence of liver tumor cells. (Dkt. 87-2 at ¶ 68; Dkt. 98 at ¶ 68). Plaintiff subsequently began treatment for the cancer. (Dkt. 87-2 at ¶ 69; Dkt. 98 at ¶ 69). On November 6, 2014, Jenkins and Schmidt came to the infirmary to take Plaintiff on a medical trip, but the medical trip was terminated after an argument. (Dkt. 87-2 at ¶ 70; Dkt. 98 at ¶ 70). Plaintiff alleges that Jenkins told him that he would transport Plaintiff to Strong in the future and "fuck you up," and that Jenkins and Schmidt told him: "we're both going to fuck you up next time." (Dkt. 98 at 22; Dkt. 1 at ¶ 78). Defendants contend that Plaintiff does not know why the trip was canceled and does not recall if Plaintiff told Jenkins and Schmidt that he was not going to go. (Dkt. 87-2 at ¶ 71). Plaintiff was escorted back to the SHU and claims he had liver pain as a result of the missed medical appointment. (Dkt. 87-2 at ¶¶ 72-73; Dkt. 98 at ¶¶ 72-72).

Plaintiff filed a grievance regarding this incident and appealed the IGRC's decision to the Five Points superintendent, but there is no record of the grievance being appealed to CORC. (Dkt. 87-9 at 32 (Grievance FPT-29636-14)). Plaintiff contends that he did not receive a timely response to his appeal of the IGRC's decision from the superintendent, and that he filed a letter of appeal with the IGP clerk but never received a response from CORC. (Dkt. 99 at ¶ 14).

### D. December 1, 2014 Claims

On December 1, 2014, Plaintiff was in his SHU cell standing by his door while Superintendent Sheahan ("Sheahan"), Deputy Superintendent Thoms ("Thoms"), and Deputy Superintendent Coveny ("Coveny") were conducting rounds. (Dkt. 87-2 at ¶ 75; Dkt. 98 at ¶ 75). Plaintiff called out to them and told them about the events of October 16, 2014. (Dkt. 87-2 at ¶ 76; Dkt. 98 at ¶ 76). Sheahan, Thoms, and Coveny said they would investigate, but they never did, and Jenkins

continued to take Plaintiff on medical trips. (Dkt. 87-2 at ¶ 77; Dkt. 98 at ¶ 77). There is no record of a grievance regarding this incident. Plaintiff claims he filed a grievance, but that it was never processed by the IGRC. (Dkt. 99 at ¶¶ 15-17).

### E. December 2014 Pain Medication and Infirmary Claims

On December 18, 2014, Plaintiff underwent a medical procedure. (Dkt. 87-2 at ¶ 78; Dkt. 98 at ¶ 78). From December 19, 2014, to December 24, 2014, Plaintiff asked for the pain medication Percocet, but was told that the medication would be given to him in the infirmary. (Dkt. 87-2 at ¶ 79; Dkt. 98 at ¶ 79). Defendants contend that Plaintiff denied pain and refused admission to the infirmary, but was told that if he had unbearable pain, he could be admitted to the infirmary for pain control. (Dkt. 87-2 at ¶ 90; Dkt. 98 at ¶ 90). Defendants contend that on December 23, 2014, Plaintiff refused antibiotics and instead took the medication in his hand and told the nurse he would take it later. (Dkt. 87-2 at ¶ 86; Dkt. 98 at ¶ 90).

**\*4** From December 24, 2014, to December 29, 2014, Plaintiff was in the infirmary to receive the pain medication. (Dkt. 87-2 at ¶ 80; Dkt. 98 at ¶ 80). Plaintiff was on special "feed up" procedures in the infirmary because he had thrown a container of milk from his SHU cell at a corrections officer. (Dkt. 87-2 at ¶ 81; Dkt. 98 at ¶ 81). Plaintiff did not receive his morning and mid-day meals on December 26, 27, and 28, 2014, when Corrections Officer Gould ("Gould") was working, but does not know exactly what days. (Dkt. 87-2 at ¶¶ 82-84; Dkt. 98 at ¶¶ 82-84). Gould would walk by with Plaintiff's meal, and when he asked her about his food, she would continue to walk and ignore Plaintiff. (Dkt. 87-7 at 178). Additionally, when Plaintiff did receive meals during that time period, it was a tray of Jell-O. (*Id.* at 182). Plaintiff does not remember telling the nurses about his lack of food. (Dkt. 87-2 at ¶ 85; Dkt. 98 at ¶ 85). On December 29, 2014, Defendants contend Plaintiff was in the infirmary when an unnamed nurse told Nurse Salotti Plaintiff was not taking his medications, and that Plaintiff was later discharged back to the SHU. (Dkt. 87-2 at ¶ 87).

Plaintiff filed a grievance regarding the denial of pain relief medication (Dkt. 87-10 at 6 (Grievance 29856-15)), but there is no record of the grievance being appealed to the superintendent or to CORC (*id.* at 5; Dkt. 87-6 at ¶ 11). Plaintiff's claims regarding Gould were fully grieved. (Dkt. 99 at 37 (Grievance FPT-29839-15); Dkt. 87-10 at 5).

### F. January 2015 Claims

The morning of January 13, 2015, it was cold and snowy, and Jenkins, Corrections Officer Joseph Lunduski ("Lunduski"), and Sergeant Matthew Krzeminski ("Krzeminski") transported Plaintiff to Upstate Hospital. (Dkt. 87-2 at ¶ 94; Dkt. 98 at ¶ 94). Plaintiff complained that the handcuffs were too tight, but he does not remember if the belly chain was a problem. (Dkt. 87-2 at ¶¶ 94, 96; Dkt. 98 at ¶¶ 94, 96). Plaintiff has a history of cutting himself, including slashing his arms on July 27, 2015 and August 8, 2015, after he heard voices telling him to kill himself. (Dkt. 87-2 at ¶¶ 108-09; Dkt. 98 at ¶¶ 108-09).

In the van, Plaintiff sat in the second row behind Plexiglas. (Dkt. 87-2 at ¶ 100; Dkt. 98 at ¶ 100). Jenkins opened the driver-side window, and some of the cold air came back to where Plaintiff was seated. (Dkt. 87-2 at ¶¶ 101, 103; Dkt. 98 at ¶¶ 101, 103). Defendants contend Plaintiff did not discuss being cold during the trip, but Plaintiff denies these allegations. (Dkt. 87-2 at ¶ 104; Dkt. 98 at ¶ 104). On the way back from the hospital, Jenkins did not allow Plaintiff to wear his coat. (Dkt. 87-2 at ¶ 99; Dkt. 98 at ¶ 99).

There is no record of a grievance being filed regarding the events of January 13, 2015. (*See* Dkt. 87-10 at 5). Plaintiff contends he filed a grievance with the IGRC, but that it was not processed. (Dkt. 99 at ¶¶ 19-20).

### G. Fall 2015 Denial of Medical Care Claims

On September 19, 2015, Plaintiff was at Upstate Medical Center to have a thermal ablation, which is a procedure where the abdomen is punctured by a needle which burns a lesion. (Dkt. 87-2 at ¶ 112; Dkt. 98 at ¶ 112). Plaintiff was prescribed Percocet after his medical procedures. (Dkt. 87-2 at ¶ 120; Dkt. 98 at ¶ 120). Plaintiff returned to Five Points that day, first going to the infirmary and then the SHU. (Dkt. 87-2 at ¶ 113; Dkt. 98 at ¶ 113). Plaintiff does not remember a problem with Nurse T. Jones upon arriving back at Five Points, nor does he remember if he refused treatment that day. (Dkt. 87-2 at ¶¶ 114-15; Dkt. 98 at ¶¶ 114-15). In his Complaint, Plaintiff alleged that on September 30, 2015, he requested his prescribed pain medication from Nurse Salotti but she refused to give it to him. (Dkt. 1 at 29). However, Plaintiff concedes he does not remember having contact with Nurse Salotti on September 30, 2015, although he did speak with her on many occasions, and she told him he would not get a narcotic. (Dkt. 87-2 at ¶¶ 117-18; Dkt. 98 at ¶¶ 117-18). Plaintiff filed a grievance about Nurse Salotti refusing to give

him pain medication on September 30, 2015 (Dkt. 87-10 at 12 (Grievance FPT-30385-15)), and the grievance was fully exhausted (Dkt. 87-2 at 5).

**\*5** In early October 2015, Nurse T. Jones would walk by Plaintiff's cell without giving him his medication, but stated that Plaintiff repeatedly refused his medication. (Dkt. 87-2 at ¶¶ 123-24; Dkt. 98 at ¶¶ 123-24).

Plaintiff informed Superintendent Colvin on October 5, 2015, that he had been denied medication for his liver cancer, and that he had been assaulted by Jenkins and Schmidt (Dkt. 87-2 at ¶ 137; Dkt. 98 at ¶ 137), but Plaintiff contends that Colvin told him that "no one likes you" and did nothing. (Dkt. 100 at 36; *see* Dkt. 1 at ¶¶ 110-11). There is no record of a grievance having been filed about Plaintiff's conversation with Colvin. Plaintiff claims that he filed a grievance with the IGRC, but that it was never processed. (Dkt. 99 at ¶¶ 24-26).

Also on October 5, 2015, Plaintiff complained to Lieutenant Marketos ("Marketos") and Casper during rounds that he had a painful, bleeding anus and wanted medical treatment, but Marketos and Casper did not say anything. (Dkt. 87-2 at ¶¶ 130-31; Dkt. 87-10 at 17; Dkt. 98 at ¶¶ 130-31).

On October 7, 2015, Corrections Officer Labrake ("Labrake") looked into Plaintiff's cell to see if Plaintiff was properly dressed and then told the nurse that Plaintiff refused his medications. (Dkt. 87-2 at ¶ 138; Dkt. 98 at ¶ 138). On October 9, 2015, Plaintiff asked Nurse T. Jones and another nurse for his medication, but they walked by his cell and indicated that Plaintiff had refused treatment. (Dkt. 87-2 at ¶ 140; Dkt. 98 at ¶ 140). Plaintiff contends that Nurse T. Jones repeatedly falsely reported that Plaintiff refused his medication. (Dkt. 100 at 33; *see* Dkt. 1 at ¶¶ 101-08).

Defendants contend that on October 15, 2015, Nurse Salotti and Nurse Jensen discontinued Plaintiff's medications due to the repeated reports that Plaintiff was refusing his medication. (Dkt. 87-2 at ¶ 148). The medications that were discontinued included Colace for constipation, and the nutritional supplement Boost. (Dkt. 87-2 at ¶¶ 150-51; Dkt. 98 at ¶¶ 150-51).

Plaintiff filed grievances throughout October regarding Nurse T. Jones, McIntyre, Casper, Marketos, and LaBrake, which were all treated as the same grievance. (Dkt. 87-10 at 13-19 (Grievance FPT-30609-15)). The grievance was fully exhausted. (*Id.* at 5).

On October 30, 2015, Nurse Spencer [2] made a sick call round with Corrections Officer Jarzyna ("Jarzyna"). (Dkt. 87-10 at 21). Nurse Spencer did not stop at Plaintiff's cell to address a sick call slip he had submitted, and ignored Plaintiff when he called for her. (*Id.*). Jarzyna approached and asked why Plaintiff was yelling, and Plaintiff told Jarzyna that his sick call slip had been ignored by Nurse Spencer. (*Id.*). Jarzyna left without getting him treatment. (Dkt. 87-2 at ¶ 156; Dkt. 98 at ¶ 156). Plaintiff was seen by a nurse on October 31, 2015. (Dkt. 87-2 at ¶ 157; Dkt. 98 at ¶157). Plaintiff submitted a grievance about this incident, which was fully exhausted. (Dkt. 87-10 at 21 (Grievance FPT-31039-15)); (*id.* at 5).

### H. October 14, 2015 Claims [3]
*6   On October 14, 2015, Plaintiff was going to Upstate Medical Center with Corrections Officers Schmidt, Alvaro, and Glasser. (Dkt. 87-2 at ¶ 141; Dkt. 98 at ¶ 141). Plaintiff told Schmidt, who was driving, that he was going to sue him. (Dkt. 87-2 at ¶ 142; Dkt. 98 at ¶ 142). Schmidt stopped the van, got out, opened the side door, got in the van, and punched Plaintiff once in the face and told Plaintiff, "Sue me for that." (Dkt. 87-2 at ¶ 143; Dkt. 98 at ¶ 143). The punch gave Plaintiff red skin, a cut in the mouth, and a broken molar. (Dkt. 87-2 at ¶ 144; Dkt. 98 at ¶ 144). They then drove back to Five Points, and Plaintiff went to the infirmary before returning to the SHU. (Dkt. 87-2 at ¶ 145; Dkt. 98 at ¶ 145). Plaintiff submitted a grievance about this incident with regards to Schmidt, which was fully exhausted. (Dkt. 87-10 at 20 (Grievance FPT-30940-15)); (*id.* at 5). However, Alvara and Glasser were not referred to in the grievance. (Dkt. 87-10 at 20).

### I. November and December 2015 Claims
On November 4, 2015, Plaintiff was scheduled to go on a medical trip to an outside hospital. (Dkt. 87-2 at ¶ 158; Dkt. 98 at ¶ 158). Plaintiff contends he was fully restrained in the front lobby of Five Points, and Jenkins and Schmidt threatened to shoot Plaintiff. (Dkt. 87-2 at ¶ 160; Dkt. 98 at ¶ 160). Plaintiff threatened to file a grievance against the officers present, and Jenkins and Schmidt falsely represented that Plaintiff refused to go to his appointment. (Dkt. 87-10 at 22). Plaintiff was then escorted back to the SHU. (Dkt. 87-2 at ¶ 160; Dkt. 98 at ¶ 160). Defendants state that Plaintiff refused to go to the hospital "as long as security assigns individuals that put their hands on me." (Dkt. 87-2 at ¶ 161; Dkt. 98 at ¶ 161). Nurse Salotti attempted to discuss the risks and consequences

of refusing to go to the hospital with Plaintiff, but Plaintiff banged on the cell door and told her to "get the fuck out" of there. (Dkt. 87-2 at ¶ 162; Dkt. 98 at ¶ 162). Plaintiff contends that from November 4, 2015 to March 14, 2016, Nurse Salotti ignored his repeated requests to see an outside oncologist and hematologist for treatment. (Dkt. 100 at 39; *see* Dkt. 99 at 43). Plaintiff filed a grievance with regards to the actions of Jenkins and Schmidt that was fully exhausted. (Dkt. 87-10 at 5, 22 (Grievance FPT-30940-15)). Although Defendants contend that Plaintiff did not submit a grievance regarding the November 4, 2015 claims Salotti (Dkt. 87-11), Plaintiff filed a grievance against Salotti regarding her alleged refusal since November 4, 2015, to schedule Plaintiff for outside medical treatment. (Dkt. 99 at 43 (Grievance FPT-31515-16)).

Plaintiff wrote to Deputy Superintendent Lamana about his missed medical trip on November 22, 2015, to which Lamana responded on December 8, 2015, noting that the records indicated Plaintiff refused numerous outside trips. (Dkt. 87-2 at ¶¶ 168-69). On December 3, 2015, Plaintiff wrote to Commissioner Annucci about the lack of cancer treatment. (Dkt. 87-2 at ¶ 164; Dkt. 98 at ¶ 164). Dr. Koenigsmann wrote back on December 23, 2015, stating that Plaintiff's treatment was being monitored. (Dkt. 87-2 at ¶ 165; Dkt. 98 at ¶ 165). Plaintiff previously filed a lawsuit against Dr. Koenigsmann in the Northern District of New York, which was dismissed. (Dkt. 87-2 at ¶ 166; Dkt. 98 at ¶ 166). There is no record of grievances regarding the responses to Plaintiff's letters.

### J. 2016 Transfer to Elmira Claims
On February 10, 2016, Hill informed Plaintiff that a transfer recommendation was being filed (Dkt. 87-2 at ¶ 174; Dkt. 98 at ¶ 174), and on September 13, 2016, Plaintiff was transferred to the Elmira Correctional Facility ("Elmira") (Dkt. 87-2 at ¶ 175; Dkt. 98 at ¶ 175). Plaintiff's cancer treatment was restarted at Elmira. (Dkt. 87-2 at ¶ 176; Dkt. 98 at ¶ 176). Plaintiff did not want to be transferred from Five Points because he thought the transfer would delay his treatment. (Dkt. 87-2 at ¶ 177; Dkt. 98 at ¶ 177). There is no record of a grievance about Plaintiff's objection to the transfer.

## II. Procedural Background
*7   Plaintiff filed the instant lawsuit on April 4, 2016. (Dkt. 1). The Court issued a screening order on June 17, 2016, allowing Plaintiff's claims to go forward. (Dkt. 8). Defendants filed their Answers on October 4, 2016 (Dkt. 20; Dkt. 21; Dkt. 22; Dkt. 23; Dkt. 24; Dkt. 25; Dkt. 26; Dkt. 27; Dkt. 28; Dkt. 29; Dkt. 30; Dkt. 31; Dkt. 32; Dkt. 33; Dkt. 34; Dkt. 35; Dkt.

36; Dkt. 37; Dkt. 38; Dkt. 39; Dkt. 40; Dkt. 41; Dkt. 42; Dkt. 43; Dkt. 44; Dkt. 45; Dkt. 46), October 14, 2016 (Dkt. 49), and October 19, 2016 (Dkt. 51). Discovery closed on February 28, 2017 (Dkt. 79), and Defendants filed the instant motion for summary judgment on May 31, 2018 (Dkt. 87). Plaintiff submitted his response on October 1, 2018. (Dkt. 98; Dkt. 99; Dkt. 100).

## DISCUSSION

### I. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party." Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact...." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." Johnson v. Xerox Corp., 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015) (quoting Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown, 654 F.3d at 358. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

### II. Exhaustion

Defendants argue that the following claims should be dismissed for failure to exhaust: the October 16, 2014, deliberate indifference claims against Jenkins related to the events at Strong; the October 16, 2014, excessive force and failure to intervene claims against Jenkins, Schmidt, and Reynolds; the October 17, 2014, failure to investigate and conspiracy claims against Williams, Norris, and Pierce; the October 17, 2014, deliberate indifference claims against Trabout, Salotti, and Cheasman; the October 18, 2014, deliberate indifference claims against Nurse T. Jones; any claims related to the November 6, 2014, incident against Jenkins and Schmidt; any claims against Sheahan, Thoms, and Coveny related to the December 1, 2014, events; any claims against Salotti and the Jane Doe nurse related to Plaintiff's alleged denial of medication in December 2014; the January 13, 2015, excessive force and unlawful conditions of confinement claims against Jenkins, Lunduski, and Krzeminski; the September 20, 2015, deliberate indifference claims against Nurse T. Jones; the October 5, 2015, deliberate indifference claim against Colvin; the October 14, 2015, failure to protect claims against Alvaro and Glasser; the November 4, 2015, deliberate indifference and retaliation claims against Jensen and Salotti; the deliberate indifference claim against Dr. Koenigsmann; and the unlawful transfer claim against Lamana and Hill.

*8 Pursuant to 42 U.S.C. § 1997e, "[n]o action shall be brought with respect to prison conditions under [ § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

> To satisfy that requirement, prisoners in New York must ordinarily follow a three-step [DOCCS] grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance Resolution Committee. Next, the inmate may appeal an adverse decision to the prison superintendent.

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 195 of 482

Benitez v. Salotti, Not Reported in Fed. Supp. (2020)

Finally, the inmate may appeal the superintendent's decision to [CORC]. In general, it is only upon completion of all three levels of review that a prisoner may seek relief in federal court under 🚩 § 1983.

*Crenshaw*, 686 F. Supp. 2d at 236 (citations omitted). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." 🚩 *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011).

Pursuant to the Second Circuit's decision in 🚩 *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), a failure to exhaust administrative remedies may be excused where: "(1) the administrative remedies were not in fact available; [or] (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) 'special circumstances justify the prisoner's failure to comply with administrative procedural requirements.' " *Dabney v. Pegano*, 604 F. App'x 1, 3 (2d Cir. 2015) (quoting 🚩 *Hemphill*, 380 F.3d at 686). However, the third prong of *Hemphill*, relating to "special circumstances" was abrogated by the Supreme Court's decision in 🚩 *Ross v. Blake*, 136 S. Ct. 1850 (2016). *See* 🚩 *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016). The inquiry which used to be under the third prong of *Hemphill* is now considered "entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Id.*

With respect to the burden of proof, "failure to exhaust is an affirmative defense" which "must be pleaded and proved by a defendant." *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 580 (S.D.N.Y. 2015) (citations and quotations omitted). However, once a defendant demonstrates that the plaintiff has not exhausted his administrative remedies, "the burden of proof shifts to the plaintiff to show his case falls under at least one of the exceptions" to the exhaustion requirement. *Perry v. Rupert*, No. 9:10-CV-1033 LEK/TWD, 2013 WL 6816795, at *4 (N.D.N.Y. Dec. 20, 2013); *see also* 🚩 *Hubbs v. Suffolk Cty. Sheriffs Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (once defendants meet their initial burden of showing failure to exhaust, the burden shifts to the plaintiff "to demonstrate that other facts ... rendered a nominally available procedure unavailable as a matter of fact").

As a preliminary matter, Plaintiff concedes that he failed to file grievances against Alvaro, Glasser, Koenigsmann, Lamana, Hill, and Jensen, and that those claims should be dismissed. (Dkt. 100 at 37, 40). Accordingly, the Court grants Defendants' motion as to the claims against Alvaro, Glasser, Koenigsmann, Lamana, Hill, and Jensen.

As for the remaining claims listed above, with the exception of the November 4, 2015 retaliation claim against Salotti,[4] Defendants have met their initial burden of demonstrating Plaintiff failed to exhaust these claims. Defendants submitted records of all the grievances filed by Plaintiff with the IGRC in 2014 and 2015 and the appeals history of each grievance. (Dkt. 87-9 at 32; Dkt. 87-10 at 5). According to the lists, while confined at Five Points, Plaintiff successfully filed and appealed 25 grievances during 2014 and 2015. (Dkt. 87-9 at 32; Dkt. 87-10 at 5). At least five of those grievances are relevant to Plaintiff's claims in the instant matter (FPT-29839-15, FPT-30385-15, FPT-30609-15, FPT-30940-15, FPT-31039-15). (Dkt. 87-9 at 32; Dkt. 87-10 at 5).

**\*9** Plaintiff maintains that he filed grievances and letters of appeal for the claims that Defendants move to dismiss for failure to exhaust, which were "confiscated" by prison guards at Elmira and Attica. (Dkt. 99 at ¶ 5). However, Plaintiff does not submit evidence nor allege with any specificity as to when or how these documents were confiscated at Elmira or Attica, or who he originally handed the grievances or letters to at Five Points for submission to the IGP.[5] The Court also notes that while in DOCCS custody, as of September 26, 2016, Plaintiff successfully used the IGP to its fullest extent on 677 other occasions. (Dkt. 87-9 at 3-30). Plaintiff's unsupported and unspecified statements are insufficient to create a genuine issue of material fact. *See Scott v. Kastner-Smith*, 290 F. Supp. 3d 545, 555 (W.D.N.Y. 2018) ("[C]ourts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." (quotation omitted)); *Mims v. Yehl*, No. 13-CV-6405-FPG, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014) (inmate's "unsupported statement" that he submitted a grievance is "insufficient at the summary judgment stage"); 🚩 *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) ("[An] inmate's unsupported claims that his grievances were lost at the Grievance Committee Office or destroyed by officers ... fails to excuse [the] inmate from fully grieving remedies[.]" (citation omitted)).

Moreover, as previously discussed, Plaintiff successfully filed and exhausted 25 grievances throughout 2014 and 2015. (*Id.* at 5). As such, the Court finds the record is consistent with finding the grievance process was available to Plaintiff. *See Davis v. Grant*, No. 15-CV-5359 (KMK), 2019 WL 498277, at *9 (S.D.N.Y. Feb. 8, 2019) (plaintiff's unsupported statements failed to create issue of fact, in part, where plaintiff successfully used IGP on 39 previous occasions); *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (grievance process not unavailable where evidence demonstrated that four grievances were filed within a year of purportedly lost grievance), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017); *McKinney v. Prack*, 170 F. Supp. 3d 510, 517 (W.D.N.Y. 2016) (finding plaintiff's allegations that IGP refused to process grievances did not raise issue of fact where record showed that plaintiff "appealed and exhausted approximately 20 grievances during his 29 years of incarceration").

The Court acknowledges that "[t]his may seem like a harsh result, but it is compelled by the plain language of the [Prison Litigation Reform Act ('PLRA')]." *Keitt v. NYS Dep't of Corr. & Cmty. Supervision*, No. 11-CV-855-LJV-MJR, 2017 WL 9471826, at *6 (W.D.N.Y. Jan. 4, 2017). Binding Supreme Court precedent makes clear that the PLRA, which governs in the instant matter, establishes a mandatory exhaustion regime that forecloses judicial discretion, *see Ross*, 136 S. Ct. at 1857; *Woodford v. Ngo*, 548 U.S. 81, 95 (2006) ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction[.]"), and here, as discussed above, there is no statutory exception to this mandatory exhaustion requirement that Plaintiff's claims fall under. Accordingly, the Court grants summary judgment as to Plaintiff's unexhausted claims as listed above.

## III. Deliberate Indifference Claim—Gould

Defendants contends that Plaintiff's Eighth Amendment claim against Gould should be dismissed.[6] The Court denies Defendants' motion as to this claim for the reasons below.

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). The assessment of whether the measures taken are reasonable turns on an analysis of two factors. First, the inmate must show that "objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quotation omitted). Second, the inmate must demonstrate that "the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." *Id.* (quotation and alteration omitted). Deliberate indifference must be measured subjectively, that is:

> **\*10** [A] prison official cannot be found liable under the Eighth Amendment ... unless the official knows of and disregards an excessive risk to [the] inmate['s] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.

Viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Plaintiff suffered a sufficiently serious deprivation. " '[A] substantial deprivation of food' can cause serious physical harm sufficient to find cruel and unusual punishment in violation of the Eighth Amendment." *Jackson v. Marks*, 722 F. App'x 106, 107 (2d Cir. 2018) (quoting *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983)). The record viewed in the light most favorable to Plaintiff shows that he was denied at least two out of three meals for three of the days that he was in the infirmary due to severe pain from his cancer treatment, and that the meals he did receive consisted of a tray of Jell-O. (Dkt. 87-7 at 178, 182). "When a prison guard deprives a prisoner of two of the regularly three meals served each day, the objective prong of the Eighth Amendment may be met if the defendants do not satisfy their burden of showing that the one meal served is nutritionally adequate." *Beckford v. Portuondo*, 151 F. Supp. 2d 204,

213 (N.D.N.Y. 2001). Defendants have presented no evidence that a tray of Jell-O is nutritionally adequate. The Court finds that a reasonable trier of fact could determine that depriving a cancer patient of two out of three meals for three days and otherwise only giving him Jell-O presented an immediate danger to Plaintiff's health and well-being. *See Williams v. Coughlin*, 875 F. Supp. 1004, 1011-13 (W.D.N.Y. 1995) (denying summary judgment where the plaintiff was deprived of five consecutive meals over a two-day period).

The cases cited by Defendants are not dispositive. Defendants cite two cases where the courts addressed the deprivation of one to three meals total, *see Butler v. Hogue*, No. 9:08-CV-264 GLS DRH, 2010 WL 4025886, at *3 (N.D.N.Y. Oct. 13, 2010) (finding the "[d]eprivation of only two meals over a two-day period" did not rise to level of Eighth Amendment violation), *aff'd*, 434 F. App'x 36 (2d Cir. 2011); *Benjamin v. Kooi*, No. 9:07-CV-0506, 2010 WL 985844, at *11 (N.D.N.Y. Feb. 25, 2010) (dismissing claim where the plaintiff claimed "that he was essentially denied anywhere from one to three meals"), *report and recommendation adopted*, No. 9:07-CV-0506LEK/DRH, 2010 WL 985823 (N.D.N.Y. Mar. 17, 2010), whereas here the record viewed in the light most favorable to Plaintiff shows he was deprived of two out of three meals over a three day period, *see Abascal v. Fleckenstein*, No. 06-CV-349S, 2012 WL 638977, at *3 (W.D.N.Y. Feb. 27, 2012) (denying summary judgment where the plaintiff he was denied seven meals in a four day period). Defendants also cite a case where the court found denying an inmate food for two or three days was not sufficient to state an Eighth Amendment claim. *See Barclay v. New York*, 477 F. Supp. 2d 546, 545-55 (N.D.N.Y. 2007). Although it is true that like the *Barclay* plaintiff, Plaintiff's medical records do not mention his pain, the record before the Court supports that Plaintiff was in pain—the reason Plaintiff was in the infirmary was to receive pain medication. (Dkt. 87-2 at ¶ 90; Dkt. 98 at ¶ 90). Additionally, the *Barclay* court further noted there was "no evidence that the denial of food was done maliciously to cause pain," *id.* at 555, whereas here the record viewed in the light most favorable to Plaintiff shows that Gould purposely ignored Plaintiff when he asked for his meals. (Dkt. 87-7 at 178). Accordingly, Defendants' motion for summary judgment is denied as to the claims against Gould.

## IV. September 30, 2015 Denial of Medical Care Claim Against Salotti

**\*11** Plaintiff claims that Salotti's refusal to give Plaintiff the narcotic Percocet was deliberate indifference to a serious medical need. A reasonable trier of fact could not find that Salotti's conduct amounted to a violation of Plaintiff's constitutional rights for the reasons that follow.

"The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment, guarantees freedom from cruel and unusual punishment." *Jones v. Westchester Cty. Dep't of Corrs.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). An Eighth Amendment claim arising out of inadequate medical care requires a plaintiff-inmate to demonstrate that a defendant was deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A claim for deliberate indifference has both an objective and a subjective component. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).

Objectively, a medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). "[I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay ... in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (quotation and original alteration omitted). It is appropriate "to consider the absence of concrete medical injury as one of the relevant factors in determining whether the asserted deprivation of medical care was sufficiently serious to establish a claim under the Eighth Amendment." *Smith v. Carpenter*, 316 F.3d 178, 189 (2d Cir. 2003).

"Subjectively, the official charged with deliberate indifference must have acted with the requisite state of mind, the 'equivalent of criminal recklessness.' " *Lapierre v. County of Nassau*, 459 F. App'x 28, 29 (2d Cir. 2012) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Specifically, a plaintiff must prove that the prison

Benitez v. Salotti, Not Reported in Fed. Supp. (2020)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 198 of 482

official knew of a serious medical condition and nonetheless disregarded the plaintiff's medical needs. *Farmer*, 511 U.S. at 837 (holding that a prison official does not act in a deliberately indifferent manner towards an inmate unless he "knows of and disregards an excessive risk to inmate health or safety"); *see also Beaman v. Unger*, 838 F. Supp. 2d 108, 110 (W.D.N.Y. 2011) ("To establish deliberate indifference, ... [a] plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain."). More than medical malpractice is required to establish a constitutional violation. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness[.]"). Similarly, mere negligence is not actionable. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

**\*12** The record does not support that Plaintiff's medical need was serious. On September 19, 2015, Plaintiff had undergone a thermal ablation procedure at a hospital, and when he returned to Five Points he stayed in the infirmary overnight, although his medical records indicate that he did not want to stay overnight. (Dkt. 89-3 at 25). Plaintiff returned to the SHU on September 20, 2015. (*Id.*). There is no evidence in the record that Plaintiff complained of pain between the time of his return to the SHU on September 20, 2015, and September 30, 2015. Additionally, Plaintiff's medical records from September 30, 2015, indicate that his pain was "intermittent" and "changes with positioning." (*Id.*). "It is well-established that such minor injuries do not normally rise to the level of seriousness required to support a viable claim [of] medical indifference under the Eighth Amendment." *Cintron v. Reome*, No. 914CV0116TJMDEP, 2016 WL 4063765, at \*6 (N.D.N.Y. June 29, 2016) (collecting cases), *report and recommendation adopted*, No. 914CV116TJMDEP, 2016 WL 4098581 (N.D.N.Y. July 28, 2016); *see Salaam v. Adams*, No. 9:03CV0517(LEK/GHL), 2006 WL 2827687, at \*10 (N.D.N.Y. Sept. 29, 2006) (finding no serious medical need where the medical records indicated that the plaintiff exhibited no signs of injury "during the days and weeks following the alleged assault," and where the records indicated that the complaints were "sporadic in nature and not of such severity as to be 'urgent' ").

Additionally, the record before the Court does not show that Salotti acted with deliberate indifference. Plaintiff does not contend that Salotti refused to treat him; instead, Plaintiff claims that on September 30, 2015, Salotti refused to give him pain medication "prescribed by his outside treating oncologist" (Dkt. 1 at ¶ 102), which Plaintiff later stated was the narcotic Percocet (Dkt. 87-7 at 238). The record does not demonstrate that Five Points was in receipt of a prescription from any outside treating physician. (*See* Dkt. 89-3 at 25 (medical record from September 30, 2015, stating Plaintiff requested two "medications ordered by specialist," but noting there were "none in the records")). In any event, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703. A prisoner "is not entitled under the Eighth Amendment to the best treatment available; he is merely entitled to 'reasonable care.' " *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (citing *Salahuddin*, 467 F.3d at 279).

The record before the Court shows that Nurse Salotti advised Plaintiff that no medication would prevent the type of discomfort described by Plaintiff at that time, *i.e.*, "occasional jolts" of pain. (Dkt. 87-4 at ¶ 13). There is no evidence in the record contradicting this assertion, or demonstrating that such a statement would be more than malpractice or negligence. *See Estelle*, 429 U.S. at 106 ("A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness[.]"). Additionally, the record supports that Five Points had a policy of only giving narcotics to prisoners admitted to the infirmary. (Dkt. 87-2 at ¶ 90; Dkt. 98 at ¶ 90); *see Trammel v. Keane*, 338 F.3d 155, 163 (2d Cir. 2003) (discussing that courts should accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979))). Accordingly, a reasonable trier of fact looking at the record before the Court could not find that

Nurse Salotti acted with deliberate indifference on September 30, 2015, by not giving Plaintiff a narcotic, and Defendants' motion is granted with respect to that claim.

## V. October 5, 2015 Claims

**\*13** Defendants contend the Court should grant summary judgment as to Plaintiff's failure to protect claims against Casper and Marketos, regarding his rectal bleeding on October 5, 2015, as well as the denial of medical care claims against Nurse T. Jones. The Court disagrees for the following reasons.

With respect to claims for failure to protect, the Second Circuit has explained as follows:

> The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

> The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (internal citations omitted) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).

The record before the Court viewed in the light most favorable to Plaintiff demonstrates that Plaintiff complained to them on October 5, 2015, that he had a painful, bleeding anus and wanted medical treatment, but that Marketos and Casper did not do or say anything about Plaintiff's complaints. (Dkt. 87-2 at ¶¶ 130-31; Dkt. 87-10 at 17). Further, the record viewed in the light most favorable to Plaintiff shows that when

he informed Nurse T. Jones about his rectal bleeding, she merely told him to put in for a sick call and did not treat him. (Dkt 87-10 at 17). Defendants argue that the bleeding from Plaintiff's anus "was a reoccurring problem," and that Plaintiff "was regularly seen by medical care providers" at that time. (Dkt. 87-11 at 38). However, nothing in the medical records indicates that Plaintiff received treatment in October 2015 for his rectal bleeding. (*See* Dkt. 89-3 at 26-27; Dkt. 87-10 at 26). The Court finds that a reasonable trier of fact could find the alleged actions by Marketos and Casper amounted to a failure to protect and that the alleged actions by Nurse T. Jones constituted deliberate indifference to a serious medical need, and the Court denies Defendants' motion as to these claims.

## VI. October 30, 2015 Claims Against Jarzyna and Spencer

The Court finds that the record does not support a deliberate indifference claim against Jarzyna and Nurse Spencer. Plaintiff claims that on October 30, 2015, he was ignored by Jarzyna and Nurse Spencer even though he submitted a sick call slip and made oral complaints to them, and as a result he "continued to suffer from severe pain in his liver due to the cancer therein." (Dkt. 1 at ¶¶ 118-19). However, nothing in the record indicates that Plaintiff's treatment suffered an unreasonable delay. Plaintiff was seen by a nurse the next day, and the medical records indicate that a copy of his sick call was made and forwarded to his provider. (Dkt. 89-3 at 28). Additionally, when Plaintiff requested that the nurse give him the pain medication prescribed by his outside oncologist, she informed him that Nurse Salotti had already made a recommendation for the pain medication. (*Id.*). The record does not show that Plaintiff's treatment would have been any different if Nurse Spencer had attended to him the night before. *See Bilal v. White*, 494 F. App'x 143, 146 (2d Cir. 2012) (holding summary judgment was appropriate where the record demonstrated no "serious consequence at all from the delay in treatment"); *Carpenter*, 316 F.3d at 187 ("[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."). Accordingly, a reasonable trier of fact could not find on the record before the Court that any delay in Plaintiff's treatment led to other consequential injurious effects, and the Court grants Defendants' motion as to the claims against Jarzyna and Spencer.

## VII. October 2015 Denial of Medication Claims

Benitez v. Salotti, Not Reported in Fed. Supp. (2020)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 200 of 482

**\*14**  The Court finds there are genuine issues of material fact with respect to Plaintiff's October 2015 denial of medical care claims against Nurse T. Jones, McIntyre, and LaBrake.

Defendants contend that Plaintiff repeatedly refused to take his medication for a period of approximately two weeks in October 2015, and as a result administration of his medications—which included Corgard for high blood pressure, Colace for constipation, and a multivitamin—was discontinued. (Dkt. 87-1 at 37). Plaintiff, on the other hand, argues that he did not refuse to take his medications, but instead that Nurse T. Jones, McIntyre, and LaBrake, as well as Nurse Baker who has not yet been served, would not give him his medication throughout October, and then falsely reported that he was refusing to take it. (Dkt. 87-2 at ¶¶ 123, 138, 140; Dkt. 87-10 at 16). Although Plaintiff admits that he does not "have a problem with constipation" (Dkt. 87-7 at 288), the record before the Court viewed in the light most favorable to Plaintiff shows that discontinuing the high blood pressure medication contributed to his rectal bleeding (*id.* at 287-88). The Court finds that a reasonable trier of fact viewing the record in the light most favorable to Plaintiff could determine that repeatedly failing to administer medication to Plaintiff and then falsely reporting that Plaintiff was refusing to take that medication, resulting in the discontinuance of Plaintiff receiving his high blood pressure medication and the continuance of his rectal bleeding, constitutes deliberate indifference to a serious medical need. Therefore, Defendants' motion is denied as to these claims.

## VIII. November 4, 2015 Claims

Defendants argue the retaliation and denial of medical care claims against Jenkins, Schmidt, and Williams for the events of November 4, 2015 should be dismissed. The Court finds there are genuine issues of material fact regarding these claims.

"Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds,* *Swierkeiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)). A plaintiff asserting

First Amendment retaliation claims must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis,* 320 F.3d at 352 (quoting *Dawes,* 239 F.3d at 492). "The filing of formal prisoner grievances is protected conduct under the First Amendment." *Shariff v. Poole,* 689 F. Supp. 2d 470, 478 (W.D.N.Y. 2010) (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995)).

"Adverse action," defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis,* 320 F.3d at 353). "In other words, in the context of prisoner retaliation suits, a prisoner need not demonstrate 'actual chill.' The issue is whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his constitutional rights.' " *Lashley v. Wakefield,* 483 F. Supp. 2d 297, 300 (W.D.N.Y. 2007) (quoting *Gill,* 389 F.3d at 381). "This objective inquiry is not static across contexts, but rather must be tailored to the different circumstances in which retaliation claims arise." *Dawes,* 239 F.3d at 493 (internal quotation omitted). "Prisoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 353.

**\*15**  In evaluating whether a plaintiff has established the necessary causal connection of a retaliation claim, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Shariff,* 689 F. Supp. 2d at 479. "The Second Circuit has held that temporal proximity between an inmate's grievance and disciplinary action may serve as circumstantial evidence of retaliation[.]" *Candelaria v. Higley,* No. 04-CV-0277(MAT), 2013 WL 104910, at \*9 (W.D.N.Y. Jan. 8, 2013) (citing *Colon,* 58 F.3d at 872-73). Accordingly, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that

2013 WL 103575
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jerry BOWENS, Plaintiff,
v.
Joseph T. SMITH, Brian Fischer, et al., Defendants.

No. 9:11–CV–784 (GLS/ATB).
|
Jan. 8, 2013.

**Attorneys and Law Firms**

Jerry Bowens, pro se.

Richard Lombardo, AAG, for the Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation, pursuant to 🚩 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c), by the Honorable Gary L. Sharpe, Chief United States District Judge.

In this amended civil rights complaint, plaintiff alleges that defendants improperly retained plaintiff in administrative segregation at Shawangunk Correctional Facility without due process [1] for "over" five hundred and seventy five days. (Amended Complaint ("AC") ¶ 9). Plaintiff claims that this lengthy stay in administrative segregation ("Ad Seg") violated his First, Fourth, and Eighth Amendment rights, and he also claims that he has been denied Equal Protection. (AC at pp. 24–27). [2] Plaintiff seeks injunctive and substantial monetary relief.

Presently before the court is defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and (b)(6). (Dkt. No. 19). For the following reasons, this court will recommend granting the motion in part and denying it in part.

**DISCUSSION**

**I.** *Facts and Procedural History*

**A. Facts**

Plaintiff alleges that when he was incarcerated at Downstate Correctional Facility ("Downstate") in 2009, [3] he was allowed to be in General Population. (AC ¶ 1). Plaintiff states that he was in General Population at Downstate for approximately one and one half months before he was transferred to Shawangunk Correctional Facility ("Shawangunk"). Upon his transfer to Shawangunk, he was told that he would be placed in Ad Seg. Plaintiff claims that although he had a hearing prior to Ad Seg placement, he was not allowed to introduce any exhibits or letters of reference in an effort to prove that he should not be placed in restrictive confinement. (AC ¶¶ 6, 8).

Plaintiff states that he maintained "an outstanding disciplinary record," and he was given no reason for his continued confinement in Ad Seg. (AC ¶¶ 8–9). However, plaintiff also states that he was placed in Ad Seg "as a result of the people plaintiff *knew* or *knows* on the outside ...." (AC ¶ 10) (emphasis in original). Plaintiff also states that the defendants' belief that plaintiff is "a threat to its [sic] security or other inmates" is "insane" and "extreme." (*Id.*)

Plaintiff states that his conditions in Ad Seg have been unconstitutionally harsh. He was denied use of the telephone and denied access to his "spiritual leader" when plaintiff's father died. Plaintiff states that his right to visitation, association, and possession of personal property were limited, and his commissary and package privileges were limited. (AC ¶¶ 12–13). Plaintiff alleges that he had the same restrictions placed upon him as inmates who were in the Special Housing Unit ("SHU") for disciplinary violations. He was shackled when he was escorted to the showers, and had no contact with his "peers." (AC ¶ 14).

**B. Procedural History**

Plaintiff filed this action on July 11, 2011, naming 19 defendants, including the State of New York and several John/Jane Does. (Dkt. No. 1). On October 12, 2011, Chief Judge Sharpe ordered plaintiff to file an amended complaint or risk dismissal of the action based on his failure to state a claim against any of the named defendants. (Dkt. No. 7). On November 9, 2011, plaintiff filed this amended complaint. (Dkt. No. 8). Chief Judge Sharpe reviewed the amended complaint, finding that the amended complaint "consists of a copy of the original complaint, to which Bowens appended

'an explanation as to why each defendant is being sued.' " (Dkt. No. 10 at 3) (citing AC at 44).

**\*2** Although plaintiff included an "explanation" in his amended complaint, he still failed to state a claim with respect to several defendants, including the John/Jane Doe defendants. (Dkt. No. 10 at 3–4). The court found that the plaintiff's "explanation" with respect to these individuals was "wholly conclusory" and did not suffice to suggest personal involvement. (Dkt. No. 10 at 4). The court dismissed defendants Beilein, Pingotti, Capone, Salo, Boll, and Annucci without prejudice. (*Id.*) Chief Judge Sharpe also dismissed claims against the Department of Corrections and Community Supervision ("DOCCS") and the State of New York with prejudice. (Dkt. No. 10 at 5). Chief Judge Sharpe dismissed any individual claims for damages against defendant Fischer, but allowed the case to proceed on the issue of prospective injunctive relief as against defendant Fischer in his official capacity. (*Id.*)

Finally, Chief Judge Sharpe allowed the plaintiff's damage action to proceed against defendants Joseph T. Smith, Albert Prack, and Lucien J. LeClaire, Jr. individually. (Dkt. No. 10 at 6–7). These remaining defendants have filed the motion to dismiss. (Dkt. No. 19).

## II. *Motion to Dismiss*

### A. Legal Standards for Fed.R.Civ.P. 12(b)(6)

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167

L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

### B. Legal Standards for Fed.R.Civ.P. 12(b)(1)

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) is addressed to the court's jurisdiction. The standard of review for a motion under Rule 12(b)(1) is " 'substantively identical' " to the standard under Rule 12(b)(6). *Kaufman v. All Seasons Marine Works, Inc.,* No. 3:11–CV–1874, 2012 WL 4928862, at \*2 (D.Conn. Oct. 16, 2012) (quoting *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.2003)). One difference in the two rules is that in a motion under Rule 12(b)(1), the party asserting the court's jurisdiction has the burden of proof to demonstrate that subject matter jurisdiction exists, while in a motion under Rule 12(b)(6), the movant bears the burden of proof. *Id.*

**\*3** Another difference between the two rules is that while the court's review of a motion under Rule 12(b)(6) is generally limited to the four corners of the complaint with some exceptions, in a motion under Rule 12(b)(1), the court may resolve factual issues by reference to evidence outside the pleadings, including affidavits. *Id.* at \*3 (quoting *State Employees Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 77 n. 4 (2d Cir.2007)).

### III. *Injunctive Relief*

In his amended complaint, plaintiff requested that defendants be ordered to release him from Ad Seg. In the part of their motion to dismiss addressed to lack of subject matter jurisdiction, defendants state that plaintiff has now been released from Ad Seg, and has been transferred to the Assessment and Program Preparation Unit ("APPU") at Clinton Correctional Facility. In support of this argument, defendants have submitted the declaration of James Facteau, Corrections Captain at Clinton Correctional Facility. (Dkt. No. 19–2; Facteau Decl. ¶ 3). Captain Facteau states that on December 6, 2011, defendant Smith issued an order, releasing plaintiff from Ad Seg. (*Id.* & Ex. A). On December 19, 2011, plaintiff was transferred to Clinton's APPU, where he has been incarcerated since that time. (*Id.* ¶¶ 4–5 & Ex. B). The APPU is a housing unit at Clinton which is

designed to house high profile, easily targeted, or victim-prone inmates. (*Id.* ¶ 6). Captain Facteau states that APPU inmates have all the privileges accorded to inmates in general population, including all the privileges about which plaintiff is complaining in this amended complaint. (*Id.* ¶ 7).

Exhibit A to the Facteau Declaration is Superintendent Smith's order releasing plaintiff from Ad Seg, finding that his "status in Administrative Segregation is no longer warranted." (Facteau Decl. Ex. A). The first part of the order indicates the reason that plaintiff was initially placed in Ad Seg, but then states that plaintiff's behavior was "problem free," and his "attitude towards staff continues to be positive." (*Id.*) Exhibit B shows that plaintiff was transferred to Clinton's APPU on December 19, 2011. Thus, it is clear that plaintiff has not been housed in Ad Seg since December of 2011.

### A. Mootness—Legal Standard

A case is moot, and the court has no jurisdiction when the "parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Federal courts are without power to decide questions that cannot affect the rights of the parties in the case before the court. *See Swaby v. Ashcroft,* 357 F.3d 156, 159–160 (2d Cir.2004) (petitioner's injury must be traceable to respondent and likely to be redressed by a favorable judicial decision). The plaintiff must have a "personal stake" in the litigation. *Fox v. Board of Trustees of the State University of New York,* 42 F.3d 135, 140 (2d Cir.1994), *cert. denied,* 515 U.S. 1169, 115 S.Ct. 2634, 132 L.Ed.2d 873 (1995).

### B. Application

**\*4** In this case, plaintiff was released from Ad Seg and has been housed in Clinton's APPU[4] since December of 2011. Plaintiff has been afforded the injunctive relief that he sought in the amended complaint. Plaintiff no longer has a "personal stake" in the injunctive relief he requested. Therefore, any claims for injunctive relief against defendant Fischer[5] in his official capacity may be dismissed as moot. *See also Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (transfer from a prison facility moots an action for injunctive relief against the transferring facility); *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976) (plaintiff's release from incarceration moots

claim for injunctive relief); *Schauer v. Fogg,* 885 F.Supp. 28, 31 (N.D.N.Y.1995)). Plaintiff's claims for monetary relief, however, survive his release from Ad Seg. *See Prins,* 76 F.3d at 506; *Mawhinney,* 542 F.2d at 2.

## IV. *Personal Involvement*

### A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). A supervisory official is personally involved if that official directly participated in the infraction. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). The defendant may have been personally involved if he or she failed to remedy the wrong after learning about it through a report or appeal; if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue, or if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

The failure of a supervisory official to investigate a letter of protest written by an inmate is insufficient to establish personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006). Mere notice of alleged wrongdoing is insufficient to establish a supervisor's or administrator'[s] personal involvement. *Gibson v. Comm'r of Mental Health,* No. 04 Civ. 4350, 2008 WL 4276208, at *8, 2008 U.S. Dist. LEXIS 70080, at *27 (S.D.N.Y. Sept. 17, 2008). While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... '[p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.' " *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (quoting *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002).

### B. Application

Defendants Prack and LeClaire argue that plaintiff has failed to sufficiently allege that they were personally involved in the alleged constitutional violations. According to plaintiff, defendant Prack was the Acting Director of Special Housing, whose office is in Albany, New York. (Dkt. No. 8 at p. 6). Defendant Lucien LeClaire, Jr. is the Deputy Commissioner of DOCCS, whose office is also in Albany. (*Id.*) These individuals are clearly supervisory officials.

### 1. Defendant LeClaire

**\*5** In the amended portion of plaintiff's complaint, in a very short paragraph, he explains that he "sent several letters, complaints [and] grievances" to defendant LeClaire, and that his "deliberate indifference has led to cruel and unusual punishment," a violation of equal protection, and "the other causes of action." (AC at p. 49). There is no other indication that defendant LeClaire was in any way involved in the Ad Seg placement, its periodic review, or was responsible for any of the conditions in SHU. As stated above, the letters alone do not establish personal involvement, and plaintiff's conclusory statement that defendant LeClaire's "deliberate indifference" led to "cruel and unusual punishment" or a denial of equal protection, without more, is insufficient to state a constitutional claim. *See also Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (conclusory allegations are insufficient to state a claim for relief under section 1983).

### 2. Defendant Prack

The amended complaint contains the same type of conclusory allegations against defendant Prack. Plaintiff states that defendant Prack is liable because he "has control over all SHU." (AC at p. 49). Plaintiff claims that he sent letters to defendant Prack, but that he "failed to intervene" to remedy "the violations." Plaintiff states nothing more than a claim based upon respondeat superior, which as stated above, is insufficient to state a section 1983 claim. Thus, the amended complaint may be dismissed in its entirety as against defendant Prack.

The court will turn to an analysis of plaintiff's claims against the remaining defendant, Joseph Smith, Superintendent of Shawangunk.

## V. *Superintendent Smith*

### 1. Procedural Due Process

### A. Legal Standards

In order to begin a due process analysis, the court determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin."* *Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

**\*6** "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—*e.g.,* 30 days—and there was no indication that the

plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).

In *Arce v. Walker,* 139 F.3d 329, 334–35 (2d Cir.1998), the Second Circuit made it clear that even though the prison condition at issue in *Sandin* was an inmate's challenge to his confinement in "disciplinary" segregation, the *Sandin* analysis is properly applied to determine whether non-punitive, "administrative" segregation implicates a state-created liberty interest. Once the court determines that a liberty interest exists, then the distinction between administrative and disciplinary segregation determines how much process is due. *See Wilkinson v. Austin,* 545 U.S. 209, 224–25, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (when a liberty interest is established, the court turns to the question of what process is due an inmate because the requirements of due process are flexible depending on what the particular situation demands) (citing *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

New York regulations governing Ad Seg provide that an inmate receive a hearing within fourteen days of entering Ad Seg. 7 N.Y.C.R .R. § 301.4(a). Once it is determined that Ad Seg is appropriate, the inmate's status must be reviewed every sixty days. *Id.* § 301.4(d). Inmates in Ad Seg are housed in the SHU and are subject to most of the same restrictions as inmates housed in SHU for disciplinary reasons. *See id.* § 301.4(c) (Ad Seg inmates will be subject to the same rules and regulations as those disciplinary inmates who have completed 30 days of satisfactory adjustment).

If it is determined that the inmate had a liberty interest in remaining free of Ad Seg, due process requires only that the inmate must receive some notice of the reasons for the placement and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate into Ad Seg. *Samms v. Fischer,* No. 9:0–CV–349, 2011 WL 3876528, at *10 (N.D.N.Y. March 25, 2011) (ReportRecommendation), *adopted by* 2011 WL 3876522 (N.D.N.Y. Aug.31, 2011).[6] This opportunity to present his views need not be as formal as that required for disciplinary proceedings, rather, the officials must conduct an informal and non-adversary review of the information in support of

the inmate's transfer into administrative custody. *Id.* (citations omitted).

**B. Application**

**\*7** Defendants do not argue that plaintiff lacked a liberty interest, and they do not argue that defendant Smith lacked personal involvement.[7] Instead, defendants argue that plaintiff is confusing Ad Seg with disciplinary segregation when he argues that he did not receive a misbehavior report and was not allowed to present exhibits in opposition to the Ad Seg placement. (Def.s' Mem. of Law at 9–10). This court disagrees.

Plaintiff clearly cites the Ad Seg regulations in his amended complaint, and states that he is aware that inmates may be placed in Ad Seg if their presence in general population poses a threat to the safety and security of the facility. (AC ¶ 7) (citing 7 N.Y.C.R.R. § 301.4(b)). Plaintiff states that at his initial Ad Seg hearing, in January of 2010, he was given "absolutely no reason whatsoever to ... believe that plaintiff would be or become a threat to the security or safety of the institution." (AC ¶ 8). Plaintiff does state that he never had "so much as a disciplinary infraction." (*Id.* ¶ 9). However, this court interprets plaintiff's statement liberally[8] as an assertion that he maintained appropriate behavior while in Ad Seg, and that he should have been released sooner, or not placed in Ad Seg at all. The court does not find that plaintiff has confused Ad Seg and disciplinary confinement.

In his amended complaint, plaintiff alleges that he was in Ad Seg for more than 500 days,[9] long enough to establish a liberty interest under *Colon, supra.* Thus, plaintiff would have been entitled to at least the minimum due process requirements for Ad Seg. Because this is a motion to dismiss, and the court has only plaintiff's amended complaint upon which to rely, the court cannot determine whether plaintiff's due process rights were violated either in his initial placement or in the required periodic reviews. Plaintiff claims that there was "no reason whatsoever" for his placement or his maintenance in Ad Seg. Further, although he may not have been entitled to submit "exhibits," without more, it is not clear that he was given a sufficient opportunity to respond.

The court notes that defendants have filed Superintendent Smith's order releasing plaintiff from Ad Seg only for purposes of showing that plaintiff is no longer incarcerated in Ad Seg. While this document is appropriately submitted

in conjunction with defendants' mootness/jurisdictional argument, pursuant to Rule 12(b)(1), the court cannot accept the additional information in that document in support of a decision on the merits of a motion to dismiss pursuant to Rule 12(b)(6). It is clear that the document is incomplete, and even though the document releasing plaintiff from Ad Seg contains information regarding his placement, there is no indication what was contained in the initial document or in the periodic reviews. Thus, the court will not recommend granting a motion to dismiss as against defendant Smith on plaintiff's procedural due process claim. [10] The court makes no finding as to whether such a claim would survive summary judgment.

### 2. Free Exercise of Religion/Equal Protection

#### A. Legal Standards

**i. Religion**

**\*8** The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at \*4, 2007 U.S. Dist. LEXIS 77239 (N.D.N.Y. Oct.17, 2007). However, the Second Circuit has also found that a prisoner's free exercise right is not extinguished by his confinement in SHU or keeplock. *Ford,* 352 F.3d at 597 (citing *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993)). In order to limit this right, DOCCS must provide a legitimate penological interest. *See Turner v. Safely,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

**ii. Equal Protection**

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Generally, the equal protection clause has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.' " *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 601, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (citation omitted) To establish an equal protection violation, the plaintiff must show that the defendants applied a different standard to similarly situated individuals. *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 111 (2d Cir.2006). Plaintiff must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination. *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Then, plaintiff must show that the difference in treatment cannot survive the appropriate level of scrutiny. *Id.*

#### B. Application

In this case, plaintiff alleges that for the entire time that he was in Ad Seg, he was denied the right to attend congregate religious services by the "administration." Defendants in this case cite *Bellamy v. McMickens,* 692 F.Supp. 205, 214–15 (S.D.N.Y.1988) and *Matiyn v. Henderson,* 841 F.2d 31, 37 (2d Cir .), *cert. denied,* 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988) for the proposition that a denial of congregate services due to incarceration in Ad Seg does not rise to the level of a First Amendment violation. (Def.s' Mem. of Law at 7–8). However, prohibiting a particular inmate's attendance at congregate religious services because he is housed in Ad Seg does not violate the First Amendment *if the restriction serves a valid penological purpose. Graham v. Coughlin,* No. 86 Civ. 163, 2000 WL 1473723, at \*6 (S.D.N.Y. Sept.29, 2000) (citing *Bellamy v. McMickens,* 692 F.Supp. at 214–15).

**\*9** The court would point out that *Matiyn* and *Bellamy* were decided on summary judgment motions. In determining that there was a legitimate penological interest in both of the cited cases, the courts went beyond asserting that the restriction was reasonable simply because plaintiff was in Ad Seg. *See Matiyn,* 841 F.2d at 37 (Matiyn was in Ad Seg for four days, and the court found that he was prevented from attending communal services for reasons related to legitimate penological interests). In *Bellamy,* the court also examined whether the plaintiff had alternative means to exercise his right. *See Bellamy,* 692 F.Supp. at 215 (plaintiff was not permitted from attending communal

religious services because of the threat posed to him by other inmates, and he was ministered to each week in private and attended bible study classes conducted on the maximum security tier). *See also Shepherd v. Powers,* No.2012 WL 4477241, at *8 (S.D.N.Y. Sept. 27, 2012) (it is error to assume that prison officials are justified in limiting an inmate's free exercise rights simply because the inmate is in disciplinary confinement).

This case comes before the court on a motion to dismiss, and plaintiff claims that he was not able to attend congregate services or have a minister come to him even after his father passed away. [11] Because this is a motion to dismiss, the court has no basis upon which to determine whether the restriction is reasonable, and no basis to determine whether plaintiff had any alternative methods of exercising his First Amendment right.

Additionally, plaintiff alleges that inmates of other religions that are housed in plaintiff's unit are frequently visited by their rabbis or chaplains, while plaintiff was refused the same treatment. (AC at p. 44). If inmates of other religions who are housed in Ad Seg were being treated differently, then plaintiff might have an Equal Protection claim in addition to a First Amendment claim. The court cannot determine these issues on a motion to dismiss. Thus, the court will not recommend dismissal of the First Amendment Religion or the Equal Protection claim (in relation to religion) [12] as against defendant Smith. [13]

### 3. Property Claims

#### A. Legal Standards

The deprivation of property, whether intentional or unintentional, without more, is not actionable under section 1983 as long as the state has an adequate post deprivation procedure available. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (no protected property interest in a prison cell). New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates. *See Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Love v. Coughlin,* 714 F.2d 207, 209 (2d Cir.1983); *see also* N.Y. CT. CL. ACT § 10(6) (McKinney 1998). Plaintiff also has no right to be free of unreasonable searches and seizures while incarcerated because he has no reasonable expectation of privacy in his cell. *Hudson,* 468 U.S. at 529–30.

#### B. Application

**\*10** In this case, plaintiff alleges that he was not allowed to have all of his property in Ad Seg. Plaintiff states that most of his property been in "long term storage," (AC at p. 27), some of the property has been lost or stolen, and some has "never again been seen." (AC at p. 48). Even if defendant Smith had deprived plaintiff of property, his claim would not be actionable under section 1983. Therefore, any claims that plaintiff was temporarily deprived of his property while he was in Ad Seg, or that some of his property may have been lost or stolen while he was in Ad Seg may be dismissed, whether he bases his argument on Fourth or Fourteenth Amendment grounds.

### 4. Eighth Amendment

#### A. Legal Standards

In order to show that conditions of confinement violate the Eighth Amendment, the plaintiff must demonstrate that the conditions result in an "unquestioned and serious deprivation of basic human needs," and that defendants imposed those conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Whitley v. Albers,* 475 U.S. 312, 319–20, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)). The placement of restraints such as handcuffs on an inmate does not, by itself, amount to excessive force or cruel and unusual punishment. *See Bridgeforth v. County of Rensselaer,* No. 1:08–CV–779, 2012 WL 2873361, at *6 (N.D.N.Y. July 12, 2012) (absent some allegation beyond forceful cuffing, the claim against defendant was insufficient as a matter of law). Confinement in SHU, in itself, notwithstanding its additional restrictions on inmates, has not been held to constitute cruel and unusual punishment. *See Monroe v. Janes,* No. 9:06–CV–859, 2008 WL 508905, at *7 (N.D.N.Y. Feb.21, 2008) (Report–Recommendation), *adopted by* 2008 WL 508905, at *1 (N.D.N.Y. Feb.21, 2008).

#### B. Application

Plaintiff appears to claim that the restrictions imposed upon him in SHU constituted cruel and unusual punishment, but he does not describe any restrictions, other than the deprivations normally occurring in SHU, whether the inmate is in disciplinary or administrative confinement. Plaintiff alleges that he was handcuffed when escorted to the shower (AC at p. 27), but does not allege any abuse or injuries resulting from this conduct. Placing restraints on an inmate does not violate the Eighth Amendment unless the placement is totally without penological justification, grossly disproportionate, or involves the unnecessary or wanton infliction of pain.

*Delgado v. Bezio,* No. 09 Civ. 6899, 2011 WL 1842294, at *7 (S.D.N.Y. May 9, 2011). Walking to the shower in restraints, without more, is insufficient to state an Eighth Amendment claim. *See also Harvey v. Harder,* No. 9:09–CV–154, 2012 WL 4093792, at *9 (N.D.N.Y. July 31, 2012) (citing *Bridgeforth v. County of Rensselaer,* No. 1:08–CV–779, 2012 WL 2873361, at *6 (N.D.N.Y. July 12, 2012) (absent some allegation beyond forceful cuffing, the claim against defendant was insufficient as a matter of law)).

### 5. Communication

#### A. Legal Standards

**\*11** An inmate's right to communicate with family and friends is essentially a First Amendment right, subject to section 1983 protection. *Pitsley v. Ricks,* No. 9:96–CV–372, 2000 WL 362023, at *4 (N.D.N.Y. March 31, 2000) (citing *Morgan v. LaVallee,* 526 F.2d 221, 225 (2d Cir.1975). Because of security concerns in correctional facilities, these First Amendment rights are subject to reasonable restrictions. *Id.* (citations omitted). An inmate has no right to unlimited telephone use. *Id.* Prison restrictions on inmate telephone calls have been upheld when the affected inmate has alternative means of communicating with the outside world, most often by use of the mail. *Id.* (citing *inter alia Rivera v. Senkowski,* 62 F.3d 80 (2d Cir.1995)).

#### B. Application

Plaintiff in this case alleges that in all the time he was incarcerated in SHU he was only allowed to use the telephone once, and therefore, his family had to come to visit him rather than speaking with him on the telephone. Plaintiff claims that this was a hardship for his family, but he does not claim that

he was denied visitation.[14] Additionally, plaintiff concedes that he was allowed to write to his family, and there were no restrictions on this form of correspondence.[15]

Plaintiff also alleges that he has virtually no interaction with other inmates and has not been allowed to "exercise as desired with other inmates in general population."[16] (AC at p. 27). Limitation on communication with other inmates is standard even for inmates who are not housed in SHU. *See* DOCCS Directive No. 4422(III)(6)(c) (inmates need advance authorization from the Superintendents of the facilities involved in order to correspond with other inmates). Additionally, although a minimum amount of exercise is required, this court knows of no constitutional right to exercising "as desired" with other inmates from general population.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 19) be **GRANTED IN PART,** and the amended complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST DEFENDANTS FISCHER, PRACK AND LECLAIRE,** and it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 19) be **DENIED IN PART,** and plaintiff's amended complaint may proceed only as to plaintiff's **PROCEDURAL DUE PROCESS and RELIGION CLAIMS** as against defendant **SMITH.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 103575

## Footnotes

1    Plaintiff asserts procedural and substantive due process violations.

2    These pages refer to the pages assigned to Dkt. No. 8 by the court's electronic case management system ("CM/ECF"). There are two sets of numbers at the top of many of the pages of the amended complaint. When plaintiff filed his amended complaint, he re-filed his original complaint with additional pages. The original complaint still has the pages that were assigned by CM/ECF to Dkt. No. 1. Thus, I will refer to those pages that were assigned by CM/ECF when plaintiff filed his amended complaint (Dkt. No. 8).

3    Plaintiff also alleges that he was sent to Downstate in 2011, and was placed in General Population even though he had been in Ad Seg at Shawangunk since his transfer there in 2010. (AC ¶ 2).

4    The court notes that plaintiff mentions APPU in his amended complaint and implies that it would be an acceptable alternative to Ad Seg. (AC at p. 36).

5    Chief Judge Sharpe kept Commissioner Fischer as a defendant in this action, in his official capacity only, for purposes of prospective injunctive relief. Plaintiff's claim for injunctive relief is moot, thus, it is no longer necessary to have the Commissioner as a defendant in this action.

6    The district court in *Samms* relied upon *Hewitt v. Helms,* 459 U.S. 460, 476, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), for this due process requirement. The court did note that although the *Hewitt* analysis for determining the existence of a liberty interest was overruled in *Sandin,* the *Hewitt* decision was still instructive in determining the appropriate level of procedural safeguards once a liberty interest is found. 2011 WL 3876528, at *10 n. 4 (citing *Wilkinson v. Austin,* 545 U.S. at 229).

7    Defendant Smith was clearly involved in the decision to release plaintiff from Ad Seg because he signed the order, and the regulations specifically provide for the Superintendent's (or his designee's) involvement in the determination. *See* 7 N.Y.C.R.R. § 301.4(d)(2).

8    It is well-settled that the court must interpret a pro se plaintiff's arguments with the utmost liberality. *See* *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")).

9    In fact, it is clear from defendants' submission that plaintiff was in Ad Seg from December 29, 2009 until defendant Smith signed the release order on December 6, 2011. (Dkt. No. 19–3 at 2).

10   Plaintiff also generally states that his "substantive" due process rights were violated. *See e.g.* AC at p. 19 (challenging his visitation privileges in Ad Seg as a denial of procedural and substantive due process). The court notes that if a constitutional claim is covered by a specific provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard applicable to the specific provision, not under the more general "substantive due process" standard. *United States v. Lanier,* 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). Thus, to the extent that plaintiff in this case mentions "substantive" due process, the court will analyze his claims under the specific constitutional provision applicable to his claims as discussed below.

11   It is true that the First Amendment does not compel that the prison provide inmates with the spiritual counselors of their choice. *Graham v. Coughlin,* 2000 WL 1473723, at *6. The state need only provide inmates

a reasonable opportunity to worship. *Id.* Because this is a motion to dismiss, the court has no way of evaluating the merits of plaintiff's allegation that he was not given the opportunity to worship.

12    Plaintiff uses the term "equal protection" in various parts of the amended complaint, but the religion claim is the only one in which plaintiff may actually state a claim for equal protection in addition to a First Amendment claim. (*See e.g.* AC at p. 49) (where plaintiff states that defendant Prack's failure to intervene "commits Equal Protection under the law").

13    The court notes that defendants also claim that they are entitled to qualified immunity. (Def.s' Mem. of Law at 19–21). The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It is well-established that inmates have a constitutional right to participate in congregate services with the exceptions noted above. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993). Because this is a motion to dismiss, and the court cannot make a determination of whether the plaintiff's constitutional rights were violated without a factual determination of the reasonableness of the restriction or whether inmates of other religions were treated differently, the court will not recommend granting dismissal on qualified immunity grounds.

14    He states that he was allowed one visit per week "without due process," although he also complains that this was insufficient. (AC ¶ 13).

15    In the amended complaint, plaintiff states that "[a]lthough I do receive mail, my mail has to come from a completely different state and is not adequate as my father has had to visit personally ...." (AC at p. 46). Plaintiff's point was that having to communicate by mail was a hardship, and that his family suffered because they could not afford to travel. His father suffered because he was ill, and it was difficult for him to travel.

16    Plaintiff includes this allegation in his Eighth Amendment cause of action, but it is more appropriately discussed in the section on communication and association.

---

**End of Document**                                               © 2023 Thomson Reuters. No claim to original U.S. Government Works.

protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

Defendants contend that on the morning of November 4, 2015, Plaintiff refused to go on a medical trip to get a C.T. scan of his liver and was returned to the SHU. (Dkt. 87-2 at ¶ 161). However, Plaintiff takes the position that he did not refuse to go, but that Jenkins and Schmidt verbally threatened Plaintiff in front of Williams, and when Plaintiff stated he would file grievances against them, they cancelled the trip and falsely reported that he refused to go. (Dkt. 87-10 at 22). As a result, Plaintiff's cancer treatment was delayed. (Dkt. 87-7 at 302). The Court finds that a reasonable trier of fact viewing the record in the light most favorable to Plaintiff could find that prison guards lying to cancel Plaintiff's medical appointment, which resulted in delayed cancer treatment, amounts to deliberate indifference to a serious medical need.

Additionally, Defendants are not entitled to summary judgment with regards to the retaliation claim against Schmidt, Jenkins, and Williams. The record viewed in the light most favorable to Plaintiff shows that Plaintiff threatened to file a grievance against Jenkins, Schmidt, and Williams, and that immediately afterwards they cancelled Plaintiff's medical appointment scheduled for that day. A reasonable trier of fact could find this conduct amounts to retaliation.

Defendants argue that "verbal harassment does not rise to the level of a constitutional violation." (Dkt. 87-11 at 42). While Defendants make an accurate statement of the law, *see Davis*, 320 F.3d at 353 (" '[S]arcastic' comments, without more, do not constitute an adverse action."), the issue of material fact in dispute is not whether Jenkins and Schmidt verbally harassed Plaintiff in front of Williams, but whether Plaintiff's medical appointment for his cancer treatment was cancelled by Jenkins, Schmidt, and Williams because Plaintiff threatened to filed grievances against them. Accordingly, the Court denies Defendants' summary judgment motion as to the November 4, 2015 claims against Jenkins, Schmidt, and Williams.

## IX. Remaining Claims Against Salotti

Defendants contend summary judgment should be granted as to the remaining retaliation and denial of medical care claims against Salotti for her alleged refusal to schedule Plaintiff's outside medical treatment for his liver cancer after November 4, 2015. The Court agrees for the following reasons.

Defendants point to multiple portions of the record to support their position that the reason Plaintiff did not receive treatment for his liver cancer after November 4, 2015, was because of his refusal to attend his scheduled medical appointments. For example, a refusal of medical examination form from January 16, 2016 states Plaintiff "refused medical services after throwing milk on an officer." (Dkt. 89-2 at 40). Additionally, in Salotti's declaration made under penalty of perjury, she states that Plaintiff's treatment was interrupted because he "had several incidents of self-harm which resulted in him being in Mental Health Unit[ ] observation cells or [the] infirmary one on one watch" (Dkt. 87-4 at ¶ 25), and that Plaintiff's treatment resumed after March 14, 2016, after Salotti discussed with him "the need to avoid refusals of medication and treatment" (*id.* at ¶ 26). The only evidence of record in support of Plaintiff's position are statements that Salotti has "refused since November 4, 2015 ... to schedule me for outside medical treatment for my liver cancer" and that "Salotti continues to deny me urgently needed medical treatment for my cancer." (Dkt. 99 at 43). The Court finds that these conclusory allegations without the support of any other evidence of record are insufficient to withstand summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact."); *Smith v. County of Nassau*, No. 12-CV-4344 SJF GRB, 2014 WL 2862849, at *6 (E.D.N.Y. June 18, 2014) (granting summary judgment where the plaintiffs did not dispute the justifications offered by the defendants "except to offer a conclusory, unsupported statement"). Accordingly, the Court grants Defendants' motion for summary judgment as to the remaining claims against Salotti.

## CONCLUSION

**\*16** For the reasons stated above, the Court grants in part and denies in part Defendants' motion for partial summary judgment. (Dkt. 87). The only claims remaining in the instant lawsuit related to the Defendants presently before the Court are the December 2014 deliberate indifference/conditions of confinement and retaliation claims against Gould; the October 5, 2015 failure to protect claims against Casper and Marketos and deliberate indifference claim against Nurse T. Jones; the October 2015 deliberate indifference for denial of medication claims against Nurse T. Jones, McIntyre, and LaBrake; the October 14, 2015 excessive use of force claim against

Schmidt; and the November 4, 2015 deliberate indifference and retaliation claims against Jenkins, Schmidt, and Williams. The Clerk of Court is directed to terminate the following Defendants as parties to this action: Salotti, Reynolds, Alvaro, Glasser, Norris, Pierce, Trabout, Cheasman, Sheahan, Thoms, Coveny, Jensen, Ludenski, Krzeminski, Colvin, Jarzyna, LaMana, Hill, Spencer, [7] and Koenigsmann.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1703208

## Footnotes

1    Although Defendants do not make this clear, it appears they only concede certain facts as set forth herein for purposes of this motion. (*See, e.g.*, Dkt. 87-11 at 18 ("*Plaintiff claims* that after the biopsy at Strong Memorial Hospital he was driven back to Five Points where he was beaten by CO Jenkins[.]" (emphasis added))).

2    Plaintiff referred to Nurse Spencer as "Spinner" in his Complaint.

3    Defendants do not move for summary judgment as to the excessive use of force claim against Schmidt related to this incident. (Dkt. 87-11 at 46).

4    Defendants contend that Plaintiff did not submit a grievance regarding the November 4, 2015 claims against Jensen and Salotti. (Dkt. 87-11). While Plaintiff concedes he did not grieve the claim against Jensen (Dkt. 100 at 39), he has submitted a grievance he filed against Salotti regarding her alleged refusal since November 4, 2015, to schedule Plaintiff for outside medical treatment. (Dkt. 99 at 43 (Grievance FPT-31515-16)).

5    Plaintiff has submitted letters with requests for status updates regarding grievances he submitted in early 2014 and May 2016, all of which are unrelated to the instant matter. (Dkt. 99 at 9-16).

6    Defendants make no arguments with regards to the retaliation claim against Gould. (*See* Dkt. 8 at 6 (screening order allowing retaliation claim against Gould to proceed to service)). Accordingly, Defendants' motion is denied as to that claim.

7    As previously noted, Plaintiff referred to Spencer as "Spinner" in the Complaint, and she is so listed in the caption.

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 987374

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Derrick HAMILTON, Plaintiff,

v.

Brian FISHER, Commissioner of New York State Department of Correctional Services;[1] Joseph T. Smith, Superintendent of Shawangunk Corr.; John Maly, Deputy of Shawangunk Corr. Fac.; Kay Knott, Deputy of Shawangunk Corr. Fac.; Dennis Giglio, Captain of Shawangunk Corr. Fac.; G. Gardner, Lieutenant of Shawangunk Corr. Fac.; R.K. Woods, Superintendent of Shawangunk Corr. Fac.;[2] M. Sheahan, Deputy Supt. of Shawangunk Corr. Fac.;[3] Seargent Brand, Upstate Corr. Fac.; Curtis Drowns, Commissioner Hearing Officer; Norman Bezio, Director of Special Housing; H. Moss, Sergeant Shawangunk Corr. Fac.; M. Signorella, Corr. Officer, Shawangunk Corr. Fac.; D. Forbes, Corr. Officer, Shawangunk Corr. Fac.; Joe Wolczyk, Commissioner Hearing Officer; Neil Hochman, Psychologist, Shawangunk Corr. Fac.; Susan Strickland, Mental Health Unit Chief Auburn Corr. Fac.; Osman Yildiz, Social Worker, Sullivan Corr. Fac.; Sue Ann Smith, Unit Chief, Sullivan Corr. Fac.; Doctor Mahmud, Psychiatrist, Sullivan Corr. Fac.; Doreen Faber, Social Worker, Auburn Corr. Fac.; Christopher P. Mayer, Unit Chief, Auburn Corr. Fac., Defendants.

Civ. No. 9:10–CV–1066 (MAD/RFT).

|

Feb. 29, 2012.

**Attorneys and Law Firms**

Derrick Hamilton, New Haven, CT, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Cathy Y. Sheehan, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants[4].

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Derrick Hamilton brings this civil rights action, pursuant to 42 U.S.C. § 1983, against twenty-two Defendants, alleging, *inter alia,* that they violated his due process rights in three disciplinary hearings, violated his Eighth Amendment right to be free from cruel and unusual punishment, violated his First Amendment right to free exercise of religion, retaliated against him for filing grievances, and conspired against him. Dkt. No. 1, Compl. Defendants now move for dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 47. Plaintiff opposes the Motion. Dkt. No. 49. For the reasons that follow, we recommend that Defendants' Motion be **granted** in part and **denied** in part.

**I. BACKGROUND**

The following facts are derived from Plaintiff's Complaint, which, in accordance with the standard of review on a motion to dismiss, must be taken as true. *See infra* Part II.A.

On or about November 30, 2007, while incarcerated at Shawangunk Correctional Facility ("Shawangunk"), Defendants Gardner, Giglio, Maly, and Smith sent two non-Defendant officers to Plaintiff's cell in order to confiscate all of Plaintiff's legal and personal documents. *See* Compl. at ¶ 35. One of the documents confiscated resulted in the dismissal of an unrelated 42 U.S.C. § 1983 claim. *Id.*

On December 10, 2007, Defendant Giglio presided over a disciplinary hearing on the charges that Plaintiff took nude photos while at a family reunion site, and sentenced Plaintiff to forty-five days of "keeplock" segregation, including the loss of packages, phone, commissary, and programs such as congregate and religious services. *Id.* at ¶¶ 36–37. Plaintiff began serving the sentence on December 13, 2007. *Id.* at ¶ 37. In keeplock, Plaintiff was deprived of the "everyday social stimuli afforded [to] the general prison population," group recreation activities, and vocational, academic, and/or social programs. *Id.* at ¶ 38. On February 8, 2008, Defendant Bezio reversed Defendant Giglio's guilty disposition, but Plaintiff had served the entire penalty by then. *Id.*

On February 12, 2008, Plaintiff was issued a false misbehavior report charging him with drug use. *Id.* at ¶ 39a.[5] On February 29, 2008, Defendant Knott presided

over the disciplinary hearing, found Plaintiff guilty, and sentenced him to eighteen months in the special housing unit ("SHU") with a corresponding loss of phone, packages, and commissary. *Id.* Plaintiff states that "[d]uring the hearing[,] [D]efendant Knott violated [his] constitutional and regulatory rights and disregarded clear and convincing evidence that the urine tested was not [Plaintiff]'s." *Id.* On March 11, 2008, Defendant Bezio reversed Defendant Knott's decision and ordered a new hearing. *Id.* at ¶ 39b. However, Defendants Smith and Maly "refused to release Hamilton from the special housing unit pending the hearing." *Id.* On March 18, Defendant Drowns held the rehearing ordered by Defendant Bezio and found Plaintiff guilty, and, like Defendant Knott, imposed a sentence of eighteen months confinement in SHU and loss of phones, packages and commissary; Plaintiff was not in attendance at the hearing. *Id.* at ¶ 40.

**\*2** It is unclear from Plaintiff's Complaint exactly what happened next, but from what this Court can discern, on May 22, 2008, Defendant Bezio again reversed this disposition. *Id.* at ¶ 41. At an unstated time, Defendant Smith "signed his signature to confirm that the hearings held on December [10], 2007,[6] February 29, 2008[,] and March 18, 2008[,] were conducted in accordance with constitutional and regulatory rights." *Id.* at ¶ 42.

Meanwhile, on May 1, 2008, Defendants Fischer and Bezio approved Defendant Smith's request to transfer Plaintiff to Upstate Correctional Facility ("Upstate"). Plaintiff alleges that Defendant Smith's transfer request was in retaliation to the grievances Plaintiff made about Defendants Smith and Knott; specifically, that Defendant Smith was liable for the wrongful death of "Larry Davis," that Defendant Knott denied Plaintiff unspecified rights at the February 29, 2008 administrative hearing, and that Defendant Knott "deliberately destroy[ed] evidence to hide ... due process violations captured on the audio tape." *Id.* at ¶ 59. While at Upstate, Plaintiff was deprived of headphones, lotion, television, daily access to the law library, family day events, and was subjected to loud banging and yelling from other inmates, among other things. *See id.* at ¶ 60. At some point, Defendants Woods, Sheahan, and Brand destroyed five bags of Plaintiff's personal property, which contained chiefly clothes, hygienic products, and approximately one thousand photographs. *Id .* at ¶ 61.

On June 3, 2008, Plaintiff was transferred back to the Shawangunk general population by Defendants Fischer and Bezio after reports of Plaintiff's misbehavior. *Id.* at ¶

43. Plaintiff served an aggregate total of 135 days of "segregation time" on the incidents described above. *Id.* at ¶ 42. Plaintiff claims that he was returned to "atypical and significant hardships" when he reentered Shawangunk, and that Defendants Fischer and Bezio "failed to correct the policies, and practices, [of][D]efendants Smith, Maly, Drowns, Knott, Gardner, Giglio, and all others named above who participated in the unconstitutional activity." *Id.* at ¶¶ 62–63.

On March 2, 2009, Plaintiff became an inmate liaison committee clerk. *Id.* at ¶ 44. On or about March 10, Defendant Gardner threatened Plaintiff to stop making complaints about the correctional facility staff or that Plaintiff would lose his liaison job and be placed in SHU. *Id.* at ¶ 45. Then on March 13, 2009, Defendant Gardner "placed Hamilton in the special housing unit under involuntary protective custody status[,][i]n a cell without any desk, chair, lockers or humane conditions." *Id.* Defendant Drowns held an administrative hearing on March 19, affirming the involuntary protective custody placement. *Id.* at ¶ 46. Defendants Drowns and Gardner lied at the hearing when they claimed that "the Blood gang wanted to harm" Plaintiff; Plaintiff was also denied the opportunity to present documentary evidence. *Id.*

**\*3** From March 13, 2009 until November 2, 2009, Plaintiff was kept in SHU under involuntary protective custody status, while he "complained constantly" to Defendants Fischer, Smith, Maly, Giglio, Knott, and Hochman that this placement was causing "sever[e] depression[,][e]specially since [D]efendants ... continually informed Hamilton that his life was[ ] in jeopardy [,] [c]ausing Hamilton to become paranoid, unable to sleep and delusional [.]" *Id.* at ¶ 48. Defendant Maly "conducted sham reviews of Hamilton's involuntary protective custody placement [without] meaningful effort ... to return Hamilton to the general population or transfer Hamilton." *Id.* at ¶ 47. Additionally, Defendants "Fischer, Smith, Maly, Giglio, Knott, Hochman, Bezio, and others" refused to provide Plaintiff with "mental health treatment or transfer him out of the conditions that caused the depression [,] [but rather] continued the sham mental health interviews." *Id.* at ¶ 49.

On November 2, 2009, Plaintiff told Defendant Moss that he wanted to be removed from SHU and be placed in a "one on one strip cell," and that Plaintiff had medication in his possession he "was thinking of taking unless he was removed." *Id.* at ¶ 50. Defendant Moss did not immediately move Plaintiff, and Plaintiff "swallowed a handful of pills

[in an] attempt[ ] to commit suicide." *Id.* He was taken to Cornwall St. Luke's Hospital and treated. *Id.* at ¶ 51. While at St. Luke's, Defendants Signorella and Forbes repeatedly punched Plaintiff in the ribs, stomach, and chest while he was shackled in the bed, causing him "tremendous[ ]" pain; they also threatened to kill him. *Id.* at ¶ 52. Because Plaintiff refused to leave the hospital, Defendants Signorella and Forbes falsified a report stating that Plaintiff caused a disturbance. *Id.*

Plaintiff was transferred to the mental health unit at the Sullivan Correctional Facility where he remained until November 13, 2009. *Id.* at ¶ 51. There, Plaintiff saw Defendants Osman Yildiz, a mental health clinician, and Doctor Mahmud, to whom Plaintiff explained that he would attempt suicide again if returned to Shawangunk's SHU. *Id.* at ¶ 53. These Defendants were "informed by security at [S]hawangunk that Hamilton only took the pills as a ploy to be removed from special housing[,]" but Plaintiff told them that "he took the pills because [D]efendants Moss, Hochman, Fischer, Bezio, and others did not take his depression seriously." *Id.* at ¶ 54. Plaintiff was diagnosed with an adjustment disorder with mixed anxiety and depressed mood, but despite the diagnosis, Defendants Yildiz and Mahmud tried to persuade Plaintiff to return to Shawangunk. *Id.* at ¶ 55.

Plaintiff claims that on or about November 5, 2009, Defendents Yildiz, Mahmud, and Sue Ann Smith conspired with Defendants Moss when they stated that Plaintiff was "attempting to manipulate the mental health unit to be removed from involuntary protective custody ." Defendant Moss also wrote a false misbehavior report charging Plaintiff with faking a suicide attempt in order to be removed from Shawangunk's SHU. *Id.* at ¶¶ 56–58.

**\*4** On November 13, 2009, Defendants Fischer and Bezio transferred Plaintiff to Auburn Correctional Facility ("Auburn") and assigned him to the SHU. On November 14, 2009, Plaintiff was issued two misbehavior reports, which Plaintiff attests were issued "in retaliation for the November 2, 2009, mental anxiety and depression Hamilton suffered while at Shawangunk." *Id.* at ¶ 64. Defendant Wolczyk presided over Plaintiff's disciplinary hearing, and on December 10, 2009, found Plaintiff guilty and assigned him twelve months confinement in SHU, loss of phones, commissary, packages, and good time credits; at this hearing, Plaintiff was "deprived from calling relevant witnesses or

[from] produc[ing] documentary evidence (mental health records)." *Id.* at ¶ 66.

Plaintiff also claims that Defendant Fischer has refused to let Plaintiff practice Judaism or provide Plaintiff with a kosher diet, and that Defendants Fischer, Strickland, Faber, and Mayer deprived Plaintiff from seeing a psychiatrist, a therapeutic counselor, or receive any mental health treatment. *Id.* at ¶¶ 72–75. Instead, these Defendants "filed false documents to make it seem as if Hamilton was being screened by staff [ ] and was found to be in good mental health." *Id.* at ¶ 75.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See 🚩Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." 🚩*Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." 🚩*Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*overruled on other grounds by* 🚩*Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (citing 🚩*Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." 🚩*Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting 🚩*Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See* 🔖 *Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also* 🚩 *Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 🔖 *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

**\*5** A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." 🔖 *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); 🔖 *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1960, 173 L.Ed.2d 868 (citing *Twombly* ).[7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🔖 *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." 🔖 *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 🔖 *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1950–51, 173 L.Ed.2d 868.

**B. Plaintiff's Claims**

In his often-conclusory and always-confusing Complaint, Plaintiff makes a variety of allegations against the myriad Defendants in this action. This Court will address those claims *seriatim.*

### 1. *Eighth Amendment*

Reading his Complaint liberally, Plaintiff states three distinct Eighth Amendment claims: deliberate indifference to his serious medical needs, excessive force, and inhumane conditions of confinement.

### i. *Deliberate Indifference to a Serious Medical Need*

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." 🔖 *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " 🔖 *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting 🔖 *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. 🔖 *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). Under the objective prong, the alleged medical need must be "sufficiently serious." *Id.;* 🔖 *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." 🔖 *Chance v. Armstrong,* 143 F.3d at 702 (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Id.* (quoting 🚩 *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). Under the subjective component, the plaintiff must demonstrate that the defendant acted with "a

sufficiently culpable state of mind." *Hathaway I,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

**\*6** Plaintiff claims that he suffers from mental health ailments, particularly, adjustment disorder with mixed anxiety and depressed mood. *See* Compl. at ¶ 55. According to his Complaint, the "involuntary protective custody status caused him overt depression," and this, in turn, either manifested itself "to the extent of being suicidal," or "he took the pills because Defendants Moss, Hochman, Fischer, Bezio, and others did not take his depression seriously." *Id.* at ¶¶ 53–54. Regardless of whether the Plaintiff states a "serious medical condition," he fails to allege that the Defendants objectively deprived him of adequate medical care such that they would be constitutionally liable. *See* *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006); *see also* *Mercado v. City of New York,* 2011 WL 6057839, at \*5 n. 6 (S.D.N.Y. Dec.5, 2011) ("Regardless whether he was suicidal, that condition is not dispositive of the seriousness inquiry: 'although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care ... establish[es] constitutional liability.' ") (quoting *Salahuddin,* 467 F.3d at 280).

Plaintiff alleges that after he "swallowed a handful of pills," he was taken to St. Luke's Hospital and treated for the overdose, and then transferred to the mental health unit at Sullivan Correctional Facility, where he stayed for eleven days. Compl. at ¶¶ 50–51. His only complaint about the medical care he received was that the medical personnel, Defendants Sue Ann Smith, Yildiz, and Mahmud, believed "Hamilton was attempting to manipulate the mental health unit to be removed from involuntary protective custody ." *Id.* at ¶ 56. Thus, Plaintiff does not allege any facts by which this Court could find that Defendants denied him adequate medical care.

Further, Plaintiff does not allege that the Defendants acted with the requisite culpable state of mind for a finding of deliberate indifference. Plaintiff states that he "informed [D]efendant Moss that he wanted to be removed from [SHU] and placed in a one on one strip cell. As he (Hamilton) had in his possession medication he was thinking of taking unless he was removed. Defendant Moss refused to move Hamilton

from the cell in an expedient manner and Hamilton swallowed a handful of pills and attempted to commit suicide." *Id.* at ¶ 50. Plaintiff was then transported to Auburn, issued a misbehavior report by Defendant Moss for faking a suicide attempt, and subsequently removed from the mental health treatment program by Defendants Strickland, Fischer, Faber, and Mayer. *Id.* at ¶¶ 58 & 72–75.

A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. 825, 836–37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also* *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. at 837.

**\*7** Plaintiff does not state any facts by which we can impute subjective culpability upon any Defendant. Nothing in his allegations indicates that any Defendant knew of a substantial risk that Plaintiff might attempt to commit suicide and that they then responded with deliberate indifference. Further, discharging Plaintiff—after a lengthy hospital stay—under the suspicion that Plaintiff faked a suicide attempt in order to be removed from SHU might be considered negligent conduct under certain circumstances, but that finding, at best, is not sufficient to state an Eighth Amendment claim. *Estelle v. Gamble,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) ("Mere negligence or inadvertent failure ... is not a constitutional violation, however. 'Deliberate indifference' must be demonstrated by proof that corrections personnel intentionally denied, delayed access to, or interfered with prescribed treatment."). Akin to the *Farmer v. Brennan* standard above, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553

(2d Cir.1996)); *see also* 🏴 *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

Therefore, Plaintiff's claim that Defendants Sue Ann Smith, Yildiz, Mahmud, Moss, Fischer, Bezio, Strickland, Faber, and Mayer were deliberately indifferent to his serious medical needs should be **dismissed.**

### ii. Excessive Force

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. 🏴 *Robinson v. California,* 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (cited in 🏴 *Tramell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003)). To determine whether an Eighth Amendment violation occurred where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 🏴 *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoted in 🏴 *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994)). To validly assert an Eighth Amendment violation through the use of excessive force, an inmate must state (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant acted wantonly and in bad faith. 🏴 *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotations and citations omitted).

Plaintiff asserts that Defendants Forbes and Signorella assaulted him repeatedly while he was shackled in a bed at St. Luke's hospital. *See* Compl. at ¶ 52. Plaintiff claims he was "bruised, in pain[,] and suffered tremendously from the repeated blows and excessive force inflicted by [D]efendants." *Id.* Besides stating that the correctional officers wrote a false report stating that Plaintiff caused a disturbance, he does not state any other facts about this incident or the nature of any injures he suffered, and Plaintiff does not allege that he sought medical treatment.

**\*8** Liberally construed, Plaintiff's allegations that the Defendants hit him while he was restrained in a hospital bed may well indicate that the Defendants acted wantonly. *See Dallio v. Santamore,* 2010 WL 125774, at \*8–9 (N.D.N.Y. Jan.7, 2010) (finding that allegations that assaulting officers

continued to hit plaintiff after he was restrained and thus compliant and defenseless triggered an Eighth Amendment claim). While Plaintiff states his claims in a conclusory fashion, he states enough at this state to allege a plausible Eighth Amendment excessive force violation and thus should be entitled to offer evidence to support his claims. Accordingly, Defendants' Motion to Dismiss Plaintiff claims against Defendants Signorella and Forbes should be **denied** and Plaintiff's claim should continue to the next stage of litigation. [8]

### iii. Conditions of Confinement

Plaintiff claims that he suffered cruel and unusual punishment when incarcerated in SHU at Shawangunk. Specifically, he claims that he was locked in a cell for twenty-three hours a day without any desk, chair, lockers, phone or package privileges, religious services, family day picnics, community events, re-entry and transitional services, or "humane conditions," and was subjected to "complete isolation, loud yelling, banging on cell doors, banging on walls, [and] feces being thrown," among other things. Compl. at ¶¶ 38, 40, 45, & 48. He complained "constantly" about the conditions of his confinement to Defendants Fischer, Smith, Maly, Giglio, Knott, Bezio, Hochman, and Moss, but Defendants did not remove Plaintiff from SHU. *Id.* at ¶¶ 48–49.

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." 🏴 *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "[c]onditions of confinement only constitute an Eighth Amendment violation if they involve the deprivation of a single identifiable human need or denial of the minimum civilized measure of life's necessities, and the defendants' state of mind was one of deliberate indifference to that deprivation." 🔺 *Johnson v. Smith,* 2006 WL 1843292, at \*9 (N.D.N.Y. June 29, 2006). The Eighth Amendment does not "mandate comfortable prisons," 🏴 *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), and "only those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation[,]" 🏴 *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting 🏴 *Rhodes v. Chapman,* 452 U.S. at 347).

Reading Plaintiff's Complaint liberally, he does not allege enough facts to establish that he was exposed to objectively serious prison conditions that violate the Eighth Amendment. An inmate normally cannot state a valid claim based on "inmate-generated" noise as an impermissibly harsh condition of confinement, *see* 🚩 *Griffin v. Coughlin,* 743 F.Supp. 1006, 1018 (N.D.N.Y.1990) (citing 🚩 *Whitely v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)), nor that a deprivation of his ability to go to programs and to socialize triggers the Eighth Amendment, *see Jeffrey v. Ahmed,* 2011 WL 4390220, at *14 (N.D.N.Y. Aug.22, 2011). Additionally, "normal" conditions of SHU confinement do not constitute an Eighth Amendment violation. *See Branch v. Goord,* 2006 WL 2807168, at *5 (S.D.N.Y. Sept.28, 2006); *see also Shannon v. Selsky,* 2005 WL 578943, at *6 (S.D.N.Y. Mar.10, 2005) (noting solitary confinement for twenty-three hours a day with one hour of exercise is not an Eighth Amendment violation). Rather, SHU confinement is not cruel and unusual unless it is "totally without penological justification, grossly disproportionate, or involve[s] the unnecessary and wanton infliction of pain." 🚩 *Smith v. Coughlin,* 748 F.2d 783, 787 (2d Cir.1984) (internal quotation marks and citations omitted). Further, while the Second Circuit has held that allegations of unsanitary conditions may support an Eighth Amendment claim, *see* 🚩 *Gaston v. Coughlin,* 249 F.3d 156, 165–66 (2d Cir.2001) (finding that triable issue of fact existed where prisoner alleged that he was, *inter alia,* exposed to freezing temperatures throughout the winter, rodent infestation, and exposed to a corridor filled with sewage and human feces for several days), allegations of unsanitary conditions that are "general in nature and do not specify any particularized facts regarding the ... level of hygiene," do not state a claim upon which relief can be granted, *Williams v. Carbello,* 666 F.Supp.2d 373, 379 (S.D.N.Y.2009) (citing *Gaston* ). Plaintiff's allegation of "feces being thrown" is clearly not as severe as the conditions described in *Gaston* nor are his allegations specific enough to plausibly suggest that the conditions which he was exposed to in SHU, viewed collectively, were sufficiently "serious" to satisfy the objective prong of his Eighth Amendment claim.

**\*9** Accordingly, because Plaintiff fails to allege any such objectively serious deprivation of the minimum civilized measure of life's necessities, he fails to state a claim upon which relief can be granted regarding the conditions of his confinement. Thus, his claim should be **dismissed.**

### 2. *Due Process*

Plaintiff alleges that Defendants Giglio, Knott, Drowns, Gardner, Wolczyk, and Smith violated his Due Process rights during his December 10, 2007, February 29, 2008, March 18, 2008, and December 10, 2009, disciplinary hearings which resulted in Plaintiff's confinement in keeplock and SHU. Specifically, Plaintiff claims that Defendant Giglio found Plaintiff guilty during a December 2007 disciplinary hearing although he "admitted the law and facts were as Hamilton stated above;" Defendant "Knott violated Hamilton['s] constitutional and regulatory rights and disregarded clear and convincing evidence" relating to urine testing at Plaintiff's February 29, 2008 disciplinary hearing; on March 18, 2008, Defendant Drowns "violated Hamilton's [c]onstitutional and regulatory rights to be present" when he ruled during the rehearing to the February 29, 2008 disposition ordered by Defendant Bezio; Defendants Drowns and Gardner "deliberately lied" at Plaintiff's March 19, 2009 administrative hearing affirming Plaintiff's placement in involuntary protective custody; Defendant Wolczyk prevented Plaintiff from calling relevant witnesses or producing documentary evidence in his December 10, 2009 hearing; and that Defendant Smith, at some unknown time, "signed his signature to confirm that the hearings held on December [10], 2007, February 29, 2008, and March 18, 2008 were conducted in accordance with constitutional and regulatory rights [despite] the evidence presented." *See* Compl. at ¶¶ 36, 40, 42, 46, & 66.

Here, we find that Plaintiff's conclusory assertions against Defendants Giglio, Knott, and Smith, unaccompanied by any explanations or factual context, are insufficient to state a due process claim upon which relief can be granted. *See, e.g.,* 🚩 *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990) (noting that complaints based on violations of constitutional rights must contain more than conclusory allegations to avoid dismissal). For the same reason, Plaintiff's claim against Defendants Drowns and Gardner, as related to the March 19, 2009 disciplinary hearing, also fails to state a claim.

We turn now to Plaintiff's due process claims against Defendant Drowns, in relation to the March 18, 2008 disciplinary hearing he presided over, and against Defendant Wolczyk, in relation to Plaintiff's December 10, 2009 disciplinary hearing. Compl. at ¶¶ 40 & 66. In order to state a due process claim under 🚩 § 1983, an inmate

must establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). A prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed the requisite atypical and significant hardship. *See* *Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (noting that a prisoner is not entitled to due process protections unless the resulting restricting confinement subjected the prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life"). Whether the conditions of the segregation amounted to an atypical and significant hardship "turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d at 336 (citations omitted).

**\*10** Defendant Drowns sentenced Plaintiff on March 18, 2008, to an eighteen-month term in SHU with a corresponding loss of phone, packages, and commissary privileges. Compl. at ¶ 40. On May 22, 2008, however, Defendant Drowns' determination was reversed by Defendant Bezio, who found that "[D]efendant Drowns violated Hamilton['s] right to be present during the administrative hearing." *Id.* at ¶ 41. Here, because Defendant Drowns' guilty finding in Plaintiff's March 18, 2008 disciplinary hearing was reversed by Defendant Bezio on May 22, 2008, Plaintiff was not subject to a penalty—confinement in SHU—from Defendant Drowns' disposition for longer than about two months. Compl. at ¶¶ 40–41. The Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the above-stated *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *see also* *Ayers v. Ryan,* 152 F.3d 77, 83 (2d Cir.1998) ("Whether or not a period of disciplinary confinement amounts to an atypical and significant hardship is a fact-intensive inquiry[.]"). Nevertheless, the Second Circuit has suggested that confinement for a period of less than 101 days would not constitute an atypical and significant hardship. *See* *Colon v. Howard,* 215 F.3d 227, 231–32 (2d Cir.2000). Plaintiff provides no facts indicating that the conditions of his confinement were additionally abnormal, outside the conditions inherent in SHU. Therefore, we find that Plaintiff's

confinement in SHU and his loss of various privileges from the March 18, 2008 disciplinary hearing Defendant Drowns' presided over, as reversed by Defendant Bezio, did not constitute an atypical and significant hardship, and his due process claim against Defendant Drowns should be **dismissed.**

Addressing Plaintiff's claim against Defendant Wolczyk, the Second Circuit has held that segregative sentences of 125–288 days confinement in SHU are deemed to be "relatively long" and therefore necessitate "specific articulation of fact findings before the district court could properly term the confinement atypical or insignificant." *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000). Therefore, Defendant Wolczyk's sentence of twelve months in SHU from Plaintiff's December 10, 2009 disciplinary hearing established a liberty interest by which Plaintiff was entitled to some measure of due process before being deprived therewith; namely, the ability to call "relevant witnesses or to produce documentary evidence[.]" Compl. at ¶ 66.

Accordingly, we find that Plaintiff states a valid due process claim against Defendant Wolczyk upon which relief can be granted. Plaintiff's claims against Defendants Giglio, Knott, Gardner, Smith, Drowns, and Bezio, to the extent Plaintiff brings due process claims against Defendant Bezio for his role in reversing the guilty findings in Plaintiff's disciplinary hearings, should be **dismissed** for failure to state a claim.

### 3. *First Amendment Free Exercise and RLUIPA*

**\*11** In Plaintiff's extensive twenty-four-page Complaint, he states once, and seemingly in passing, that Defendant Fischer violated his First Amendment free exercise rights and rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") by "refusing to permit Hamilton to practice the Judasim [sic] religious tenets [sic]." Compl. at ¶ 71. Plaintiff claims only that Defendant Fischer has "refused to acknowledge Hamilton's request to note he is of the Judaism faith[,][a]nd to provide a kosher diet to Hamilton like all other prisoners of this faith receive." *Id.*

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. U.S. CONST. AMEND. I; *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). The free exercise clause applies to prison inmates, subject to appropriate

limiting factors. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

Further, RLUIPA provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

The principles which guide the analysis of plaintiff's free exercise claim are similar to those applicable to a RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks. *See Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006). RLUIPA prohibits governmental entities subject to its reach from imposing a substantial burden on religion even where it stems from a generally applicable law, practice, or policy, but it places a higher burden on the defendants than does the First Amendment, which requires only that an infringement be "reasonably related to legitimate penological interests." *Dove v. Broome County Corr. Facility,* 2011 WL 1118452, at *10 (N.D.N.Y. Feb.17, 2011) (internal citations omitted).[9] While the statute does not define "substantial burden," the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence ... Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007) (citations omitted). The Supreme Court has held that a substantial burden is one that "put [s]

substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 717–718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (cited in *Westchester Day Sch. v. Vill. of Mamaroneck* ).

**\*12** Here, Plaintiff fails to allege enough facts for this Court to determine if he adequately states either a First Amendment and/or RLUIPA claim. His terse, one-paragraph allegation gives no details, such as the duration of the denial of a kosher diet, by which we could evaluate whether he states a claim upon which relief could be granted. *See, e.g., McEachm v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) ("There may be inconveniences [regarding denials of religiously required food] so trivial that they are most properly ignored."); *Tafari v. Annets,* 2008 WL 2413995, at *16 (S.D.N.Y. June 12, 2008) (finding a single meal that was not in accordance with plaintiff's religious dietary needs was a *de minimis* violation insufficient to constitute a violation under the First Amendment). Accordingly, we recommend **dismissal** of Plaintiff's First Amendment and RLUIPA claim **without prejudice** and with **leave to amend** his Complaint to provide this Court with supporting facts that correspond to his claim.

### 4. Conspiracy

Plaintiff alleges that Defendants Gardner, Giglio, Maly, and Smith conspired together to cause legal and personal documents of Plaintiff's to be confiscated and not returned, and that Defendants Mahmud, Moss, and Smith conspired to declare that Plaintiff was "attempting to manipulate the mental health unit to be removed from involuntary protective custody." *See* Compl. at ¶¶ 35 & 56.[10]

To support a conspiracy claim under § 1983, a plaintiff must demonstrate (1) an agreement between two or more state actors or a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002). In addition, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of

misconduct." 🚩 *Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993) (citations, internal quotation marks, and internal alterations omitted).

Additionally, although he does not explicitly assert it in his Complaint, this Court, in consideration of the leniency given to *pro se* litigants, interprets Plaintiff's action as claiming a violation of 🚩 42 U.S.C. § 1985, as well.

The only relevant section of that statute is subsection (3) which states, in pertinent part:

> If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ..., if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**\*13** 🚩 42 U.S.C. § 1985(3).

To recover under this section, a plaintiff must show the existence of (1) a conspiracy (2) meant to deprive a person or persons of the equal protection of the laws or privileges and immunities under the laws with (3) "an overt act in furtherance of the conspiracy[,] (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States[,]" and (5) "some racial or perhaps otherwise class-based, invidious discriminatory animus[.]" 🚩 *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999) (citations omitted). "In this context, 'class-based animus' encompasses only those groups with discrete and

immutable characteristics such as race, national origin, and sex." *Martin v. New York State Dep't. of Corr. Servs.,* 115 F.Supp.2d 307, 316 (N.D.N.Y.2000) (citations omitted).

Thus, to recover damages under 🚩 § 1985, Plaintiff must allege facts from which purposeful discriminatory intent can be inferred. 🚩 *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 390–91, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (cited in *Hill v. Philip Morris USA,* 2004 WL 1065548, at \*4 (S.D.N.Y. May 11, 2004)); *see also* 🚩 *Spencer v. Casavilla,* 903 F.2d 171, 174 (2d Cir.1990) (finding that in order to state a claim under 🚩 § 1985(3), a plaintiff "must allege, *inter alia,* that the defendants who allegedly conspired sought, with *discriminatory intent,* to deprive the plaintiff of a right covered by the Constitution or other laws") (emphasis added).

Plaintiff has failed to state a valid conspiracy claim upon which relief can be granted. In fact, Plaintiff's only states that the Defendants conspired; he provides no other facts, or even circumstances, from which this Court can surmise that any such conspiracy occurred. Additionally, Plaintiff's allegations of racial discriminatory animus against him is conclusory. His only claims regarding his race were that Defendants Fischer, Wolxzyk, and Bezio, subjected Plaintiff to "mental anxiety and depression[ ][t]hrough acts of disparate treatment, discrimination, [and] racism." Compl. at ¶ 68. He provides no other details nor does he relate a discriminatory animus to Defendants Gardner, Giglio, Maly, Smith, Mahmud, or Moss. Therefore, Plaintiff's claims of conspiracy, pursuant to either 🚩 § 1983 or 🚩 § 1985, should be **dismissed.**

### 5. *Retaliation*

Plaintiff states that Defendant Gardner removed Plaintiff from his position as an inmate liaison and placed Plaintiff in SHU under "involuntary protective custody status" in retaliation for complaints he made, and that Defendant Smith [11] petitioned Defendants Fischer and Bezio to transfer Plaintiff to Upstate Correctional Facility in retaliation to the grievances Plaintiff made about Defendants Smith and Knott. Compl. at ¶¶ 45 & 59.

In order to state a valid retaliation claim, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the

protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004)). The required causal connection means, "in other words, that the protected conduct was a 'substantial or motivating factor' in the defendants' decision to take action against the plaintiff." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

**\*14** The Second Circuit has made clear that an inmate has a right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances as guaranteed under the First and Fourteenth Amendments. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (cited in *Dorsey v. Fisher,* 2010 WL 2008966, at \*12 (N.D.N.Y. May 19, 2010)); *see also Colon v. Coughlin,* 58 F.3d 865, 972 (2d Cir.1995) ("Prisoners, like non-prisoners, have a constitutional right ... to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."). Thus, there is no question that Plaintiff's conduct, filing grievances and making "complaints," is protected by the Constitution and satisfies the first prong of a retaliation claim.

Plaintiff's allegations—again, taken as true for the purposes of this Motion—also establish that the Defendants took "adverse action" sufficient to state a valid retaliation claim. He claims that Defendant Gardner placed Plaintiff in SHU in response to complaints he made. An "alleged transfer to SHU in retaliation ... could be considered adverse action." *See Smith v. Hash,* 2006 WL 2806464, at \*6 (N.D.N.Y. Sept.28, 2006). He further claims that Defendant Smith transferred Plaintiff from Shawangunk to Upstate in response to grievances Plaintiff made about Defendant Smith. Compl. at ¶ 59. While "prison officials retain significant flexibility and wide discretion in managing the corrections system and placing inmates appropriately," *Houston v. Goord,* 2009 WL 890658, at \*13 (N.D.N.Y. Mar.31, 2009) (citing N.Y. Corr. L. §§ 23, 72, & 112(1), & *Prins v. Coughlin,* 76 F.3d 504, 507 (2d Cir.1996)), when such a transfer is made purely with a retaliatory motive, a claim of unlawful retaliation under

the First Amendment is established, *see Meriwhether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989).

Lastly, Plaintiff alleges, although tersely, enough to state a causal connection between the protected conduct of filing complaints or grievances and the adverse action of being confined in SHU or transferred between correctional facilities. He claims that Defendant Gardner threatened Plaintiff with an incarceration in SHU, based on the complaints Plaintiff was making, on March 10, 2009, and that he was placed in SHU on March 13, 2009. Compl. at ¶ 45. Plaintiff does not state the dates he filed grievances against Defendants Smith and Knott, but he alleges that those grievances were the direct reason that Defendant Smith petitioned to have Plaintiff transferred to Upstate. *Id.* at ¶ 59. Because of the ease of alleging retaliatory animus and the potential for abuse, courts must approach retaliations claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (internal citations omitted). Nonetheless, Plaintiff's allegations at this stage in the litigation are sufficient to state valid retaliation claims against Defendants Gardner and Smith. To the extent that Defendants' move for this claim to be dismissed, we recommend their Motion be **denied.** [12]

### 6. *Destruction/Confiscation of property*

**\*15** Plaintiff claims that on or about November 30, 2007, Defendants Gardner, Giglio, Maly, and Smith instructed two non-Defendants correctional officers to confiscate Plaintiff's legal and personal documents from his cell. Compl. at ¶ 35.

Reading his Complaint liberally, Plaintiff may be alleging that the Defendants violated his right of access to the courts. The Supreme Court has held that the constitutional right of access to courts entitles plaintiffs to "adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). To establish a *Bounds* violation, a plaintiff must show "actual injury," as *"Bounds* did not create an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 349 & 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Thus, to establish a claim of inadequate access to the courts under *Bounds,* a plaintiff must show " 'that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a

legal claim'—for example, by demonstrating that he has been unable to file a complaint or has had a complaint dismissed for failure to observe a technicality." *Benjamin v. Fraser,* 264 F.3d 175, 184 (2d Cir.2001) (citing *Lewis v. Casey,* 518 U.S. at 351).

Plaintiff fails to meet this burden. He claims only that the confiscation of an affidavit resulted in the dismissal of an unrelated 42 U.S.C. § 1983 claim. This conclusory statement, unsupported with any other details or facts, is not enough to state a claim upon which relief can be given. Thus, to the extent Plaintiff may be claiming that he was denied access to the courts, this claim against Defendants Gardner, Giglio, Maly, and Smith should be **dismissed.**

Plaintiff also claims that Defendants Brand, Sheahan, and Woods "destroyed five bags of personal property that contained: 45 shirts, 1 pair of shoes, 3 sweatpants, 3 sweatshirts, 2 can openers, 13 towels, 5 wash cloths, 2 combs, 1 nail clipper[ ], 2 cream rinse[s], 10 lotions, 3 toothbrushes, 1 toothpaste, 1 electric razor, 2 pair[s] of gloves, 1,000 photographs, 6 bar[s] of soap, 2 knee braces, and 3 pair[s] of sneakers." Compl. at ¶ 61.

"[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York penological system. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *see also Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

**\*16** Because "New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates," *Nash v. McGinnis,* 585 F.Supp.2d 455, 461 (W.D.N.Y.2008) (citing, *inter alia, Koehl v. Dalsheim,* 85 F.3d at 88), we find that Plaintiff's constitutional due process rights were not violated and recommend that the Court **dismiss** this claim.

### C. Unserved Defendants

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). [13] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, dismissing the case without prejudice as to that defendant. *Id.*

In this case, there is no indication that the Defendants named in the Complaint as "Osman Yildiz" and "Sue Ann Smith" have been properly served. *See* Dkt. Nos. 26 & 27, Lt. (indicating that Sullivan Correctional Facility does not have employees named Osman Yildiz or Susan Ann Smith). [14]

Although the courts must afford plaintiffs notice before they may dismiss a claim for failure to serve a defendant, FED. R. CIV. P. 4(m), in this case, because Plaintiff's claims against these Defendants lack merit, granting Plaintiff the opportunity to properly serve them would be futile. Thus, it is recommended that Plaintiff's claims against Defendants Yildiz and Smith be **dismissed.**

Furthermore, Defendant Curtis Drowns is deceased. *See* Dkt. No. 25, Lt. Federal Rule of Civil Procedure 25(a)(1) provides that if a party dies and the claim is not extinguished by the party's death, substitution of the proper party may occur. A motion for substitution may be made by any party, and the motion must be served on the parties as provided in Federal Rule of Civil Procedure 5, and served upon non-parties as one would serve a summons pursuant to Rule 4. FED. R. CIV. P. 25(a)(1). Further, unless a motion for substitution is made within 90 days after the death is "suggested upon the record by service of a statement of the fact of the death as provided [in the rule] for the service of the motion," the action will be dismissed as against the deceased party. *Id.*

2019 WL 539935

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.

Lemuel SMITH, Plaintiffs,

v.

Anthony J. ANNUCCI, Acting Commissioner,
Department of Corrections and Community
Supervision, et al., Defendants.

6:18-cv-06261 EAW

|

Signed 02/11/2019

**Attorneys and Law Firms**

Steven Jay Hyman, Jonathan Robert Jeremias, McLaughlin &
Stern, LLP, New York, NY, for Plaintiffs.

Hillel David Deutsch, NYS Attorney General's Office
Department of Law, Rochester, NY, for Defendants Anthony
J. Annucci, James O'Gorman, Joseph Bellnier.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

 **\*1** Plaintiff Lemuel Smith ("Plaintiff") is an inmate in the
custody of the New York State Department of Corrections and
Community Supervision ("DOCCS"), currently housed at the
Five Points Correctional Facility ("Five Points"). (Dkt. 1 at
¶¶ 2-3). Represented by counsel, Plaintiff alleges that he has
been unlawfully held in "conditions of extreme isolation and
restricted movement for nearly 37 years," first in DOCCS'
Special Housing Unit (the "SHU"), and then, "for the past 22
years, in Administrative Segregation ('Ad Seg') status." (*Id.*
at ¶ 2). Pursuant to 42 U.S.C § 1983, Plaintiff alleges
violations of his Eighth Amendment right to be free from
cruel and unusual punishment and his Fourteenth Amendment
right to due process of law. (*Id.* at ¶¶ 80-100).

Defendants have filed a motion pursuant to Federal Rule
of Civil Procedure 12(b)(6) seeking partial dismissal of
Plaintiff's Complaint. (Dkt. 8). In particular, Defendants seek
dismissal of all of Plaintiff's claims except his procedural due
process claims beginning March 30, 2015. (Dkt. 8-1 at 12).
Defendants further argue that Plaintiff should be limited to
seeking only nominal and punitive damages. (*Id.*). For the

reasons discussed below, Defendants' motion is granted with
respect to Plaintiff's substantive due process claim and as to
his procedural due process claim to the extent it relies on
reviews of his status that occurred before March 30, 2015, and
is denied in all other respects.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I. Factual Background**

The facts underlying Plaintiff's initial commitment to the
SHU and subsequent placement in administrative segregation
are a matter of public record, having been litigated in
numerous courts, and are set forth below to provide context.
As is required at this stage of the proceedings, the Court
has treated Plaintiff's factual allegations set forth in the
Complaint as true.

In May 1981, Plaintiff, who was then serving two 25-
years-to-life sentences for second degree murder, murdered
Corrections Officer Donna Payant at the Green Haven
Correctional Facility ("Green Haven"). *Smith v. Coughlin,
748 F.2d 783, 785 (2d Cir. 1984).* Plaintiff was convicted of
first degree murder in April 1983 and was sentenced to death
in June 1983. *Id.* He was thereafter transferred to the Unit of
Condemned Persons at Green Haven. *Id.* In June 1984, the
New York Court of Appeals ruled that the portion of New
York's death penalty statute pursuant to which Plaintiff had
been sentenced was unconstitutional, vacated Plaintiff's death
sentence, and remanded for resentencing. *People v. Smith,
63 N.Y.2d 41, 79 (1984).* Plaintiff was thereafter sentenced to
life imprisonment. *Smith v. Goord,* 250 A.D.2d 946, 946 (3d
Dep't 1998). The New York State Appellate Division, Third
Department (the "Appellate Division") has explained:

> In addition, following a tier III
> disciplinary hearing, petitioner was
> found guilty of institutional rule
> violations in connection with the
> Payant murder and as a penalty
> received 15 years in the special
> housing unit. In September 1996,
> just prior to the completion of that
> penalty, petitioner was given notice
> of the recommendation that he be
> placed in administrative segregation
> pursuant to 7 NYCRR 301.4.[1]

Smith v. Annucci, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 226 of 482

Following a hearing conducted pursuant to 🚩7 NYCRR 301.4(a) and 🚩7 NYCRR part 254, the recommendation was confirmed and administrative segregation was ordered. That determination was affirmed upon administrative review[.]

**\*2** *Id.* Plaintiff challenged his placement in administrative segregation in state court, and the Appellate Division affirmed DOCCS' decision, finding:

> Deferring to [DOCCS'] unique expertise in predicting inmates' future behavior on the basis of a subjective evaluation of their past conduct, we conclude that the considerable record evidence concerning petitioner's numerous heinous crimes, including his several murder convictions and other acts of brutality toward women, and particularly his murder of a prison employee while housed in a maximum security prison, adequately support the conclusion that petitioner is a sexual predator who cannot be released into the general prison population without posing a serious threat to the life and safety of female employees[.]

*Id.* at 947.

Pursuant to New York State regulation, "[a]n inmate in administrative segregation status shall have such status reviewed every 60 days" by a "three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff." 🚩7 NYCRR § 301.4(d). The committee is instructed to "examine the inmate's institutional record and prepare and submit to the superintendent ... a report setting forth ...: (i) reasons why the inmate was initially determined to be appropriate for administrative segregation; (ii) information on the inmate's subsequent behavior and attitude; and (iii)

any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation." *Id.* Thereafter, the superintendent is to review the committee's report along with "any written statement received from the inmate," and to "make a determination to retain the inmate in or release the inmate from administrative segregation." *Id.* Plaintiff alleges that he has not received meaningful review of his administrative segregation status since it began in 1996, and that instead Defendants have arbitrarily and capriciously predetermined that Plaintiff will stay in administrative segregation status indefinitely. (Dkt. 1 at ¶¶ 95-96).

Plaintiff further alleges that the conditions of his confinement in administrative segregation have been detrimental to his physical and mental health and amount to cruel and unusual punishment. (*Id.* at ¶ 46). In administrative segregation, Plaintiff has limited contact with his family and friends and "no access to group recreation, group education, group prayer, or group meals." (*Id.* at ¶¶ 48-49). Plaintiff is confined by himself to his cell for "23 to 24 hours each day" and, because he must use a wheelchair, "is sedentary nearly 24 hours each day[.]" (*Id.* at ¶¶ 3, 50-51). Plaintiff's cell has one small window which faces a "recreational cage" that adjoins his cell and is accessible through a door. (*Id.* at ¶ 53). Plaintiff's cell was, until recently, located near the "strip cell" where prisoners suffering from mental illness are temporarily held, and Plaintiff was "regularly subjected to [those prisoners'] screaming, outbursts, and banging." (*Id.* at ¶ 55). Plaintiff's physical limitations prevent him from cleaning his own cell, so a porter cleans it each Saturday. (*Id.* at ¶ 56). Plaintiff is given two hours per day of "recreation time," during which he is allowed access to the recreational cage that adjoins his cell. (*Id.* at ¶ 57).

**\*3** From 2013 until approximately April 2017, Plaintiff was allowed one 30-minute monitored phone call per week. (*Id.* at ¶ 58). In April 2017, his phone privileges were reduced to one 15-minute monitored call per week. (*Id.*). Between approximately June 2012 and April 2017, Plaintiff was allowed "out-of-cell time" for a maximum of two hours per week, during which he was placed in a restraint chair and permitted to watch a video. (*Id.* at ¶ 59). Plaintiff's ability to participate in out-of-cell time was terminated in April 2017 without explanation. (*Id.*).

Plaintiff is now 76 years old and his health is poor. (*Id.* at ¶¶ 2, 61). He is confined to a wheelchair and suffers from muscle atrophy in his hands and legs, as well as a

spinal condition. (*Id.* at ¶¶ 61-62). Plaintiff takes more than 19 medications daily and has had surgeries on his neck, elbows, and left foot, and has "great difficulty moving his wheelchair." (*Id.* at ¶ 64). Plaintiff is required to wear a helmet due to seizures, has arthritis in both hands and carpal tunnel syndrome in his wrists, has sores on his body due to his sedentary condition, and requires the use of a back brace. (*Id.* at ¶¶ 65-68). Plaintiff is severely depressed and experiences persistent feelings of hopelessness, along with a lack of concentration and forgetfulness. (*Id.* at ¶ 69).

## II. **Procedural Background**

Plaintiff commenced the instant action on March 30, 2018. (Dkt. 1). Defendants filed their motion to dismiss on May 22, 2018. (Dkt. 8). Plaintiff filed a response in opposition on June 18, 2018 (Dkt. 12), and Defendants filed a reply on June 28, 2018 (Dkt. 13).

### **DISCUSSION**

## I. **Legal Standard**

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff."

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.,* 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 2279 (2017). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft,* 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do." *Twombly,* 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Nielsen v. AECOM Tech. Corp.,* 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly,* 550 U.S. at 555).

## II. **Procedural Due Process Claim**

Plaintiff's third cause of action alleges a violation of his right to procedural due process under the Fourteenth Amendment. (Dkt. 1 at ¶¶ 92-97). In particular, Plaintiff alleges that Defendants have denied him "meaningful and timely periodic reviews of his continued long-term and indefinite detention in Ad Seg, and meaningful notice of what he must do to earn release[.]" (*Id.* at ¶ 93).

**\*4** "To ensure that a state prison facility does not use Ad Seg as a pretext to commit an inmate to the SHU indefinitely, the Due Process Clause of the Fourteenth Amendment mandates that prison officials periodically review whether an inmate continues to pose a threat to the facility." *Proctor v. LeClaire,* 846 F.3d 597, 601 (2d Cir. 2017) ("*Proctor II*"). Accordingly, "[o]nce an inmate has been confined in Ad Seg," it is necessary for prison officials to " 'engage in some sort of periodic review of the confinement' to verify that the inmate 'remains a security risk' throughout his term." *Id.* at 609 (quoting *Hewitt v. Helms,* 459 U.S. 460, 477 n.9 (1983) ). The Second Circuit has explained:

> [M]eaningful periodic reviews of Ad Seg must at least satisfy the following criteria: First, the reviewing prison officials must actually evaluate whether the inmate's continued Ad Seg confinement is justified. It is not sufficient for officials to go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in Ad Seg no matter what the evidence shows. Review with a pre-ordained outcome is tantamount to no review at all. Second, the reviewing officials must evaluate whether the

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 228 of 482

Smith v. Annucci, Not Reported in Fed. Supp. (2019)

justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available.... Third and finally, the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term.

*Id.* at 611 (citation omitted).

Here, Plaintiff alleges that he has been deprived of any meaningful review of his continued confinement in administrative segregation, that Defendants have pre-ordained that he will remain in administrative segregation indefinitely, and that Defendants have failed to take into new relevant information regarding his dangerousness (or lack thereof) as it has become available. As assessed against the standards set forth in *Proctor*, Plaintiff has clearly set forth a viable procedural due process claim.

Defendants do not argue to the contrary. Instead, they seek to limit Plaintiff's procedural due process claim in two ways. First, they argue that Plaintiff's challenge to any reviews occurring before March 30, 2015, is barred by the applicable statute of limitations. Second, they argue that this Court lacks the authority to order Plaintiff released from administrative segregation and that Plaintiff therefore cannot seek compensatory damages for the time he claims to have wrongfully been held in isolation.

The Court agrees with Defendants that Plaintiff cannot maintain his procedural due process claim for any reviews that occurred prior to March 30, 2015. "New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs section 1983 actions in New York." *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997). Plaintiff's Complaint was filed on March 30, 2018 (Dkt. 1), and so any of his claims that accrued prior to March 30, 2015, are time-barred.

Plaintiff argues that his procedural due process claim is timely as to all of his reviews because he has pleaded a continuing violation of his constitutional rights. This argument lacks merit. "The continuing violation doctrine, where applicable, provides an exception to the normal ... accrual date" and "applies to claims composed of a series of separate acts that collectively constitute one unlawful [ ] practice." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quotations omitted). Importantly, the continuing violation doctrine does not apply to "discrete unlawful acts, even where those discrete acts are part of a serial violation[.]" *Id.* (quotation omitted). Instead, it applies "to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Id.* (rejecting application of the continuing violation doctrine to claim by inmate that he had been housed in the SHU without appropriate review).

**\*5** The procedural due process violations complained of by Plaintiff in this case, while arguably part of a serial violation of his constitutional rights, constitute discrete unlawful acts. Plaintiff could have brought a claim for violation of his right to procedural due process each time his administrative segregation was continued. *See Proctor v. LeClaire*, 715 F.3d 402, 416 (2d Cir. 2013) ("*Proctor I*") (noting that, "[i]n theory," an inmate confined to administrative segregation could bring an action after each adverse review, although such seriatim litigation is unlikely in practice). As such, the reviews in question do not constitute a continuing violation, and Plaintiff's procedural due process claim may proceed only as to the reviews that occurred within three years of the filing of his Complaint. *See Gonzalez*, 802 F.3d at 223-24 ("[A] discrete [due process] claim may accrue ... each time that a defendant fails to provide an inmate with the notice, hearing, or evaluation to which he is entitled after a liberty interest attaches. These denials or failures are discrete acts, which may combine to form a 'serial violation.' But / *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ] forecloses the continuing violation doctrine's application to claims of this nature."); *see also J.S. v. Swaha*, No. 11 CIV. 103 (NRB), 2015 WL 10786859, at \*1 (S.D.N.Y. Sept. 11, 2015) ("[A] prison administrator's failure to review an inmate's SHU assignment over a period of time is considered a series of discrete acts.") (quotation omitted); *Cabassa v. Gummerson*, No. 9:01-CV-1039, 2008 WL 4416411, at \*8 (N.D.N.Y. Sept. 24, 2008) (finding the continuing violation doctrine inapplicable to claim that the defendants had retained the plaintiff in administrative segregation for 161 days without meaningful review); *McFadden v. Kralik*, No. 04CIV8135RCCJCF, 2007 WL 924464, at \*7 (S.D.N.Y. Mar. 28, 2007) (finding the continuing violation doctrine inapplicable to the plaintiff's claim regarding a "series of decisions over five years by

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 229 of 482

Smith v. Annucci, Not Reported in Fed. Supp. (2019)

DOCS to keep him in administrative segregation"). The Court therefore grants Defendants' motion to dismiss with respect to Plaintiff's procedural due process claim to the extent it is based on reviews prior to March 30, 2015. [2]

Plaintiff cites *Edmonson v. Coughlin*, 21 F. Supp. 2d 242 (W.D.N.Y. 1998) for the proposition that his procedural due process claims constitute a continuing violation. However, *Edmonson* predates the decision in *Gonzalez*, wherein the Second Circuit expressly found that procedural due process claims of the nature asserted by Plaintiff in this case are not subject to the continuing violation doctrine. Accordingly, *Edmonson* does not change the Court's conclusions.

With respect to available remedies, the Court is not persuaded by Defendants' argument that it lacks authority to order that Plaintiff be released from administrative segregation should this matter ultimately resolve in Plaintiff's favor. While it is true that this Court cannot "review the substance of Defendants' decision to confine [Plaintiff] in Ad Seg" or "substitute [its] judgment for Defendants'" as to *Plaintiff's dangerousness, Proctor II*, 846 F.3d at 608, the Court nevertheless has "considerable authority to effectuate its orders and prevent the continuation of unconstitutional conduct proven in the courtroom[.]" *Blake v. Coughlin*, No. 9:92CV1351, 2006 WL 2270383, at *12 (N.D.N.Y. Aug. 8, 2006) (holding that in order to obtain release from administrative segregation, the plaintiff would have to show that parties before the court had violated his constitutional right to due process); *see also Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991) (holding that an inmate may use civil rights law to "seek[ ] a different program or location or environment ..., even if, as will usually be the case, the program or location or environment he is challenging is more restrictive than the alternative he seeks"). To be clear, the Court is not reaching a finding that release from administrative segregation would necessarily be the appropriate remedy in this case. However, the Court rejects Defendants' argument that it lacks the authority to order that Plaintiff be moved from administrative segregation into a less restrictive environment. Moreover, because Defendants' argument regarding compensatory damages is contingent on its argument that the Court lacks the authority to order Plaintiff released from administrative segregation, it also fails. Accordingly, the Court will not dismiss Plaintiff's request for release from administrative segregation or his claim for compensatory damages at this juncture.

### III. Eighth Amendment Claims

**\*6** Plaintiff's first two causes of action allege violations of his Eighth Amendment right to be free from cruel and unusual punishment. In particular, Plaintiff's first cause of action alleges that his "prolonged isolated confinement" has deprived him of "life's necessities" and caused him "serious psychological pain and serious physical injury." (Dkt 1, ¶¶ 80-88). Plaintiff's second cause of action alleges that his "prolonged isolated confinement" serves "no legitimate penological interest" and thus represents a "disproportionate punishment." (*Id.* at ¶¶ 89-91). Defendants seek dismissal of these claims, arguing that Plaintiff has alleged only that he has been subject to the standard conditions of administrative segregation and that, without more, this is insufficient to support an Eighth Amendment claim. (Dkt. 8-1 at 5-7). For the reasons set forth below, the Court finds that Plaintiff's Eighth Amendment claims are not subject to dismissal at this time.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotations and citations omitted). As the Second Circuit has explained:

> To demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test. First, the plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs. Second, the plaintiff must demonstrate that the defendants imposed those conditions with deliberate indifference.

*Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) (quotations and citations omitted). "The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to 'adequate food,

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 230 of 482

Smith v. Annucci, Not Reported in Fed. Supp. (2019)

clothing, shelter, sanitation, medical care and personal safety.' " *Walker v. Bellnier*, No. 917CV1008GTSCFH, 2017 WL 5135702, at *9 (N.D.N.Y. Nov. 3, 2017) (quoting 🚩 *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978) ).

Courts in this Circuit have held that that as a general rule, "administrative segregation conditions, even though restrictive and harsh, are insufficient to establish Eighth Amendment violations because they are part of the penalty that criminal offenders pay for their offenses against society." *Tavares v. Amato*, 954 F. Supp. 2d 79, 92 (N.D.N.Y. 2013) (quotations and alterations omitted). However, courts are also cognizant that "the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented," including the fact that prolonged solitary confinement "can and does lead to significant psychological harm." 🚩 *Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016). Accordingly, courts have found Eighth Amendment violations where inmates are held in solitary confinement for extended periods of time, such that the effects are "grossly disproportionate" to the reasons for the isolation. *Peoples v. Fischer*, 898 F. Supp. 2d 618, 621 (S.D.N.Y. 2012); *see also Shoatz v. Wetzel*, No. 2:13-CV-0657, 2014 WL 294988, at *2-3 (W.D. Pa. Jan. 27, 2014) (denying motion to dismiss Eighth Amendment claim brought by a plaintiff who had been held in solitary confinement for "over twenty-two consecutive years" because "[t]he duration of Plaintiff's solitary confinement has continued for a sufficient length of time that relief on his Eighth Amendment claim is plausible"); 🚩 *Silverstein v. Fed. Bureau of Prisons*, 704 F. Supp. 2d 1077, 1098 (D. Colo. 2010) (denying motion to dismiss Eighth Amendment claim where the plaintiff, who had murdered two inmates and a corrections officer, had been held in solitary confinement for more than twenty years).

*\*7* Defendants argue that Plaintiff's Eighth Amendment claims must be dismissed because the Court cannot second-guess Defendants' determination that Plaintiff is dangerous and that his prolonged confinement in administrative segregation is therefore penologically justified. The Court is not persuaded. While the initial 1996 determination that Plaintiff should be confined to administrative segregation, which was upheld by the Appellate Division, is unreviewable by this Court, Plaintiff alleges that since that time Defendants have failed to perform a single meaningful review of his status, but have instead pre-ordained that he shall remain in administrative segregation regardless of any new evidence

or changed circumstances. Treating these allegations as true (as the Court must at this stage of the proceedings), Plaintiff has adequately alleged that his long-term isolation has been imposed not for legitimate penological purposes, but solely for the purpose of inflicting harm upon him. Moreover, the Court cannot impermissibly second-guess a determination of dangerousness by Defendants where Defendants have not actually made any such determination but have instead merely gone through the motions to reach a pre-ordained conclusion. In other words, Plaintiff's Eighth Amendment claims are intertwined with his procedural due process claims—if Defendants have failed to provide any meaningful review of Plaintiff's status for more than 20 years but have instead held him in administrative segregation for solely punitive reasons, his right to due process and his right to be free from cruel and unusual punishment are both implicated. On the other hand, if Defendants have appropriately reviewed Plaintiff's status and have reached the conclusion that Plaintiff cannot be released from administrative segregation for reasons of institutional safety, Plaintiff cannot succeed on either of his claims. Accordingly, because the viability of Plaintiff's Eighth Amendment claims turns on issues of fact, Defendants' motion to dismiss these claims is denied.

The Court further finds that, unlike his procedural due process claim, Plaintiff's Eighth Amendment claims state a continuing violation, because they did not accrue until sufficient time had passed to render Plaintiff's continued confinement cruel and unusual. *See Gonzalez*, 802 F.3d at 224 ("An Eighth Amendment claim predicated on SHU confinement ... typically accrues only after an inmate has been confined in the SHU for a prolonged period of time.... [The plaintiff's Eighth Amendment] claim as he has pled it, assuming it otherwise is viable, accrued only after the defendants had confined him in the SHU for some threshold period of time. This renders the continuing violation doctrine applicable."). Accordingly, Plaintiff's Eighth Amendment claims are not time-barred, even with respect to events occurring before March 30, 2015.

Defendants also argue that they are entitled to qualified immunity with respect to Plaintiff's Eighth Amendment claims. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." 🚩 *Reichle v. Howards*, 566 U.S. 658, 664 (2012) "A right is 'clearly established' if it would be clear to a reasonable officer that his conduct

Smith v. Annucci, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 231 of 482

was unlawful in the situation he confronted." *Beckles v. City of N.Y.*, 492 F. App'x 181, 182 (2d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001) ). Here, the Court finds that there are issues of fact regarding Defendants' entitlement to qualified immunity. "Numerous courts have found that long stretches of segregation can constitute cruel and unusual punishment." *Fischer*, 898 F. Supp. 2d at 625-26. If, as Plaintiff alleges, Defendants knowingly confined him in administrative segregation for multiple decades strictly for punitive reasons and without penological justification, the Court cannot conclude, at this stage of the proceedings, that qualified immunity would shield those actions. *See Shoatz v. Wetzel*, No. 2:13-CV-0657, 2016 WL 595337, at * 12 (W.D. Pa. Feb. 12, 2016) (denying motion for summary judgment on Eighth Amendment claims on basis of qualified immunity and noting that "in 1978, the Supreme Court stated that '[c]onfinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards' " (quoting *Hutto v. Finney*, 437 U.S. 678, 685 (1978) ) ).

## IV. Substantive Due Process Claim

Plaintiff's fourth cause of action alleges a violation of his Fourteenth Amendment right to substantive due process, on the basis that Defendants have predetermined he will stay in administrative segregation, thereby "rendering the periodic reviews substantively meaningless." (Dkt. 1 at ¶¶ 98-100). Defendants seek dismissal of this cause of action, arguing that it is "subsumed by the Eighth Amendment claims" and that Plaintiff has "not pled a condition which is arbitrary, conscience-shocking, or oppressive in a constitutional sense as required to state a claim under the Fourteenth Amendment." (Dkt. 8-1 at 5-6) (quotation omitted). For the reasons discussed below, the Court agrees that Plaintiff has failed to plead a viable substantive due process claim.

**\*8** "[W]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." *Kia P. v. McIntyre*, 235 F.3d 749, 757-58 (2d Cir. 2000) (quotations omitted). The only allegedly shocking behavior in this case is Defendants' confinement of Plaintiff in administrative segregation without penological justification. "In other words, what would serve to raise [Defendants'] actions beyond the wrongful to the unconscionable and shocking are facts which, if proven, would constitute, in themselves, specific constitutional violations." *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005). Under these circumstances, Plaintiff's substantive due process claim is "subsumed in [his] more particularized allegations," and subject to dismissal. *Id.*; *see also Proctor v. LeClaire*, No. 909CV1114GLSDEP, 2017 WL 3396538, at *3 (N.D.N.Y. Aug. 8, 2017) (dismissing substantive due process claim based on prolonged confinement in administrative segregation because the plaintiff was "packag[ing] arguments that should be directed at procedural due process and Eighth Amendment claims into a claim based on a violation of substantive due process; simply stated, these assertions do not fit the claim before the court"). The Court grants Defendants' motion to dismiss with respect to Plaintiff's fourth cause of action.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss (Dkt. 8) is granted with respect to Plaintiff's procedural due process claim (Plaintiff's third cause of action) solely to the extent it is based on reviews that occurred prior to March 30, 2015, and with respect to Plaintiff's substantive due process claim (Plaintiff's fourth cause of action) in its entirety. Defendants' motion is denied in all other respects.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 539935

## Footnotes

Smith v. Annucci, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 232 of 482

1   "NYCRR" refers to the New York Codes, Rules and Regulations.

2   For the reasons discussed in section III of this Decision and Order, the Court finds that Plaintiff's Eighth Amendment claims are subject to the continuing violation doctrine and that those claims are contingent on whether, as Plaintiff claims, Defendants pre-ordained that he was to remain in administrative segregation regardless of the outcome of the periodic reviews. Accordingly, while Plaintiff may not seek damages based on any reviews that occurred prior to March 30, 2015, he may nonetheless conduct discovery regarding such reviews and the manner in which they were conducted. *Cf.* *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) (holding that evidence of events that occurred outside the statute of limitations may be admissible where they constitute necessary background information).

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 987122
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Derrick HAMILTON, Plaintiff,

v.

Brian FISHER [1], Commissioner of New York State
Department of Correctional Services, Joseph T. Smith,
Superintendent of Shawangunk Corr., John Maly,
Deputy Shawangunk Corr. Fac., Kay Knott, Deputy
of Shawangunk Corr. Fac., Dennis Giglio, Captain of
Shawangunk Corr. Fac., G. Gardner, Lieutenant of
Shawangunk Corr. Fac., R.K. Woods, Superintendent
of Shawangunk Corr. Fac., M. Sheahan, Deputy
Supt. of Shawangunk Corr. Fac., Sergeant Brand,
Upstate Corr. Fac., Curtis Drowns, Commissioner
Hearing Officer, Norman Bezio, Director of Special
Housing, H. Moss, Sergeant Shawangunk Corr. Fac.,
M. Signorella, Corr. Officer, Shawangunk Corr. Fac.,
D. Forbes, Corr. Officer, Shawangunk Corr. Fac.,
Joe Wolczyk, Commissioner Hearing Officer, Neil
Hochman, Psychologist, Shawangunk Corr. Fac., Susan
Strickland, Mental Health Unit Chief Auburn Corr.
Fac., Osman Yildiz, Social Worker, Sullivan Corr. Fac.,
Sue Ann Smith, Unit Chief, Sullivan Corr. Fac., Doctor
Mahmud, Psychiatrist, Sullivan Corr. Fac., Doreen
Faber, Social Worker, Auburn Corr. Fac., Christopher
P. Mayer, Unit Chief, Auburn Corr. Fac., Defendants.

No. 9:10–CV–1066 (MAD/RFT).
|
March 22, 2012.

**Attorneys and Law Firms**

Derrick Hamilton, New Haven, CT, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of
New York, Cathy Y. Sheehan, Esq., of Counsel, Albany, NY,
for Defendants.

## ORDER

MAE A. D'AGOSTINO, District Judge.

*\*1* In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional and Community Supervision
("DOCCS"), claims that defendants violated his Eighth
Amendment rights, First Amendment rights and Due Process
rights. Additionally, plaintiff alleges that defendants retaliated
against him for filing grievances and conspired against
him. Defendants' moved to dismiss the amended complaint
pursuant to Fed.R.Civ.P. 12(b)(6) (Dkt. No. 47). The motions
were referred to United States Magistrate Judge Randolph
R. Treece for a Report–Recommendation pursuant to 28
U.S.C. § 636(b) (1)(B) and Local Rule 72.3(c). Magistrate
Judge Treece issued a ReportRecommendation (Dkt. No. 52)
recommending that defendants' motion to dismiss be granted
in part and denied in part. [2]

When a party files specific objections to a magistrate judge's
report-recommendation, the district court makes a *"de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." 28 U.S.C. § 636(b)(1). When a party fails to make
specific objections, however, the court reviews the magistrate
judge's report for clear error. *See Farid v. Bouey,* 554
F.Supp.2d 301, 307 (N.D.N.Y.2008); *see also Gamble v.
Barnhart,* No. 02CV1126, 2004 WL 2725126, \*1 (S.D.N.Y.
Nov. 29, 2004) (citations omitted). After the appropriate
review, "the court may accept, reject, or modify, in whole or in
part, the findings or recommendations made by the magistrate
judge." 28 U.S.C. § 636(b)(1).

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

**ORDERED** that:

**1.** Magistrate Judge Treece's Report–Recommendation and
Order is **ADOPTED** for the reasons stated therein.

**2.** The Clerk of the Court shall serve a copy of this Order
and Magistrate Judge Treece's February 29, 2012 Report–
Recommendation and Order on all parties in compliance with
the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 987122

## Footnotes

1    The correct spelling of defendant's name is "Brian Fischer".

2    The Clerk is directed to append Judge Treece's Report–Recommendation to this decision, and familiarity is presumed. (Dkt. No. 52).

---

**End of Document**© 2023 Thomson Reuters. No claim to original U.S. Government Works.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Here, neither Plaintiff nor any Defendant has moved for a motion of substitution. The "rule makes it clear that any party may make a motion for substitution, but as soon as a 'suggestion of death' is filed, the motion for substitution must be made within 90 days." *Withrow v. Taylor,* 2007 WL 3274858, at *2 (N.D.N.Y. Nov.5, 2007) (citing FED. R. CIV. P. 25(a)(1)). There are two affirmative steps required to file a "proper suggestion of death" sufficient to trigger the 90–day time limitation: first, the death must be "formally" suggested "upon the record;" second, the "suggesting party" must serve other parties and non-party successors or representatives of the deceased with a suggestion of death in the same manner as required for service of the motion to substitute. *See id.* at *2–*3 (quoting *George v. United States,* 208 F.R.D. 29, 31 (D.Conn.2001) (internal citations omitted)).

**\*17** In this case, William M. Gonzalez, Esq., Deputy Counsel of the New York State Department of Corrections and Community Supervision ("DOCCS"), filed a letter on April 29, 2011, indicating that Defendant Drowns was deceased. Dkt. No. 25. Plaintiff has not responded nor requested any action from the Court regarding this letter, even though Plaintiff was served with the letter. It is unclear, however, if Attorney Gonzalez or Defendants complied with the requirements for a proper suggestion of death, because there is no indication that the decedent's representative was served. Although technically the Plaintiff's time to move for substitution would not begin to run until a proper suggestion of death is filed, because this Court finds that Plaintiff's claims against Defendant Drowns are meritless and is recommending dismissal, there is no need for substitution of a personal representative.

### D. Personal Involvement

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Furthermore, the doctrine of *respondeat superior* is inapplicable to § 1983 claims. *See Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Thus, a defendant may not be liable for damages simply by virtue of holding a supervisory position. *See, e.g., Black v. Coughlin,* 76 F.3d 72, 74 (2d

Cir.1996). Rather, the personal involvement of a supervisory defendant may be shown when:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873. [15]

Defendants contest that Defendants Bezio and Fischer were not personally involved in any of Plaintiff's alleged constitutional violations, but instead were included by virtue of their supervisory positions only. We agree. Plaintiff alleged that Defendant Bezio and Fischer approved transfers of Plaintiff between correctional facilities and authorized him to be placed in the SHU. Compl. at ¶¶ 59, 61, & 64. Further, on three different occasions, Defendant Bezio reversed the sanctions that hearing officers levied on Plaintiff pursuant to disciplinary hearings. *See* Compl. at ¶¶ 38, 39(b) & 41. These claims are insufficient to state direct participation by the Defendants in any constitutional violation, that the Defendants' policies allowed the continuance of constitutional violations, or that the Defendants were negligent in their supervision of subordinates, besides conclusory statements that they were. Therefore, to the extent supervisory liability is alleged based on any cause of action we recommend proceeding forward, such as excessive force, Plaintiff has failed to allege the personal involvement of any supervisor.

### E. Eleventh Amendment

**\*18**  Plaintiff brings this action against each Defendant in his or her individual and official capacity and seeks both monetary compensation and injunctive relief. Compl. at ¶¶ 89–92.

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although by its terms, the amendment bars suit by citizens of one State against another State, the Supreme Court has held that such amendment similarly bars suits against a State by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the State, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing, *inter alia, Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

In appropriate circumstances, the jurisdictional bar of the Eleventh Amendment may immunize a state official acting in his or her official capacity. *See In re Deposit Ins. Agency,* 482 F.3d 612, 617 (2d Cir.2007) (citation omitted). However, under the doctrine of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a suit may proceed against a state official in his or her official capacity—notwithstanding the Eleventh Amendment—when a plaintiff "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *In re Deposit Ins. Agency,* 482 F.3d at 618 (quotations and citations omitted).

In his Complaint, Plaintiff seeks declaratory relief as well as compensatory damages. It is not clear from this pleading, however, whether by seeking declaratory relief, Plaintiff is in any way seeking prospective relief. Plaintiff also is no longer incarcerated, as he was released from DOCCS custody on November 10, 2009. *See* New York State DOCCS, Inmate Population Information Search, *available at* http://nysdoccslookup.doccs.state.ny.us (last visited February 16, 2012, search for Department Identification Number ("DIN") 93–A–5631); *see also* Dkt. No. 50, Pl. Lt. [16] Therefore, any claim for prospective relief would invariably be denied as moot. *Young v. Coughlin,* 866 F.2d 567, 568 n. 1 (2d Cir.1989) (noting that the prisoner's transfer to another facility renders his claims for declaratory and injunctive relief moot); *Hallett v. New York State Dep't of Corr. Servs.,* 109 F.Supp.2d 190, 196 (S.D.N.Y.2000) (noting that upon plaintiff's release from prison, he was "no longer incarcerated under the supervision of any of the named defendants," thus rendering moot his requests for injunctive and declaratory relief). As such, all claims for relief against all Defendants in their official capacities should be **dismissed** pursuant to the Eleventh Amendment. However, such claims for compensatory damages may be pursued against the Defendants in their individual capacities consistent with the recommendations stated herein.

### F. Qualified Immunity

**\*19**  The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Firzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). The doctrine protects public officials from "personally facing the risk of incurring ruinous liability in the form of money damages, which would deter

2020 WL 4346896
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Angelo D. JOHNSON, Plaintiff,

v.

C. MILLER, et al., Defendants.

9:20-CV-0622 (LEK/ATB)
|
Signed 07/29/2020

**Attorneys and Law Firms**

Angelo D. Johnson, Romulus, NY, pro se.

**DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review a complaint submitted by pro se plaintiff Angelo D. Johnson raising claims pursuant to 42 U.S.C. § 1983. Dkt. No. 2 ("Complaint"). [1] Plaintiff, who is incarcerated at Five Points Correctional Facility ("Five Points C.F."), has not paid the filing fee for this action.

Plaintiff asserts claims against the following defendants: Great Meadow Correctional Facility ("Great Meadow C.F.") Superintendent C. Miller; Great Meadow C.F. First Deputy Superintendent Mrs. McIntosh; Great Meadow C.F. Deputy Superintendent G. Caron; Great Meadow C.F. Assistant Deputy Superintendent M. Collins; Great Meadow C.F. Lieutenant G. Murphy; Great Meadow C.F. Sergeant Gilles; Great Meadow C.F. Correction Officer P. Boule; Great Meadow C.F. Correction Officer Rich; Great Meadow C.F. Correction Officer Papa; Great Meadow C.F. Correction Officer John Doe #1; Great Meadow C.F. Correction Officer John Doe #2; Great Meadow C.F. Correction Officer Jane Doe #3; New York State Department of Corrections and Community Supervision ("DOCCS") Dr. Goe; DOCCS Dr. Karandy; DOCCS Physician Assistant Nesmith; DOCCS Nurse Rocque; DOCCS Nurse Christy; DOCCS Dr. John Morley; DOCCS Regional Health Administrator Mary Tandy-Walters; DOCCS Nurse J. Perez; DOCCS Nurse

Jane Doe; and Five Points C.F. Superintendent Tomas (collectively, "Defendants"). Id. at 1, 3–9.

**II. SUFFICIENCY OF THE COMPLAINT**

**A. Governing Legal Standard**

Under 28 U.S.C. § 1915, when a plaintiff seeks to proceed in forma pauperis, "... the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." § 1915(e)(2)(B). [2] Thus, even if a plaintiff meets the financial criteria to commence an action in forma pauperis, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint before the court permits the plaintiff to proceed with an action in forma pauperis. See id.

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." § 1915A; see also Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (stating that § 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both §§ 1915 and 1915A are available to evaluate prisoner pro se complaints).

**\*2** A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. "Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice." Id. (citing 🔖 Twombly, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " 🔖 Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." 🔖 Iqbal, 556 U.S. at 678 (citing 🔖 Twombly, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. Id. (internal quotation marks and alterations omitted).

In reviewing a pro se complaint, the court has a duty to show liberality toward pro se litigants, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," 🔖 Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted) (emphasis in original).

### B. Summary of the Complaint

Plaintiff alleges that wrongdoing occurred while he was in DOCCS custody, including while he was incarcerated at Great Meadow C.F. and Five Points C.F. See generally Compl. The following facts arising out of Plaintiff's incarceration at these facilities are alleged in Plaintiff's Complaint. [3]

### 1. Plaintiff's Medical Conditions

Plaintiff suffers from a number of medical conditions, including "chronic type 1 and 2 acute migraines," chronic sinus infections, high blood pressure, glaucoma, a corneal defect, rheumatoid arthritis, a severe tear in his shoulder, two pinched and severed nerves in his lower neck and back, tears in his right meniscus, depression, post-traumatic stress disorder, personality disorder, hepatitis C, and seizures. Compl. at 10–11. At unidentified times, Plaintiff has been diagnosed with depression, anxiety, post-traumatic stress disorder, and personality disorder. Id. at 10. Plaintiff has attempted suicide on at least four occasions and was placed

in a mental health hospital for 30 days in 2006 after one such attempt. Id.

### 2. Medical Care at Great Meadow C.F.

Plaintiff was transferred to Great Meadow C.F. on October 29, 2018. Compl. at 15–16. Upon arriving at Great Meadow C.F., Plaintiff was seen by Defendant Rocque for an "initial medical assessment." Id. at 15. Rocque "wantonly stripped ... plaintiff of all his prior necessary ... medication that was [prescribed by] a physician," including pain medication for pinched nerves and medication for migraine headaches, despite "knowing that such actions would subject ... plaintiff to severe pain." Id. at 16. The discontinuation of Plaintiff's medications disregarded "prior recommendations" by specialists. Id. As a result, Plaintiff was in "severe pain" following his arrival at Great Meadow C.F. Id.

On November 1, 2018, Plaintiff was seen by Goe. Id. at 16. During the visit, Plaintiff attempted to explain his medical concerns and "serious chronic issues[,]" but Goe "maliciously ... stated" that Plaintiff has "to[o] many issues" and, "despite ... seeing plaintiff in severe pain and witnessing [his] serious incapacitated condition of limited mobility[,]" failed to order Plaintiff migraine or pain medication. Id. at 16–18.

**\*3** On or about November 16, 2018, Plaintiff was seen by Nesmith. Id. at 17. Nesmith "maliciously and sadistically refused to hear" about Plaintiff's medical conditions and concerns and instead advised Plaintiff that he has to choose "one issue" that he thinks deserves serious attention. Id. Plaintiff then "attempted to voice[ ] his concern" about his migraine medication, but Nesmith cut him off "mid-sentence." Id at 17–18. Following the visit, Plaintiff remained without his previously prescribed medication. Id. at 18.

On or about November 21, 2018, Plaintiff was again seen by Nesmith, who "repeated the same behavior and reckless conduct" by "not rendering ... needed ... medical care and treatment[,]" despite witnessing Plaintiff in "severe" pain and listening to Plaintiff attempt to "speak[ ] about his medical ... issues[.]" Id. at 18.

Plaintiff filed administrative complaints regarding the medical treatment he received in November 2018, including a complaint with the DOCCS Chief Medical Officer, Morley, on November 20, 2018. Id. at 18. Plaintiff also filed a

grievance on November 25, 2018, regarding Goe's inadequate medical treatment. Id.

On or about December 5, 2018, Plaintiff was seen by Karandy. Id. at 19. During the appointment, Karandy "went over all [of] plaintiff's serious chronic medical issues" and "admitted" that he did not "understand" why Plaintiff's migraine medication was discontinued. Id. Karandy also told Plaintiff that he would "immediately ... get [Plaintiff] needed treatment" for his pinched nerves. Id. at 20.

Karandy, however, only ordered a "partial" month supply of Plaintiff's migraine medication, which was not sufficient to treat Plaintiff's medical needs. Id. at 19. In addition, Karandy failed to order pain medication for Plaintiff's pinched nerves and other physical ailments. Id. at 20.

Later that month, Plaintiff filed three sick call slips "for issues of pinch[ed] nerves and right knee [pain]" in which he detailed "how [his] conditions [were] causing severe pain and agony[.]" Id.

On December 14, 2018, Plaintiff "received a detailed response[ ] letter from defendant [Regional Health Services Administrator] Mary Tandy-Walters ... that showed full awareness of plaintiff's situation but deliberately and maliciously failed to remedy plaintiff's underlying conditions[.]" Id. at 23. [4]

On January 11 and January 16, 2019, Plaintiff filed "formal complaint letters" with Miller and DOCCS Commissioner Anthony Annucci, regarding inadequate medical treatment related to his pinched nerves, right knee complications, and "eyecare[.]" Id. at 20. On February 5, 2019, Plaintiff received "a detailed response[ ] letter" from Morley, who "allowed plaintiff's providers to recklessly and maliciously delay[ ] and ... withhold[ ] necessary adequate pain medications [and] depriv[e] [Plaintiff of] needed [physical] therapy[,]" despite knowing about Plaintiff's "serious medical needs." Id. at 24–25.

**\*4** Sometime in January or February 2019, Plaintiff attended his first session with a physical therapist. Id. at 21. The physical therapist advised Plaintiff that he had "placed orders of physical therapy" beginning in early December 2018. Id. However, as a result of Goe and Karandy's failure to follow up on these orders, Plaintiff's physical therapy was delayed. Id.

During Plaintiff's second physical therapy session, which occurred sometime in January or February 2019, the physical therapist advised Plaintiff that he "has a serious condition[,]" explained that his "limited mobility is due to the lack[ ] of treatment and care[,]" and advised that his "severe pain" could only be "eas[ed] by meds and continual adequate therapy[.]" Id. at 21–22.

On or about February 14, 2019, Plaintiff was seen by Goe, who once again denied Plaintiff pain medication for his pinched nerves and right knee, despite witnessing Plaintiff in "a serious chronic painful state[.]" Id. at 22.

On or about February 25, 2019, Plaintiff was transported to Coxsackie Correctional Facility to see an orthopedic specialist regarding his right knee. Id. at 23. The specialist ordered an MRI, but no pain medication or physical therapy. Id.

On or about March 29, 2019, Plaintiff submitted a letter to Karandy regarding inadequate medical care he was receiving for his right knee and pain associated with his pinched nerves. Id. at 25. On or about May 17, 2019, Plaintiff was seen by Goe, who continued to deny him "adequate pain medications" and "treatment" for his "chronic medical conditions[,]" despite again witnessing Plaintiff "in a state of excruciating pain[.]" Id.

In June and July 2019, Plaintiff continued to submit sick call slips for "ongoing severe pain to [his] right knee and two pinch[ed] nerves." Id. at 26. In September 2019, Plaintiff submitted three more sick call slips for "ongoing severe pain that is ... causing great agony mentally." Id.

In October or November 2019, Plaintiff was seen by an orthopedic specialist at Coxsackie Correctional Facility. Id. at 26. During the appointment, Plaintiff received a cortisone shot in his right knee. Id. The specialist told Plaintiff that the shot was typically "only good for 3 to 6 months[,]" and sometimes less, and that he should therefore "let [his] provider know when the pain becomes very severe again[ ] so [he] can receive another shot." Id. The specialist also advised Plaintiff that he had "put in many follow-ups" for further evaluation after Plaintiff had received an MRI. Id.

*3. Use-of-Force Incident at Great Meadow C.F. and Subsequent Restrictive Confinement*

On or about June 17, 2019, while in the recreation yard, Plaintiff became dizzy and passed out. Compl. at 28. When Plaintiff regained consciousness, he was en route to the medical department. Id. Upon arriving at the infirmary, Gilles, Boule, Rich, Papa, Doe #1, Doe #2, and Doe #3 threw Plaintiff on the infirmary table. Id. Gilles then "aggressively question[ed]" Plaintiff and accused him of being "high on K2," a synthetic cannabinoid Id. Plaintiff "respectfully denied" the accusation and attempted to compose himself to avoid having a seizure. Id. at 29.

While Plaintiff's hands and feet were in restraints, Nesmith put a "very harmful concoction on his gloved hands and viciously cover[ed] [Plaintiff's] mouth and nose" while applying pressure. Id. at 29. Simultaneously, Gilles ordered his subordinates to "hold plaintiff's arms and legs down[.]" Id. The substance that Nesmith placed on Plaintiff's mouth caused him "extreme pain[.]" Id.

 *5  After Plaintiff was unsuccessful in his effort to struggle out of the hold, Nesmith "stopped and let up, while laughing[.]" Id. at 30. "Plaintiff immediately start[ed] yelling[,] ... 'they are trying to kill me back here.' " Id. In response, Gilles ordered "the C.O. defendants ... to tighten up the handcuffs[,]" which "caused [Plaintiff's] circulation to be cut[ ] of[f] and extreme pain to [his] hands." Id. Nesmith then "again tried to viciously suff[o]cate ... plaintiff" with the "harmful concoction on his hands." Id.

Eventually, Nesmith removed his hands from Plaintiff's face. Id. at 30. Gilles then ordered the correction officers in the room to lift Plaintiff up and bring him to the second floor of the medical department. Id. at 30. While en route to the second floor, Plaintiff's wrists remained tightly handcuffed and his arms were "maliciously extended backwards[,]" which caused him "excruciating pain." Id. at 31.

Upon arriving at the second floor, Plaintiff was taken to an observation room, and Gilles ordered the other escorting officers to remove Plaintiff's restraints. Id. at 31. After the restraints were removed, Gilles ordered Plaintiff to strip. Id. Plaintiff removed all of his clothes except his underwear then asked Gilles if he would remove all the other officers from the room. Id. Gilles "grew indignant" and ordered the correction officers in the room to assault Plaintiff, which they did. Id.

Following the assault, Plaintiff was placed back in restraints and forced onto a mattress, face down. Id. at 32. One of the officers then removed Plaintiff's underwear and Plaintiff

was held in a compromised position while Gilles conducted a body cavity search. Id. Thereafter, the officials in the room took turns mocking Plaintiff while he remained naked on the mattress. Id. at 32–33. Plaintiff's handcuffs were then tightened at the direction of Gilles, and the officials left the room. Id. at 33.

The next day, Plaintiff was cleared by a medical professional and returned to his cell block, but "unlawfully" placed on "punitive Adseg. keeplock[.]" Id. at 35.

On or about June 23, 2019, Plaintiff attended a disciplinary hearing before Correction Lieutenant Murphy. Id. at 35. Before the hearing began, Murphy encouraged Plaintiff to plead guilty in exchange for a sentence of 60 days of keeplock confinement and advised Plaintiff that, if he did not plead guilty, he would be found guilty and sentenced to more than 60 days of confinement in the special housing unit ("SHU"). Id. Plaintiff refused to plead guilty, and Murphy responded, "have it your way[.]" Id.

Murphy began the hearing by reading Plaintiff's "alleged misbehavior report charges to ... [him]." Id. at 35. Plaintiff objected because he had not been served with a misbehavior report or provided assistance preparing for the hearing. Id. at 35–36. Plaintiff then identified on the record the witnesses he desired to call and cross-examine. Id. at 36. Murphy adjourned the hearing in light of Plaintiff's objection. Id.

On or about July 1, 2019, Plaintiff was brought back to the "hearing room" with Murphy, and the disciplinary hearing resumed. Id. at 36. At some point after the hearing commenced, Murphy ordered an unidentified correction official to escort Plaintiff back to his cell. Id. Plaintiff was removed from the hearing room before he was able to call any witnesses or cross-examine adverse witnesses. Id. Thereafter, Murphy falsely represented on the record that Plaintiff did not want to participate in the hearing. Id. at 37.

 *6  On or about July 9, 2019, Gilles and another unidentified official escorted Plaintiff from his cell to SHU "per his Tier 3 hearing outcome." Id. Plaintiff never received a copy of Murphy's written disciplinary disposition. Id.

After Plaintiff arrived at SHU, he was seen by Rocque and "asked medical questions[.]" Id. at 38. Plaintiff informed Rocque that he did not have any of his "carry on meds for his seizures, high blood pres[s]ure, chronic ... migrains [sic], chronic sinus [issues], [or] glaucoma," and also did not have a

contact case or contact solution. Id. Rocque advised Plaintiff that he would receive his medication later in the day. Id.

Plaintiff's SHU cell was "extremely unduly hot" and had no ventilation. Id. at 38. As a result of the "extreme heat, inadequate ventilation, and ... cigaret[te] smoke that ... flooded plaintiff's cell[,]" he experienced a "serious acute migrain[e]" and "became dizzy." Id. at 39. The next day, Plaintiff suffered a seizure. Id.

Following the seizure, Plaintiff was taken to the medical department at Great Meadow C.F., where Gilles ordered unidentified officials to hold his arms and legs down while Nesmith and Christy "prepare[d] something." Id. at 39. While Plaintiff was held down and in restraints, Nesmith again covered his mouth and nose with "that very very harmful concoction on his hands[,]" which caused Plaintiff's lips to burn "severely." Id.

After "a while," Nesmith stopped covering Plaintiff's mouth. Id. at 39. Christy then "proceeded to do the same" while Gilles repeatedly referred to Plaintiff, an African-American man, as a "monkey." Id.

The next day, Plaintiff was discharged from the medical facility without any treatment for the injury to his lips. Id. at 41. The burn on Plaintiff's lips caused him severe pain for three days, hindering his ability to eat and drink during this time. Id.

Plaintiff was kept in SHU under "inhuman living conditions[,]" forced to shower in "dirty ... stalls" and fed "insufficient food" from "dirty trays[.]" Id. at 41–42. Plaintiff repeatedly complained about the conditions of his confinement to Miller, McIntosh, Collins, and Caron when these officials made their weekly rounds within SHU. Id. at 42. Plaintiff also complained to these officials about his visibly "agonizing state" from the assaults against him, and "inadequate medical treatment" for his physical ailments, yet they failed to remedy "the daily constitutional violations." Id.

On July 15, 2019, Plaintiff received a portion of Murphy's written disciplinary disposition, which indicated that he was sentenced to 75 days of SHU confinement beginning on July 2, 2019, and would lose 120 days of packages, commissary, and telephone privileges. Id. at 42–43. Plaintiff was not credited for the "Adseg confinement" he served between June 17 and July 1, 2019. Id.

Sometime in "late July, 2019," Plaintiff was transported to Coxsackie Correctional Facility, where he was seen by an orthopedic specialist and given a cortisone shot for the "excruciating pain" in his left shoulder that he had experienced daily since June 17, 2019, when he was "brutally assaulted." Id. at 43. Goe and Karandy failed to treat Plaintiff's left shoulder following the assault on June 17, 2019, despite knowing about Plaintiff's medical needs. Id. at 43–44.

*7 Collins and Caron refused to grant Plaintiff "time cuts" provided for in the "reform[ed] SHU laws pass[ed] in 2016." Id. at 43. As a result, Plaintiff served his entire SHU sentence. Id.

### 4. Transfer to Five Points C.F.

On or about January 16, 2020, Plaintiff was told to pack up his property because he was being transferred. Compl. at 44. After Plaintiff packed "four draft bags" of property, an unidentified official ordered him to carry the bags out of his cell. Id. Plaintiff was unable to do so because of his pinched nerves and right knee condition. Id.

While Plaintiff was "in the draft room being processed [for his] transfer[,]" Correction Sergeant Cook told Plaintiff that based on "all the ... complaints" he filed against officers, and his refusal to carry his property bags, he should not be surprised if his property did not make it to the next location. Id. at 44. Thereafter, Plaintiff witnessed officials load inmate property bags onto a transport bus and return his property bags back to the facility. Id.

On January 17, 2020, Plaintiff arrived at Auburn Correctional Facility, where he was incarcerated for five days. Id. at 44. Upon his arrival, Plaintiff was told that his pain medications were lost and the medical department could not do anything for him. Id. Plaintiff was denied a shower, access to hot water, toothpaste, and a tooth brush, and was forced to sleep in a cold cell without "sufficient sheets and blankets." Id. at 44–45.

On or about January 21, 2020, Plaintiff was transferred to Five Points C.F. Id. at 45. Upon arriving at Five Points C.F., Plaintiff was placed in SHU, despite having completed his prior disciplinary sentence on January 16, 2020. Id. at 47. Plaintiff was not initially told why he was confined in the SHU. Id. at 48.

Following his arrival at Five Points C.F., Plaintiff was seen by Nurse Jane Doe for "his initial medical intake." Id. at 45. Plaintiff informed her that his medications and contact solution were lost in transit and detailed his medical conditions that require medication and treatment. Id. Nurse Jane Doe declined to provide Plaintiff with contact solution or any medications. Id. at 45–46.

On or about January 27, 2020, Plaintiff received a written disciplinary disposition based on a disciplinary hearing that occurred at Great Meadow C.F. on January 10, 2020. Id. at 48. The disciplinary hearing was conducted by Collins and resulted in a finding of guilt on one or more of the unidentified disciplinary charges and a sentence of 30 days of SHU confinement. Id. Plaintiff was never given an opportunity to attend this hearing, which was conducted without his knowledge or consent. Id.

On February 9, 2020, another disciplinary hearing was held by Collins at Great Meadow C.F., once again in Plaintiff's absence and without his knowledge or consent. Id. at 48. At the conclusion of the hearing, Collins found Plaintiff guilty of one or more of the unidentified disciplinary charges and sentenced him to 54 days of SHU confinement. Id.

Between January and March, 2020, Plaintiff was denied medical treatment by Perez, which Tomas failed to remedy despite witnessing Plaintiff in severe pain. Id. at 9, 46–47.

### 5. Plaintiff's Claims Based on Events that Occurred at Great Meadow C.F.

**\*8** Liberally construed, the Complaint asserts the following claims based on events that occurred at Great Meadow C.F. against various defendants in their individual and official capacities:[5] (1) Eighth Amendment medical indifference claims against Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Boule, Rich, Papa, Doe #1, Doe #2, Doe #3, Miller, McIntosh, Collins, and Caron; (2) Eighth Amendment excessive force and failure-to-intervene claims against Gilles, Boule, Rich, Papa, Doe #1, Doe #2, Doe #3, Nesmith, and Christy; (3) an Eighth Amendment sexual abuse claim against Gilles, Boule, Rich, Papa, Doe #1, Doe #2, and Doe #3; (4) a Fourth Amendment unlawful search claim against Gilles, Boule, Rich, Papa, Doe #1, Doe #2, and Doe #3; (5) an Eighth Amendment conditions-of-confinement claim against Miller, McIntosh, Collins, and Caron; (6) Fourteenth Amendment due process claims against

Murphy and Collins; and (7) a Fourteenth Amendment equal protection claim against Gilles.[6]

Plaintiff seeks injunctive and monetary relief. Compl. at 49–50. For a complete statement of Plaintiff's claims, reference is made to the Complaint.

### C. Severance and Transfer of Claims Arising at Five Points C.F.

Rule 21 of the Federal Rules of Civil Procedure permits the Court to sever any claim against a party and proceed with that claim separately. Fed. R. Civ. P. 21. In deciding whether to sever a claim, the Court should consider the following:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

Morris v. Northrop Grumman Corp., 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999). "A claim may be severed based upon lack of a significant relationship between defendants or solely for the purpose of facilitating transfer. Where the administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants." Cain v. New York State Bd. of Elections, 630 F. Supp. 221, 225–26 (E.D.N.Y. 1986). "A decision to sever lies within the discretion of the Court." Id. at 225.

Here, the claims arising out of Plaintiff's incarceration at Five Points C.F. are more appropriately heard in the Western District of New York, where that facility is located. See 28 U.S.C. § 112(d).[7] Those claims are separate and distinct from the claims arising out of Plaintiff's incarceration at Great Meadow C.F. and will require different witnesses and documentary proof. The remainder of the factors do not weigh against severance. Thus, pursuant to Fed. R. Civ. P. 21 and

28 U.S.C. § 1404(a),[8] the claims that arose while Plaintiff was incarcerated at Five Points C.F., in the Western District of New York, along with the Defendants associated with those claims, are severed from this action and transferred to the Western District of New York.

**\*9** This District will retain jurisdiction over the claims that arose while Plaintiff was incarcerated at Great Meadow C.F., and the Court therefore reviews the sufficiency of those claims below. The Court takes no position regarding the sufficiency of the claims that have been severed and will be transferred to the Western District of New York, leaving that determination to the Western District of New York.

#### D. Sufficiency of Plaintiff's Remaining Claims

"42 U.S.C. § 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive rights; it provides civil litigants a procedure to redress the deprivation of rights established elsewhere. Id. (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under the color of state law deprived him of a federal right." Id.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a § 1983 Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. See Polk Cty. v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); Wright, 21 F.3d at 501.

Rather, supervisory personnel may be considered "personally involved" in an alleged constitutional violation only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) were grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that a violation was occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[9]

##### 1. Official Capacity Claims

The Eleventh Amendment has long been construed as barring lawsuits against states in federal court, under the fundamental principle of sovereign immunity. U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); Hans v. Louisiana, 134 U.S. 1, 10–21 (1890); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. Gollomp v. Spitzer, 568 F.3d 355, 365–66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through § 1983, see Quern v. Jordan, 440 U.S. 332, 343–45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in Plaintiff's Complaint. See generally Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38–40 (2d Cir. 1977); Dawkins v. State of New York, No. 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. 1996).

**\*10** The Eleventh Amendment bars suits for damages against state officials acting in their official capacities. See Kentucky v. Graham, 473 U.S. 159, 169 (1985) (explaining that a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); Ying Jing Gan v. City of New York, 996 F.2d 522, 529

(2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); Severino v. Negron, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under § 1983] for money damages against state officials in their official capacities.")

Accordingly, to the extent that Plaintiff seeks monetary damages under § 1983 against any named defendant remaining in this action in his or her official capacity, such claims are dismissed with prejudice pursuant to §§ 1915(e) (2)(B) and 1915A(b) as barred by the Eleventh Amendment.

### 2. Medical Indifference Claims

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the Eighth Amendment's protection from the imposition of cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 102, 104 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and that is incompatible with "the evolving standards of decency that mark the progress of a maturing society." Id.; see also Whitley v. Albers, 475 U.S. 312, 319 (1986) (citing Estelle). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle, 429 U.S. at 104). "First, the alleged deprivation must be, in objective terms, sufficiently serious." Chance, 143 F.3d at 702 (internal quotation marks and citations omitted). Addressing the objective element, to prevail, a plaintiff must demonstrate a violation sufficiently serious, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." Hathaway

v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996). "Second, the defendant must act with a sufficiently culpable state of mind." Chance, 143 F.3d at 702 (internal quotation marks and citations omitted). That is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837; see also Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999) (with respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness' ").

Non-medical personnel may be held liable for deliberate indifference to medical needs where a plaintiff demonstrates that the prison personnel intentionally denied or delayed access to medical care or intentionally interfered with medical treatment once it was prescribed. See Banks v. No. 8932 Corr. Officer, No. 11-CV-8359, 2013 WL 673883, at *4 (S.D.N.Y. Feb. 25, 2013) ("A prison guard's deliberate indifference to a serious medical need of a prisoner means intentionally denying or delaying access to medical care or intentionally interfering with medical treatment once it was prescribed."); see also Estelle, 429 U.S. at 104–05 (noting that deliberate indifference may be manifested when prison guards intentionally deny or delay access to medical care).

**\*11** At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, [10] Plaintiff has alleged sufficient facts to warrant a response to his medical indifference claims. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 3. Excessive Force and Failure-to-Intervene Claims

The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." Blyden, 186 F.3d at 262–63 (internal quotations omitted) (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)). [11]

"The Eighth Amendment [also] requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer, 511 U.S. at 832). Law enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. Curley v. Vill. of Suffern, 268 F.3d 65, 72 (2d Cir. 2001); see also Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (prison official's Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers); Terebesi v. Torreso, 764 F.3d 217, 244 (2d Cir. 2014) ("[I]nsofar as the raid plan included the use of substantial and violent force, the plaintiff alleged facts suggesting that every defendant had the opportunity to intervene. Whether some of the defendants were in fact unable to intercede in particular uses of force, either because they were not involved in the planning process, or because of the manner, place, and timing of their deployment in the raid itself, is properly a question for a jury.").

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Eighth Amendment excessive force and failure-to-intervene claims require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 4. Sexual Abuse Claim

"Because sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997). "A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." Crawford v. Cuomo, 796 F.3d 252, 256–57 (2d Cir. 2015).

**\*12** Once again mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed,

the Court finds that Plaintiff's Eighth Amendment sexual abuse claim also requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 5. Unlawful Search Claim

The Supreme Court has upheld the practice of conducting visual body-cavity searches of pre-trial detainees following contact visits, finding that the Fourth Amendment does not require probable cause for correction officials to conduct such searches; instead, such searches are subject to a reasonableness standard. Bell v. Wolfish, 441 U.S. 520, 558–60 (1979); see also Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 330 (2012) (holding that arrestees who are committed to the general population of a detention center may be subject to a close visual inspection while undressed). The Second Circuit and district courts within the Circuit have also upheld routine random strip searches, including body-cavity inspections, performed on prison inmates. See Covino v. Patrissi, 967 F.2d 73, 76–80 (2d Cir. 1992); see also Hurley v. Ward, 584 F.2d 609, 612 (2d Cir. 1978) (reversing portion of injunction prohibiting strip searches of prison inmates); Castro-Sanchez v. N.Y. State Dep't of Corr. Servs., No. 10-CV-8314, 2011 WL 6057837, at *9 (S.D.N.Y. Dec. 6, 2011) ("Routine random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment."). Assessing the reasonableness of a strip search "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 559.

An inmate bears the burden of showing that a search was unreasonable, Shabazz v. Pico, 994 F. Supp. 460, 473 (S.D.N.Y. 1998), so at the pleading stage, a plaintiff must "plead facts sufficient to give rise to a plausible inference" that the search he challenges was unreasonable under the standards described above. Simmons v. Cripps, No. 12-CV-1061, 2013 WL 1290268, at *21 (S.D.N.Y. Feb. 15, 2013), report and recommendation adopted by 2013 WL 1285417 (S.D.N.Y. Mar. 28, 2013).

At this very early stage of the proceeding, the Court finds that Plaintiff has alleged sufficient facts to warrant a response to his Fourth Amendment unlawful search claim. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 6. Conditions-of-Confinement Claims

The Second Circuit, in addressing the rights protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom. Bell, 441 U.S. 520; Lareau v. Manson, 651 F.2d 96, 106 (2d Cir. 1981). To demonstrate that conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element. See Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir. 1985); see also Jolly, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference." Wilson v. Seiter, 501 U.S. 294, 303–04 (1991).

**\*13** "When a plaintiff alleges multiple unconstitutional conditions of confinement, the court may aggregate the effect of all of the conditions, 'but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (quoting Wilson, 501 U.S. at 304). "Each condition 'must be measured by its severity and duration, not the resulting injury,' and the conditions are not subject to 'a bright-line durational or severity threshold.' " Van Hoven v. City of New York, No. 16-CV-2080, 2018 WL 5914858, at \*7 (S.D.N.Y. Aug. 21, 2018) (quoting Darnell v. Pineiro, 849 F.3d 17, 32 (2d Cir. 2017)), report and recommendation adopted by 2018 WL 4417842 (S.D.N.Y. Sept. 17, 2018).

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Eighth Amendment conditions-of-confinement claims require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 7. Due Process Claims

To successfully state a claim under § 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. Shakur v. Selsky, 391 F.3d 106, 118 (2d Cir. 2004) (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under Sandin. The Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under Sandin. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citing Sealey v. Giltner, 197 F.3d 578, 589–90 (2d Cir. 1999)). [12] The "atypicality" inquiry under Sandin is normally a question of law. Colon, 215 F.3d at 230–31; Sealey, 197 F.3d at 585. In making that determination, the Court must consider the specific circumstances of the confinement, including both the duration and the conditions thereof. Id.

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include: advance written notice of the charges; a fair and impartial hearing officer; a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence; and a written statement of the evidence upon which the hearing officer relied in making his determination. Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citing

Wolff v. McDonnell, 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." Id. (citing Superintendent v. Hill, 472 U.S. 445, 455 (1985)).

**\*14** Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Fourteenth Amendment due process claims require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 8. Equal Protection Claim

The Equal Protection Clause requires that the government treat all similarly situated people alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (quoting LeClair v. Saunders, 627 F.2d 606, 609–10 (2d Cir. 1980)). To state a viable claim for denial of equal protection, a plaintiff generally must allege "purposeful discrimination ... directed at an identifiable or suspect class." Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a "class of one" theory, a plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); DeMuria v. Hawkes, 328 F.3d 704, 706 (2d Cir. 2003).

"[V]erbal harassment or profanity alone, unaccompanied by an injury[,] no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." Moncrieffe v. Witbeck, No. 97-CV-253, 2000 WL 949457, at \*3 (N.D.N.Y. June 29, 2000) (quoting Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998)). Additionally, "threats do not

amount to violations of constitutional rights." Id. (quoting Malsh v. Austin, 901 F. Supp. 757, 763 (S.D.N.Y. 1995)).

However, "[c]ourts in this circuit and elsewhere have held that officers' use of racial epithets may be regarded as direct evidence of racial animus and, when combined with physical abuse or other unlawful actions, may establish an equal protection violation." Ali v. Connick, 136 F. Supp. 3d 270, 280 (E.D.N.Y. 2015); see also Cole v. Fischer, 379 F. App'x 40, 43 (2d Cir. 2010) ("When the verbal harassment and simultaneous physical abuse alleged in the amended complaint are considered together, we have little trouble concluding that plaintiff's allegations were sufficient to state a § 1983 claim for discrimination on the basis of race and religion."); cf. Abuhouran v. Acker, No. 04-CV-2265, 2005 WL 1532496, at \*4–5 (E.D. Pa. June 29, 2005) (denying dismissal of an Equal Protection claim where an Arab-American inmate alleged that the defendant officer mocked the plaintiff because of his "name, accent, and religion," called him "a little terrorist," and subjected him to harassing conduct and unfavorable treatment).

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that Plaintiff's Fourteenth Amendment equal protection claim against Gilles requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### III. CONCLUSION

**\*15** Accordingly, it is hereby:

**ORDERED**, that the claims arising out of Plaintiff's confinement at Five Points Correctional Facility are severed and transferred to the Western District of New York; and it is further

**ORDERED**, that the Clerk shall advise the Clerk of the Western District of New York, in writing, of the entry of this Order and provide that Clerk with all information necessary for the Western District Clerk to electronically access the documents filed in this action; and it is further

**ORDERED**, that Defendants Perez, Tomas, and Nurse Jane Doe are **TERMINATED** from this action; and it is further

**ORDERED**, that the following claims asserted against the defendants remaining in the action before this Court in

their individual capacities **SURVIVE** sua sponte review and require a response: (1) Plaintiff's Eighth Amendment medical indifference claims against Defendants Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer Papa, Correction Officer John Doe #1, Correction Officer John Doe #2, Correction Officer Jane Doe #3, Miller, McIntosh, Collins, and Caron; (2) Plaintiff's Eighth Amendment excessive force and failure-to-intervene claims against Defendants Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer Papa, Correction Officer John Doe #1, Correction Officer John Doe #2, Correction Officer Jane Doe #3, Nesmith, and Christy; (3) Plaintiff's Eighth Amendment sexual abuse claim against Defendants Gilles, Boule, Rich, Papa, John Doe #1, John Doe #2, and Jane Doe #3; (4) Plaintiff's Fourth Amendment unlawful search claim against Defendants Gilles, Boule, Rich, Papa, John Doe #1, John Doe #2, and Jane Doe #3; (5) Plaintiff's Eighth Amendment conditions-of-confinement claim against Defendants Miller, McIntosh, Collins, and Caron; (6) Plaintiff's Fourteenth Amendment due process claims against Defendants Murphy and Collins; and (7) Plaintiff's Fourteenth Amendment equal protection claim against Defendant Gilles; and it is further

**ORDERED**, that Plaintiff's official capacity claims against the defendants remaining in the action before this Court are **DISMISSED with prejudice** pursuant to 🚩 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) as barred by the Eleventh Amendment and for failure to state a claim upon which relief may be granted; [13] and it is further

**ORDERED**, that upon receipt from Plaintiff of the documents required for service, the Clerk shall issue summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon Defendants Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer Papa, Miller, McIntosh, Collins, and Caron. [14] The Clerk shall also forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

*\*16* **ORDERED**, that Defendants Goe, Karandy, Nesmith, Rocque, Christy, Morley, Tandy-Walters, Gilles, Correction Officer Boule, Correction Officer Rich, Correction Officer Papa, Miller, McIntosh, Collins, and Caron, or their counsel, respond to the Complaint as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that Plaintiff must take reasonable steps to ascertain the identities of Defendants Correction Officer John Doe #1, Correction Officer John Doe #2, and Correction Officer Jane Doe #3 and, when identified, seek to amend the Complaint to add these individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a); and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; Plaintiff's failure to do so will result in the dismissal of this action**; and it is further

**ORDERED**, that the Clerk serve a copy of this Decision and Order on Plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 4346896

**Footnotes**

KeyCite Yellow Flag - Negative Treatment

On Reconsideration in Part   Peoples v. Fischer,   S.D.N.Y.,   June 26, 2012

2012 WL 1575302

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Leroy PEOPLES, Plaintiff,

v.

Brian FISCHER, Lucien Leclaire, Jr., Docs Office
of Counsel, William Lee, Peter A. Crusco, Eric C.
Rosenbaum, Richard A. Brown, Lt. L. Ward, Sgt.,
O'Connor, Co. Malare, Co. Drown, Norman Bezio,
D. Rock, Lt. Ward, and Karen Bellamy, Defendants.

No. 11 Civ. 2694(SAS).

|

May 3, 2012.

**Attorneys and Law Firms**

LeRoy Peoples, Attica, NY, pro se.

Jeb Harben, Assistant Attorney General, New York, NY, for
Defendants.

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

**\*1** Leroy Peoples, proceeding pro se, brings this action
against, *inter alia:* Brian Fischer, Commissioner of the New
York State Department of Correctional Services ("DOCS");
Lucien J. Leclaire Jr., Deputy Commissioner of DOCS;
Office of Counsel for DOCS; William Lee, Superintendent
of the Green Haven Correctional Facility ("Green Haven");
Richard Ward, a Green Haven Lieutenant; Sergeant K.
O'Connor; Green Haven Correction Officers ("C.O.s") Curtis
Drown and Malare, Norman Bezio, Director of the Special
Housing Unit ("SHU"); David Rock, Superintendent of
the Upstate Correctional Facility ("Upstate"); and Karen
Bellamy, Director of the Inmate Grievance Program ("IGP"),
Central Office Review Committee ("CORC") (collectively,
the "defendants"). [1]

Peoples seeks compensatory and punitive damages and
injunctive relief pursuant to section 1983 of Title 42 of the
United States Code (" section 1983"). Peoples alleges that
defendants deprived him of rights and privileges secured by
the First, Fourth, Sixth, Eighth, and Fourteenth Amendments
to the United States Constitution. Specifically, plaintiff brings
the following claims: a Fourth Amendment claim resulting
from a pat frisk and subsequent search of his prison cell;
an Eighth Amendment cruel and unusual punishment claim
resulting from his three-year sentence to SHU confinement;
an Eighth Amendment claim regarding his altercation with a
fellow inmate; a Fourteenth Amendment due process claim
arising in connection with his disciplinary hearing; and a
right of access to the courts claim under the First and Sixth
Amendments.

Defendants now move to dismiss Peoples' remaining claims
pursuant to Federal Rule of Civil Procedure 12(b)(1) and
12(b)(6) on the following grounds: (1) failure to state a claim;
(2) failure to exhaust administrative remedies; (3) lack of
personal involvement; (4) Eleventh Amendment immunity;
and (5) qualified immunity. For the reasons discussed herein,
defendants' motion is granted in part and denied in part.

## II. BACKGROUND [2]

Peoples is currently an inmate at Upstate and was previously
an inmate at Green Haven. [3] On October 5, 2009, while
Peoples was at Green Haven, Sergeant O'Connor and CO.
Malare approached him while he was at his industry work
program and performed a pat and frisk search. [4] Peoples
was then escorted to his cell, F–Block 150, where O'Connor
and Malare searched his cell. [5] Peoples alleges that certain
papers were seized and that his personal mail, legal mail,
family photos, clothing and other miscellaneous property was
scattered all over his cell. [6]

Peoples was immediately taken to the SHU. [7] The next
day, October 6, 2009, Peoples was served with the Inmate
Misbehavior Report (the "Report"), which alleged that he
violated rules 107.21 [8] and 113.30 [9] of the Standards of
Inmate Behavior rule book . [10] The Report further states that
on October 5, 2009, prior to the search, CO. O'Connor was
given a packet of papers sent from the Queens County District
Attorneys Office. [11] The cover letter with the materials
identified the papers as "U.C.C. [and] other financial claims

that are bogus [and] without legal basis." [12] The Report states that the subsequent search of Peoples' cell "produced approx[imately] 148 documents which all also appear to violate the above referenced charges." [13]

**\*2** On October 13, 2009, a misbehavior report hearing was conducted. [14] Peoples alleges that he was walked through the "normal formalities of a hearing." [15] At the end of the hearing, Peoples was sentenced to three years confinement in the SHU, a three-year loss of phone, package and commissary privileges, and seventy-two months recommended loss of good time credit. [16]

Peoples appealed the hearing disposition to SHU Director Bezio who denied his appeal. [17] In November of 2009, while still confined in the SHU and under Superintendent Rock's watch, Peoples was involved in a fist fight with fellow inmate Larry Allen and lost a tooth. [18] In April 2010, Peoples drafted an Article 78 motion addressing some of the issues raised in the instant Complaint. Upon his return from Court, however, the Article 78 motion was confiscated by corrections officers acting under Rock's orders. [19]

On March 7, 2011, Peoples filed a grievance in connection with alleged violations of his constitutional rights. [20] The grievance referenced violations of various Constitutional amendments including the First, Sixth, and Fourteenth Amendments. [21] Peoples complained about the addition of rules 107.21 and 113.30 of the Standards of Inmate Behavior rule book and complained that he was affected by these rules by being placed in the SHU for three years along with three years of lost phone, package and commissary privileges. [22]

On March 9, 2011, Peoples received a response from the Inmate Grievance Review Committee ("IGRC") and simultaneously appealed to the Superintendent of DOCS. [23] On March 15, 2011, Superintendent Rock responded to Peoples' appeal. [24] Two days later, on March 17, 2011, Peoples appealed to the CORC. [25] On April 18, 2011, Peoples commenced the instant action. On June 8, 2011, he received a response from the CORC. [26]

Peoples generally suffers from "stress, fear ... depression and other psychological impacts" which are side effects from his confinement in the SHU, which he has described as "psychological torture." [27] Peoples alleges that Superintendent Rock was personally involved by continuously and unlawfully confining Peoples in the SHU, upholding the CORC's determination of Peoples' appeal, and being in a supervisory role at the time Peoples was involved in a fist fight with Allen. [28] Similarly, Peoples alleges that Bellamy, the Director of the CORC, was personally involved by virtue of upholding the rules that Peoples challenged, suppressing Peoples' "communication, forbidding access to the court and law books, [and] authorizing the seizure" of Peoples and his papers. [29] SHU Director Bezio was alleged to be personally involved when he "affirmed and confirmed the disposition of unlawful confinement and revoked privileges" in violation of the aforementioned constitutional amendments. [30]

Peoples alleges that Lieutenant Ward was personally involved because he authorized the seizure of Peoples and his papers as well as his unlawful confinement in the SHU. [31] C.O. Drown's alleged personal involvement arises from sentencing Peoples to three years in the SHU with loss of privileges and loss of good time credit. [32]

**\*3** Peoples alleges that Fischer was personally involved because he facilitated the enactment of the rules that Peoples was accused of violating. [33] Peoples also claims that after Fischer learned of the violations of Peoples' constitutional rights, he failed to remedy the situation. [34] Fischer allegedly created the "policy procedure, or custom which violated the constitutional rights and allowed [it] to continue." [35] Similarly, Deputy Commissioner Leclaire's involvement was based on the preparation of the July 24, 2009 memorandum advising Superintendents Lee and Rock of the addition of rules 107.21 and 113.30. [36]

Superintendent Lee's only involvement seems to be that he received the package of materials from the District Attorneys's office and sent them to C.O. O'Connor, which precipitated the search of Peoples' cell. [37] CO. O'Connor's personal involvement in this action was limited to the search he performed of Peoples' cell and the subsequent preparation of the Report. [38]

### III. LEGAL STANDARDS

#### A. Motion to Dismiss Under Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor."[39] The court then evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal.*[40] *First,* a court " 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.' "[41] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss.[42] *Second,* "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[43] To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[44] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[45] Plausibility "is not akin to a probability requirement," rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[46]

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[47] However, the court may also consider a document that is not incorporated by reference, "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[48] A court may also take judicial notice of "the status of other lawsuits in other courts and the substance of papers filed in those actions."[49]

**\*4** Where the plaintiff is proceeding pro se, his pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers,"[50] and must be "interpret[ed] ... to raise the strongest arguments they suggest."[51] These same principles apply to briefs and opposition papers submitted by pro se litigants.[52] Notwithstanding liberal treatment of their pleadings, pro se status does not relieve a plaintiff from satisfying the pleading requirements set forth above.[53]

**B. Leave to Amend the Complaint**

Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint should be "freely given when justice so requires."[54] A court should not dismiss a pro se complaint for failure to state a claim "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[55] However, "it is well established that leave to amend a complaint need not be granted when amendment would be futile."[56]

## IV. APPLICABLE LAW

### A. Section 1983

Section 1983 states, in relevant part, that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...[57]

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[58] "The purpose of [section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."[59]

### 1. Personal Involvement

In 1995, the Second Circuit held that the personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being

informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicated that unconstitutional acts were occurring. [60]

However, in 2009, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... [Section] 1983 suits, a plaintiff must [prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." [61] "Accordingly only the first and third Colon factors have survived the Supreme Court's decision in *Iqbal.*" [62]

### B. Exhaustion of Remedies

**\*5** The Prison Litigation Reform Act ("PLRA"), provides that "[n]o action shall be brought with respect to prison conditions under 🏳 section 1983 of this title, or any other Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." [63] This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [64]

The requirement to exhaust available remedies, "refer[s] to the procedural means, not the particular relief ordered," since "one 'exhausts' processes, not forms of relief." [65] While exhaustion is a prerequisite to suit, the "PLRA exhaustion requirement is not jurisdictional." [66]

DOCS has a well established inmate grievance resolution process. To exhaust their administrative remedies, inmates must complete all three steps. Inmates must: "(1) file a grievance with the [Inmate Grievance Resolution Committee ("IGRC") ] ...; (2) appeal to the superintendent within four working days of receiving the IGRC's written response ...; and (3) appeal to the CORC in Albany, New York within four working days of receipt of the superintendent's written response." [67] The CORC then has thirty days to review the appeal and render a decision on the grievance. [68]

Additionally, the Second Circuit has held that "the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." [69] As noted by the Second Circuit, "[u]ncounselled inmates navigating prison administrative procedures without assistance cannot be expected to satisfy a standard more stringent than that of notice pleading." [70] The "PLRA's exhaustion requirement ... require[s] that prison officials be 'afford[ed] ... time and opportunity to address complaints internally.'" [71] "In order to exhaust ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." [72]

An appeal is not exhausted until an inmate appeals to the CORC and receives a final decision regarding his grievance. [73] The Second Circuit, however, has recognized that in some situations a prisoner who has failed to fully exhaust administrative remedies may survive a motion to dismiss. In *Hemphill v. New York,* [74] the Second Circuit announced a three-part inquiry "appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA." In examining a complaint the court should determine:

> [*First,*] whether administrative remedies were in fact 'available' to the prisoner. [*Second* ], ... whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. [*Third* ], [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements. [75]

**\*6** As noted by the Second Circuit in *Hemphill,* where an inmate does not receive a response to a grievance, there may be a question as to whether further administrative remedies are available. [76] As noted by the Supreme Court "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's

critical procedural rules." [77]  When a prisoner "complie[s] with all of the administrative requirements and ma[kes] a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has ... neglected ... to issue a final administrative determination." [78]

### C. Favorable Termination Rule

The favorable termination rule provides that a section 1983 plaintiff who brings a claim that would implicate the validity of his conviction or sentence, must first prove that the conviction or sentence was vacated or reversed. [79]  However, this rule does not bar prisoners from bringing section 1983 claims with respect to the conditions of their confinement that do not implicate the validity of their underlying sentence. When a section 1983 claim is made, the court must:

> consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed. [80]

A section 1983 claim implicating the deprivation of good-time credits can be brought only if the good-time credit sanction has been invalidated. [81]  However, in this Circuit, a prisoner who receives mixed sanctions affecting both the duration and conditions of confinement at a prison disciplinary hearing can proceed to challenge those sanctions, as long as the inmate agrees to waive any challenge to the sanction affecting the length of his confinement. [82]

### D. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and officials acting in their official capacity from suit under section 1983. [83]  Generally, a suit may "not be maintained directly against the State itself, or against an agency or department of the State, unless the State has waived its sovereign immunity." [84]  " '[It] does not protect [an official]

from personal liability if ... sued in his 'individual' or 'personal' capacity.' " [85]

### E. Qualified Immunity

Agency officials performing discretionary functions are generally granted qualified immunity and are immune from suit provided that " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " [86]  The Second Circuit has held that "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." [87]

**\*7** To prevail on a motion to dismiss claiming qualified immunity "[n]ot only must the facts supporting the defense appear on the face of the complaint, but as with all Rule 12(b)(6) motions ... the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." [88]

### F. Access to the Courts

"[P]risoners have a constitutional right of access to the courts" that is "adequate, effective, and meaningful." [89]  To establish a constitutional violation based on denial of access to the courts, a plaintiff must show "actual injury." [90]  "[A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." [91]  *Bounds v. Smith* does not "guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." [92]  Meaningful access requires that inmates be provided the tools they need "in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." [93]  The "[i]mpairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." [94]

### G. Procedural Due Process

In order to maintain a due process claim with respect to a prisoner's disciplinary proceeding, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the

defendant(s) deprived him of that interest as a result of insufficient process." [95] A prisoner can only establish a due process claim in connection with prison disciplinary proceedings resulting in segregative confinement or loss of privileges by demonstrating that the sanctions "impose[d] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." [96] "The duration of SHU confinement is a relevant, but not the only, factor with respect to whether such confinement is 'atypical.' " [97] "Generally, periods of confinement in SHU lasting fewer than 101 days have been found not to amount to atypical and significant hardship." [98] The Second Circuit has held that confinement in the SHU for a period of 305 days, without anything more, satisfies the *Sandin* standard of atypical and significant hardship. [99]

With respect to process, "[f]or a prison disciplinary proceeding to provide due process there must be, among other things, 'some evidence' to support the sanction imposed." [100] Additionally, "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." [101]

### H. Fourth Amendment Right to Be Free from Unreasonable Search and Seizure

"While persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights." [102] "These constraints on inmates, and in some cases the complete withdrawal of certain rights, are 'justified by the considerations underlying our penal system.' " [103] "The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of 'institutional needs and objectives' of prison facilities ... chief among which is internal security." [104] In fact, the Supreme Court has repeatedly "confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.' " [105] "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." [106]

### I. Eighth Amendment Violations

**\*8** "[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." [107] However, not

every incident causing injury "translates into constitutional liability for prison officials responsible for the victim's safety." [108] Thus, a plaintiff alleging a violation of the Eighth Amendment is required to establish two elements. *First,* that he is incarcerated under conditions posing a substantial risk of serious harm. [109] *Second,* that the prison officials had a sufficiently culpable state of mind, or at the very least that they were deliberately indifferent. [110] The first element is objective while the second element is subjective. The Supreme Court has held that to demonstrate deliberate indifference, an official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." [111]

## V. DISCUSSION

### A. Access to the Courts

Peoples' claim that his right of access to the courts was violated is dismissed. Peoples has failed to allege that he was denied tools needed to attack his sentence directly or collaterally, which is the right he is constitutionally guaranteed. [112] Peoples alleged that defendants actions violated his right to instigate a special court proceeding under the Uniform Commercial Code for commercial purposes. [113] However, the right to institute such proceedings is not the type of meaningful access to the courts that is protected. [114] As Peoples has failed to allege that he has been deprived of the right of meaningful access to the courts and that he suffered actual injury, this claim is dismissed.

### B. Fourth Amendment Claims

Peoples' claims relating to alleged violations of his Fourth Amendment rights to be free from unreasonable searches and seizures are similarly dismissed. Peoples has not pled factual allegations that allow this Court to find that the pat frisk search or the search of Peoples' cell were not reasonably related to legitimate penological interests. As a result, Peoples' claims arising from the alleged violations of his Fourth Amendment rights are dismissed.

### C. Fourteenth Amendment Claims

Defendants have argued that Peoples' due process claim is barred because of the favorable termination rule, which

provides that a prisoner cannot bring a 📁 section 1983 claim if a judgment in his favor would imply the invalidity of his conviction or sentence, unless the "conviction or sentence has been reversed." [115] This rule applies to Peoples' challenge to his loss of good time credit. [116] Thus, Peoples' due process claim can only proceed if he agrees to waive any challenge to any sanction affecting the length of his confinement, including the loss of good time credit. [117]

Peoples has adequately pled a protected liberty interest, [118] and that he was deprived of his liberty as a result of insufficient process in that there is no evidence to support the sanction of three years in the SHU. However, Peoples has not waived any challenge to the loss of his good time credit. If he were to waive the challenge to the loss of good time credit, Peoples' due process claim could proceed as it would no longer implicate the length of his underlying criminal conviction. Accordingly, until Peoples waives his challenge to the loss of good time credit, his due process claim is dismissed.

### D. Eighth Amendment Claims

**\*9** Peoples' Eighth Amendment claim is dismissed to the extent it is based on his altercation with Larry Allen. Peoples has not alleged any facts that would allow this Court to infer that the prison officials acted with deliberate indifference, in connection with this altercation. [119]

However, Peoples states a viable Eighth Amendment claim based on his three-year sentence in the SHU. As previously discussed, three years in the SHU is an extraordinary amount of time. Construing the allegations in Peoples' Complaint liberally, Peoples has adequately pled that he was incarcerated under conditions that pose a substantial risk of harm. Additionally, Peoples' allegations that the defendants were deliberately indifferent is plausible given the length of his confinement in the SHU. Accordingly, Peoples' Eighth Amendment claim in connection with his sentence of three years confinement in the SHU, together with the other loss of privileges, may proceed.

### E. Exhaustion of Remedies

Defendants' argument that plaintiff has failed to exhaust his administrative remedies fails. [120] Peoples complied with all of the DOCS's procedural rules, thereby giving DOCS a fair opportunity to consider his grievance. [121] Peoples made his

final appeal to the CORC on March 17, 2011. [122] Pursuant to New York State Regulations, the CORC had thirty days to respond. [123] The final denial of his appeal was issued on June 8, 2011. [124] Had the CORC timely provided a response to Peoples' appeal, he would have received a response prior to filing the instant action. Defendants do not contest this fact. Peoples complied with the administrative requirements and made a good faith effort to exhaust. The CORC's failure to timely respond does not bar his claim. [125] Moreover, the CORC has since denied his appeal. [126] Thus, Peoples' claim relating to his three-year confinement in the SHU is deemed to be fully exhausted. [127]

### F. Personal Involvement

Peoples' surviving Eighth Amendment claim must be dismissed as to Fischer, Leclaire, Lee, O'Connor and Bellamy as their personal involvement in unlawfully confining him to the SHU has not been adequately alleged. However, Peoples' claim against Ward, Bezio and Rock, remains as he has pled that these defendants were personally involved. [128]

### G. Eleventh Amendment Immunity

Peoples' claims against the Office of Counsel for DOCS are dismissed because that Office is an arm of the State of New York, which has not waived its sovereign immunity. [129]

### H. Qualified Immunity

To succeed on their claim for qualified immunity Ward, Bezio and Rock must show that from the "face of the complaint they did not violate a clearly established right of which they should have known." [130] By sentencing and confining Peoples to the SHU for three years, [131] Ward, Bezio and Rock violated a clearly established right protecting inmates from cruel and unusual punishment. Thus, these defendants are not entitled to the defense of qualified immunity.

### I. Leave to Amend

**\*10** Because Peoples cannot cure his claims against Fischer, Leclaire, Lee, O'Connor and Bellamy due to their lack of personal involvement, the claims against these defendants are dismissed with prejudice and without leave to amend. Furthermore, Peoples may not amend his Complaint as to the alleged Fourth Amendment violations, his right to access to the courts claim, his claim regarding his altercation with a

fellow inmate, and his claims against the Office of Counsel for DOCS, as any such amendments would be futile.

Peoples may amend his Complaint in connection with his Fourteenth Amendment due process claim. In order to do so, he must first waive his challenge to the loss of good time credit. Peoples may amend this claim within thirty days of the date of this Order. If Peoples submits a timely Amended Complaint, this Court will review it to determine whether Peoples has adequately pled a Fourteenth Amendment due process claim.

## VI. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. [132] The Clerk of the Court is directed to close this motion [Docket No. 33]. A status conference has been scheduled for June 12, 2012, at 4:30 p.m. in Courtroom 15C.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 1575302

---

## Footnotes

1    Former defendants Peter A. Crusco, Eric C. Rosenbanm and Richard A. Brown were previously dismissed in this Court's December 1, 2011 Opinion and Order. Additionally, a review of the docket sheet indicates that the Complaint ("Compl." or "Complaint") was filed on April 18, 2011. Rule 4(m) of the Federal Rules of Civil Procedure provides that if a defendant is not served within 120 days after a complaint is filed, the claims may be dismissed without prejudice. Because Malare has not been served to date, the claims against him are dismissed without prejudice pursuant to Rule 4(m).

2    These facts are drawn from Peoples' Complaint and the exhibits annexed thereto. In addition, because Peoples is proceeding pro se, the factual allegations made in his Opposition to Motion to Dismiss dated January 5, 2012 ("Pl.Opp."), together with the exhibits annexed thereto, will be treated as part of the Complaint to the extent they are consistent with the Complaint. See  *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim).

3    *See* Compl., I(A) and II(A).

4    *See id.* III(D) ¶ 2.

5    *See id.*

6    *See id.* ¶¶ 1, 11.

7    *See id.* ¶ 2.

8    *See id.* Rule 107.21 states that "[a]n inmate shall not file or record any document or instrument of any description which purports to create a lien or record a security interest of any kind against the person or property of any officer or employee of the Department, the State of New York, or the United States, absent prior written authorization from the superintendent or a court order authorizing such filing." 7/24/09 Inmate Rule Book Additions, Ex. A to Compl., at 6.

9    Rule 113.30 provides that "[a]n inmate shall not possess any Uniform Commercial Code (UCC) Article 9 Form, including but not limited to any financing statement, ... correction statement ...., or information request

whether printed, copied, typed or hand written, or any document concerning a scheme involving an inmate's 'strawman.' " *Id.*

10    *See* Report, Ex. A to Compl., at 1.

11    *See id.*

12    *Id.*

13    *Id.*

14    *See* Compl., III(D) ¶ 3.

15    *Id.*

16    *See id. See also* Superintendent Hearing Disposition Report, Ex. A to CompL, at 2. At the time of the hearing, Peoples had not yet accrued seventy-two months of good time credit. *See* Compl., III(D) ¶ 3.

17    *See id.* ¶ 4.

18    *Id.* ¶¶ 8, 9.

19    *See id.* ¶ 17(g).

20    *See* 3/7/11 Inmate Grievance, Ex. A to Compl., at 4.

21    *See id.*

22    *See id.*

23    *See* Compl., III(D) ¶ 8. *See also* 3/9/11 IGRC Response, Ex. A to Compl., at 5.

24    *See* 3/15/11 Response from Inmate Grievance Program Superintendent, Ex. A to Compl., at 6.

25    *See id.*

26    *See* CORC's 6/8/11 CORC Response, Ex. B to Pl. Opp., at 1.

27    Compl., III(D) ¶¶ 7, 9.

28    *See id.* ¶¶ 1, 8.

29    *Id.*

30    *Id.* ¶ 4.

31    *See id.* ¶¶ 1, 10.

32    *See id.* ¶ 1.

33    *See id.* ¶ 14.

34    *See id.*

35    *Id.*

36    *See id.* ¶ 5. *See also* 7/24/09 Inmate Rule Book Additions, Ex. A to Compl., at 7.

37    *See* Compl., III(D) ¶ 1.

38    *See id.* ¶¶ 1, 2.

39    *Wilson v. Merrill Lynch & Co., Inc.,* 671 F.3d 120, 128 (2d Cir.2011) (quotation marks and citation omitted).

40    556 U.S. 662, 679 (2009).

41    *Hoyden v. Patterson,* 594 F.3d 150, 161 (quoting *Iqbal,* 556 U.S. at 664). *Accord Ruston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 59 (2d Cir.2010).

42    *Iqbal,* 556 U.S. at 663 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

43    *Id.* at 670. *Accord Kiobel v. Royal Dutch Petroleum Co.,* 621 F.3d 111, 124 (2d Cir.2010).

44    *Twombly,* 550 U.S. at 564.

45    *Iqbal,* 556 U.S. at 678 (quotation marks and citation omitted).

46    *Id.* (quotation marks and citation omitted).

47    *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) (citing *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002)).

48    *Id.* (quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006)). *Accord Global Network Commc'ns, Inc. v. City of N.Y.,* 458 F.3d 150, 156 (2d Cir.2006).

49    *Schenk v. Citibank/Citigroup/Citicorp,* No. 10 Civ. 5056, 2010 WL 5094360, at *2 (S.D.N.Y. Dec. 9, 2010) (citing *Anderson v. Rochester–Genesee Reg'l Transp. Auth.,* 337 F.3d 201, 205 n. 4 (2d Cir.2003)).

50    *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

51    *Burgos,* 14 F.3d at 790.

52    *See Ortiz v. McBride,* 323 F.3d 191, 194 (2d Cir.2003); *Burgos,* 14 F.3d at 790.

53    *See Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995) ("Failure to comply with Rule 8(a) may result in dismissal of a complaint, even if the pleader is proceeding pro se.") (citing *Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972)).

54    Fed.R.Civ.P. 15(a).

55    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (quotation marks and citations omitted).

56    *Ellis v. Chao,* 336 F.3d 114, 127 (2d Cir.2003).

57    42 U.S.C. § 1983.

58    *Morris–Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985)). *Accord* *Gonzaga Univ. v. Doe,* 536 U.S. 273, 285 (2002) (" '[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything.' ") (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617 (1979)).

59    *Wyatt v. Cole,* 504 U.S. 158, 161 (1992).

60    *See* *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

61    *Iqbal,* 556 U.S. at 677 (citations omitted) (explicitly rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution").

62    *Spear v. Hugles,* No. 08 Civ. 4026, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009).

63    42 U.S.C. § 1997e(a).

64    *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

65    *Booth v. Churner,* 532 U.S. 731, 739 (2001).

66    *Woodford v. Ngo,* 548 U.S. 81, 101 (2006).

67    *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004).

68    *See* 7 N.Y.C.CR. § 701.5.

69    *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).

70    *Id.*

71    *Id.* (quoting *Porter,* 534 U.S. at 524–25).

72    *Johnson,* 380 F.3d at 697.

73    *See* *Par tee v. Grood,* No. 06 Civ. 15528, 2007 WL 2164529, at *3 (S.D.N.Y. July 25, 2007), *aff'd sub nom, Par tee v. Wright,* 335 Fed. App'x 85 (2d Cir.2009).

74    380 F.3d 680, 686–91 (2d Cir.2004).

75    *Id.*

76    *See id.* at 690, n. 6 (citing *Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir.2002) ("agree[ing with other circuits] that the failure to respond to a grievance within the time limits contained in the grievance policy

renders an administrative remedy unavailable"); *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir.2002) (stating that prison's failure timely to respond renders administrative remedies unavailable); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir.2001) (holding that defendants failed to prove non-exhaustion where they presented no evidence to refute plaintiff's contention that he could not pursue grievance further after warden did not respond to his grievance); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir.1998) (holding that "available administrative remedies are exhausted when the time limits for the prison's response set forth in the prison Grievance Procedures have expired")). *See also Whitington v. Ortiz,* 472 F.3d 804, 807–08 (10th Cir.2007) ("[A] prisoner cannot be required to wait indefinitely for a response to his final grievance before he may seek judicial review. That is, when prison officials fail to timely respond to a grievance, the prisoner has exhausted 'available' administrative remedies under the PLRA."); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004); *Sergent v. Norris,* 330 F.3d 1084, 1085 (8th Cir.2003) (recognizing that officials' failure timely to respond to grievance could be basis for prisoner to show he exhausted available administrative remedies).

77    *Woodford,* 548 U.S. at 95.

78    *Torres v. Carry,* 672 F.Supp.2d 338, 345 (S.D.N.Y.2009).

79    *Heck v. Humphrey,* 512 U.S. 477, 486–87 (1994).

80    *Id.* at 487.

81    See *Edward v. Balisock,* 520 U.S. 641, 645 (1997).

82    See *Peralta v. Vasquez,* 467 F.3d 98, 104 (2d Cir.2006).

83    See *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office. As such, it is no different from a suit against the State itself.").

84    *Florida Dep't of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 684 (1982).

85    *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 605 (S.D.N.Y.2009) (quoting *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988)).

86    *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)).

87    *Id.* (quotation marks and citations omitted).

88    *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004) (internal citations omitted). *Accord Percinthe v. Julien,* No. 08 Civ. 893, 2008 WL 4489777, at *3 (S.D.N.Y. Oct. 4, 2008).

89    *Bounds v. Smith,* 430 U.S. 817, 821–22 (1977).

90    *Lewis v. Casey,* 518 U.S. 343, 349 (1996).

2020 WL 374578
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Damilola ANIMASHAUN, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

9:19-CV-0820 (LEK/DJS)
|
Signed 01/23/2020

**Attorneys and Law Firms**

DAMILOLA ANIMASHAUN, Plaintiff, pro se, 389078, Baltimore County Detention Center, 720 Bosley Avenue, Towson, MD 21204.

**DECISION AND ORDER**

LAWRENCE E. KAHN, Senior United States District Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review an amended complaint submitted by pro se plaintiff Damilola Animashaun asserting claims pursuant to 42 U.S.C. § 1983 ("Section 1983"). By Decision and Order filed on October 24, 2019, this Court reviewed the complaint in accordance with 28 U.S.C. § 1915A(b), and found that it was subject to dismissal for failure to state a claim upon which relief may be granted. Dkt. No. 9 ("October 2019 Order"). [1] In light of his pro se status, plaintiff was afforded an opportunity to submit an amended complaint. *Id.* at 14-16.

Presently before the Court is plaintiff's amended complaint and letter request to update the amended complaint to name three additional individuals, each referenced in the amended complaint, as defendants. Dkt. No. 12 ("Am. Compl."); [2] Dkt. No. 13 ("Letter Request").

**II. SUFFICIENCY OF THE AMENDED COMPLAINT**

**A. The Complaint and October 2019 Order**
In his original complaint, plaintiff asserted claims against the following individuals related to his confinement in a special housing unit ("SHU") at various correctional facilities beginning on August 18, 2016: (1) former

DOCCS Commissioner Brian Fischer; (2) current DOCCS Commissioner Anthony J. Annucci; (3) "John Doe(s)"; (4) "Jane Doe(s)"; and (5) Elmira Correctional Facility Corrections Sergeant John Doe. *See generally*, Compl. The complaint was construed to assert Eighth Amendment claims against the named defendants. *See* October 2019 Order at 8.

Following review of the complaint pursuant to 28 U.S.C. § 1915A(b), plaintiff's Section 1983 claims were dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* October 2019 Order at 10-16.

**B. Review of the Amended Complaint**
Because plaintiff is proceeding in forma pauperis and is an inmate suing one or more government employees, his amended complaint must be reviewed in accordance with 28 U.S.C. § 1915A(b). The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to 28 U.S.C. § 1915A(b) was discussed at length in the October 2019 Order and it will not be restated in this Decision and Order. *See* October 2019 Order at 1-2.

Plaintiff's amended complaint contains allegations similar to those set forth in the original complaint, but names certain individuals as defendants in place of the "John Doe(s)" and "Jane Does(s)," provides more detail regarding certain events that gave rise to his SHU confinement, and asserts new constitutional claims in addition to re-asserting Eighth Amendment claims based on his SHU confinement. *See generally*, Am. Compl. The following facts are set forth as alleged by plaintiff in his amended complaint, and as supplemented by his Letter Request. [3]

**1. 2016 Incidents at Auburn Correctional
Facility Giving Rise to SHU Confinement**

**\*2** On or about August 18, 2016, a corrections official at Auburn Correctional Facility "spat on [plaintiff] multiple times then threw an unknown green liquid substance on [plaintiff,] which caused [him] severe physical injuries[.]" Am. Compl. at 19. The corrections officer then issued plaintiff a " 'cover up' ticket" that "wrongly accused [plaintiff of] disobeying the direct orders of an officer" and "falsely" accused him of "squeez[ing] the contents [of a lotion bottle]" on that officer. *Id.* at 18-19.

Following this incident, plaintiff was placed in SHU. Am. Compl. at 18. The next day, defendant Corrections Officer John Doe refused to accept a grievance from plaintiff regarding the events of August 18, 2016. *Id.* at 2.

Thereafter, plaintiff attended a disciplinary hearing arising out of the misbehavior report he received. Am. Compl. at 9. [4] At the conclusion of the disciplinary hearing, defendant Hearing Officer Mogavero sentenced plaintiff to six months of SHU confinement, revoked certain of his privileges, and imposed a $5.00 fine. *Id.* [5] On or around this date, plaintiff was also sentenced to an additional 90 days of SHU confinement and 30 days of keeplock confinement for one or more other disciplinary infractions. *Id.* at 23. [6]

### 2. 2016 and 2017 Incidents at Southport Correctional Facility Giving Rise to SHU Confinement

On October 1, 2016, plaintiff was transferred to Southport Correctional Facility. Am. Compl. at 20. During his time at this facility, he received "multiple additional infractions[,]" which resulted in him receiving disciplinary sentences that included 8 months of SHU confinement and 30 days of keeplock confinement. *Id.* [7]

### 3. 2017 Incidents at Elmira Correctional Facility Giving Rise to SHU Confinement

In or around April, 2017, plaintiff was transferred to Elmira Correctional Facility "to serve the 30 days keeplock sanction." Am. Compl. at 20-21. On or about May 27, 2017, plaintiff informed an unidentified corrections officer that he intended to take his own life and showed the officer a weapon he created and intended to use. *Id.* at 25; Dkt. No. 1-1 at 18. Plaintiff was then escorted to the mental health clinic and placed on suicide watch. Am. Compl. at 25.

**\*3** On or about May 30, 2017, plaintiff made a request to defendant John Doe Corrections Sergeant that he be placed in protective custody. Am. Compl. at 16; Dkt. No. 1-1 at 22. Plaintiff told Corrections Sergeant John Doe that he was "in fear for imminent danger pose[d] ... to [him] by [an inmate] porter Kendall Jones[.]" Am. Compl. at 16. Plaintiff stated that inmate Jones advised plaintiff that he intended to harm him. *Id.* Corrections Sergeant John Doe denied plaintiff's request for protective custody. *Id.* at 16, 26.

Thereafter, plaintiff was released from suicide watch and returned to his cell. Am. Compl. at 25-26. A few days later, and just three days prior to the completion of plaintiff's keeplock sentence, he was involved in an altercation with inmate Kendall. *Id.* Around this time, plaintiff also received a separate disciplinary charge for lying to a corrections officer about his possession of an identification card. *Id.* at 10-11, 37. As a result of the altercation, plaintiff received a misbehavior report, was subsequently found guilty of the charges after a disciplinary hearing, and sentenced to six months of SHU confinement. *Id.* at 21, 37. [8]

### 4. 2017 Incidents at Southport Correctional Facility Giving Rise to SHU Confinement

On or about June 11, 2017, plaintiff was transferred back to Southport Correctional Facility. Am. Compl. at 27. During plaintiff's confinement at this facility, he was involved in at least four separate incidents that resulted in disciplinary charges against him. *Id.* at 37-38. One of those incidents involved plaintiff's refusal to return a food tray; another involved "lewd conduct." *Id.* at 38. It appears plaintiff may have also been involved in an altercation with an inmate. *Id.* at 30. [9]

### 5. 2018 Incidents at Downstate Correctional Facility Giving Rise to SHU Confinement

In or around March, 2018, plaintiff was transferred to Downstate Correctional Facility. Am. Compl. at 8. While plaintiff was on the transport bus, he was involved in an altercation with another inmate. *Id.* at 8, 38. As a result of the altercation, plaintiff received a misbehavior report, was subsequently found guilty of the charge(s) after a disciplinary hearing, and sentenced to an unidentified amount of SHU confinement. *Id.* [10]

### 6. 2018 Incidents at Upstate Correctional Facility Giving Rise to SHU Confinement

On or about March 23, 2018, plaintiff was transferred to Upstate Correctional Facility. Am. Compl. at 8, 12. Shortly after plaintiff's transfer, he was involved in an altercation with his assigned cell mate. *Id.* at 12, 30, 38. Thereafter,

plaintiff was involved in another altercation with a different assigned cell mate. *Id.* at 12, 30. At other unidentified times during plaintiff's confinement at Upstate Correctional Facility, he apparently also received disciplinary infractions for requesting sexual favors from a nurse and engaging in a lewd act. *Id.* at 12-13.

**\*4** In total, plaintiff received disciplinary charges for five different incidents that occurred during his confinement at Upstate Correctional Facility. [11] Am. Compl. at 8, 12-13, 38. Defendant Hearing Officer Cantwell presided over one or more of the disciplinary hearings arising out of these disciplinary charges. *Id.* at 8, 12. Plaintiff was apparently found guilty of the various disciplinary charges during separate disciplinary hearings, and sentenced to an unidentified amount of additional SHU confinement. *Id.* [12]

### 7. 2018 Incidents at Clinton Correctional Facility Giving Rise to SHU Confinement

On August 31, 2018, plaintiff was transferred to Clinton Correctional Facility for better mental health treatment. Am. Compl. at 21, 31. While plaintiff was in a van en route to Clinton Correctional Facility, he was involved in an altercation with one of the prison transport officers, which resulted in disciplinary charges against him. *Id.* at 31, 36.

Shortly after plaintiff's arrival, he received a daily prescription for 15 milligrams of Remeron to treat his depression and stress. *Id.* at 14, 21, 29, 32. A short time later, the dosage was increased to 30 milligrams, and plaintiff also received a daily prescription for 50 milligrams of Vistaril to treat his insomnia, stress, anxiety, and delusional state. *Id.* at 14.

Between September 24 and October 12, 2018, plaintiff received disciplinary charges for "spitting on an inmate[,] ... not leaving the shower area when told to do so, ... [and] lewd conduct." Am. Compl. at 8. Following each of the disciplinary charges against plaintiff during his confinement at Clinton Correctional Facility, he received a disciplinary hearing. *Id.* at 8, 12-13. Defendant Cantwell served as the hearing officer for one or more of these disciplinary hearings. *Id.* at 13. Apparently following each of the disciplinary hearings, plaintiff was sentenced to additional "SHU/keeplock" confinement "despite [his] claims of mental illnesses[.]" *Id.* at 8, 14. [13]

### 8. 2019 Incidents at Attica Correctional Facility Giving Rise to SHU Confinement

On or about October 16, 2018, plaintiff was transferred to Attica Correctional Facility. Am. Compl. at 21, 31-32. In or around February, 2019, plaintiff received a misbehavior report charging him with lewd conduct, interference with staff, and disobeying a direct order. *Id.* at 7. On or about February 20, 2019, plaintiff's disciplinary hearing arising out of these charges commenced before defendant Hearing Officer Burns. *Id.* Defendant Burns found plaintiff guilty of the charges in the misbehavior report and sentenced him to an unidentified amount of additional confinement in SHU. *Id.* [14]

### 9. 2019 Incidents at Mid-State Correctional Facility Giving Rise to SHU Confinement

**\*5** On or about April 2, 2019, plaintiff was transferred to Mid-State Correctional Facility. Am. Compl. at 22. On July 7, 2019, defendant Corrections Officer Annarino issued plaintiff a "disciplinary infraction" falsely charging him with using inappropriate language directed at her. *Id.* at 3-4. As a result of the disciplinary infraction, plaintiff was "placed on recreation deprivation" by defendant Corrections Sergeant Burns, which lasted approximately four (4) days. *Id.* at 3; Letter Request at 1-2. [15]

On or about July 18, 2019, plaintiff's disciplinary hearing arising out of the disciplinary infraction issued by defendant Annarino commenced before defendant Corrections Lieutenant Klein. Am. Compl. at 3. Defendant Annarino testified during the hearing that plaintiff used the inappropriate language described in the disciplinary infraction. *Id.* at 4. However, defendant Annarino was unable to identify any witness who could support her version of events. *Id.*

Following defendant Annarino's testimony, plaintiff requested "audio/video" footage from the date of the charged incident to rebut defendant Annarino's testimony, and defendant Klein postponed the hearing to "determine if the audio was intelligible[.]" Am. Compl. at 4. Upon reconvening the disciplinary hearing, defendant Klein stated for the record that the "video part of the surveillance" from July 7, 2019, was "not working[.]" *Id.* at 5. Plaintiff then

requested to call his "neighbors or the state actors known to walk the area of the incident" to rebut defendant Annarino's testimony. *Id.* Defendant Klein denied plaintiff's request and found him guilty of the charges in the disciplinary infraction. *Id.* Plaintiff's disciplinary sentence included revocation of his "phone incentive," a \$5.00 fine, and 30 days of keeplock confinement. *Id.* at 5-6.

Following the disciplinary hearing, defendant Corrections Officer Riley relocated plaintiff's cell to a cell with a less preferable view, which adversely impacted plaintiff's mental state. *Id.* at 6-7; Letter Request at 1. [16]

In September, 2019, plaintiff's "progress into Phase 3 [of the] Step Down Program" was delayed by one week by "the counselors of the Step Down Program," defendants Diego, Loomis, Martin, Strajack, Fischer, "Ms. C" and "Ms. A." Am. Compl. at 6, 17. Because of the one-week delay in plaintiff's progression to Phase 3 of the Step Down program, plaintiff's access to commissary buy privileges was also delayed. *Id.* at 6.

On September 12, 2019, plaintiff was extradited to the Baltimore County Detention Center. Am. Compl. at 17. On October 27, 2019, plaintiff was placed in protective custody at that facility. *Id.*

### 10. Supervisory Officials

Both current DOCCS Commissioner Anthony Annucci and former DOCCS Commissioner Brian Fischer allowed plaintiff's "prohibited extensive SHU/keeplock confinement sentences" despite knowing that the Honorable Shira A. Scheindlin preliminarily approved a settlement agreement in *Peoples v. Fischer*, which prohibited "harsh and disproportionate" SHU sentences. Am. Compl. at 42-44. [17]

### 11. ⚑ Section 1983 Claims

**\*6** Liberally construed, the amended complaint asserts the following ⚑ Section 1983 claims against the defendants in their individual and official capacities: (1) a First Amendment free-flow-of-mail claim against defendant Corrections Officer John Doe from Auburn Correctional Facility; (2) Eighth Amendment conditions-of-confinement claims against defendants Annarino and Burns based on

the revocation of plaintiff's recreation privileges; (3) an Eighth Amendment conditions-of-confinement claim against defendant Riley based on the relocation of plaintiff's cell; (4) Eighth Amendment conditions-of-confinement claims against defendants Mogavero, Cantwell, Klein, Hearing Officer Burns, Annucci, and Brian Fischer based on plaintiff's SHU confinement; (5) an Eighth Amendment failure-to-protect claim against defendant Corrections Sergeant John Doe from Elmira Correctional Facility; (6) Fourteenth Amendment due process claims against defendants Annarino and Corrections Sergeant Burns based on the revocation of plaintiff's recreation privileges; (7) a Fourteenth Amendment due process claim against defendants Diego, Loomis, Martin, Strajack, Fischer, "Ms. C" and "Ms. A" based on delaying plaintiff's progression through the "Step Down Program"; and (8) Fourteenth Amendment disciplinary due process claims against defendants Mogavero, Cantwell, Klein, and Hearing Officer Burns.

Plaintiff seeks monetary damages. Am. Compl. at 17. For a more complete statement of plaintiff's claims, reference is made to the amended complaint.

### C. Severance and Transfer of Failure-to-Protect Claim

Rule 21 of the Federal Rules of Civil Procedure permits the Court to sever any claim against a party and proceed with that claim separately. Fed. R. Civ. P. 21. In deciding whether to sever a claim, the Court should consider the following:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999). "A claim may be severed based upon lack of a significant relationship between defendants or solely for the purpose of facilitating transfer. Where the administration of justice would be materially advanced by severance and

transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants." *Cain v. New York State Bd. of Elections*, 630 F. Supp. 221, 225-26 (E.D.N.Y. 1986). "A decision to sever lies within the discretion of the Court." *Id.* at 225.

Here, plaintiff's failure-to-protect claim arising out of his confinement at Elmira Correctional Facility is more appropriately heard in the Western District of New York ("Western District"), where that facility is located. The allegations pertaining to this claim involve a different defendant than the allegations pertaining to plaintiff's other claims, and the failure-to-protect claim is based on a discrete event, which bears no relationship to plaintiff's other claims or SHU confinement. Thus, the witnesses and documentary proof will be distinct. In addition, the Court is sensitive to the burden, upon both the individuals and the taxpayers of New York, of requiring individuals who are employed and most likely reside in the Western District to travel to the Northern District to defend against allegations that occurred in the Western District.

For the foregoing reasons, and because the amended complaint fails to state a cognizable claim against any other official from Elmira Correctional Facility for the reasons discussed more fully below, plaintiff's failure-to-protect claim arising out of wrongdoing that allegedly occurred at Elmira Correctional Facility (and the named defendant against whom this claim is asserted) is severed from this amended complaint and venue of the claim (and related defendant) is transferred to the Western District in the interests of justice and judicial efficiency. The Court makes no ruling as to the sufficiency of the failure-to-protect claim, thereby leaving that determination to the Western District of New York.

### D. Analysis of Plaintiff's Remaining Claims

**\*7** Plaintiff seeks relief pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990)); *see also Myers v. Wollowitz*, No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at \*2 (N.D.N.Y. Apr. 10, 1995) (finding that "[ ] Section 1983 is the vehicle by which

individuals may seek redress for alleged violations of their constitutional rights").

### 1. Official Capacity Claims

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through Section 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's amended complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York,* No. 5:93-CV-1298 (RSP/GJD), 1996 WL 156764 at \*2 (N.D.N.Y. 1996).

In addition, the Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.").

Accordingly, to the extent that plaintiff seeks monetary damages under Section 1983 against any defendant in his or her official capacity, such claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment. [18]

### 2. Defendant Brian Fischer

**\*8** The events giving rise to plaintiff's claims began in August, 2016. Publically available information on the DOCCS website makes clear that Brian Fischer retired as the Commissioner of DOCCS on April 30, 2013. *See* http://www.doccs.ny.gov/NewsRoom/external_news/2013-03-04_Fischer_Retirement_Letter. pdf (last visited Jan. 22, 2020). [19] Thus, there is no basis for the Court to plausibly infer that defendant Fischer was personally involved in any of the wrongdoing alleged in the amended complaint.

Accordingly, defendant Fischer, and all claims asserted against him, are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. First Amendment Free-Flow-of-Mail Claim

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). A prisoner's mail may only be restricted to further " 'one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)). "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." *Bellezza v. Holland*, No. 09-CV-8434, 2011 WL 2848141, at *6 (S.D.N.Y. July 12, 2011) (dismissing access-to-the-courts claim for failure to allege injury, but holding that plaintiff adequately alleged a violation of his right to send and receive mail). "It is thus not necessary to allege actual injury when asserting a violation of one's right to the free flow of mail." *Antrobus v. City of New York*, No. 11-

CV-2524, 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014) (citations omitted).

As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to legal mail than to non-legal mail[.]" *Davis*, 320 F.3d at 351. "While a prisoner has a right to be present when his legal mail is opened, ... an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351 (citations omitted). However, in *Washington v. James*, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139); *see also Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

**\*9** In this case, plaintiff alleges that on one occasion, defendant Corrections Officer John Doe refused to accept plaintiff's grievance for filing. Am. Compl. at 2. As an initial matter, inmates do not have a constitutional right to state grievance programs. *See Shell v. Brzeniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does [sic] not give rise to a cognizable § 1983 claim."); *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[P]articipation in an inmate grievance process is not a constitutionally protected right."); *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to see it that grievances are properly processed does not create a claim under Section 1983).

Furthermore, the amended complaint is devoid of any allegations which plausibly suggest that Corrections Officer John Doe's alleged refusal to accept plaintiff's grievance for filing on one occasion was part of an ongoing practice of

censorship unjustified by a substantial government interest, or unjustifiably chilled plaintiff's right of access to the courts or impaired his legal representation. Moreover, the amended complaint lacks any allegations that Corrections Officer John Doe refused to deliver plaintiff's mail thereafter.

Accordingly, plaintiff's First Amendment free-flow-of-mail claim is dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 4. Eighth Amendment Conditions-of-Confinement Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. Wilson v. Seiter, 501 U.S. 294, 296-97 (1991); Estelle v. Gamble, 429 U.S. 97, 104 (1976). Although it is clear that the Eighth Amendment "does not mandate comfortable prisons," it does not permit inhumane treatment of those in custody.

Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994) and Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). Prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).

"Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety." Price v. Oropallo, No. 13-CV-563, 2014 WL 4146276, at *8 (N.D.N.Y. Aug. 19, 2014). To satisfy the deliberate indifference standard, a plaintiff must show that (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) "the defendant prison officials possessed sufficient culpable intent." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer, 511 U.S. at 834). The first prong is objective and requires that prison officials provide inmates with "basic human needs, one of which is 'reasonable safety.' " Helling v. McKinney, 509 U.S. 25, 30, 33 (1993) (quoting DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 199 (1989)). "The second prong

of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry." Hayes, 84 F.3d at 620. In particular, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* As the Supreme Court has made clear, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

### a. Annarino and Corrections Sergeant Burns

**\*10** Liberally construed, the amended complaint asserts a conditions-of-confinement claim against defendants Annarino and Corrections Sergeant Burns based on allegations that they engaged in conduct that deprived him of recreation on four consecutive days, even though plaintiff had yet to receive his disciplinary hearing on the charges in the misbehavior report issued by defendant Annarino. *See* Am. Compl. at 3-4; Letter Request at 1-2. Setting aside the conclusory nature of plaintiff's allegations, it is well-settled that the denial of recreation for such a limited number of days is not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation. *See, e.g.,* Branham v. Meachum, 77 F.3d 626, 630-31 (2d Cir. 1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days was insufficient to satisfy the subjective prong and therefore does not violate the Eighth Amendment); Dumpson v. Goord, No. 00-CV-6039, 2011 WL 4345760, at *9 (W.D.N.Y. Sep. 15, 2011) (denial of recreation for two weeks "does not reach the level of an objectively unconstitutional deprivation of exercise"); Houston v. Goord, No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at *15 (N.D.N.Y. Mar. 31, 2009) (declaring Eighth Amendment claim without merit because denial of opportunity to exercise outdoors for less than two weeks was de minimis); Barnes v. Craft, No. 9:04-CV-1269 (NAM/GHL), 2008 WL 3884369, at *9 (N.D.N.Y. Aug. 18, 2008) (denial of outdoor exercise "for six days [was] simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation"); Gibson v. City of N.Y., No. 96-CV-3409, 1998 WL 146688, at *3 (S.D.N.Y. Mar. 25, 1998) (finding the "deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the

deprivation of an opportunity to exercise on two consecutive days" was not sufficiently serious); 📄 *Davidson v. Coughlin*, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (deprivation of outdoor exercise for fourteen days did not violate Eighth Amendment); *cf. Anderson v. Coughlin*, 757 F.2d 32, 36 (2d Cir. 1985) ("[A]n occasional day without exercise when weather conditions preclude outdoor activities ... is not cruel and unusual punishment.").

Accordingly, plaintiff's Eighth Amendment conditions-of-confinement claims against defendants Annarino and Corrections Sergeant Burns are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. Riley

Plaintiff separately asserts a conditions-of-confinement claim against defendant Riley based on allegations that he moved plaintiff from a cell with a desirable view to a cell with a more limited and depressing view, which adversely impacted plaintiff's mental state at Mid-State Correctional Facility. Am. Compl. at 6-7; Letter Request at 1.

As an initial matter, plaintiff generally does not have a constitutional right to the cell of his choosing. *See, e.g., White v. Williams*, 9:12-CV-1775 (NAM/RFT), 2014 WL 1672634, at *2 (N.D.N.Y. Apr. 28, 2014) ("[T]he law is clear that an inmate does not have a right to be confined to the prison of his own choosing or to a particular type of housing." (collecting cases)); *Cagle v. Gravlin*, No. 09-CV-0648 (FJS/GHL), 2010 WL 2088267, at *4 (N.D.N.Y. Apr. 29, 2010) ("I can find no case holding that a prisoner has a constitutional right either to the cell of his choice or to disobey a direct order."), *report and recommendation adopted by* 2010 WL 2087437 (N.D.N.Y. May 25, 2010); *Sheehan v. Beyer*, 51 F.3d 1170, 1174 (3d Cir. 1995) ("An inmate does not have a right to be placed in the cell of his choice."). Moreover, housing an inmate in a cell with an obstructed view of outdoor scenery "falls far short of the type of deprivation that would implicate a 'denial of the minimal civilized measure of life's necessities.' " *Taylor v. Halladay*, No. 9:09-CV-0385 (FJS/DEP), 2010 WL 3120036, at *7 (N.D.N.Y. July 1, 2010) (rejecting plaintiff's claim that his Eighth Amendment rights were violated when he was placed in a cell with a window covered up, which precluded his ability to look outside (quoting 📄⚠ *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d

Cir. 2006)), *report and recommendation adopted by* 2010 WL 3155730 (N.D.N.Y. Aug. 9, 2010); *see also Williams v. Adams*, 143 Fed. App'x 76 (9th Cir. 2005) (affirming summary judgment dismissing plaintiff's claim that frosted cell window deprived him of natural light and constituted an Eighth Amendment violation)).

Accordingly, plaintiff's Eighth Amendment conditions-of-confinement claim against defendant Riley is dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### c. Mogavero, Cantwell, Klein, and Hearing Officer Burns

**\*11** Plaintiff asserts Eighth Amendment conditions-of-confinement claims against defendants Mogavero, Cantwell, Klein, and Hearing Officer Burns based on allegations that they wrongfully imposed excessive SHU sentences on him, in disregard of his mental health.

Generally speaking, confining an inmate in SHU, without more, and notwithstanding the restrictions that such confinement imposes on inmate life, does not constitute cruel and unusual punishment. *See Bowens v. Smith*, No. 9:11-CV-784, 2013 WL 103575, at *10 (N.D.N.Y. Jan. 8, 2013) ("Confinement in SHU, in itself, notwithstanding its additional restrictions on inmates, has not been held to constitute cruel and unusual punishment."), *report and recommendation adopted by* 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013); *Hamilton v. Fisher*, No. 9:10-CV-1066 (MAD/RFT), 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) (" '[N]ormal' conditions of SHU confinement do not constitute an Eighth Amendment violation." (citations omitted)), *report and recommendation adopted by* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012). "However, courts are also cognizant that 'the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented,' including the fact that prolonged solitary confinement 'can and does lead to significant psychological harm.' " *Smith v. Annucci*, No. 18-CV-06261, 2019 WL 539935, at *6 (W.D.N.Y. Feb. 11, 2019) (quoting 📄 *Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016)). "Accordingly, courts have found Eighth Amendment violations where inmates are held in solitary confinement for extended periods of time, such that the effects are 'grossly disproportionate' to the reasons for the isolation."

*Smith*, 2019 WL 539935, at \*6 (citing, *inter alia, Peoples v. Fischer*, 898 F. Supp. 2d 618, 621 (S.D.N.Y. 2012)).

As an initial matter, the allegations in the amended complaint make clear that the entirety of plaintiff's SHU confinement was disciplinary. *See generally*, Am. Compl. [20] Furthermore, plaintiff appears to accept guilt for multiple charges related to assaulting other inmates and staff, and engaging in lewd acts in front of staff. *See* Am. Compl. at 8, 12, 21, 25-26, 30-31, 36-38. Thus, this case is not analogous to those in which inmates have challenged their administrative SHU confinement after the completion of their disciplinary sentences as excessive. Rather, it appears to be plaintiff's claim that, after a certain unidentified period of time, imposing SHU confinement for disciplinary infractions constituted cruel and unusual punishment, regardless of the nature of his own actions that resulted in the SHU sentences. While the Court declines to blanketly accept such a nebulous contention, a further discussion is necessary to explain why the allegations in the amended complaint are insufficient to state an Eighth Amendment claim with respect to any of the imposed SHU sentences.

### (i) 2016 SHU Sentences

With respect to plaintiff's initial SHU confinement, plaintiff alleges that in August, 2016, he began serving a six month SHU sentence while at Auburn Correctional Facility for "disobeying the direct orders of an officer" and "squeez[ing] the contents [of a lotion bottle]" on that officer. Am. Compl. at 9, 18-19. Plaintiff further alleges that before the expiration of this initial SHU confinement period, he received additional disciplinary charges while at Southport Correctional Facility, which resulted in one or more sentences of additional SHU confinement that continued until April, 2017, when he was transferred to Elmira Correctional Facility and placed on keeplock status, apparently to conclude the disciplinary sentence he received at Southport Correctional Facility. Am. Compl. at 20-21. [21]

**\*12** The amended complaint is devoid of any allegations explaining the nature of the disciplinary charges that resulted in plaintiff's initial SHU confinement beyond six months. Furthermore, the amended complaint lacks any allegations which plausibly suggest that any of the hearing officers who imposed disciplinary sentences that resulted in plaintiff's SHU confinement between August, 2016 and April, 2017, were aware that plaintiff was suffering from any mental

health problems likely to be impacted by SHU confinement. Indeed, plaintiff does not even allege that he was suffering from mental health problems during this time. Thus, there is no basis for the Court to plausibly infer that plaintiff's SHU confinement between August, 2016 and April, 2017, was grossly disproportionate to the charged violations and/or imposed out of deliberate indifference to a significant risk to plaintiff's well-being.

### (ii) SHU Sentence in May 2017

Plaintiff alleges that three days before the conclusion of the disciplinary sentences imposed in 2016, he was placed in SHU for six months after he was found guilty of being involved in an altercation with another inmate. *See* Am. Compl. at 12, 20-21. Plaintiff does not deny his involvement in the altercation, and in fact alleges that he cut the inmate he fought with a weapon. *Id.* at 26-27. In addition, the amended complaint lacks any allegations which plausibly suggest that the hearing officer who imposed this disciplinary sentence did so despite knowing that plaintiff was suffering from mental health problems likely to be impacted by SHU confinement. Thus, there is no basis to plausibly infer that the disciplinary sentence of SHU confinement imposed following plaintiff's placement on keeplock status was grossly disproportionate to the charged violation and/or issued out of deliberate indifference to a significant risk to plaintiff's well-being.

### (iii) SHU Sentences After May 2017

Plaintiff alleges that he received at least fifteen disciplinary charges between June, 2017 and July, 2019, including charges for assaulting other inmates and a corrections official. Am. Compl. at 3-5, 7-8, 12-13, 30-31, 36-38. The amended complaint lacks any allegations indicating the amount of SHU confinement imposed on plaintiff for any of the disciplinary sentences he received between June, 2017 and February, 2019, and contains virtually no details regarding plaintiff's conduct giving rise to these charges. In addition, although plaintiff alleges that he was sentenced to 30 days of SHU confinement at his most recent disciplinary hearing in July, 2019, the amended complaint does not contain any allegations which plausibly suggest that the hearing officer, defendant Klein, or any of the other hearing officers who imposed disciplinary sentences after May, 2017, were aware, before sentencing plaintiff, either of how much time he had already spent in SHU, or how much additional SHU time he was

already facing as a result of prior disciplinary sentences. Nor does the amended complaint contain any allegations which plausibly suggest that any of the hearing officers who sentenced plaintiff to SHU confinement between June, 2017 and July, 2019 were aware that he was suffering from a mental illness impacted by SHU confinement.

Moreover, pursuant to 7 NYCRR § 254.6(b), a hearing officer presiding over a disciplinary hearing is required to "consider evidence regarding the inmate's mental condition ... at the time of the incident and at the time of the hearing" when the inmate's mental state is "at issue." The regulation expressly states that an inmate's mental state is "at issue" when

> (i) the inmate is classified as level 1 by the Office of Mental Health (OMH), as indicated on the hearing record sheet; (ii) the inmate is designated as an "S" by OMH, as indicated on the hearing record sheet; (iii) the inmate is charged with engaging in an act of self-harm in violation of rule 123.10 (section 270.2(B)(23)(i) of this Title), as indicated on the misbehavior report; (iv) the incident occurred while the inmate was being transported to or from the Central New York Psychiatric Center (CNYPC), as alleged in the misbehavior report; (v) the inmate was an inpatient at the CNYPC within nine months prior to the incident, as indicated on the hearing record sheet; (vi) the incident occurred while the inmate was assigned to an OMH satellite unit, or intermediate care program, as indicated on the hearing record sheet; (vii) the incident occurred while the inmate was being escorted to or from an OMH satellite unit or intermediate care program, as alleged in the misbehavior report; (viii) the hearing was delayed or adjourned, after an extension of time was obtained in accordance with section 251-5.1 of this Title, because the inmate became an inpatient at the CNYPC or was assigned to the OMH satellite unit; or (ix) it appears

to the hearing officer, based on the inmate's testimony, demeanor, the circumstances of the alleged offense or any other reason, that the inmate may have been mentally impaired at the time of the incident or may be mentally impaired at the time of the hearing.

**\*13** 7 NYCRR § 254.6(b)(1)(i)-(ix).

When an inmate's mental state is "at issue," the hearing officer is required to undertake steps to ensure that the inmate understands the disciplinary charge(s), the purpose of the hearing, and the role of the participants in the hearing, and evaluate the inmate's mental condition at the time of the incident and the hearing. 7 NYCRR § 254.6(c). In addition, if it is determined that the inmate whose mental state is "at issue" is "capable of proceeding with the hearing[,] and a finding of guilt is subsequently made with regard to one or more of the charges," the hearing officer is required to "consider the inmate's mental condition ... at the time of the incident ... in determining the appropriate penalty to be imposed[,]" and may dismiss the charge(s) altogether if the officer believes that a penalty would "serve no useful purpose[.]" 7 NYCRR § 254.6(f). When the inmate's mental state is "at issue," the written disposition of the charges must also "reflect how the inmate's mental condition ... was considered." *Id.*

Thus, even if the Court were to assume that each hearing officer who presided over plaintiff's disciplinary hearings in and after June, 2017, was aware that plaintiff was suffering from a mental health issue at the time of the disciplinary event or hearing,[22] the amended complaint fails to allege facts which plausibly suggest that plaintiff's mental health was not taken into consideration by any of these hearing officers when his disciplinary sentences were imposed. For example, plaintiff does not allege that any hearing officer failed to investigate his mental condition at the time of the charged infraction or hearing, or advise him in the written disposition how his mental health was considered. Nor does plaintiff allege that any medical professional recommended against a disciplinary sentence of SHU confinement, which was nonetheless imposed by one or more hearing officers.[23] Plaintiff also does not allege that he appealed any of the disciplinary sentences that included SHU confinement.

In other words, the Court has no basis to plausibly infer from the allegations in the amended complaint, or documents attached to the original complaint, that any hearing officer imposed a disciplinary sentence of SHU confinement on plaintiff in deliberate disregard to his mental condition, and the impact SHU confinement might have on him. There is also no basis to infer from the allegations in the amended complaint that any of the imposed sentences of SHU confinement were grossly disproportionate to the charged misconduct.

For all of these reasons, plaintiff's Eighth Amendment conditions-of-confinement claims against defendants Mogavero, Cantwell, Klein, and Hearing Officer Burns are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

#### d. Annucci

*14 Insofar as plaintiff has asserted a conditions-of-confinement claim against defendant Annucci for allegedly failing to take steps to either shorten plaintiff's period of SHU confinement due to his mental health condition(s), or prevent plaintiff from suffering an indefinite period of SHU confinement, his claim must be dismissed because the amended complaint fails to adequately plead that plaintiff's placement in SHU at any point violated his Eighth Amendment rights. *See Toole v. Connell*, No. 9:04-CV-0724 (LEK/DEP), 2008 WL 4186334, at *7 (N.D.N.Y. Sep. 10, 2008) (Peebles, M.J.), *report and recommendation adopted by* 2008 WL 4186334, at *1 (supervisory defendant cannot be liable for failing to investigate or correct conduct that has already been found to be not actionable under 🔖 section 1983); *see also Linares v. Mahunik*, No. 9:05-CV-625 (GLS/RJT), 2006 WL 2595200, at *11 (N.D.N.Y. Sept. 11, 2006), *report and recommendation adopted by* 2006 WL 2595200, at *1 (plaintiff could not "sustain a supervisory liability claim as there was no wrong for [supervisor-defendant] to remedy since there [was] no constitutional violation"); *Johnson v. McClure*, No. 9:06-CV-0431 (GTS/DEP), 2009 WL 2356147, at *20 (N.D.N.Y. May 11, 2009) ("Rather than providing an independent basis for a cause of action, supervisory liability on the part of any of the defendants is more appropriately considered in the context of each of the substantive constitutional claims raised in the case. Since I have recommended dismissal of each of those claims, there is therefore no basis to find supervisory liability in connection

with any of them."), *report and recommendation adopted by* 2009 WL 2356147, at *1-3 (N.D.N.Y. July 28, 2009). [24]

Furthermore, even if plaintiff had alleged sufficient facts to plausibly suggest that one or more of his SHU sentences was cruel and unusual, the amended complaint lacks any allegations which plausibly suggest that procedural safeguards were not implemented or followed to ensure that plaintiff was not forced to remain confined in SHU despite a significant risk to his mental health. To the contrary, by plaintiff's own allegations, he was in "phase 2" of a "Step-Down Program" in September, 2019, and on track to be released from SHU in less than nine months, despite disciplinary determinations that were supposed to keep him in SHU through at least March, 2023. Am. Compl. at 40.

In addition, plaintiff alleges that he was transferred to Clinton Correctional Facility on August 31, 2018, for better mental health treatment. Am. Compl. at 21, 31. Thereafter, he was transferred to Attica Correctional Facility and then Mid-State Correctional Facility before his transfer out of state to the Baltimore County Detention Facility. Publically available information on the New York State Office of Mental Health's website makes clear that each of these facilities is a level 1 facility. *See* https://www.omh.ny.gov/omhweb/facilities/cnpc/satellite.pdf (last visited Jan. 22, 2020). [25]

*15 Pursuant to 7 NYCRR § 310.1, each correctional facility designated as level 1 by the Office of Mental Health ("OMH") must set up "a committee to be known as the special housing unit case management committee[,]" which must be "co-chaired by the first deputy superintendent or deputy superintendent for security or designee and the unit chief or clinical director of the OMH mental health satellite unit or designee." Each co-chairperson must also select at least two individuals to sit as additional committee members from among a select list, and "[i]f the OMH co-chairperson is not a clinician[,] at least one of the additional individuals selected to sit on the committee shall be an OMH clinician." *Id.* Pursuant to 7 NYCRR § 310.2, the special housing unit case management committee is assigned to

> review, monitor and coordinate the behavior and treatment plan for those inmates assigned to SHU in a correctional facility designated as level 1 by OMH who are on the OMH mental health caseload and other

SHU inmates based upon a recent request to the committee from OMH or department staff, and to initially review the status of all inmates newly assigned to SHU in a correctional facility designated as level 1 by OMH following a superintendent's hearing in which the inmate's mental state ... was deemed to be at issue[.]

After reviewing the inmate's status, which includes discussing the inmate's disciplinary and criminal history, mental health diagnoses, and treatment needs, the committee may, among other things, "recommend to the superintendent the temporary or permanent restoration of one or more privileges, the suspension or reduction of confinement time, or a housing reassignment." 7 NYCRR § 310.2(c), (d)(1).

Thus, assuming plaintiff's mental condition was "at issue" during any of his disciplinary hearings after August 31, 2018, or that he was on the OMH mental health caseload, at least one medical professional from the special housing unit case management committee was supposed to evaluate the medical effects, if any, of plaintiff's continued SHU confinement.[26] Moreover, it is clear from the documents attached to the original complaint that plaintiff received mental health evaluations throughout 2018 and 2019. *See* Am. Compl. at 14, 21, 29, 32; Dkt. No. 1-1 at 2-48.

*16  Simply put, if plaintiff's mental condition might have warranted reducing or ending his SHU confinement, it appears procedures were in place for this to occur, and plaintiff has not alleged otherwise. The Court therefore has no basis to plausibly infer that defendant Annucci failed to take the necessary steps to ensure that plaintiff was not indefinitely confined to SHU, or confined to SHU despite a release being medically necessary.

For all of these reasons, plaintiff's Eighth Amendment conditions-of-confinement claim against defendant Annucci is dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 5. Fourteenth Amendment Due Process Claims

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under *Sandin*. Although the Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights, SHU confinement for more than 305 days rises to the level of atypicality. *See Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

#### a. Annarino and Corrections Sergeant Burns

As noted, the amended complaint alleges that defendants Annarino and Corrections Sergeant Burns engaged in conduct that denied plaintiff recreation on four consecutive days, even though plaintiff had yet to have his disciplinary hearing on the charges in the misbehavior report issued by defendant Annarino. *See* Am. Compl. at 3-4; Letter Request at 1-2.

It is well-settled that a brief deprivation of recreation privileges, such as that alleged here, does not constitute an atypical and significant hardship implicating a protected liberty interest. *See Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998) (twenty-one days in pre-hearing keeplock not an atypical hardship); *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (eighteen days of administrative confinement and exercise deprivation not an atypical hardship); *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996) (twelve days

in pre-hearing confinement not an atypical or significant hardship); *Latona v. Chautauqua Cty. Jail*, No. 97-CV-0661, 2004 WL 2457797, at *5 (W.D.N.Y. Nov. 2, 2004) (finding that "the 17-day keeplock status and denial of recreation did not create an atypical or significant hardship in relation to the ordinary incidents of prison life [and] [t]hus, the plaintiff ... may not maintain the due process claims asserted in this matter"); *Wells v. Wade*, 36 F. Supp. 2d 154, 158 (S.D.N.Y. 1999) ("Wells's thirteen days of keeplock confinement was less severe than that of the inmate in Sandin both in duration and condition. At his deposition, Wells complained that during his thirteen days of confinement he could not enjoy the same opportunities for recreation normally available to inmates in dormitory housing, including viewing television, cooking, and playing games.... Absent any allegation of unusual conditions, denial of such privileges for less than two weeks does not implicate a liberty interest and is not actionable under § 1983."); *Ragland v. Crawford*, No. 95-CV-10069, 1997 WL 53279, *3 (S.D.N.Y. Feb. 7, 1997) ("In light of the Court's holding in *Sandin*, neither Ragland's loss of one hour daily recreation time for one week, nor his alleged confinement to keeplock on October 13, 1995, constitutes an atypical, significant hardship implicating a protected liberty interest.").

**\*17**  Accordingly, plaintiff's Fourteenth Amendment due process claims against defendants Annarino and Corrections Sergeant Burns are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.[27]

### b. Diego, Loomis, Martin, Strajack, Fischer, "Ms. C" and "Ms. A"

The amended complaint alleges that in September, 2019, defendants Diego, Loomis, Martin, Strajack, Fischer, "Ms. C" and "Ms. A." delayed plaintiff's "progress into Phase 3 [of the] Step Down Program" by one week, and as a result, plaintiff's SHU confinement and lack of access to commissary buy privileges was extended by one week. *Id.* at 6.

As an initial matter, the amended complaint is devoid of any allegations explaining why plaintiff's progression into "Phase 3" of the "Step-Down Program" was delayed, or if plaintiff was given notice and an opportunity to be heard prior to the alleged delay. Plaintiff also does not explain how

or when he was admitted into the program, or under what terms. Thus, the Court has no basis to plausibly infer that the alleged delay was wrongful in any respect. Moreover, it does not appear that plaintiff has a protected liberty interest in participating in the "Step-Down Program," which is apparently a program designed to facilitate plaintiff's early release from SHU confinement. *See Nieves v. Prack*, No. 15-CV-6101, 2016 WL 1165820, at *4 (W.D.N.Y. Mar. 24, 2016) ("[Plaintiff's] claim that his inability ... to participate in various educational, vocational, rehabilitative or self-help programs might have hindered his ability to receive an early parole or release is ... speculative and fails to allege interference with a protected liberty interest.") (citations omitted); *Thompson v. LaClair*, No. 08-CV-0037 (FJS/DEP), 2009 WL 2762164, at *5 (N.D.N.Y. Jan. 30, 2009) ("Courts considering inmate claims regarding [the] denial of participation in or access to prison programs or privileges under *Sandin* have uniformly concluded that inmates do not enjoy a protected liberty interest in such aspects of prison life."), *report and recommendation adopted by* 2009 WL 2762164 (N.D.N.Y. Aug. 25, 2009). In any event, and even assuming that the State has granted plaintiff a liberty interest in participating in the "Step-Down Program," such a brief denial of plaintiff's progression through the program, which allegedly only had the effect of prolonging his SHU confinement and lack of access to commissary buy privileges by one week, did not impose an "atypical and significant hardship" on plaintiff. *Shariff v. Artuz*, No. 99-CV-0321, 2000 WL 1219381, at *6 (S.D.N.Y. Aug. 28, 2000) (concluding that, even assuming "the State has granted inmates, by regulation or statute, a protected liberty interest ... in participating in Honor Block, it is clear that the mere denial of the extra privileges associated with Honor Block does not impose an 'atypical and significant hardship' on plaintiffs").

**\*18**  Accordingly, plaintiff's Fourteenth Amendment due process claims against defendants Diego, Loomis, Martin, Strajack, Fischer, "Ms. C" and "Ms. A" are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### c. Mogavero, Cantwell, Klein, and Hearing Officer Burns

Liberally construed, the amended complaint alleges that defendants Mogavero, Cantwell, Klein, and Hearing Officer Burns denied plaintiff due process during his disciplinary hearings before them. For purposes of this Decision and Order

only, the Court assumes that plaintiff had a protected liberty interest in remaining free from the SHU confinement that resulted from each of the disciplinary sentences imposed by these defendants. Even with that assumption, plaintiff has failed to allege facts which plausibly suggest that any of hearing officers named as defendants denied him the process to which he was entitled during any of his disciplinary hearings.

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination.
*Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

With respect to defendants Mogavero, Cantwell, and Hearing Officer Burns, the amended complaint is devoid of any allegations regarding plaintiff's disciplinary hearings before them. Instead, plaintiff simply alleges that these defendants presided over disciplinary hearings that resulted in sentences of SHU confinement. *See* Am. Compl. at 7-12, 14, 21, 37. Thus, plaintiff has failed to allege sufficient facts to plausibly suggest that any of these hearing officers denied him the process to which he was entitled during one or more of his disciplinary hearings before them.

Furthermore, with respect to defendant Klein, plaintiff alleges only that this defendant refused to allow him to call any witnesses to rebut defendant Annarino's testimony that plaintiff directed inappropriate language at her from his cell, which was the basis for the misbehavior report she authored. Am. Compl. at 3-5.

It is well-settled that an inmate's due process right to call witnesses "is not unfettered." *Allen v. Graham*, No. 9:16-CV-47 (GTS/ATB), 2017 WL 9511168, at *15 (N.D.N.Y. Sept. 26, 2017) (citing *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985))), *report and recommendation adopted by* 2017 WL 5957742 (N.D.N.Y. Dec. 1, 2017). Rather, it

"may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity." *Id.* (citing *Alicea*, 387 F. Supp. 2d at 234). "An inmate's due process right to witnesses is only violated when a prison hearing officer refuses to interview witnesses without assigning a reason 'logically related to 'preventing undue hazards to 'institutional safety or correctional goals.'" *Id.* (quoting *Ponte*, 471 U.S. at 497).

**\*19** While plaintiff alleges that he sought to call his "neighbors or the state actors known to walk the area of the incident" to rebut defendant Annarino's testimony, he fails to allege that any of these individuals actually witnessed the events giving rise to the misbehavior report. In addition, based on plaintiff's allegations that he challenged the credibility of defendant Annarino's testimony, and stated his innocence to defendant Klein, *see* Am. Compl. at 4-5, it appears that plaintiff sought to call these witnesses only to further corroborate his version of the events. It is well-settled that "[t]he refusal to call witnesses whose testimony would be redundant is not a violation of any established due process right." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014); *see also* *Russell v. Selsky*, 35 F.3d 55, 58-59 (2d Cir. 1994) (prison official "did not violate any clearly established constitutional or statutory right" when he refused to permit inmate's requested witnesses to testify where the witnesses' testimony would have been "duplicative or non-probative"); *Garrett v. Ask-Carlson*, No. 15-CV-0723, 2016 WL 439029, at *4 (S.D.N.Y. Feb. 3, 2016) ("The complaint alleges that inmate Brito witnessed Rodriguez refuse to permit Garrett witness the sealing of his urine sample. If called to testify, the Court assumes Brito would have corroborated Garrett's account. But such corroboration would be merely duplicative of Garrett's own testimony, and thus the hearing officer permissibly exercised his discretion to refuse to call the witness.").

Furthermore, the amended complaint lacks any allegations which plausibly suggest that defendant Klein denied plaintiff's request without assigning a justifiable reason. In addition, there is no basis for the Court to plausibly infer from the allegations in the amended complaint that defendant Klein's determination of guilt was not based on some credible evidence. *See Hinton v. Prack*, 9:12-CV-1844 (LEK/RFT), 2014 WL 4627120, at *15 (N.D.N.Y. Sept. 11, 2014) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the

incident and was based upon his first hand observation and detailed account of the incident); *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same). Thus, plaintiff has failed to allege sufficient facts to plausibly suggest that defendant Klein denied him the process to which he was entitled during his disciplinary hearing in July, 2019.

Accordingly, plaintiff's Fourteenth Amendment due process claims against defendants Mogavero, Cantwell, Klein, and Hearing Officer Burns are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. [28]

### E. Dismissal with Leave to Amend

Based on the foregoing, plaintiff's amended complaint is dismissed under 28 U.S.C. § 1915A(b). Although plaintiff was already given an opportunity to amend his complaint and it does not appear that plaintiff will be able to state a cognizable claim against the named defendants, in light of his pro se status, the Court will afford plaintiff a final opportunity to file a proper amended complaint with respect to the claims that were not dismissed with prejudice or transferred. *See* *Gomez v. USAA Fed. Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999).

Any amended complaint filed by plaintiff must bear his original signature, and must be a complete pleading which will supersede and replace the original complaint in its entirety. Plaintiff must name one or more defendants, and must set forth a short and plain statement of the facts he relies on in support of his claim that the individual named as a defendant engaged in misconduct or wrongdoing that violated plaintiff's constitutional rights.

**\*20** Plaintiff is forewarned that, if he fails to submit an amended complaint within thirty (30) days of the filing date of this Decision and Order, the Court will, without further order, dismiss this action without prejudice pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### III. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that the Clerk is directed to attach a copy of the exhibits to the original complaint (Dkt. No. 1-1; Dkt. No. 6-1) to the amended complaint; and it is further

**ORDERED** that the Clerk is directed to revise the docket to add the following individuals as defendants: (1) Corrections Officer John Doe, Auburn Correctional Facility; (2) Corrections Lieutenant Klein, Mid-State Correctional Facility; (3) Corrections Officer Riley, Mid-State Correctional Facility; (4) Corrections Sergeant Burns, Mid-State Correctional Facility; (5) Hearing Officer Mogavero, Auburn Correctional Facility; (6) Hearing Officer Burns, Attica Correctional Facility; (7) Hearing Officer Cantwell, Upstate Correctional Facility; (8) Corrections Officer Annarino, Mid-State Correctional Facility; (9) Diego, Step Down Program Counselor; (10) Loomis, Step Down Program Counselor; (11) Martin, Step Down Program Counselor; (12) Strajack, Step Down Program Counselor; (13) Fischer, Step Down Program Counselor; (14) "Ms. C", Step Down Program Counselor; and (15) "Ms. A", Step Down Program Counselor; and it is further

**ORDERED** that the claim(s) arising out of plaintiff's confinement at Elmira Correctional Facility asserted against defendant Corrections Sergeant John Doe are severed and transferred to the Western District of New York; and it is further

**ORDERED** that the Clerk shall advise the Clerk of the Western District of New York, in writing, of the entry of this Order and provide that Clerk with a certified copy of this Order and of the docket sheet for this action, together with all information necessary for the Western District Clerk to electronically access the documents filed in this action; and it is further

**ORDERED** that the Clerk shall remove Corrections Sergeant John Doe from the docket as a defendant in the Northern District action; and it is further

**ORDERED** that plaintiff's Letter Request (Dkt. No. 13) is **GRANTED** to the extent that plaintiff seeks to name Hearing Officer Mogavero, Corrections Officer Riley, and Corrections Sergeant Burns as defendants and **DENIED** in all other respects; and it is further

**ORDERED** that plaintiff's official capacity claims against each of the named defendants, as well as his individual capacity claims against former DOCCS Commissioner Brian Fischer, are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. The Clerk is directed to terminate

former DOCCS Commissioner Brian Fischer as a defendant; and it is further

**ORDERED** that the remaining claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that if plaintiff wishes to proceed with this action, he must file an amended complaint as directed above within thirty (30) days from the filing date of this Decision and Order; and it is further

**ORDERED** that, if plaintiff timely files an amended complaint, this matter be returned to the Court for further review; and it is further

 **\*21  ORDERED** that if plaintiff fails to timely file an amended complaint as directed above, the Clerk shall enter judgment indicating that this action is **DISMISSED without prejudice** without further order of this Court pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. In that event, the Clerk is directed to close this case; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so may result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 374578

---

### Footnotes

1    Because plaintiff paid the filing fee for this action, the Court also struck the inmate authorization form filed by plaintiff. *See* October 2019 Order at 1, 14-15.

2    Plaintiff's amended complaint is comprised of a document entitled "Amendment of Complaint per 10/24/2019 Court Order of the United States District Court Northern District of New York (U.S. District Judge Lawrence E. Kahn)" and a document entitled "Affidavit in Support of Claims in Damilola Animashaun vs Brian Fischer et al." Page citations to the amended complaint refer to the page numbers electronically generated by the Court's electronic filing system, CM/ECF.

3    The amended complaint also makes reference to the exhibits attached to the original complaint (Dkt. No. 1-1) and supplemental submission in support of the original complaint (Dkt. No. 6-1), and requests that those exhibits be considered and filed with the amended complaint. Am. Compl. at 1, 17. The Court has considered those exhibits as part of its review of the amended complaint in accordance with 28 U.S.C. § 1915A. The Clerk is directed to attach a copy of those exhibits (Dkt. No. 1-1; Dkt. No. 6-1) to the amended complaint.

4    Apparently after the events of August 18, 2016, and while plaintiff was awaiting his disciplinary hearing, he received two other disciplinary infractions. *See* Am. Compl. at 23.

5    Although the amended complaint does not name Hearing Officer Mogavero as a defendant, plaintiff's Letter Request seeks to modify the amended complaint to do so. *See* Letter Request at 1. The Letter Request

2020 WL 4382001
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Nathaniel JAY, Plaintiff,
v.
D. VENETOZZI and William Hughes, Defendants.

15-CV-147S
|
Signed 07/30/2020

**Attorneys and Law Firms**

Nathaniel Jay, Otisville, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

### DECISION AND ORDER

WILLIAM M. SKRETNY, United States District Judge

### I. INTRODUCTION

**\*1** In this action, Plaintiff Nathaniel Jay alleges that Defendants, employees of the New York Department of Corrections and Community Supervision ("DOCCS"), violated his constitutional rights by denying him due process at a disciplinary hearing and by affirming the decision that resulted from that hearing. Before this Court is Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which Jay opposes. (Docket Nos. 40, 46). For the following reasons, Defendants' motion for summary judgment is granted.

### II. BACKGROUND

Unless otherwise noted, the following facts are not disputed for purposes of the motion for summary judgment. This Court takes the facts in the light most favorable to Jay, the non-moving party. See 📁 Mitchell v. City of New York, 841 F.3d 72, 75 (2d Cir. 2016) (at summary judgment, a court "views the evidentiary record in the light most favorable to ... the non-moving party").

At all relevant times, Jay was an inmate at Attica Correctional facility, under the care and custody of DOCCS. (Defendants' Statement of Undisputed Facts, Docket No. 40-1, ¶ 1.) Defendant William Hughes was Deputy Superintendent of Security ("DSS") at Attica. (Id., ¶ 2.) Defendant Donald Venetozzi was the Director of the Special Housing Unit ("SHU") for DOCCS. (Id., ¶ 3.)

### A. The February 17, 2012, Incident

On February 17, 2012, an incident occurred between Jay and C.O. Summers. According to the misbehavior report subsequently authored by Summers, Jay reached his arm out of his cell and struck Summers in the left shoulder with an altered mirror. (Docket No. 40-3 at p. 50.) The report indicates that Summers ordered Jay to stop, and that Jay refused to stop or to surrender the mirror. (Id.) Jay appears to contest these allegations. (Docket No. 46 at pp. 8, 17.) Summers left and reported the incident to Sergeant Leonard. (Docket No. 40-3 at p. 50.)

After this incident, Summers recovered the altered mirror in Jay's cell. (Id.) Jay disputes whether Summers actually performed the search. (Docket No. 46 at p. 8.) Jay was served with Summers's misbehavior report on this incident on February 21, 2012. (Docket No. 40-1, ¶ 9.)

### B. The Tier III Hearing

Defendant William Hughes presided over the Tier III disciplinary hearing related to this incident. The hearing began on February 23, 2012, and ended on March 5, 2012, after being adjourned several times. (Docket No. 40-1, ¶ 6.) Jay was charged with seven violations: violent conduct; assault on staff; possession of a weapon; possession of an altered item; harassment; refusing a direct order; and threats. (Docket No. 1 at p. 20; see also Docket No. 40-3 at p. 54.)

There is no evidence in the record suggesting that Hughes personally participated in any investigation of Jay's alleged misconduct prior to the hearing.

All of the witnesses Jay requested testified at the hearing: C.O. Summers; Sergeant Leonard; C.O. Caldwell; and Nurse Cathy Sault. (Id. at pp. 39-46.) Jay asked many questions of the witnesses during the hearing. (Id.) At the hearing, Jay's hands were restrained behind his back. He asked for the restraints to be removed, or that his hands be cuffed in front of him to permit him to access his documents. (Docket No. 40-3 at p. 16) In response, Hughes stated, "No but anything

you want let me know I will grab it," to which Jay replied, "alright." (Id.)

*2  During the hearing, Jay requested the introduction of his disciplinary records. (Id. at p. 44.) Hughes denied this request, stating that the records were irrelevant. (Id. at p. 45.) After hearing the witnesses' testimony, Hughes found Jay guilty of all charges and imposed a penalty of 24 months in SHU with a corresponding loss of privileges. (Id. at pp. 46-47.) There are two versions of the hearing disposition form in the record, one without a tape number, [1] which Jay attached to his complaint (Docket No. 1 at p. 20), and one with a tape number, which Defendants attached to their motion for summary judgment. (Docket No. 40-3 at p. 56.)

### C. Jay's Appeal and Article 78 Proceeding

Jay appealed Hughes' decision and sentence to defendant Donald Venetozzi, director of the SHU. (Docket No. 40-1, ¶ 3.) On May 15, 2012, Venetozzi modified Jay's sentence to 18 months of SHU and loss of privileges. (Docket No. 40-3 at p. 58.) Jay ultimately served 13 months and 20 days of his SHU sentence. (Id. at p. 123.)

Jay filed an Article 78 Motion in New York State Supreme Court in Wyoming County, seeking review of his Tier III hearing. (Id. at p. 125.) Acting Supreme Court Justice Mark Dadd denied Jay's petition, finding that Jay's due process rights were not violated at the hearing. (Id. at p. 126.) Judge Dadd held that Jay was not prevented from calling witnesses or submitting relevant documentary evidence, that Hughes acted rationally when he excluded Jay's disciplinary record as irrelevant, that credibility determinations were validly made, and that the sanction imposed was not excessive. (Id.) Jay appealed this decision to the Appellate Division, Fourth Department, which affirmed Judge Dadd's decision on June 13, 2014. (Id. at pp. 128-29.)

### III. DISCUSSION

Cognizant of the distinct disadvantage that *pro se* litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest arguments that they suggest. See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). This is especially important when reviewing *pro se* complaints alleging civil

rights violations. See Weinstein v. Albright, 261 F.3d 127, 132 (2d Cir. 2001). Since Jay is proceeding *pro se*, this Court has considered his submissions and arguments accordingly.

Two claims remain from Jay's original complaint. [2]  He claims first that Hughes denied him due process at his Tier III hearing, by (1) failing to serve as an impartial hearing officer; (2) serving as a hearing officer when his role as DSS was to oversee search and contraband; (3) keeping Jay in manual restraints during the hearing; (4) refusing to admit evidence of Jay's prior disciplinary history at the hearing; (5) failing to record the tape number on the hearing disposition sheet; and (6) imposing a sentence beyond that recommended in DOCCS guidelines. (Third Cause of Action.) Jay also claims that Venetozzi violated his rights by affirming Hughes' determination, and that Venetozzi's reduction of Jay's penalty proves that Hughes' original sentence violated Jay's rights. (Second Cause of Action.)

*3  Defendants move for summary judgment on Jay's claims against Hughes and Venetozzi on the basis that Jay was afforded due process at his Tier III hearing, and that Venetozzi is not liable for affirming Hughes' finding or for reducing Jay's sentence.

### A. Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 1609, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."

Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the non-moving party. See Anderson, 477 U.S. at 252.

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.' " Triestman v. Fed. Bur. of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (quoting Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)). "A *pro se* plaintiff, however, cannot defeat a motion for summary judgment by simply relying on the allegations of his complaint; he must present admissible evidence from which a reasonable jury could find in his favor." Belpasso v. Port Auth. of NY & NJ, 400 F. App'x. 600, 601 (2d Cir. 2010); see Champion v. Artuz, 76 F.3d 483, 485 (2d Cir. 1996) (summary judgment properly entered against *pro se* plaintiff who failed to oppose motion with admissible evidence after receiving plainly worded warning of the consequences of such failure).

In the end, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

## B. 42 U.S.C. § 1983

**\*4** Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Jay's claims against Hughes and Venetozzi are grounded in the Fourteenth Amendment.

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983. See Haygood v. City of New York, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999). It is well settled in this circuit that personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983. See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). Personal involvement need not be active participation. It can be found "when an official has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989). Thus, personal involvement can be established by showing that

the defendant participated directly in the alleged constitutional violation; (2)

the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to others' rights by failing to act on information indicating that constitutional acts were occurring.

Liner v. Goord, 582 F. Supp. 2d 431, 433 (W.D.N.Y. 2008) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)); Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003).

## C. Due Process Claims

Jay argues that Hughes violated his Fourteenth Amendment Due Process rights at his Tier III hearing. Jay also argues that Venetozzi violated his Fourteenth Amendment rights by affirming Hughes's Tier III guilty determination, and that Venetozzi's reduction of Jay's SHU sentence proves the invalidity of Hughes's initial sentence. Defendants argue that Hughes afforded Jay all the process required by the Constitution, and that Venetozzi is not liable either for affirming Hughes's decision or for reducing Jay's sentence.

### 1. Legal Standards

Jay alleges that his Tier III hearing was constitutionally infirm. He thus asserts a procedural due process claim. To prevail on this claim, he must establish (1) that he possessed a protected liberty or property interest and (2) that Defendants deprived him of that interest through constitutionally insufficient procedures. See Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citing Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir. 1996)).

### a. Liberty Interest

**\*5**  "A liberty interest may arise from either of two sources – the Due Process Clause itself [or] the laws of the States."

Rodriguez v. McLoughlin, 214 F.3d 328, 337 (2d Cir. 2000) (quoting Kentucky Dep't of Corrs. v. Thompson, 490 U.S. 454, 460, 109 S. Ct. 1904, 104 L.Ed.2d 506 (1989) (internal quotation omitted)). A prisoner must identify a viable liberty interest before he can demonstrate that such an interest was infringed. Palmer v. Richards, 364 F.3d 60, 64 n. 2 (2d Cir. 2004); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996) (per curiam). Confinement in SHU can implicate a liberty interest when an inmate is subjected to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). The parties here do not contest that Jay had a liberty interest at stake.

### b. Process Due

After determining whether a liberty interest is implicated, a court must determine whether the inmate received the process he or she was due. Wolff v. McDonnell, 418 U.S. 539, 563-66, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). Due process rights for prisoner whose liberty interest is implicated provide for the following procedural safeguards:

> advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken.

Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (relying on Wolff).

Judicial review of the written findings required by due process is limited to determining whether the disposition is supported by "some evidence." Superintendent v. Hill, 472 U.S. 445, 455, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985). This

standard is extremely tolerant and is satisfied if "there is any evidence in the record that supports" the disciplinary ruling. Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000). Nevertheless, the "some evidence" standard requires some *reliable* evidence. Sira, 380 F.3d at 69 (citing Luna v. Pico, 356 F.3d 481, 488 (2d Cir. 2004)).

State statutes and regulations do not create federally protected due process rights. Shakur v. Selsky, 391 F.3d 106, 119 (2d Cir. 2004); Ruggiero v. Prack, 168 F. Supp. 3d 495, 513–14 (W.D.N.Y. 2016) (citing Wolff, 418 U.S. at 564–70). In § 1983 cases, "federal law, not state regulations, determines the procedures necessary to protect that liberty interest." Blouin v. Spitzer, 356 F.3d 348, 363 (2d Cir. 2004) (citing cases). For this reason, "the only relevant inquiry [is] whether constitutional 'minimal procedures' [for the loss of a protected liberty interest] were met, not whether state procedures were followed." Shakur, 391 F.3d at 119 (discussing Holcomb v. Lykens, 337 F.3d 217 (2d Cir. 2003)).

### 2. Jay's Due Process Claims against Hughes

#### a. Impartial hearing officer

Jay argues first that Hughes was not an impartial hearing officer, because as Deputy Superintendent of Security at Attica, he was in charge of all contraband in the facility and had knowledge of the investigatory procedures used at the facility. Defendants argue that Hughes provided Jay with all the process he was due at Jay's Tier III hearing.

Inmates are not entitled to hearing officers "with the same level of impartiality required by judges," though they are "entitled to a hearing untainted by arbitrary or pre-determined findings of guilt." Fowler v. New York State Dep't of Corr. & Cmty. Supervision, No. 13-CV-6546-FPG, 2020 WL 1905233, at *3–4 (W.D.N.Y. Apr. 17, 2020). "[A] hearing officer's limited impartiality requirements are satisfied where the record contains 'some evidence' to support the officer's findings." Id. (quoting Superintendent v. Hill, 472 U.S. at 455).

**\*6** For purposes of a constitutional inquiry, the Second Circuit has held that the involvement of a hearing officer in the investigation of the incident, without more, does not violate a prisoner's due process rights. Shabazz v. Bezio, 669 F. App'x 592, 593 (2d Cir. 2016) (summary order) ("Standing alone, the fact that Bezio both heard the case and participated in its investigation is not a conflict of sufficient magnitude to violate due process.").

Here, Jay claims that Hughes was biased because, as DSS, his *role* was to oversee investigations. Jay argues that, as DSS, Hughes had a "facility function as a senior security person over-seeing contraband." (Docket No. 48 at p. 5.) Jay argues that Hughes was "privy to the search procedure in detail" because his role as DSS "provid[ed] him with intricate knowledge and detail of the explained protocol of the officer involved." (Docket No. 1 at p. 18.) Jay notes that the facility's contraband receipt instructs recipients that they may write to the superintendent of security regarding confiscated items. (Id.) He concludes from this statement that Hughes was "already abreast to alleged contraband logged at the time of the hearing." (Id.)

In essence, Jay concludes from Hughes's official duties that Hughes had actual prior knowledge of the case when he served as Jay's hearing officer. (Id. at p. 6.) What is missing from Jay's argument is any evidence suggesting that Hughes personally participated in investigating the February 12 incident, or inspected the allegedly altered mirror, and that that these actions made Hughes biased against Jay. A role as supervisor of contraband and a familiarity with investigation protocols, without more, do not establish that Hughes participated in the investigation of this particular case, let alone that it made him biased against Jay.

Jay points to interactions at the hearing that he believes demonstrate Hughes' bias against him. (Docket No. 48 at p. 7.) Having carefully reviewed the hearing transcript, this Court does not see any bias in Hughes' conduct in the hearing.

Jay further argues that Hughes' serving as a hearing officer violated DOCCS guidelines. He cites 7 N.Y.C.R.R. § 254.1 for the proposition that "a person who was directly involved in the incident" and "a person who has investigated the incident" shall not be appointed to conduct the proceeding. (Docket No. 48 at p. 5.) In response, Defendants point to the same regulation, which allows "the superintendent, a deputy superintendent, captain or commissioner's hearing officer employed by the department's central office" or someone else appointed by the superintendent to serve as a hearing officer. (Docket No. 40-2 at p. 8.)

New York regulations, however, are not relevant to this Court's inquiry, because "federal law, not state regulations, determines the procedures necessary to protect that liberty interest." 🚩⚠️ Blouin, 356 F.3d at 363. The relevant question for this Court's analysis is whether there are any facts suggesting that Hughes's personal actions caused him to be biased against Jay. Given that there is no evidence of Hughes' participation in the investigation, and having carefully reviewed the hearing transcript, this Court finds that a reasonable jury could not determine that Hughes's conduct of the Tier III hearing was biased or partial. As reflected in the disciplinary hearing transcript and memorialized on the hearing disposition form, Hughes permitted Jay to voice his objections during the hearing and gave Jay the opportunity to testify and call witnesses. (See Docket No. 40-3 at pp. 13-47, 56.) Hughes states that he relied upon the written report and verbal testimony of Correction Officer Summers, and the verbal testimony of Correction Officers Leonard and Caldwell, and Nurse Sault. See Sloane v. Borawski, 64 F. Supp. 3d 473, 488 (W.D.N.Y. 2014). A reasonable jury could not find that Hughes was biased in his conduct of the hearing, and Jay's claim fails on this basis.

### b. Mechanical restraints during the hearing

 *7  Jay next argues that Hughes violated his due process rights by keeping him in hand restraints during the hearing, which prevented Jay from taking notes or accessing his documents during the hearing. Defendants argue that the restraints were used to protect Hughes and others, that Jay did not object to the use of the restraints during the hearing, and that Jay was able to participate in the hearing despite the restraints.

Jay argues that Defendants violated 🚩 7 NYCRR § 250.2, which states that "mechanical means of physical restraint must never be used for disciplinary purposes ... and may be used only when necessary while transporting inmates within or outside of the facility." (Docket No. 46, ¶ 11.) There is no indication that the restraints used here were used for disciplinary purposes, rather than for officer safety, during the hearing. In any event, because state regulations do not create federal constitutional rights, Ruggiero, 168 F. Supp. 3d at 513–14, this dispute is not relevant to this Court's inquiry.

This Court has carefully reviewed the hearing transcript, and does not find evidence from which a reasonable jury could conclude that mechanical restraints prevented Jay from receiving his basic rights of advance written notice; the opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition. See 🚩⚠️ Sira, 380 F.3d at 69. Rather, this Court notes that Jay assented when Hughes told him the restraints could not be removed, and that Hughes would assist him in getting any documents he needed. (Docket No. 40-3 at p. 16.) It further observes that Jay was able to call the witnesses he wanted and actively interrogate them. A reasonable jury could not find that Defendants' use of mechanical restraints during Jay's Tier III hearing violated his due process rights, and summary judgment is warranted on this claim as well.

### c. Refusal to admit evidence of Jay's disciplinary history

Jay further argues that Hughes erred in refusing to admit Jay's disciplinary history as evidence at the hearing. Defendants argue that this history was irrelevant to the question addressed at the hearing, and that, even if refusing this evidence was error, it was harmless, because Jay's disciplinary history reveals a number of violent incidents.

When facing a disciplinary hearing, a prisoner has a right to call witnesses and present documentary evidence in his defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." LeBron v. Artus, No. 06-CV-0532 VEB, 2008 WL 111194, at *5 (W.D.N.Y. Jan. 9, 2008) (citing 🚩 Wolff, 418 U.S. at 566). "A hearing officer may rationally exclude witnesses or documents when they would be irrelevant or unnecessary to a determination of the issues in the disciplinary hearing." 🚩 Kalwasinski v. Morse, 201 F.3d 103, 109 (2d Cir. 1999). The burden is on the prison official to demonstrate "the rationality of his position." 🚩 Fox v. Coughlin, 893 F.2d 475, 478 (2d Cir. 1990).

Even if an officer fails to clearly state reasons for excluding evidence, it is harmless error if the documents would not have led to a different result. Payne v. Coburn, No. 915CV00392GLSTWD, 2017 WL 4330372, at *13–14 (N.D.N.Y. Aug. 29, 2017), report and recommendation adopted, No. 915CV392GLSTWD, 2017 WL 4326079

(N.D.N.Y. Sept. 27, 2017) ("Even assuming Deputy Supt. Colao failed to state the reason why the grievances were denied on the hearing record, the Court finds such error was harmless.... Because the past grievances would not have affected the outcome of Plaintiff's disciplinary hearing any error pertaining to the denied documents was harmless.").

**\*8** Here, Hughes refused Jay's request to use his disciplinary history as evidence on the grounds that it was irrelevant. (Docket No. 40-3 at pp. 44-45.) This Court agrees that evidence of Jay's past conduct was not relevant to a determination of the events on February 17, 2012. Further, Jay's disciplinary history (supplied by Defendants in support of their motion for summary judgment) reflects four guilty dispositions for fighting or violent conduct between 2007 and 2011. (See Docket No. 40-3 at pp. 92-94.) It was not error for Hughes to refuse to admit these records—both because past incidents would not have helped Hughes' factual determination and because the records would not have affected the outcome of Jay's case.

### d. Failure to note the tape number on the hearing disposition sheet

Jay next argues that Hughes violated his rights by failing to record the tape number on his hearing disposition sheet. Defendants argue that (1) the hearing disposition sheet does contain a tape number, (2) having a tape number recorded on a hearing disposition is not one of an inmate's due process rights; and (3) even if there were no tape number, Jay was not harmed because he was able to timely grieve the hearing disposition, bring and appeal an Article 78 proceeding in state court, and file this suit in federal court.

As an initial matter, this Court observes that the hearing disposition sheet submitted with Defendants' motion for summary judgment contains a tape number on the relevant line (see Docket No. 40-3 at p. 56), while the copy of the same document submitted by Jay with his Complaint does not. (See Docket No. 1 at p.20.) Resolving this inconsistency in Jay's favor, this Court will assume that Defendants failed to include the tape number on their original hearing disposition sheet.

But neither New York regulations nor due process require a tape number. 🔖 Dixon v. Goord, 224 F. Supp. 2d 739, 744–45 (S.D.N.Y. 2002). DOCCS regulations require that a hearing be electronically recorded, but they do not require a tape number on a written statement of the disposition

of a disciplinary hearing. See 7 N.Y.C.R.R. § 253.6(b) ("The entire hearing must be electronically recorded."). As discussed above, violations of state law procedural requirements do not alone constitute a deprivation of due process since "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." 🔖 Russell v. Coughlin, 910 F.2d 75, 78 n. 1 (2d Cir. 1990). Procedural due process requires notice of the disposition, and Jay acknowledges that he received this notice.

Viewing Jay's submissions in the most favorable light, however, this Court will take him to claim that the lack of a tape number impeded his ability to appeal the outcome of the hearing, or, in other words, that Defendants hindered his access to the courts.

The Constitution requires a correctional facility to provide an inmate with meaningful access to the courts. 🔖 Lewis v. Casey, 518 U.S. 343, 350, 116 S. Ct. 2174, 2179, 135 L. Ed. 2d 606 (1996). In order to state a constitutional claim, "some showing of impaired access is required," Arce v. Walker, 58 F. Supp. 2d 39, 44 (W.D.N.Y. 1999), and a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim." 🔖 Lewis, 518 U.S. at 351; accord 🔖 Morello v. James, 810 F.2d 344, 347 (2d Cir. 1987).

A plaintiff has not shown actual injury unless he shows that a "nonfrivolous legal claim had been frustrated or was being impeded" due to the actions of prison officials. 🔖 Lewis, 518 U.S. at 351-52. See Jermosen v. Coughlin, No. 89 Civ. 1866 (RJW), 1995 WL 144155, at \*4 (S.D.N.Y. Mar. 30, 1995) ("Interferences that merely delay an inmate's ability to work on a pending cause of action or to communicate with the courts do not violate this constitutional right."); Herrera v. Scully, 815 F. Supp. 713, 725 (S.D.N.Y. 1993) ("A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.").

**\*9** Here, the lack of a tape number on his hearing disposition sheet did not delay or prevent Jay from appealing the hearing's outcome. Jay was able to timely appeal Hughes' decision to Venettozzi, successfully have his SHU sentence reduced, bring a state Article 78 proceeding, appeal that decision to the state's appellate division, and bring the instant suit in federal court. Hughes' failure to include a tape number, therefore, did not violate any of Jay's constitutional rights.

### e. Excessive sentence

Jay next argues that Hughes' 24-month SHU sentence violated his due process rights because it exceeded DOCCS guidelines. Defendants argue that that these guidelines are discretionary, so that a sentence in excess of them is permissible, and that Venetozzi's later reduction of Jay's sentence afforded him due process protections that corrected any possible defect in the original sentence.

Jay argues that his 24-month sentence exceeded DOCCS sentencing guidelines. But "the failure to follow a DOCS Directive or prison regulation does not give rise to a federal constitutional claim." Rivera v. Wohlrab, 232 F.Supp.2d 117, 123 (S.D.N.Y. 2002). "Accordingly, such guidelines do not rise to a level of constitutional significance," and the failure to sentence within them does not present a basis for a due process claim." Id.

Because this Court is to read pro-se litigants' arguments liberally, interpreting them to raise the strongest arguments they suggest, this Court will also assess whether the SHU sentence Jay ultimately served constituted excessive punishment in violation of the Eighth or Fourteenth Amendment. The record shows that Jay served 13 months and 20 days in SHU. (Docket No. 40-3 at p. 58.)

"Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." Encarnacion v. Goord, 669 F. App'x 61, 62 (2d Cir. 2016) (citing Hutto v. Finney, 437 U.S. 678, 685, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978)).To succeed on an Eighth Amendment claim, a plaintiff must show "(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official." Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001) (internal quotation marks omitted). "[W]hether incarceration in the SHU violates the Eighth Amendment ... depends on the duration and conditions of confinement." Gonzalez v. Hasty, 802 F.3d 212, 224 (2d Cir. 2015). "Although it is perfectly obvious that every decision to remove a particular inmate from the general population ... could not be characterized as cruel and unusual, it is equally plain that the length of confinement cannot be ignored in deciding whether the overall conditions of confinement

meet constitutional standards." Id. (internal quotation marks and alterations omitted). Courts must consider whether the confinement violates "the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958).

Numerous cases in this circuit have upheld long SHU sentences that were challenged only based on the amount of time prisoners were held in segregation. See, e.g., Sostre v. McGinnis, 442 F.2d 178, 193, overruled on other grounds by Davidson v. Scully, 114 F.3d 12 (2d Cir. 1997) (declining to hold that plaintiff's confinement in punitive segregation for more than twelve months violated the Eighth Amendment); Bunting v. Fischer, No. 14-CV-0578-RJA-MJR, 2016 WL 4939389, at *4 (W.D.N.Y. Aug. 4, 2016), report and recommendation adopted, No. 14-CV-578A, 2016 WL 4804099 (W.D.N.Y. Sept. 14, 2016) (dismissing a claim for excessive punishment for approximately 4 years in SHU); Gulley v. Roach, 02-cv-908S, 2004 WL 2331922 (W.D.N.Y. Oct. 15, 2004) (holding that seven-month "duration of Plaintiff's confinement alone does not rise to the level of a constitutional violation").

**\*10** Here, Jay has not provided any details of the conditions he experienced during the 13 months he ultimately served in SHU. Without such evidence, a reasonable jury could not find that the 13 months and 20 days Jay served in SHU violated contemporary standards of decency as needed for a claim of excessive punishment.

This Court will therefore grant summary judgment for Defendants on Jay's claim regarding his SHU sentence.

### 3. Jay's Due Process Claim against Venetozzi

Jay argues that Venetozzi is liable to him for affirming Hughes' unconstitutional Tier III hearing. Because this Court does not find a due process violation in Jay's Tier III hearing, it does not find a due process violation in Venetozzi's affirmance of that decision.

If a disciplinary hearing does not violate an inmate's Fourteenth Amendment rights, then neither can a supervisor's affirmance of the outcome of that hearing. See, e.g., Hameed v. Mann, 57 F.3d 217, 224 (2d Cir. 1995) (Director of Special Housing and Inmate Grievance Programs entitled to dismissal of claims where plaintiff failed to establish constitutional violations at disciplinary hearing); Lopez v.

Whitmore, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (N.D.N.Y. July 16, 2015) (dismissing due process claim against DSH Prack "[b]ecause his only involvement in the plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process"); Davis v. Rynkewicz, No. 11-CV-431SR, 2015 WL 1038098, at *14 (W.D.N.Y. Mar. 10, 2015) ("As plaintiff was not deprived of his federal constitutional right to due process during the course of the disciplinary hearing, Director Prack's denial of plaintiff's request for reconsideration of that determination cannot establish a federal constitutional violation"); Wesolowski v. Harvey, 784 F. Supp. 2d 231, 234 (W.D.N.Y. 2011) (finding no constitutional claim against supervisor where no underlying constitutional violation occurred); Alston v. Bendheim, 672 F. Supp. 2d 378, 388 (S.D.N.Y. 2009) ("The failure to state a claim for an underlying constitutional violation forecloses supervisory liability.").

Because this Court finds that no constitutional violation occurred at Jay's Tier III hearing, it finds no violation in Venetozzi's affirmation of Hughes' guilty finding.

Jay argues that Venetozzi's reduction of his SHU term from 24 months to the guidelines 18 months is proof that Hughes' earlier sentence was unconstitutional. But, as discussed above, a sentence above the state-imposed discretionary guidelines, standing alone, does not violate due process.

Additionally, Venetozzi's reduction of the sentence Hughes imposed, from 24 to 18 months, was a proper example of due process. Young v. Hoffman, 970 F.2d 1154, 1156 (2d Cir. 1992) ("The administrative reversal constituted part of the due process protection he received, and it cured any procedural defect that may have occurred. We believe that, as a policy matter, this possibility of cure through the administrative appeals process will encourage prison administrators to correct errors as an alternative to forcing inmates to seek relief in state or federal courts.")

Because this Court finds that no reasonable jury could find that Venetozzi violated Jay's due process rights, it will grant summary judgment to Defendants on this claim.

**4. Preclusive effect of New York state court decisions.**
 **\*11**  Defendants also argue that summary judgment is warranted because the New York State Supreme Court and Appellate Division decisions on Jay's claims preclude this Court's reconsideration of the issues. Because this Court has concluded on its own that no reasonable jury could find that a constitutional violation occurred, it will not address Defendants' preclusion argument here.

**IV. CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment is granted. Jay has raised no genuine issue of material fact suggesting that Hughes violated Jay's rights in the course of the Tier III hearing, or that Venetozzi violated his constitutional rights, either in affirming Hughes' Tier III determination or in reducing Jay's sentence.

**V. ORDERS**

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 40) is GRANTED.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 4382001

---

### Footnotes

1    § 254.6(a)(2) states that an inmate's disciplinary hearing must be recorded. This Court notes that the DOCCS hearing disposition sheet has a blank where a "tape number" is presumably to be entered. See, e.g., Docket No. 1 at p. 20.

2      On August 15, 2015, the Hon. David Larimer granted Jay's motion to proceed *in forma pauperis* and dismissed his claims against Defendants Mark Bradt, Daniel Leonard, Christopher Summers, and F.J. Cromwell pursuant to 18 U.S.C. § 1915 (a). (Docket No. 3.)

---

**End of Document**                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

also states that this individual was "the hearing officer whom [sic] conducted the Elmira Correction[al] Facility disciplinary hearing" arising out of charges that plaintiff lied to a corrections official at that facility regarding his possession of an identification card. *Id.*

6    The amended complaint lacks any allegations explaining when plaintiff received these other disciplinary charges, what he was charged with, when he received a disciplinary hearing for these charges, or who acted as the hearing officer.

7    Plaintiff alleges that the incidents giving rise to the disciplinary infractions occurred in October 2016, December 2016, and February 2017. Am. Compl. at 37. The amended complaint, however, lacks any allegations explaining what plaintiff was charged with, when he received disciplinary hearings for these charges, or who acted as the hearing officer at the hearings. The amended complaint also lacks any allegation that any hearing officer who imposed a sentence resulting in some portion of the additional 8 months of SHU confinement and 30 days of keeplock was aware of plaintiff's mental health issues, or how much additional SHU confinement plaintiff already faced as a result of the disciplinary sentence(s) issued based on earlier events.

8    Plaintiff alleges that he received a separate hearing for the disciplinary charge of lying to the corrections official, and received a $5.00 fine at the conclusion of that hearing. Am. Compl. at 10-12. It is unclear whether plaintiff received any additional punishment as a result of this disciplinary charge.

9    The amended complaint lacks any allegations explaining who acted as the hearing officer(s) for these disciplinary charges, or the amount of SHU confinement, if any, plaintiff received as a result of these disciplinary charges. The amended complaint also lacks any allegation that the hearing officer(s) who imposed the disciplinary sentence(s) were aware of plaintiff's mental health issues, or how much additional SHU confinement plaintiff already faced as a result of prior disciplinary sentences.

10   Plaintiff alleges that he was involved in two incidents at Downstate Correctional Facility that resulted in two separate disciplinary hearings. Am. Compl. at 8. The amended complaint, however, fails to identify the charge(s) that gave rise to the other disciplinary hearing, or the outcome of that hearing.

11   The amended complaint lacks any allegations regarding a fifth incident.

12   The amended complaint lacks any allegations indicating the amount of SHU confinement imposed on plaintiff after any of the these disciplinary hearings. The amended complaint also lacks any allegation that the hearing officer(s) who imposed the disciplinary sentence(s) were aware of plaintiff's mental health issues, or how much additional SHU confinement plaintiff already faced as a result of prior disciplinary sentences.

13   The amended complaint lacks any allegations indicating the amount of SHU confinement imposed on plaintiff after any of these disciplinary charges, or that defendant Cantwell was aware of how much additional SHU confinement plaintiff already faced as a result of prior disciplinary sentences.

14   The amended complaint lacks any allegations indicating the amount of SHU confinement imposed on plaintiff, or that defendant Burns was aware of plaintiff's mental health issues, or how much additional SHU confinement plaintiff already faced as a result of prior disciplinary sentences.

15   Plaintiff's Letter Request clarifies plaintiff's desire to name Corrections Sergeant Burns as a defendant. It is unclear whether this individual is the same individual with the last name "Burns" who presided over plaintiff's disciplinary hearing at Attica Correctional Facility. However, because plaintiff named Hearing Officer Burns as a defendant in the "parties" section of the amended complaint, and sought to add Corrections Sergeant

Burns as a defendant in his Letter Request, the Court assumes that there are two individuals with the last name "Burns" that plaintiff desires to name as defendants.

16    The Letter Request clarifies plaintiff's desire to name Corrections Officer Riley as the person allegedly responsible for plaintiff's cell relocation.

17    As noted in the October 2019 Order, in December, 2015, the Honorable Shira A. Scheindlin preliminarily approved a settlement agreement in the consolidated action, and conditionally certified a class of all inmates in DOCCS custody who were then serving, or would serve in the future, a disciplinary confinement sanction in a SHU. *See* October 2019 Order at 6-7 (citing *Peoples v. Fischer*, No. 11-CV-02694 (S.D.N.Y.), Dkt. Nos. 144, 329). On March 31, 2016, Judge Scheindlin granted the final joint motion for settlement approval, and in doing so, approved the parties' settlement agreement. *Id.* (citing *Peoples v. Fischer*, No. 11-CV-02694 (S.D.N.Y.), Dkt. No. 329).

18    In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law, and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities). In this case, plaintiff has not sought injunctive relief or alleged facts which plausibly suggest the existence of an ongoing violation of law or the Constitution. *See generally*, Am. Compl.

19    Pursuant to Fed. R. Evid. 201, a court may at any stage of a proceeding take judicial notice of "a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." This includes "information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.' " *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n. 8 (S.D.N.Y. 2006) (quoting prior version of Fed. R. Evid. 201(b) amended in 2011 as part of the restyling of the Evidence Rules). The accuracy and authenticity of DOCCS's website cannot reasonably be questioned.

20    Part 301 of the New York Code, Rules and Regulations lists the grounds for special housing unit admissions, which include disciplinary, detention, administrative segregation, and protective custody.

21    By plaintiff's own allegations, he was released from SHU and confined to his cell on keeplock status for twenty-seven days while housed at Elmira Correctional Facility. Am. Compl. at 12, 20.

22    Plaintiff conclusorily alleges that by June, 2018, it became apparent that he was suffering from mental health issues impacted by his SHU confinement. *See* Am. Compl. at 15.

23    Plaintiff attached documents to the original complaint showing that between July, 2018, and March, 2019, he received a mental health examination by a medical professional roughly once a month. *See* Dkt. No. 1-1 at 37-48.

24    Prior to *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred,

2004 WL 2331922

Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.

Steven GULLEY (91–B–1924), Plaintiff,

v.

John ROACH, Robert Murphy
and Donald Selsky, Defendants.

No. 02–CV–908S.

|

Oct. 15, 2004.

**Attorneys and Law Firms**

Steve Gulley, Pine City, NY, pro se.

Darren Longo, Office of the New York State Attorney General, Buffalo, NY, for Defendants.

DECISION AND ORDER

SKRETNY, J.

## I. INTRODUCTION

**\*1** In this action, *pro se* Plaintiff Steven Gulley, an inmate at the Southport Correctional Facility, alleges that Defendants John Roach, Robert Murphy and Donald Selsky deprived him of his Eighth and Fourteenth Amendment rights. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983.

On February 26, 2004, Defendants filed a Motion for Summary Judgment. On September 30, 2004, this Court filed an Order granting Defendants' motion and advising that this full Decision and Order would follow. This Court granted Defendants' Motion for Summary Judgment for the reasons stated below.

## II. BACKGROUND

A. Facts

The pertinent facts of this case are undisputed. [1] Plaintiff is an inmate in the custody of the New York State Department of Correctional Services ("DOCS"). (Defendants' Statement of Undisputed Facts ("Defendants' Statement"), ¶ 1.) At all times relevant to the incidents giving rise to this lawsuit, Plaintiff was an inmate at the Attica Correctional Facility ("Attica"). (Defendants' Statement, ¶ 2.) Defendant John Roach is a Hearing Officer at Attica. (Defendants' Statement, ¶ 4.) Defendant Robert Murphy is the Assistant Director of Special Housing and Inmate Disciplinary Services for DOCS. (Defendants' Statement, ¶ 5.) Defendant Donald Selsky is the Director of Special Housing and Inmate Disciplinary Services for DOCS. (Defendants' Statement, ¶ 6 .)

1. The Cell Search and Issuance of the Misbehavior Report

On June 1, 2000, corrections officers conducted a search of Plaintiff's prison cell and every other cell on Plaintiff's gallery. (Defendants' Statement, ¶ 7.) Plaintiff was not present during the search. (Defendants' Statement, ¶ 8.) When Plaintiff returned after the search, there was a contraband slip (Form 2077) left in the bars of his cell. (Defendants' Statement, ¶¶ 9–10.) A contraband slip consists of a top original sheet with a carbon copy underneath. (Defendants' Statement, ¶ 10.) The top original sheet was left in Plaintiff's cell, the carbon copy was retained and routed to Attica's Deputy Superintendent for Security. (Defendants' Statement, ¶ 11.) Corrections Officer Fial completed the contraband slip, and Corrections Officer Lasker signed it. (Defendants' Statement, ¶¶ 15, 16.)

As a result of the cell search, Plaintiff was charged in a Misbehavior Report with possessing weapons and contraband. (Defendants' Statement, ¶ 13.) Corrections Officer Collette signed the Misbehavior Report, and Corrections Officer Lasker endorsed it. (Defendants' Statement, ¶¶ 14, 17.)

A hearing before Defendant Roach was scheduled on the Misbehavior Report. (Defendants' Statement, ¶ 18.) Prior to the hearing, Plaintiff was assigned an employee assistant who spoke with Plaintiff, provided him documents that he requested, and noted the witnesses that Plaintiff wished to call at the hearing. (Defendants' Statement, ¶¶ 19, 20.)

2. The Disciplinary Hearing

Defendant Roach held a hearing on the Misbehavior Report. (Defendants' Statement, ¶¶ 18, 23.) Plaintiff's theory of defense was that the Misbehavior Report was mistakenly issued to him due to an error on the contraband slip. (Defendants' Statement, ¶ 21.) The contraband slip contains a box that may be marked to indicate that no contraband

was found during the cell search. (Defendants' Statement, ¶ 12.) Plaintiff maintained that the original contraband slip that was left for him in the bars of his cell had that box marked, thus indicating that no contraband was found. (Defendants' Statement, ¶ 22.) Defendant Roach had the facility's carbon copy of the contraband slip, which did not have the "no contraband" box marked. (Defendants' Statement, ¶ 24.)

**\*2** Plaintiff requested that Defendant Roach call Corrections Officer Fial as a witness to testify at the hearing. (Defendants' Statement, ¶ 27.) Plaintiff wanted Corrections Officer Fial to testify as to why he had checked the "no contraband" box on Plaintiff's contraband slip. (Defendants' Statement, ¶ 28.) Plaintiff explained his purpose for wanting to call Corrections Officer Fial, but Defendant Roach declined to call him as a witness. (Defendants' Statement, ¶¶ 29, 30.) Defendant Roach explained his decision not to call Corrections Officer Fial to Plaintiff, and put the reasons underlying his decision in writing. (Defendants' Statement, ¶ 42.)

Plaintiff also claimed that another inmate a few cells down from him, Henry Justice, received a contraband slip for two weapons that matched the description of the weapons contained in Plaintiff's Misbehavior Report. (Defendants' Statement, ¶¶ 25, 43.) Mr. Justice testified at the hearing that the weapons Plaintiff had been charged with possessing in the Misbehavior Report were found in his own cell (Mr. Justice's cell). (Defendants' Statement, ¶ 44.) When Defendant Roach informed Mr. Justice that his admission could result in the issuance of a Misbehavior Report against him, Mr. Justice began to evade questions about whether the weapons were actually found in his cell. (Defendants' Statement, ¶ 45.)

Finally, Plaintiff argued that prison officials up the chain of command made inconsistent and conflicting claims as to which officer actually discovered weapons in his cell. (Defendants' Statement, ¶ 26.) For example, the Misbehavior Report indicated that Corrections Officer Collette, who wrote the report, had found the weapons during the search of Plaintiff's cell. (Defendants' Statement, ¶ 32.) However, First Deputy Superintendent at Attica James Conway wrote a memorandum regarding the search and stated therein that Corrections Officer Manno found the weapons in Plaintiff's cell. (Defendants' Statement, ¶ 31.) Plaintiff explained to Defendant Roach that he wanted to call Deputy Superintendent Conway as a witness and ask him where he had received his information and why his information differed from the Misbehavior Report. (Defendants' Statement, ¶¶ 33, 34.) Defendant Roach declined to call Deputy Superintendent

Conway as a witness, explained his decision to Plaintiff, and put the reasons underlying his decision in writing. (Defendants' Statement, ¶¶ 35, 42.)

In addition, the documentation concerning the search of Plaintiff's cell included a memorandum written by Lieutenant Hendel to Deputy Superintendent for Security John Burns. (Defendants' Statement, ¶ 36.) This memorandum also indicated that Corrections Officer Manno, assisted by Corrections Officer Collette, discovered the weapons in Plaintiff's cell. (Defendants' Statement, ¶ 37.) Plaintiff explained to Defendant Roach that he wanted to call Deputy Superintendent Burns as a witness to ask him whether he had investigated the search, and to ask him whether the facility's carbon copy of the contraband form had the "no contraband" box marked. (Defendants' Statement, ¶¶ 38–40.) Defendant Roach declined to call Deputy Superintendent Burns as a witness, explained his decision to Plaintiff, and put the reasons underlying his decision in writing. [2] (Defendants' Statement, ¶ 41, 42.)

**\*3** At the end of the hearing, Defendant Roach determined that Plaintiff was guilty of the charges in the Misbehavior Report. (Defendants' Statement, ¶ 46.) Consequently, he sentenced Plaintiff to 24 months in the Special Housing Unit ("SHU") and loss of 24 months of good time credit. (Defendants' Statement, ¶ 46.) At the time of the hearing, Plaintiff was already serving a previous SHU sentence. (Defendants' Statement, ¶ 47.)

3. Plaintiff's Appeals

Plaintiff appealed Defendant Roach's determination to Defendant Murphy, the Assistant Director of Special Housing and Inmate Disciplinary Services for DOCS. (Defendants' Statement, ¶¶ 5, 49 .) Defendant Murphy resolved Plaintiff's appeal by reducing his sentence by half: 12 months in SHU and loss of 12 months of good time credit. (Defendants' Statement, ¶ 49.)

Plaintiff further appealed Defendant Murphy's determination to Defendant Selsky, the Director of Special Housing and Inmate Disciplinary Services for DOCS. (Defendants' Statement, ¶¶ 6, 50 .) Defendant Selsky reversed Defendant Roach's guilty determination altogether after an Article 78 proceeding in New York State Supreme Court resulted in reversal of the guilty finding. (Defendants' Statement, ¶ 50.) At the time of Defendant Selsky's decision, Plaintiff had

served approximately seven months in SHU as a result of Defendant Roach's sentence. (Defendants' Statement, ¶ 51.)

B. Procedural History

Plaintiff instituted this action on December 16, 2002, by filing a Complaint in the United States District Court for the Western District of New York. Defendants Roach, Murphy and Selsky filed their Answers to the Complaint on April 23, May 6, and June 6, 2003, respectively. On February 26, 2004, Defendants filed the instant Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. [3] After this Court extended Plaintiff's time within which to respond to Defendants' motion three times, Plaintiff filed his response in opposition on September 28, 2004. [4] On September 30, 2004, this Court issued an Order granting Defendants' Motion for Summary Judgment and indicating that this full Decision and Order would follow.

## III. DISCUSSION

A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

**\*4** In addition, because Plaintiff is proceeding pro se, this Court reads his submissions liberally, and interprets them to raise the strongest arguments that they suggest. See Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994); Mikinberg v. Baltic S.S. Co., 988 F.2d 327, 330 (2d Cir.1993). "However, when alleging a violation of a civil rights statute, even a pro se litigant must make 'specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " Carlisle v. Snyder, 02–CV–6662, 2004 WL 1588209, at \*3 (W.D.N.Y. July 14, 2004) (quoting Barr v. Abrams, 810 F.2d 358, 363 (2d Cir.1987)).

B. Defendants' Motion for Summary Judgment

Plaintiff alleges that he was denied Due Process under the Fourteenth Amendment during his Tier III disciplinary hearing, and that the seven months he served in SHU after being found guilty by Defendant Roach violated his Eighth Amendment right to be free from cruel and unusual punishment. [5]

Defendants move for summary judgment on the basis that even accepting Plaintiff's allegations as true, he cannot establish that his constitutional rights were violated. Alternatively, Defendants argue that they are entitled to qualified immunity.

C. Legal Standards and Analysis

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983; Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 137 (2d Cir.1999). On its own, § 1983 does not provide a source of substantive rights, but rather, provides a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)).

Accordingly, as a threshold matter in reviewing claims brought pursuant to ⚑ § 1983, it is necessary to precisely identify the constitutional violations alleged. *See* ⚑ *Baker,* 443 U.S. at 140. Here, Plaintiff's claim is that Defendants violated his Fourteenth and Eighth Amendment rights. [6]

### 1. Fourteenth Amendment: Due Process

The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. CONST. amend. XIV. There are two broad categories of due process claims—substantive and procedural. A substantive due process claim is based upon the deprivation of a constitutionally protected life, liberty, or property interest. *See* ⚑ *B.D. v. DeBuono,* 130 F.Supp.2d 401, 431 (S.D.N.Y.2000). A procedural due process violation occurs when the Government deprives a person of a protected life, liberty, or property interest without first providing that person with notice and an opportunity to be heard. ⚑ *Id.* at 432–33. With respect to any due process claim—substantive or procedural—"[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." ⚑ *Narumanchi v. Bd. of Trs. of Conn. State Univ.,* 850 F.2d 70, 72 (2d Cir.1988).

**\*5** Plaintiff alleges that the Tier III hearing on his Misbehavior Report was constitutionally infirm. He thus asserts a procedural due process claim. To prevail on this claim, he must establish (1) that he possessed a protected liberty or property interest and (2) that Defendants deprived him of that interest through constitutionally insufficient procedures. *See* ⚑ *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing ⚑ *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996)); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1214 (W.D.N.Y.2003).

#### a. Liberty Interest

"A liberty interest may arise from either of two sources—the Due Process Clause itself [or] the laws of the States." ⚑ *Rodriguez v. McLoughlin,* 214 F.3d 328, 337 (2d Cir.2000) (quoting ⚑ *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (internal quotation omitted)). Of course a prisoner must identify a viable liberty interest before he can demonstrate that such an

interest was infringed. ⚑⚠ *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004); ⚑ *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (per curiam).

In this case, Plaintiff alleges that his loss of good time credits and confinement in SHU for seven months constitute a deprivation of his liberty. Loss of good time credits implicates a prisoner's liberty interest. ⚑ *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (quoting ⚑ *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). However, Defendant Selsky's reversal of Defendant Roach's guilty determination prevented Plaintiff from losing his good time credits. Consequently, Plaintiff has suffered no constitutional deprivation. However, freedom from SHU confinement is a protected liberty interest under New York law. *See Welch v. Bartlett,* 296 F.3d 389, 394 n. 4 (2d Cir.1999) (Noting that New York state law "create[s] a liberty interest in not being confined to the SHU."). Plaintiff has therefore facially alleged the infringement of a recognized liberty interest.

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' ⚑⚠ *Palmer,* 364 F.3d at 64 (quoting ⚑ *Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). The prisoner's actual punishment must be examined in making this determination. *See Scott v. Albury,* 156 F.3d 283, 287 (2d Cir.1998) (per curiam). In this regard, the Second Circuit has consistently held that both the duration and conditions of confinement must be considered. *See* ⚑⚠ *Palmer,* 364 F.3d at 64; *Ortiz v. McBride,* 323 F.3d 191, 195 (2d Cir.2003) (per curiam); ⚑ *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical.").

**\*6** While there is no bright-line rule regarding the length or type of sanction that constitutes an atypical and significant hardship under *Sandin,* the Second Circuit has provided guidance on the type of treatment that implicates a prisoner's liberty interest. *See* ⚑ *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (no bright-line rule). For example, SHU

confinement of less than 101 days does not implicate a prisoner's liberty interest unless it is demonstrated that the conditions were more severe or extreme than normal SHU conditions. *See* 🚩⚠️ *Palmer,* 364 F.3d at 65. SHU confinement of an intermediate duration—between 101 and 304 days—requires the district court to develop a detailed record of the conditions of confinement relative to ordinary prison conditions. *See* 🚩 *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000). SHU confinement of more than an intermediate duration (305 days or more) under normal conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*" *Id.* at 231 (finding that a prisoner's liberty interest was infringed by 305–day SHU confinement). Here, the duration of confinement is not in dispute: Plaintiff was held in SHU for seven months (or approximately 214 days) as a result of the guilty determination by Defendant Roach. (Defendants' Statement, ¶ 51; Plaintiff's Statement, ¶ 5.) Plaintiff's confinement therefore falls in the "intermediate duration" category. 🚩 *Colon,* 215 F.3d at 232. This Court must therefore "make a fact-intensive inquiry," 🚩 *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000), of the "actual circumstances of [Plaintiff's] SHU confinement," 🚩 *Kalwasinski v. Morse,* 201 F.3d 103, 106 (2d Cir.1999) (per curiam).

The only allegation in Plaintiff's Complaint regarding the conditions of his confinement is that he was in "isolation and full restraints." [7] (Complaint, ¶ 17.) Plaintiff further explained the conditions of his confinement in his affirmation submitted in opposition to Defendants' summary judgment motion. Therein, Plaintiff asserts the following:

> The Plaintiff SHU confinement included the loss of several privileges that prisoners normally enjoy. The Plaintiff (and all S.H .U. inmates) are entitled to only one non-legal visit per week, denied of any telephone privileges, denied of personal property, permitted only an hour of exercise out of the cell, which is subjected to restrictions, limited to a minimum [8] of two showers per week, denied educational and vocational programs and the wages associated with them, the legal assistance is very limited, and the Plaintiff was subjected to a tentative loss of good time for 24 months, then reduced to 12 months. All of this is materially different from the basic conditions of his confinement, also, the Plaintiff part of this SHU time was spend in Southport Correctional Facility, which is considered one of

the harshest S.H.U.s within the state because the facility is maintained strictly for the purpose of holding S.H.U. inmates. [9]

**\*7** (Gulley Affirm., ¶ 11.)

Accepting Plaintiff's supported allegations regarding the conditions of his SHU confinement as true, this Court finds that he was subjected to normal SHU conditions. *See, e.g.,* 🚩 *Colon,* 215 F.3d at 230 (noting that normal SHU conditions in New York include limitations on the frequency and duration of visits, restrictions on the number of books permitted in the cell, a maximum of two showers per week, and denial of the opportunity to work and receive out-of-cell schooling); 🚩 *Sealey,* 197 F.3d at 581 (noting that SHU conditions include limitations on showers per week, limited library privileges and no telephone privileges); 🚩⚠️ *Harris v. McGinnis,* No. 02 Civ. 6481, 2004 WL 2187137, at \*4 (S.D.N.Y. Sept.30, 2004) (similarly describing "normal" SHU conditions).

This Court is therefore left to determine whether 214 days of confinement in SHU under normal conditions imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 🚩 *Sandin,* 515 U.S. at 484. One hundred and one days of normal SHU confinement is the longest period that the Second Circuit has recognized as *not* meeting the *Sandin* atypicality requirement. *See* 🚩 *Sealey,* 197 F.3d at 589; *see also Ortiz,* 380 F.3d at 654 (recognizing that 101 days is the longest period of confinement under normal SHU conditions permitted thus far by the Second Circuit). On the other hand, the Second Circuit has explicitly held that a 305–day period of normal SHU confinement meets the *Sandin* requirement. 🚩 *Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*")

Plaintiff's case falls almost squarely between *Sealey* and *Colon:* At approximately 214 days, Plaintiff's period of confinement is 113 days more than *Sealey,* and 91 days less than *Colon.* As discussed above, in situations such as this, the Second Circuit instructs that district courts should fully develop the record to assist in appellate review. *See* 🚩 *Colon,* 215 F.3d at 231 ("in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305

days, development of a detailed record will assist appellate review"). For instance, the Second Circuit noted that the parties might develop evidence regarding the psychological effects of SHU confinement and the frequency of SHU confinements of varying durations. *Id.* The record currently before this Court contains no such evidence. This is perhaps because Plaintiff's Complaint focuses on the alleged Due Process violations during the disciplinary hearing, rather than on the conditions of his confinement. It is also due in part to the fact that Defendants have simply assumed the truth of Plaintiff's factual assertions for purposes of this motion, rather than introduced contradictory evidence.

**\*8** As will be fully discussed below, this Court finds that Plaintiff's disciplinary hearing was not constitutionally infirm. Plaintiff's Due Process claim therefore fails on that point. Accordingly, with insufficient evidence from which to make a definitive ruling on the *Sandin* issue, this Court will assume without deciding that Plaintiff's confinement in SHU for approximately 214 days under normal conditions is a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.* [10] *Cf.* Luna v. Pico, 356 F.3d 481, 487 n. 3 (2d Cir.2004) (assuming without deciding that 204 days of SHU confinement was an "atypical and significant hardship"); *see* Moore v. Selsky, 900 F.Supp. 670, 673 (S.D.N.Y.1995) ("Because defendants' motion for summary judgment can be granted on other grounds ... this Court will not reach the question of *Sandin's* impact.").

### b. Hearing Procedures

Along with demonstrating the deprivation of a liberty interest, Plaintiff must also establish that Defendants deprived him of that interest as a result of insufficient process. *See Ortiz,* 380 F.3d at 654; Harris, 2004 WL 2187137, at \*4. This Plaintiff cannot do.

It is well-settled that inmates retain Due Process rights in prison disciplinary proceedings. *Porter v. Goord,* 04–CV–485, 2004 WL 2271383, at \*2 (W.D.N.Y. Oct.5, 2004) (quoting Hanrahan v.. Doling, 331 F.3d 93, 97 (2d Cir.2003)). In *Wolff,* the Supreme Court held that whenever an inmate is subjected to a prison disciplinary proceeding that might result in the deprivation of a liberty interest, prison officials must ensure that certain procedural safeguards are in place. 418 U.S. at 563–66. For example, the inmate must be provided with advance written notice of the charges

against him and a written statement by the hearing officer setting forth the evidence relied upon and the reasons for the disciplinary action taken. Id. at 563–64. The inmate must also be afforded some opportunity to call witnesses and present documentary evidence. Id. at 566. In addition, the hearing tribunal must be sufficiently impartial to guard against "a hazard of arbitrary decision making." Id. at 571. Finally, the hearing disposition must be supported by at least "some evidence." *See* Superintendent v. Hill, 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). The procedural protections mandated by *Wolff* apply to inmates facing SHU confinement. Kalwasinski, 201 F.3d at 108 (citing McCann v. Coughlin, 698 F.2d 112, 121–22 (2d Cir.1983)).

Plaintiff asserts that he was denied Due Process because Defendant Roach refused to call Corrections Officer Fial, Deputy Superintendent Conway, and Deputy Superintendent Burns as witnesses during his Tier III disciplinary hearing. Plaintiff's assertion is without merit.

Under *Wolff,* an inmate facing disciplinary proceedings must "be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566. It is well-settled that an inmate's right to call and confront witnesses is limited by the special circumstances attendant to prison life. *See id.;* Walker v. McClellan, 126 F.3d 127, 130 (2d Cir.1997). A prison official "may refuse to call witnesses as long as the refusal is justifiable." Scott v. Kelly, 962 F.2d 145, 146 (2d Cir.1992). Moreover, "a prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." Id. at 147 (quoting Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir.1991)).

**\*9** Plaintiff wanted Defendant Roach to call Corrections Officer Fial to testify about the contraband slip. At the disciplinary hearing, Corrections Officer Lasker testified that he signed the contraband slip, but that Corrections Officer Fial filled it out. (Gulley Dep., p. 22. [11]) Plaintiff maintained that Corrections Officer Fial must have made a mistake because Plaintiff's copy of the contraband slip had the "no contraband" box marked. Defendant Roach, however, had the facility's carbon copy of the contraband slip, which did not have the

"no contraband" box marked. (Gulley Dep., pp. 29–30.) It is important to note that Plaintiff had the original copy of the contraband slip. (Gulley Dep., p. 30.) The issue was therefore one of credibility: Because the facility carbon copy did not have the "no contraband" box marked, Defendant Roach did not believe that Plaintiff's original copy was authentic. (Gulley Dep., p. 30.) That is, he believed that Plaintiff simply marked the "no contraband" box himself after he was left the original copy. (Gulley Dep., pp. 30–31.) That explained why the facility's carbon copy did not have the "no contraband" box marked.

At best there was some confusion as to whether the two copies of the contraband slip could be reconciled. In this regard, the documents spoke for themselves. Faced with the carbon copy of the contraband slip that did not have the "no contraband" box marked, this Court finds it more than reasonable for Defendant Roach to doubt the authenticity of Plaintiff's original contraband slip that had the "no contraband" box marked. Under the circumstances, the veracity of Plaintiff's assertion that his copy was accurate and that the carbon copy was somehow changed or substituted was seriously questionable and unworthy of extended consideration. Corrections Officer Fial's testimony was therefore not necessary for Defendant Roach to resolve this issue. This Court finds that Defendant Roach was well within his discretion to decline to call him as a witness. *See* *Scott,* 962 F.2d at 146.

Plaintiff also wanted Defendant Roach to call Deputy Superintendent Conway to testify about a post-search memorandum, wherein he wrote that Corrections Officer Manno discovered the weapons in Plaintiff's cell. (Gulley Tr., p. 38.) Plaintiff wanted Deputy Superintendent Conway to explain why he wrote that Corrections Officer Manno found the weapons, when in fact, the Misbehavior Report indicated that Corrections Officer Collette found the weapons. (Gulley Tr., p. 38.) Plaintiff believed that if he could demonstrate that Deputy Superintendent Conway's memorandum was inconsistent with the Misbehavior Report, then the whole incident would be called into question. (Gulley Tr., p. 39.)

This Court finds no constitutional error in Defendant Roach's refusal to call Deputy Superintendent Conway as a witness. Corrections Officer Collette testified at the hearing that he was the one who discovered the weapons. (Gulley Tr., p. 40.) Corrections Officer Manno testified that he could not recall whether he or Corrections Officer Collette discovered the weapons. (Gulley Tr., p. 41.) Either way, the record

contained testimony that weapons were found in Plaintiff's cell. Therefore, even if Deputy Superintendent Conway was called as a witness and testified that he was under the impression that Corrections Officer Manno found the weapons, Plaintiff's cause would not have been helped. Whether there was a discrepancy in Deputy Superintendent Conway's memorandum is simply irrelevant to the issue of whether weapons were found in Plaintiff's cell and who found them. Consequently, Deputy Superintendent Conway's testimony, even if he testified as Plaintiff hoped, would not have impacted Defendant Roach's guilty finding because there was evidence in the record that weapons were found during the search of Plaintiff's cell. Accordingly, it was unnecessary for Defendant Roach to call Deputy Superintendent Conway as a witness, and this Court finds that he was justified in refusing to do so.

**\*10** Finally, Plaintiff wanted Defendant Roach to call Deputy Superintendent Burns as a witness for two reasons. First, Plaintiff wanted Deputy Superintendent Burns to testify about another discrepancy in a post-search memorandum, this one written by Lieutenant Hendel. (Gulley Tr., pp. 43–44.) This memorandum, like the one written by Deputy Superintendent Conway, indicated that Corrections Officer Manno discovered or assisted Corrections Officer Collette in discovering the weapons in Plaintiff's cell. (Gulley Tr., p. 43.) For the reasons just discussed in the context of Defendant Roach's refusal to call Deputy Superintendent Conway, this Court finds that Defendant Roach was equally justified in not calling Deputy Superintendent Burns for the purpose of explaining the discrepancy in the memorandum.

The second reason Plaintiff wanted to call Deputy Superintendent Burns was to ask him whether he had a copy of the contraband slip. (Gulley Tr., p. 45.) This Court finds that such testimony was unnecessary because Defendant Roach had the facility's copy of the contraband slip in his possession and informed Plaintiff that he had acquired it from Deputy Superintendent Burns. (Gulley Tr., p. 45.) There was thus no reason to call Deputy Superintendent Burns to testify at the hearing, and Defendant Roach was justified in declining to do so. *Kingsley,* 937 F.2d at 30.

Plaintiff concedes that he was permitted to make all of his arguments and present his defense at the Tier III disciplinary hearing. (Gulley Tr., p. 48.) His complaint is that he could possibly have strengthened his defense by questioning these additional witness. Not only is this contention purely speculative, but the Fourteenth Amendment does not require

that an inmate be permitted to call every witness he chooses. *Cf.* *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994) (rejecting the suggestion that a hearing officer must continue to call witnesses *ad infinitum* in support of the defendant's defense). For the reasons fully set forth above, this Court finds that Defendant Roach's refusal to call Corrections Officer Fial, Deputy Superintendent Conway, and Deputy Superintendent Burns was justified. Defendant Roach therefore did not violate Plaintiff's Due Process rights. *Scott,* 962 F.2d at 146.

Likewise, because Plaintiff has failed to establish a Due Process claim against Defendant Roach, his Due Process claims against Defendants Murphy and Selsky also necessarily fail. *See Carlisle v. Snyder,* 02–CV–6662, 2004 WL 1588209, at *3 (W.D.N.Y. July 14, 2004); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1215 (W.D.N.Y.2003); *Black v. Selsky,* 15 F.Supp.2d 311, 318 (W.D.N.Y.1998) ("because [the plaintiff's] claims against [the hearing officer] are meritless and [the defendant's] alleged wrongdoing was based on his affirming [the hearing officer's] determination, there is no basis for the claims against [the defendant] either").

Thus, for the reasons stated above, Defendants are entitled to summary judgment on Plaintiff's Fourteenth Amendment Due Process claims.

### 2. Eighth Amendment

**\*11** Plaintiff also alleges that Defendants violated his Eighth Amendment rights by keeping him in SHU for seven months. The Eighth Amendment, which applies to the states through incorporation into the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Sims,* 230 F.3d at 20 (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)).

The subjective component "requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Sims,*

230 F.3d at 21 (citations omitted). The objective component is "contextual and responsive to contemporary standards of decency." *Id.* (quoting *Hudson,* 503 U.S. at 8).

In order to establish the objective component of an Eighth Amendment claim, the plaintiff must establish a "sufficiently serious deprivation of a basic human need." *Williams v. Goord,* 142 F.Supp.2d 416, 425 (S.D.N.Y.2001) (citing *Wilson v. Seiter,* 501 U.S. 294, 303–04, 111 S.Ct. 2321, 115 L.Ed.2d 271. 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). With respect to a prisoner's claim that the conditions of his confinement violated the Eighth Amendment, "a prisoner must show 'extreme deprivations,' '[b]ecause routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society." ' *Sims,* 230 F.3d at 21 (quoting *Hudson,* 503 U.S. at 9); *see also* *Blyden,* 186 F.3d at 263 (holding that "[b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim."). Conditions of confinement only violate the Eighth Amendment when "they result 'in unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measure of life's necessities.' " *Anderson v. Coughlin,* 757 F.2d 33, 34–35 (2d Cir.1985) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

This Court finds that Plaintiff has not demonstrated the existence of any genuine issue of fact regarding his Eighth Amendment claim. Accepting Plaintiff's supported allegations regarding the conditions of his confinement as true, this Court finds that he was merely subjected to normal SHU confinement. Plaintiff alleges that his SHU confinement, standing alone, violated the Eighth Amendment. However, "[t]he conditions of special housing units do not *per se* constitute cruel and unusual punishment in violation of the Eighth Amendment." *Dixon v. Goord,* 224 F.Supp.2d 739, 748 (S.D.N.Y.2002) (citing *Anderson,* 757 F.2d at 34–35); *Hailey v. Provost,* No. 94–CV–1616, 1997 WL 627547, at *6 n. 4 (N.D.N.Y. Oct.9, 1997) (placement in SHU without more does not violate Eighth Amendment).

**\*12** Moreover, this Court finds that the duration of Plaintiff's confinement alone does not rise to the level of a constitutional

violation. *See, e.g., Jones v. Bishop,* 981 F.Supp. 290, 294 (S.D.N.Y.1997) (455 days in SHU in the cold is insufficient to state an Eighth Amendment claim); *Warren v. Irvin,* 985 F.Supp. 350, 357 (W.D.N.Y.1997) (ordinary deprivations claimed during 161 days in SHU "are not sufficiently serious to constitute cruel and unusual punishment under the Eighth Amendment"); *Kingwood v. Coombe,* 96 Civ. 0432, 1997 WL 323913, at *7 (S.D.N.Y. June 13, 1997) (plaintiff spent more than 200 days in SHU, but "absent any allegations that plaintiff's treatment in SHU confinement was in some manner differed from usual SHU treatment, his [Eighth Amendment] claim must fail"). There is simply no evidence that Defendants acted with wantonness or that Plaintiff suffered serious deprivation of his basic human needs. As such, this Court finds that Defendants are entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim.

3. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 1696, 143 L.Ed.2d 818 (1999) (internal quotations and citation omitted). In light of the fact that this Court finds that Plaintiff's

constitutional rights were not infringed, it is unnecessary to reach the merits of Defendants' alternate qualified immunity argument.

IV. CONCLUSION

For the reasons stated above, this Court granted Defendants' Motion for Summary Judgment by Order filed September 30, 2004.

V. ORDERS

IT HEREBY IS ORDERED, that as stated in this Court's Order of September 30, 2004 (Docket No. 49) Defendants' Motion for Summary Judgment (Docket No. 33) is GRANTED in its entirety.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 2331922

---

**Footnotes**

1     Plaintiff generally concedes the accuracy of Defendants' Statement of Undisputed Facts. (*See* Plaintiff's Memorandum of Law, p. 2.) This Court notes that Plaintiff does contest six statements set forth in Defendants' Statement. (*See* Plaintiff's Statement of Material Facts.) These statements, however, include Defendants' characterization of Plaintiff's position, Defendants' assessment of the sufficiency of the evidence, and several legal conclusions. (*See* Defendants' Statement, ¶¶ 52–55, 57–58.) As such, Plaintiff's opposition to these statements does not raise questions of material fact that preclude summary judgment.

2     Although the parties agree that Defendant Roach provided a written explanation of his decision not to call the witnesses Plaintiff requested, neither side has submitted that explanation. Plaintiff does not, however, challenge Defendant Roach's written decision specifically. Rather, Plaintiff simply maintains as a general matter that he should have been provided the opportunity to question Corrections Officer Fial, Deputy Superintendent Conway, and Deputy Superintendent Bums.

3     In support of its Motion for Summary Judgment, Defendants filed the following documents: the Declaration of Darren Longo, Esq., with attached exhibits, a Rule 56 Statement of Undisputed Facts, and a memorandum of law.

4    In opposition to Defendants' motion, Plaintiff filed the following documents: the Affirmation of Steven Gulley, a Statement of Disputed Material Facts, and a memorandum of law.

5    This Court notes that Defendants did not address whether Plaintiff's confinement in SHU violated the Eighth Amendment. Plaintiff's Complaint focuses almost exclusively on his Due Process allegations. However, there is a statement at the end of the Complaint indicating that the constitutional basis for Plaintiff's ⚑ § 1983 claim is, *inter alia,* "cruel and unusual punishment." Construing Plaintiff's Complaint liberally as required, this Court will consider this an Eighth Amendment claim and analyze it accordingly.

6    Plaintiff's Complaint does not specify whether this action is brought against Defendants in both their individual and official capacities, or solely in their individual capacities. If it is the former, Plaintiff's Complaint against Defendants in their official capacities must be dismissed on Eleventh Amendment immunity grounds. It is well settled that the Eleventh Amendment bars suits against states and state agencies. *See* ⚑ *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); ⚑ *Jones v. N.Y.S. Div. of Military & Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1999). Moreover, neither the state, its agencies, nor its employees acting in their official capacities are "persons" subject to suit under ⚑ 42 U.S.C. § 1983. *See* ⚑ *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office ... As such, it is no different from a suit against the State itself."). Accordingly, to the extent Plaintiff asserts his claims against Defendants in their official capacities, those claims are dismissed.

7    In a pretrial ruling, the Magistrate Judge noted that "[t]he SHU Restraint Order Renewals indicate that [P]laintiff was to be 'cuff[ed] from behind' whenever he was outside of his cell." *Gulley v. Roach,* 02–CV–908, 2004 WL 1570281, at *1 (W.D.N.Y. June 7, 2004). Moreover, the Magistrate Judge noted in his decision (and therefore alerted Plaintiff) that the circumstances surrounding the use of "full restraints" in this case would impact whether a liberty interest was implicated. The Magistrate Judge therefore made the following discovery rulings:

> Whether or not the use of mechanical restraints during such an intermediate term of SHU confinement is sufficient to implicate a liberty interest will potentially be influenced by the prevalence of the application of mechanical restraints within both the SHU and general population. Accordingly, the defendants shall produce any 'memorandums and directives on the use of mechanical restraints' within the entire population at Attica or indicate that such restraints are only employed within the SHU.
>
> ...
>
> [D]efendants shall produce documentation indicating the number of inmates at Attica who were subject to a restraint order during the period June, 2000 through June, 2001, and if such information is available, the duration of such restraint orders and whether they were imposed upon inmates within the general population or just SHU, or state that no such document exists.

*Gulley,* 2004 WL 1570281, at *2–*3.

Defendants produced the documents ordered by the Magistrate Judge. (Docket No. 42.) Despite receiving this information and being alerted to the fact that it was relevant to this motion, Plaintiff has not submitted any evidence regarding the use of full restraints during his SHU confinement, nor does he discuss use of the restraints in his opposition papers. This Court will therefore not consider the use of "full restraints" as a condition of Plaintiff's SHU confinement.

8 This Court assumes that Plaintiff intended to state that he was limited to a *maximum* of two showers per week.

9 It has been recognized that SHU conditions are harsher at Southport Correctional Facility, which is a SHU-only facility, than at other New York Prisons. *See, e.g.,* ⚑*Colon,* 215 F.3d at 234 n. 7 (citing ⚑*Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998).* However, Plaintiff has not provided any information concerning either the duration of his SHU confinement at Southport or the conditions of such confinement. As a result, this Court cannot meaningfully consider the time that Plaintiff spent in SHU at Southport.

10 It is noted that had Plaintiff presented evidence or sworn assertions regarding the use of "full restraints" during his SHU confinement and the duration and conditions of his confinement in SHU at Southport, it is likely that this Court would have definitively found that such treatment, coupled with the fact that Plaintiff was in SHU for 214 days, constituted a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.* Either way, however, Plaintiff's claim fails because his disciplinary hearing comported with the Due Process requirements of the Fourteenth Amendment.

11 Referring to the deposition transcript of Steven Gulley, which is attached as Exhibit A to the Longo Declaration.

---

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Bunting v. Fischer, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 300 of 482

2016 WL 4804099
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Johnny BUNTING, Plaintiff,

v.

Brian FISCHER, Albert Prack, Norman Bezio, Sibatu
Khahaifa, Mark Passage, David F. Napoli, M. Sheahan,
James Esgrow, Richard A. Donahue, Patrick Griffin,
Thomas Griffin, Stephen Wenderlich, Defendants.

14-CV-578A
|
Signed 09/14/2016

**Attorneys and Law Firms**

Johnny Bunting, Mount Vernon, NY, pro se.

Christopher L. Boyd, NYS Attorney General's Office,
Buffalo, NY, for Defendants.

DECISION AND ORDER

HONORABLE RICHARD J. ARCARA, UNITED STATES
DISTRICT JUDGE

**\*1** The above-referenced case was referred to Magistrate
Judge Michael J. Roemer, pursuant to 28 U.S.C. § 636(b)
(1)(B). On August 4, 2016, Magistrate Judge Roemer filed a
Report and Recommendation (Dkt. No. 24), recommending
that defendants' motion to dismiss for failure to state a claim
(Dkt. No. 16) be granted.

The Court has carefully reviewed the Report and
Recommendation, the record in this case, and the pleadings
and materials submitted by the parties, and no objections
having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and
for the reasons set forth in Magistrate Judge Roemer's Report
and Recommendation, defendants' motion to dismiss for
failure to state a claim is granted.

The Clerk of Court shall take all steps necessary to close the
case.

IT IS SO ORDERED.

Dated: September 14, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4804099

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Exxon Mobil Corp. v. Saudi Basic Industries Corp.,   U.S.,
March 30, 2005

1998 WL 695927
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Neal WIESNER, Plaintiff,

v.

Hon. Ernst H. ROSENBERGER, Hon. Eugene Nardelli,
Hon. Milton L. Williams, Hon. Peter Tom, Hon. Angela
M. Mazzarelli, as Justices of the Supreme Court,
Appellate Division, First Department, Defendants.

No. 98 Civ. 1512(HB).
|
Oct. 6, 1998.

*OPINION AND ORDER*

BAER, J. [1]

**\*1** Defendants Ernst H. Rosenberger *et al.,* move to dismiss
pursuant to Fed.R.Civ.P. 12(b)(1)("Rule 12(b)(1)") for lack of
subject matter jurisdiction and under Fed R. Civ. P. 12(b)(6)
("Rule 12(b)(6)") for failure to state a claim upon which relief
can be granted. For the reasons set forth below, the motion to
dismiss is GRANTED.

### I. Introduction

Neal Wiesner, a 1994 graduate of City University of New
York Law School, successfully passed the New York State
Bar Examination in July of that year. Amended Complaint
("Am.Compl.") ¶ 11. In January of 1995, Wiesner submitted
his application for admission to practice as an attorney to
the Office of the Committee on Character and Fitness for
the Appellate Division, First Department ("Committee").
Am. Compl. ¶ 15. Subsequently, as is the practice where a
concern is raised, a subcommittee was formed to investigate
his application. Am. Compl. ¶ 16. After an initial interview
with a sub-committee member, the sub-committee deferred
Wiesner's application pending a hearing and informed him
that it had concerns with respect to his past criminal
convictions and whether he could demonstrate the requisite

character and fitness for admission to the bar. Defs. Ex. D at
p. 1. [2]

The hearing took place over a scattered three day period,
beginning on April 7, 1995 and ending on May 12, 1995.
Am. Compl. ¶ 17. Despite the testimony of numerous
distinguished members of the bar in support of Wiesner's
application, who by the way continue to support his efforts, [3]
Am. Compl. ¶¶ 20–23, and evidence of a history of
commendable employment and community service, Am.
Compl. ¶¶ 24–27, the Committee recommended that his
application for admission to the bar be denied. Am. Compl.
¶ 28.

On November 27, 1995, Wiesner applied to the Appellate
Division, First Department ("Appellate Division") for
an order granting his application, notwithstanding the
Committee's decision. Am. Compl. ¶ 30. By order dated
March 8, 1996 the Appellate Division denied his petition. Am.
Compl. ¶ 31. Leave to appeal before the Court of Appeals
was denied on June 11, 1996. Am. Compl. ¶ 32. Wiesner then
filed a series of motions before the Appellate Division seeking
permission to renew his application. Am. Compl. ¶¶ 33–40.
These motions were denied, the last on January 27, 1998. *Id.*

Wiesner commenced this action *pro se* on March 2, 1998
pursuant to 42 U.S.C. § 1983, alleging that the Appellate
Division violated his constitutional rights to Due Process
and Equal Protection of the law. He subsequently amended
his Complaint on May 6, 1998 to allege that the rules and
procedures governing the character and fitness standards for
admission to the New York Bar are unconstitutional on their
face, and as applied. [4] The plaintiff also contends that the
defendants' actions unlawfully restrained trade and violated
New York Corrections and Human Rights Law.

### II. Discussion

#### A. Rooker–Feldman

**\*2** Defendants move to dismiss plaintiff's claims for lack
of subject matter jurisdiction, contending that the Court is
barred from entertaining the plaintiff's claims pursuant to the
*Rooker–Feldman* doctrine. In *Rooker,* the Supreme Court held
that a district court properly refused to declare an Indiana state
court judgment null and void on the ground that the judgment

violated the Contract, Due Process and Equal Protection Clauses of the Constitution. *See* 🔖 *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 414–15, 44 S.Ct. 149, 68 L.Ed. 362 (1923). The Supreme Court reasoned that within the federal judiciary only it had jurisdiction to reverse or modify a state court judgment. 🔖 *Id.* at 415–16. In *Feldman,* the Supreme Court affirmed a district court's conclusion that it lacked jurisdiction to entertain the denial of plaintiffs' applications to the District of Columbia Bar as violative of the Fifth Amendment and the Sherman Act. *See* 🔖 *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 468–70, 487, 103 S.Ct. 1303, 75 L.Ed.2d 206(1983). The Supreme Court held that the federal district court did not have subject matter jurisdiction to entertain any challenge to a judicial determination made by the District of Columbia Court of Appeals. 🔖 *Id.* at 476–79.

Under the *Rooker–Feldman* doctrine, a plaintiff may not initiate a federal court action that: (1) directly challenges a State court holding or decision; or (2) indirectly challenges a State court holding or decision by raising claims in federal court that are inextricably intertwined with the State court judgment. *See* 🚩 *Moccio v. New York State Office of Court Admin.,* 95 F.3d 195, 198 (2d Cir.1996); 🔶 *Smith v. Wayne Weinberger, P.C.,* 994 F.Supp. 418, 423 (E.D.N.Y.1998). The doctrine, however, is not without limitation. [5] A district court can entertain a general challenge to the constitutionality of a state statute, rule or regulation that is not "inextricably intertwined" with a State court judgment.

Supreme Court jurisprudence provides "little guidance" with respect to determining whether a prior State court judgment is inextricably intertwined with federal claims. *See* 🚩 *Moccio,* 95 F.3d at 198. However, in *Moccio* the Second Circuit noted that "the Supreme Court's use of inextricably intertwined means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding ... subsequent litigation of the claim will be barred under the *Rooker–Feldman* doctrine if it would be barred under the principles of preclusion." *Id.* at 199–200 (citations and internal quotations omitted). Therefore, where the federal claims were never presented in the State court proceedings and the plaintiff did not have the opportunity to present the claims in those proceedings, subject matter jurisdiction exists. *Id.* at 198 (citation omitted). Understanding such, any claim where Wiesner baldly seeks review of the merits of the Appellate Division's determination is barred by

*Rooker–Feldman.* The defendants maintain that the plaintiff's Amended Complaint should be dismissed in its entirety because all of the claims are inextricably intertwined with the Appellate Division's decision. I disagree.

**\*3** Wiesner's first cause of action alleges that the Appellate Division violated his right to Due Process. The Due Process clause bars arbitrary, wrongful government actions, and guarantees procedural fairness when a state action deprives a citizen of a protected interest in life, liberty, or property. *See* 🔖 *Daniels v. Williams,* 474 U.S. 327, 330–32 (1986). Wiesner first alleges a Due Process violation with respect to the merits of the decision on his application. *See* Am. Compl. ¶¶ 42–49. For example, Wiesner alleges that "his denial upon the record that exists is violative of his right to due process," Am. Compl. ¶ 46, and that the "defendants' conduct was arbitrary and capricious, without rational basis or without fair support in the record." Am. Compl. ¶ 48. This Due Process claim is dismissed because it seeks review of the Appellate Division's judgment.

Second, Wiesner alleges a Due Process violation on the basis of the general constitutional invalidity of the character and fitness rules and procedures for admission. *See* Am. Compl. ¶¶ 50–53. The Amended Complaint alleges that the rules and procedures "are unconstitutionally vague, arbitrary, capricious, overbroad and/or fail to give sufficient notice of what is required or prohibited," Am. Compl. ¶ 50, and are unconstitutional as applied to him. Am. Compl. ¶ 51. These Due Process challenges, mounting a general attack on the character and fitness rules and procedures, may not be dismissed pursuant to the Rooker–Feldman doctrine.

The argument that the character and fitness rules and procedures are unconstitutional falls squarely within an established *Rooker–Feldman* exception. *See* 🔖 *Feldman,* 460 U.S. at 482–83 ("[t]o the extent that [plaintiffs] mounted a general challenge to the constitutionality of Rule 46 I(b) (3) ... the District Court did have subject matter jurisdiction"). Defendants' reliance on 🚩 *Campbell v. Greisberger,* 80 F.3d 703 (2d Cir.1996) is misplaced. In *Campbell,* the Second Circuit dismissed the action pursuant to *Rooker–Feldman* because the plaintiff specifically sought federal court review of the state court's decision to deny his application pending submission of medical evidence to determine his fitness to practice law. *Id.* at 707. Here, liberally construed, one portion of Wiesner's Due Process claim challenges the *prima facie* validity of the rules and procedures governing admission to

the bar, and does not seek review of the Appellate Division's decision. Indeed, he seeks a declaratory judgment that the rules and procedures are unconstitutional, Am. Compl. ¶ 78, a requested remedy absent in *Campbell.*

Moreover, Wiesner's general Due Process claim is not barred under preclusion principles. He did not raise any constitutional challenge in a prior state proceeding, nor did he have an opportunity to do so. Indeed, even had Wiesner challenged the Appellate Division's denial of his application as arbitrary and capricious in an Article 78 proceeding, the plaintiff's general constitutional challenge would not be precluded. *See Hachamovitch v. DeBuono,* 159 F.3d 687, 1998 WL 634766, at *8 (2d Cir. Sept. 16, 1998) (general constitutional challenge not precluded in subsequent federal litigation since a petitioner in a Article 78 proceeding cannot contest the validity of a legislative act or regulation).

**\*4** Nonetheless, the Due Process claim challenging the rules and procedures of the Appellate Division as applied to the plaintiff fails. It fails because it constitutes a thinly veiled attempt to review the Appellate Division's decision, to do indirectly what the law prohibits doing directly. Clearly, the sought for analysis requires a review of the merits of the decision with respect to the plaintiff's application. It is beyond peradventure that the *Rooker–Feldman* doctrine precludes such inquiry. *See Campbell,* 80 F.3d at 707 ("[A] review of a judicial decision of the state court on an individual's application may be had only in the Supreme Court."). Therefore, the Due Process challenge to the character and fitness rules and procedures, as applied, is barred under *Rooker–Feldman* and that claim is dismissed for lack of subject matter jurisdiction.

Wiesner's second cause of action claims that the Appellate Division violated his right to Equal Protection. Am. Compl. ¶¶ 54–62. He alleges that "there is no rational basis for the gross disparity in process and result between the [Appellate Divisions in the] First and Second Departments regarding his application." Am. Compl. ¶ 62. Wiesner also claims that "there is no rational basis for distinguishing between himself" and other applicants with serious criminal histories "and accordingly, that he was denied his right of Equal Protection." Am. Compl. ¶ 61.

Using the same template as the Due Process analysis above, Wiesner's Equal Protection claim is not precluded by the *Rooker–Feldman* doctrine with respect to a general

constitutional challenge to the character and fitness rules and procedures. However, to the extent that Wiesner's Equal Protection claim is solely concerned with the character and fitness rules and procedures as applied to him, it must be dismissed for lack of subject matter jurisdiction. [6]

### A. Failure to State a Claim

Defendants move to dismiss plaintiff's remaining allegations for failure to state a claim upon which relief can be granted under Rule 12(b)(6). A court will only grant a 12(b)(6) motion when it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 63 (2d. Cir.1997) (citations and internal quotations omitted). When deciding a 12(b)(6) motion, a court must "accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Id.* Since subject matter jurisdiction exists over the plaintiff's general Due Process and Equal Protection challenges to the constitutionality of the character rules and procedures, I now consider the merits of these claims.

### 1. Due Process

In his first cause of action, Wiesner contends that the rules and procedures governing admission to the bar violate Due Process. He alleges that these rules and procedures—New York Judiciary Law § 90(1)(a), New York C.P.L.R. § 9404, and 22 N.Y.C.R.R. § 520.12—are unconstitutionally vague, overbroad, capricious and permit an arbitrary exercise of discretion. Am. Compl. ¶¶ 50, 52. I disagree.

**\*5** Judiciary Law § 90(1)(a) requires that an applicant for the bar possess "the character and fitness requisite for an attorney." C.P .L.R. § 9404 provides that no person shall be admitted to practice unless the Appellate Division Committee, after an investigation, determines that the applicant possesses the character and fitness required of an attorney. Establishing character and fitness appropriate for membership in the bar of this State is not an exact science. It lends itself to an analysis by men and women such as those solicited by the Court to join the Committee (all with many years at the bar and with respected careers), and of course in the last analysis by the Court itself. Without discretion, there can be no meaningful evaluation. In a similar vein, 22 N.Y.C.R.R. § 520.12 requires an applicant

to submit to the Committee affidavits of "reputable persons that applicant possesses the good moral character and general fitness requisite for an attorney." In *Law Students Civil Rights Research Council, Inc. v. Wadmond,* the Supreme Court found that 🚩 Judiciary Law § 90(1)(a) and C.P.L.R. § 9404 were not void for vagueness on First Amendment grounds. 🚩 401 U.S. 154, 159, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971) [hereinafter *Law Students* ].[7] The Court concluded that the character and fitness requirement was constitutional and reasoned that it had been narrowly construed as "encompassing no more than 'dishonorable conduct relevant to the legal profession." ' *Law Students,* 401 U.S. at 159 (quoting *Law Students Civil Research Council Inc. v. Wadmond,* 299 F.Supp. 117, 144, n. 20 (S.D.N.Y.1969)).

Given such strong precedent, it cannot be said that the character requirements evinced in the rules and regulations challenged by the plaintiff are so vague as to give no standard at all. That is, it follows that if 🚩 Judiciary Law § 90(1)(a) and C.P.L.R. § 9404 were not void for vagueness under the First Amendment standard, then they and 22 N.Y.C.R.R. § 520.12 are *a fortiori* constitutional under a void for vagueness Due Process analysis. Accordingly, I find that Wiesner's Due Process challenge to 🚩 Judiciary Law § 90(1)(a), C.P.L.R. § 9404 and 22 N.Y.C.R.R. § 520.12 must be dismissed for failure to state a claim upon which relief can be granted.

## 2. *Equal Protection*

In his second cause of action, Wiesner maintains that the character and fitness rules and procedures violate Equal Protection because they allow for disparate application with respect to similarly situated bar applicants in different departments. Am. Compl. ¶¶ 54–62. The State of New York is divided into four judicial departments, each one consisting of counties embraced within specified judicial districts. 🚩 N.Y. Const. Art. 6, § 4; N.Y. Judiciary Law § 70. There is one Appellate Division of the Supreme Court of the State of New York in each department. *Id.* The Appellate Divisions apply the same character and fitness rules and procedures, but are granted a fair amount of discretion in their application.

*See* 🚩 N.Y. Judiciary Law § 90. This amounts to a type of home rule in admitting bar applicants that is similar to the home rule which a state may allot to its several counties. *See* 🚩 *Griffin v. County School Bd. of Prince Edward County,* 377 U.S. 218, 231, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) (state

possesses "wide discretion" in deciding whether laws shall operate statewide or in certain counties, but that discretion does not *per se* lend itself to unconstitutional practices). In this vein, Wiesner's Equal Protection claim is essentially a geographic challenge.

**\*6** His challenge, therefore, is subject to rational basis review since the plaintiff does not, and cannot, allege that the character rules and regulations result in disparate treatment based on a suspect classification, or impair fundamental rights. *See* 🚩 *Moccio,* 95 F.3d at 201. Under such review, "[a]s long as there is any reasonably conceivable state of facts" that could provide a rational basis for the government action, there is no Equal Protection violation. *Id.* Given the significant population and sheer size of New York State, it is certainly reasonable for bar applications to be processed in four separate regions. *See* ❓ *McGowan v. Maryland,* 366 U.S. 420, 427 (1961) ("the Equal Protection Clause relates to equality between persons as such, rather than between areas and [ ] territorial uniformity is not a constitutional prerequisite"). Accordingly, the Equal Protection challenge is dismissed for failure to state a claim upon which relief can be granted.

## 3. *State Claims*

In causes of action four through six, Wiesner alleges violations of 🚩 New York Corrections Law §§ 753, 754 and 🚩 New York Executive Law § 296. A district court may decline to exercise jurisdiction where all claims over which it has original jurisdiction have been dismissed. *See* 🚩 28 U.S.C. § 1367(c)(3). Here, I have granted the defendants' motion to dismiss all of the plaintiff's federal causes of action. Accordingly, I decline to exercise supplemental jurisdiction over the plaintiff's remaining State causes of action and they are dismissed without prejudice. *See Lanza v. Merrill Lynch & Company, Inc.,* 154F.3d 56, 🚩 1998 WL 546949, at *5 (2d Cir. Aug. 31, 1998) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine ... will point toward declining jurisdiction over the remaining state-law claims") (quoting 🚩 *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)); *DeJoie v. Texaco, Inc.,* 1997 WL 431032, at *2 (S.D.N.Y. Jul. 31, 1997) (declining to exercise supplemental jurisdiction

where Title VII claims were dismissed and only New York Human Rights Law claims remained).

### III. Conclusion

For the reasons discussed above, the motion to dismiss is GRANTED with respect to claims one through three. I decline to exercise supplemental jurisdiction over claims four through six. The Clerk is instructed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 695927

## Footnotes

1  Fernando A. Bohorquez, Jr., a third year student at New York Law School, assisted in the research and preparation of this decision.

2  Wiesner has two felony convictions. In 1987, Wiesner pleaded guilty to conspiracy to violate federal narcotics laws and to distribution and possession of Quaaludes. Compl. Ex. D at p. 2. Four years later, Wiesner pleaded guilty to a state charge of attempted murder in the second degree. *Id.* at p. 4.

3  These individuals include Fordham Law School Dean John Feerick, Brooklyn District Attorney Charles Hynes, Criminal Court Judge Leslie Leach, United States District Court Judge Gerald L. Goettel, Commissioner Virginia Hauer of the New York State Workers Compensation Board, New York City Probation Officer Dennis Texcidor and Joseph Forstadt, a partner at Stroock Stroock & Lavan.

4  The character and fitness rules and procedures for admission to the New York Bar are codified in N.Y.J.L. § 90(1)(a); C.P.L.R. § 9404; 22 N.Y.C.R.R. § 520.12. The 🚩 Judiciary Law § 90(1)(a) requires that an applicant must be certified by the state board of law examiners as possessing the "character and fitness requisite for an attorney and counselor-at-law." C.P.L.R. § 9404 states that "no person shall be admitted to practice without a certificate from the proper committee that it has carefully investigated the character and fitness of the applicant." 22 N.Y.C.R.R. § 520.12 requires that "[e]very applicant for admission to practice must file with a committee on character and fitness appointed by the Appellate Division of the Supreme Court affidavits of reputable persons that applicant possesses the good moral character and general fitness requisite for an attorney and counselor-at law as required by 🚩 section 90 of the Judiciary Law."

5  First and foremost the *Rooker–Feldman* doctrine is inapplicable in *habeas corpus* proceedings. *See* 🚩 *Sumner v. Mata,* 449 U.S. 539, 543–544, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). This exception is not pertinent in the instant action. Second, the doctrine does not apply to state court decisions that are administrative in nature and form. *See* 🚩 *Feldman,* 460 U.S. at 475; *Levitin v. Homburger,* 932 F.Supp. 508, 518 (S.D.N.Y.1996). Following the rationale of the court in *Feldman,* I conclude that the instant matter deals with a judicial, not an administrative, ruling on the part of the State court. *See* 🚩 *Feldman,* 460 U.S. at 476–82. Finally, *Rooker–Feldman* does not bar an indirect federal challenge which is not inextricably intertwined with the prior 🚩 state court judgment. *See Moccio,* 95 F.3d at 198–200. This is the applicable exception in the instant case.

6  Wiesner's third cause of action alleges that the Appellate Division violated his right to be free from unlawful restraint of trade since their actions were "without rational basis or legitimate objective." Am. Compl. ¶ 63. A

state may not exclude a person from the practice of law or any other occupation in a manner that contravene the Due Process or Equal Protection clauses of the Fourteenth Amendment. *See* *Schware v. Board of Bar Exam. of State of N. M.,* 353 U.S. 232, 238, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). Accordingly, the analysis of the unlawful restraint cause of action is necessarily the same as the Due Process or Equal Protection inquiries. *See infra,* at §§ II.A.1–2. The fourth through sixth causes of action are state law claims based on alleged violations of New York State Corrections and Human Rights Law. Am. Compl. ¶¶ 64–74. These causes of actions are discussed in § II.A.3.

7    Although the Supreme Court did not consider 22 N.Y.C.R.R. § 520 . 12, this provision is functionally equivalent to Judiciary Law § 90(1)(a) and C.P.L.R. § 9404.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4939389
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Johnny BUNTING, Plaintiff,

v.

Brian FISCHER, Albert Prack, Norman Bezio, Sibatu
Khahaifa, Mark Passage, David F. Napoli, M. Sheahan,
James Esgrow, Richard A. Donahue, Patrick Griffin,
Thomas Griffin, Stephen Wenderlich, Defendants.

14-CV-0578-RJA-MJR
|
Signed August 2, 2016
|
Filed 08/04/2016

**Attorneys and Law Firms**

Johnny Bunting, Mount Vernon, NY, pro se.

Christopher L. Boyd, NYS Attorney General's Office,
Buffalo, NY, for Defendants.

REPORT AND RECOMMENDATION

MICHAEL J. ROEMER, United States Magistrate Judge

*\*1* This case has been referred to the undersigned by the
Hon. Richard J. Arcara for all pre-trial matters, including
preparation of a report and recommendation on dispositive
motions. (Dkt. No. 22). Before the Court is a motion to
dismiss for failure to state a claim brought on behalf of all
the defendants. (Dkt. No. 16). For the following reasons, I
recommend that the motion be granted in its entirety.

**BACKGROUND**

Johnny Bunting commenced this *pro se* action under 42
U.S.C. § 1983 on July 17, 2014, while he was incarcerated
at Southport Correctional Facility. By that time, Bunting
had served more than sixty-five months in the Special
Housing Unit (SHU). (Dkt No. 1 at ¶ 127). He alleged
that the long SHU sentences he had received violated his
Eighth Amendment right to be free from cruel and unusual

punishment and his Fourteenth Amendment due process
rights. (*Id.* at ¶¶ 158, 159).

According to the complaint, Bunting, who was then
incarcerated at Orleans Correctional Facility, was first sent
to the SHU on January 22, 2009, on a twenty day sentence
"for smuggling, interference, refusing [a] direct order and
threats." (*Id.* at ¶ 68). While he was serving the twenty day
sentence, Bunting was charged with "false statements, [1] [a]
correspondence violation, soliciting, and selling articles." (*Id.*
at ¶ 69). Defendant Mark Passage sentenced him to 180 days
in the SHU with loss of correspondence privileges for two
years. (*Id.* at ¶ 69).

On April 16, 2009, Bunting was transferred to Southport
Correctional Facility. (*Id.* at ¶ 73). Eight days after his
arrival, he was given a misbehavior report for sending an
"invoice" to defendant Sibatu Khahaifa, the superintendent of
the Orleans Correctional Facility. (*Id.* at ¶¶ 15, 74). Defendant
James Esgrow found Bunting guilty of harassment, lying, and
tampering with property, and sentenced him to twenty-one
months in the SHU with three months suspended. (*Id.* at ¶
74). Based on a misbehavior report filed two days later for
an unhygienic act, threats, and harassment, Esgrow sentenced
him to six additional months in the SHU. (*Id.* at ¶ 77).
Defendant Norman Bezio affirmed the sentences on appeal.
(*Id.* at ¶ 80-81).

On September 23, 2009, after a hearing for possession
of unauthorized identification and unauthorized UCC
material, [2] Esgrow sentenced Bunting to eighteen months in
the SHU. (*Id.* at ¶¶ 82-83, 85-86). After the hearing, Bunting
wrote letters to defendants David Napoli and M. Sheahan,
the superintendent and acting superintendent of Southport
Correctional Facility, to complain about "the overbroad usage
of the UCC rules." (*Id.* at ¶¶ 17-18, 89-90). He also wrote two
grievances challenging Esgrow's actions, both of which were
dismissed. (*Id.* at ¶ 91).

*\*2* On September 30, 2009, after a hearing on charges of
smuggling tobacco, defendant Richard Donahue sentenced
Bunting to ninety days in the SHU. (*Id.* at ¶¶ 88, 92).

On November 6, 2009, Bezio reduced the sentence from
the September 23rd hearing to twelve months. (*Id.* at ¶
95.) Later that month, Bunting wrote to Napoli requesting
a discretionary review of the September 23, 2009 decision.
(*Id.* at ¶ 96). His request was denied by Sheahan, the acting
superintendent. (*Id.*)

On November 30, 2009, Esgrow held a hearing on a misbehavior report charging Bunting with possession of UCC material, an unauthorized lien, and violating a direct order. (*Id.* at ¶¶ 97-98). Bunting alleges that Esgrow ejected him from the hearing, even though Bunting did not present any threat to security. (*Id.* at ¶ 98). Esgrow sentenced him to eighteen months in the SHU. (*Id.* at ¶ 99).

On February 12, 2010, and February 18, 2010, Bunting received additional misbehavior reports for possession of unauthorized UCC material and a correspondence violation. (*Id.* at ¶ 102-03). He alleges that these two misbehavior reports were based on the same document at issue at the November 30, 2009 hearing, which according to Bunting was "an affidavit for a tort claim." (*Id.* at ¶ 104). Esgrow ejected Bunting from the hearing on the February 12, 2010 misbehavior report, "claiming that Mr. Bunting glared at a witness." (*Id.* at ¶ 106). At the end of the hearing, Esgrow sentenced Bunting to twenty-one months in the SHU. (*Id.* at ¶ 107). The decision was affirmed by Bezio. (*Id.* at ¶ 115). Esgrow also ejected Bunting from the hearing on the February 18, 2010 misbehavior report "because he raised the defense of immunity as a sovereign." (*Id.* at ¶ 110). Esgrow imposed a sentence of an additional five months in the SHU. (*Id.* at ¶ 111). Defendant Albert Prack affirmed the decision. (*Id.* at ¶ 116).

On March 15, 2010, Bunting wrote to Patrick Griffin, the superintendent of the Southport Correctional Facility at the time, requesting that he review the misbehavior reports connected to the UCC material. (*Id.* at ¶ 113). His request was denied. (*Id.*)

On July 7, 2010, Bunting received another misbehavior report for possession of unauthorized UCC material. (*Id.* at ¶ 117). Esgrow sentenced him to twelve months in the SHU. (*Id.* at ¶ 118).

On May 9, 2011, Bunting had a hearing before Esgrow on charges of soliciting, smuggling, stealing, and a correspondence violation. (*Id.* at ¶¶ 120-121). Esgrow found him guilty and sentenced him to six months in the SHU. (*Id.* at ¶ 121).

Bunting has not alleged that he received any new sentences after May 9, 2011, but he was confined in the SHU until his release from prison on January 6, 2015. (Dkt. No. 20 at 5; Dkt. No. 9). Defendants Thomas Griffin and Stephen Wenderlich

were superintendents of Southport Correctional Facility in 2012 and 2014, respectively, and are alleged to have reviewed and authorized Bunting's continued confinement in the SHU. (Dkt. No. 1 at ¶¶ 124-25).

Bunting originally pleaded four causes of action. He has withdrawn the first two, which requested declaratory and injunctive relief, because he is no longer incarcerated. Defendant Brian Fischer, the Commissioner for Department of Corrections and Community Supervision (DOCCS), was sued only under those two causes of actions, so there are no active claims against him. Bunting's two remaining claims seek money damages from the other defendants for alleged violations of his rights under the Eighth Amendment and the Fourteenth Amendment due process clause.

### Analysis

#### Motion to Dismiss Standard

**\*3** A motion to dismiss for failure to state a claim should be granted where the complaint fails "to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 546 (2007). To state a plausible claim, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facts described in the complaint must "possess enough heft to 'show that the pleader is entitled to relief.' " *Bell Atlantic Corp.*, 550 U.S. at 557 (citing Fed. R. Civ. P. 8(a)(2)). Legal conclusions that are unsupported by facts cannot save a complaint from dismissal. *Ashcroft*, 556 U.S. at 679.

#### Statute of Limitations

The statute of limitations for section 1983 actions in New York's federal district courts is three years. *Jewell v. County of Nassau*, 917 F.2d 738, 740 (2d Cir. 1990). Defendants argue that Bunting's action is barred by the statute of limitations because the last SHU sentence mentioned in his complaint was imposed on May 9, 2011, and Bunting did not file the complaint until July 17, 2014, more than three years later.

In general, the statute of limitations begins to run when the plaintiff "knows or has reason to know of the injury that is the

basis of the action." *Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993) (internal quotation omitted). Where the complaint is based on a continuing violation, i.e. where the constitutional violation is the cumulative effect of a series of activities, the entire course of conduct will be considered timely as long as some of the actions took place within three years of the complaint being filed. *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015).

The Second Circuit has held that the continuing violation doctrine should be applied to Eighth Amendment claims based on SHU confinement because these claims "typically accrue[ ] only after an inmate has been confined in the SHU for a prolonged period of time." *Id.* at 224. The "entire Eighth Amendment claim will be timely as long as the violation of rights continued past the cutoff date." *Id.* Since Bunting's allegedly unconstitutional SHU confinement continued past the cutoff date—in fact, he was still in the SHU when the complaint was filed—his Eighth Amendment claim is not time-barred.

The continuing violation doctrine does not apply to the Fourteenth Amendment due process claim, however. A due process claim arises when the defendants have deprived the plaintiff of a liberty interest as a result of insufficient process. *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004). Each decision made without due process is a discrete violation, and the statute of limitations begins to run from the date that the plaintiff was denied the full and fair hearing that he was entitled to. *See Gonzalez*, 802 F.3d at 223 (a separate claim for violation of due process rights accrues "each time that a defendant fails to provide an inmate with the notice, hearing, or evaluation to which he is entitled after a liberty interest attaches.") Since the last allegedly unlawful SHU sentence mentioned in Bunting's complaint was imposed at a hearing on May 9, 2011, more than three years before the complaint was filed, the due process claims are untimely.

Bunting requests equitable tolling of the statute of limitations because he was in the SHU until his release from prison in 2015. He has not explained why his SHU confinement would have prevented him from filing the complaint, however. To seek equitable tolling, the plaintiff "must have acted with reasonable diligence throughout the period he seeks to toll." *Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000). He cannot "avoid statute of limitations problems when he knew after each allegedly wrongful act that it was actionable, but chose not to file federal claims regarding them within the

limitations period." *Konigsberg v. Lefevre*, 267 F.Supp.2d 255, 262 (N.D.N.Y. 2003). Bunting has not pleaded any facts from which the Court could infer that he acted with reasonable diligence in failing to bring this lawsuit until July 2014. While he was in the SHU, he was able to file grievances and legal papers, as evidenced by the various letters he describes in his complaint and the fact that the complaint in this action was filed when he was in the SHU. The statute of limitations will not be tolled.

**\*4** As the Fourteenth Amendment claim is barred by the statute of limitations, it must be dismissed.

*Eighth Amendment*

Bunting's Eighth Amendment claim is based on the length of his confinement in the SHU. He does not allege that he was treated any differently from other prisoners in SHU confinement, only detailed the ways in which SHU confinement is more restrictive than regular confinement. In Bunting's eyes, the long periods he spent in isolation constitute cruel and unusual punishment. But SHU confinement is a common punishment within state prisons, and the regular conditions of SHU confinement do not violate the Eighth Amendment. *Dixon v. Goord*, 224 F.Supp.2d 739, 748 (S.D.N.Y. 2002). Numerous cases in this circuit have upheld long SHU sentences that were challenged merely for the amount of time prisoners were held in segregation. *See, e.g.*, *Sostre v. McGinnis*, 442 F.2d 178, 193, *overruled on other grounds by Davidson v. Scully*, 114 F.3d 12 (2d Cir. 1997) (declining to hold that plaintiff's confinement in punitive segregation for more than twelve months violated the Eighth Amendment); *Gulley v. Roach*, 02-cv-908S, 2004 WL 2331922 (W.D.N.Y. Oct. 15, 2004) (holding that seven-month "duration of Plaintiff's confinement alone does not rise to the level of a constitutional violation"). Given this precedent, Bunting's complaint does not state a claim that would entitle him to relief, and the Eighth Amendment claim should be dismissed.

**Conclusion**

The plaintiff has withdrawn his first two causes of action, leaving claims under the Eighth Amendment and the Fourteenth Amendment. As the Fourteenth Amendment claims are barred by the statute of limitations and the Eighth Amendment claims fail to state a cause of action,

Bunting v. Fischer, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 310 of 482

I recommend that the defendants' motion be granted in its entirety and the complaint dismissed.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 72. Any requests for an extension of this deadline must be made to Judge Arcara.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See* *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**\*5 SO ORDERED.**

Dated: August 2, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4939389

## Footnotes

1    According to the defendants, Bunting had filed fraudulent liens under the Uniform Commercial Code (UCC) against a member of the parole board, an assistant attorney general, and several corrections officers. (Dkt. No. 16-1 at 3-4).

2    Several of Bunting's offenses appear to be related to his activities as a "sovereign citizen." (*See* Dkt. No. 16-1 at 3). Sovereign citizens view the American government as illegitimate and claim to be exempt from various laws. Creating non-governmental drivers' licenses and making inappropriate filings under the Uniform Commercial Code are typical of sovereign citizens. *See* UNC School of Government, *A Quick Guide to Sovereign Citizens* 1 (2013).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

(4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)). The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*); *see also Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" (citing *Grullon*, 720 F.3d at 139)). For purposes of this Decision and Order, the Court assumes that all five categories under *Colon* remain valid.

25    The accuracy and authenticity of OMH's website cannot reasonably be questioned.

26    Plaintiff was evaluated by OMH professionals several times throughout 2018. *See* Dkt. No. 1-1 at 2-48. In addition, as noted, between July, 2018, and March, 2019, plaintiff received a mental health examination by a medical professional roughly once a month. *Id.* at 37-48. Thus, if plaintiff was never evaluated by a special housing unit case management committee, it appears that would be because of a determination by one or more OMH professionals that he was not suffering from a condition that (1) placed his mental health "at issue" during any of his disciplinary hearings, or (2) warranted placement on the OMH mental health caseload. A non-medical professional's deference to such a determination does not give rise to a cognizable Eighth Amendment claim against that official. *See Sharma v. D'Silva*, 157 F. Supp. 3d 293, 305 (S.D.N.Y. Jan. 25, 2016) ("As a non-medical official, Defendant Annucci was not in a position to critically evaluate the quality of Plaintiff's medical treatment nor was he required to engage in a deep-dive investigation of the exact nature of Plaintiff's medical ailments. The Court finds that Defendant Annucci's course of action does not establish that he acted with deliberate indifference towards Plaintiff and dismisses Plaintiff's claim against Defendant Annucci."); *Gonzales v. Wright*, 9:06-CV-1424, 2010 WL 681323, at *10 (N.D.N.Y. Feb. 23, 2010) ("The Superintendent's and Deputy Superintendent's delegation of medical judgment to appropriate staff was proper as the Second Circuit has cautioned that non-medical Defendants should not intercede in the medical care and treatment of an inmate.") (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 111(2d Cir. 2000) ("One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given particular prisoners....")).

27    Defendant Annarino's alleged issuance of a false misbehavior report also does not, without more, give rise to a cognizable Section 1983 claim. *See Freeman v. Rideout*, 808 F.2d 949, 950, 953 (2d Cir. 1986) ("[T]he filing of unfounded charges is not *per se* a constitutional violation under section 1983[.]"); *Mitchell v. Senkowski*, 158 Fed. App'x 346, 349 (2d Cir. 2005) ("The issuance of false misbehavior reports and provision of false testimony against an inmate ... violates due process only where either procedural protections were denied that would have allowed the inmate to expose the falsity of the evidence against him, ..., or where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights...." (internal citations omitted)).

28    Plaintiff also cannot state a Fourteenth Amendment substantive due process claim against these defendants based on allegations that they wrongfully imposed disciplinary sentences that included SHU confinement because such allegations are more properly analyzed under the Eighth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 274-75 (1994) (where a specific amendment provides protection against a particular

government action, claims must be brought pursuant to that amendment rather than as a violation of substantive due process under the Fourteenth Amendment); *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process.").

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 7274397
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Darnell TUBBS, a/k/a Darnell Johnson, Plaintiff,
v.
Don VENETTOZZI, et al., Defendants.

9:19-CV-0126 (LEK/DJS)
|
Signed July 20, 2022

**Attorneys and Law Firms**

DARNELL TUBBS, 95-B-1929, Plaintiff, pro se, Five Points
Correctional Facility, Caller Box 119, Romulus, New York
14541.

HON. LETITIA JAMES, New York State Attorney General,
RYAN W. HICKEY, ESQ., Assistant Attorney General,
Attorney for Defendants, The Capitol, Albany, New York
12224.

**REPORT-RECOMMENDATION AND ORDER** [1]

DANIEL J. STEWART, United States Magistrate Judge

**\*1** Plaintiff is an inmate in the custody of the New York
State Department of Corrections and Community Supervision
("DOCCS") and commenced this action pursuant to 42
U.S.C. § 1983 alleging that Defendants violated his federal
constitutional rights. *See generally* Dkt. No. 15, Am. Compl.
The District Court reviewed the Amended Complaint under
28 U.S.C. §§ 1915 & 1915A and dismissed certain
claims and Defendants and permitted the filing of the
Amended Complaint. Dkt. No. 24. Following that review the
following claims remain: (1) Eighth Amendment excessive
force and failure to intervene claims against Defendants
Uhler, Garland, and Mitchell; (2) Eighth Amendment medical
indifference claims against Defendants Garland, Gravel,
and Mandalaywa; (3) First Amendment retaliation claims
against Defendants Garland, Manson, and Woodruff; and
(4) Fourteenth Amendment due process claims against
Defendants Woodruff and Venettozzi. Defendants Woodruff
and Venettozzi now move for summary judgment under FED.
R. CIV. P. 56 with respect to Plaintiff's due process claims.
Dkt. Nos. 108 & 108-9, Defs.' Mem. of Law at pp. 5-11. [2]

Defendant Mandalaywa seeks summary judgment on the sole
remaining claim against him. Dkt. No. 108; Defs.' Mem. of
Law at pp. 12-14. Plaintiff opposes the Motion. Dkt. No. 118,
Pl.'s Opp. [3]

For the reasons set forth below, the Court recommends that
the Motion be granted in part and denied in part.

## I. FACTUAL BACKGROUND [4]

On November 29, 2016, while an inmate at Upstate
Correctional Facility, Plaintiff received an inmate
misbehavior report issued by Corrections Officer W. Garland.
Dkt. No. 108-2, Woodruff Decl., ¶ 8 & Ex A. [5] That report
charged him with failure to comply with a direct order and
an unhygienic act. *Id.* Plaintiff was given the opportunity to
request an employee assistant prior to a disciplinary hearing
being held. Woodruff Decl. at Ex. B at p. 47. Plaintiff
met with his employee assistant, identified several potential
witnesses he wished to call at his hearing, and identified
documentary evidence he wished to present at his hearing.
*Id.* at pp. 45-46. Defendant Woodruff was designated to
act at the disciplinary hearing regarding the November 29
misbehavior report. Woodruff Decl. at ¶ 12. That hearing
began on December 7, 2016 and was adjourned several times.
*Id.* at ¶ 13 & Ex. B. at pp. 7-9. The hearing was completed on
January 4, 2017 at which time Plaintiff was found guilty of
both charges lodged in the report. Woodruff Decl. at Ex. B at
p. 1. Plaintiff appealed the decision and the disposition was
modified by dismissal of the failure to comply with a direct
order charge. *Id.*

## II. SUMMARY JUDGMENT STANDARD

**\*2** Pursuant to Federal Rule of Civil Procedure 56(a),
summary judgment is appropriate only where "there is no
genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." The moving
party bears the burden to demonstrate through "pleadings,
depositions, answers to interrogatories, and admissions on
file, together with [ ] affidavits, if any," that there is no
genuine issue of material fact. *F.D.I.C. v. Giammettei,*
*34 F.3d 51, 54 (2d Cir. 1994)* (quoting *Celotex Corp. v.*
*Catrett, 477 U.S. 317, 323 (1986)*).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c);

*see also* 🚩 *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); 🚩 *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. 🚩 *Scott v. Coughlin*, 344 F.3d at 289 (citing 🚩 *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and 🚩 *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. 🚩 *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). In considering a summary judgment motion, the Court's role "is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." 🚩 *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." 🚩 *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." 🚩 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. DISCUSSION

### A. Eighth Amendment Claim

Plaintiff's Amended Complaint alleges that Defendant Mandalaywala was deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment. Mandalaywala is alleged to be the Facility Heath Services Director at Upstate Correctional Facility. Am. Compl. at p. 3. Plaintiff alleges that Dr. Mandalaywala was made aware that Plaintiff had allegedly swallowed several sharp objects, but provided no medical treatment. *Id.* at ¶¶ 67-68; *see also* Dkt. No. 24 at p. 12. [6] Plaintiff alleges that Defendant improperly cancelled medical appointments. Am. Compl. at ¶ 99. He further alleges that Dr. Mandalaywala was present during an improperly conducted examination following an alleged sexual assault. *Id.* at ¶ 100.

**\*3** Dr. Mandalaywala has not offered a sworn statement denying any of these allegations. He relies instead on Plaintiff's deposition testimony to argue that Plaintiff's allegations regarding the cancellation of appointments and the medical examination are too speculative and conclusory to state a claim. Defs.' Mem. of Law at p. 14. While conclusory allegations are generally insufficient under 🚩 section 1983, *Houghton v. Cardone*, 295 F. Supp. 2d 268, 273 (W.D.N.Y. 2003), the Court disagrees that on this record Plaintiffs claims are so conclusory that dismissal on summary judgment is appropriate.

The Amended Complaint specifically alleges that Defendant acted with deliberate indifference to Plaintiff's medical needs when outside medical appointments were cancelled. Am. Compl. at ¶ 99. While Plaintiff's deposition testimony could not specifically establish that Defendant had been the one who cancelled the appointments, it does allege that Defendant was one of two people who could have done so. Pl.'s Dep. at pp. 291-292. Dr. Mandalaywala has not offered any evidence to the contrary. Again, here, given that this claim was sufficient to withstand initial review and no additional evidence has been offered by Defendant, the Court recommends that summary judgment on that claim be denied. [7]

With respect to the medical examination allegedly conducted in an improper manner, the Amended Complaint specifically alleges that Dr. Mandalaywala was present and did not intervene. Am. Compl. at ¶ 100. Defendant relies on testimony from Plaintiff's deposition that he was not sure if Mandalaywala was present for the exam. *See* Defs.' Mem. of Law at p. 14 (citing Dkt. No. 108-8, Pl.'s Dep. at p. 289). In Defendant's view, that makes Plaintiff's claim conclusory. Plaintiff, however, testified elsewhere during his deposition

that while he was not certain whether Dr. Mandalaywala was present at the precise moment when the examination took place, he did see him near the examination room around the time of the examination. Pl.'s Dep. at p. 150. Given that part of Plaintiff's claim is that the examination was not held in a proper area and Dr. Mandalaywala should have made certain it was conducted in a proper area, *id.* at p. 290, these allegations are sufficient to defeat the present Motion. As noted, Plaintiff's Amended Complaint specifically alleged Defendant's presence at the time of the examination and his deposition testimony about Mandalaywala's involvement did not explicitly contradict that allegation. *See Brown v. Kerbein*, 2009 WL 1514667, at *2 (W.D.N.Y. May 29, 2009) (finding no personal involvement when "plaintiff's deposition testimony directly contradicts his allegation of defendant['s] ... personal involvement."). Moreover, given that Dr. Mandalaywala has not offered a sworn statement denying he was present or advising what, if any, knowledge he has regarding the conduct of the examination, the allegations in the Amended Complaint remain, as they were at the initial review stage, sufficient to require further proceedings. *See Jackson v. Yando*, 2016 WL 11478235, at *6 (N.D.N.Y. Jan. 19, 2016), *report and recommendation adopted*, 2016 WL 756540 (N.D.N.Y. Feb. 23, 2016) (finding allegation of personal involvement conclusory and granting summary judgment given defendant's sworn statement that he was not present when plaintiff had testified at deposition only that he was unsure if defendant was present.)

**\*4** For these reasons, the Court recommends that Dr. Mandalaywala's Motion for Summary Judgment be denied.

## B. Due Process Claim

In the context of inmate disciplinary hearings, the Fourteenth Amendment requires inmates receive certain protections including: (1) at least twenty-four hours written notice of the disciplinary charges; (2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals"; (3) the inmate be judged by a fair and impartial hearing officer; (4) the disciplinary conviction be supported by some evidence; and (5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken. 📁 *Wolff v. McDonnell*, 418 U.S. 539, 563-66 (1974).

### 1. Defendant Woodruff

Defendant Woodruff conducted the inmate disciplinary hearing at issue in this case. Plaintiff concedes he received timely notice of the inmate misbehavior report. Pl.'s Opp. at p. 2. The Amended Complaint makes a number of allegations regarding the alleged denial of other protections identified by *Wolff*. Though some of the claims do not fit squarely in the *Wolff* categories, they provide a useful tool for organizing the Court's discussion of Plaintiff's claims.

#### a. Impartial Hearing Officer

Plaintiff makes numerous allegations of bias against Woodruff, including his insistence on proceeding with the hearing despite Plaintiff not being prepared, his alleged coaching of witnesses, his failure to consider exculpatory evidence, and his alleged conflict of interest. Am. Compl. at ¶¶ 41-56; *see also* Pl.'s Opp. at pp. 4-7. None of these claims is sufficient to withstand summary judgment.

"An impartial hearing officer is one who 'does not prejudge the evidence' or an inmate's guilt." *Sowell v. Bullis*, 2016 WL 1696454, at *13 (N.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, 2016 WL 1700410 (N.D.N.Y. Apr. 27, 2016). Plaintiff's factual allegation of bias is initially belied by his own statement during his hearing that Woodruff was "a good hearing officer." Woodruff Decl., Ex. C at p. 16.

With respect to the alleged coaching of witnesses, Plaintiff argues that the hearing transcript "conveniently doesn't show this." Pl.'s Opp. at p. 5. Plaintiff cites a number of transcript pages as evidence, though he does not explain exactly how the cited pages support his position. *Id.* Plaintiff's conclusory allegations that the transcript has been tampered with are insufficient to create a question of fact. 📁 *Hilson v. Maltese*, 2012 WL 6965105, at *6 n. 10 (N.D.N.Y. Dec. 14, 2012), *report and recommendation adopted*, 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013); *Proctor v. Kelly*, 2008 WL 5243925, at *5 (N.D.N.Y. Dec. 16, 2008). [8] As are the non-specific allegations of witness coaching. *Allen v. Graham*, 2017 WL 9511168, at *15 (N.D.N.Y. Sept. 26, 2017), *report and recommendation adopted*, 2017 WL 5957742 (N.D.N.Y. Dec. 1, 2017).

**\*5**  Moreover, "[w]here claims of bias are based on purely conclusory allegations, 'they are routinely dismissed.' " *Williams v. Chuttey*, 2017 WL 9673722, at \*11 (N.D.N.Y. Sept. 5, 2017), *report and recommendation adopted*, 2018 WL 1413049 (N.D.N.Y. Mar. 21, 2018) (quoting *McAllister v. Call*, 2014 WL 5475293, at \*12 (N.D.N.Y. Oct. 29, 2014)); *see also Brown v. Dubois*, 2017 WL 9511165, at \*3 (N.D.N.Y. Feb. 28, 2017), *report and recommendation adopted*, 2017 WL 1102746 (N.D.N.Y. Mar. 24, 2017) ("Claims of hearing officer bias are common in § 1983 cases by inmate plaintiffs, and where they are based on purely conclusory allegations, they are routinely dismissed."); *Lopez v. Whitmore*, 2015 WL 4394604, at \*11 (N.D.N.Y. July 16, 2015) ("An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact."). Prison officials serving as hearing officers "are presumed to be unbiased." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). Nothing in Plaintiff's Amended Complaint rebuts that presumption here.

The Amended Complaint makes an additional claim that Woodruff operated under a conflict of interest because of his role in investigating the incident underlying the misbehavior report. Am. Compl. at ¶ 56. There is no evidence that this in true in the record. Moreover, the Court notes that given "the special characteristics of the prison environment, it is permissible for the impartiality of [hearing officers] to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989). The fact that a hearing officer may have had information regarding the underlying incident does not itself create an impermissible conflict for purposes of due process. *Moore v. Griffin*, 2015 WL 5330366, at \*10 (N.D.N.Y. Sept. 11, 2015). Nor is the conclusory allegation that Woodruff was biased as a result of prior grievances filed against him sufficient to state a claim. *Vega v. Artus*, 610 F. Supp. 2d 185, 200 (N.D.N.Y. 2009).

### *b. Documentary Evidence*

Inmates have a right to present documentary evidence at their disciplinary hearing. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). "[A]n inmate's right to present documentary evidence in his defense does not entail an obligation on the part of prison officials to retrieve every document that an inmate requests for his case. Even when documents are relevant and obtainable." *Amaker v. Coombe*, 2002 WL 523388, at \*10 (S.D.N.Y. Mar. 29, 2002). Plaintiff objects that he was not provided with a copy of the report addressing this incident prior to the hearing. Am. Compl. at ¶ 43. Woodruff advised that Plaintiff would be entitled to view the report after appropriate redactions were made. Woodruff Decl., Ex. C at p. 3. He adjourned the hearing in order to permit Plaintiff access to report, which Plaintiff was eventually able to view. Woodruff Decl. at ¶ 30. After Plaintiff reviewed the report Woodruff asked Plaintiff if he wished to recall any witnesses and he declined. Woodruff Decl. at ¶ 32. As a result, he was aware of the contents of the report during the hearing and has not established prejudice from the fact that he did not have an actual copy of the report prior to the start of the hearing. *See Loving v. Selsky*, 2009 WL 87452, at \*3 (W.D.N.Y. Jan. 12, 2009) ("Even if it would have been preferable to have obtained [documents] for plaintiff's review prior to the hearing, plaintiff has not shown or explained how the hearing would likely have had a different outcome if that had been done.").

### *c. Some Evidence*

**\*6**  "[J]udicial review of the written findings required by due process is limited to determining whether the disposition is supported by some evidence." *McDonald v. Zerniak*, 2016 WL 6581289, at \*5 (N.D.N.Y. Nov. 4, 2016) (internal quotation and alteration omitted). This requires the Court to determine "whether there was reliable evidence of the inmate's guilt." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004). Plaintiff claims that given the existence of exculpatory evidence, finding him guilty of the charges violated his due process rights. This claim lacks merit.

First, to the extent Plaintiff claims that video evidence was altered, by the removal of audio, to undermine his defense, Pl.'s Opp. at pp. 5-6, this claim is purely conclusory and insufficient to defeat summary judgment. *Hilson v. Maltese*, 2012 WL 6965105, at \*6 n. 10; *Proctor v. Kelly*, 2008 WL 5243925, at \*5.

Second, Plaintiff claims that the video evidence itself does not support the allegations in the misbehavior report and that Mitchell and Garland testified contrary to prior statements.

Pl.'s Opp. at p. 6. These arguments represent merely a disagreement on Plaintiff's part with the way Defendant Woodruff evaluated the evidence. "[I]t is not the role of the Court to evaluate the credibility of witnesses at a disciplinary hearing." *Johnson v. Goord*, 487 F. Supp. 2d 377, 385 (S.D.N.Y. 2007). Instead, "it was within the hearing officer's province to assess the credibility of the witnesses." *Alsaifullah v. Smith*, 2016 WL 1595391, at *7 (N.D.N.Y. Apr. 20, 2016). Here, Woodruff specifically found the testimony of correctional staff credible. Woodruff Decl., Ex. B at p. 2. "The fact that [Woodruff] made these credibility assessments does not amount to a due process violation." *Pilgrim v. Dixon*, 2012 WL 4052003, at *2 (W.D.N.Y. Sept. 13, 2012). "Defendant Woodruff was entitled to make credibility determinations in rendering his decision and Plaintiff's own testimony to the contrary does not render the disposition unsupported by some evidence." *Kotler v. Daby*, 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013). The "some evidence" standard is satisfied when hearing testimony was consistent with the written misbehavior report. *See Hinton v. Prack*, 2014 WL 4627120, at *15 (N.D.N.Y. Sept. 11, 2014) (citation omitted); *Kotler v. Daby*, 2013 WL 1294282, at *10; *Creech v. Schoelkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same).

### 2. *Defendant Venettozzi*

Plaintiff alleges that his due process rights were violated by virtue of Venettozzi's partial affirmance of the disciplinary hearing conducted by Defendant Woodruff. Am. Compl. at ¶ 81. The Court recommends that Venettozzi's Motion be granted.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). A supervisory official "may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Despite this rule, the Second Circuit for some time held that a supervisory official could be held liable under circumstances related to that supervisory role that did not involve their direct action. *See Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). *Colon* set forth five theories of liability that could

apply to supervisory officials. *Id.* at 873. The Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), however, "engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*." *Reynolds v. Barrett*, 685 F.3d 193, 205 n. 14 (2d Cir. 2012). The conflict remained unresolved until the Second Circuit's decision in *Tangreti v. Bachmann* which concluded that "after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. at 676).

**\*7** *Tangreti* requires that Plaintiff allege and establish that Defendants violated his rights "by [their] own conduct, not by reason of [their] supervision of others who committed the violation." 983 F.3d at 619. Plaintiff's allegation here is that Venettozzi knew of the violations of others and did nothing to remedy them. That is insufficient to establish his personal involvement. "It is well settled that affirming the outcome of a disciplinary hearing does not in itself constitute personal involvement in any potential due process violation." *Abdul-Halim v. Bruyere*, 2021 WL 3783087, at *3 (N.D.N.Y. Aug. 26, 2021); *see also Jackson v. Polizzi*, 2021 WL 5909979, at *4 (S.D.N.Y. Dec. 13, 2021); *Smart v. Annucci*, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) (that "Venettozzi denied Plaintiff's administrative appeal" is not a basis for establishing his personal involvement). The Court, therefore, recommends that Venettozzi's Motion be granted.

Accordingly, the Court recommends that Defendants be granted summary judgment on Plaintiff's due process claim.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 108) be **GRANTED as to Plaintiff's Fourteenth Amendment Due Process claims against Defendants Woodruff and Venettozzi and otherwise DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 🚩 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. 🚩 *Roldan*

*v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing 🚩 *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 🚩 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2022 WL 7274397

---

## Footnotes

1    This matter was referred to the undersigned for a report-recommendation pursuant to 🚩 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    The District Court's review of the Amended Complaint found that it contained a First Amendment retaliation claim against Defendant Woodruff. Dkt. No. 24 at pp. 14-15; *see also* Am. Compl. at ¶ 86. Woodruff now seeks summary judgment as to that claim "for the same reasons" he seeks summary judgment as to the due process claims. Defs.' Mem. of Law at p. 9 n.3. Due process and retaliation claims, however, apply very different legal standards. Given that Defendant Woodruff makes no arguments specific to the applicable First Amendment standards, the Court recommends that the Motion be denied as to the retaliation claim.

3    Plaintiff's opposition contains several different documents, which have been filed under the same docket number. For ease of reference his opposition is cited throughout this opinion as Pl.'s Opp. followed by page citations to the page numbers provided by the Court's CM/ECF system.

4    Only facts related to Plaintiff's due process claim are recounted here.

5    The exhibits to the Woodruff Declaration are contained in Dkt. Nos. 108-2 – 108-6.

6    Defendant makes no argument as to why this claim should be dismissed and so summary judgment should be denied as to it.

7    The same argument applies to Defendant's contention that Plaintiff has not alleged a sufficiently culpable state of mind. Defs.' Mem. of Law at p. 14. The District Court found that Plaintiff's claims could proceed and there is no evidence in the record regarding Dr. Mandalaywala's subjective views on which this Court could base a contrary finding.

8    Plaintiff makes a claim that he requested other witnesses who were not called to testify. He further claims that the actual audio recording of the hearing establishes this fact. Pl.'s Opp. at p. 5. Plaintiff has not offered that tape as evidence in opposition to the Motion and so his claim as to the witnesses should also be dismissed as conclusory.

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

91   *Id.* at 351.

92   *Id.* at 355.

93   *Id.*

94   *Id.*

95   *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001).

96   *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

97   *Alicea v. Howell,* 387 F.Supp.2d 227, 231 (W.D.N.Y.2005) (citing *Ortiz v. McBride,* 380 F.3d 649, 654–55 (2d Cir.2004)).

98   *Dawkins,* 646 F.Supp.2d at 606. *Accord Ortiz,* 380 F.3d at 655 (prison conditions such as "solitary confinement for twenty-three hours a day, provid[ing] one hour of exercise in the prison yard per day, and permitt[ing] two showers per week" for less than 101 days does not amount to atypical and significant hardship).

99   *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) ( "Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin."* ).

100  *Ortiz,* 380 F.3d at 655 (quoting *Gaston v. Coughlin,* 249 F.3d 156, 163 (2d Cir.2001)).

101  *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *Wolff v. McDonnell,* 418 U.S. 539, 570–71 (1974); *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990) ("[A]n impartial decisionmaker is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen.").

102  *Hudson v. Palmer,* 468 U.S. 517, 524 (1984) (citing *Bell v. Wolfish,* 441 U.S. 520, 545 (1979)).

103  *Id.* (quoting *Price v. Johnston,* 334 U.S. 266, 285 (1948)).

104  *Id.* (internal citations omitted).

105  *Florence v. Board of Chosen Freeholders of the County of Burlington,* 566 U.S. ——, 132 S.Ct. 1510, 1515 (2012).

106  *Hudson,* 468 U.S. at 526.

107  *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

108  *Id.* at 834.

109  *See id.*

110    *See id.*

111    *Id.* at 837.

112    *See* 🚩 *Lewis,* 518 U.S. at 355.

113    *See* Compl., III(D) ¶ 5.

114    *See* 🚩 *Lewis,* 518 U.S. at 355 ("[i]mpairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration").

115    🚩 *Heck,* 512 U.S. at 487.

116    *See* 🚩 *Edward,* 520 U.S. at 645.

117    *See* 🚩 *Peralta,* 467 F.3d at 104.

118    *See* 🚩 *Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*").

119    *See* 🚩 *Farmer,* 511 U.S. at 834–37. Additionally even if he had made these allegations, Peoples' claim in relation to his altercation with Allen would still be dismissed as he has not exhausted his administrative remedies in connection with this claim.

120    To the extent defendants sought to dismiss the claims based upon lack of subject matter jurisdiction because they claim Peoples failed to exhaust his remedies, it should be noted that the PLRA is not a jurisdictional requirement. *See* 🚩 *Woodford,* 548 U.S. at 101.

121    *See* 🚩 *id.* at 95.

122    *See* Appeal Statement, Ex. A to Compl., at 6.

123    *See* 7 N.Y.C.CR. § 701.5.

124    *See* 6/8/11 CORC Response, Ex. B to Pl. Opp., at 1.

125    *Cf.* 🚩 *Torres,* 672 F.Supp.2d at 345. It is unclear how long an inmate must wait after not receiving a response from the CORC before he can commence a 🚩 section 1983 action. However, when an inmate has complied with all administrative requirements and waited for the response period to expire, he has exhausted all the administrative remedies that are available to him. Peoples should not be penalized for the CORC's failure to timely respond, especially where the eventual response denied the requested relief.

126    *See* 6/8/11 CORC Response, Ex. B to Pl. Opp., at 1.

127    *See* 🚩 *Canedy v. Liberty Mut. Ins. Co.,* 126 F.3d 100, 103 (2d Cir.1997) (holding that where facts are not contested by either party, the pleading may be deemed amended).

128   As there is no indication that the Attorney General's office represents Drown, I decline to dismiss him from this action. Additionally, because Drown was the officer who imposed the three-year SHU sentence, it is unlikely that he would be dismissed at this stage of these proceedings.

129   *See* *Treasure Salvors, Inc.,* 458 U.S. at 684.

130   *Percinthe,* 2008 WL 4489777, at *3. *Accord* *McKenna,* 386 F.3d at 436 (internal citations omitted).

131   This is an extraordinary amount of time given the nature of the charges filed against him.

132   If Peoples wishes to purse the claims described in his February 13, 2012 letter to this Court, he should do so by commencing a new action.

---

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1    This action was originally commenced in the Southern District of New York. By Order filed May 14, 2020, the Honorable Colleen McMahon of the Southern District of New York granted Plaintiff's application to proceed in forma pauperis. Dkt. No. 4. By Order filed June 3, 2020, the Honorable Kenneth M. Karas of the Southern District of New York severed and transferred Plaintiff's claims arising out of his incarceration at Great Meadow Correctional Facility and Five Points Correctional Facility to the Northern District of New York. Dkt. No. 6.

2    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." See Neitzke v. Williams, 490 U.S. 319, 325 (1989).

3    Page numbers cited herein refer to those generated by the Court's electronic filing system ("ECF").

4    Plaintiff also alleges that on January 15, 2020, he received a response from the Central Office Review Committee ("CORC") regarding one of his grievances, which indicated that the Division of Health Services had conducted an investigation into Plaintiff's concerns about his medical treatment and found that he was receiving appropriate medical care and had been properly weaned off Neurontin, the pain medication prescribed to Plaintiff before his transfer to Great Meadow C.F. Compl. at 24. Plaintiff further alleges that CORC's statements are false because Tandy-Walters knew—on an unidentified date before January 15, 2020—that he was not receiving treatment for his right knee, medication for his migraine headaches, or adequate eyecare, and was not weaned off Neurontin, but was instead taken off that medication "cold turkey[.]" Id.

5    Because Plaintiff has not named any officials from Auburn Correctional Facility as defendants, the Court does not construe the complaint to assert any claims based on Plaintiff's incarceration at that facility. Moreover, because Plaintiff's claims based on events that occurred during his confinement at Five Points C.F. are severed and transferred to the Western District of New York, as discussed below, the Court leaves the determination of those claims for the Western District of New York.

6    As noted, Plaintiff alleges that Collins and Caron refused to grant him "time cuts" provided for in the "reform[ed] SHU laws pass[ed] in 2016." Compl. at 43. Although some courts have recognized a potential Eighth Amendment claim based on alleged excessive SHU confinement, see Peoples v. Annucci, No. 11-CV-2694, 2012 WL 1575302, at *9 (S.D.N.Y. May 2, 2012), neither Collins nor Caron is alleged to have been responsible for the duration of Plaintiff's SHU confinement. Moreover, the Complaint is devoid of any allegations which plausibly suggest that either of these Defendants refused to reduce Plaintiff's SHU confinement period out of deliberate indifference to his health or safety. For these reasons, the Court does not construe the Complaint to assert an Eighth Amendment claim against either of these officials based on Plaintiff's SHU confinement.

7    Five Points C.F. is located in Seneca County.

8    "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all the parties have consented." 28 U.S.C. § 1404(a). Under 28 U.S.C. § 1391(b), "[a] civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."

9    The Second Circuit has not yet addressed how the Supreme Court's decision in Iqbal affected the standards in Colon for establishing supervisory liability. See Grullon v. City of New Haven, 720 F.3d 133, 139 (2d

Cir. 2013) (noting that Iqbal may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of Iqbal on Colon because the complaint "did not adequately plead the Warden's personal involvement even under Colon"). For purposes of this Decision and Order, the Court assumes that all five categories under Colon remain valid.

10     See, e.g., Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008).

11     In this regard, while "a *de minimis* use of force will rarely suffice to state a constitutional claim," Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated." Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7 (citing Whitley, 475 U.S. at 321–22); see also Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).

12     A New York state inmate confined in SHU is placed in a solitary confinement cell for 23 hours a day. The inmate may exercise in the yard for one hour each day, is limited to two showers a week, and may not work or attend programming. See Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000); N.Y. COMP. CODES R. & REGS., tit. 7, §§ 304.1–.14.

13     Generally, when a district court dismisses a pro se action sua sponte, the plaintiff will be allowed to amend his action. See Gomez, 171 F.3d at 796. However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Pucci v. Brown, 423 F. App'x 77, 78 (2d Cir. 2011).

14     Summonses will not issue for the "Doe" defendants because the U.S. Marshal cannot effect service on an individual who has not been identified by name.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

qualified people from public service." *Eng v. Coughlin,* 858 F.2d at 895.

Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. at 815). The only pleading filed in the present case is the Plaintiff's Complaint. Defendants have not raised this affirmative defense in a responsive pleading as set forth in FED. R. CIV. P. 8(c), but rather in their memorandum of law in support of their Motion to Dismiss. *See* Dkt.No. 47–1, at pp. 18–19. Generally, however, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also* *McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004) (quoting *Green* ). An exception to the general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019); *see also* *McKenna v. Wright,* 386 F.3d at 434–55 (noting that the "qualified immunity defense can be presented in a Rule 12(b)(6) motion, but that the defense faces a formidable hurdle").

Pursuant to this Court's analysis, the remaining claims are excessive force claims against Defendants Signorella and Forbes, a due process claim against Defendant Wolczyk, and retaliation claims against Defendants Gardner and Smith. A fair reading of the Complaint does not give rise to the qualified immunity defense at this juncture. Indeed, it cannot be said that Plaintiff's rights were not clearly established at the time of the alleged constitutional violations. If a plaintiff had a "clearly established, constitutionally protected right that was violated, [Defendants] must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law." *Gill v. Hoadley,* 261 F.Supp.2d 113, 125 (N.D.N.Y.2003) (citing, *inter alia,* *Harhay v. Town of Ellington Bd. of Educ. .,* 323 F.3d 206, 211 (2d Cir.2003)); *see also* *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999). Thus, the inquiry depends on the reasonableness of the Defendants' acts. The Second Circuit has held, however, that such analysis

"turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vermont Dep't of Educ.,* 313 F.3d 768, 793 (2d Cir.2002). For these reasons, any adjudication as to the applicability of the qualified immunity affirmative defense would be premature since "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y.2004).

### G. Protective Order Barring Discovery

**\*20** Defendants also move for a protective order staying discovery pending the resolution of defendant's motion to dismiss, pursuant to Rule 26(c)(1) of the Federal Rules of Civil Procedure. That rule provides, in relevant part, that

> [a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ... The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

FED. R. CIV. P. 26(c)(1); *see also* *Spencer Trask Software and Info. Servs., LLC v. RPost Int'l Ltd.,* 206 F.R.D. 367, 368 (S.D.N.Y.2002) (granting stay of discovery pending determination of motion to dismiss where court found defendants presented "substantial arguments" for dismissal of many if not all of the claims in the lawsuit); *United States v. Cnty. of Nassau,* 188 F.R.D. 187, 188–89 (E.D.N.Y.1999) (granting stay of discovery during the pendency of a motion to dismiss where the "interests of fairness, economy and efficiency ... favor[ed] the issuance of a stay of discovery," and where the plaintiff failed to claim prejudice in the event of a stay).

This Court notes, however, that the Defendants have not yet filed an answer and a scheduling order mandating and setting

2022 WL 4545542
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Darnell TUBBS, a/k/a Darnell Johnson, Plaintiff,
v.
Don VENETTOZZI, et al., Defendants.

9:19-CV-0126 (LEK/DJS)
|
Signed September 29, 2022

**Attorneys and Law Firms**

Darnell Tubbs, Romulus, NY, Pro Se.

Ryan W. Hickey, New York State Attorney General, Albany, NY, for Defendants Don Venettozzi, Donald Uhler, Pete Woodruff, Wayne Garland, Jeniffer Gravel, Randy Mitchell, Michael Manson, ViJay Mandalaywala.

---

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

 **\*1** Plaintiff is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 15 ("Amended Complaint" or "Complaint"). He brought this action pro se pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging that various defendants violated his constitutional rights. Id. The Court reviewed his Complaint under 28 U.S.C. §§ 1915, 1915A,[1] and dismissed certain claims and defendants before allowing the Complaint to be served on the remaining defendants. Dkt. No. 24. The following claims remained: (1) Eighth Amendment excessive force and failure to intervene claims against Superintendent Donald Uhler, Correction Officer ("C.O.") Wayne Garland, and C.O. Randy Mitchell; (2) Eighth Amendment medical indifference claims against C.O. Garland, Counselor Jeniffer Gravel, and Doctor Vijay Mandalaywala; (3) First Amendment retaliation claims against C.O. Garland, C.O. Michael Manson, and Deputy Superintendent of Security Paul Woodruff;[2] and (4) Fourteenth Amendment due process claims against Deputy Woodruff and Director of Special Housing Donald Venettozzi.

The case proceeded to discovery. On September 10, 2021, Defendants Woodruff and Venettozzi moved for summary judgment with respect to Plaintiff's due process claims, and Defendant Mandalaywala moved for summary judgment on the sole medical indifference claim against him. Dkt. No. 108 ("Motion"). Plaintiff responded on November 8, 2021. Dkt. No. 118 ("Plaintiff's Response"). No Defendant filed a reply. On July 20, 2022, the Honorable Daniel J. Stewart, United States Magistrate Judge, recommended that Mandalaywala's Motion be denied, Dkt. No. 123 ("Report-Recommendation") at 5–8, but that Woodruff and Venettozzi's Motions be granted, id. at 8–15. Plaintiff filed objections to the Report-Recommendation. Dkt. No. 124 ("Objections"). No Defendant responded. For the reasons set forth below, the Court approves and adopts the Report-Recommendation in its entirety.

**II. BACKGROUND**

**A. Factual Allegations**
Plaintiff's factual allegations are detailed in the Report-Recommendation, familiarity with which is assumed. See R. & R. at 3, 9, 11, 14 (recounting facts related to Plaintiff's due process claims); id. at 5–7 (recounting facts related to Plaintiff's medical indifference claims).

**B. The Report-Recommendation**
First, the Magistrate Judge analyzed Plaintiff's medical indifference claim against Mandalaywala. R. & R. at 5–8. The Magistrate Judge recommended that Mandalaywala's Motion be denied because Mandalaywala failed to provide a sworn statement or any other evidence that contradicts the allegations of medical indifference made by Plaintiff. Defendant merely argued that Plaintiff's statements were "too speculative and conclusory to state a claim." Id. at 6. The Magistrate Judge found that Plaintiffs claims were not "so conclusory that dismissal on summary judgment is appropriate," id., as Mandalaywala had suggested, and, therefore, recommended the denial of Mandalaywala's Motion, id. at 8.

 **\*2** Then, the Magistrate Judge proceeded to analyze Plaintiff's due process claims against Woodruff and Venettozzi. R. & R. at 8–15. The Magistrate Judge observed at the outset of his analysis that:

---

In the context of inmate disciplinary hearings, the Fourteenth Amendment requires inmates receive certain protections including: (1) at least twenty-four hours written notice of the disciplinary charges; (2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals"; (3) the inmate be judged by a fair and impartial hearing officer; (4) the disciplinary conviction be supported by some evidence; and (5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

R. & R. at 8–9 (citing Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974)). He added that while "some of [Plaintiff's] claims do not fit squarely in the Wolff categories, they provide a useful tool for organizing the Court's discussion of Plaintiff's claims." R. & R. at 9. [3]

The Magistrate Judge recommended that the Court grant summary judgment to Woodruff on Plaintiff's due process claims because Plaintiff failed to present specific facts that would show a "genuine issue for trial." R. & R. at 4. With respect to Plaintiff's claim that Woodruff was biased and partial as a hearing officer, the Magistrate Judge found that Plaintiff only supported this claim with conclusory allegations, which are not enough to survive summary judgment. Id. at 9–10. Plaintiff's second claim regarding the documentary evidence was also insufficient because he failed to identify any prejudice from not receiving "a copy of the report addressing [the] incident" before the hearing started. Id. at 12. [4] As for Plaintiff's third claim that his due process rights were violated because of the "existence of exculpatory evidence," id. at 13, the Magistrate Judge found it similarly lacking because Plaintiff only supported this claim by expressing disagreement "with the way Defendant Woodruff evaluated the evidence," id. Accordingly, the Magistrate Judge recommended granting Woodruff's Motion.

 **\*3** The Magistrate Judge then recommended that the Court grant summary judgment to Venettozzi because Plaintiff failed to establish Venettozzi violated Plaintiff's rights "by [Venettozzi's] own conduct...." R. & R. at 15 (quoting Tangreti v. Bachmann, 983 F.3d 609, 619 (2d Cir. 2020)) ("[The plaintiff] must ... establish that [the defendant] violated [his constitutional rights] by [the defendant's] own conduct, not by reason of [the defendant's] supervision of others who

committed the violation."). In support of his recommendation, the Magistrate Judge noted that "affirming the outcome of a disciplinary hearing does not in itself constitute personal involvement" sufficient to establish liability under Section 1983. R. & R. at 15 (citing Abdul-Halim v. Bruyere, No. 19-CV-740, 2021 WL 3783087, at \*3 (N.D.N.Y. Aug. 26, 2021)).

**C. Plaintiff's Objections**
Plaintiff objected to the Report-Recommendation on August 5, 2022. See Obj. Plaintiff only opposed the Magistrate Judge's recommendation to grant summary judgment to Woodruff. See id. Plaintiff did not object to the other recommendations. See id.

In his Objections, Plaintiff argues that "[a] primary reason" the Magistrate Judge rejected his claim regarding Woodruff's bias was Plaintiff's hearing testimony that Woodruff was "a good hearing officer." Pl.'s Obj. at 2–3; see R. & R. at 9 (quoting Woodruff Decl., Ex. C at 16). Plaintiff claims that this was "faulty" because he never made this statement, and that in two of his filings, he swore the hearing transcript was tampered with. Pl.'s Obj. at 3.

Plaintiff also cites two of the Magistrate Judge's prior opinions in which Plaintiff claims the Magistrate Judge "stresses the need and importance in reviewing audio and/ or video footage where it exists when there is a dispute of events/facts." Id. (citing Barnes v. Fischer, No. 13-CV-164, 2018 WL 5660414 (N.D.N.Y. Mar. 16, 2018) and White v. Williams, No. 12-CV-1775, 2016 WL 4006461 (N.D.N.Y. June 22, 2016)). Plaintiff seems to suggest that the Magistrate Judge failed to carry out that obligation here. See Pl.'s Obj. at 3–4 ("Magistrate Stewart disregarded the hearing record (tape) despite the Plaintiff swearing that the transcript is a misrepresentation, and the tape which proves such. In fact, the Magistrate's reason for not ruling in Plaintiff's favor in [the] motion for spoliation is due to the existence of the hearing tape.").

Plaintiff also objects to the Magistrate Judge's finding that Plaintiff failed to show any prejudice from not receiving the report of the incident prior to the start of the hearing. Id. at 3. He again claims that the hearing officer was biased when he began the hearing despite Plaintiff not having obtained the report ahead of time, and therefore, that he lost the opportunity "to prepare a defense" for himself. Id.

Plaintiff also raises several other arguments, not necessarily directed at the Report-Recommendation itself, but toward the general merits of his claims. In his Objections, he reiterates that C.O. Garland and C.O. Mitchell were "coached by [Defendant] Woodruff." Id. at 4. Plaintiff also argues that their testimony "did not agree with ... any ... documentary evidence," id., and thus Woodruff should not have credited their testimony as credible.

## III. STANDARD OF REVIEW

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Edwards v. Fischer, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006). Clear error "is present when upon review of the entire record, the court is left with the definite and firm conviction that a mistake has been committed." Rivera v. Fed. Bureau of Prisons, 368 F. Supp. 3d 741, 744 (S.D.N.Y. 2019). "A district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

## IV. DISCUSSION

**\*4** Plaintiff's Objections to the Report-Recommendation were due August 3, 2022. R. & R. at 16 (specifying that Plaintiff had fourteen days "to file written objections to the foregoing report"). The Court did not receive his Objections until August 5, 2022. See Pl.'s Obj. However, Plaintiff appears to have signed them on July 31, 2022, id. at 4, and they were postmarked on August 3, 2022, id. at 5. The prison mailbox rule states that a "[p]laintiff's papers are deemed filed at the time he delivers them to authorities at the facility where he is incarcerated for purposes of forwarding them to the Court Clerk." McMillian v. County of Onondaga, No. 13-CV-1124, 2016 WL 9781807, at \*1 (N.D.N.Y. Mar. 29, 2016). Since Plaintiff sent his Objections in the mail by the deadline, the Court deems them timely. Accordingly, the Court must

"make a de novo determination of the ... recommendations to which objection is made." 28 U.S.C. § 636(b).

Plaintiff specifically objects to what he alleges is "[a] primary reason" the Magistrate Judge rejected his claim that Woodruff was a biased hearing officer—i.e., Plaintiff's hearing testimony that Woodruff was "a good hearing officer." Pl.'s Obj. at 2–3; R. & R. at 9 (quoting Woodruff Decl., Ex. C at 16). Plaintiff claims that he never made this statement, and that in two separate documents, he provided a sworn statement that the hearing transcript was tampered with. [5] The Court reviews this specific objection de novo.

Although the Magistrate Judge began his analysis stating that "[p]laintiff's factual allegation of bias is initially belied by his own statement during his hearing that Woodruff was a 'good hearing officer,' " R. & R. at 9, the Magistrate Judge did not rely solely, or even primarily, on this statement to make his determination. Instead, the Magistrate Judge explains throughout the Report-Recommendation how Plaintiff failed to show a genuine dispute of material fact regarding his claim of bias because Plaintiff relied exclusively on his own non-specific and conclusory allegations. Id. at 10–11.

The Court agrees with the Magistrate Judge that Plaintiff's claims of bias are non-specific and conclusory. As the Magistrate Judge correctly pointed out in the Report-Recommendation, Plaintiff has broadly alleged that the hearing transcript was tampered with, and that Defendant coached the witnesses, yet has failed to provide any supporting evidence for either of these claims other than his own broad allegations of impropriety. Id. at 10. Plaintiff must "rely on more than his own conclusory allegations; to avoid summary judgment, Plaintiff must offer 'some hard evidence' of his version of the facts." Odom v. Kerns, No. 99-CV-10668, 2008 WL 2463890, at \*11 (S.D.N.Y. June 18, 2008) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

Even when Plaintiff claims to identify evidence in the hearing transcript supporting his claims of bias, he fails to explain in any detail why the identified excerpts actually support such claims. See generally Dkt. No. 118 ("Plaintiff's Opposition to the Motion"). For instance, Plaintiff states that "Woodruff being biased ... is clear in the records," Pl.'s Opp'n at 5, but provides no meaningful explanation for why the records show that to be the case. Plaintiff also states that Defendant's "coaching of the witnesses is clear in the record" by citing

to several pages in the hearing transcript, yet fails to discuss how these cited pages are evidence of witness coaching. Id. ("As an example [of this witness coaching] in the transcripts this is clear on pg. 10, 11, 13, 18, 22, and more. The way this obvious display of partiality cause[d] prejudice that affected the outcome of the hearing is obvious and plain."). Ultimately, by failing to support his "own subjective belief that [Woodruff] was biased" with specific evidence in the record, Plaintiff has failed "to create a genuine issue of material fact." ⚑ Lopez v. Whitmore, No. 13-CV-952, 2015 WL 4394604, at *11 (N.D.N.Y. July 16, 2015).

 **\*5**  Plaintiff's related suggestion that the Magistrate Judge failed to review the hearing tape in granting summary judgment also fails. As the Magistrate Judge correctly noted, "Plaintiff has not offered that tape as evidence in opposition to the Motion." R. & R. at 10 n.8. Plaintiff previously represented to this Court that he possesses a copy of the original hearing tape. Dkt. No. 68 at 1. There is no reason why Plaintiff could not have pointed to evidence on the tape to show the bias he believes tainted his hearing.

Plaintiff's remaining objections concerning Woodruff are not specifically directed at the Report-Recommendation, and rather reiterate arguments already made to the Magistrate Judge. Compare, e.g., Pl.'s Obj. at 3 (arguing he was unable "to prepare a defense" because he did not receive documentary evidence ahead of the hearing), with Pl.'s Opp'n ¶ 19 (stating that "[n]o assistance/documentary evidence had been given" to him before "witnesses were called" and "before Plaintiff could form a defense"). The Court therefore reviews these portions of the Report-Recommendation for clear error and finds none.

Plaintiff did not object to the Magistrate Judge's remaining recommendations for Mandalaywala or Venettozzi. The Court also reviews these remaining recommendations for clear error and finds none.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 123) is **APPROVED and ADOPTED** in its entirety; and it is further

**ORDERED**, that the motion for summary judgment (Dkt. No. 108) is **DENIED in part** with respect to Mandalaywala; and it is further

**ORDERED**, that the motion for summary judgment (Dkt. No. 108) is **GRANTED in part** with respect to Woodruff and Venettozzi; and it is further

**ORDERED**, that Venettozzi is **DISMISSED with prejudice** as a defendant to this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Slip Copy, 2022 WL 4545542

---

## Footnotes

1   ⚑ Title 28 of the United States Code, Section 1915, requires a federal district court to dismiss an action brought in forma pauperis if the court determines sua sponte that the action is frivolous or malicious, fails to state a claim, or seeks damages from a defendant who is immune from such relief. ⚑ 28 U.S.C. §§ 1915(e)(2)(B)(i)–(iii).

2   Plaintiff identified Paul Woodruff as "Pete" Woodruff in his Complaint. See Compl. at 2.

3   For instance, there is no indication in the record that Plaintiff did not receive "at least twenty-four hours written notice of the disciplinary charges" against him. ⚑ Wolff, 418 U.S. at 563. Rather, Plaintiff has claimed that

he did not receive certain documentary evidence—i.e., a report addressing the contested incident—prior to the start of the hearing. Compl. ¶ 43.

4    Woodruff "adjourned the hearing in order to permit Plaintiff access to [a redacted version] of the report, which Plaintiff was eventually able to view." R. & R. at 12 (citing Woodruff Decl. ¶ 30). "After Plaintiff reviewed the report Woodruff asked Plaintiff if he wished to recall any witnesses and he declined." R. & R. at 12 (citing Woodruff Decl. ¶ 30). "As a result, he was aware of the contents of the report during the hearing and has not established prejudice from the fact that he did not have an actual copy of the report prior to the start of the hearing." R. & R. at 12 (citing Loving v. Selsky, No. 07-CV-6393, 2009 WL 87452, at *3 (W.D.N.Y. Jan. 12, 2009)).

5    In Plaintiff's earlier Motion for Spoilation of Evidence, Dkt. No. 68, Plaintiff did not claim that this statement ("a good hearing officer") was added or fabricated, but rather alleged that the hearing transcript was altered to make it seem as if his testimony was mostly "inaudible." The Magistrate Judge denied the motion, Dkt. No. 95, in part because Plaintiff stated "he has a copy of the original Tier Hearing tape" and failed to "establish[ ] that any actions of Defendants have prevented him from using that information." Id. at 3.

---

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

forth a time-table for discovery has not yet been issued. Thus, no discovery has occurred, and this request is moot.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 47) be **granted in part** and **denied in part** as follows:

1. To the extent asserted, Eighth Amendment excessive force claims against Defendants Signorella and Forbes, relating to an assault on Plaintiff at St. Luke's Hospital, should survive Defendants' Motion and proceed to discovery;

2. To the extent asserted, retaliation claims against Defendant Gardner, relating to his confinement of Plaintiff in SHU under involuntary protective custody status pursuant to complaints Plaintiff made, and against Defendant Smith, relating to his request to transfer Plaintiff pursuant to Plaintiff's filing of grievances against Defendant Smith, should survive Defendants' Motion and proceed to discovery;

3. To the extent asserted, due process claims against Defendant Wolczyk, relating to the disciplinary hearing of December 10, 2009, which he presided over, should survive Defendants' Motion and proceed to discovery;

4. To the extent asserted, and should the District Court adopt the above recommendations, Plaintiff's First Amendment and RLUIPA claim against Defendant Fischer should be **dismissed without prejudice** and Plaintiff be **granted leave to amend** his Complaint within thirty (30) days of the date of such adoption that is consistent with the recommendations made herein;

5. All other asserted claims against all other Defendants be **dismissed** for failure to state a claim; and it is further

 **\*21 ORDERED,** that the Clerk of the Court remove Cathy Y. Sheehan, Esq., as counsel for the unserved Defendant Sue Ann Smith; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec'y of Health and Human Servs. ., 892 F.2d 15 (2d Cir.1989)*); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.2d, 2012 WL 987374

### Footnotes

1   In the caption to his Complaint, Plaintiff spells this Defendant as "Brian Fisher." However, according to this Defendant's executed Acknowledgment of Service, the correct spelling of his last name is "Fischer," which Plaintiff utilizes throughout his Complaint. Dkt. No. 20. We will refer to him as such.

2   Defendant Woods is named in Plaintiff's Complaint as a Superintendent at Shawangunk Correctional Facility. Upon information and belief, Defendant Woods was located at Upstate Correctional Facility during the pertinent period of time described in this action. *See* Compl. at ¶ 9; Dkt. No. 35, Ack. of Service.

3   Defendant Sheahan is named in Plaintiff's Complaint as a Deputy Superintendent at Shawangunk Correctional Facility. Upon information and belief, Defendant Sheahan was located at Upstate Correctional

Facility during the pertinent period of time described in this action. *See* Compl. at ¶ 10; Dkt. No. 33, Ack. of Service.

4    Three Defendants have not been served in this action, and thus the Attorney General's Office has not appeared on their behalf. *See infra* Part II.C.

5    Plaintiff mistakenly labels two consecutive and separate paragraphs in his Complaint with the number thirty-nine (39). For ease of reference, this Court will refer to the first paragraph as "39a" and the second as "39b."

6    Plaintiff clearly states that the administrative hearing Defendant Giglio presided over occurred on December 10, 2007. *See* Compl. at ¶ 36. He further states that he began "serving the sanctions" assigned from that hearing on December 13, 2007. *Id.* at ¶ 37. Accordingly, when he references a "hearing[ ] held on December 13, 2007," *see id.* at ¶ 42, we presume Plaintiff is referring to his December 10, 2007 hearing.

7    By its opinion in *Bell Atl. Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 561 (2007) (quoting 🚩*Conley,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

8    Plaintiff also may be claiming that he was harassed by each Defendant, who "constantly informed Hamilton that his life was[ ] in jeopardy." Compl. at ¶ 48. Allegations of verbal harassment are insufficient to support a 🏴§ 1983 claim. *See* 🏴*Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) ("To the extent that the complaint can be read to assert an Eighth Amendment cruel and unusual punishment claim ... based on alleged verbal harassment of plaintiff, such conduct is not actionable under 🏴§ 1983 ."); *see also* 🏴*Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986).

9    This court also notes that RLUIPA may not allow monetary damages against defendants in their individual or official capacities. *See, e.g.,* 🏴*Pugh v. Goord,* 571 F.Supp.2d 477, 507 (S.D.N.Y.2008) (citing cases). A discussion on such at this point in the litigation would be premature.

10   It is impossible to discern from Plaintiff's Complaint whether he is levying these claims against Defendant Joseph T. Smith, or Defendant Sue Ann Smith, or both. However, because Plaintiff fails to state a conspiracy claim upon which relief can be granted, our analysis can proceed despite the confusion.

11   Here, this Court will assume Plaintiff is referring to Defendant Joseph T. Smith, who, as Superintendent of Shawangunk Correctional Facility, would more likely be involved with inmate transfers from Shawangunk than Defendant Sue Ann Smith, a Unit Chief at Sullivan Correctional Facility.

12   Defendants do not include a discussion of Plaintiff's retaliation claim in their Memorandum of Law in support of their Motion to Dismiss. *See* Dkt. No. 47–1. However, they make clear that they seek dismissal of Plaintiff's Complaint "in its entirety." *Id.* at p. 21.

13   Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b).

14   The Court notes, however, that Cathy Y. Sheehan, Esq., has been assigned on the case docket as representing Sue Ann Smith. However, a review of the Notices of Appearance Attorney Sheehan filed on behalf of the Defendants, *see* Dkt. Nos. 30, 37, & 42, as well as the Notice of Defendants' Motion to Dismiss,

*see* Dkt. No. 41, shows no mention of Defendant Sue Ann Smith. The Clerk of the Court is directed to correct this mistaken oversight and remove Attorney Sheehan as counsel to Sue Ann Smith.

15    Several lower courts have struggled with the impact 🚩*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) had upon *Colon,* and specifically whether *Iqbal* calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See* 🚩*Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009) (collecting cases). Because the Second Circuit has not yet issued a decision settling this matter, *Colon* remains good law.

16    "When determining the sufficiency of plaintiff's claims, for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiff's complaint, to documents attached to the complaint as an exhibit or incorporated by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in brining suit." *Wachtmeister v. Swiesz,* 2002 WL 1585526, at *2 (N.D.N.Y. June 12, 2002) (citing 🚩*Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991)). This Court takes judicial notice of the fact that Plaintiff was released from DOCCS custody. *See* 🚩*Marcus v. AT & T Corp.,* 938 F.Supp. 1158, 1164–65 (S.D.N.Y.1996) (stating that a court may take judicial notice of public documents even if not included in or attached to the plaintiff's complaint).

---

**End of Document** <span style="float:right">© 2023 Thomson Reuters. No claim to original U.S. Government Works.</span>

2013 WL 103596
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jerry BOWENS, Plaintiff,

v.

Joseph T. SMITH, et al., Defendants.

Civil Action No. 9:11–cv–784 (GLS/ATB).

|

Jan. 8, 2013.

*** Start Section

...

**Attorneys and Law Firms**

Jerry Bowens, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Richard Lombardo, Esq., of Counsel, Albany, NY, for the Defendants.

### *ORDER*

GARY L. SHARPE, Chief Judge.

**\*1** The above-captioned matter comes to this court following a Report–Recommendation by Magistrate Judge Andrew T. Baxter, duly filed December 7, 2012. Following

ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

ORDERED, that the Report–Recommendation of Magistrate Judge Andrew T. Baxter filed December 7, 2012 is ACCEPTED in its entirety for the reasons state therein; and it is further

ORDERED that defendants' motion to dismiss (Dkt. No. 19) is GRANTED IN PART, and the amended complaint is DISMISSED IN ITS ENTIRETY AS AGAINST DEFENDANTS FISCHER, PRACK AND LECLAIRE; and it is further

ORDERED, that defendants' motion to dismiss (Dkt. No. 19) is DENIED IN PART, and plaintiff's amended complaint may proceed only as to plaintiff's PROCEDURAL DUE PROCESS and RELIGION CLAIMS as against defendant SMITH; and it is further

ORDERED, that the Clerk provide a copy of this order upon the parties in accordance with the court's local rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 103596

---

**End of Document**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

...

2018 WL 3408135
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ahmadou SANKARA, Plaintiff,

v.

MONTGOMERY, Burgess and Lopez, Defendants.

9:16-CV-885 (FJS/TWD)
|
Signed 07/13/2018

**Attorneys and Law Firms**

AHMADOU SANKARA, 16-R-122, Coxsackie Correctional
Facility, P.O. Box 999, Coxsackie, New York 12051, pro se.

OFFICE OF THE NEW YORK, STATE ATTORNEY
GENERAL, OF COUNSEL, MATTHEW P. REED, AAG,
The Capitol, Albany, New York 12224, Attorneys for
Defendants.

**ORDER**

Frederick J. Scullin, Jr., Senior United States District Judge

 *1  The sole remaining claim in this civil rights action
is Plaintiff's Eighth Amendment conditions-of-confinement
claim involving the alleged denial of meals against
Defendants Keith Montgomery, a Department of Corrections
and Community Supervision ("DOCCS") Sergeant at Fishkill
Correctional Facility; Erik Burgess, a Corrections Officer at
Fishkill Correctional Facility; and Jessica Lopez, a former
Corrections Officer at Fishkill Correctional Facility.

Defendants moved for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure on the grounds that
Plaintiff had failed to exhaust his administrative remedies and
had not asserted a constitutional violation. See Dkt. No. 81.
Plaintiff filed papers in opposition to Defendants' motion. See
Dkt. No. 84.

In a Order and Report-Recommendation dated June 25,
2018, Magistrate Judge Dancks recommended that this
Court grant Defendants' motion for summary judgment. See
Dkt. No. 88. Specifically, after thoroughly reviewing the
record, she concluded that Plaintiff had failed to exhaust
his administrative remedies with regard to his Eighth

Amendment claim. See id. at 9-17. Alternatively, she found
that summary judgment was warranted because the evidence
fell "short of that required to support an Eighth Amendment
violation, and the evidence [did] not support a finding that
Plaintiff [had] suffered a sufficiently serious condition [as a
result of the] denial of a meal or meals." See id. at 21.

On July 2, 2018, the Court received Plaintiff's objections to
Magistrate Judge Danck's recommendations. See Dkt. No. 89.

After reviewing a magistrate judge's recommendations,
the district court may accept, reject or modify those
recommendations. See 28 U.S.C. § 636(b)(1). The court
reviews de novo those portions of the magistrate judge's
recommendations to which a party objects. See Pizzaro
v. Bartlett, 776 F. Supp. 815, 817 (S.D.N.Y. 1991). "
'If, however, the party "makes only conclusory or general
objections, or simply reiterates his original arguments, the
Court reviews the Report and Recommendation only for clear
error.' " " McAllan v. Von Essen, 517 F. Supp. 2d 672, 679
(S.D.N.Y. 2007) (quotation and other citations omitted).

Plaintiff's objections are, for the most part, general and
conclusory. In addition, some of his objections do not
refer to his Eighth Amendment claim but, rather, concern
claims that this Court has already dismissed. Moreover,
to the extent that Plaintiff objects to Magistrate Judge
Dancks' recommendations regarding the issue of whether
he exhausted his administrative remedies, Plaintiff basically
makes the same arguments that he made in opposition to
Defendants' motion for summary judgment, which Magistrate
Judge Dancks thoroughly reviewed and found no evidence
to support Plaintiff's contention that he had filed grievances
regarding the denial of meals.

Alternatively, the Court notes that, even if it were to find
that Plaintiff had exhausted his administrative remedies with
regard to denial of his meals, Defendants would still be
entitled to summary judgment on Plaintiff's claim because,
as Magistrate Judge Dancks thoroughly explained, the denial
of five meals over the course of fifty-three days does not rise
to the level of a violation of Plaintiff's Eighth Amendment
rights; and, furthermore, the evidence does not support a
finding that Plaintiff suffered a sufficiently serious condition
as a result of Defendants' denial of those meals.

 *2  Accordingly, having reviewed the entire file in this
matter, Magistrate Judge Dancks' June 25, 2018 Order and

**Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)**

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 335 of 482

Report-Recommendation, and Plaintiff's objections thereto, as well as the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Dancks' June 25, 2018 Order and Report-Recommendation, *see* Dkt. No. 88, is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 81, is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3408135

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

(W.D.N.Y. August 10, 2012) (despite no visible injuries, summary judgment denied where plaintiff alleged that he was victim of unprovoked assault; *Abascal v. Fleckenstein,* 2012 WL 638977, *6 (W.D.N.Y. February 27, 2012) (despite minor injury, summary judgment denied where plaintiff alleged that CO committed brief but unprovoked assault unrelated to any effort to maintain or restore discipline); *see also*

⚑ *Griffin v. Crippen,* 193 F.3d at 90–92 (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against him after he was subdued and handcuffed); *Jordan v. Fischer,* 773 F.Supp.2d 255, 272 (N.D.N.Y.2011) (although plaintiff suffered only minor injury, summary judgment denied where excessive force claims turned on issues of credibility). In so concluding, this court expresses no view on the underlying merits of plaintiff's claim, but notes only that, if successful, "the relatively modest nature of his alleged injuries will no doubt limit the damages he may recover." ⚑ *Wilkins,* 130 S.Ct. at 1180. Accordingly, the defendants' motion for summary judgment dismissing the excessive force claim is denied.

**Retaliation**

**\*5** Although plaintiff has not explicitly alleged a First Amendment retaliation claim, the defendants note that, in his complaint filed July 14, 2010, plaintiff sought relief in the form of "an order of protection to avoid any future retaliation for my lawsuit against Diehl and Hutton." Dkt. # 1, p. 6. Defendants argue that plaintiff has failed to establish a *prima facie* case of retaliation and, to the extent that such a claim has been alleged, it should be dismissed. Plaintiff's earlier lawsuit against Corrections Officers Diehl and Hutton, docketed as 10–CV–343, was commenced on April 26, 2010 and was dismissed in a Decision and Order dated December 12, 2012. Given the timing of the events in question, plaintiff could not have reasonably alleged that the assault of February 24, 2010 was in retaliation for the filing of the lawsuit, as the action against Diehl and Hutton had not been commenced at that time. Even assuming that plaintiff filed a grievance against Diehl and Hutton prior to the alleged assault of February 24, 2010, plaintiff has offered no proof of any causal connection between his protected conduct and the alleged retaliatory action. *See* ⚑ *Davis v. Goord,* 320 F.3d 346, 352 (2d. Cir.2003) (a plaintiff asserting a First Amendment

retaliation claim must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action). To the extent that plaintiff intended to state a claim for retaliation in violation of the First Amendment, that claim is dismissed.

**Qualified Immunity**

In their motion, defendants argue that they are protected from suit by the doctrine of qualified immunity. The doctrine of qualified immunity "protects prison officials from personal liability [for damages] under ⚑ § 1983 when their 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " ⚑ *Horne v. Coughlin,* 155 F.3d 26, 29 (2d Cir.1998) (quoting ⚑ *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To determine whether a constitutional right is "clearly established" courts consider the following factors: "whether the right was defined with reasonable specificity; whether the decisional law of the Supreme Court and the applicable circuit courts supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful." *Horne,* 155 F.3d at 29 (quoting ⚑ *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995)).

The right asserted by the plaintiff, to be free from cruel and unusual punishment in the form of excessive force, is clearly established and the defendants would have reasonably understood that their acts, in allegedly assaulting the plaintiff without provocation and not in response to any security threat or disciplinary issue, were unlawful. The Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." ⚑ *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) (internal quotation marks omitted). Accordingly, the defendants' motion for summary judgment on the grounds of qualified immunity is denied.

**CONCLUSION**

**\*6** The defendants' motion for summary judgment on plaintiff's claim of excessive use of force is denied.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Clark v. Gardner,  N.D.N.Y.,  July 5, 2018

2007 WL 4555932

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Bashan TAYLOR, Plaintiff,

v.

Dale ARTUS, Superintendent, Clinton Correctional
Facility; Lieutenant Armsteal, Tier Two Hearing
officer; Renown, Correctional Sergeant; Castiron,
Correctional Officer; Christian, Correctional Officer;
and Mahuta, Correctional Officer., Defendants.

No. 9:05-CV-0271 (LEK/GHL).
|
Dec. 19, 2007.

**Attorneys and Law Firms**

Bashan Taylor, Ray Brook, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Jeffrey P. Mans, Esq., Assistant Attorney General,
of Counsel, Albany, NY.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

 **\*1**  This matter comes before the Court following a
Report-Recommendation filed on November 5, 2007, by the
Honorable George H. Lowe, United States Magistrate Judge,
pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the
Northern District of New York. Report-Rec. (Dkt. No. 34).

Within ten days, excluding weekends and holidays, after a
party has been served with a copy of a Magistrate Judge's
Report-Recommendation, the party "may serve and file
specific, written objections to the proposed findings and
recommendations," FED. R. CIV. P. 72(b), in compliance
with L.R. 72.1. No objections have been raised in the allotted
time with respect to Judge Lowe's Report-Recommendation.
Furthermore, after examining the record, the Court has

determined that the Report-Recommendation is not subject to
attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 34)
is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it
is further

**ORDERED,** that Defendants' Motion for summary judgment
(Dkt. No. 32) is **GRANTED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all
parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and
Recommendation by the Honorable Lawrence E. Kahn,
Senior United States District Judge, pursuant to 28 U.S.C.
§ 636(b) and Local Rule 72.3(c) of the Local Rules of Practice
for this Court. Plaintiff Bashan Taylor ("Plaintiff"), currently
an inmate at Adirondack Correctional Facility, commenced
this *pro se* civil rights action pursuant to 42 U.S.C. § 1983.

Liberally construed, Plaintiff's Amended Complaint alleges
that seven employees of Clinton Correctional Facility
("Clinton C.F.")-Superintendent Dale Artus, Correctional
Lieutenant Armsteal, Correction Sergeant Renown, and
Correctional Officers Castiron, Chapman, Christian, and
Mahuta ("Defendants")-violated his rights under the
First, Eighth and Fourteenth Amendments when, between
approximately August 13, 2004, and June 2, 2005, they
committed various acts of misconduct, including (1) issuing
unjustified misbehavior reports charging him with variety of
infractions (e.g., burning incense in his cell, not attending
a mandatory meal, not responding to "call out[s]" to
"attend [ ] law library"), (2) not following the proper
procedures at prison disciplinary hearings, resulting in his
disciplinary convictions, (3) refusing to help him when he
complained about the aforementioned misbehavior reports
and disciplinary convictions, (4) threatening to beat him,
(5) denying him access to the facility's law library, and (6)

depriving him of various pieces of his personal property (e.g., taking money out of his facility bank account due to his "[disciplinary] tickets," and taking various legal papers that he had been instructed to leave outside a mess hall). (*See generally* Dkt. No. 9 [Plf.'s Am. Compl.].)

**\*2** Currently pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 32.) Despite having been twice advised of the potential consequences of failing to respond to Defendants' motion (Dkt. No. 32, Part 1; Dkt. No. 33), Plaintiff has not responded. For the reasons that follow, I recommend that Defendants' motion be granted. In the alternative, I recommend that the Court revoke Plaintiff's *in forma pauperis* status as having been improvidently granted, and dismiss his Amended Complaint without prejudice to refiling upon payment of the filing fee.

## I. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Unopposed Motion for Summary Judgment Under Rule 56 of the Federal Rules of Civil Procedure

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [2]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [5]

What this somewhat complex burden-shifting standard means is that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no response to a summary judgment motion does not ... [by

itself] mean that the motion is to be granted automatically." [6] Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendants. [7] However, where a plaintiff has failed to respond to a defendant's statements of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Statement will be accepted as true [8] to the extent that (1) those facts are supported by the evidence in the record, [9] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. [10] Here, I note that Plaintiff has been *twice* so advised-first by Defendants on or about December 29, 2006, and then by the Court on or about July 3, 2007. [11]

**\*3** Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.* [12] However, in the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit. [13] Here, I note that Plaintiffs' Amended Complaint does *not* contains a verification pursuant to 28 U.S.C. § 1746. [14]

### B. Legal Standard Governing Unopposed Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6) of the Federal Rules of Civil Procedure

To the extent that a defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is based solely on the allegations asserted in a plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Rule 12(b)(6). In such a circumstance, "a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." [15] Here, I note that several portions of Defendants' Memorandum of Law argue that various of Plaintiff's claims should be dismissed due to his failure to state a claim upon which relief may be granted. [16]

Moreover, I note that, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [17]

For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing Rule 12(b)(6) motions to dismiss. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [18] or (2) a challenge to the legal cognizability of the claim. [19]

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [20] The purpose of this rule is to "facilitate a proper decision on the merits." [21] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [22]

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [23] However, it is well established that even this liberal notice pleading standard "has its limits." [24] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [25]

**\*4** Most notably, in the recent decision of *Bell Atl. Corp. v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in 🚩*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." 🚩--- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [26] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. 🚩*Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [27] Moreover, it should be noted that "[t]his standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [28] In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are generally to be construed with an *extra* degree of liberality. Indeed, generally "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [29] In addition, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [30] However, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [31] For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [32]

Finally, it is important to observe that "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). The Court's consideration of whether a movant has met its burden "to demonstrate entitlement" to the relief requested under Local Rule 7 .1(b)(3) is a more

limited endeavor than a consideration of a contested motion requesting such relief. [33]

## II. ANALYSIS

**\*5** Because Plaintiff has failed to respond to Defendants' motion (despite having been twice advised of the adverse consequences of failing to so respond), the task before the Court is to determine whether Defendants have met their lightened burden on their motion. *See, supra,* Parts I.A., I.B. of this Report-Recommendation.

Defendants' motion is premised on the following five legal arguments, which are set forth in their Memorandum of Law: (1) all of Plaintiff's claims should be dismissed because he failed to allege facts plausibly suggesting, and/or failed to adduce any evidence establishing, that he exhausted his available administrative remedies before filing this action in federal court; (2) Plaintiff's due process claim (under the Fourteenth Amendment) should be dismissed because (a) he has adduced no evidence that he had a liberty interest protected by the Fourteenth Amendment, and (b) in any event, he has adduced no evidence that he was not afforded all the process that he was due at his disciplinary hearings; (3) Plaintiff's deprivation-of-property claim (under the Fourteenth Amendment) should be dismissed because (a) he fails to allege facts plausibly suggesting that any Defendant was personally involved in the deprivation of his property, and (b) in any event, he fails to adduce evidence establishing that he availed himself of the state-provided post-deprivation remedy for such a deprivation of property, i.e., the filing of an action in the New York State Court of Claims; (4) Plaintiff's denial-of-access-to-the-courts claim (under the First Amendment) should be dismissed because he has failed to allege facts plausibly suggesting that he suffered any injury as a result of that denial; and (5) any retaliation claim (under the First Amendment) that Plaintiff is attempting to assert should be dismissed because he has failed to allege facts plausibly suggesting that he had been engaging in activity that is protected by the First Amendment before adverse action had been taken against him. (*See* Dkt. No. 32, Part 21, at 9-20 [Defs.' Mem. of Law].) I will address each of these arguments in turn (to the extent that I need to do so).

### A. Whether Plaintiff's Amended Complaint Should Be Dismissed Due to a Failure to Exhaust His Available Administrative Remedies

Defendants correctly recite the law governing prisoners' exhaustion of available administrative remedies. (*See* Dkt. No. 32, Part 21, at 9-11 [Defs.' Mem. of Law].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e.

The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 [citation omitted]. Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

### 1. Availability

**\*6** Defendants do not, in their motion papers, offer specific evidence (such as the affidavit of the supervisor or coordinator of the Clinton C.F. Inmate Grievance Program) that, during the time in question, there was a working grievance program specifically *at Clinton C.F.* Granted, in his *original* Complaint, which was verified, Plaintiff answered "yes" to the question, "Is there a prisoner grievance procedure at [Clinton Correctional Facility]?" (Dkt. No. 1, ¶ 4.a. [Plf.'s Verified Compl., dated 2/22/04].) Ordinarily, a sworn allegation such as this is sufficient to constitute evidence for purposes of a motion for summary judgment. [34] The

problem is that, after making this sworn allegation in his original Complaint, Plaintiff filed an Amended Complaint which was not verified (and which, in any event, made no such allegation). It is rather well settled that an amended complaint supersedes the original complaint for all pleading purposes (unless the amended complaint has incorporated a portion of the original complaint by specific reference). However, it appears to be a matter of some dispute whether an *unsworn* amended complaint renders a *sworn* original complaint as without any evidentiary value whatsoever for purposes of a summary judgment motion. [35]

Fortunately for Defendants, the Court need not resolve this issue in order to decide Defendants' motion. This is because, in order for Defendants to meet their modest threshold burden with respect to this first inquiry on a motion for summary judgment, it does not appear that they need to adduce evidence that, during the time in question, there was a working grievance program *specifically at Clinton C.F.* Rather, it appears sufficient for a defendant to adduce evidence merely that, during the time in question, the New York State Department of Correctional Services ("DOCS") had available to inmates, *in general,* an Inmate Grievance Program. [36] Here, Defendants have adduced at least some evidence of such a fact. [37]

The steps involved in this Inmate Grievance Program are well established:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

*White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6, 2002 WL 31235713 (S.D.N.Y. Oct. 3, 2002) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7). DOCS also has a separate and distinct administrative appeal process for inmate misbehavior hearings:

> A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;
>
> *7 B. For Tier II disciplinary hearings, the appeal is to the facility Superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and
>
> C. For Tier I violation hearings, the appeal is to the facility Superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

Individual decisions or dispositions regarding inmate misbehavior reports and hearings, or inmate grievances, are not considered grievable matters; however, the policies, rules and procedures of the disciplinary and grievance programs may be the subject of a grievance. *See* 7 N.Y.C.R.R. § 701.3(e)(1), (2); *see also* N .Y. Dep't Corr. Serv. Directive No. 4040 at III.E. Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

In their motion papers, Defendants have adduced evidence establishing that, despite this available grievance procedure, Plaintiff never filed any grievance appeal with CORC during the time in question (or at any time). (Dkt. No. 32, Part 3, ¶ 3 [Affid. of Eagen].) Plaintiff has adduced no record evidence controverting this fact. [38]

As a result, I find that, despite the fact that administrative remedies were indeed available to Plaintiff, he failed to pursue those remedies.

### 2. Forfeiture/Estoppel

I find no evidence in the record that Defendants forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it. (*See* Dkt. No. 28, Part 1, ¶¶ 16-17 [Defs.' Answer, raising exhaustion as a defense].) Nor do I find any evidence in the record that Defendants' own actions somehow

inhibited Plaintiff's exhaustion of remedies sufficient to estop one or more of the Defendants from raising Plaintiff's failure to exhaust as a defense. Granted, I acknowledge that, in his Amended Complaint, Plaintiff alleges that, at various points in time, (1) Defendant Castiron "threatened to beat [Plaintiff]," (2) Defendant Renown "threatened" Plaintiff, and (3) Defendant Amsteal "act[ed] crazy." (Dkt. No. 1, ¶¶ 5, 7, 10 [Plf.'s Am. Compl.].) However, Plaintiff has adduced no evidence in support of the alleged actions. The Amended Complaint does not constitute such evidence since it is not verified. And, while the original Complaint is verified, it contains absolutely no factual assertions regarding such actions. (*See* Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].)

### 3. Special Circumstances

Finally, I find no evidence in the record establishing (or even factual allegations in Plaintiff's Amended Complaint plausibly suggesting) the existence of any special circumstances that would justify Plaintiff's failure to comply with the administrative procedural requirements.

As a result, I recommend that Plaintiff's Amended Complaint be dismissed due to his failure to adduce any evidence that he exhausted his administrative remedies before filing this action in federal court.

### B. Defendants' Other Asserted Grounds for Dismissal

**\*8** Because I find that Defendants' have met their modest burden with regard to their first ground for dismissal (i.e., Plaintiff's failure to exhaust his available administrative remedies before filing this action in federal court), I need not, and do not, reach the merits of their other arguments, except to make the following two observations.

First, with respect to Defendants' argument that Plaintiff has adduced no evidence that he had a liberty interest protected by the Fourteenth Amendment, Defendants appear to be correct when they argue that, for several *separate* periods of confinement to be considered *together* (for purposes of applying 🔖 *Sandlin v. Connor*, 515 U.S. 472 [1995] ), those separate periods of confinement must be *consecutive*. (Dkt. No. 32, Part 21, at 12-14 [Defs.' Mem. of Law].) In particular, the precise issue, in such a circumstance, is whether the disciplinary confinements in question constitute a "sustained" period of confinement such that they may be aggregated for purposes of the Due Process Clause. [39] Generally, it appears from Second Circuit decisions that separate SHU sentences

constitute a "sustained" period of confinement when (1) they are contiguous *and* (2) they either (a) were imposed by the same disciplinary hearing officer or (b) were based on the same administrative rationale and are executed under the same conditions. [40] Here, Defendants have adduced evidence that the five periods of confinement in question were *not* contiguous or consecutive. (*See* Dkt. No. 32, Parts 10, 12, 14, 16, 18 [Affid. of Jarvis, attaching, as exhibits, Plaintiff's disciplinary hearing dispositions, showing sentences imposed as a result of his disciplinary convictions].) And Plaintiff has adduced no evidence controverting that fact.

Second, with respect to Defendants' argument that Plaintiff's denial-of-access-to-the-courts claim (under the First Amendment) should be dismissed because he has failed to allege facts plausibly suggesting that he suffered any injury as a result of that denial, Defendants are correct when they argue that, to be viable, such a claim must allege facts plausibly suggesting that Plaintiff suffered an injury as a result of the denial. It is well settled that inmates have a First Amendment right of access to the courts that requires states "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [41] "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a 🔖 Section 1983 claim without a showing of 'actual injury.' " [42] As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. [43] It is worth noting that "[t]his actual injury requirement 'is not satisfied by just any type of frustrated legal claim,' because the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." [44] " 'Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.' " [45] Here, Plaintiff does not allege facts plausibly suggesting that he suffered any injury as a result of being denied the ability to go to the facility's law library and being deprived of certain of his legal materials. (*See generally* Dkt. No. 9 [Plf.'s Am. Compl.].) Even if he had alleged such facts, he has not adduced any evidence in support of such an allegation.

**C. Whether, in the Alternative, the Court Should Revoke Plaintiff's *In Forma Pauperis* Status as Having Been Improvidently Granted, and Dismiss Plaintiff's Amended Complaint Without Prejudice to Refiling Upon Payment of the Filing Fee**

**\*9**  Finally, in the interest of thoroughness, I think it is appropriate to mention an alternative ground for dismissal of Plaintiff's Amended Complaint. Under the so-called "Three Strikes Rule" set forth in the federal statute governing *in forma pauperis* proceedings, in no event shall a prisoner be permitted to bring an action *in forma pauperis*

> if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it ... fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The power of a federal district court to invoke this rule is not limited to the outset of a litigation but extends all throughout the pendency of the proceeding. In other words, specifically, federal district courts have the authority to rescind or revoke the *in forma pauperis* status that it has previously bestowed upon a plaintiff, where it discovers that the status was improvidently granted, even if the courts exercise that authority well into the pendency of the proceedings. [46]

Here, the Court granted Plaintiff's request to proceed *in forma pauperis* on July 7, 2005. (Dkt. No. 10, at 3.) However, it is clear from the United States Courts' Public Access to Court Electronic Records ("PACER") Service that, as of July 7, 2005, Plaintiff had already received three "strikes" for purposes of 28 U.S.C. § 1915(g). Specifically, Plaintiff's

Complaint in the prisoner civil-rights action of *Taylor v. Goldman,* 04-CV-1212 (E .D.N.Y.), was dismissed by Order of Chief Judge Raymond J. Dearie, of the Eastern District of New York, on April 8, 2004, for failure to state a claim upon which relief may be granted. His Complaint in the prisoner civil-rights action of *Taylor v. Zubizarreta,* 04-CV-1565 (E.D.N.Y.), was dismissed, also by Order of Chief Judge Dearie, on August 12, 2004, for failure to state a claim upon which relief may be granted. And his Complaint in the prisoner civil-rights action of *Taylor v. Goldman,* 04-CV-5121 (E.D.N.Y.), was dismissed, also by Order of Chief Judge Dearie, on December 3, 2004, for failure to state a claim upon which relief may be granted. [47]  Finally, I find nothing on the face of the Amended Complaint indicating that Plaintiff is in "imminent danger of serious physical injury." [48]

As a result, I recommend that, in the alternative, the Court should revoke Plaintiff's *in forma pauperis* status and dismiss Plaintiff's Amended Complaint without prejudice to refiling upon payment of the filing fee.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 32) be *GRANTED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4555932

**Footnotes**

1     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

2     *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

3     Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

4     Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

5     *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

6     *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

7     *See Champion,* 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits of Plaintiff's claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the nonmoving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

8     *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ).

9     *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In

this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3, 2002 WL 449757 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

10   *See* *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

11   (Dkt. No. 32, Part 1, at 1-2 [Defendants' Notice of Motion, filed 12/29/06, specifically advising Plaintiff of consequences of failing to respond to their motion, including the consequences of failing to respond to their Rule 7.1 Statement of Material Facts], *accord,* Dkt. No. 33, at 2-3 [Order of Court, filed 7/3/07, sua sponte giving Plaintiff an additional 30 days in which to respond to Defendants' motion, and advising him of the consequences of failing to oppose their motion, including the consequences of failing to respond to their Rule 7.1 Statement of Material Facts].)

12   *See* *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13, 2004 WL 5477530 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

13   *See* *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

14   (Dkt. No. 1.)

15   *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

16   (*See, e.g.,* Dkt. No. 32, Part 21, at 9-12, 15-20 [Defs.' Mem. of Law].)

17    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)
(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma
pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state
a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune
from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss
the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails
to state a claim upon which relief may be granted ...."

18    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss
for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)
(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion
under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has
conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to
relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the
formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P.
8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

19    *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These
allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they
rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA.");

*Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice
requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which

relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is
to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter

of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between
a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of

disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods.
Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a
theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted];

*Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL
2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under
Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,*
331 F.Supp.2d 91, 101-02 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS
1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule
12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the
legal sufficiency of the claims).

20    *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that

the complaint failed to meet this test) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ); *see also*

*Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County
Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)

(quoting *Conley,* 355 U.S. at 47).

21    *See* *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

22    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* ⬚ 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit§ 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g.,* *Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

23    *See, e.g.,* *Swierkiewicz,* 534 U.S. at 513-14 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

24    2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

25    *See, e.g.,* *Bell Atl. Corp. v. Twombly,* ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-74, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord,* *Dura Pharm.,* 125 S.Ct. at 1634-35, *Christopher v. Harbury,* 536 U.S. 403, 416-22, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-35 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-09 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

26    The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

27    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

28    *Hernandez,* 18 F.3d at 136 [citation omitted]; *see also* *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

29    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

30    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

31  *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord,* 🏴 *Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz,* 2007 WL 2027912, at *2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); 🏴 *Ariola v. Onondaga County Sheriff's Dep't.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting report-recommendation of Lowe, M.J.).

32  🏴 *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also* 🏴 *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

33  *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious*") (emphasis added) (citations omitted); *Race Safe Sys., Inc. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-10 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b] [3] ); *see also Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2, 1997 WL 640982 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b] [3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 WL 589372, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), 🏴 *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

34  *See, supra,* note 13 of this Report-Recommendation.

35  On the one hand, there are cases holding that an unsworn amended complaint renders a sworn original complaint as without evidentiary value for purposes of a summary judgment motion. *See, e.g., Hatcher v. Fields,* No. 96-7085, 1997 WL 431784, at *2, n. 2 (10th Cir. Aug.1, 1997); 🏴 *King v. Dogan,* 31 F.3d 344, 346 (5th Cir.1994). On the other hand, there are cases holding that a sworn original complaint retains its evidentiary value, for purposes of a summary judgment motion, even after the filing of an unsworn amended complaint. *See, e.g., Morrison v. Fox,* 05-CV-3394, 2007 U.S. Dist. LEXIS 73328, at *3, n. 1, 2007 WL 2908480 (D.S.C. Oct. 1, 2007) ("[I]n light of the Plaintiff's *pro se* status, the Court considers any factual allegations set forth in the Plaintiff's unverified amended complaint that mirror the allegations set forth in his initial verified complaint as evidence for purposes of evaluating the Defendants' motion for summary judgment."); *White v. Simpson,* 04-CV-0728, 2006 WL 1007527, at *2, n. 4 (N.D.Tex. Apr.18, 2006) (even where plaintiff submitted an unsworn amended complaint, the court relied on his sworn original complaint, for purpose of summary judgment motion); *cf.* 🚩 *Hoskins v. Alameda County Sheriff's Deputies,* 96-CV-0428, 1998 U.S. Dist. LEXIS 12404, at *6, 1998 WL 470480 (N.D.Cal. Aug. 5, 1998) ("Because plaintiff's original complaint was verified ... and he amended his complaint in response to this court's order, this court will liberally construe the amended complaint to be verified as well."), *rev'd on other grounds,* ❓ 188 F.3d 513 (9th Cir.Cal.1999). Here, I note that Plaintiff's unsworn Amended Complaint (which was filed in response to

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 349 of 482

2016 WL 5322113
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Aaron JABOT, Plaintiff,

v.

CORRECTION OFFICER MINOR, Defendant.

9:13-CV-01407 (DNH/TWD)
|
Signed July 14, 2016
|
Filed 07/15/2016

**Attorneys and Law Firms**

AARON JABOT, 15-A-4539, Auburn Correctional Facility, P.O. Box 618, Auburn, New York 13201, Plaintiff, pro se.

FITZGERALD MORRIS BAKER FIRTH P.C., 16 Pearl Street, P.O. Box. 2017, OF COUNSEL: JOSHUA D. LINDY, ESQ., Glens Falls, New York 12801, Attorneys for Defendant.


## REPORT-RECOMMENDATION AND ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule ("L.R.") 72.3(c). Plaintiff Aaron Jabot, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleges violations of his civil rights while confined at Washington County Correctional Facility, located in the Town of Fort Edward, New York. (*See generally* Dkt. No. 5.) Specifically, Plaintiff alleges that Defendant Correction Officer Michele Minor, who served as the hearing officer at Plaintiff's November 6, 2013, disciplinary hearing, violated his Fourteenth Amendment due process rights. *Id.* at 2. [1]

Currently pending before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 52.) Plaintiff has opposed the motion. (Dkt. No. 54.) Defendant has filed a reply. (Dkt. No. 55.) For the reasons that follow, the Court recommends that Defendant's motion be granted. (Dkt. No. 52).


## I. BACKGROUND [2]

On July 2, 2013, Plaintiff was arrested on a parole violation, and was committed to the Washington County Correctional Facility. (Dkt. No. 52-11 at ¶ 7.) On or about October 20, 2013, at approximately 18:20 hours, Plaintiff asked Correction Officer Jacob Freebern ("C.O. Freebern") if he could have some hot water. (Dkt. No. 52-8 at ¶ 4.) C.O. Freebern reminded Plaintiff that his microwave privileges had been suspended by Sergeant Strain, and advised Plaintiff that if he had any questions regarding the microwave suspension, he could address the issue with Sergeant Strain when he was in the unit. [3] *Id.* at ¶ 5. Immediately thereafter, Plaintiff became verbally assaultive by shouting obscenities and banging on his cell door. *Id.*

Later that evening, C.O. Freebern issued Plaintiff a misbehavior report charging him with the following violations: (1) verbal or written harassment; (2) profanity and unnecessary noise; (3) insolence towards facility staff; and (4) disruptive conduct. (Dkt. No. 52-8 at 10. [4]) C.O. Freebern provided a copy of the Inmate Misbehavior Report to Plaintiff. (Dkt. No. 52-11.) On November 3, 2013, Plaintiff was provided with a "24 Hour Hearing Board Notice," indicating that the disciplinary hearing was scheduled to take place November 6, 2013. (Dkt. No. 52-9 at 41.) Plaintiff refused to acknowledge receipt of that Notice. *Id.*

**\*2** On November 6, 2013, Defendant served as the Hearing Officer at Plaintiff's disciplinary hearing. (Dkt. No. 52-9 at ¶ 17.) Plaintiff did not object in writing to Defendant serving as the hearing officer, nor did Plaintiff submit in writing (or any other form), a list of questions that he wanted asked of any potential witnesses. *Id.* at ¶ 18.

At the beginning of the hearing, Defendant read the charges to Plaintiff. *Id.* Plaintiff responded that he understood the charges. *Id.* at ¶ 19. Defendant then read C.O. Freebern's statement. *Id.* In response, Plaintiff stated, "I object, you are not laying grounds for proper evidence." *Id.* at ¶ 20. Thereafter, Plaintiff requested to call C.O. Freebern as a witness. *Id.* Defendant denied that request because she had previously questioned C.O. Freebern and read his statement

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 350 of 482

into evidence. *Id.* at ¶ 21. Plaintiff responded to Defendant's denial by stating, "Monroe vs. Monroe." *Id.* at ¶ 22.

Defendant then asked Plaintiff if he wanted to call other any witnesses. *Id.* Plaintiff objected again. *Id.* Defendant informed Plaintiff that this was his opportunity to present his defense to the October 20, 2013, disciplinary charges. *Id.* at ¶ 23. In response, Plaintiff stated that he no longer felt safe and requested to return to his cell. *Id.* at ¶ 24. Accordingly, two correction officers escorted Plaintiff to his cell. *Id.*

On November 6, 2013, following the conclusion of the disciplinary hearing, Defendant prepared an "Inmate Disciplinary Hearing Record." *Id.* at p. 47. Based upon C.O. Freebern's statement, Defendant found Plaintiff guilty of all charges, and sentenced Plaintiff to 200 days of keep lock, 30 days loss of commissary, reduced showers and shaving for 40 days, loss of 1 visit for 30 days, and a $25.00 fine. *Id.* at p. 47. [5] Plaintiff did not appeal the disposition of the November 6, 2013, disciplinary hearing. *Id.* at ¶ 28. [6]

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on November 12, 2013, alleging that on November 6, 2013, Defendant denied him a fair disciplinary hearing. (Dkt. No. 1 at 4-5.) Specifically, Plaintiff alleged he was not permitted to call witnesses at the hearing, he was denied access to the statements made against him by corrections staff, and Defendant failed to make a proper and complete recording of the disciplinary hearing. *Id.* at 4. As a result of these purported injustices, Plaintiff alleged he was being held in the segregated housing unit ("SHU") illegally. *Id.*

Upon initial review, the Court *sua sponte* dismissed Plaintiff's complaint with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted, in part, because Plaintiff failed to include any factual allegations regarding the length of the disciplinary confinement imposed as a sanction, nor did he allege any facts regarding the conditions of that confinement. (Dkt. No. 4 at 6-8.)

**\*3** Plaintiff timely filed an amended complaint on December 4, 2013. (Dkt. No. 5.) Plaintiff alleged he was denied due process at the November 6, 2013, hearing, and claimed the conditions of his disciplinary confinement were atypical and significant, in part, due to his mental illness. *Id.* at 2-13. Plaintiff also attached a copy of Defendant's written statement

of the November 6, 2013, decision to the amended complaint. *Id.* at 17. Upon initial review of the amended complaint, the Court found Plaintiff's allegations were sufficient to the cure the pleading deficiencies described in the November 12, 2013, Order. [7] Plaintiff's amended complaint was accepted for filing and is the operative complaint in this action. (Dkt. No. 8.) Defendant filed her answer on June 6, 2014. (Dkt. No. 12.)

## III. APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, including pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006); *see also* *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). A party opposing summary judgment is required to submit admissible evidence. *See* *Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

**\*4** In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haynes v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). The court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

However, this does not mean that a *pro se* litigant is excused from following the procedural formalities of summary judgment, *Govan*, 289 F. Supp. 2d at 295, and "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3, (S.D.N.Y. Oct. 28, 1999) [8] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)). Moreover, the latitude accorded a *pro se* litigant "does not relieve him of the obligation to respond to a motion for summary judgment with sufficient admissible evidence." *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

## IV. ANALYSIS

### A. Deficiencies in Plaintiff's Opposition
As required under L.R. 7.1, Defendant filed a statement of material facts with citations to the summary judgment record. (Dkt. No. 52-11.) Although Plaintiff has opposed Defendant's motion, Plaintiff failed to respond to the statement of material facts filed by Defendant as required under L.R. 7.1(a)(3). (*See* Dkt No. 54.) Under the rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 7.1(a)(3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record [9] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. [10] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

**\*5** Here, because Plaintiff was warned of the consequences of failing to properly respond to Defendant's L.R. 7.1 Statement, and he failed to do so, the Court recommends that the facts contained in Defendant's Statement be treated as having been admitted to the extent they are supported by accurate record citations. *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011). As to any facts not contained in Defendant's Statement of Facts, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

The Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 352 of 482

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). The Court has opted to review the entire record in this case.

A verified complaint is to be treated as an affidavit for summary judgment purposes. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). Here, however, Plaintiff's amended complaint is not verified, nor is his opposition to Defendant's motion. (*See* Dkt. Nos. 5, 54.) Unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g., Witzenburg v. Jurgens*, No. CV-05-4827 (SJF)(AKT), 2009 WL 1033395, at *11 (E.D.N.Y. Apr. 14, 2009) (unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment).

Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g., Hamm v. Hatcher*, No. 05 Civ. 503(ER), 2013 WL 71770, at *7 (S.D.N.Y. Jan. 7, 2013) (to afford the *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa*, No. 09CV718 (HBS), 2012 WL 2401574, at *7 (W.D.N.Y. June 25, 2012).

In deference to Plaintiff's *pro se* status, the Court has considered Plaintiff's unsworn response (Dkt. No. 54) in opposition to Defendant's motion for summary judgment (Dkt. No. 52). However, the Court's review has revealed that Plaintiff's submission contains very little in the way of admissible evidence.

## B. Due Process Rights under the Fourteenth Amendment

Plaintiff alleges that Defendant deprived him of due process at the November 6, 2013, disciplinary hearing. (Dkt. No. 5.) Defendant moves for summary judgment arguing that (1) Plaintiff was not deprived of a protected liberty interest; (2)

Plaintiff was nevertheless accorded all of the process to which he was entitled at the disciplinary hearing; and (3) in the alternative, Defendant is entitled to qualified immunity. (Dkt. No. 52-12 at 4-16).

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citation omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

**\*6** To establish a claim under § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

### 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *Lewis v. Murphy*, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Accordingly, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

*Sandin*, 515 U.S. at 783-84; *Tellier, 280 F.3d at 79-80*; *Hynes, 143 F.3d at 658*.

As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). Thus, the Court must inquire whether the allegations related to the conditions of Plaintiff's SHU confinement under *Sandin*. "Plaintiff has the burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under *§ 1983. Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013); *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009) (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)); *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)); *see Murray v. Arquitt*, No. 9:10-CV-1440 (NAM/CFH), 2014 WL 4676569, at *14 (N.D.N.Y. Sept. 18, 2014).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted). However, the Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id. at 64-65* (citing *Colon, 215 F.3d at 232*). In the absence of a dispute about the conditions of

confinement, summary judgment may be issued as a matter of law. *Id.* at 65 (citations omitted).

**\*7** Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon, 215 F.3d at 231-32*). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short-e.g. 30 days-and there was no indication [of] ... unusual conditions." *Harvey v. Harder*, No. 09-CV-154 (TJM/ATB), 2012 WL 4093792, at *6 (N.D.N.Y. July 31, 2012) (citing *inter alia*, *Palmer, 364 F 3d at 65-66*).

Here, Plaintiff was sentenced to 200 days of segregated confinement. (Dkt. No. 52-9 at 47.) Because Plaintiff's confinement was of an "intermediate duration," the Court must make a fact-intensive inquiry that examines the actual conditions of SHU confinement compared to the ordinary prison conditions at Washington County Correctional Facility. *See* *Palmer, 364 F.3d at 65*; *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009).

To establish that Plaintiff's 200 day SHU confinement was not atypical and not significant, Defendant submits the affidavit of Eugene McKenna, Jail Administrator at Washington County Correctional Facility. (Dkt. No. 52-10. [11]) McKenna declares that all inmates held at the Washington County Correctional Facility are provided with a handbook to assist them during their incarceration. *Id.* at ¶ 5. The handbook is meant to provide inmates with a written explanation of facility policies, including policies concerning visitation, exercise, hygiene, discipline, and restrictive housing. *Id.* The handbook provides that inmates will be entitled to two contact visits per week, with each visit not to exceed one hour. *Id.* at ¶ 6, p. 9. With regard to hygiene, showers are available to inmates throughout the day, except for mandatory lock-in times. *Id.* at ¶ 7, p. 15. Inmates are afforded a minimum of one hour of exercise per day, which may be extended based upon inmate behavior, including the cleanliness of the housing unit. *Id.*

With regard to discipline, inmates are subject to different levels of discipline including verbal warnings, being locked in a cell, loss of privileges, or loss of good-time credits. *Id.* at ¶ 8, p. 20. If the infraction is of a more serious or repetitive nature, the inmate will be issued a misbehavior report and

will appear in front of a hearing officer. *Id.* at ¶ 9, p. 20. Inmates receive a notice within twenty-four hours of a hearing board proceeding, which can be waived by the inmate. *Id.* at ¶ 10, p. 20. If the charges against the inmate are affirmed as a result of the hearing, sanctions may be imposed based upon the inmate's past history and the severity of the offense, including (1) counsel or reprimand, (2) loss of one or more specific privileges, (3) restitution; and/or (4) confinement to a cell, room, or the SHU. *Id.* at ¶ 11, p. 21.

**\*8** At Washington County Correctional Facility, the SHU consists of ten cells in one linear row, one of which is designated for medical confinement. *Id.* at ¶ 13. Each cell is seven feet by sixteen feet in dimension. *Id.* On the outside of each cell is an attached seven feet by eight feet cage reserved for recreation purposes. *Id.* Inmates housed in the SHU can communicate with other inmates in the SHU based upon their proximity to each other. *Id.*

McKenna declares, and the handbook provides, that all SHU inmates are offered one hour of recreation and a shower between the hours of 8:30am and 2:00pm at the housing unit officer's discretion. *Id.* at ¶ 14, p. 21. In addition, all inmates assigned to the SHU, keep-lock, or other types of restrictive housing are afforded visitation privileges, have access to the same healthcare and mental-health services afforded to all other inmates, and are served the same meals in their cells as those served in the facility mess hall. *Id.* at ¶¶ 15-17.

Similarly, in *Vasquez v. Coughlin,* the defendants submitted the affidavit of Anthony J. Annucci, Deputy Commissioner and Counsel for the New York State Department of Correctional Services, which provided a thorough analysis of segregated housing in comparison with other types of confinement. 2 F. Supp. 2d 255, 259-60 (N.D.N.Y. 1998). Relying on Annucci's affidavit, Judge McAvoy held that despite being housed in the SHU for 545 days, the conditions of the inmate's confinement in the SHU did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life. *Id.* Indeed, Judge McAvoy noted that the conditions of the inmate's confinement were, for the most part, similar to those of the general prison population with the exception that the inmate received his meals in his cell and received one less shower per week. *Id.*; *cf. Bowens v. Pollock,* No. 06-CV-0457A (SR), 2010 WL 5589350, at \*15 (W.D.N.Y. Oct. 12, 2010) (district court concluded that it lacked a sufficient record upon which to assess whether plaintiff had demonstrated a liberty interest where defendants had presented no evidence regarding typical conditions of

keeplock confinement compared to the general population and the actual conditions of the plaintiff's keeplock).

Defendant has provided extensive information regarding the conditions of Plaintiff's segregated confinement at Washington County Correctional Facility compared to the general population at the facility. (Dkt. No. 52-10.) However, despite bearing the burden of proving that the conditions of his confinement constituted an atypical, significant hardship, *Vasquez,* 2 F. Supp. 2d at 260, Plaintiff has offered no challenge to the submitted facts of McKenna, nor has he disputed them with facts of his own. (Dkt. No. 54.) Instead, the entire focus of Plaintiff's opposition is on the purported due process violations at his November 6, 2013, disciplinary hearing. *Id.*

Plaintiff alleges that being housed in the SHU "illegally" for twenty-three hours a day, and being denied visitation and telephone calls with family, "worsened" his mental health issues, including having a hard time sleeping and eating. (Dkt. No. 54 at 10-11.) Plaintiff's testimony regarding his loss of privileges (such as telephone, visitation, and use of microwave) and the conditions of his confinement (including lack of sleep, trouble eating, and being handcuffed and shackled during facility transport), is insufficient to warrant constitutional protections. Indeed, "there is no liberty interest in remaining a part of the general prison population." *Lewis,* 2014 WL 3729362, at \*8 (citing 🚩*Frazier,* 81 F.3d at 317).

**\*9** While Plaintiff's conditions of confinement are certainly more restrictive than those in general population, they are insufficient to implicate a liberty interest, even when coupled with Plaintiff's 200 days confined to the SHU. *See, e.g., Johnson v. Enu,* No. 08-CV-158 (FHS/DNH), 2011 WL 3439179, at \*12 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest); 🚩*Smart v. Goord,* 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) (loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest); *Spence v. Senkowski,* No. 91-CV-955 (NPM), 1998 WL 214719, at \*3 (N.D.N.Y. Apr. 17, 1998) (plaintiff's confinement in the SHU for 180 days, with a corresponding loss of packages, telephone privileges, commissary privileges and his prison job was not an atypical or significant hardship to establish the existence of a liberty interest).

At his deposition, Plaintiff testified that he has borderline personality order, depression, and anxiety. (Dkt. No. 52-6 at

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 355 of 482

176.) As set forth above, McKenna's affidavit established that all Washington County Correctional Facility inmates assigned to the SHU, keep-lock, or other types of restrictive housing are afforded visitation privileges, and have access to the same healthcare and mental health services afforded to all other inmates. (Dkt. No. 52-10 at ¶ 15.) Significantly, Plaintiff never testified that he was denied healthcare or mental-health services while housed in the SHU.

Based on the undisputed evidence in the record, the Court finds that Plaintiff's 200 day confinement to the SHU with loss of certain privileges was not an atypical, significant hardship in relation to other ordinary incidents of prison life. *See* ⚑ ⚠ *Palmer*, 364 F.3d at 65 (if the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law). Thus, Plaintiff is not entitled to the protections of the Fourteenth Amendment. *See* ⚑ ⚠ *Palmer*, 364 F.3d at 64 (plaintiff has "no right to due process [at his hearing] *unless* a liberty interest was infringed as a result") (emphasis in original).

Accordingly, the Court recommends granting Defendant's motion for summary judgment (Dkt. No. 52).

### 2. Due Process

Even assuming a liberty interest exists, the Court recommends granting Defendant's motion because Plaintiff was afforded the minimum requirements of due process at his November 6, 2013, disciplinary hearing.

The Fourteenth Amendment due process protections afforded to a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." ⚑ ⚠ *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). "An inmate is entitled to advance written notice of the charges against him; a hearing affording a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Id.* (citing ⚑ *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). In some circumstances, an inmate also has a limited right to assistance. ⚑ *Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1998).

The due process clause requires that a hearing officer's determination be supported by "some evidence." ⚑ *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied if 'there is any evidence in the record that supports' the disciplinary ruling." ⚑ ⚠ *Sira*, 380 F.3d at 69 (quoting ⚑ *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). In the Second Circuit, the "some evidence" standard requires some "reliable evidence." ⚑ *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004).

**\*10** Moreover, to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 429, 429 (W.D.N.Y. 2008) (citing, *inter alia, Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison disciplinary hearing because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial.")).

#### a. Notice

Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are ...." *Wolff*, 418 U.S. 563-64. Here, Plaintiff was provided with a copy of the October 20, 2013, Inmate Misbehavior Report. (Dkt. No. 52-9 at 34.) On November 3, 2013, Plaintiff was provided with formal notice that his disciplinary hearing involving the October 20, 2013, events was scheduled to take place on November 6, 2013. *Id.* at 41. As such, Plaintiff was provided with adequate written notice. *See* ⚑ ⚠ *Sira*, 380 F.3d at 69.

#### b. Opportunity to be Heard and Present Witnesses

An accused prisoner has the right to a hearing where he is given a reasonable opportunity to call witnesses and present documentary evidence. ⚑ ⚠ *Sira*, 380 F.3d at 69. Here, Plaintiff was afforded the opportunity to be present at his disciplinary hearing on November 6, 2013. *See, e.g., Smith v. Fisher*, 803 F.3d 124 (2d Cir. 2015) (inmate had an "opportunity to attend" where he knowingly waived his right

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 356 of 482

to attend his disciplinary hearing, where he asked to leave the room, and refused to participate).

However, Plaintiff alleges that he was denied all witnesses and deprived of an opportunity to present documentary evidence. (Dkt. No. 5 at 2.) Contrary to Plaintiff's position, the record supports the conclusion that Plaintiff was granted a hearing with a reasonable opportunity to call witnesses and present documentary evidence.

Prior to the hearing, Defendant questioned C.O. Freebern, and he provided a written statement. (Dkt. No. 52-9 at ¶ 20.) At the beginning of the hearing, Defendant read C.O. Freebern's statement into the record. *Id.* Defendant then provided Plaintiff with an opportunity to call witnesses. *Id.* at ¶ 21. Plaintiff requested to call C.O. Freebern as a witness. *Id.* Defendant explained to Plaintiff he would not be permitted to call C.O. Freebern as a witness, as she had already questioned C.O. Freebern and had just read his statement into the record. *Id.*

Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia*, *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence)); *see also Eleby v. Selsky*, 682 F. Supp. 2d 289, 291-92 (W.D.N.Y. 2010) (hearing officers have discretion to keep the hearing within reasonable limits, and "included within that discretion is the authority to refuse to call witnesses whose testimony the prison official reasonably regards as duplicative or non-probative"). Thus, having explained her reasoning for denying Plaintiff's request to call C.O. Freebern as a witness, Defendant was acting within her discretion as a hearing officer to control the hearing. Moreover, despite being offered numerous opportunities to do so, Plaintiff failed to request any other witness to testify at the hearing.

**\*11** In addition, Plaintiff raised several objections throughout the hearing, and although he was provided with an opportunity to present evidence, Plaintiff declined to do so. (Dkt. No. 52-9 at ¶ 21.) Accordingly, the Court finds no triable issue of fact exists as to whether Plaintiff had an opportunity to appear and call witnesses.

#### c. Impartial Hearing Officer and "Some Evidence"

Prisoners have a constitutional right to a fair and impartial hearing officer. *Sira*, 380 F.3d at 69. However, it is well settled "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Espinal v. Goord*, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff*, 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent*, 472 U.S. at 455. "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). "[O]nly 'reliable' evidence can constitute 'some evidence.' " *Id.* at 76 (quoting *Luna*, 356 F.3d at 488).

In this case, Plaintiff was charged and found guilty, of the following violations: (i) Rule 2.05 (verbally or in writing harass anyone); (ii) Rule 5.06 (inmate shall refrain from profanity and unnecessary noise); (iii) Rule 5.03 (insolence towards facility staff); and (iv) Rule 5.00 (conduct which disrupts the orderly running of the facility). (Dkt. No. 52-9 at 47.)

Defendant relied upon C.O. Freebern's statement that on October 20, 2013, Plaintiff "became verbally assaultive, shouting obscenities at me and banging on his cell door. [Plaintiff] continued to shout 'suck my dick' and 'freebitch' as well as many obscenities of a sexual nature pertaining" to Correction Officer Kendrick. (Dkt. No. 52-9 at 36.) C.O. Freebern further declared that Plaintiff "proceeded to threaten me numerous times with lawsuits and prison time if he was not granted what he wanted." *Id.* Thus, Defendant's determination of Plaintiff's guilt was supported by "some evidence" as required in *Hill*, 472 U.S. at 455, and "reliable evidence" pursuant to *Luna*, 356 F.3d at 488. *See Hinton v. Prack*, No. 9:12–CV–1844 (LEK/RFT), 2014 WL 4627120, at \*15 (N.D.N.Y. Sept. 11, 2014) (citation omitted) ("some evidence" standard satisfied where

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 357 of 482

the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident); *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same).

Moreover, prison officials "enjoy a rebuttable presumption that they are unbiased." *See Rodriguez v. Selsky*, No. 9:07–CV–0432 (LEK/DEP), 2011 WL 1086001, at *11 (N.D.N.Y. Jan. 25, 2011) (citation omitted). Indeed, "[a]n inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez*, No. 9:09 CV-626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 12, 2011) (citing *Francis*, 891 F.2d at 46). Thus, Plaintiff's conclusory allegation that he did not "get along" with Defendant fails to create an issue of material fact. [12]

**\*12**  In light of the above, the Court finds that Defendant was impartial and that her guilty determination was supported by "some evidence" sufficient for due process.

#### d. Written Statement of Decision

An accused prisoner has the right to a written statement of decision, including a statement of the evidence relied upon by the hearing officer. *Sira*, 380 F.3d at 69. In this case, Plaintiff does not allege, nor does the record support, a claim that he was not provided with such a written statement of Defendant's decision. (*See* Dkt. No. 52-9 at pp. 46-47.) In fact, Plaintiff attached a copy of the November 6, 2013, Inmate Disciplinary Hearing Record to his amended complaint. (Dkt. No. 5 at 17.)

#### e. Assistance

In certain circumstances, inmates have a "limited" right to assistance. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng*, 858 F.2d at 897. An inmate may need assistance, for example, if they are "illiterate, confined to [the] SHU, or unable to grasp the complexity of the issues." *Silva*, 992 F.2d at (citing *Wolff*,

418 U.S. at 570, *Eng*, 858 F.2d at 897). However an inmate's right to assistance is limited, and an inmate has no right to full counsel. *Silva*, 992 F.2d at 22. Indeed, the assistant need only perform what the plaintiff would have done but need not go beyond. *Lewis v. Johnson*, No. 9:08-CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5, 2010). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009).

Plaintiff argues that he was entitled to assistance, and Defendant fails to address this argument in her motion papers. However, even assuming Plaintiff was entitled to assistance which he did not receive, no reasonable factfinder could conclude that the deprivation resulted in any prejudice to Plaintiff. *See, e.g., Pilgrim*, 571 F.3d at 206 (any error on the assistant assigned to assist the plaintiff, including failing to comply with the plaintiff's instructions on interviewing witnesses and gathering documents, were harmless in light of the plaintiff's failure to identify any relevant testimony that was excluded as a result, his decision to not call witnesses when given the opportunity, and his decision to walk out of the hearing in protest of a particular defendant serving as the hearing officer).

At the outset of the hearing, Defendant read the charges to Plaintiff. (Dkt. No. 52-9 at 45.) Plaintiff stated that he understood the charges. *Id.* Defendant provided Plaintiff with an opportunity to present witnesses and rebuttal evidence. *Id.* Plaintiff made several objections throughout the hearing. *Id.* Yet Plaintiff failed to name any witnesses, other than C.O. Freebern, that he wished to call. *Id.*

Plaintiff has argued that the October 20, 2013, charges "were all lies." (Dkt. No. 52-6 at 135.) However, Plaintiff has failed to demonstrate that the outcome of his disciplinary hearing would have been any different had he been provided with an assistant. *Lewis*, 2014 WL 3729362, at *13 (the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results); *Liao*, 2016 WL 1128245 at *7 (finding any error on assistant was harmless in light of hearing officer's rejection of plaintiff's request to recall the potential witnesses plaintiff alleges that his assistant should have contacted prior to the hearing).

**\*13**  Plaintiff testified that had he been provided with an assistant, the assistant would have interviewed witnesses to the alleged events of October 20, 2013, including "a couple of inmates," and that their testimony would have

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 358 of 482

*Jabot v. Correction Officer Minor*, Not Reported in Fed. Supp. (2016)

proven Plaintiff's innocence. (Dkt. No. 52-6 at 135.) Plaintiff's argument that these witnesses' testimonies would have affected the outcome of his hearing is entirely speculative and conclusory. *See Hinton*, 2014 WL 4627120, at *2 (citation omitted). Further, Plaintiff admitted that had his witnesses testified, Defendant would have been presented with two versions of the October 20, 2013, events, C.O. Freebern's and Plaintiff's witnesses. *Id.* However, as set forth above, Defendant based her decision on C.O. Freebern's statement, which was supported by "some evidence."

Finally, Plaintiff testified that he expressed all of his concerns and purported violations of due process, including the denial of assistance and witnesses, to Defendant during the disciplinary hearing. (Dkt. No. 52-6 at 125-128.) However, Plaintiff did not appeal Defendant's decision. (Dkt. No. 52-9 at ¶ 28.)

Accordingly, the Court finds that Plaintiff was not prejudiced, in the sense that the errors affected the outcome of the hearing, based upon his purported lack of assistance.

#### f. Additional Due Process Violations

Plaintiff also alleges that his due process rights were violated because Defendant failed to tape record the hearing, there is "no verbatim" record of his objections, and therefore, he was unable to appeal Defendant's decision. (Dkt. No. 5 at 2-3 [13].)

As an initial matter, due process does not require that disciplinary proceedings be recorded. [14] *See Livingston v. Griffin*, 9:04-CV-00607-JKS, 2007 WL 1500382, at *5 (N.D.N.Y. May 21, 2007) (while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate constitutional due process); *see also Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003) (New York State's regulation requiring that a disciplinary hearing be recorded does not impute a federal constitutional protection).

Although Plaintiff contends that "[t]here is no appeals process [at Washington County Correctional Facility] ... [t]here is no verbatim records ... [t]here's nothing" (Dkt. No. 52-6 at 126), his argument is undermined by his testimony that he has in fact utilized the appeals process at Washington County

Correctional Facility. *Id.* at 154. What's more, Plaintiff testified that he received an appeal form from Defendant on November 8, 2013, and that he "may" have appealed Defendant's November 6, 2013, determination. *Id.* at 160, 162. Thus, Plaintiff's argument is without merit, and his dissatisfaction with the appeals process, in part because disciplinary hearings are not tape recorded at Washington County Correctional Facility, is misplaced.

Based upon the aforementioned, the Court finds that Plaintiff received the minimum due process to which he was entitled during his November 6, 2013, disciplinary hearing. Therefore, the Court also recommends that Defendant's motion for summary judgment (Dkt. No. 52) be granted on the grounds that she did not violate Plaintiff's due process rights during his November 6, 2013, disciplinary hearing.

#### C. Qualified Immunity

**\*14** In the alternative, Defendant seeks dismissal of Plaintiff's Fourteenth Amendment due process claim on qualified immunity grounds. (Dkt. No. 52-12 at 15-16.) Inasmuch as the Court is recommending that Defendant's motion for summary judgment be granted on other grounds, it finds it unnecessary to reach the qualified immunity argument.

**ACCORDINGLY** it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 52) be **GRANTED**; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 359 of 482

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

Dated: July 14, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5322113

## Footnotes

1    Unless otherwise noted, page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docketing system.

2    In light of the procedural posture of this case, the following recitation is derived from the record now before the Court, with all inferences and ambiguities resolved in Plaintiff's favor. 🚩 *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

3    Plaintiff was housed in administrative segregation in the C-Unit. (Dkt. No. 52-8 at ¶ 3.)

4    Specifically, Plaintiff shouted "suck my dick" and "freebitch" at C.O. Freebern. (Dkt. No. 52-8 at ¶ 6.) Plaintiff also yelled obscenities of a sexual nature regarding Correction Officer Kendrick. *Id.* Plaintiff threatened to call social services because C.O. Freebern was planning to harm his son. *Id.* at ¶ 8. Plaintiff also made numerous threats of lawsuits and prison time to C.O. Freebern, if he did not get what he wanted. *Id.* at ¶ 9. Plaintiff claims that the charges were all lies. (Dkt. No. 52-6 at 135.)

5    Specifically, Plaintiff was sentenced as follows: (i) 90 days keep lock with 30 days loss of commissary for verbally (or in writing) harassing anyone; (ii) 40 days keep lock with three showers/shaving per week at 08:30 on Monday, Wednesday, and Friday for failing to refrain from profanity and unnecessary noise; (iii) 60 days of keep lock with loss of 1 visit for 30 days for displaying insolence towards facility staff; and (iv) 10 days keep lock and a $25.00 fine for the disruption of facility routine. (Dkt. No. 52-9 at 47.)

6    Although Plaintiff alleges that Washington County Correctional Facility does not have an appeal process, Plaintiff testified that he may have appealed Defendant's decision. Plaintiff has not produced a copy of an appeal. (Dkt. No. 52-6 at 160.)

7    Although Plaintiff alleged he was "being placed in SHU for no reason," and thus was being subjected to "cruel and unusual punishment," the Court did not construe the amended complaint to raise a separate Eighth Amendment challenge to the conditions of confinement. (*See* Dkt. No. 8.) Instead, the Court determined Plaintiff's allegations that his SHU confinement "worsened" his "mental illness" and thus was "cruel and unusual punishment" was Plaintiff's attempt to demonstrate an "atypical and significant hardship" under 🚩 *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). *Id.* at 3.

8    The Court will provide Plaintiff with copies of unpublished decisions in accordance with the Second Circuit's decision in 🚩 *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

9    L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *But see* 🚩 *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court

may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

10   Defendant has complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to summary judgment motion. (Dkt. Nos. 52, 52-11.)

11   McKenna was hired as a Correction Officer for the Washington County Sheriff's Office at the Washington County Correctional Facility in October 2003, and was promoted to Sergeant in 2008. (Dkt. No. 52-10 at ¶ 2.) He became the Jail Administrator for the facility on October 23, 2009. *Id.* Prior to his employment at the Washington County Correctional Facility, McKenna was a Police Officer at the Whitehall Police Department from 1986 through 2002. *Id.* at ¶ 3. He also served as a Correction Officer at Riker's Island for the New York City Department of Corrections from 1983 through 1985. *Id.* McKenna's affidavit is based upon the records, regulations, directions, and policy guidelines of the Washington County Correctional Facility, as well as he own personal knowledge as the Jail Administrator. *Id.* at ¶ 2. A copy of the handbook is attached to McKenna's Affidavit. *See id.* at pp. 8-36.

12   Plaintiff's claim that he was falsely issued the October 20, 2013, misbehavior report, and thus Defendant was biased for "covering up" the "trumped up charges" is without merit. *See, e.g., Gantt v. Mielenz,* No. 9:10-CV-0083 (GTS/TWD) 2012 WL 4033723, at *4 (N.D.N.Y. Sept. 12, 2012) (Suddaby, J.) ("[J]ust as an inmate possess no due process right to be free from being issued a false misbehavior report, an inmate possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at disciplinary hearing.").

13   At his deposition, Plaintiff testified "how can you appeal a record if a record don't exist? How can you appeal your objections if your objections don't exist on paper because there is not a verbatim record?" (Dkt. No. 52-6 at 161.)

14   In fact, Plaintiff should be aware that there is no constitutional right to have disciplinary hearings recorded by stenograph or other means. (*See* November 11, 2012, Decision and Order, Dkt. No. 33 at 6 in *Jabot v. Warren County Sherriff's Office,* No. 9:11-cv-01217 (GLS/DEP)).

---

**End of Document**                                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1090802
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Equarn WHITE, Plaintiff,
v.
John MARINELLI, et al., Defendants.

9:17-CV-1094 (LEK/ATB)
|
Signed 03/08/2019

**Attorneys and Law Firms**

Equarn White, Attica, NY, pro se.

Erik Boule Pinsonnault, New York State Attorney General,
Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

 *1 Plaintiff, a state prisoner, brings various constitutional
claims stemming from his incarceration at Upstate
Correctional Facility. Dkt. No. 1 ("Complaint"). The
Complaint names twenty-two correctional officers as
defendants. Id. at 1. On November 17, 2017, the Court
granted Plaintiff leave to proceed in forma pauperis, reviewed
the Complaint, and dismissed many of Plaintiff's claims.
Dkt. No. 4 ("November Order"). Defendants Tracy Nelson,
Randel Smith, and George Waterson have moved to dismiss
the surviving claims. Dkt. No. 19 ("Motion to Dismiss").
While the Motion to Dismiss was pending, Plaintiff filed his
Motion to Amend, attaching a 253-page proposed Amended
Complaint that seeks to revive the dismissed claims and add
numerous claims and defendants. Dkt. Nos. 28 ("Motion
to Amend"), 28-2 ("Amended Complaint"). The Honorable
Andrew T. Baxter, U.S. Magistrate Judge, issued a report-
recommendation concerning both motions. Dkt. No. 34
("Report-Recommendation"). Plaintiff has filed objections.
Dkt. No. 35 ("Objections").

For the reasons set forth below, the Court adopts the
Report-Recommendation in part and modifies it in part. It
grants the Motion to Dismiss the Eighth Amendment claim
against Waterson, but it denies the motion as to the Eighth

Amendment conditions-of-confinement claim against Randel
Smith and First Amendment retaliation claim against Nelson.
It denies the Motion to Amend. However, Plaintiff may renew
his Motion to Amend with a revised proposed amended
complaint.

**II. LEGAL STANDARD**

Within fourteen days after a party has been served with
a copy of a magistrate judge's report-recommendation, the
party "may serve and file specific, written objections to
the proposed findings and recommendations." Fed. R. Civ.
P. 72(b); L.R. 72.1(c). "The district judge must determine
de novo any part of the magistrate judge's disposition that
has been properly objected to" and it "may accept, reject,
or modify the recommended disposition; receive further
evidence; or return the matter to the magistrate judge with
instructions." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636.
However, "where [the] parties receive clear notice of the
consequences, failure timely to object to a magistrate's report
and recommendation operates as a waiver of further judicial
review of the magistrate's decision." Mario v. P & C Food
Markets, Inc., 313 F.3d 758, 766 (2d Cir. 2002); see also
Thomas v. Arn, 474 U.S. 140, 150 (1985) (holding that
Congress did not "intend[ ] to require district court review of
a magistrate's factual or legal conclusions, under a de novo
or any other standard, when neither party objects to those
findings").

The Court may excuse a party's failure to object "in
the interests of justice," and modify or reject the report-
recommendation, if "the magistrate judge committed plain
error in ruling against the defaulting party." Spence v.
Superintendent, Great Meadow Corr. Facility, 219 F.3d 162,
174 (2d Cir. 2000). Therefore, when no party objects to
a magistrate judge's report-recommendation, courts in this
circuit review it only to determine whether the magistrate
judge made a clear error. Boice v. M+W U.S., Inc., 130 F.
Supp. 3d 677, 684 (N.D.N.Y. 2015); see also Fed. R. Civ. P.
72(b), Advisory Committee Notes: 1983 Addition ("When no
timely objection is filed, the court need only satisfy itself that
there is no clear error on the face of the record in order to
accept the recommendation.").

**III. PROCEDURAL HISTORY**

  **A. Initial Review**

White v. Marinelli, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 362 of 482

**\*2** On November 17, 2017, the Court held that the following claims survived its initial sua sponte review conducted pursuant to 🔖 28 U.S.C. § 1915:

(1) An Eighth Amendment medical indifference claim against Nurse George Waterson for failing to treat an infected rodent bite;

(2) An Eighth Amendment conditions-of-confinement claim against Sergeant Randel Smith for placing Plaintiff in Cell 18 next to an inmate "Reeder" who kicked and banged on Plaintiff's cell, depriving him of sleep, in December 2015; and

(3) A First Amendment claim alleging that Offender Rehabilitation Counselors Denise Bernier, Tracy Nelson, and Roxanne LeClerc retaliated against Plaintiff by withholding copies of video footage he had requested to support a grievance and referring him to the sex offender program.

The Court also found that the following claims were plausible, but were time-barred because they accrued before September 24, 2014; however, it allowed Plaintiff an opportunity to amend if he could identify a reason the Court should toll the statute of limitations:

(4) Eighth Amendment deliberate medical indifference claims against Sergeants Luc Maynard and Patrick Baker, Officer Richard Winston, mental health worker John Marinelli, Nurse Heath Baker, and Lieutenant Robert Barkman, based on Plaintiff's mental health needs in Spring 2014; and

(5) Eighth Amendment conditions of confinement claims against: (a) Maynard, Winston, Officer Adam Gallagher, Officer Brian Fournier, and Sergeant Richard Scott based on unsanitary conditions in Cell 13 May 2014; and

(b) Sergeants Michael Eddy and Laura Gokey, Marinelli, and Randel Smith for keeping Plaintiff in Cell 15 next to Reeder (the loud neighbor), resulting in sleep deprivation, in May 2014.

Finally, the Court dismissed the following claims for failure to plausibly allege a constitutional violation:

(6) A Fourteenth Amendment deprivation of property claim against Scott and Bernier;

(7) Eighth Amendment medical indifference claims against: (a) Heath Baker, for failing to treat a rash, foot fungus, and shingles; (b) Nurse Michele Byno, for discontinuing Plaintiff's mental health medication in October 2014; and (c) Nurse Christy Conklin, for failing to treat an infected rodent bite;

(8) Eighth Amendment conditions of confinement claims against: (a) Fournier and Officer Michael Bashaw for not allowing Plaintiff to attend dinner on May 6, 2014; and (b) Fournier, Officer Jeffry Premo, Officer Nicholas Ashline, and Randel Smith for barring him from the barber shop and commissary;

(9) An Eighth Amendment claim against Nelson for verbal sexual harassment;

(10) Fourteenth Amendment due process claims against: (a) Bernier and LeClerc for placing Plaintiff in a sex offender program; and (b) Eddy related to Plaintiff's security status;

(11) Fourteenth Amendment equal protection claims against Bernier and LeClere for placing him in the sex offender program;

(12) Fourteenth Amendment due process claims against Bernier and Nelson for failing to respond to Plaintiff's FOIL requests;

(13) First Amendment claims alleging that Scott, Heath Baker, Nurse Administrator Nancy Smith, Fournier, Bashaw, Randel Smith, Premo, Ashline, and Laura Gokey retaliated against Plaintiff for filing grievances;

**\*3** (14) A First Amendment access-to-court claim against Bernier;

(15) Conspiracy claims against Heath Baker and Marinelli; and

(16) Related claims against two supervisory officers: (a) Nancy Smith, for failing to remedy the violations regarding Plaintiff's medical needs; and

(b) Superintendent Donald Uhler, for failing to transfer Plaintiff from his noisy cell.

Nov. Order at 14–43.

### B. Motions to Dismiss and Amend

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 363 of 482

White v. Marinelli, Not Reported in Fed. Supp. (2019)

Bernier and LeClerc answered the Complaint. Dkt. No. 22 ("Answer"). Waterson, Randel Smith, and Nelson moved to dismiss the three surviving claims against them. Mot. to Dismiss. They argued that the Eighth Amendment allegations against Smith and Waterson, and the First Amendment allegations against Nelson, fail to state claims. Id. at 2, 6–17. Plaintiff then filed his Motion to Amend. Bernier, LeClerc, Nelson, Randel Smith, and Waterson opposed that motion. Dkt. No. 32 ("Opp'n to Mot. to Amend"). The other defendants named in the original and proposed amended complaints have not been served process. Id. at 4.

### C. Report-Recommendation

On December 12, 2018, Judge Baxter issued the Report-Recommendation. In it, he recommends that this Court deny the Motion to Dismiss and allow discovery concerning the Eighth Amendment conditions-of-confinement claim against Randel Smith. R. &. R at 1. However, he concludes that the Court should dismiss the other two surviving claims: the Eighth Amendment medical indifference claim against Waterson and the First Amendment retaliation claim against Nelson. Id. Judge Baxter also recommends that the Court deny Plaintiff's Motion to Amend because the 253-page proposed Amended Complaint is not appropriately "short and plain." Fed. R. Civ. P. 8(a)(2). In support, he finds that "most of plaintiff's proposed amendments are futile because they fail to correct the defects identified in the [November Order]." R. &. R. at 19. However, he suggests granting Plaintiff leave to file a revised proposed amended complaint to add *only* his revised conditions-of-confinement claims against Maynard, Winston, Marinelli, Patrick Baker, Heath Baker, Barkman, Scott, Gallagher, Fournier, Eddy, and Laura Gokey, which the Court had previously dismissed as untimely. Id. at 2. He concluded that "[i]n his Proposed Amended Complaint, Plaintiff has provided documentation that he had timely initiated the administrative grievance process with respect to those claims, and that he had not received final determinations on those grievances until at least October 2014. Therefore, Plaintiff has presented a colorable argument in favor of equitable tolling with respect to those claims." Id.

Accordingly, the Magistrate Judge concludes that "the revised amended complaint should only include: (1) those claims that survive Defendants' motion to dismiss," meaning (a) the Eighth Amendment claims against Randel Smith "related to inmate noise and rodent infestation, and [ (b) ] retaliation claims against defendants Bernier and LeClerc," and "(2) the [May and June 2014] conditions of confinement claims that have a colorable argument in favor of equitable tolling." Id.

at 23 n.14; see also id. at 20–23 (describing conditions of confinement claims).

## IV. DISCUSSION

**\*4** Since Defendants have not objected to the Report-Recommendation, the Court reviewed the Magistrate Judge's decisions in favor of Plaintiff for clear error. It has found none. Thus, Plaintiff's Eighth Amendment conditions-of-confinement claim against Randel Smith survives, and Plaintiff may amend his complaint to add his conditions-of-confinement claim against Maynard, Winston, Marinelli, the Bakers, Barkman, Scott, Gallagher, Fournier, Eddy, and Gokey within thirty days.

At issue are Plaintiff's objections, filed on January 2, 2019. Obj. He attacks the Report-Recommendation on two fronts. First, he argues that the Eighth Amendment medical indifference claim against Waterson and the First Amendment retaliation claim against Nelson each state a claim and should not be dismissed. Second, he argues that the Motion to Amend should be granted. He asserts that the claims raised in his proposed Amended Complaint are plausible, not futile. The Court will address each set of objections in turn.

As explained below, the Court agrees with the Magistrate Judge that the Complaint fails to state a claim against Waterson, but finds that it does state a valid retaliation claim against Nelson. Furthermore, the Court adopts Judge Baxter's recommendation to deny Plaintiff's Motion to Amend. It agrees that the proposed Amended Complaint fails to revive some claims that were dismissed in the November 2017 Order. However, the Court finds that several of Plaintiff's claims in the proposed Amended Complaint are plausible. Accordingly, it will allow Plaintiff to file an Amended Complaint with respect to those claims.

### A. Motion to Dismiss

Rule 12(b)(6) requires a complaint to be dismissed if it "fail[s] to state a claim on which relief may be granted." To state a valid claim, a complaint must allege "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 8(a)(2). The Court may disregard "legal conclusions couched as factual allegations" that are "devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). However, a court must take the "well-pleaded factual allegations" as true, id. at 679, and "draw[ ] all reasonable

inferences in the plaintiff's favor," Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). To " 'nudge[ ] [the plaintiff's] claims across the line from conceivable to plausible,' " the facts need only " 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.' " Citizens United v. Schneiderman, 882 F.3d 374, 380 (2d Cir. 2018) (quoting Twombly, 550 U.S. at 556–57, 570). Where, as here, a plaintiff is litigating pro se, the Court must construe his or her pleadings "liberally and interpret[ ] them to raise the strongest arguments that they suggest." Sykes v. Bank of Am., 723 F. 3d 399, 403 (2d Cir. 2013).

When deciding a motion to dismiss under Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). It may also consider "documents or information contained in [the] defendant's motion papers if the plaintiff has knowledge or possession of the material and relied on it in framing the complaint," as well as "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." Envtl. Servs. v. Recycle Green Servs., 7 F. Supp. 3d 260, 270 (E.D.N.Y. 2014) (quoting In re Merrill Lynch & Co., 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003) ).

**\*5** The facts alleged in the Complaint and Amended Complaint were recited in the November Order and Report-Recommendation, and they are elaborated as necessary below. To decide the Motions to Dismiss and Amend, the Court will take them as true and draw all permissible inferences in Plaintiff's favor. Harris, 572 F.3d at 71.

*1. Eighth Amendment Medical Indifference Claim* Against Waterson

The Magistrate Judge correctly found that the facts alleged in both the Complaint and Amended Complaint failed to state an Eighth Amendment medical mistreatment claim against Waterson. On April 16, 2016, a mouse bit Plaintiff on the toe. Am. Compl. at 109–110, ¶ 164. [1] Waterson, a staff nurse, came to Plaintiff's cell and viewed the "bite mark as it was bleeding." Id. He told Plaintiff he would get a bandage, but did not return that day. Id. On April 17, another nurse, Heath Baker, treated the bite with povidone-iodine, an antiseptic. Id.

¶ 166. The next day, April 18, Defendant Waterson returned, "s[aw] that Plaintiff['s] foot was infected, but refused to treat Plaintiff." Id. Plaintiff gave him a sick call slip—a request to see a doctor—but Waterson destroyed it. Id. ¶¶ 166–67. In his original Complaint, Plaintiff alleged that the next morning, April 19, he experienced "severe stomach pain," and his skin was "turning yellow and green" around the bite mark. Compl. at 47, ¶ 123. That afternoon, he began "coughing up blood and whispered that he need[ed an] emergency sick call." Am. Compl. at 111, ¶ 168. "[F]ive minutes later, nurse [Christy] Conklin came to Plaintiff's cell. And 30 minutes later, [she] came back" and treated him with pain medication for head and stomach pain, hydrogen peroxide antiseptic, and bacitracin ointment for the bite. Id.

An Eighth Amendment claim has "subjective" and "objective" components. Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006). The subjective component requires that the defendant have acted with a culpable state of mind: "deliberate indifference" to the plaintiff's health. Farmer v. Brennan, 511 U.S. 825, 834 (1994). The standard equates to criminal recklessness; the prison official must "consciously disregard a substantial risk of serious harm." Id. at 839. Plaintiff asserts that Waterson acted with such deliberate indifference because he ignored then intercepted Plaintiff's requests for medical staff to treat the bite. Obj. at 4. The Court assumes, without deciding, that these allegations are sufficient to satisfy the subjective element.

However, Plaintiff must also make an objective showing that he (1) was "actually deprived of adequate medical care," meaning that prison officials "fail[ed] to take reasonable measures in response to [his] medical condition;" and (2) that "the inadequacy in medical care is sufficiently serious" in view of the "harm, if any, the inadequacy has caused or will likely cause" Plaintiff. Salahuddin, 467 F.3d at 279. He must have had a "condition of urgency, one that may produce death, degeneration or extreme pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). Whether a condition is sufficiently serious depends on "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Id.

White v. Marinelli, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 365 of 482

**\*6** Even if Waterson had a culpable mindset, Plaintiff fails to satisfy the objective element—because even if Waterson sought to withhold "adequate medical care" from Plaintiff, he failed. Salahuddin, 467 F.3d at 279. Nurses Baker and Conklin "took reasonable measures in response" to Plaintiff's bite and infection when they treated his toe with antiseptic and medication. Id.; Am. Compl. ¶ 168. Plaintiff's wound was not even infected when Baker sterilized it on April 17, and he does not allege that nurse Conklin's April 19 treatment failed to resolve the infection or other symptoms. Therefore, there is nothing to suggest that Plaintiff was deprived of "reasonably necessary care." Langley v. Coughlin, 888 F.2d 252, 254 (2d Cir. 1989). That he requested a tetanus shot does not change the analysis. Nov. Order at 23–24; see also Chance, 143 F.3d 703 ("So long as the treatment is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

Therefore, at most, Plaintiff can allege that Waterson (by ignoring Plaintiff's request for a bandage on April 16, after the bite, and by destroying his sick call slip on April 18, when the infection developed) delayed Baker and Conklin's otherwise reasonable treatments by one day each. "When a prisoner alleges 'a temporary delay or interruption in the provision of otherwise adequate medical treatment,' " the Court must "focus on the seriousness of the particular risk of harm that resulted from 'the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " Bellotto v. Cty. of Orange, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting Smith v. Carpenter, 316 F.3d 178, 184–86 (2d Cir. 2003) ). A delay in providing necessary medical care only violates the Eighth Amendment if it exposes the inmate to "the unnecessary and wanton infliction of pain," or an "unreasonable risk" that he will suffer similarly "serious harm" in the future. Smith, 316 F.3d at 186–87. The Second Circuit " 'has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, see Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984)[where delay also caused "extreme pain" and miscarriage], ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years.' " Demata v. N.Y. State Corr. Dep't of Health Servs., 198 F.3d 233 (2d Cir. 1999) (citations omitted). In short, the facts must demonstrate that the delay "exposed the inmate to undue suffering" before he was treated, "or the threat of tangible residual injury" afterward. Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004).

Plaintiff does not provide facts suggesting that the one-day delays in treating his bite and subsequent infection exposed him to extreme pain or threatened his future health. Even though Waterson may have "deliberately delayed" the treatments, Plaintiff was not in pain at least until the morning of April 19, and Conklin treated that pain within a few hours. Am. Compl. at 111, ¶ 168. Given the short time period, the pain was not "chronic," and Plaintiff does not suggest that it interfered with his daily activities. Chance, 143 F.3d at 702. In addition, the facts do not indicate that the infection was "life-threatening," "fast-degenerating," or otherwise risked further deterioration; it quickly resolved after Conklin applied another antiseptic, some pain medication, and ointment. Am. Compl. ¶ 168. With any allegations of more severe injuries or lasting complications, Plaintiff's statement that his toe infection and stomach ache caused him "extreme pain" for a few hours does not plausibly demonstrate that he endured "cruel and unusual punishment" of a constitutional dimension. See Frith v. City of New York, 203 F. Supp. 3d 386, 389–90 (S.D.N.Y. 2016) (one-day delay in treating infected mouth abscess that allegedly caused "extreme pain" did not state a claim because plaintiff did not provide enough facts to show "that the delay itself caused or exacerbated the infection, caused him extreme pain, or caused any permanent harm"). [2]

**\*7** Therefore, even if Plaintiff's Amended Complaint establishes that Waterson deliberately ignored Plaintiff's infected mouse-bite, its allegations demonstrate that other professionals gave Plaintiff all the medical care that was "reasonably necessary" to treat his condition and did so before it became sufficiently serious. Langley, 888 F.2d at 254. As a result, Plaintiff's Eighth Amendment medical mistreatment claim against Waterson must be dismissed. Salahuddin, 467 F.3d at 279.

### 2. First Amendment Retaliation Claim Against Tracy Nelson

Plaintiff also objects to the Magistrate Judge's recommendation to dismiss Plaintiff's retaliation claim against Nelson, a Supervising Offender Rehabilitation Coordinator ("SORC").

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 366 of 482

White v. Marinelli, Not Reported in Fed. Supp. (2019)

To prove a retaliation claim under § 1983, a prisoner must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004). "It is well established that the filing of a prison grievance is a constitutionally protected activity." Burton v. Lynch, 664 F. Supp. 2d 349, 366 (S.D.N.Y. 2009) (citing Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996) ). An "adverse action" is one that "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights" (by filing a grievance, for example). Gill, 389 F.3d at 381. A "causal connection" is one in which the protected conduct was "a substantial or motivating factor for the adverse actions taken by prison officials." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). Because "prisoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration," id., the Second Circuit has "insisted on a higher level of detail in pleading" prisoners' retaliation claims, Gill, 824 F.2d at 194, and instructed courts to "examine [them] with skepticism and particular care," Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Thus, Plaintiff must supply "specific and detailed factual allegations" suggesting that Defendants retaliated against him for filing grievances, and may not rely on "wholly conclusory" statements to support such claims. Dolan v. Connolly, 794 F.3d 290, 295 (2d Cir. 2015).

Plaintiff alleges that on March 28, 2016, he filed a grievance against Nelson and Bernier for ignoring Plaintiff's Freedom of Information Law ("FOIL") requests for video footage that supported his grievances against Bernier, LeClerc, and others,[3] and for charging an exorbitant price for the footage ($96.00 instead of the appropriate $0.60 cents). Compl. at 44, ¶ 115; see also id. at 38–45. Nelson showed up at Plaintiff's cell on April 21, 2016 and had a protracted conversation with him. Id. at 50–52, ¶¶ 127-32. Plaintiff states that this was highly unusual; in his four years, six months in state custody, a SORC had never visited or spoken to him. Id. at 52, ¶ 131. Nelson was holding a copy of his March 2016 grievance. Id. at 52, ¶ 132. She "tried to get [him] to apologize about calling her Denise Bernier['s] flunky," and for his accusation that she was involved in "corruption." Id. Plaintiff also alleges that she asked him to expose his penis. Id. at 52, ¶ 131. When Plaintiff

refused, Nelson threatened that she had "been working for DOCCS for 15 years" and knew that "all [she] had to do [was] tell the C.O." that Plaintiff exposed himself and he would be disciplined. Id. Approximately fifteen months later, in August 2017, a New York court ordered Nelson to grant Plaintiff's FOIL request and produce the video footage. Compl. at 62–63, ¶ 164(D). Instead of complying, Nelson destroyed "3 different DVDs and multiple documents" related to Plaintiff's request. Obj. at 9; Compl. at 44, ¶¶ 108, 113–14. And Nelson continued to insist that Plaintiff pay the excessive $96.00 to process his F.O.I.L. request. Id.

**\*8** The Magistrate Judge found that the Complaint lacks facts showing that Plaintiff's March 2016 grievance prompted Nelson to charge the exorbitant fee and destroy the video footage. R. & R. at 15. Indeed, Plaintiff concedes in the Complaint that Nelson had already decided to charge Plaintiff $96.000 before Plaintiff filed the March 2016 grievance and, therefore, does not plausibly suggest that the overcharging was retaliatory. Compl. at 38–40, 44, ¶¶ 103, 106–08, 114. However, at least two alleged facts plausibly suggest that Nelson acted with a retaliatory animus in destroying the tapes: first, her April 16, 2016 visit to Plaintiff's cell—in which she rebuked Plaintiff for filing the grievance and tried to coax him expose himself so that she could file disciplinary charges. Baskerville v. Blot, 224 F. Supp. 2d 723, 733 (S.D.N.Y. 2002) (defendants' statements chiding plaintiff for filing grievances, and administrative finding that plaintiff's discipline was unjustified, sufficed to allege that discipline was retaliatory, even though plaintiff did not allege grievances were filed recently). Second, destroying the tapes violated the state court's order. Obj. at 9; Compl. at 38–44, 52, ¶¶ 108, 112–114, 131. Such improper conduct evinces improper motives. See Shakur, 391 F.3d at 116 ("[F]ailure to abide by established procedures or standards can evince an improper objective" or "personal prejudice.").

Indeed, there is no obvious reason other than retaliation why Nelson would have destroyed the video footage Plaintiff requested. The fact that a year passed before she did so does not prove otherwise; until the state court ordered Nelson to produce the footage in 2017, she could simply withhold it from Plaintiff; there was no reason to destroy it. Obj. at 9; see also Espinal, 558 F.3d (finding passage of time less of an obstacle where there was a plausible reason officers would have waited so long to retaliate); cf. Clark, 532 U.S. at 274 ("Action taken (as here) 20 months later suggests, by itself, no causality at all").

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 367 of 482

White v. Marinelli, Not Reported in Fed. Supp. (2019)

**B. Motion to Amend**

"Leave to file an amended complaint 'shall be freely given when justice so requires,' and should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001) (quoting Fed. R. Civ. P. 15 and citing Foman v. Davis, 371 U.S. 178, 182 (1962) ). To determine if an amendment would "prejudice" the opposing party, courts must consider whether its allowance would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993). An amendment is "futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim." Id. at 110.

A proposed amended complaint may also be subject to dismissal (and therefore futile) if it is not "short and plain." Fed. R. Civ. P. 8(a)(2). As the Second Circuit has written:

> Rule 8 [of the Federal Rules of Civil Procedure] provides that a complaint "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The [complaint's] statement [of the plaintiff's claim] should be plain because the principal function of pleadings under the Federal Rules is to give the [defendants] fair notice of the claim asserted so as to enable [them] to answer and prepare for trial. The statement should be short because "[u]nnecessary prolixity [meaning too much unneeded detail] in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."

> When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, Fed. R. Civ. P. 12(f), or to dismiss the complaint. Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised. When the court chooses to dismiss, it normally grants leave to file an amended pleading that conforms to the requirements of Rule 8.

**\*9** Salahuddin v. Cuomo, 861 F.2d 40, 41–42 (2d Cir. 1988) (concluding that the district court was within its discretion to dismiss a 15-page, single-spaced complaint that was not "vague or incomprehensible," but contained too much detail; granting leave to amend); see also Jones v. Nat'l Commc'ns & Surveillance Networks, 266 F. App'x 31, 33 (2d Cir. 2008) ("[T]he district court's determination, that [plaintiff's] single-spaced 58–page complaint with 87 additional pages of attachments, alleging over twenty separate causes of action against more than 40 defendants, violated the short and plain statement requirement of Rule 8, was not an abuse of discretion.").

*1. Excessive Length*

Plaintiff's proposed Amended Complaint comprises 308 paragraphs, divided into numerous subparagraphs, and spans 253 pages. Large portions of it are devoted to legal argument. Accordingly, it is neither "short" nor "plain," as Rule 8(a)(2) requires. In addition, the Magistrate Judge was correct to conclude that it fails to allege information adequate to revive many of the claims dismissed in the November Order. Requiring defendants to answer such a lengthy complaint, with so much extraneous material, would waste their time and stall this case unnecessarily. The Court could comb through the proposed amended complaint to identify and strike the irrelevant and non-factual material. But doing so "would [waste] resources upon which other litigants have an equal call." VTech Holdings Ltd. v. PriceWaterhouseCoopers, LLP, No. 03-CV-1419, 2003 WL 21756623, at *2 (S.D.N.Y. July 30, 2003). In sum, allowing the Motion to Amend would prejudice Defendants, delay this case, and strain judicial time and resources—which alone justifies denying it. Block, 988 F.2d at 350.

That said, the Court agrees with Plaintiff that many of the allegations in his proposed Amended Complaint provide enough detail to correct defects in certain claims that were dismissed in the November Order. Obj. at 11–12. Therefore, the Court will allow Plaintiff to file a proposed Amended Complaint that includes only the facts relevant to the claims that survive this Memorandum-Decision and Order, which the Court will list below. [4] The revised amended complaint should not include claims that this Court has previously dismissed or deems futile in this opinion. Since Plaintiff has

had two opportunities to plead those claims and has described the underlying events in significant detail, and since this case has stalled in the pleading stage for over a year and consumed significant judicial time and resources in the interim, the Court dismisses those claims without leave to re-plead. See De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 72 (2d Cir. 1996) (stating that a court may "dismiss a [claim] without leave to replead when a party has been given ample prior opportunity to allege [the] claim"). [5]

The Court will first address the claims in the proposed Amended Complaint that are viable; then, it will address the claims that are futile.

### 2. Assault Claims against Michael Gokey, Sarah Tomkins, and John Does

**\*10** First, Plaintiff alleges that on September 2, 2014, he was "sexually assaulted by staff" including Michael Gokey and unidentified officers at Green Haven. Am. Compl. at 52, ¶ 101(F)(1). He states that he was "punched in the testicles, and staff ... rammed their fingers in [Plaintiff's] anus," causing swelling and other injuries. Id. He also alleges that at least eight times from March 24 to September 8, 2015, Officer Sarah Tomkins would "pull Plaintiff to the side" in the "library and make inappropriate comments." Am. Compl. at 63, ¶ 109. Among other things, she said that her "home girl," referring to Tracy Smith, "said your sexy ass is scared of pussy." Am. Compl. at 63, ¶ 109. After Plaintiff filed a grievance against Smith for sexual harassment, Tompkins chided him about it, saying, "you['re] not stupid enough to file a grievance against me." Id. ¶ 115. Plaintiff then describes how, on September 22, 2016, Tompkins conspired with four other officers to assault Plaintiff in a vacant classroom near the prison library. Id. ¶¶ 118–19. The officers then falsely charged Plaintiff with "lewd conduct" and assaulting staff. Id. ¶¶ 119–21.

### i. Eighth Amendment Claims Against Gokey, Tomkins, and Does

Prison guards may not use force in such a way—"maliciously and sadistically to cause harm"—even if they cause only minor injuries (or, for that matter, no injuries). Griffin v. Crippen, 193 F.3d 89, 92 (2d Cir. 1999). Such physical assaults by guards to humiliate an inmate, or in retaliation for past conduct, violate the Eighth Amendment. Crawford

v. Cuomo, 796 F.3d 252, 257 (2d Cir. 2015) ("A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment."); Edwards v. McGrain, No. 09-CV-582, 2012 WL 6701826, at *5 (W.D.N.Y. Dec. 26, 2012) (Eighth Amendment claim based on beating by correctional officers in retaliation for grievance overcame summary judgment despite only minor injuries). Accordingly, Plaintiff states a valid Eighth Amendment excessive force claim against Gokey, Tompkins, and the John Doe officers who acted in concert with them. [6]

### ii. First Amendment Retaliation Claims Against Tompkins

Given the facts suggesting that Tracey Smith was friends with Tompkins and told her about her sexual harassment of Plaintiff and his grievance about it, it is also plausible that Tompkins instigated the September 22, 2016 beating in retaliation for that grievance. See Am. Compl. at 63–64, ¶¶ 109, 115. Therefore, Plaintiff also states a First Amendment retaliation claim against Tompkins—both for the beating and the false disciplinary charges (for lewd conduct and assault) designed to fabricate a justification for it. Ford v. Martuscello, No. 14-CV-1566, 2016 WL 5322166, at *5 (N.D.N.Y. June 23, 2016), adopted, 2016 WL 5256901 (N.D.N.Y. Sept. 22, 2016) (inmate stated claim that defendants, in beating inmate, retaliated for complaints against other officers where facts suggested the officers were aware of his grievances against their friends and assaulted plaintiff within one to four months of their filing); Gill, 389 F.3d at 384 (holding that filing a false misbehavior report was an adverse action for purposes of retaliation analysis).

### 3. First Amendment Retaliation Claim Against Laura Gokey and Randel Smith

In his original Complaint, Plaintiff also alleged that Sergeants Laura Gokey and Randel Smith retaliated against him by keeping him in a cell neighboring inmate Reeder, who loudly "banged and kicked" Plaintiff's cell door so incessantly that Plaintiff "was only able to sleep two to three hours a day and began to hallucinate, developed migraines, and lost his impulse control." Nov. Order at 27. "Plaintiff claim[ed] that he was placed in a cell adjacent to [Reeder] on two occasions: first, during his initial confinement at Upstate in Cell 15 from May 2014 until [September] 2014 and, second, in Cell

White v. Marinelli, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 369 of 482

18 from December 29, 2015 until April 25, 2016." Id. at 40. Plaintiff repeats the same allegations in his proposed Amended Complaint. Am. Compl. at 51–59, ¶ 101. The Court previously upheld Plaintiff's Eighth Amendment claim based on these allegations, but dismissed his related retaliation claim because Plaintiff failed to describe any particular grievance that precipitated his cell placements. Nov. Order at 27, 35–36; R. & R. at 9–11, 26.

 **\*11**  However, additional facts in the Amended Complaint describe just such a grievance and plausibly allege a causal connection to Gokey and Smith's actions. Plaintiff now asserts that on September 8, 2014, he filed a grievance regarding the September 2, 2014 sexual assault by staff. Am. Compl. at 52, ¶ 101(F)(1). "A couple of inmates told Plaintiff that one of the officers was [Laura] Gokey's husband Michael Gokey, who's known for assaulting inmates." Id. ¶ 101(F)(2). Laura Gokey plausibly knew about the grievance because it was against her husband, and on September 10, 2014, she took Plaintiff from his cell for another guard to photograph his injuries and questioned him about the assault. Id. During the questioning, she told him that he "should let it go." Id. Later, when Plaintiff asked why other inmates around him were being transferred to different cells when he was not, even though Reeder was "depriving him of sleep," Gokey "whispered, 'because they don't write grievances.' " Id. ¶ 101(F)(3).

On September 19, 2014, Plaintiff received a letter stating that he should have been moved to a different floor, and that Randel Smith, Laura Gokey, and another officer (Eddy) knew why he had not yet been moved. Id. ¶ 101(M). When Plaintiff asked Smith why, he lied that there was "no [other] cell open." Id. Smith also allegedly misrepresented to the IGRC that he interviewed Plaintiff about his September 8, 2014 grievance against Smith and Gokey concerning Reeder. Am. Compl. at 55–56, ¶ 101(L), (M), (N)(2); Dkt. Nos. 28-3 at 40–41 ("Exhibit S"), 28-3 at 42–43 ("Exhibit T"). The Inmate Grievance Review Committee ("IGRC") dismissed the grievance because Smith stated that Plaintiff could not "substantiate" it. Id. On December 29, 2015, when Plaintiff was transferred back to Upstate, Smith interviewed him and returned him to the cell neighboring Reeder over Plaintiff's protest. Id. at 58, ¶ 101(N)(7).

The proposed allegations, taken as true, suggest that Gokey and Smith had retaliatory motives and influenced the decision to keep Plaintiff in the cell next to Reeder. According to the Amended Complaint, Gokey: (1) was married to subject of Plaintiff's grievance and therefore, had a reason to retaliate;

(2) warned Plaintiff to withdraw the grievance; (3) had the power to prevent Plaintiff's transfer; and (4) suggested that Plaintiff was being kept in Cell 15 next to Reeder because of his grievances. And Smith: (1) must have known about Plaintiff's 2014 grievance regarding Reeder, given that he told the IGRC he had interviewed Plaintiff about it; (2) was willing to lie to Plaintiff and the IGRC to keep Plaintiff in the cell; and (3) another officer suggested that Smith knew the reasons Plaintiff was not being moved despite protocol indicating that he should have been. Finally, Plaintiff alleges that it was a common practice at Upstate to place inmates who filed grievances next to Reeder as punishment. Am. Compl. at 60, ¶ 104; Dkt. No. 28-3 at 63 ("Exhibit EE"). These facts make it plausible that Gokey and Smith refused to move Plaintiff in late 2014, and that Smith returned him to the same cell when he returned to Upstate, in retaliation for Plaintiff's grievances against them.

Although Smith and Gokey's 2014 actions were outside the applicable limitation period (that is, before September 24, 2014), the Magistrate Judge concluded that equitable tolling may apply to the claims based on those actions, a conclusion to which Defendants did not object. R. & R. at 22. Thus, the allegations against both Gokey (in 2014) and Smith (in 2014 and 2015) regarding Reeder and Plaintiff's resulting sleep deprivation state a claim for First Amendment retaliation.

### 4. Due Process Claim against Eric Gutwine

In December 2015, Officer Gutwine held a disciplinary hearing concerning Tompkins' and her cohorts' allegedly false charges that Plaintiff engaged in "lewd conduct" and assaulted staff members in the classroom near the prison library. Am. Compl. at 68–69, ¶¶ 120–21. Gutwine found Plaintiff guilty and sentenced him to 270 days of confinement in the Special Housing Unit ("SHU") and "loss of privileges." Id. at 83, ¶ 124(C). The finding caused Plaintiff's subsequent transfer back to Upstate on December 24, 2015 (where Randel Smith allegedly placed him next to inmate Reeder) and was used as the basis for referring Plaintiff to the Sex Offender Counseling and Treatment Program ("SOCTP"). Id. at 83–84, ¶ 127; Obj. at 15. Plaintiff alleges that he was denied due process at the hearing. These allegations may state a claim under the Fourteenth Amendment, and the Court cannot conclude they are futile.

 **\*12**  To establish that prison officials violated the Due Process Clause, Plaintiff must show that they deprived him of a liberty interest without adequate procedural protections.

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 370 of 482

White v. Marinelli, Not Reported in Fed. Supp. (2019)

Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995) ). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." Arce v. Walker, 139 F.3d 329, 336 (2d Cir. 1998).

In the Complaint, Plaintiff focused on his referral to SOCTP as the relevant liberty deprivation underlying his due process claim. Compl. at 61–64. The Court previously concluded that such "sex offender classification and programming do not trigger due process rights" in prison. Nov. Order at 30–31 (citing Blake v. Fischer, No. 09-CV-266, 2010 WL 2522198, at *10 (N.D.N.Y. Mar. 5, 2010), adopted, 2010 WL 2521978 (N.D.N.Y. June 15, 2010) ). In his Amended Complaint and Objection, however, Plaintiff clarifies that he was also confined in the SHU for 290 days. Obj. at 15; Am. Compl. at 83, ¶ 124(C). "Where the plaintiff was confined [in SHU] for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required [to determine whether a prisoner's liberty interest was infringed]." Palmer, 364 F.3d at 64–65. "In the absence of a detailed factual record," the Second Circuit has "affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that Sandin plaintiff spent in SHU— and there was no indication that the plaintiff endured unusual SHU conditions." Id. at 65–66. In this case, Plaintiff's allegation that he was held in the SHU for 270 days, especially coupled with the sleep-depriving conditions he allegedly experienced there, implicate a liberty interest. See Colon v. Howard, 215 F.3d 227, 232 (2d Cir. 2000) (holding after a trial that confinement in SHU for 305 days implicated a liberty interest); Thomas v. Calero, 824 F. Supp. 2d 488, 500 (S.D.N.Y. 2011) (denying motion to dismiss because 291 days in SHU implicated liberty interest).

Nonetheless, to state a claim for a violation of due process, Plaintiff must also allege facts showing that the hearing lacked "that minimal process guaranteed by the Constitution" to assure basic fairness in the correctional context. Shakur v. Selsky, 391 F.3d 106, 119 (2d Cir. 2004); see also Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (listing constitutional requirements). Many of the alleged defects in Plaintiff's hearing were not so fundamental as to deny him the process due under the Constitution.

First, Gutwine delayed the hearing six times, from October 5 to December 9, 2015. Am. Compl. ¶¶ 122(A), (B)(11). New York regulations provide that when an inmate is in segregated confinement pending his disciplinary hearing, the hearing must commence within seven days unless the "commissioner or his designee" authorizes the delays. 7 N.Y.C.R.R. 251-5.1. However, violations of New York regulations governing disciplinary hearings do not always violate the stricter, minimum standards imposed by the Fourteenth Amendment. Shakur, 391 F.3d at 119. Here, the delay did not violate the regulation because the hearing officer granted requests for extensions of time. Am. Compl. ¶¶ 122(A), (B) (11). In any event, the delay only resulted in Plaintiff's pre-hearing confinement in the SHU for approximately 65 days —a duration which, in normal SHU conditions, does not implicate a liberty interest (or, therefore, any constitutional right to process) under normal SHU conditions. See Tafari v. McCarthy, 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (stating that sixty and ninety-day SHU confinements "fall within the 'short range' of disciplinary confinement and thus implicate a liberty interest only if 'the conditions were more severe than the normal SHU conditions' " (quoting Palmer, 364 F.3d at 65) ).

*13 Second, Plaintiff asserts that an off-the-record conversation shows that Gutwine "predetermin[ed] Plaintiff's guilt." Am. Compl. at 81, ¶ 124. Gutwine allegedly advised Plaintiff he was "digging [him]self in a deeper hole" because he had "contradicted [him]self" several times, and asked Plaintiff why he believed the corrections officers would lie, among other things. Id. ¶ 124(A). But "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996). Gutwine's skepticism would have been a rational response to perceived contradictions within Plaintiff's testimony. Even if Gutwine was mistaken, and Plaintiff's testimony was consistent, such a misunderstanding does not

suggest that Gutwine prejudged any evidence he had not yet seen. Sawyer v. Prack, No. 14-CV-1198, 2016 WL 5440596, at *11 (N.D.N.Y. July 29, 2016), adopted, 2016 WL 5415790 (N.D.N.Y. Sept. 28, 2016). Accordingly, Plaintiff has not stated a claim that Gutwine was so biased as to deny Plaintiff a fundamentally fair hearing.

Nevertheless, the other defects Plaintiff alleges—that Gutwine denied without explanation his requests to present witnesses and documents, and that his inmate assistant failed to marshal any such evidence while Plaintiff was incapacitated in the SHU—may provide a viable basis for a due process claim.

A prisoner facing a loss of liberty has a qualified "right ... to call and present witnesses and documentary evidence in his defense before the disciplinary board." Ponte v. Real, 471 U.S. 491, 495 (1985) (citing Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974) ). Institutional interests in safety and "swift discipline in individual cases" give prison officials the "discretion to keep the hearing within reasonable limits and to refuse to call witnesses" when doing so "may create a risk of reprisal or undermine authority." Id. Thus, a hearing officer may deny a request to call a witness "on the basis of irrelevance or lack of necessity," Scott v. Kelly, 962 F.2d 145, 147 (2d Cir. 1992), and may "limit access to other inmates to collect statements or to compile other documentary evidence," Ponte, 471 U.S. at 495. "Courts will not ... second guess the [reasonable] judgment of prison officials with respect to such matters." Sira, 380 F.3d at 75. Still, "prison officials who decide to circumscribe inmates' procedural rights at disciplinary proceedings must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." Id.; Ponte, 471 U.S. at 492 (holding that due process "requires that prison officials at some point state their reason for refusing to call witnesses requested by an inmate at a disciplinary hearing"). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of [his or her] position." Kingsley v. Bureau of Prisons, 937 F.2d 26, 30–31 (2d Cir. 1991).

In addition, prisoners who are confined to the SHU and "unable to 'marshal evidence and present a defense' " have a right to "be assigned to the inmate [or staff member] to

act as his surrogate—to do what the inmate would have done were he able." Silva v. Casey, 992 F.2d 20, 22 (2d Cir. 1993) (quoting Eng v. Coughlin, 858 F.2d 889, 898 (2d Cir. 1988) )."[S]uch help certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses"—the investigatory tasks which the inmate, were he able, could perform for himself." Eng, 858 F.2d at 898. Furthermore:

> **\*14** The assistance must be provided in good faith and in the best interests of the inmate. "For example, an assistant ... who is requested to interview a group of prisoners too numerous to interview must attempt to determine independently who the most relevant witnesses might be and to interview them.

Id. "[A]n assigned assistant who does nothing to assist a disabled prisoner—one who is segregated from the general prison population—has failed to accord the prisoner his limited constitutional due process right of assistance." Id.

The proposed Amended Complaint plausibly alleges that before the hearing, Plaintiff's staff inmate assistant declined to interview witnesses or retrieve documents, and that at the hearing, Gutwine denied Plaintiff's requests to call witnesses. Am. Compl. at 71, ¶¶ 122(B)–124. Neither defendant offered any legitimate reason for their decisions. Id. Thus, Plaintiff appears to state a claim that the inmate assistant (who is not identified) and Gutwine prevented Plaintiff from marshaling witnesses and evidence in his defense and did so without justification.

Nevertheless, Plaintiff's due process claims may face another hurdle. It is "inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial." Powell v. Coughlin, 953 F.2d 744, 750 (2d Cir. 1991). Since it is not clear from the Proposed Amended Complaint why any of the requested documents or witnesses were relevant to Plaintiff's case, the Court cannot determine whether Gutwine may have acquitted Plaintiff if he had been allowed to present the evidence he requested. Still, it appears reasonably likely that Plaintiff will be able to clarify the relevance of the suppressed evidence and witnesses in his revised Amended Complaint. Therefore, Court will allow him to attempt to replead his due process claim against Gutwine and the inmate assistant in his revised amended complaint.

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 372 of 482

White v. Marinelli, Not Reported in Fed. Supp. (2019)

That said, the Court expresses no opinion on whether Plaintiff's present allegations, which do not show prejudice, state a due process claim. It may indeed be sufficient for Plaintiff to plead what he already does: that the staff assistant and Gutwine prevented Plaintiff from presenting the requested witnesses and evidence and did so without justification. See Chavis v. Zodlow, 128 F. App'x 800, 805 (2d Cir. 2005) (denying pre-Twombly motion to dismiss because prisoner was denied opportunity to call witnesses; not requiring prisoner to plead prejudice). In other words, it is possible that "harmless error" is an affirmative defense; if so, it would be incumbent on prison officials to show it "clear from the face of the complaint and matters of which the court may take judicial notice" that any such errors were harmless. Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 (2d Cir. 2014) (describing standard for dismissal based on affirmative defense). Indeed, in an appeal from or collateral attack on a criminal conviction, the state has the burden to show that any constitutional error was harmless. Lainfiesta v. Artuz, 253 F.3d 151, 158 (2d Cir. 2001) (holding that "[w]hen evaluating presumptively correct convictions on collateral *habeas* review" [t]he burden of persuasion is on the government" to show "harmless error"); Chapman v. California, 386 U.S. 18, 24 (1967) (holding that on direct review of a criminal conviction the state must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.").

**\*15** On the other hand, to show that the state unconstitutionally suppressed evidence in the first place, even a criminal defendant must show that the suppression "deprive[d] [him] of a fair trial." United States v. Bagley, 473 U.S. 667, 674 (1985). Therefore, he must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433 (1995). Likewise, a criminal defendant alleging his attorney was unconstitutionally inadequate must show that "any deficiencies in counsel's performance [were] prejudicial to the defense," meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 691–92 (1984). Accordingly, the Court's tentative view is that to state a due process claim based on the suppression of witnesses or evidence at his disciplinary hearing, Plaintiff must plead facts showing that the evidence and testimony the hearing officer suppressed,

or that his inmate assistant failed to marshal, would have been reasonably likely to change the outcome of the hearing. Accord Sawyer v. Prack, No. 14-CV-1198, 2016 WL 5440596, at \*12 (N.D.N.Y. July 29, 2016), adopted, No. 14-CV-1198, 2016 WL 5415790 (N.D.N.Y. Sept. 28, 2016) (dismissing due process claim because Plaintiff failed to "demonstrate prejudice and non-harmless error from a disciplinary hearing officer's refusal to ask that potential witness to participate in the hearing"); Hinton v. Prack, No. 12-CV-1844, 2014 WL 4627120, at \*12 (N.D.N.Y. Sept. 11, 2014) (dismissing due process claim based on unexplained denial of witnesses "because Plaintiff failed to allege, in any fashion, how he was prejudiced").

The issue of who must show prejudice (or lack thereof) will be moot, and the due process claims will survive, if Plaintiff explains more clearly in his revised amended complaint why the suppressed evidence could have changed the outcome of his disciplinary hearing. Therefore, the Court will not decide now whether Plaintiff must plead prejudice to state a viable claim that the hearing officer's exclusion of witnesses and documents violated the Due Process Clause. It will assess such claims based on any allegations supporting them in any revised amended complaint.

*5. Access-to-Courts Claim Against Bernier*

Plaintiff's "access to courts" claim against Bernier concerns video footage of Plaintiff's disciplinary hearing, including the "off-the-record" conversation with Gutwine. Plaintiff alleges that he requested copies of the video footage to support his petition for judicial review of the hearing outcome under Article 78 of the New York Civil Practice Law and Rules, but that Bernier withheld that footage, Obj. at 13; Am. Compl. at 88, ¶ 136. The state court ultimately denied Plaintiff's petition, stating that it "did not find that petitioner['s] claims that he was denied the right to call witnesses and present documentary evidence demonstrated a violation of his due process rights." Id. ¶ 136(D).

The Constitution guarantees prisoners "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." Lewis v. Casey, 518 U.S. 343, 351 (1996). To establish a constitutional claim for denying access to the courts, a plaintiff must show that the defendant acted deliberately and maliciously, Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003), and "hindered" the plaintiff's efforts to pursue a "non-frivolous" legal claim,

2016 WL 632546
United States District Court, N.D. New York.

Elena M. RIZZO, Plaintiff,

v.

HEALTH RESEARCH, INC., Defendant.

1:12-CV-1397
|
Signed 02/16/2016

**Attorneys and Law Firms**

RONALD J. KIM, ESQ., LAW OFFICES OF RONALD J. KIM, P.C., Counsel for Plaintiff, P.O. Box 318, Saratoga Springs, NY 12866.

CHRISTOPHER M. McDONALD, ESQ., HEATHER D. DIDDEL, ESQ., ROBERT S. ROSBOROUGH, IV, ESQ., WHITEMAN, OSTERMAN & HANNA, LLP, Counsel for Defendant, One Commerce Plaza, Suite 1900, Albany, NY 12260.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this employment discrimination action filed by Elena Rizzo ("Plaintiff") against Health Research, Inc. ("HRI" or "Defendant"), are Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 38) and Plaintiff's cross-motion to strike certain affidavits and exhibits filed in support of Defendant's motion, pursuant to Fed. R. Civ. P. 37 (Dkt. No. 58.) For the reasons set forth below, Defendant's motion for summary judgment is granted, and Plaintiff's cross-motion is denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Amended Complaint**

Plaintiff's Amended Complaint asserts the following five claims: (1) a claim that Plaintiff suffered continued discrimination and retaliation due to her FMLA sanctioned leave that was so severe that she was constructively discharged by Defendant; (2) a claim for retaliatory discharge under the FMLA, 29 U.S.C. § 2615; (3) a claim for interference with Plaintiff's rights under the FMLA, 29 U.S.C.

§ 2615; (4) a claim for discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA") and the New York State Human Rights Law ("NYSHRL"); and (5) a claim for retaliation on the basis of disability in violation of the ADA and NYSHRL. (Dkt. No. 16, ¶¶ 46-81 [Pl.'s Am. Compl.].)

**B. Defendant's Motion for Summary Judgment**

Defendant has moved for summary judgment to dismiss Plaintiff's Amended Complaint in its entirety. (Dkt. No. 38.) In support of its motion, Defendant argues that Plaintiff cannot establish a prima case of retaliation under the FMLA, ADA, and NYSHRL for the following six reasons: (1) Plaintiff was not constructively discharged; (2) Plaintiff was never stripped of any job titles or barred from attending unit manager meetings after she returned from FMLA leave because she requested and was granted a transfer to a new supervisor with different responsibilities; (3) none of HRI's employment actions were materially adverse; (4) none of the allegedly adverse employment actions occurred under circumstances giving rise to an inference of retaliation; (5) legitimate, non-retaliatory reasons existed for all of the allegedly adverse employment actions; and (6) the end of grant funding for Plaintiff's position is not a pretext for retaliation. (Dkt. No. 40, at 6-22 [Def.'s Mem. of Law].)

With respect to Plaintiff's FMLA interference claim, Defendant argues that this claim should be dismissed because HRI did not deny Plaintiff any benefits to which she was entitled by the FMLA. (*Id.* at 22-23.)

Finally, with respect to Plaintiff's ADA and NYSHRL disability discrimination claims, Defendant argues that these claims should be dismissed for the following three reasons: (1) there is no admissible record evidence establishing that Plaintiff requested and was denied an accommodation; (2) Plaintiff has not identified any ways in which she was treated differently from other similarly situated employees; and (3) Plaintiff cannot establish a hostile work environment based on her disability. (*Id.* at 24-25.)

**C. Plaintiff's Cross-Motion to Strike**

**\*2** Plaintiff's cross-motion requests an Order striking the affidavits of the following affiants, filed in support of Defendant's motion for summary judgment: (1) Debra Blog, (2) Bryan Cherry, (3) Kimberly Kilby, (4) Deena Reyes, (5) Michael Saglimbeni, and (6) Shelley Zansky. (Dkt. No. 59, at 1 [Pl.'s Mem. of Law].) In addition, Plaintiff's cross-motion

2016 Wage & Hour Cas.2d (BNA) 43,794

requests an Order striking Exhibits A, I, and K, which were filed as exhibits to the Kuhles Affidavit. (*Id.*) In support of this motion, Plaintiff argues that Defendant never disclosed the identity of these six affiants or three exhibits in response to discovery requests. (*Id.*)

### D. Statement of Material Facts

### 1. Plaintiff's Failure to Comply with N.D.N.Y. Local Rule 7.1

Before reciting the material facts of this case, the Court must address Plaintiff's response to Defendant's Rule 7.1 Statement of Material Facts. Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires a party moving for summary judgment to submit a statement of material facts supported by specific citations to the record where those facts are established. N.D.N.Y. L.R. 7.1(a)(3). The non-moving party's subsequent response must mirror the moving party's statement of material facts by (1) admitting and/or denying each of the moving party's factual assertions in matching numbered paragraphs and (2) supporting any denials with specific citations to the record where the factual issues arise. *Id.* Importantly, "[t]he Court shall deem admitted any properly supported facts set forth in the [moving party's] Statement of Material Facts that the [non-moving] party does not specifically controvert." *Id.*

This Court's "Local Rule requirements are not empty formalities." *Bombard v. Gen. Motors Corp.*, 238 F. Supp. 2d 464, 467 (N.D.N.Y. 2002) (Munson, J.) (stating that "[t]he courts of the Northern District have adhered to a strict application of Local Rule 7.1[a][3]'s requirement on summary judgment motions"); *accord, Cross v. Potter*, 09-CV-1293, 2013 WL 1149525, at *3 (N.D.N.Y. Mar. 19, 2013) (McAvoy, J.). Indeed, the underlying purpose of this rule "is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment." *Youngblood v. Glasser*, 10-CV-1430, 2012 WL 4051846, at *4 (N.D.N.Y. Aug. 22, 2012) (Peebles, M.J.); *see also* N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 649 (2d Cir. 2005) (noting that "Rules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties' ")

(quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 [2d Cir. 2001]). This purpose is especially important here, where the record on Defendant's motion exceeds 1500 pages in length.

In the present case, Plaintiff has largely failed to respond appropriately to Defendant's Rule 7.1 Statement of Material Facts. Specifically, Plaintiff claims to deny 136 of the 216 paragraphs of HRI's Rule 7.1 Statement. (*See generally* Dkt. No. 57 [Pl.'s Rule 7.1 Response].) Of these 136 denials, 117 denials do not contain a specific citation to the record.[1] Therefore, the facts "denied" by these paragraphs will be deemed admitted. *See* Aktas v. JMC Dev. Co., Inc., 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with Local Rule 7.1[a][3]); Archie Comic Publ'ns, Inc. v. DeCarlo, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiff's Rule 56.1 statement but declined to provide record citations in support); N.Y. Teamsters, 426 F.3d at 648-49 (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations").

**\*3** With respect to the remaining 19 of these 136 denials, Plaintiff "admits" various of the material facts stated in two of the paragraphs 85 and 96–notwithstanding their inclusion of additional facts or legal argument in those responses. The various facts at issue will therefore be deemed admitted. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit' "); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed' "). With regard to 13 of the 17 remaining denials, Plaintiff provides appropriate record citation following the denials; however, the cited evidence does not *support* those denials.[2] Accordingly, the facts

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 375 of 482

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 43,794

asserted in these 13 paragraphs will be deemed admitted.

*See* 🚩 *Holtz*, 258 F.3d at 73-74 (noting that, "where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion").

The Court further notes that 21 of Plaintiff's 136 denials will be deemed admitted on the additional basis that she makes editorial comments and legal arguments that are non-responsive.[3] *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials ... improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").[4] Similarly, for 118 of Plaintiff's 136 denials, Plaintiff asserts that these facts should be disregarded because they rely on inadmissible evidence.[5] A denial based upon "inadmissible evidence," without more, is insufficient to object to a material fact under this Court's Local Rules. Rather, Fed. R. Civ. P. 56 requires merely that the material contained in the exhibits "*can* [ ] *be* presented in a form that *would be* admissible in evidence [at trial]." Fed. R. Civ. P. 56(c)(2) (emphasis added). In any event, as discussed below in Point III.A. of this Decision and Order, the Court finds that the affidavits proffered by Defendant in support of each statement challenged in this fashion are admissible.

In sum, after carefully reviewing the parties' respective Rule 7.1 Statements, the Court finds that the material facts contained in Defendant's Statement are supported by the record and that only the material facts contained in the following four paragraphs have been properly refuted by Plaintiff: ¶¶ 35, 120, 188-86.

### 2. Undisputed Material Facts

**\*4** Plaintiff was hired by HRI in 2002 to work at the Bureau of Communicable Disease Control ("BCDC" or the "Bureau") as a Program Research Specialist II, Grade 18. (Dkt. No. 39, ¶ 19 [Def.'s Rule 7.1 Statement].) During the course of her employment, Plaintiff was promoted

twice and, at the time of her layoff, held the position of Associate Program Research Specialist, Grade 25. (*Id.*, ¶¶ 26, 31.) Plaintiff's employment with BCDC was terminated on October 31, 2012, when the funding provided by the Center for Disease Control and Prevention ("CDC") for her position ended. (*Id.*, ¶ 211.)

### HRI & BCDC

HRI is a private not-for-profit corporation incorporated in New York State and is a grants administrator. (*Id.*, ¶¶ 1-2.) Its mission is primarily to support and enhance the ability of the New York State Department of Health ("DOH") and the Roswell Park Cancer Institute Corporation ("Roswell") in undertaking public health ventures and initiatives. (*Id.*, ¶ 2.) DOH is a state agency tasked with, among other things, promoting and supervising public health activities throughout New York State and reducing infectious diseases such as food and waterborne illnesses, hepatitis, HIV, meningitis, sexually transmitted diseases, tuberculosis, and chronic disabling illnesses such as heart disease, cancer, stroke, and respiratory diseases. (*Id.*, ¶ 10.) As part of its mission, DOH works with the State's health care community to ensure appropriate readiness and response to potential health threats, including providing emergency triage services to contain and treat infectious diseases. (*Id.*, ¶ 11.)

The BCDC is a bureau within the DOH for Community Health, Division of Epidemiology. (*Id.*, ¶ 12.) Some BCDC programs are funded by competitive grants from the CDC, lasting between three and five years each. (*Id.*, ¶ 14.) As noted above, Plaintiff's position was a grant-funded position and she understood that the position could end if grant funding ceased. (*Id.*, ¶ 20.) As a Program Research Specialist II, Plaintiff was responsible for surveillance of Hepatitis A, B, and C, which entailed development of detailed reporting protocols, management of databases, evaluation of the quality of data, and assessment of the effectiveness of the surveillance systems. (*Id.*, ¶ 22.)

### Re-structuring of BCDC

During Plaintiff's employment, the BCDC leadership and programs were in a constant state of change. (*Id.*, ¶ 37.) Plaintiff was supervised by four different Bureau directors within a span of ten years while employed by HRI. (*Id.*, ¶ 38.) In late 2008, the BCDC, which contained six programs

Case 9:21-cv-00901-DNH-ML Document 152 Filed 07/20/23 Page 376 of 482

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 43,794

at the time, was split into three separate bureaus. (*Id.*, ¶ 39.) As a result of this restructuring, the BCDC was left severely understaffed with reduced funding. (*Id.*, ¶¶ 41-42.) In early 2009, Dr. Kimberly Kilby, the new Bureau Director, was tasked with reorganizing BCDC and streamlining operations to respond more efficiently to the CDC's changing grant deliverables. (*Id.*, ¶ 45.) For example, Dr. Kilby created the Data Management Unit to coordinate surveillance of all communicable diseases tracked by BCDC, including the hepatitis surveillance program on which Plaintiff worked. (*Id.*, ¶ 47.) Dr. Bryan Cherry was the director of the Data Management Unit and supervised Plaintiff. (*Id.*, ¶ 48.)

Dr. Kilby also implemented cross-training initiatives, which involved training of epidemiological staff to address public health issues relating to all communicable disease program areas, not merely the area in which they had particular expertise. (*Id.*, ¶ 50.) This included establishing phone coverage rotations called epidemiologist of the day ("EOD") and rabies consultant of the day ("ROD"). (*Id.*, ¶ 51.) Under these rotations, epidemiological staff members, including Plaintiff, were assigned to answer consult calls from labs and local health departments on a rotating weekly basis. (*Id.*) Dr. Kilby and Dr. Cherry asked all epidemiological staff to step out of their comfort zones and contribute in areas that may not have been directly related to the grants on which they were funded because BCDC was so severely understaffed. (*Id.*, ¶ 52.) Accordingly, Plaintiff was asked to spend approximately 10% to 20% of her time assisting with the EOD, ROD, and other matters that were not necessarily related to hepatitis surveillance. (*Id.*, ¶ 53.)

### Plaintiff's Dissatisfaction with Non-Hepatitis Related Work

**\*5** By early 2010, Plaintiff began to express frustration with having to perform non-grant-related work for the Bureau because she felt it was not part of her job. (*Id.*, ¶¶ 54, 67.) In June 2010, Plaintiff requested a "temporary reprieve" from non-hepatitis related work so that she could work on the upcoming hepatitis grant renewal. (*Id.*, ¶ 73.) Dr. Kilby and Dr. Cherry accommodated Plaintiff's request to the extent that they could and agreed to reduce Plaintiff's rotation on EOD to once every three weeks and agreed to remove her from the ROD rotation altogether. (*Id.*, ¶ 74.) However, in an e-mail written by Dr. Cherry on July 13, 2010, Dr. Cherry explained to Plaintiff that the Bureau was too understaffed to permit Plaintiff to work only on hepatitis-related programs. (*Id.*, ¶ 75.) He further advised that she was "part of a bureau

where everyone is being asked to step out of their usual role in order to maintain cross training" and it was part of her job to perform work for program areas other than hepatitis. (*Id.*) Dr. Cherry also assured Plaintiff that her opinions concerning hepatitis surveillance were considered when the Bureau leadership made decisions concerning the hepatitis program, but advised her that the decisions did not rest solely on her input. (*Id.*, ¶ 76.) Nonetheless, Dr. Cherry expressed concern that Plaintiff was dissatisfied with her work and that her dissatisfaction was negatively impacting her attitude toward other employees. (*Id.*, ¶ 77.)

On July 21, 2010, Plaintiff wrote a rebuttal to Dr. Cherry's e-mail of July 13, 2010, for her own records claiming that she felt retaliated against because she "asked for relief of some of [her] non-hepatitis responsibilities." (*Id.*, ¶ 78.) Plaintiff also expressed continued frustration with the "management style" of her supervisors and the "change in the office environment over the past several months." (*Id.*) Plaintiff did not attribute any of her supervisors' actions to any actual or perceived disability she may have had. (*Id.*)

### Plaintiff's First FMLA Request

Under HRI's FMLA Leave Policy, eligible employees are entitled to up to 12 weeks of leave in a 12-month period for, among other things, a "serious health condition" that makes it impossible to perform essential job functions. (*Id.*, ¶ 79.) The form used by HRI for a FMLA leave request was developed by the Equal Employment Opportunity Commission ("EEOC"). (*Id.*, ¶ 80.) The form does not reveal anything about an employee's health condition, but merely seeks acknowledgment from the employee's supervisor indicating that the supervisor was made aware that the employee is seeking FMLA leave. (*Id.*) HRI's Human Resources Department reviews and finally determines all FMLA requests. (*Id.*, ¶ 82.) HRI's FMLA Leave Policy further provides that an employee returning from approved FMLA leave "will be restored to the same position or to a position with the same benefits, pay, and other terms and conditions of employment." (*Id.*, ¶ 83.) However, the policy also states that "FMLA leave will not extend to a period of appointment beyond the date the employment would otherwise terminate. If the position held by an employee on FMLA leave is terminated while the employee is on leave, the leave will terminate on the date that the position is terminated." (*Id.*, ¶ 84.)

2016 Wage & Hour Cas.2d (BNA) 43,794

In 2010, Plaintiff was diagnosed with Major Depressive Disorder, a medical condition rendering her intermittently disabled. (*Id.*, ¶ 32.) On the morning of August 4, 2010, Plaintiff requested that Dr. Cherry, as her supervisor, sign the FMLA leave acknowledgment form indicating that she was applying for FMLA leave. (*Id.*, ¶ 85.) Dr. Cherry was unfamiliar with the form and HRI's FMLA leave policy and sought clarification from Lori Hallenbeck, the BCDC office administrator. (*Id.*, ¶ 86.) After being advised that all he had to do was sign the form acknowledging Plaintiff's request, Dr. Cherry did so, and neither he nor Dr. Kilby was involved in Plaintiff's leave determination, which was handled by human resources. (*Id.*, ¶¶ 87-88.)

### The Fox Incident

Later on the same day that Plaintiff presented Dr. Cherry with her FMLA form, Plaintiff received a phone call while at work from a wildlife rehabilitator, Wendy Hall, whom she knew outside of work. (*Id.*, ¶ 89.) Ms. Hall was distraught regarding the impending euthanasia of a fox in her care as a result of a potential rabies exposure to a child. (*Id.*) Plaintiff, who had obtained a wildlife rehabilitation permit from the New York State Department of Environmental Conservation in January 2010, using Dr. Cherry as a character reference, was active in the North Country Wild Care, a local animal rehabilitation organization, as a volunteer wildlife rehabilitator. (*Id.*, ¶ 90.) Plaintiff immediately spoke with Dr. Cherry (who was also the New York State Veterinarian at the time) about the situation and relayed the information that Ms. Hall had told her. (*Id.*, ¶ 91.) Dr. Cherry advised Plaintiff that, as long as there was no evidence that the child had been bitten, he did not see any need to euthanize the fox. (*Id.*) Thereafter, Dr. Cherry spoke with the Saratoga County Local Health Department and received information indicating that the fox did in fact bite the child; Dr. Cherry agreed that the fox should be euthanized and its brain sent for rabies testing. (*Id.*, ¶ 92.)

 **\*6** Plaintiff confronted Dr. Cherry in the hallway outside of his office and challenged his decision, claiming that Dr. Cherry knew that the fox did not have rabies. (*Id.*, ¶ 93.) Plaintiff began crying and criticized Dr. Cherry's decision, calling it "disgusting." (*Id.*, ¶ 94.) Plaintiff then returned to her office and continued crying and commenting loudly about the situation. (*Id.*) Plaintiff's comments and behavior were witnessed by other staff in the office at the time. (*Id.*)

Dr. Cherry spoke with Dr. Kilby about Plaintiff's behavior and they agreed that Dr. Cherry showed extremely poor judgment and an inability to keep her outside involvement in wildlife rehabilitation from interfering with the performance of her work. (*Id.*, ¶ 95.) Dr. Kilby sought advice in handling the situation from, among others, (1) Ms. Hallenbeck in Human Resources, (2) Marybeth Fader, the administrator for the Division, (3) Ellen Anderson, the Director of the Center for Community Health, and (4) Dr. Perry Smith, the Director of the Division. (*Id.*, ¶ 96.) HRI Human Resources decided that Plaintiff should be counseled about her unprofessional behavior and required that Plaintiff submit an outside employment request to HRI for approval of her continued involvement with wildlife rehabilitation services. (*Id.*, ¶ 97.) Between August 5 and 6, 2010, Dr. Cherry drafted a counseling memo for Plaintiff and received comments on it from Ms. Hallenbeck and Ms. Fader. (*Id.*, ¶ 98.) On August 6, 2010, Plaintiff spoke about the fox incident with Ms. Fader and Dr. Anderson. (*Id.*, ¶ 99.) During that meeting, Plaintiff requested that she no longer be supervised by Dr. Cherry and Ms. Fader, and Dr. Anderson indicated that they would try to accommodate her request. (*Id.*)

Later that day, Ms. Fader and Dr. Cherry conducted a formal counseling session with Plaintiff regarding her behavior in the office on August 4, 2010. (*Id.*, ¶ 100.) Dr. Cherry explained to Plaintiff that her behavior was disrespectful and unprofessional. (*Id.*, ¶ 101.) He further explained that "your outside activities related to wildlife rehabilitation do not in any way give you authority or responsibility, as an HRI employee in this department, to become involved in matters with external entities regarding wildlife and potential rabies exposure." (*Id.*) Dr. Cherry and Ms. Fader explained to Plaintiff that the counseling session was not discipline, but was conducted for training purposes and was intended to prompt Plaintiff to change her behavior. (*Id.*, ¶ 103.) Plaintiff was very upset and emotional during the meeting and reacted in a hostile manner toward Dr. Cherry and Ms. Fader. (*Id.*, ¶ 101.) Plaintiff believes that the fox incident as well as the subsequent counseling session occurred in retaliation for her request for a reprieve from non-hepatitis related duties. (*Id.*, ¶ 109.)

Dr. Cherry and Ms. Fader did not provide Plaintiff with the counseling memo at the conclusion of their meeting because they wanted to amend it to reflect what was discussed in the meeting. (*Id.*, ¶ 105.) However, Dr. Cherry was unable to provide Plaintiff with a copy of the memo because she advised Dr. Cherry that her doctor had instructed her to stay

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 378 of 482

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)
2016 Wage & Hour Cas.2d (BNA) 43,794

home the following week. (*Id.*, ¶ 106.) HRI subsequently granted Plaintiff's request for intermittent FMLA leave in its entirety. (*Id.*, ¶ 107.) Plaintiff remained on FMLA leave until September 13, 2010. (*Id.*, ¶ 108.)

Plaintiff's Request for New Supervision

Following Plaintiff's request for a new supervisor, it was decided that, upon Plaintiff's return from FMLA leave, Plaintiff would be supervised by Dr. Shelley Zansky in the Emerging Infections Program ("EIP"). (*Id.*, ¶ 110.) Because Plaintiff also did not want to remain in the same office with Dr. Cherry, HRI decided to physically relocate Plaintiff's office from the Data Management Unit to the EIP where Dr. Zansky's office was located. (*Id.*, ¶ 111.) In addition, Dr. Kilby also granted Plaintiff's request to be taken off the EOD rotation. (*Id.*, ¶ 112.) Although all other epidemiological staff would continue to participate in the rotation, Plaintiff was consulted only when she was in the office and when the issue required involvement of someone with her expertise. (*Id.*) This new arrangement accommodated Plaintiff's desire to focus only on her grant deliverables as she previously requested. (*Id.*, ¶ 113.)

Plaintiff's Subsequent FMLA Leave

**\*7** Between January 1, 2011, and June 30, 2011, Plaintiff requested, and HRI granted her, intermittent FMLA leave. (*Id.*, ¶ 123.) Plaintiff's leave during this time period was between a few hours and two days at a time. (*Id.*) On June 30, 2011, Plaintiff began a continuous FMLA leave, which concluded on August 2, 2011. (*Id.*, ¶ 124.) Although Plaintiff remained out of work until August 20, 2011, the rest of Plaintiff's leave was not considered as FMLA leave because she had exceeded the 12-week statutory maximum. (*Id.*) Nevertheless, Plaintiff was permitted to take all the time that she needed until she was medically cleared to return to work. (*Id.*)

Dr. Daniel Kuhles Becomes New BCDC Director

In July 2011, Dr. Kuhles became the Director of BCDC. (*Id.*, ¶ 125.) Dr. Kuhles came to BCDC/DOH from a local health department, and thus had a unique perspective on how the Bureau should respond to the challenges that local health departments face in the field. (*Id.*, ¶ 126.) Dr. Kuhles sought to

centralize the decision-making relative to the activities of the various programs within the Bureau. (*Id.*, ¶ 128.) To that end, he instructed all staff members, including Plaintiff, to consult with their direct supervisors and himself for any requests that would be made to entities outside of BCDC. (*Id.*)

In early September 2011, the CDC announced that hepatitis would no longer be part of the EIP competitive renewal and that hepatitis surveillance was being taken off the EIP grant. (*Id.*, ¶ 129.) The CDC also announced that there would be a cooperative agreement that would provide hepatitis surveillance funding for the first 10 months of 2012 ("bridge funding"), at which time BCDC would have to apply for a new competitive grant. (*Id.*, ¶ 129.) Dr. Kuhles had a particular interest in hepatitis surveillance and encouraged Plaintiff, who had typically written grant applications on her own without assistance from other BCDC staff, to work cooperatively as a member of a team to apply for the bridge funding. (*Id.*, ¶ 130.) Because Plaintiff was not used to having to go through supervisors to contact other entities, she had a difficult time adjusting to Dr. Kuhles' change of approach. (*Id.*, ¶ 132.) For example, Plaintiff repeatedly requested that the Director of the Statistical Unit in the Division of Epidemiology make certain changes to data surveillance systems to suit her needs without first consulting Dr. Kuhles or Dr. Deborah Blog. (*Id.*, ¶ 133.) Dr. Kuhles repeatedly advised Plaintiff that her requests to other Bureaus or to Divisions within DOH should be discussed internally before they were made. (*Id.*, ¶ 134.) Plaintiff, nonetheless, continued to prioritize her own needs without considering the overreaching needs of the Bureau. (*Id.*)

According to Dr. Kuhles, Plaintiff demonstrated a continuous pattern of acting outside of her purview and failing to appreciate and have insight into other department priorities and relationships. (*Id.*, ¶ 135.) Plaintiff also had significant difficulty working cooperatively with her colleagues at the BCDC, as Dr. Kuhles had requested. (*Id.*, ¶ 136.) For example, BCDC surveillance officers Ms. Knickerbocker, Ms. Kufel, and Ms. Mulhern complained that Plaintiff ruled with an iron fist and on several occasions instructed them not to answer hepatitis-related questions without consulting with her first, even if she was out of the office on leave or on vacation. (*Id.*, ¶ 137.) After several similar complaints were made, Dr. Kuhles brought the concerns of the BCDC staff to Dr. Blog, and they decided that it was no longer appropriate to have Plaintiff supervise staff within the Bureau and the regional offices. (*Id.*, ¶ 140.)

Complaints Concerning Dr. Kuhles' Supervision

**\*8** On May 9, 2012, Plaintiff met with Dr. Blog to discuss her work with Dr. Kuhles and the significant re-structuring of the Bureau that was occurring under his supervision. (*Id.*, ¶ 147.) Plaintiff complained that, because of the re-structuring implemented by Dr. Kuhles, "there was no one working on hepatitis surveillance that was paid on hepatitis surveillance and a lot of the day-to-day activities had ceased." (*Id.*, ¶ 148.) Plaintiff also complained that the employees she had previously supervised had been reassigned. (*Id.*) Plaintiff further alleged that Dr. Kuhles had been "bullying" and "harassing" Plaintiff because he was demanding, and that he imposed strict deadlines, became agitated at times, made changes to the hepatitis program allegedly without informing Dr. Zansky or Dr. Blog, restructured the communications protocol for communications with outside Bureaus, Divisions, and local health departments, often changed his mind, and was rude in meetings. (*Id.*, ¶ 149.) However, Plaintiff did not at any time claim that Dr. Kuhles' actions were in retaliation for Plaintiff's FMLA leave or disability. (*Id.*, ¶ 150.) Rather, Plaintiff attributed Dr. Kuhles' actions toward her as a result of her prior tensions with Dr. Cherry and Dr. Kilby, which Plaintiff stated began when she asked for a temporary reprieve from non-grant work. (*Id.*, ¶ 151.)

Thereafter, on May 17, 2012, Plaintiff met with HRI Human Resources representatives to complain about Dr. Kuhles' supervision. (*Id.*, ¶¶ 152-53.) Plaintiff complained that Dr. Kuhles was harassing her and that his restructuring of the Bureau had changed her job duties, which she claimed violated the current hepatitis grant deliverables. (*Id.*, ¶¶ 154-55.) Ms. Bailey, who was one of the representatives with whom Plaintiff met, concluded that no illegal harassment had occurred and that Dr. Kuhles was merely a demanding supervisor. (*Id.*, ¶ 154.) Ms. Bailey and Ms. Tamayo investigated Plaintiff's allegations of harassment further by meeting with Dr. Zansky on May 25, 2012. (*Id.*, ¶ 157.) Dr. Zansky confirmed that Dr. Kuhles had not harassed Plaintiff and was just a demanding supervisor for all of his employees. (*Id.*) In fact, many employees, including Dr. Zansky, complained about Dr. Kuhles' management style to Dr. Blog. (*Id.*, ¶ 160.) Dr. Zansky informed Dr. Blog that, if Dr. Kuhles' unreasonable demands and interference in EIP did not end, she would be forced to retire. (*Id.*). Similarly, Dr. Reena Reyes, who worked as an epidemiologist in the Investigations Unit in BCDC, witnessed Dr. Kuhles berating other BCDC employees in meetings that sometimes brought them to tears, harshly criticized their work, and micromanaged their assignments. (*Id.*, ¶¶ 162, 164.) Dr. Reyes never took FMLA leave and does not have a disability; however, Dr. Kuhles was similarly demanding towards her. (*Id.*, ¶ 163.) Dr. Reyes eventually left BCDC because she could no longer work for Dr. Kuhles. (*Id.*, ¶ 165.)

May 2012 CDC Site Visit

On or around March 20, 2012, a representative from CDC contacted Plaintiff regarding a possible site visit by CDC to conduct a "lessons learned" review relating to hepatitis surveillance and prevention in New York. (*Id.*, ¶ 167.) Plaintiff passed this information along to Dr. Zansky and Dr. Kuhles. (*Id.*) Staff at BCDC viewed the site visit ahead of the expected funding opportunity announcement ("FOA") as an opportunity to impress CDC with BCDC's accomplishments during the prior funding periods and remain competitive for the new funding. (*Id.*, ¶ 168.) Following subsequent discussion with the CDC, the site visit was scheduled for May 21-22, 2012, and an agenda was developed by mutual agreement between the CDC and DOH. (*Id.*, ¶ 169.)

Dr. Kuhles initially asked Plaintiff to give a presentation on Quality Improvement/Performance Management ("QI") during the CDC site visit. (*Id.*, ¶ 170.) However, Plaintiff did not feel comfortable presenting on QI because she felt that she did not know the topic very well. (*Id.*, ¶ 171.) On May 14, 2012, Plaintiff requested, through Dr. Zansky, that someone else be chosen to present on QI at the CDC site visit, and Dr. Kuhles accommodated her request. (*Id.*, ¶ 172.) Dr. Kuhles decided that Plaintiff should prepare a 30-45 minute presentation using the Strengths, Weaknesses, Opportunities, and Threats ("SWOT") analysis, on the future of hepatitis and public health, a topic on which Dr. Kuhles believed Plaintiff was particularly suited to present given her 10 years of experience in the field. (*Id.*, ¶ 173.)

**\*9** Plaintiff's presentation was scheduled to occur on the afternoon of Tuesday, May 22, 2012. (*Id.*, ¶ 174.) However, due to delays in preparing the presentation, Dr. Zansky determined that Plaintiff's final draft was too "scattered" to present without substantial revisions. (*Id.*, ¶¶ 175-78.) Therefore, Plaintiff did not present at the CDC site visit because she was not able to complete the presentation in a form that would have reflected positively on the Bureau

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 43,794

before the CDC. (*Id.*, ¶ 179.) Instead, Plaintiff joined the CDC site visit. (*Id.*)

June 2012 CSTE Conference in Nebraska

In March 2012, Plaintiff was invited to attend a conference of the Council of State and Territorial Epidemiologists ("CSTE") scheduled for June 3-7, 2012, in Omaha, Nebraska, during which there would be a special meeting to "summarize lessons learned from hepatitis surveillance activities in EIP, collection of specimens, and novel applications of surveillance data for targeting and evaluation prevention." (*Id.*, ¶ 180.) Although the special meeting was related to Plaintiff's field of work, attending the conference was not one of the deliverables of the hepatitis surveillance grant. (*Id.*)

On or about March 23, 2012, Plaintiff sought permission to attend the CSTE conference. (*Id.*, ¶ 181.) Dr. Zansky and a number of other individuals working in EIP also submitted requests to attend the CSTE conference. (*Id.*, ¶ 182.) All of these requests were sent to Dr. Kuhles, who in turn forwarded them to Dr. Blog, who then forwarded them to her supervisors for a decision. (*Id.*) Initially, all of the requests were denied because Governor Cuomo had issued a "no travel" policy that prohibited unnecessary travel for state employees due to funding. (*Id.*, ¶ 183.) However, Dr. Zansky's request was ultimately approved because she was required to attend the conference as a supervisor of a CSTE graduate fellow pursuant to the fellowship requirements. (*Id.*, ¶ 184.) Dr. Blog and Dr. Cherry also attended the conference due to their respective positions as State Epidemiologist and State Veterinarian and their presence was required. (*Id.*) Plaintiff's request was initially denied; however, there is conflicting evidence regarding whether her request was subsequently approved. (*Id.*, ¶ 185.) Nonetheless, Plaintiff was required to attend a QI leadership training in Albany, New York, which was scheduled to take place during the latter part of the CSTE conference. (*Id.*, ¶ 185-86.) Accordingly, if Plaintiff was allowed to attend the CSTE conference, she would have had to leave in time to attend the QI leadership training. (*Id.*, ¶ 185.) It is undisputed that Plaintiff never attended the CSTE conference. (*Id.*, ¶ 186.)

2012 CDC Hepatitis Grant and the
End of Funding for Plaintiff's Position

In June 2012, Plaintiff applied for and received permission to take intermittent FMLA leave starting on June 12, 2012. (*Id.*, ¶ 187.) While Plaintiff was out on FMLA leave, BCDC received the FOA for the new CDC grant funding for hepatitis prevention and surveillance. (*Id.*, ¶ 188.) The FOA included a hepatitis prevention component, and had designed the enhanced hepatitis surveillance work on the new grant to serve its prevention efforts. (*Id.*, ¶ 189.) The FOA also indicated that the CDC intended to award only 5 to 10 grants for hepatitis surveillance nationwide. (*Id.*)

BCDC had a shortened period of time to apply for the new available funding and had to compete for the grants not only nationwide but also with the New York City Department of Health and Mental Hygiene. (*Id.*, ¶¶ 190, 192.) The hepatitis grant-related decisions were made by a committee that included DOH Deputy Commissioner Gus Birkhead, CHC Director Brad Hutton, Division Director Dr. Blog, and Dr. Kuhles. (*Id.*, ¶ 191.) The committee fully intended to include Plaintiff in the DOH's response to the FOA when on July 20, 2012, during Plaintiff's FMLA leave, Plaintiff's counsel advised HRI that Plaintiff considered herself constructively discharged. (*Id.*, ¶ 196.) Accordingly, Plaintiff declared that she did not intend to work at BCDC and removed herself from the workforce. (*Id.*, ¶ 198.)

**\*10** As the CDC grant application deadline neared, the committee had to make a decision as to what to do with the funds that had been planned on being budgeted to continue to support Plaintiff on the new grant. (*Id.*, ¶ 199.) However, because the committee was advised that Plaintiff would not be returning to BCDC, the committee decided to budget for a Programmer/Analyst position in order to better demonstrate BCDC's ability to enhance electronic reporting of viral hepatitis data. (*Id.*) Due to the reduced CDC funding and the new design of the hepatitis surveillance program, other employees lost funding for their positions in hepatitis surveillance. (*Id.*, ¶ 201.)

On August 10, 2012, HRI responded to Plaintiff, through counsel, that it was still willing to allow her to return to work if and when she was able to do so at the end of her FMLA leave. (*Id.*, ¶ 203.) HRI gave Plaintiff until August 28, 2012, to notify it of her decision and, if it did not receive a response, it would treat her prior correspondence as a notice of resignation. (*Id.*) Plaintiff received HRI's letter but did not respond. (*Id.*, ¶ 204.) Nonetheless, because HRI received a notice from the Hartford that Plaintiff's disability payments were being extended through November 1, 2012, HRI kept

Plaintiff on its payroll to ensure she had access to health insurance while she was out on FMLA leave. (*Id.*, ¶ 205.)

Pursuant to HRI's collective bargaining agreement with CSEA, Plaintiff, as well as other employees, received rescindable layoff letters dated October 12, 2012, indicating that the prior hepatitis grant funding would end on October 31, 2012, and that their employment would be terminated at that time due to a lack of funding. (*Id.*, ¶ 206.) HRI kept Plaintiff on the payroll until October 31, 2012. (*Id.*, ¶ 211.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2). As the Supreme Court has famously explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movign party. *Anderson*, 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial

burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c), (e). Where the non-movant fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*11**  Finally, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B. Standard Governing a Motion to Strike Evidence

Pursuant to Fed. R. Civ. P. 37(c), "[i]f a party fails to ... identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). "In enforcing these rules, the court may impose sanctions, which where appropriate, include precluding the testimony." *See LaVigna v. State Farm Mut. Auto Ins. Co.*, 736 F. Supp. 2d 504, 510-11 (N.D.N.Y. 2010) (Sharpe, J.) (citing *Patterson v. Balsamico*, 440 F.3d 104, 117 [2d Cir. 2006]).

When considering whether to exclude evidence pursuant to Rule 37, this court must consider (1) the non-disclosing party's explanation for the failure to comply with the Federal

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 43,794

Rules, (2) the importance of the evidence, (3) the prejudice suffered by the opposing party of having to prepare to meet the new evidence, and (4) the possibility of a continuance. *See*

🚩 *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006). Although a finding of the non-disclosing party's bad faith is not required in order to impose sanctions under Rule 37, it is a factor that may be considered as part of the non-disclosing party's explanation for its failure to comply. *See*

🚩 *Design Strategy, Inc.*, 469 F.3d at 296.

## III. ANALYSIS

### A. Whether the Affidavits Filed in Support of Defendant's Motion Should Be Struck [6]

Plaintiff argues that the four *Design Strategy* factors weigh in favor of precluding the six affidavits and three exhibits at issue. (Dkt. No. 59, at 3-6 [Pl.'s Mem. of Law].) First, Plaintiff argues that the failure to disclose these six affiants was not inadvertent because they are high-ranking employees of either HRI or DOH with information relevant to this case. (*Id.* at 4.) Furthermore, Plaintiff argues that HRI's initial disclosure identified only two individuals (other than Plaintiff) who had information HRI would use to support its defenses: Carol Bailey and Daniel Kuhles. (*Id.*)

Second, Plaintiff argues that Defendant has placed great importance on this evidence by relying heavily on it throughout its summary judgment motion. (*Id.* 4-5.)

Third, Plaintiff argues that she would be prejudiced if these individuals are not excluded as witnesses. (*Id.* at 5-6.) Plaintiff concedes that, while she was able to depose Dr. Cherry and Dr. Zansky, the other four individuals were not deposed. (*Id.* at 5.) Notwithstanding these depositions, Plaintiff argues that, had she been given notice that these two individuals were potential witnesses, she could have sought additional discovery, such as information about their employment, could have had the opportunity to question them about their affidavits during depositions. (*Id.*)

*12 Fourth, and finally, Plaintiff argues that a continuance to re-open discovery to cure these issues is not a viable option due to her limited financial resources, the time and effort it has already taken to reach this point in litigation, and the likelihood of having to re-brief her response to Defendant's motion for summary judgment after additional discovery is completed. (*Id.* at 5-6.)

In opposition, Defendant makes five arguments. First, Defendant argues that Plaintiff identified Dr. Cherry and Dr. Zansky in her initial disclosures and stated that she believed they would have information relevant to the circumstances of her employment. (Dkt. No. 63, at 21 [Def.'s Opp'n Mem. of Law].) Furthermore, Defendant argues that Plaintiff was the one who scheduled and conducted depositions of both of these witnesses. (*Id.*)

Second, with respect to Dr. Blog and Dr. Kilby, Defendant argues that Plaintiff was the one who identified them in her initial disclosures and responses to HRI's interrogatories. (*Id.* at 22.) Defendant also notes that Plaintiff testified at length about both of these witnesses during her deposition, and that they were discussed during Plaintiff's depositions of Dr. Cherry, Dr. Kuhles, and Dr. Zansky. (*Id.*) Furthermore, Defendant argues that it has produced numerous emails that were sent and received by Dr. Kilby, which Plaintiff has relied upon heavily in her opposition to Defendant's summary judgment motion. (*Id.*) In sum, Defendant argues that Plaintiff was fully aware of the significance of Dr. Kilby's and Dr. Blog's roles and knowledge pertaining to the claims in this case and cannot now reasonably complain that she chose not to depose them. (*Id.*)

Third, with respect to Ms. Reyes, Defendant argues that it produced 62 documents during discovery that referenced her. (*Id.* at 23.) In particular, Defendant argues that at least nine of these documents involved Ms. Reyes's interactions with Plaintiff and Dr. Kuhles where Dr. Kuhles allegedly responded to Plaintiff and Ms. Reyes in a brusque manner. (*Id.*) Defendant further notes that Plaintiff worked in the same bureau as Ms. Reyes and attended the same weekly meetings conducted by Dr. Kuhles. (*Id.*) Accordingly, Defendant argues that Plaintiff was clearly on notice of Ms. Reyes's potential testimony and could have sought to depose her prior to the close of discovery. (*Id.*) Finally, Defendant argues that Ms. Reyes's testimony is critical in showing that Dr. Kuhles's difficult management style affected non-disabled employees and employees who did not take FMLA leave in the same way as Plaintiff. (*Id.*)

Fourth, in regard to Mr. Saglimbeni's affidavit, Defendant argues that it merely recites publically available background information, which the Court may take judicial notice of and does not prejudice Plaintiff. (*Id.* at 24.)

After carefully considering the matter, the Court agrees with Defendant for the reasons stated in its opposition

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 43,794

memorandum of law. (Dkt. No. 63, at 20-25 [Def.'s Opp'n Mem. of Law].) To those reasons, the Court adds only that, while the Court does not condone a parties' failure to comply with its obligations under Fed. R. Civ. P. 26(a)(e), the undisputed facts reveal that these individuals, with the exception of Mr. Saglimbeni, either supervised Plaintiff or interacted with her regularly during her employment. Therefore, Plaintiff was well aware of their identities and the scope of their knowledge as it pertains to this lawsuit. See *Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 177 (S.D.N.Y. 2013) (holding that former employee's failure to disclose supervisors as potential witnesses did not warrant preclusion of supervisors' affirmations on motion for summary judgment where employee was aware of supervisors' identities and scope of their knowledge); *LaVigna*, 736 F. Supp. 2d at 511 (denying motion to strike where affiant supervised plaintiff during period leading up to termination, plaintiff had awareness of affiant's role and involvement of events at issue, and several documents mentioning affiant were turned over); *Lore v. City of Syracuse*, 00-CV-1833, 2005 WL 3095506, at *2 (N.D.N.Y. Nov. 17, 2005) (Munson, J.) (holding that, "[w]hile it may be true that plaintiff failed to adhere to the letter of the discovery rules, the court is convinced that defendants were sufficiently aware of the existence and relevance of the persons in question so that defendants are not being subject to trial by ambush"); *Morgenstern v. Cty. of Nassau*, 04-CV-0058, 2008 WL 4449335, at *2 (E.D.N.Y. Sept. 29, 2008) (finding harmless error where plaintiff was aware of affiant's role in lawsuit, testified about affiant's role in deposition, and served document request on defendant seeking documents from affiant); *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, 01-CV-1047, 2002 WL 31108380, at *2 (S.D.N.Y. Sept. 23, 2002) ("[A] failure to disclose witness information is harmless if the other party was well aware of the identity of the undisclosed witness and the scope of their knowledge well before trial.") (internal quotation marks omitted); *cf. Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011) (refusing to strike affidavits because non-disclosed affiants were mentioned at depositions), *vacated in part on other grounds sub nom. Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013).

**\*13** Accordingly, Plaintiff's cross-motion is denied.

### B. Whether Plaintiff's Constructive Discharge Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in Defendant's memorandum of law and reply memorandum of law. (Dkt. No. 40, at 8-14 [Def.'s Mem. of Law]; Dkt. No. 63, at 6-7 [Def.'s Reply Mem. of Law].) To those reasons, the Court adds that Defendant went to great lengths in its memorandum of law to argue that Plaintiff's constructive discharge claim should be dismissed. (Dkt. No. 40, at 8-14 [Def.'s Mem. of Law].) Plaintiff's opposition memorandum of law is conspicuously devoid of a response to these arguments. It is well established that a court may infer that a plaintiff has abandoned a claim where the plaintiff has failed to defend against a challenge to that claim. *Jackson v. Fed. Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014); *see also Petrisch v. HSBC Bank USA, Inc.*, 07-CV-3303, 2013 WL 1316712, at *17 (E.D.N.Y. Mar. 28, 2013) (holding that the plaintiff abandoned her NYCHRL claim because she "conspicuously le[ft] out the NYCHRL"); *Plahutnik v. Daikin Am., Inc.*, 10-CV-1071, 2012 WL 6108236, at *5 (S.D.N.Y. Dec. 6, 2012) ("Arguments not made in opposition to a motion for summary judgment are deemed abandoned."); *Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 280 (S.D.N.Y. 2011) (holding that the plaintiff abandoned six claims when her brief failed to respond to the defendants' arguments on those claims).

Furthermore, as stated above in Point II.A. of the Decision and Order, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. N.D.N.Y. L.R. 7.1(b)(3). Here, the Court has carefully reviewed Defendant's arguments in support of its motion to dismiss Plaintiff's constructive discharge claim and finds that they possess facial merit such that Defendant has met its modest burden in favor of dismissal. For all these reasons, Plaintiff's constructive discharge claim is dismissed.

### C. Whether Plaintiff's FMLA, ADA, and NYSHRL Retaliation Claims Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth below.

Retaliation claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Croons v. New York State*

*Office of Mental Health*, 18 F. Supp. 3d 193, 207 (N.D.N.Y. 2014) (Hurd, J.); *accord, Knox v. Town of Southeast*, 599 F. App'x 411, 413-14 (2d Cir. 2015). Accordingly, to establish a prima facie case of retaliation under the FMLA, ADA, and NYSHRL, a plaintiff must show the following: "(1) participation in a protected activity known to the defendant; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action." [7] *Housel v. Rochester Inst. of Tech.*, 6 F. Supp. 3d 294, 303 (W.D.N.Y. 2014); *accord, Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004).

**\*14** "Thereafter, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Housel*, 6 F. Supp. 3d at 303 (citing *Holt v. KMI–Cont'l, Inc.*, 95 F.3d 123, 129 [2d Cir. 1996]). "If the defendant satisfies this burden, the plaintiff must present evidence that the articulated reason was a pretext for discrimination." *Id.* "Specifically, a plaintiff must show that, 'but-for' the protected activity, he or she would not have suffered the adverse employment action." *Id.* (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 [2013]).

In the present case, it is undisputed that Plaintiff engaged in protected activity that was known to HRI when she applied for FMLA leave. As noted above, however, Defendant argues that Plaintiff cannot establish that she suffered an adverse employment action or that any of the alleged adverse employment actions occurred under circumstances giving rise to an inference of retaliatory intent. (Dkt. No. 40, at 8-18 [Def.'s Mem. of Law].) The Supreme Court has defined "adverse employment action" as one that a reasonable employee would find "materially adverse," meaning that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Furthermore, "[m]aterial adversity is to be determined objectively, based on the reactions of a reasonable employee." *Tepperwein v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (citing *White*, 548 U.S. at 69-70); *see also Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 440 (E.D.N.Y. 2015) (noting that "[t]he applicable test in the retaliation context is that a 'plaintiff must show that a reasonable employee would have found the challenged action materially adverse"). " 'Context matters,' as

some actions may take on more or less significance depending on the context." *Tepperwein*, 663 F.3d at 568. However, "petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor can a plaintiff's " 'subjective feelings' concerning an employment action ... establish that the action was materially adverse." *Guzman v. City of New York*, 93 F. Supp. 3d 248, 257 (S.D.N.Y. 2015) (citing *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d 75, 87 [E.D.N.Y. 2002]).

In opposition to Defendant's motion, Plaintiff argues that, when she returned from her first FMLA leave, she was suddenly "barred" from attending unit manager meetings. (Dkt. No. 60, at 11-12 [Pl.'s Opp'n Mem. of Law].) In addition, Plaintiff argues that, after returning from her second FMLA leave, she was precluded from planning and participating in the May 2012 CDC site visit, even though she was the viral hepatitis surveillance coordinator, her position was 100% funded by the CDC, and the assignments she was given by Dr. Kuhles during the site visit were not consistent with this funding. (*Id.*, at 13.) Finally, Plaintiff argues that she was not allowed to attend the CSTE conference in Omaha, Nebraska, despite being the coordinator of the hepatitis surveillance program and being allowed to attend these conferences for many years prior to taking FMLA leave. (*Id.*, at 13-14.)

With respect to Plaintiff's argument regarding the unit manager meetings, the Court is unpersuaded that her exclusion from the meeting constitutes an adverse employment action. More specifically, the undisputed facts reveal that, after returning from FMLA leave, Plaintiff requested a transfer from the Data Management Unit and Dr. Cherry's supervision. As a result of being placed in the EIP, [8] Plaintiff was no longer a unit manager in the Data Management Unit and no longer required to attend the unit manager meetings that she previously attended. (Dkt. No. 41, ¶ 99 [Cherry Aff.]; Dkt. No. 46, ¶¶ 92-99 [Kilby Aff.].) Although Dr. Zansky had requested Plaintiff to attend one of the meetings on her behalf, Dr. Kilby e-mailed Plaintiff ahead of time to advise that her presence was not required. (Dkt. No. 46, Attach. 10.) Plaintiff did not read the e-mail and attended the meeting as requested by Dr. Zansky but was informed by Dr. Kilby that she did not need to be there. (*Id.*) Notwithstanding this one-time arrangement, it is clear that Plaintiff was no longer required to participate in the meetings by virtue of her

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 385 of 482

2016 WL 7116126
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

O'Dell WILLIS, Plaintiff,
v.
The COUNTY OF ONONDAGA, Defendant.

5:14-CV-1306 (GTS/ATB)
|
Signed 12/06/2016

**Attorneys and Law Firms**

OFFICE OF K. FELICIA DAVIS, P.O. Box 591, OF COUNSEL: K. FELICIA DAVIS, ESQ., Syracuse, NY 13201-3049, Counsel for Plaintiff.

HON. ROBERT A. DURR, Onondaga County Attorney, John H. Mulroy Civic Center, 10th Floor, 421 Montgomery Street, OF COUNSEL: CAROL L. RHINEHART, ESQ., Deputy County Attorney, Syracuse, NY 13202, Counsel for Defendant.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

 *1  Currently before the Court, in this employment civil rights action by Odell Willis ("Plaintiff") against the County of Onondaga ("Defendant"), is Defendant's motion for summary judgment. (Dkt. No. 13.) For the reasons set forth below, Defendant's motion is granted and Plaintiff's Complaint is dismissed.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**
Generally, in his Complaint, Plaintiff alleges that, between approximately December 2011 and October 2014, he has been racially and sexually discriminated against and harassed during his employment at the Onondaga County Sheriff's Office in numerous ways including, but not limited to, the following: (1) unwanted sexual touching and attention by Sgt. B. and fellow deputies; (2) graphic sexual comments by Sgt. B. and fellow deputies; (3) racially hostile comments, epithets and jokes by fellow deputies; (4) racially and sexually motivated abuse of authority by Sgt. B., including retaliation

for making a complaint of racial and sexual discrimination; and (5) a failure by Defendant to take effective action to stop such harassment. (*See generally* Dkt. No. 1.)

Based on these allegations, Plaintiff asserts six claims against Defendant: (1) a claim that Defendant discriminated against him based on his race and/or sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (2) a claim that Defendant discriminated against him based on his race and/or sex, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"); (3) a claim that Defendant subjected him to intentional infliction of emotional distress, in violation of New York State common law; (4) a claim that Defendant subjected him to negligent infliction of emotional distress, in violation of New York State common law; (5) a claim of breach of contract in violation of New York State common law, arising from Defendant's breach of the anti-harassment provision of its collective bargaining agreement with the Deputy Sheriff's Benevolent Association, under which Plaintiff is a covered employee; and (6) a claim that Defendant harassed him based on his race and/or sex, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"). (*Id.*)

As relief for these violations, Plaintiff requests, *inter alia*, punitive damages under Section 1981, and the NYSHRL. (*Id.*)

**B. Undisputed Material Facts**
Unless otherwise noted, the following facts were asserted and supported by Defendant in its statement of material facts and either expressly admitted or inadequately denied by Plaintiff in his response thereto. (*Compare* Dkt. No. 13, Attach. 21 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 19 [Plf.'s Rule 7.1 Response].)

The Parties

1. Odell Willis ("Plaintiff") is an African-American heterosexual male.

2. Plaintiff has been employed as a deputy sheriff for Onondaga County Sheriff's Office Custody Department since October 26, 1987.

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 386 of 482

**\*2**  3. He is one of two African-Americans who work in the Transport Unit of the Custody Department. [1]

4. The County of Onondaga ("Defendant") is a municipal corporation duly incorporated pursuant to the laws of the State of New York, and employs more than 15 employees.

### The Onondaga County Sheriff's Office

5. The Onondaga County Sheriff's Office is a paramilitary organization with Sheriff Conway serving as its highest ranking official.

6. The chain of command beneath the Sheriff in descending order includes undersheriff, chief, assistant chief, captain, lieutenant, sergeant and deputy.

7. The Sheriff's Office Duty Manual contains the written standards of conduct for all members of the Sheriff's Office. [2]

**\*3**  8. The Sheriff's Office Policy and Procedure Directives Manual is the official compilation of written statements of policy and procedures. [3]

9. Employees of the Sheriff's Office must comply with all provisions of the Duty Manual and all provisions of the Policy and Procedure Directives Manual. [4]

10. Employees of the Sheriff's Office who fail to comply with the Duty Manual and/or the Policy and Procedures Directives Manual are subject to disciplinary action. [5]

11. Generally, such disciplinary action is progressive and ranges in severity beginning with a counseling or supervisor's memorandum (which is the least severe action), an oral warning, a written reprimand, and an article charge (which is the most severe action). [6]

12. Supervisor's memoranda are not formal discipline and may be issued by a sergeant or higher ranking officer without the Administration's approval. [7]

**\*4**  13. Any other form of discipline (i.e., oral warning, written reprimand or Article charges) may not be issued by a sergeant or lieutenant without the Administration's approval. [8]

14. All deputy sheriffs are members of the local union, which is the Deputy Sheriff's Benevolent Association of Onondaga County, Inc. ("DSBA"), and are subject to the terms of the Collective Bargaining Agreement between Defendant and the DSBA.

15. The Collective Bargaining Agreement sets forth the Grievance and Arbitration Procedure for resolving grievances.

16. The Sheriff's Office Directive entitled "Harassment" states the office's written policy against harassment, discrimination and retaliation in the work place, defines the prohibited conduct, and sets forth the procedures for resolving incidents of discrimination. [9]

17. All newly hired deputy sheriffs receive cultural diversity training as part of their training for employment as deputies. [10]

**\*5**  18. In addition, this cultural diversity training is reinforced through yearly "in-service training" sessions. [11]

19. Plaintiff is familiar with the Sheriff's Office Written Directive addressing Harassment and Retaliation as well as Defendant's Harassment and Anti-Retaliation Policy and has received cultural diversity training through the Sheriff's Office. [12]

### Plaintiff's Litigation History Against Defendant County

20. During Plaintiff's employment with Defendant, he has been involved in three civil rights employment actions in which he has made allegations of a racially hostile work environment, a sexually hostile work environment and/or retaliation. [13]

**\*6**  21. More specifically, in 1997, Plaintiff was one of several African-American deputy sheriffs who brought a civil rights action against Defendant claiming a racially hostile work environment; that action was dismissed with prejudice in 2001. [14]

22. In 2004, Plaintiff was one of a number of African-American deputy sheriffs who again brought a civil rights

action claiming that the County knowingly permitted a racially hostile work environment to exist and continue. [15]

23. In that action, Plaintiff alleged that he was subjected to the following: (1) a racially hostile environment and disparate treatment; (2) a sexually hostile work environment and disparate treatment; and (3) retaliation for having complained about the foregoing violations. [16]

24. Also in that action, Plaintiff gave sworn testimony of the following: (1) that sometime in 2000 Deputy A made vulgar sexual comments to him including requests to perform oral sex; (2) that in August of 2000 Deputy A pushed a pen into Plaintiff's anus and that, when Plaintiff jumped, Deputy A stated "What's that, an orgasm?"; (3) that sometime in 2000 Deputy D.B. grabbed Plaintiff in a bear hug, forced him over a table and humped him in a sexual manner; and (4) that Deputy D.B. did this because Plaintiff is a black man.

**\*7** 25. Plaintiff's hostile work environment claim proceeded to a jury trial in February 2010; however, he was precluded from offering testimony on his claims regarding sexual harassment because he failed to assert those claims in his EEOC complaint.

26. On February 24, 2010, a jury rendered a verdict in favor of Plaintiff on his hostile environment claim and awarded him $1.00 in damages.

27. After the trial concluded, Plaintiff continued to work in the Transport Unit; he claims that he was harassed during the first three weeks of that continued work. [17]

28. More specifically, Plaintiff claims that, at some point during the first or second day after the trial concluded, he found spit on the door of his locker.

29. Plaintiff also claims that, within one week of the conclusion of the trial, he discovered the contents of his mailbox in the trash.

30. Plaintiff also claims that, approximately three weeks after the trial in February 2010, a picture of Martin Luther King that was taped to the outside door of his locker was ripped off, leaving just the four corners of the picture remaining taped to the locker.

31. Plaintiff reported this incident to Sgt. Marshall, who was one of Plaintiff's supervisors at the time. [18]

32. The day after Plaintiff reported the picture incident, Sgt. Marshall gave him a copy of a computer image of Martin Luther King, which Plaintiff placed on the front of his locker, and it has remained there since.

**\*8** 33. Further, several days after the picture incident, Sergeant Ames directed deputies during roll call to keep their hands off other people's property. [19]

34. Thereafter, according to Plaintiff, the harassment abated; as he testified in his deposition on November 25, 2015, "Well, now people pretty much stay [away]—you get little comments; you know, but [it's] a long time in taking a toll." [20]

## Plaintiff's Current Claims

**\*9** 35. On March 12, 2014, Sgt. B, one of the day supervisors, ordered Plaintiff and several white deputies to go outside, shovel snow off of the transport vehicles, and move them into the Everson Museum parking garage because of a snow storm. [21]

36. Approximately five to ten minutes after all of the white deputies had gone outside to comply with the order, Plaintiff informed Sgt. B that there were no keys left. [22]

37. Sgt. B responded that no keys were left because the other deputies had them, and again ordered Plaintiff to go outside to assist the other deputies with the detail. [23]

**\*10** 38. Plaintiff felt he was being pushed and "everything [he] was holding in ... just sort of came out"; approaching Sgt. B, he said, "We need to talk" and "I'm tired of the way you've been talking to me." [24]

39. In response, Sgt. B directed Plaintiff to write a report addressing this incident. [25]

40. On or about March 14, 2014, Plaintiff wrote a report regarding the incident, and also made a number of accusations against Sgt. B regarding inappropriate conduct; included in this report were three instances of physical contact that

Case 9:21-cv-00901-DNH-ML Document 152 Filed 07/20/23 Page 388 of 482

allegedly occurred between December 2011 and March 2014. [26]

41. According to Plaintiff, the first instance of physical contact occurred in mid-to-late December 2011 in the presence of 15 to 20 transport members and allegedly involved Sgt. B swiping a bladed hand between Plaintiff's buttocks, creating a wedgie in Plaintiff's uniform pants. The second incident of physical contact occurred in mid-February 2014 and involved Sgt. B allegedly grabbing Plaintiff's buttocks as Sgt. B fell or stumbled; Plaintiff did not report this second incident at the time. The third incident of physical contact occurred during the first week of March 2014 and involved Sgt. B allegedly putting his hands on Plaintiff's shoulders; Plaintiff did not report this third incident at the time. [27]

*11 42. Plaintiff acknowledges that Sgt. B did not take these actions "to be sexual with [Plaintiff]" but to get Plaintiff to react. [28]

43. Plaintiff submitted the report to Sgt. B on or about March 17, 2014.

44. Sgt. B also wrote a report, which addressed Plaintiff's failure to follow his orders; he then submitted the report to Lt. Raus, requesting that formal disciplinary action be taken against Plaintiff. [29]

45. The matter was investigated and, on April 7, 2014, Plaintiff was issued a supervisor's memorandum for failing to obey orders, being loud and argumentative toward Sgt. B and making derogatory comments.

46. Plaintiff admits that, while he initially went to the key box to grab car keys, he never complied with Sgt. B's order to assist shoveling snow off the transport vehicles and assist moving them to the garage; Plaintiff now claims he was still cold from when he came into work. [30]

47. Because Plaintiff's Miscellaneous Report of March 14, 2014, also included allegations of inappropriate conduct by Sgt. B, Plaintiff was directed by Sgt. Marshall to submit separate reports addressing each of the allegations against Sgt. B.

*12 48. Plaintiff complied with Sgt. Marshall's request and submitted five separate Miscellaneous Reports.

49. The five Miscellaneous Reports allege the following incidents, which were perceived by Plaintiff to be racial harassment, sexual harassment or bullying:

(i) On or about April 17, 2012, Sgt. B directed Plaintiff to place mail in the appropriate mailboxes; although Plaintiff perceived this to be a form of bullying, he did not report this to any Transport Supervisors at the time. (Plaintiff admits that this was not racial or sexual harassment.) [31]

(ii) On May 16, 2012, Sgt. B interrupted Plaintiff by not allowing him to speak during roll call when Plaintiff attempted to address a claim that Plaintiff had been skipped for an overtime assignment; Plaintiff perceived this incident to be a form of bullying. (Plaintiff believes that he was skipped for overtime because of his race.);

(iii) During the first week of April 2014, Plaintiff claims that Sgt. B grabbed Plaintiff's buttocks in an apparent attempt to prevent falling; Plaintiff did not report this incident to any Transport Supervisor at the time; [32]

(iv) On May 30, 2012, in the presence of several transport members, Sgt. B blocked Plaintiff's path down an aisle requiring Plaintiff to verbally request to get by; although Plaintiff perceived this as an attempt to harass and intimidate Plaintiff, he did not report the incident to any Transport Supervisors. (Plaintiff admits that this was neither racial or sexual harassment.); and

(v) Sometime during the third week of December 2011, Sgt. B walked behind Plaintiff and with a bladed hand swiped the crack of Plaintiff's buttocks creating a wedgie in Plaintiff's uniform pants. Plaintiff claims that he spoke to Sgt. Marshall about this incident and they typed a report together but Plaintiff did not submit the report; Plaintiff also claims that he spoke to Lt. Raus about the incident and that the incident was addressed with Sgt. B. Plaintiff claims that Sgt. B left him alone after this. [33]

*13 50. Sgt. Marshall investigated the allegations in each of Plaintiff's Miscellaneous Reports. [34]

51. The investigation included interviewing Plaintiff, Sgt. B and several other members of the Transport Unit, and searching records maintained by Sgt. Marshall and the Sheriff's Office. [35]

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 389 of 482

52. Sgt. B strongly denied Plaintiff's allegations of harassment, sexual harassment and bullying. [36]

**\*14**  53. After investigating the incidents, Sgt. Marshall found no merit to Plaintiff's allegations and submitted his investigative findings to Lt. Raus.

54. Thereafter, Captain Caiella directed Lt. Raus to investigate the matter further.

55. Lt. Raus then interviewed all members of the Transport Unit regarding Plaintiff's allegations and submitted his investigation packet to the Captain; no further action was taken.

56. Defendant has addressed incidents of inappropriate conduct in the Transport Unit when Plaintiff has complained and even when he has not complained. [37]

57. In November 2013, there was an incident of inappropriate conduct in the Transport Unit involving a rookie deputy being pushed in a shopping cart up and down the hallways while handcuffed to the cart. [38]

58. The matter was investigated and the individuals involved were issued supervisor's memorandum.

59. In September 2014, Plaintiff complained that Dep. A punched him in the thigh; he also complained about what he perceived as inappropriate conduct involving Dep. A and several other deputies. [39]

60. This matter was investigated and Dep. A was issued a supervisor's memorandum. [40]

**\*15**  61. Finally, in June 2015, Sgt. Marshall witnessed an incident in which a deputy played a video on his cell phone in the roll call room while in the presence of several deputies including Plaintiff; Sgt. Marshall observed, at the conclusion of the video, a racial slur being repeated numerous times. [41]

62. Sgt. Marshall immediately addressed the incident with Plaintiff and the deputy who played the video. [42]

63. The deputy who played the inappropriate video was issued a supervisor's memorandum. [43]

**\*16**  64. On June 3, 2014, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant has discriminated against him on the basis of his race and sex; Plaintiff also claimed retaliation for having complained about discriminatory conduct. [44]

65. After investigation, the EEOC determined that it was unable to conclude that the information obtained established a violation of the statutes; the EEOC dismissed the Charge and issued Plaintiff a right to sue letter on July 24, 2014.

66. Thereafter, on October 24, 2014, Plaintiff filed this employment civil rights action in United States District Court for the Northern District of New York alleging six causes of action against Defendant for violations of Title VII, Section 1981 and the NYSHRL.

**C. Summary of Parties' Arguments**

**1. Defendant's Memorandum of Law in Chief**

Generally, in its memorandum of law, Defendant asserts six arguments. (Dkt. No. 13, Attach. 22 [Def.'s Memo. of Law].)

First, Defendant argues, Plaintiff's First Cause of Action (asserting a hostile work environment claim) must be dismissed for the following reasons: (a) to save that portion of his Title VII claim based on events allegedly occurring before August 7, 2013, 300 days before Plaintiff filed his EEOC complaint on June 3, 2014), he must rely on the continuing violation doctrine, but he cannot do so because he cannot establish either (i) that a specific policy or practice caused the alleged discrimination or (ii) that the post-August 7, 2013, portion of his claim (specifically the portion of his claim based events occurring on or after March 14, 2014) is continuous in time with the pre-August 7, 2013, portion of his claim; (b) he cannot establish a sexual harassment claim because (i) the incidents of sexual harassment that he alleges, which constitute mere male-on-male teasing, are not severe enough to alter the conditions of the workplace, and (ii) the incidents in question are too few in number and spread out over too long a time to be pervasive enough to

Case 9:21-cv-00901-DNH-ML Document 152 Filed 07/20/23 Page 390 of 482

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

alter the conditions of the workplace; (c) similarly, he cannot establish a racial harassment claim because (i) the incidents of racial harassment that he alleges, the majority of which have only a speculative connection to race, are not severe enough to alter the conditions of his employment, and (ii) the incidents in question are too few in number and spread out over too long a time to be pervasive enough to alter the conditions of his employment; and (d) in any event, Defendant cannot be liable for either sexual harassment or racial harassment because Plaintiff cannot establish a specific basis for imputing the conduct to Defendant, which had policies prohibiting sexual and racial harassment, reasonable avenues for complaining of such harassment, and a record of investigating and addressing such complaints (commensurate with the evidence discovered). (*Id.*)

Second, Defendant argues, Plaintiff's Second, Third and Fourth Causes of Action (asserting claims of discrimination under NYSHRL, intentional infliction of emotional distress, and negligent infliction of emotional distress) must be dismissed because of his failure to comply with N.Y. County Law § 5, which requires that a notice of claim be filed with 90 days of the incident giving rise to the claim. (*Id.*)

**\*17** Third, Plaintiff's Fifth Cause of Action (asserting a breach-of-contract claim) must be dismissed because (a) under New York State law, an employee may litigate a collective-bargaining-agreement issue directly against an employer only when the employee's union has failed in its duty of fair representation, and (b) here, the collective bargaining agreement has a grievance procedure, and Plaintiff has not asserted a claim against the union. (*Id.*)

Fourth, Plaintiff's Sixth Cause of Action (asserting a claim of sexual and racial harassment under 🔖 Section 1981) must be dismissed because (a) 🔖 Section 1981 deals only with race-based forms of discrimination, and (b) he has failed to establish a racially hostile environment that resulted from the execution of a racially discriminatory policy or custom, for the reasons discussed above in Defendant's first argument. (*Id.*)

Fifth, Plaintiff cannot establish a claim of retaliation under Title VII because (a) none of Plaintiff's six causes of action assert a claim of retaliation, and the only paragraph of the Complaint that mentions retaliation is Paragraph 21, (b) even if the Complaint could be construed as asserting a claim of retaliation, Plaintiff cannot establish a prima facie case of

retaliation (which requires him to demonstrate, *inter alia*, a causal link between his protected activity and an employment action or decision that is adverse to Plaintiff), and (c) even if he did so, he cannot establish that Defendant's articulated reason for issuing a supervisor's memorandum was a pretext for retaliation rather than the result of his own misconduct (e.g., his failure to comply with an order to assist other deputies in moving the transport vehicles). (*Id.*)

Sixth, Plaintiff is not entitled to punitive damages because, while punitive damages will normally lie in cases where persons who are sued in their personal capacity recklessly or carelessly disregarded the plaintiff's rights, punitive damages will never lie against a municipality. (*Id.*)

## 2. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff asserts three arguments. (Dkt. No. 18, Attach. 3 [Plf.'s Opp'n Memo. of Law].)

First, Plaintiff argues, his Title VII claim is not time barred because those events occurring before August 7, 2013, were continuous in time with, and are of the same nature and character as, the events occurring after August 7, 2013. (*Id.*)

Second, Plaintiff argues, he makes out claims for a sexually and racially hostile work environment under Title VII, Section 1981 and the NYSHRL, for the following reasons: (a) evidence exists that the incidents of sexual and racial harassment that he alleges were severe enough to alter the conditions of his employment (i.e., the fact that he has been subjectively and reasonably offended by being sexually touched by others including his superior officer, his having a poster of Martin Luther King Jr. ripped down, his hearing a video played that repeatedly used the racial slur "n———," and others offering him a dollar after they engaged in racially offensive conduct); (b) evidence exists that the incidents in question were pervasive enough to alter the conditions of his employment (i.e., the fact that he hears sexual jokes on a daily basis, he witnesses sexual touching between males in the Unit, and he has been paired with Deputy A for years despite Plaintiff's reports of sexual touching by Deputy A); (c) a specific basis exists for imputing the harassment to Defendant under Title VII and NYSHRL (i.e., Lt. Raus' inadequate investigation of Plaintiff's claim of sexual harassment by Sgt. B coupled with Lt. Raus' remark that alpha dogs control a pack by making the other dogs submit, as well as Captain Caiella's

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 391 of 482

endorsement of Sgt. Marshall's responding to the racial-slur incident by merely issuing a supervisor's memorandum instead of formal discipline); and (d) evidence exists that the harassment derived from a municipal policy or practice sufficient to render Defendant liable under 🔖 Section 1981 (i.e., the severity of the individual incidents and/or the continuous and concerted nature of the incidents). (*Id.*)

 **\*18** Third, Plaintiff argues, he can establish a claim for retaliation under Title VII because (a) evidence exists that Plaintiff complained of Sgt. B's conduct to supervisors in early 2012 and again on March 14, 2014, (b) evidence exists that Plaintiff was disciplined by receiving a supervisor's memorandum from Sgt. B on April 7, 2014, and (c) the Second Circuit has found a causal connection between protected activity and adverse action where a delay of eighth months existed between the two events. (*Id.*)

### 3. Defendant's Reply Memorandum of Law

Generally, his its reply memorandum of law, Defendant asserts three arguments. (Dkt. No. 22, Attach. 1 [Def.'s Reply Memo. of Law].)

First, Defendant argues, Plaintiff has failed to meet the standard necessary to defeat Defendant's motion for summary judgment for the following reasons: (a) Plaintiff cannot create a genuine dispute of material fact by relying on the allegations of his unverified Complaint; (b) Plaintiff cannot create a genuine dispute of material fact by relying on self-serving affidavit testimony of May 16, 2016, that contradicts his deposition testimony of November 25, 2015, and December 9, 2015; (c) Plaintiff cannot create a genuine dispute of material fact by relying on years-old events that were referenced for the first time in his affidavit and were never alleged in either his Complaint or interrogatory responses; (d) Plaintiff cannot create a genuine dispute of material fact by relying on evidence that he promised to but failed to produce (specifically, the copy of the written report that he alleges was typed in December 2011 with the assistance of Sgt. Marshall, who Marshall denies having provided such assistance); and (e) Plaintiff cannot create a genuine dispute of material fact by relying the affidavit testimony of Brian Hall stating that, on one occasion "[s]ometime between 2013-2014," *Hall* witnessed three superior officers laughing and "grabbing each other's butts." (*Id.*)

Second, Defendant argues, Plaintiff cannot establish a retaliation claim for the following reasons: (a) Defendant has clearly presented a legitimate, non-discriminatory reason for issuing Plaintiff a supervisor's memorandum of April 7, 2014 (i.e., Plaintiff's admitted failure to comply with a direct order to assist other deputies in moving the transport vehicles on March 12, 2014); (b) because Defendant has articulated a legitimate, non-discriminatory reason for issuing Plaintiff a supervisor's memorandum, the presumption of discrimination dissipates and Defendant is entitled to summary judgment unless Plaintiff can produce evidence that reasonably supports a finding of retaliation; (c) the closest that Plaintiff comes to producing such evidence is his bald assertion that his fellow deputies are directed to write false reports (between March 13, 2014, and April 7, 2014), which is completely speculative and not based on personal knowledge. (*Id.*)

Third, Defendant argues, Plaintiff's Second, Third, Fourth, Fifth and Sixth Causes of Action should be dismissed, because (a) Defendant challenged those claims in its memorandum of law in chief, (b) Plaintiff did not respond to those challenges in his opposition memorandum of law, and (c) under such circumstances, courts may deem such claims to be abandoned, *see* 🔖 *Taylor v. City of New York*, 269 F. Supp.2d 68, 75 (E.D.N.Y. 2003). (*Id.*)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing Motion for Summary Judgment

Under 🔖 Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." 🔖 Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." 🔖 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [45] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." 🔖 *Anderson*, 477 U.S. at 248.

 **\*19** In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. 🔖 *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[46]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[47]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[48] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak*

*v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

**B. Legal Standard Governing Plaintiff's Claims**

**\*20** Because the parties have (in their memoranda of law) demonstrated an adequate familiarity with the legal standards governing Plaintiff's claims, the Court will not recite in detail those legal standards in this Decision and Order, which is intended primarily for the review of the parties. Rather, the Court will discuss those legal standards only where necessary below, in Part III of this Decision and Order.

**III. ANALYSIS**

**A. Plaintiff's First Causes of Action (Asserting Claim Under Title VII)**

**1. Alleged Sexual Harassment**

Beginning with the continuing violation doctrine, the Court has trouble finding that admissible record evidence exists from which a rational fact-finder could conclude that many of the pre-August 7, 2013, events giving rise to Plaintiff's Title VII sexual-harassment claim were continuous in time with the post-August 7, 2013, events giving rise to that claim (such that they may be considered by the Court in evaluating the merits of Plaintiff's Title VII sexual-harassment claim).

Granted, Plaintiff has adduced evidence that some of the misconduct has occurred continually, that is, both before and after August 7, 2013 (i.e., 300 days before Plaintiff filed his EEOC complaint on June 3, 2014): (1) Deputy A allegedly poking his finger in Plaintiff's ear on a daily basis;[49] (2) Plaintiff's allegedly witnessing sexually explicit graffiti involving a man's penis on the dry-erase board in the Roll Call Room on a continual basis;[50] and (3) Plaintiff's allegedly hearing sexually laced language, including language about "blow jobs," used by deputies (particularly Deputy A) on a continual basis.[51] However, the first form of misconduct hardly appears to be sexual in nature; and the second and third forms of misconduct were apparently not directed exclusively at male deputies.[52]

Case 9:21-cv-00901-DNH-ML  Document 152  Filed 07/20/23  Page 393 of 482

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Furthermore, Plaintiff has adduced evidence that perhaps the most-egregious misconduct occurred before August 7, 2013: (1) Deputy A allegedly giving Plaintiff the "polish handshake" (which Plaintiff describes as a man reaching underneath another man's buttocks from behind and grabbing the other man's penis) on one occasion in 2000-2001 (or perhaps on multiple occasions first in 2008 or 2009); [53] (2) Deputy A allegedly pushing a writing pen into Plaintiff's anus on another occasion in 2000-2001; [54] and (3) Deputy B allegedly grabbing Plaintiff in a "bear hug," collapsing him over a table and "hump[ing]" him from behind in 2000-2002. [55] However, these claims could have been asserted in Plaintiff's prior employment civil rights action, triggering the doctrine of claim preclusion. Moreover, the bulk of this alleged misconduct predates the post-August 7, 2013, misconduct by more than a decade. [56]

**\*21** Having said that, the Court finds that Sgt. B's alleged misconduct of December 2011 (in which he allegedly "swiped his hand up [Plaintiff's] butt") is sufficiently close in time and similar in nature to the alleged post-August 7, 2013, events (which are alleged to have occurred on an almost-daily basis, as of at least August 7, 2013) to be appropriately considered. [57] Moreover, the Court finds that the alleged "polish handshake" of 2000-2001 (or perhaps 2008 or 2009) may be appropriately considered to the extent it explains Plaintiff's allegedly re-victimization at having to witness Deputy A give other deputies the "polish handshake" on an almost-daily basis after August 7, 2013. [58]

As a result, the Court finds that the following alleged misconduct may be considered in support of Plaintiff's Title VII sexual-harassment claim: (1) Sgt. B's allegedly "swip[ing] his hand up [Plaintiff's] butt" in December 2011; [59] (2) Sgt. B's allegedly grabbing Plaintiff's buttocks near a fax machine as Sgt B pretended to fall or stumble in the Transport Control Room at some point between 2012 and April 2014; [60] (3) Sgt. B's allegedly putting his hands on Plaintiff's shoulders at a fax machine as Sgt. B was exiting the Transport Control Room during the first week of March 2014; [61] (4) Plaintiff's allegedly witnessing of a photograph posted in the Transport Roll Call Area showing a male rookie officer inside of, and handcuffed to, a grocery cart in the spring of 2014; [62] (5) Deputy A's allegedly punching Plaintiff in the right thigh in an unprovoked manner in an apparent effort to give him a "charlie horse" on October 25, 2014; [63] (6) Plaintiff's allegedly being paired with Deputy A even

after his complaint of Deputy's A punching him; [64] and (7) Plaintiff's allegedly witnessing Deputy A give other deputies the "polish handshake" on an "almost daily" basis, which makes Plaintiff "re-live [his] experiences [of 2000-2001 or perhaps 2008-2009] with [Deputy A]." [65]

**\*22** Turning to the merits of Plaintiff's Title VII sexual-harassment claim, the first issue that the Court must address is whether the above-listed alleged conduct was "because of [Plaintiff's] sex" under Title VII. The fact that the alleged conduct occurred among males and was heterosexual in nature is not determinative. *See* 🚩 *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80-81 (1998) (Scalia, J.) ("[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex.... A same-sex harassment plaintiff may ..., of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."). Rather, the issue is whether the alleged conduct was "because of [Plaintiff's] sex" under Title VII. The Court can find little, if any, sex-based motivation with regard to the photograph and thigh-punching incident. However, the Court notes that some of the other alleged conduct involved direct contact with intimate body parts. Moreover, the Court notes that the alleged direct contact occurred between males, and that there appears to be a dearth of record evidence that females received similar physical treatment (e.g., involving the grabbing of their genitalia) by males. Under the circumstances, for the sake of brevity, the Court will assume that admissible record evidence exists (albeit barely) from which a rational fact-finder could conclude that this conduct was "because of [Plaintiff's] sex" under Title VII.

*See, e.g.,* 🚩 *Barrows v. Seneca Foods Corp.,* 512 Fed.Appx. 115, 116, 119 (2d Cir. 2013) (finding question of fact existed regarding male plaintiff's Title VII sex-discrimination claim based on, *inter alia,* record evidence that heterosexual male supervisor grabbed male plaintiff's testicles on one occasion during a work-related argument, and that male supervisor hit male plaintiff and other male employees in the crouch on other occasions).

The second issue that the Court must address is whether the alleged conduct was sufficiently severe to alter the conditions of the workplace. In deciding this issue, the Court must take into account the fact that the conduct is allegedly occurring in a sheriff's office that Plaintiff has conceded is a paramilitary organization. *See* 🚩 *Oncale,* 523

U.S. at 81-82 ("In same-sex ... harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field— even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office.") (internal quotation marks and citation omitted). However, the Court must also remember that the Second Circuit has explicitly held that "[d]irect contact with an intimate body part constitutes one of the most severe forms of sexual harassment." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 180 (2d Cir. 2012). As a result, again for the sake of brevity, the Court will assume that the first, second and seventh forms of alleged misconduct described above were, when considered together, sufficiently severe to alter the conditions of Plaintiff's workplace (again albeit barely). [66]

The third issue that the Court must address is whether the alleged conduct was sufficiently pervasive to alter the conditions of the workplace. While the first and second forms of alleged misconduct (which occurred in December 2011 and February 2014) were hardly pervasive, they must be considered together with the seventh form of alleged misconduct, which Plaintiff allegedly witnessed on an "almost daily" basis as of May 2016 (the date of his affidavit). Under the circumstances, again for the sake of brevity, the Court will assume that the alleged misconduct was sufficiently pervasive to alter the conditions of Plaintiff's workplace (again albeit barely).

The final issue that the Court must address is whether admissible record evidence exists from which a rational fact-finder could conclude that a specific policy or practice caused the alleged sexual discrimination, sufficient to impute the conduct to Defendant. After carefully considering the matter, the Court answers this question in the negative for the reasons stated by Defendant in its memoranda of law (including the fact that Defendant had policies prohibiting sexual harassment, reasonable avenues for complaining of such harassment, and a record of investigating and addressing such complaints, commensurate with the evidence discovered). *See, supra,* Part I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds the following analysis (which is meant to supplement and not supplant Defendant's reasons).

**\*23** Beginning with the first and second forms of alleged misconduct, while these forms of misconduct were committed by a supervisor, they do not evidence a policy or practice of Defendant causing the alleged sexual discrimination because (setting aside Defendant's written policy prohibiting such misconduct) Plaintiff's complaint about the misconduct resulted in a rather thorough investigation by Defendant (involving, *inter alia*, Sgt. Marshall's interviews of Plaintiff, Sgt. B and several other members of the Transport Unit, Sgt. Marshall's search of records, and Lt. Raus's interviews of all members of the Transport Unit). The mere fact that Plaintiff disagrees with the conclusions drawn by Sgt. Marshall and Lt. Raus does not mean that Defendant had a policy or practice that caused the alleged misconduct. *See Frenkel v. New York City Off-Track Betting Corp.*, 701 F. Supp.2d 544, 553 (S.D.N.Y. 2010) ("Plaintiff vehemently disagrees with the conclusions reached as a result of those investigations, but neither his disagreement with those conclusions nor his own conclusory allegations of insufficient investigation or bias are sufficient to make out the requisite demonstration of policymaker acquiescence in a longstanding discriminatory policy or custom.").

Turning to the seventh form of alleged misconduct, Plaintiff witnessed this form of misconduct being committed during the time in question by a fellow deputy (not a supervisor); furthermore, no admissible record evidence exists that Plaintiff *complained* to Defendant about witnessing this alleged misconduct during the time in question. In his deposition, Plaintiff testified that he reported Deputy A's giving the "polish handshake" *to Plaintiff* in *2008 or 2009*, not that he reported witnessing (and feeling victimized by) Deputy A's giving the "polish handshake" to *other deputies* subsequently, specifically, *between August 2013 and May 2015.* (Dkt. No. 13, Attach. 4, at 68-69, 71, 123-24 [attaching pages "67," "68," "70," "122" and "123" of Plf.'s Depo. Tr.].) [67] Moreover, in his deposition, Plaintiff testified that *in 2008-2009* "people" (including Sgt. B) witnessed the alleged misconduct, not that *subsequently* (again, between August 2013 and May 2015) supervisors witnessed it. (*Id.* at 123 [attaching page "123" of Plf.'s Depo. Tr.].) Similarly, in his affidavit, Plaintiff asserts that he "see[s] [Deputy A] ... [give the 'polish handshake'] to others," not that his supervisors see Deputy A do it. [68]

In any event, more importantly, the reports filed by Plaintiff do not complain about witnessing this alleged misconduct between others. (*See generally* Dkt. No. 13, Attach. 11, at 2-10 [Exs. C-1 through C-7 to Caiella Affid.]; Dkt. No.

13, Attach. 15, at 2 [Ex. G to Caiella Affid.]; Dkt. No. 13, Attach. 16, at 5 [Ex. H-4 to Caiella Affid.]; Dkt. No. 13, Attach. 17, at 2 [Ex. I to Caiella Affid.].) If Defendant was not notified that Plaintiff was feeling victimized by witnessing this alleged misconduct between others, it is difficult to conclude that Defendant is responsible for failing to appropriately respond to the feeling of victimization. [69] Under the circumstances, the Court finds that, based on the current record, no rational fact-finder could conclude that Defendant had a specific policy or practice that caused the alleged sexual discrimination.

For all of these reasons, Plaintiff's Title VII sexual-harassment claim is dismissed.

### 2. Alleged Racial Harassment

Beginning with the continuing violation doctrine, the Court has trouble finding that admissible record evidence exists from which a rational fact-finder could conclude that the pre-August 7, 2013, portion of Plaintiff's Title VII racial-harassment claim was continuous in time with the post-August 7, 2013, portion of that claim, given the nearly twenty-six-month lapse between the alleged misconduct in mid-to-late December 2011 (involving Sgt. B's alleged swiping of a bladed hand in between Plaintiff's buttocks) and the alleged misconduct in mid-February 2014 (involving Sgt. B's alleged grabbing Plaintiff's buttocks as Sgt. B fell or stumbled). Moreover, it is difficult to imagine how the first form of alleged misconduct (or the second one) is racial in nature.

**\*24** Having said that, the Court finds that certain other conduct, which pre-dates December 2011, appears sufficiently racial in nature and proximate to August 7, 2013, in time to be considered by the Court in evaluating the merits of Plaintiff's Title VII racial-harassment claim: specifically, Plaintiff finding spit on his locker, his finding his mail thrown in the trash, his finding his picture of Martin Luther King, Jr., torn down from his locker, and his being told "Let me give you my dollar now" a few days after his prior trial ended in February 2010. [70]

As a result, the Court finds that the following alleged misconduct may be considered in support of Plaintiff's Title VII racial-harassment claim: (1) Plaintiff allegedly finding spit on his locker, his finding his mail thrown in the trash, his finding his picture of Martin Luther King, Jr., torn down from the outside of his locker, and his being old "Let

me give you my dollar now" during the weeks after his prior race-discrimination trial ended in February 2010; [71] (2) Plaintiff allegedly being passed over for overtime on several unspecified occasions in 2012 by Sgt. B, Sgt. Marshall, Sgt. Ames and Lt. Raus, while a white deputy with less seniority (Deputy Feldman) was given more overtime; [72] (3) Sgt. B's allegedly blocking Plaintiff's way as Plaintiff was attempting to pass on an unidentified occasion in approximately 2013, requiring Plaintiff to ask permission to pass; [73] (4) Sgt. B's allegedly grabbing Plaintiff's buttocks near the fax machine as Sgt B pretended to fall or stumble in the Transport Control Room at some point between 2012 and April 2014; [74] (5) Lt. Raus allegedly smirking when Plaintiff said he thought Lt. Raus was a racist on an unidentified occasion in 2013 or 2014; [75] (6) Sgt. B's allegedly putting his hands on Plaintiff's shoulders at the fax machine as Sgt. B was exiting the Transport Control Room in the first week of March 2014; [76] (7) Sgt. B's allegedly assigning Plaintiff to shovel snow off of, and move, transport vehicles on March 12, 2014; [77] (8) Deputy A's allegedly punching Plaintiff in the right thigh in an unprovoked manner in an apparent effort to give him a "charlie horse" on October 25, 2014; [78] (9) Plaintiff's allegedly being paired with Deputy A even after his complaint of Deputy's A punching him; [79] (10) Plaintiff's alleged viewing of a video in which the word "N——" was used in June 2015; [80] (11) the alleged coercion by four or five white deputies of other white deputies not to work with Plaintiff; [81] and (12) Plaintiff allegedly being assigned by Sgt. B to put fliers or paperwork in a mailbox on one or more unidentified occasions, while white deputies were not assigned to do so. [82]

**\*25** Turning to the merits of Plaintiff's Title VII sexual-harassment claim, the first issue that the Court must address is whether the above-listed alleged conduct was "because of [Plaintiff's] sex" under Title VII. The Court can find little, if any, race-based motivation with regard to the third, fourth, sixth, eighth and ninth forms of alleged misconduct. However, the Court notes that Plaintiff's theory appears to be that he was singled out for attention and abuse because he was the only African-American on his shift, casting the aforementioned forms of alleged misconduct in a different light. Moreover, the remaining forms of alleged misconduct, while sometimes vague, appear more clearly motivated by race. As a result, under the circumstances, for the sake of brevity, the Court will assume that admissible record evidence exists from which

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 396 of 482

a rational fact-finder could conclude that this conduct was "because of [Plaintiff's] race" under Title VII.

The second issue that the Court must address is whether the alleged conduct was sufficiently severe to alter the conditions of the workplace. The Court can find little, if any, severity with regard to the third, fourth, fifth, sixth, eighth and ninth forms of alleged misconduct. However, the Court cannot render the same finding with regard to the first, second, seventh, tenth, eleventh and twelfth forms of alleged misconduct. As a result, for the sake of brevity, the Court will assume that the forms of alleged misconduct described above were, when considered together, sufficiently severe to alter the conditions of Plaintiff's workplace.

The third issue that the Court must address is whether the alleged conduct was sufficiently pervasive to alter the conditions of the workplace. Most of the forms of alleged misconduct were relatively spread out, occurring in around February 2010 (first form), one or more times in 2012 (second form), sometime in 2013 (third form), at some point between 2012 and April 2014 (fourth form), sometime in 2013 or 2014 (fifth form), the first week of March 2014 (sixth form), second week of March 2014 (the seventh form), the end of October 2014 (the eighth form), and June 2015 (the tenth form). However, the remaining forms of alleged misconduct occurred on a continual basis (the ninth, eleventh and twelfth forms). Under the circumstances, again for the sake of brevity, the Court will assume that the alleged misconduct was sufficiently pervasive to alter the conditions of Plaintiff's workplace.

The final issue that the Court must address is whether admissible record evidence exists from which a rational fact-finder could conclude that a specific policy or practice caused the alleged racial discrimination, sufficient to impute the conduct to Defendant. After carefully considering the matter, the Court answers this question in the negative for the reasons stated by Defendant in its memoranda of law (including the fact that Defendant had policies prohibiting racial harassment, reasonable avenues for complaining of such harassment, and a record of investigating and addressing such complaints, commensurate with the evidence discovered). *See, supra,* Part I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds the following analysis (which is meant to supplement and not supplant Defendant's reasons).

The record before the Court contains copious evidence of both (1) Defendant's efforts to investigate the selected forms

of alleged misconduct that Plaintiff chose to report, [83] and (2) Defendant's response to what it found to be inappropriate conduct. [84] As stated above in Part III.A. of this Decision and Order, Defendant cannot fairly be held responsible for conduct that was not reported to it. Furthermore, the mere fact that Plaintiff disagrees with the conclusions drawn by Defendant after its investigations does not mean that Defendant had a policy or practice that caused the alleged misconduct. *Frenkel,* 701 F. Supp.2d at 553. Under the circumstances, the Court finds that, based on the current record, no rational fact-finder could conclude that Defendant had a specific policy or practice that caused the alleged racial discrimination.

**\*26** For all of these reasons, Plaintiff's Title VII racial-harassment claim is dismissed.

### B. Plaintiff's Second, Third, Fourth and Fifth Causes of Action (Asserting Claims of Violation of the NYSHRL, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and Breach of Contract)

In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue,* 09-CV-0722, 2009 WL2473509, at *2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

Alternatively, the court can deem a challenged but undefended claim abandoned (regardless of the facial merit of the unresponded-to argument). *See* ⚑ *Jackson v. Fed. Exp.,* 766 F.3d 189, 197-98 (2d Cir. 2014) ("Where a partial response to a motion is made—i.e., referencing some claims or defenses but not others—a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 397 of 482

*In re Horowitz*, Not Reported in B.R. Rptr. (2016)

2016 WL 1039581
Only the Westlaw citation is currently available.
***NOT FOR PUBLICATION***
United States Bankruptcy Court, S.D. New York.

IN RE: Asher HOROWITZ, Debtor.
Burberry Limited and Burberry USA, Defendant.

v.

Asher Horowitz, Defendant.

Case No. 14–36884 (CGM)

|

Adv. No. 15–09002 (CGM)

|

Signed March 14, 2016

|

Filed March 15, 2016

**Attorneys and Law Firms**

Reich Reich & Reich, P.C., 235 Main Street, Suite 450, White Plains, N.Y. 10601, Counsel for Plaintiffs, By: Jeffrey A. Reich

Eric Streich, P.C., 235 Main Street, Suite 420, White Plains, N.Y. 10601, Co-counsel for Plaintiffs, By: Eric Streich

Genova & Malin, Attorneys, The Hampton Center, 1136 Route 9, Wappingers Falls, N.Y. 12590–4332, Counsel for Defendant, By: Andrea B. Malin Thomas Genova

**MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

CECELIA G. MORRIS, CHIEF UNITED STATES BANKRUPTCY JUDGE

**\*1** Before the Court is Burberry Limited and Burberry USA's (collectively "Burberry" or "Plaintiff") motion for summary judgment on Plaintiff's first, fourth and fifth causes of action, seeking determinations of dischargeability. *See* Compl. ¶¶ 54–89, Feb. 6, 2015, ECF No. 1; Pl.'s Mot. Summ. J. 1, Nov. 23, 2015, ECF No. 15 ("Pl.'s Mot."). [1] On summary judgment, Plaintiff asserts it is owed a non-dischargeable debt by Defendant Asher Horowitz ("Debtor" or "Defendant"), pursuant to 11 U.S.C. § 523(a)(6). *See* Pl.'s Mot. 1. In the alternative, Plaintiff seeks a global denial of discharge

under 11 U.S.C. § 727(a)(2)(A) or § 727(a)(4)(A). *See id.* For the following reasons, the Court grants Plaintiff's motion for summary judgment on the grounds that Defendant's debt to Plaintiff is non-dischargeable under § 523(a)(6).

*Jurisdiction*

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I), "determinations as to the dischargeability of particular debts" and (J), "objections to discharges[.]"

*Background*

On September 15, 2014, Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. *See* Petition, *In re Horowitz,* No. 14–36884 (Bankr.S.D.N.Y. Sept. 15, 2014), ECF No. 1. The last day to file any objections to discharge was July 9, 2015. *See* Stip., *In re Horowitz,* No. 14–36884, ECF No. 39. On February 6, 2015, Plaintiff filed a complaint against the Defendant, seeking a determination of the dischargeability of particular debt and Defendant's eligibility for discharge. Compl. ¶¶ 54–89.

Plaintiff "is an international luxury brand involved in the design, manufacture, advertising, distribution and sale of high quality apparel and accessories under its principal trademarks...." Pl.'s Statement of Facts ¶ 1, Nov. 23, 2015, ECF No. 15–28 ("Pl.'s SMF"). [2] Before filing for bankruptcy, Defendant operated an unincorporated, online retail business under the name Designers Imports. *See* Pl.'s SMF ¶¶ 2, 4 (citing Pl.'s Mot. Ex. B, at 2, Ex. C, Ex. D, at ¶¶ 18–21). While operating Designers Imports, Defendant "violated Burberry's intellectual property rights by selling counterfeit Burberry merchandise on his website," www.designersimports.com. *Id.* at ¶¶ 2–3 (citing Pl.'s Mot. Ex. B, at 5). On March 29, 2005, Defendant, on behalf of himself and Designers, entered into a settlement agreement with Burberry. *Id.* at ¶ 5 (citation omitted); *see also* Pl.'s Mot. Ex. C, at ¶ 6.2, 10–11. In the settlement, Defendant promised that he had ceased purchasing merchandise from verified counterfeit sources and further agreed not to knowingly infringe on Burberry's

trademarks in the future. *See* Pl.'s Mot. Ex. C, at ¶¶ 2.1–2.6. After Defendant executed the settlement agreement with Burberry, Defendant incorporated his retail company under the name Designers Imports, Inc. ("Designers"). Pl.'s SMF at ¶ 7 (citing Pl.'s Mot. Ex. F, at ¶¶ 19–21). Defendant was the sole shareholder of Designers. *Id.* at ¶ 8 (citing Pl.'s Mot. Ex. F, at ¶ 18).

**\*2** Despite entering into the settlement agreement, Defendant continued to purchase and sell counterfeit Burberry goods through his website. Pl.'s SMF ¶ 6 (citing Pl.'s Mot. Ex. E, at 12); *see also* Pl.'s Mot. Ex. G, at 2, 5, 7, 9. On May 7, 2007, more than two years after entering into the settlement agreement, Burberry notified Defendant that Designers was the subject of an ongoing investigation by the United States Customs and Border Protection. Pl.'s Mot. Ex. G, at 2, 5, 7, 9. On May 22, 2007, Burberry filed a complaint in the United States District Court for the Southern District of New York against Designers (the "First Federal Action"). Pl.'s SMF ¶ 10 (citing Pl.'s Mot. Ex. H). Burberry made claims for trademark counterfeiting and infringement, false designation of origin and dilution, breach of the settlement agreement, trademark infringement and unfair competition under New York common law, and asserted a likelihood of injury to business reputation as well as deceptive acts and practices under the New York General Business Law. *Id.* at ¶ 11 (citing Pl.'s Mot. Ex. H).

After a trial in the First Federal Action, the court issued a decision finding Designers committed willful trademark infringement "based on its conduct spanning several years during which Defendant repeatedly sold a variety of counterfeit Burberry merchandise." *Burberry Ltd. v. Designers Imps., Inc.,* 2010 U.S. Dist. LEXIS 3605, at \*13 (S.D.N.Y. Jan. 19, 2010). The federal court found Designers liable for \$1,500,000.00 in statutory damages, plus reasonable attorneys' fees and costs. *Id.* at \*32. In a *nunc pro tunc* Amended Final Judgment and Permanent Injunction ("Amended Final Judgment"), filed on July 29, 2010, the federal court set the final amount of damages at \$2,592,070.89 and permanently enjoined Designers from infringing on Burberry trademarks. Pl.'s Mot. Ex. I.

On February 3, 2010, prior to the entry of the Amended Final Judgment, Defendant incorporated a new company, RTC Fashion Inc. ("RTC"), and created a new website. Pl.'s SMF ¶¶ 22–23 (citing Pl.'s Mot. Ex. B, at 2, Ex. J). Designers itself ceased to do business on February 26, 2010, before the federal court issued the Amended Final Judgment. *Id.* at ¶ 27

(citing Pl.'s Mot. Ex. L, at 66:2–5). Instead, on May 4, 2010, Defendant leased the old Designers' website to RTC for \$500 a year. *Id.* at ¶ 29 (citing Pl.'s Mot. Ex. M). RTC continued to sell designer clothes and accessories through the new website. *Id.* at ¶ 24; *Burberry Ltd. v. RTC Fashion Inc.,* No. 110615/11, 2014 N.Y. Slip Op. 31232(U), at 2 (N.Y.Sup.Ct. May 9, 2014) ("*RTC* ").

On September 16, 2011, Burberry filed a state court action (the "State Action") against RTC and Defendant separately, with its first cause of action seeking to pierce Designers' corporate veil to impose personal liability on Defendant "for the unsatisfied amount of the judgment entered in the Federal Action against Designers in the sum of \$2,591,778.49." Pl.'s SMF ¶¶ 30–31 (citing Pl.'s Mot. Ex. N); *see also RTC,* 2014 N.Y. Slip Op. at 2. On May 9, 2014, the state court awarded summary judgment to Burberry on its first cause of action. *RTC,* 2014 N.Y. Slip Op. at 3. The state court saw fit to pierce the corporate veil, determining that "as a matter of law, equity will intervene to pierce the corporate veil and permit the imposition of personal liability in order to avoid fraud or injustice...." *Id.* (internal citation and quotation marks omitted).

Prior to the state court's final determination, Plaintiff filed a second federal action (the "Second Federal Action") against Defendant in his personal capacity. *See* Def.'s Mem. Law in Opp'n 7, Jan. 19, 2016, ECF No. 25; Pl.'s Reply 5, Feb. 16, 2016, ECF No. 33; Def.'s Opp'n SMF Ex. B, at 1. In the Second Federal Action, Burberry sought a judgment that Defendant had personally committed willful trademark infringement by selling the same counterfeit products from the First Federal Action. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. 41, 43 (2d Cir. 2013). On appeal, the Second Circuit held that the Second Federal Action was barred on *res judicata* grounds. *Id.* at 46–47.

**\*3** Before this Court, Plaintiff alleges that Defendant's personal liability on Designers' debt to Burberry for willful trademark infringement is non-dischargeable under 11 U.S.C. § 523(a)(6), as a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Pl.'s Mot. 8–11; 11 U.S.C. § 523(a)(6). Plaintiff claims summary judgment is appropriate under 11 U.S.C. § 523(a)(6) based on collateral estoppel grounds. Pl.'s Mot. 5–10. Plaintiff asserts that the First Federal Action found Designers willfully violated the Lanham Act and further

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 399 of 482

*In re Horowitz*, Not Reported in B.R. Rptr. (2016)

found the elements necessary to establish maliciousness in the 🚩 § 523(a)(6) context. *Id.* at 8–11. Defendant contends the State Court Action holds Defendant personally liable for the debts of Designers so as to satisfy 🚩 11 U.S.C. § 523(a)(6)'s requirement that the injury be caused by the Debtor. Pl.'s Reply 7–8.

In the alternative, Plaintiff seeks to deny the Debtor's discharge pursuant to § 727(a)(2)(A) for transferring, destroying, and/or concealing property within one year of filing the bankruptcy petition, and § 727(a)(4)(A) for making a false oath in connection with the case. Pl.'s Mot. 11–19. Under § 727(a)(2)(A) a discharge may be denied if

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate ..., has transferred, removed, destroyed, mutilated, or concealed ... (A) property of the debtor, within one year before the date of the filing of the petition;....

11 U.S.C. § 727(a)(2). Plaintiff argues that Defendant should be denied a discharge under § 727(a)(2)(A) for initially omitting the Designers website and licensing agreement from his assets listed in his bankruptcy schedules, for concealing his interests in certain real property, and for intentionally misrepresenting the nature of a $3,000 transaction. Pl.'s Mot. 11–15.

Plaintiff argues that a global denial of discharge is also warranted under § 727(a)(4)(A), pursuant to which a discharge may be denied where "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account...." 11 U.S.C. § 727(a)(4)(A). Plaintiff argues Defendant failed to accurately disclose information to the estate, including failing to name certain creditors, and for misrepresenting his income and expenses, all with the intent to defraud his creditors. Pl.'s Mot. 15–19.

In opposition, Defendant states that neither the First Federal Action nor the State Action considered whether Defendant engaged in willful and malicious trademark infringement. Def.'s Mem. Law in Opp'n 2. Defendant contends the First Federal Action only considered whether Designers was liable to Burberry for Designers' willful trademark infringement.

*Id.* at 9. Defendant argues the First Federal Action was only brought against Designers and, as such, is not applicable to Defendant on the issues litigated and decided therein. *Id.* at 9–10. Defendant asserts that the only action entitled to collateral estoppel is the Second Federal Action, and that it estops Plaintiff from litigating whether Defendant engaged in willful and malicious trademark infringement. *Id.* at 8–9. Defendant further argues that the standard for willful trademark infringement is not the same as the standard for willful and malicious injury under 🚩 § 523(a)(6). *Id.* at 17–18.

Defendant asserts the State Action only held Defendant personally liable for Designers' damages to the extent they arose out of Defendant's transfer of assets from Designers to RTC. *Id.* at 13–14. According to Defendant, the State Action's determination to pierce the corporate veil is not enough for collateral estoppel here. *Id.*

Defendant further opposes the entry of an order denying Defendant a global discharge on the grounds that Plaintiff has not met its burden to show by a preponderance of the evidence that Defendant intended to defraud his creditors by concealing assets, or that Defendant knowingly and fraudulently made a false oath in the Defendant's bankruptcy case. *Id.* at 19, 25.

### *Discussion*

**\*4** Federal Rule of Civil Procedure 56(a), made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr.P. 7056. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 🚩 *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (internal citation and quotation marks omitted).

The moving party has the initial burden to establish the absence of any genuine issue of material fact. 🚩 *Celotex Corp.,* 477 U.S. at 322–23 (citations omitted). In determining whether the moving party has met this burden, "all ambiguities must be resolved and all inferences drawn in

favor of the party against whom summary judgment is sought." *Gallo v. Prudential Residential Servs., Ltd. Pshp.,* 22 F.3d 1219, 1223 (2d Cir. 1994) (citations omitted). To establish the absence of a genuine issue of material fact, the moving party need not support its motion with affidavits. *Celotex,* 477 U.S. at 323. This is due to the fact that Rule 56 "does not require the moving party to *negate* the elements of the nonmoving party's case...." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 885 (1990) (quoting *Celotex,* 477 U.S. at 323).

Once the moving party has shown there are no genuinely disputed material facts, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (citations omitted). On a motion for summary judgment, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). A court must grant a motion for summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

Collateral estoppel and the related doctrine of *res judicata* "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (citations omitted). Where there is a final judgment on the merits, *res judicata* prevents the parties from asserting claims based on the same cause of action. *See Montana v. United States,* 440 U.S. 147, 153 (1979) (citations omitted). "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen,* 449 U.S. at 94 (citation omitted). The doctrine of offensive collateral estoppel permits "a plaintiff [to] foreclose a defendant from relitigating an issue the defendant has previously litigated but lost against another plaintiff." *S.E.C. v. Monarch Funding Corp.,* 192

F.3d 295, 303 (2d Cir. 1999) (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329 (1979)).

Where the standard of proof on the issue in question requires proof by at least a preponderance of the evidence, "a bankruptcy court could properly give collateral estoppel effect to those elements of the claim that are identical to the elements required for discharge and that were actually litigated and determined in the prior action." *Grogan v. Garner,* 498 U.S. 279, 284 (1991). In bankruptcy, the party objecting to discharge must prove its claim by a preponderance of the evidence. *See, e.g., Grogan,* 498 U.S. at 286; *In re Renshaw,* 222 F.3d 82, 86 (2d Cir. 2000). Although the standard of proof to prevail on a claim for non-dischargeabilty is a preponderance of the evidence, "exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *In re Hyman,* 502 F.3d 61, 66 (2d Cir. 2007) (citing *In re Renshaw,* 222 F.3d at 86; *In re Hayes,* 183 F.3d 162, 167 (2d Cir. 1999)).

**\*5** Under 11 U.S.C. § 523(a)(6), a discharge will not be effective against any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity...." To successfully plead a claim for non-dischargeability pursuant to § 523(a)(6), a plaintiff must establish that the debtor "acted willfully in committing the injury," and that the debtor "acted maliciously in committing the injury." *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar),* 368 B.R. 120, 127 (Bankr. E.D.N.Y. 2007) (citations omitted). The Supreme Court has held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998). The requirement that the injury be willful "may be satisfied if the debtor had actual knowledge that he or she was violating the law and the intent to bring about injury." *In re Akhtar,* 368 B.R. at 127–28.

The Second Circuit has interpreted malicious to mean "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir.

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 401 of 482

In re Horowitz, Not Reported in B.R. Rptr. (2016)

1996) (citations omitted). Malice may be implied based on the surrounding circumstances, or found constructively. *Ball, 451 F.3d at 69* (citations omitted); *Navistar,* 94 F.3d at 88 (citing *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1164 (11th Cir. 1995);* First Nat'l Bank v. Stanley (In re Stanley),* 66 F.3d 664, 668 (4th Cir. 1995)).

"Malice may be found where the debtor breached a legal duty 'wilfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstance to warrant the denial of a discharge.' " *Yash Raj Films (USA) v. Ahmed (In re Ahmed),* 359 B.R. 34, 42 (Bankr. E.D.N.Y. 2005) (citations omitted). Courts have found malicious conduct where the Defendant was on notice and yet "continued to infringe the plaintiffs' copyrights in spite of, and indeed in defiance of numerous warnings." *In re Ahmed,* 359 B.R. at 42. Additionally, malice may also be implied where "anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." *Voyatzoglou v. Hambley (In re Hambley),* 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005) (internal quotations and citations omitted).

Plaintiff alleges that the willful and malicious elements of § 523(a)(6) were decided in the First Federal Action, and that Defendant is now collaterally estopped from relitigating those issues here. "[T]he application of the collateral estoppel doctrine differs based on the forum in which first judgment was entered." *Guggenheim Capital, LLC v. Birnbaum (In re Birnbaum),* 513 B.R. 788, 800 (Bankr. E.D.N.Y. 2014). The federal standard for collateral estoppel governs the preclusive effect of a federal decision resolving issues of federal law. *See Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir. 2006). Collateral estoppel under federal law requires that "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Purdy v. Zeldes,* 337 F.3d 253, 258 (2d Cir. 2003). The party arguing for the application of collateral estoppel has the burden to establish all four elements. *See Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d

359, 368 (2d Cir. 1995) (citing *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir. 1986));* Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir. 2001) (citations omitted).

**\*6** Plaintiff has shown the identity of the issues for willful and malicious injury. To show the identity of the issues, the Court must analyze "whether the issues presented by this litigation are in substance the same as those resolved against the" Defendant previously. *Montana v. United States,* 440 U.S. 147, 155 (1979). The first element is willfulness. Under the Lanham Act, a person is liable for trademark infringement when, without the consent of the trademark holder, that person

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive....

15 U.S.C. § 1114(1)(a). Although liability for trademark infringement does not require a finding of willfulness, the statutory damages for willful trademark infringement increase to $2,000,000 per infringement. *See* 15 U.S.C. § 1117(b), (c);* Hermes Int'l v. Kiernan,* 2008 U.S. Dist. LEXIS 70506, at *10 (E.D.N.Y. Aug. 28, 2008). Willfulness requires a finding that "the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility." *Kepner–Tregoe, Inc. v. Vroom,* 186 F.3d 283, 288 (2d Cir. 1999) (quoting *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1382 (2d Cir. 1993)) (internal quotation marks omitted).

Here, the First Federal Action found Designers acted willfully based on Designers' continuing sales of counterfeit Burberry merchandise, despite the fact Burberry "repeatedly placed Defendant on notice that Defendant was violating the trademark law by selling counterfeit Burberry merchandise." *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at *13. In making a finding of willfulness, the court further found that Designers had repeatedly and knowingly violated the

settlement agreement with Burberry. *Id.* at 25. Additionally, the court determined Designers "willfully failed to investigate the bona fides of Burberry-branded goods it purchased for sale," and failed to implement procedures to prevent the sale of counterfeit merchandise. *Id.* The court also found that Designers was aware Burberry had placed a test order, and instead of filling the order from its own stock, sent Defendant's wife, Mrs. Horowitz, "to an authorized Burberry store to purchase items to fill the order." *Id.* at 26.

The findings in the First Federal Action satisfy the legal definition for willfulness in bankruptcy. Pursuant to the federal standard for willfulness, Designers knew it was violating the law and intended to cause injury to Burberry. *Kawaauhau, 523 U.S. at 61*; *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar), 368 B.R. 120, 127–28 (Bankr.E.D.N.Y.2007).* Burberry had repeatedly put Designers on notice of its illegal conduct, and Designers signed a settlement agreement promising to stop further violations. The federal court found Designers violated this settlement agreement knowingly, and continued to violate the law by selling counterfeit merchandise. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at *25. Designers failed to implement any security measures to prevent future violations and failed to investigate its purchases of Burberry-branded goods. *Id.* The injury caused by trademark infringement is the act of infringement. *Star's Edge, Inc. v. Braun (In re Braun), 327 B.R. 447, 451 (Bankr.N.D.Cal.2005).* The Ninth Circuit has held that in an action for trademark infringement, "intentional infringement is tantamount to intentional injury under bankruptcy law." *Smith v. Entrepreneur Media, Inc. (In re Smith),* 2009 Bankr.LEXIS 4582, at *26 (B.A.P. 9th Cir. Dec. 17, 2009). Designers intentionally infringed on Burberry's trademark. This is sufficient to constitute a willful injury.

 *7 Here, malice may be inferred from the First Federal Action's determination that Designers willfully, continually and deliberately infringed on Burberry's trademarks. Designers had repeated notice of its infringement. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at *13. Designers knew that the infringement was "contrary to commonly accepted duties in the ordinary relationships among people," as it had signed a settlement agreement acknowledging its infringement and promising to take steps to refrain from future infringements. *Voyatzoglou v. Hambley (In re Hambley), 329 B.R. 382, 402 (Bankr.E.D.N.Y.2005).* Even going beyond intentional infringement, Designers actively

tried to deceive and mislead Burberry by falsely filling Burberry's test order with inventory purchased from a legitimate Burberry retailer. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at *26. The federal court also found that "[s]ince there was willful infringement and no 'extenuating circumstances,' " Burberry was entitled to attorneys' fees and costs. *Id.* at *30–31. In other words, Designers' conduct was "wrongful and without just cause or excuse...." *Navistar Fin. Corp. v. Stelluti (In re Stelluti), 94 F.3d 84, 87 (2d Cir. 1996).* The elements of willful trademark infringement present the same issues required to show willful and malicious injury under *§ 523(a)(6).* Plaintiff has satisfied its burden to show the identity of the issues for willful and malicious injury under *§ 523(a)(6).*

The Court also finds that Plaintiff has met its burden on the second element required for collateral estoppel under federal law. The issues of willful and malicious injury were actually litigated in the First Federal Action. The Defendant participated in the litigation, and the federal court's determination was the result of a full-fledged trial. *See, e.g., Guggenheim Capital, LLC v. Birnbaum (In re Birnbaum), 513 B.R. 788, 801 (Bankr. E.D.N.Y. 2014)* (internal citations omitted).

The Court finds that Defendant had a full and fair opportunity to litigate the issues of willful and malicious injury in the First Federal Action. In the Second Federal Action, the Second Circuit dismissed the case on *res judicata* grounds, holding that Defendant and Designers were in privity. *Burberry Ltd. v. Horowitz, 534 Fed.Appx. 41, 43–45 (2d Cir. 2013).* The Second Circuit relied on several undisputed facts, including that Defendant was "the sole shareholder of, officer of and decision maker for[ ] the Designers Imports corporation," that Defendant "controlled and directed Designers[ ] Imports['] participation" in the First Federal Action, that Defendant "instructed the corporation's lawyers, made all client decisions for Designer Imports as a litigant in the case, and otherwise controlled the participation of Designers Imports in the lawsuit." *Id. at 44* (internal citations and quotation marks omitted). It cannot be disputed that Defendant had a full and fair opportunity to litigate the issues underpinning willful and malicious injury in the First Federal Action.

The final element required for collateral estoppel on the issues of willful and malicious injury is that the federal

court's findings were necessary to support the Amended Final Judgment. A finding of willful trademark infringement results in increased statutory penalties. *See* 15 U.S.C. § 1117(b), (c). The Amended Final Judgment in the First Federal Action determined the amount of liability based on a finding of willful trademark infringement. *See* Pl.'s Mot. Ex. I. Additionally, the Amended Final Judgment awarded Plaintiff reasonable attorneys' fees and costs based on the finding that there were no extenuating circumstances for Designers' conduct. *See id.*; *see also Burberry,* 2010 U.S. Dist. LEXIS 3605, at *30–31. Defendant does not dispute this element. Accordingly, Plaintiff has met its burden to preclude the relitigation of willful and malicious injury.

Although Defendant had a full and fair opportunity to litigate whether Designers' caused willful and malicious injury in the First Federal Action, the injury must be attributable to Defendant's conduct for the debt to be non-dischargeable under 11 U.S.C. § 523(a)(6). Although Defendant's conduct prior to the settlement agreement with Burberry is not part of the debt at issue here, the First Federal Action found that Defendant, in his individual capacity, sold counterfeit Burberry merchandise through the Designers website, entered into the settlement agreement with Burberry, agreed to cease all counterfeit sales, and paid damages to Burberry. Pl.'s SMF ¶¶ 2–7; *see also* Debtor's Aff. in Opp'n to Summ. J. ¶¶ 3–7, Jan. 21 2016, ECF No. 27–5. The First Federal Action found Designers sold adulterated counterfeit Burberry merchandise after entering into the settlement agreement, committing willful trademark infringement. *Burberry,* 2010 U.S. Dist. LEXIS 3605, at *10, 13–15, 25–26. To find the damages ordered by the First Federal Action to be non-dischargeable, Plaintiff must show that the Defendant is collaterally estopped from relitigating the issue of his personal liability based on the State Action.

**\*8** Where the issues to be precluded were determined by a state court, the law of the state where the underlying proceedings took place controls the standard for collateral estoppel. *See* 28 U.S.C. § 1736; *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985). In New York, "collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Evans v. Ottimo,* 469 F.3d 278, 281 (2d Cir. 2006) (citing *Kaufman v. Eli Lilly & Co.,* 482 N.E.2d 63, 67 (N.Y. 1985);

*Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir. 1991)). To establish the identity of the issues, the matter must have been " 'actually litigated and determined' in a prior action." *Kaufman,* 482 N.E.2d at 67 (citations omitted). Further, "the issue that was raised previously must be decisive of the present action." *LaFleur v. Whitman,* 300 F.3d 256, 271 (2d Cir. 2002) (internal citations and quotation marks omitted).

In New York, the proponent of collateral estoppel has the burden to establish the identity of the issues, that the issues were actually litigated and determined, and that they are decisive of the present action. *In re Dunn,* 27 N.E.3d 465, 468 (N.Y.2015) (citations omitted); *Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir. 2000). The party opposing collateral estoppel has the burden "to establish the absence of a full and fair opportunity to litigate." *D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.,* 564 N.E.2d 634, 636 (N.Y.1990) (citing *Kaufman,* 482 N.E.2d at 67); *see also Evans,* 469 F.3d at 281–82 (citations omitted).

The Court finds that the Plaintiff has met its burden to show Defendant's personal liability for willful and malicious injury was actually litigated and decided in the State Action, and that the issue is decisive of this non-dischargeability action under § 523(a)(6). Defendant's main argument in opposition is that Defendant's responsibility for Designers' willful and malicious conduct is an issue that has not been previously litigated. Defendant's argument is misplaced. The State Action determined that Defendant controlled Designers to such an extent that Defendant may be held liable for the acts of Designers. *Burberry Ltd. v. RTC Fashion Inc.,* No. 110615/11, 2014 N.Y. Slip Op. 31232(U), at 5 (N.Y.Sup.Ct. May 9, 2014).

The issue of Defendant's culpability for willful and malicious injury was previously litigated and decided by the state court's determination to pierce the corporate veil. As federal courts have recognized, "New York courts have made clear that the veil-piercing standard is demanding. The Court of Appeals has repeatedly emphasized that '[t]hose seeking to pierce a corporate veil ... bear a heavy burden.' " *Am. Federated Title Corp. v. GFI Mgmt. Servs.,* 2015 U.S. Dist. LEXIS 114787, at *29 (S.D.N.Y. Aug. 28, 2015) (internal citations and quotation marks omitted). New York law will permit disregard of the corporate form where there is either "a showing of fraud or

In re Horowitz, Not Reported in B.R. Rptr. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 404 of 482

upon complete control by the dominating corporation that leads to a wrong against third parties." *Wm. Passalacqua Builders v. Resnick Developers S.,* 933 F.2d 131, 138 (2d Cir. 1991) (citing *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir. 1990)). In other words, the corporate veil may "be pierced either when there is fraud or when the corporation has been used as an alter ego...."
*ITEL Containers,* 909 F.2d at 703; *see also Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir. 1979).

To pierce the corporate veil in New York based on the alter ego theory of liability, the individual to be held liable must "(1) have exercised such control that the subsidiary 'has become a mere instrumentality' of the parent, which is the real actor; (2) such control has been used to commit fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff." *Wm. Passalacqua Builders,* 933 F.2d at 138 (citing *Lowendahl v. Baltimore & Ohio R.R. Co.,* 287 N.Y.S. 62 (N.Y.App.Div.1936), *aff'd,* 6 N.E.2d 56 (1936). Per the very language of the standard, a determination of liability based on the alter ego theory is a determination that the party in control is the "real actor." *See id.* "By definition, an alter ego corporation possesses no independent volition." *Lisa Ng v. Adler (In re Adler),* 494 B.R. 43, 53 (Bankr.E.D.N.Y.2013).

**\*9** Here, the state court based its determination to pierce the corporate veil on the alter ego theory of liability. According to the state court, "piercing the corporate veil generally 'requires a showing that the individual defendants 1) exercised complete dominion and control over the corporation, and 2) used such dominion and control to commit a fraud or wrong against the plaintiff which resulted in injury.' " *RTC,* 2014 N.Y. Slip Op. at 3 (quoting *Damianos Realty Group, LLC v. Fracchia,* 825 N.Y.S.2d 274, 276 (N.Y.App.Div.2006)). The state court held that "[Defendant] completely dominated and controlled [Designers], and abused the corporate form to advance his own personal interests." *RTC,* 2014 N.Y. Slip Op. at 5. The state court further held that "Plaintiffs have shown that [Defendant] exercised his control to commit a wrong against the plaintiffs by dissolving Designers assets and transferring its domain name to his new company RTC, thereby rendering Designers incapable to satisfy the Federal Action judgment." *Id.* The state court granted summary judgment on Plaintiff's first cause of action, which it summarized as "piercing the corporate veil, in order to hold [Defendant] liable for the Federal Action judgment." *Id.* at 3.

The state court's determination to pierce the corporate veil was a finding that Defendant was responsible for the prepetition actions of Designers. The State Action found Designers to be an alter ego of Defendant on May 9, 2014, prior to Defendant's bankruptcy filing. *See RTC,* 2014 N.Y. Slip Op. at 6. As a result, and for purposes of conduct attributable to the Debtor under § 523(a)(6), "the Debtor always remained inseparable from th[e] corporate fiction[ ]. The actions and property of [Designers] were thus the actions and property of the Debtor...." *Lisa Ng,* 494 B.R. at 53. The state court's determination to pierce the corporate veil is sufficient for a finding under § 523(a)(6) that Defendant was responsible for willful and malicious injury to Burberry.

Further, the Second Circuit's decision in the Second Federal Action weighs in favor of collateral estoppel on Defendant's personal liability. The Second Circuit found that the veil-piercing claim in the State Action was the appropriate means to impose liability on Defendant. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. at 46. The Second Circuit dismissed Burberry's Second Federal Case against Defendant, holding that Defendant and Designers had been in privity during the First Federal Action. *Id.* at 43–45. As previously noted, the Second Circuit relied on Defendant's extensive relationship with Designers in the First Federal Action, including the fact that Defendant directed Designers' lawyers how to proceed.
*Id.* at 44. The Second Circuit reasoned that "Burberry has already filed a veil-piercing action in New York state court, through which it seeks to hold Horowitz personally liable for the outstanding federal judgment against Designers Imports. That litigation provides the appropriate vehicle for resolution of Burberry's claims against Horowitz individually." *Id.* According to the Second Circuit, the State Action would determine Defendant's personal responsibility for the injuries inflicted on Burberry. This Court finds that Plaintiff has met its burden to show the issue of Defendant's liability for the conduct at issue was previously litigated, decided, and is decisive of the current dispute under § 523(a)(6).

In the alternative to the non-dischargeability claim under § 523(a)(6), Plaintiff seeks to deny Defendant a global discharge pursuant to § 727(a)(2)(A) or § 727(a)(4)(A). Pl.'s Mot. 1. As the Court has found Defendant's debt to Plaintiff

In re Horowitz, Not Reported in B.R. Rptr. (2016)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 405 of 482

to be non-dischargeable under 🚩 § 523(a)(6), the Court will not address Plaintiff's alternate arguments at this time.

**Conclusion**

For the foregoing reasons, the Plaintiff's motion for summary judgment on its first cause of action is granted. The parties are to submit an order in conformity herewith.

**All Citations**

Not Reported in B.R. Rptr., 2016 WL 1039581

## Footnotes

1    Unless otherwise indicated, references to documents filed in this case can be found on the docket of adversary proceeding 15–09002.

2    In response to Plaintiff's Statement of Facts, numbering 76 paragraphs, Defendant's Response to Plaintiff's Undisputed Material Facts ("Defendant's Response Statement"), made only four general types of denials. Defendant "denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in" certain paragraphs of the Plaintiff's Statement of Facts, "denies the allegations contained in," several other paragraphs, "neither denies or admits" paragraphs 11 and 12 of Plaintiff's Statement of Facts, and "neither denies or admits the allegations contained in" the remaining paragraphs of Plaintiff's Statement of Facts, "as the documents speak for themselves." Def.'s Resp. to Pl.'s Statement of Facts ¶¶ 1–4, Jan. 19, 2016, ECF No. 23 ("Def.'s Resp. SMF").

Local Bankruptcy Rule for the Southern District of New York ("Local Bankruptcy Rule") 7056–1(b) requires a party moving for summary judgment to submit a statement of material facts. Local Bankruptcy Rule 7056–1 also requires that

(c) Papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there is a genuine issue to be tried.

(d) Each numbered paragraph in the statement of material facts required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

(e) Each statement by the movant or opponent pursuant to subdivisions (b) or (c) of this rule, including each statement controverting any statement of material fact by a movant or opponent, shall be followed by citation to evidence which would be admissible.

S.D.N.Y. LBR 7056–1(c)–(e). On a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact. *See, e.g., Cooper v. New Rochelle,* 925 F.Supp.2d 588, 605 (S.D.N.Y. 2013); *Aztar Corp. v. N.Y. Entm't, LLC,* 15 F.Supp.2d 252, 254 n.1 (E.D.N.Y. 1998) (citing 🚩 *Toyomenka Pac. Petroleum, Inc. v. Hess Oil V.I. Corp.,* 771 F.Supp. 63, 67 (S.D.N.Y.1991)). Similarly, a response contending to neither admit or deny an allegation does not create a genuine issue of fact. *See, e.g., Universal Calvary Church v. New York,* 2000 U.S. Dist. LEXIS 15153, at *7 n.6 (S.D.N.Y. Oct. 13, 2000) (citations omitted). Statements denying allegations without a citation to any supporting evidence are also insufficient to contest a disputed fact. *See Guglielmo v. Marchon Eyewear, Inc.,* 2006 U.S. Dist. LEXIS 9146, at *1 n.1 (E.D.N.Y. Feb. 15, 2006). Here, Defendant's Response Statement

In re Horowitz, Not Reported in B.R. Rptr. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 406 of 482

contains denials without citing the record, attempts to deny based on lack of knowledge or information and neither admits nor denies a variety of factual statements. As such, these purported "denials" do not suffice to create a genuine dispute of material fact.

In addition to Defendant's Response Statement, Defendant also submitted a Statement of Undisputed Material Facts in Opposition to the Plaintiff's Request for the Entry of an Order for Summary Judgment ("Defendant's Opposition Statement"). Def.'s Statement of Facts in Opp'n, Jan. 21, 2016, ECF No. 27 ("Def.'s Opp'n SMF"). To the extend Defendant does not allege a significantly different version of facts in its Opposition Statement, supported by discernable evidence, the Court must treat Plaintiff's Statement of Facts as undisputed.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 407 of 482

a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

Here, after carefully considering the matter, the Court dismisses Plaintiff's Second, Third, Fourth and Fifth Causes of Action (asserting claims of discrimination under the NYSHRL, intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of contract), because Defendant's challenges to them have facial merit (for the reasons stated in Defendant's memorandum of law in chief (*see, supra,* Part I.C.1. of this Decision and Order) and Plaintiff has failed to oppose those challenges. Alternatively, the Court dismisses Plaintiff's Second, Third, Fourth and Fifth Causes of Action as abandoned, finding that the choice of Plaintiff's counsel to carefully defend some claims but not others was deliberate.

For all of these reasons, Plaintiff's Second, Third, Fourth and Fifth Causes of Action are dismissed.

### C. Plaintiff's Sixth Cause of Action (Asserting Claim Under 🚩 Section 1981)

As an initial matter, the Court disagrees with Defendant that Plaintiff has abandoned his claim under 🚩Section 1981, because he references it three times in his opposition memorandum of law. (Dkt. No. 18, Attach. 3, at 10, 11, 13 [attaching page "8," "9" and "11" of Plf.'s Opp'n Memo. of Law].)

 **\*27**  However, the Court agrees with Defendant for the reasons stated in its memorandum of law in chief (*see, supra,* Part I.C.1. of this Decision and Order) that, to the extent Plaintiff's 🚩Section 1981 claim is based on alleged sex-based discrimination, that claim must be dismissed because 🚩Section 1981 regards only race-based discrimination.

With regard to that portion of Plaintiff's 🚩Section 1981 claim based on alleged race-based discrimination, the Court finds that Plaintiff has not adduced admissible evidence from which a rational fact-finder could conclude that Defendant had a racially discriminatory policy or custom that caused a racially hostile environment. The Court renders this finding

for the reasons stated in Defendant's memoranda of law and the reasons the Court rejected Plaintiff's Title VII racial-harassment claim. *See, supra,* Parts I.C.1., I.C.3. and III.A. of this Decision and Order

For all of these reasons, Plaintiff's sixth cause of action is dismissed.

### D. Plaintiff's Request for Punitive Damages

After carefully considering the matter, the Court dismisses Plaintiff's request for punitive damages on the alternative ground that Defendant's challenge to the request has facial merit (for the reasons stated in Defendant's memorandum of law in chief (*see, supra,* Part I.C.1. of this Decision and Order) and Plaintiff has failed to oppose that challenge. In addition to the case cited by Defendant, the Court relies on *Johnson v. New York City Health & Hosp. Corp.*, 98-CV-5505, at \*3 (S.D.N.Y. Aug. 2, 2000) ("It is equally well settled that punitive damages are unavailable against municipalities in actions under Title VII and 🚩§§ 1981 and 🚩1983.") and *Brennan v. City of White Plains, 67 F. Supp.2d 362, 378 (S.D.N.Y. 1999)* ("Punitive damages cannot be recovered under the Human Rights Law against any defendant....") (citation omitted). Alternatively, the Court dismisses Plaintiff's request for punitive damages as abandoned, finding that the choice of Plaintiff's counsel to carefully defend some claims but not that request was deliberate.

For all of these reasons, Plaintiff's request for punitive damages is dismissed.

### E. Any Retaliation Claim Asserted by Plaintiff

As argued by Defendant, the word "retaliate" appears twice in Plaintiff's Complaint (i.e., in the first and sixth sentences of Paragraph 21) and nowhere in its Causes of Action Section. (*See generally* Dkt. No. 1, ¶¶ 7-51 [Plf.'s Compl.].) While a *pro se* complaint must be extra-liberally construed as asserting all claims consistent with its factual allegations,[85] a counseled litigant's complaint need not be so construed. Rather, a counseled litigant is the master of his own complaint,[86] which need be construed with only ordinary liberality.[87] Here, even liberally construing Plaintiff's Complaint, the Court finds that the omission of the word "retaliate" (or the notion of retaliation) from the well-pleaded Causes of Action Section of the Complaint is

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 408 of 482

conspicuous, reasonably leading a defendant (and the Court) to conclude that Plaintiff had consciously chosen *not* to assert a claim of retaliation. [88] For this reason alone, this late-blossoming claim can be, and is, dismissed.

**\*28** In any event, even if the Court were to liberally construe the Complaint as asserting such a claim, it would dismiss the claim for the reasons stated by Defendant in its memoranda of law: Plaintiff cannot establish a causal link between his protected activity on March 14, 2014, and his receipt of a supervisor's memorandum on April 7, 2014, which would have been issued by Sgt. B anyway due to Plaintiff's admitted failure to comply with a direct order to assist other deputies in moving the transport vehicles (even after he came on duty, according to his own version of events). *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order. The Court notes that three of the reports written by Plaintiff's fellow deputies to Sgt. B (regarding the incident on March 12, 2014) were dated March 13, 2014—a day before Plaintiff wrote his report of March 14, 2014, regarding the incident—further establishing that the impetus for Sgt. B's supervisor's memorandum predated Plaintiff's report. (Dkt. No. 13, Attach. 10, at 7, 8, 9.)

As yet another alternative ground for dismissing this claim, the Court finds that, by itself, the receipt of a supervisor's memorandum (which was not formal discipline and could be, and was, issued by a sergeant or higher ranking officer without the Administration's approval) was not a sufficiently serious adverse employment action for purposes of Plaintiff's retaliation claim. *Cf. Vandesande v. Miami-Dade Cty.*, 431 F. Supp.2d 1245, 1254 (S.D. Fla. 2006) (finding that supervisor's memorandum to county firefighter regarding his excessive cell phone usage during training and other aspects of his behavior that were allegedly bordering on insubordination did not constitute "adverse employment actions" necessary to support retaliation claim under Fair Labor Standards Act, because memorandum did not cause firefighter any present or foreseeable future injury).

For all of these reasons, any retaliation claim asserted by Plaintiff is dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 13) is **GRANTED**, and Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7116126

---

### Footnotes

1    After expressly admitting the fact asserted by Defendant, Plaintiff attempts to assert another fact. (Dkt. No. 19, at ¶ 3 [Plf.'s Rule 7.1 Response].) The fact asserted by Defendant will be deemed admitted. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit' "); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed' "). Setting aside that the additional fact that Plaintiff attempts to assert follows an express admission, the additional fact will be ignored for each of two alternative reasons. First, to the extent that it attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, that the words "who work in the Transport Unit" mean "who work the same shift in the Transport Unit"), that attempt is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials ... improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting

2015 WL 1413362
United States District Court,
N.D. New York.

K. Felicia DAVIS, Plaintiff,

v.

CITY OF SYRACUSE; and
Stephanie A. Miner, Defendants.

No. 5:12–CV–0276 (GTS/DEP).
|
Signed March 27, 2015.

**Attorneys and Law Firms**

K. Felicia Davis, Syracuse, NY, pro se.

Bond, Schoeneck & King, Plcc, Laura H. Harshbarger, Esq., Kristen E. Smith, Esq., of Counsel, Syracuse, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in his employment discrimination action filed by K. Felecia Davis ("Plaintiff") against the City of Syracuse and Stephanie A. Miner ("Defendants"), is Defendants' motion for summary judgment. (Dkt. No. 63.) For the reasons set forth below, Defendants' motion is granted.

**I. RELEVANT BACKGROUND**

**A. Summary of Plaintiff's Claims and Defendants' Counterclaims**

Generally, in her Amended Complaint, Plaintiff asserts the following ten claims arising from her alleged wrongful termination from the position of Board Administrator of the City of Syracuse's Citizen Review Board on February 4, 2011, after she took maternity leave in late October of 2010:(1) a claim against Defendant City for sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); (2) a claim against Defendant City for retaliation under Title VII; (3) a claim against Defendant City for sex discrimination under the New York State Human Rights Law, New York Executive Law

§ 296 *et seq.* ("the Executive Law"); (4) a claim against Defendant City for retaliation under the Executive Law; (5) a claim against Defendant Miner for aiding and abetting sex discrimination under the Executive Law; (6) a claim against Defendant Miner for aiding and abetting retaliation under the Executive Law; (7) a claim against both Defendants for violation of the right to due process under the Fourteenth Amendment and 42 U.S.C. § 1983; (8) a claim against Defendant Miner for violation of the right to equal protection under 42 U.S.C. § 1983 and the Fourteenth Amendment; (9) a claim against Defendant City for violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); and (10) a claim against Defendant Miner for retaliation under 42 U.S.C. § 1983 and the First Amendment. (Dkt. No. 6.) Familiarity with the factual allegations supporting these claims is assumed in this Decision and Order, which is intended primarily for the review of the parties.

Generally, in their Answer, Defendants assert the following four counterclaims arising from Plaintiff's alleged practice of law using a City-paid secretary and City computer during the hours that she claimed to have worked for the City: (1) a counterclaim of fraud under New York State common law; (2) a counterclaim of negligent misrepresentation under New York State common law; (3) a counterclaim of unjust enrichment under New York State common law; and (4) a counterclaim of faithless servant under New York State common law. (Dkt. No. 8.)

**B. Undisputed Material Facts**

The following facts were asserted and properly supported by Defendants in their Statement of Material Facts and were either admitted or denied without proper support by Plaintiff in her Response thereto. (*Compare* Dkt. No. 63, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 67, Attach. 10 [Plf.'s Rule 7.1 Response].)

**\*2** Before reciting these facts, the Court pauses to explain the reason for certain deficiencies in Plaintiff's response to Defendants' Statement of Facts. On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute. Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to ... oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant or declarant is

competent to testify on matters stated."); *Rodriguez v. Bubnis,* 11–CV–1436, 2014 WL 6078529, at *10, n. 25 (N.D.N.Y. Nov. 13, 2014) (Suddaby, J.) (collecting cases). Moreover, the assertion of additional material facts by a non-movant is permitted only if the additional material facts are both (1) in dispute and (2) contained in separately numbered paragraphs. N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's response may also set forth any additional material facts that the non-movant contends are *in dispute* in *separately numbered* paragraphs.") (emphasis added) . [1]

### *Plaintiff's Employment by the City*

1. Plaintiff was a full-time employee of the City of Syracuse, and served as the Administrator of the City's Citizen Review Board ("CRB"). [2]

2. Plaintiff was not employed to act as a lawyer for the City or the CRB. [3]

3. Plaintiff's employment was not covered by an individual employment contract or by any of the City's collective bargaining agreements; rather, she served at the discretion of the CRB and was able to be removed by the CRB for good cause. [4]

4. The CRB is comprised of Board members who are volunteer citizens appointed by the Syracuse Common Council and the Mayor. [5]

### *Mayor's Early Decisions Regarding the CRB*

5. Even before becoming Mayor, as a Common Councilor, Mayor Stephanie Miner heard comments about the CRB that were overwhelmingly negative, and heard story after story about citizens who went to the CRB office and found it closed or who made complaints to the CRB but did not hear back from it. [6]

6. When Mayor Miner took office, the CRB was one of the issues she wanted to address. [7]

7. In her first month in office (January of 2010), Mayor Miner denied the CRB's request for authorization to hire a new employee (to fill a vacant investigator position), because she

was unwilling to devote taxpayer money to a CRB that was not producing value to the taxpayers, deciding instead that the City's money would be better spent on commissioning a study of CRBs in other cities that were more effective. [8]

8. As a result, Mayor Miner appointed Christine Fix to conduct the study. [9]

9. After Ms. Fix completed her report of CRB models in June 2010, Mayor Miner distributed the report within her administration, with the directive that she wanted to explore a new model for the CRB that would be more effective and impactful. [10]

### *Plaintiff's Non–Appearance at the Paulk Trial*

**\*3** 10. The *Paulk* case was a federal lawsuit brought by a citizen, Martin Paulk, against two SPD officers (*Paulk v. Lester,* 06–CV–1343 [N.D.N.Y.] ). [11]

11. On October 21, 2010, a process server attempted to personally serve a subpoena on Plaintiff at her home. [12]

12. The subpoena called for CRB documents and for Plaintiff to testify at the *Paulk* trial on Monday, November 1, 2010. [13]

13. Plaintiff was not home, but her husband reached her by telephone. [14]

14. Plaintiff spoke by telephone to the gentleman attempting to deliver the papers, and instructed him to deliver the papers to the City Corporation Counsel's office. [15]

15. The process server delivered the papers to the City's Corporation Counsel office on Friday, October 22, 2010. [16]

16. The *Paulk* trial was scheduled to begin on November 1, 2010. [17]

17. Before serving the subpoena, Richard Brickwedde (Paulk's attorney), had not indicated a desire to call Plaintiff as a witness . [18]

18. On October 22, 2010, Joseph Doyle, a City attorney on the *Paulk* case, submitted a letter to the presiding judge,

United States District Judge Charles Kornmann, requesting a conference to address the subpoena. [19]

19. Doyle's co-counsel, James McGinty, anticipated that Judge Kornmann would agree with the City's position that Brickwedde should not be allowed to call Plaintiff as a witness in the *Paulk* trial . [20]

20. Judge Kornmann did not address the issue of the subpoena until a pre-trial conference on October 28, 2010, during which he decided that Brickwedde would be allowed to call Plaintiff. [21]

21. At the time of the pre-trial conference on October 28, 2010, McGinty and Doyle assumed, from the fact that Plaintiff had told the process server to bring the package to their office, that Plaintiff knew that the package contained a subpoena in the *Paulk* case. [22]

22. At the time of the pre-trial conference on October 28, 2010, McGinty and Doyle were not aware that Plaintiff was pregnant or that she would be going on maternity leave. [23]

23. On Friday, October 29, 2010, McGinty called the CRB office and asked to speak with Plaintiff. [24]

24. The CRB secretary told McGinty that Plaintiff was on maternity leave. [25]

25. Plaintiff's maternity leave began on October 29, 2010. [26]

26. McGinty explained to Plaintiff's secretary that a subpoena had been issued to Plaintiff for her to testify in the *Paulk* trial on Monday at 9:00 a.m., and that whether she was on leave from work was immaterial. [27]

27. McGinty told Plaintiff's secretary that she needed to get in touch with and tell her that she needed to appear as subpoenaed or, if she could not, she needed to call the attorney who issued the subpoena, Mr. Brickwedde, to make other arrangements for her testimony. [28]

28. Plaintiff's secretary called her that day and informed her that a man from the Corporation Counsel's office had called and indicated that she should call an attorney by the name of Brickwedde . [29]

**\*4** 29. Plaintiff called Brickwedde and left a voicemail informing him that something had been received by the City for her and that she was going on maternity leave. [30]

30. Brickwedde returned Plaintiff's call but missed her and also left a voicemail. [31]

31. Brickwedde advised Plaintiff that he could not speak to her for ethical reasons and instructed her to speak to McGinty. [32]

32. Plaintiff did not call McGinty or Doyle. [33]

33. On the first day of the trial (November 1, 2010), Brickwedde called Plaintiff as a witness; however, she was not there. [34]

34. When Plaintiff did not appear, McGinty called the CRB office. [35]

35. The CRB secretary answered and told McGinty that Plaintiff had called her earlier that day to say that she was in labor and going to the hospital, which information McGinty relayed to Judge Kornmann. [36]

36. Plaintiff was not in the hospital giving birth on November 1, 2010, but was at her doctor's office; she gave birth on November 9, 2010.

37. Meanwhile, at trial, another issue was occurring: McGinty and Doyle were informed that Brickwedde had independently obtained a CRB report stating that the CRB had found his client's complaint of police misconduct "substantiated."

38. When questioned by Judge Kornmann as to why McGinty and Doyle had not produced the document during discovery, McGinty explained that the CRB had not provided it to them (after they had requested documents from the CRB during the course of the *Paulk* discovery process). [37]

39. As a result of Plaintiff's failure to appear, Judge Kornmann imposed a sanction on the police officers in the form of allowing the CRB's "substantiated" finding to come into the record without allowing any testimony to explain or minimize the impact of the detrimental document on the police officers' case. [38]

40. After a three-day trial, the jury returned a verdict in favor of the City's police officers. [39]

*New Information Emerges*
*Concerning Plaintiff's Whereabouts*

41. On November 8, 2010, Brickwedde filed a motion for a new trial and for additional sanctions in the *Paulk* case.

42. The motion was based, in large part, on Plaintiff's non-appearance at trial and the City's failure to produce all relevant CRB documents during discovery. [40]

43. On November 16, 2010, Brickwedde supplemented his motion papers on the ground that he had found out that Plaintiff had voted in an election on November 2, 2010, while the three-day *Paulk* trial was still ongoing. [41]

44. From the perspective of McGinty and City Corporation Counsel Juanita Perez–Williams, this fact called into question the information that Plaintiff's secretary had provided to McGinty on November 1, 2010, and that McGinty had, in turn, had provided to Judge Kornmann (i.e., that Plaintiff was in labor and going to the hospital on November 1, 2010). [42]

45. On November 24, 2010, Judge Kornmann issued a memorandum ordering the production of extensive documents and information about Plaintiff's whereabouts at the time of trial, as well as "all records of the office [Plaintiff] heads which deal in any way with [the *Paulk* ] case."

 **\*5** 46. To explore these issues, Judge Kornmann scheduled a hearing for January 24, 2011. [43]

47. In a letter to Perez–Williams dated December 3, 2010, Plaintiff stated, "I made a call to Mr. Brickwedde and left a voicemail informing him of my late stage of pregnancy and start of labor (I had begun to dilate), and informed [him] that I had not seen any subpoena." [44]

48. In response to Judge Kornmann's memorandum of November 24, 2010, Plaintiff provided Corporation Counsel's office with a number of CRB documents related to *Paulk* that had not been provided in response to earlier requests to her office for CRD documents related to *Paulk*. [45]

*The City's Investigation into Plaintiff*
*and the Operation of the CRB*

49. When Perez–Williams learned in late-November of the motion for a new trial and for sanctions, she informed Mayor Miner as to what was occurring; Miner first learned about the subpoena and Plaintiff's non-appearance only after Plaintiff had not appeared. [46]

50. The *Paulk* situation was deeply concerning to Mayor Miner. [47] At the time Miner took office, she believed that something had to be done about the CRB. [48] The *Paulk* matter brought the perceived problem of the CRB into a state of immediacy for her. [49] As she saw the situation, instead of merely being a waste of resources, the CRB now was creating potential liability for the City. [50]

51. Upon hearing about the *Paulk* subpoena incident, Mayor Miner asked Perez–Williams to "drill down" into what was going on with Plaintiff and the CRB and to report back to her. [51]

52. The City's investigation indicated the following:

   a. As of the end of November 2010, the CRB's two employees (Plaintiff and her secretary, Carolyn Williams) had not entered time sheets into the City's timekeeping/payroll system since June; this meant that, even though Plaintiff was currently claiming to be on maternity leave, and had been (according to her) on such leave since late October, she was allowing the City to pay her as an active employee, without having to use any of accrued time-off benefits. [52]

   b. On December 2, 2010, Plaintiff signed and submitted six months' worth of time sheets on a single day. [53]

   c. On December 8, 2010, Plaintiff filled out an FMLA request form, which "requested" permission to take an FMLA leave that had begun six weeks earlier. [54]

   d. Several CRB Board positions were vacant, other Board members had been appointed but never properly sworn in, and still other Board members' terms had expired, such that they were serving terms to which they had not been appointed; this information led Perez–Williams

to conclude that the CRB could not legally take action, because it did not have a quorum of individuals properly appointed and installed in accordance with the City charter. [55]

e. The CRB had not been forwarding citizen complaints to the Syracuse Police Department Internal Affairs Division ("IAD") on a timely basis so that the complaints could be properly investigated. [56]

**\*6** f. For example, on December 16, 2010, the CRB sent 12 citizen complaints to IAD. [57]

g. The 12 citizen complaints Plaintiff's office forwarded on December 16, 2010, had been marked as received by the CRB as much as nine months earlier; before the mass mailing to IAD on December 16, 2010, the CRB office had sent only two citizen complaints to IAD for all of 2010. [58]

h. The local law requires the CRB to forward citizen complaints to IAD upon receiving them because IAD has the first 45 days to conduct its investigation. [59]

i. While the CRB may have kept statistical reports at its office, and given those reports to the Syracuse Common Council during each budget year, the CRB had not *published monthly* and *quarterly* statistical reports, as required by the CRB ordinance. [60]

j. The last available meeting minutes were from June 2010. [61]

k. In early October of 2010, Plaintiff refused to reveal, to a Common Councilor, the current CRB Board members' names (which were considered by the Common Councilor and Perez–Williams to be public information). [62]

l. Several times Plaintiff was late in submitting her budget requests to the City's Finance Department. [63]

53. Perez–Williams shared these and the remainder of her findings with Mayor Miner. [64]

54. Based on these overall findings, including the negligent handling of the *Paulk* subpoena and the "numerous deficiencies in the operation of the CRB, caused in large part by [her] failure to exercise [her] statutory responsibilities," Mayor Miner decided to terminate Plaintiff's employment. [65]

*The City Discovers Plaintiff's Private*
*Practice Work in Her City Office on City Time*

55. Mayor Miner reached out to the New York State Comptroller and requested an audit of the CRB office concerning the issues uncovered in the City's investigation. [66]

56. Mayor Miner made this request for an audit within days of Plaintiff's termination. [67]

57. The State Comptroller performed its audit largely in late 2011 and early 2012. [68]

58. In connection with the audit process, the City was asked to provide the State Comptroller with access to the CRB office and its paper files and electronic records, including the City computer that had been issued to Plaintiff. [69]

59. As a result of the City's review of the data and information requested in connection with the audit, it was brought to Mayor Miner's attention that Plaintiff had used the City's resources (i.e., the City's office space, the City-paid secretary, the City's fax machine, the City's computer, etc.) to engage in her private law practice, and that Plaintiff had submitted time sheets claiming to have worked for the City when she had been engaged in her private law practice, not City business. [70]

60. By the late spring of 2012, Mayor Miner believed that the City was due potentially significant recompense; this determination grew out of the documentation the City reviewed in connection with and in response to the ongoing audit, which was occurring at the time the City answered the Complaint. [71]

**\*7** 61. The Comptroller's report was published in June 2012 and stated, among other things, that "[t]he analysis found that the Administrator spent a significant amount of time during normal business hours engaging in private legal work using a City-owned computer." [72]

*The City Remakes the CRB*

62. Immediately after Plaintiff's termination, the City changed the locks on the doors of the CRB office, and the CRB ceased to function (for the time being). [73]

63. The City formed an ad hoc committee to propose reforms to the CRB and, as a result of this committee's work, the Common Council passed, and Mayor Miner signed into law, new legislation designed to ensure that the CRB would be accountable and effective going forward . [74]

64. The City started fresh with new citizens Board members (five new appointments); and the new CRB Board selected a new Administrator. [75]

### C. Summary of Parties' Arguments on Defendants' Motion

#### 1. Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants assert seven arguments. (Dkt. No. 63, Attach. 13 [Defs.' Memo. of Law].)

First, Defendants argue, Plaintiff's pregnancy-discrimination claims under Title VII and the Executive Law should be dismissed for two reasons: (a) even assuming Plaintiff can meet her modest *prima facie* burden on such a claim, the City need only articulate a legitimate, non-discriminatory reason for its action (which it has done, given Plaintiff's negligence with respect to the *Paulk* matter as well as her numerous deficiencies in the operation of the CRB); and (b) the burden then shifts to Plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the City were not its true reasons but were a pretext for discrimination, and that intentional discrimination was the real reason for the adverse action (which she has not done, and cannot do, given that her disagreement with the City's assessment of her performance does establish pretext, her conspiracy theory is sheer speculation, McGinty is not a "similarly situated" comparator, her claim of being "scapegoated" for the *Paulk* debacle undercuts her pregnancy-discrimination theory, and no reasonable factfinder could conclude that the City completely overhauled the CRB merely because Plaintiff had a baby). (*Id.*)

Second, Defendants argue, in any event, Plaintiff's retaliation claims under Title VII and the Executive Law should be dismissed for three reasons: (a) after a plaintiff has established a *prima facie* case of retaliation (showing protected activity,

an adverse employment action, and a causal relationship), the employer can then meet its burden of articulating a legitimate, non-retaliatory reason for filing counterclaims by establishing a reasonable good-faith belief that the claims were valid, after which any presumption of retaliation drops out and the plaintiff bears a "substantial burden," pursuant to which she must show that, but-for the protected activity, the employer would not have taken the adverse action; (b) here, Plaintiff cannot even establish a *prima facie* case because a non-frivolous compulsory counterclaim is generally not, as a matter of law, an adverse employment action, and the counterclaims asserted by the City in this action are amply supported by the record; and (c) in any event, Plaintiff cannot establish pretext because the fact that the City's counterclaims were filed shortly after Plaintiff's Complaint was filed does not save Plaintiff's retaliation claims (in that such a proximity of time is necessary with counterclaims), and the City was investigating any actionable malfeasance long before Plaintiff filed her Complaint. (*Id.*)

**\*8** Third, Defendants argue, Plaintiff's aider-and-abettor claims under the Executive Law should be dismissed because there is no primary violation of the Executive Law to aid or abet. (*Id.*)

Fourth, Defendants argue, Plaintiff's "stigma plus" procedural due process claim under the Fourteenth Amendment should be dismissed for three reasons: (a) even if she could show a damage to her reputation (thus satisfying the "stigma" element), she was, as an at-will government employee, afforded all the process she was due, given the availability of an Article 78 proceeding to clear her name (which suffices to provide the requisite post-deprivation process to a terminated employee, even if that employee fails to avail herself of that process); (b) she cannot dispute that she was an at-will employee, because she was not subjected to any employment or collective bargaining agreement (and, indeed, her argument that she served at the pleasure of the CRB supports the conclusion that she was an at-will employee); and (c) to the extent Plaintiff argues that Mayor Miner lacked the authority to terminate her, that argument relates to a due process claim and thus Plaintiff was able to assert it in an Article 78 proceeding. (*Id.*)

Fifth, Defendants argue, Plaintiff's equal protection claim under the Fourteenth Amendment should be dismissed for the same reasons that her Title VII pregnancy-discrimination claim should be dismissed. (*Id.*)

Sixth, Defendants argue, Plaintiff's FMLA claim should be dismissed for the same reasons that her Title VII pregnancy-discrimination claim should be dismissed. (*Id.*)

Seventh, Defendants argue, Plaintiff's retaliation claim under the First Amendment should be dismissed for three reasons: (a) her testimony before Judge Kornmann during the sanctions hearing of January 24, 2011, was not "protected" (in that she was not speaking as a citizen but as an employee); (b) in any event, her termination on February 4, 2011, was not caused by that testimony but by her conduct in connection with the *Paulk* subpoena in November of 2010; and (c) at the very least, Defendant Miner is protected from liability as a matter of law by the doctrine of qualified immunity (given that the issue of whether Plaintiff was speaking as a citizen rather than as an employee was not "clearly established" during the time in question). (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in her opposition memorandum of law, Plaintiff asserts seven arguments. (Dkt. No. 67, Attach. 9 [Plf.'s Opp'n Memo. of Law].)

First, Plaintiff argues, she has established a sex-discrimination claim under Title VII (and presumably under the Executive Law) for two reasons: (a) Defendants do not dispute that she has established a *prima facie* case that she was discriminated against by the City due to her pregnancy; and (b) as a result, to avoid summary judgment, she need not show that the City's proffered reasons were false or not a factor but only that the prohibited factor (i.e., her pregnancy) was among the motivating factors (which she has done, due to Defendants' admission that her non-appearance at trial, which occurred while she was out on maternity leave, was a motivating reason for her termination). (*Id.*)

**\*9** Second, Plaintiff argues, she has established a retaliation claim under Title VII (and presumably under the Executive Law) because the City's counterclaims are baseless in that (a) she was permitted by the CRB to engage in a private legal practice and (b) Defendant Miner knew, before the events in question, that Plaintiff was engaging in that private legal practice. (*Id.*)

Third, Plaintiff argues, she has established an aiding-and-abetting claim against Defendant Miner under the Executive Law because Miner worked to develop what she knew were baseless reasons for Plaintiff's termination, which reasons

were relied on by the City of Syracuse to engage in sex discrimination and retaliation under the Executive Law. (*Id.*)

Fourth, Plaintiff argues, she has established a "stigma plus" procedural due process claim under the Fourteenth Amendment for four reasons: (a) she suffered injury to her reputation in that she was denied a job with Cornell Cooperative Extension (thus satisfying the "stigma" element); (b) she experienced defamation plus the loss of government employment (thus satisfying the "plus" element); (c) she was not afforded a pre-deprivation hearing although she had an implied employment contract with the CRB (due to the fact that CRB Board members had to determine whether to continue her employment each year) and her termination was not random and unauthorized (due to the fact that Defendant Miner was a high-ranking official with final authority over significant matters); and (d) indeed, even if she was an at-will employee, she was not afforded even a post-deprivation hearing (although she requested one). (*Id.*)

Fifth, Plaintiff argues, she has established an equal protection claim under the Fourteenth Amendment for four reasons: (a) she is a member of a protected class (in that she is female); (b) she was qualified for her position (in that she served in her capacity as CRB Administrator for 17 years, held more educational credentials than required, and had never been disciplined or reprimanded); (c) she suffered an adverse employment action (in that she was terminated from her employment); and (d) the circumstances surrounding the employment action give rise to an inference of discrimination (in that a similarly-situated male was not disciplined for conduct that Plaintiff was accused of committing but did not actually commit). (*Id.*)

Sixth, Plaintiff argues, she has established an FMLA claim for five reasons: (a) she was an eligible employee under the FMLA (in that she had worked the previous 12 months); (b) the City was a covered employer under the FMLA (in that it had the requisite number of employees); (c) she was entitled to the leave of absence (in that her maternity leave had been approved by the CRB prior to October of 2010); (d) she gave notice to the City of her intention to take leave (in that the City had such notice on or before October 6, 2010, and later when she emailed the City requesting an FMLA form); and (e) she was denied benefits to which she was otherwise entitled (in that the termination interrupted her light duty leave, and the reason for the termination was a pretext for discrimination). (*Id* .)

**\*10** Seventh, Plaintiff argues, she has established a retaliation claim under the First Amendment for four reasons: (a) her testimony at the hearing of January 24, 2011, was protected speech; (b) the subject about which she was called to testify was of public concern in that police misconduct has been recognized as being of public interest; (c) the proximity of her termination to her testimony (i.e ., 10 days) demonstrates discriminatory animus; and (d) Defendant Miner is not protected by qualified immunity (in that Plaintiff's First Amendment rights were clearly established at the time of her termination due to the fact that 📄 *Jackler v. Bryne,* 658 F.3d 225 [2d Cir.2011] was decided in February of 2011). (*Id.*)

**3. Defendants' Reply Memorandum of Law**
Generally, in their reply memorandum of law, Defendants assert seven arguments. (Dkt. No. 72 [Defs.' Reply Memo. of Law].)

First, Defendants argue, Plaintiff has taken liberties with the record in two ways: (a) she cites to the record nowhere in her opposition memorandum of law; and (b) for the most part, her primary evidence (her own affidavit) is not based on her personal knowledge, contains inadmissible material such as hearsay, and/or sets forth legal conclusions. (*Id.*)

Second, Defendants argue, Plaintiff's denials of Defendants' statements of material fact are ineffective for four reasons: (a) she denies many facts about which she could not possibly have any firsthand knowledge or evidence (e.g., conversations or telephone calls to which she was not a party, decisions made and impressions held by Mayor Miner, pre-trial events in the *Paulk* matter, as often is evident by her reliance on her "information and belief"; (b) she denies several facts about matters that are independently verifiable based on court records or documentary evidence, and about which she has no admissible evidence to dispute (e.g., the existence and contents of the *Paulk* subpoena, the date of the *Paulk* trial, the Paulk jury verdict, and the date and contents of the State Comptroller's report); (c) she denies material facts that she plainly admitted in her own prior sworn testimony (e.g., the fact that a process server attempted to serve her at her home, the fact that she did not call McGinty or Doyle after receiving a voice mail from Brickwedde, and the fact that she was aware of the *Paulk* case prior to the trial); and (d) in many instances, she muddles Defendants' fact statements by going off in another direction she likes better, which is insufficient to call Defendants' facts into dispute). (*Id.*)

Third, Defendants argue, Plaintiff fails to save her pregnancy-discrimination claim for three reasons: (a) in her attempt to establish pretext, she relies on the incorrect legal standard (i.e., one applicable in a mixed-motive case, which this is not); (b) in any event, her conspiracy theory (i.e., that the subpoena incident was a strategic effort to adversely impact and compromise Plaintiff due to her pregnancy) is supported only by speculation and hearsay, and contradicts the testimony of McGinty, Perez–Williams and Mayor Miner; and (c) her excuses for her own ineffectiveness and the CRB's ineffectiveness do not establish pretext (and fail to show that the City's belief that she did, in fact, know that a subpoena existed, was not honestly held at the time it decided to terminate her employment). (*Id.*)

**\*11** Fourth, Defendants argue, Plaintiff fails to save her retaliation claim under Title VII and the Executive Law for two reasons: (a) to avoid dismissal of this claim, she must provide sufficient, competent evidence that Defendants' counterclaims are the product of retaliatory animus; and (b) instead, Plaintiff offers only speculation (e.g., regarding Common Councilors' knowledge of her private legal practice) and misstatements of record evidence (e.g., regarding the scope and source of Mayor Miner's knowledge of Plaintiff's private legal practice, and the nature of the City's authorization of a CLE course that Plaintiff attended). (*Id.*)

Fifth, Defendants argue, Plaintiff fails to save her due process claim under the Fourteenth Amendment for two reasons: (a) the single case that Plaintiff cites in support of her argument that she had an implied employment contract ( 📄 *Potts v. City of Utica,* 86 F.2d 616 [2d Cir.1936] ) is, in addition to being old, factually distinguishable from the current case; and (b) the sole record evidence that Plaintiff adduces in support of her argument that she had an implied employment contract (i.e., the affidavit of former-CRB Board member Homer Davis) is speculative (in that the Davis ceased serving as a CRB Board member in 2008) and immaterial (in that it addresses a purported agreement to allow Plaintiff to practice law privately on City time), and in any event actually supports the fact that Plaintiff served at-will (albeit at the will of the CRB). (*Id.*)

Sixth, Defendants argue, Plaintiff fails to save her FMLA claim for two reasons: (a) her argument that Defendants interfered with her leave by terminating her while on "light duty leave" implies that *any* termination while on FMLA leave is a violation of the FMLA, which is not the law; (b)

as established by Defendants earlier, Plaintiff was terminated for legitimate, non-discriminatory reasons, and she has not presented sufficient evidence to rebut these reasons. (*Id.*)

Seventh, Defendants argue, Plaintiff fails to save her retaliation claim under the First Amendment for two reasons: (a) by focusing on whether her testimony at the *Paulk* hearing was protected speech, Plaintiff ignores Mayor Miner's position that there is no causal connection between that testimony and Plaintiff's termination; and (b) in any event, she has not overcome Mayor Miner's entitlement to qualified immunity because, although the case of *Jackler v. Bryne, 658 F.3d 225 (2d Cir.2011),* was decided in July of 2011, the contrary case of *Bearss v. Hilton, 445 F. App'x 400 (2d Cir.2011),* was decided in November of 2011, rendering the state of the law not "clearly established" when Mayor Miner acted. (*Id.*)

## II. GOVERNING LEGAL STANDARD

Under *Fed.R.Civ.P. 56,* summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(a).* In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).* In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett, 477 U.S. 317, 323–24 (1986).* However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. *Fed.R.Civ.P. 56(a),*(c),(e).

**\*12** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson, 477 U.S. at 248.* As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998)* [citation omitted]. As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material

facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585–86 (1986).*

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute—even if that nonmoving party is proceeding *pro se* .[76] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[77] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[78] For this reason, this Court has often enforced Local Rule 7.1(a) (3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has willfully failed to properly respond to that statement[79]—even where the nonmoving party was proceeding *pro se* in a civil rights case.[80]

Finally, generally, special solicitude is not extended to *pro se* litigants who are attorneys. *See e.g., Harbulak v. Suffolk, 654 F.2d 194, 198 (2d Cir.1981)* ("[Plaintiff] is a lawyer and, therefore, cannot claim the special consideration which the courts customarily grant to pro se parties."); *Davey v. Dolan, 453 F.Supp.2d 749, 754 (S.D.N.Y.2006)* ("[P]laintiff here is also a member of the New York bar and his papers will be viewed accordingly .")[81]

## III. ANALYSIS

### A. Plaintiff's Sex–Discrimination Claims Against the City Under Title VII and the Executive Law

After carefully considering the matter, the Court dismisses these claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order.

### B. Plaintiff's Retaliation Claims Against the City Under Title VII and the Executive Law

After carefully considering the matter, the Court dismisses these claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add one point. Plaintiff's reliance on the motivating-factor standard (in her opposition memorandum of law of October 21, 2014) ignores the Supreme Court's decision of June 24, 2013) in *Univ. of Tex. SW Med. Ctr. v. Nassar,* 133 S.Ct. 2517 (2013), in which the Court held that the level of causation that must be proved in a Title VII retaliation claim is one of but-for causation.

### C. Plaintiff's Aiding–and–Abetting Claims Against Mayor Miner Under the Executive Law

**\*13** After carefully considering the matter, the Court dismisses these claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add one point. In the alternative, the Court would dismiss this claim without prejudice to refiling in state court pursuant to 28 U.S.C. § 1367 due to the fact that no federal claims survive Defendants' motion.

### D. Plaintiff's Due Process Claim Against Defendants Under the Fourteenth Amendment

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add two points.

First, the Second Circuit's decision in *Potts v. City of Utica,* 86 F.2d 616 (2d Cir.1936), is distinguishable from the current case in that, in addition to not addressing a due process claim, it did not address the issue of whether an implied employment contract had been created by the fact that each year a different configuration of board members of a city agency exercised its discretion *not* to remove a city employee for good cause.

Second, in any event, there is a lack of admissible record evidence from which a rational fact-finder could conclude that the CRB Board members in fact exercised their discretion *not* to remove Plaintiff for good cause each year (especially during the years 2009 and 2010). As an initial matter, it can hardly be said that there was a *different configuration* of the Board each year. *See, supra,* Paragraphs 52(d) and 52(k) of Part I.B.of this Decision and Order. Moreover, even if there had been a different configuration each year, Plaintiff points to no record evidence establishing that the issue of her continued employment was raised annually at CRB meetings. (*See generally* Dkt. No. 67, Attach. 9 [Plf.'s Opp'n Memo. of Law].) Finally, even if the issue had been so raised, Plaintiff has adduced evidence admitting that the CRB experienced problems gathering a quorum to take official action in resolving that issue. (Dkt. No. 67, Attach. 1, at Par. 16 [Homer Davis Affid.].) *See also* Paragraph 52(d) of Part I.B.of this Decision and Order.

### E. Plaintiff's Equal Protection Claim Against Mayor Miner Under the Fourteenth Amendment

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order.

### F. Plaintiff's FMLA Claim Against the City

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order.

### G. Plaintiff's Retaliation Claim Against Mayor Miner Under the First Amendment

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add two points.

**\*14** First, the fact that Mayor Miner was previously aware of Plaintiff's representation of her husband in a lawsuit while she was employed as the Administrator of the CRB does not mean that Miner knew that Plaintiff was regularly engaged in a private law practice in City office space, using a City-paid secretary and City computer during the hours that she claimed to have worked for the City. The sole admissible record evidence on this subject is that Miner did not have such knowledge. (*Compare* Dkt. No. 63, Attach. 8, at ¶¶ 33–34 [Miner Decl., admitting awareness that Plaintiff had represented husband in case in which he was the plaintiff, but denying knowledge of scope of Plaintiff's legal practice] *and* Dkt. No. 67, Attach. 5, at 3–5, 6–7 [attaching pages "11," "12," "13," "47," and "48" of Miner's Dep. Tr., stating that she worked on case in which Plf.'s husband was a plaintiff, and had occasion to believe Plaintiff represented him in that case] *with* Dkt. No. 67, Attach. 1, at ¶¶ 24–25 [Homer Davis Affid.,

asserting "[u]pon information and belief" that Miner knew Plaintiff "was a practicing attorney"] *and* Dkt. No. 67, at ¶¶ 40–41 [Plf.'s Decl., asserting Miner's notice of case in which Plaintiff was the lead attorney "sometime in 2001–2002," and fact that "[m]any councilor's [sic] knew I was practicing"].)

Second, in any event, Plaintiff is incorrect when she argues that her First Amendment rights were clearly established at the time of her termination because 🚩 *Jackler v. Bryne,* 658 F.3d 225 (2d Cir.2011), was decided in February of 2011. In fact, *Jackle* r was not decided until July 22, 2011. It was merely *argued* in February of 2011. Moreover, that argument did not occur until February *24,* 2011–20 days after Plaintiff's termination on February 4, 2011. Simply stated, the state of the law was not clearly established on February 4, 2011.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 63) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 6) is ***DISMISSED.***

The parties are advised that remaining in this action are Defendants' four counterclaims against Plaintiff.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1413362, 2015 Wage & Hour Cas.2d (BNA) 179,902

---

## Footnotes

1    The Court notes that, under Fed.R.Civ.P. 56 and N.D.N.Y. Local Rule 7.1, there is no procedure by which a non-movant may assert a "counter statement of [undisputed] material facts" in response to a motion for summary judgment: the vehicle for such undisputed material facts would be a *cross*-motion for summary judgment (i.e., one seeking a judgment due to a *lack* of a genuine dispute of material fact). *See* Fed.R.Civ.P. 56(a); N .D.N.Y. L.R. 7.1(a)(3).

2    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 1 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

3    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 2 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 2 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

4    (Dkt. No. 63, Attach. 8, at ¶ 7 [Miner Decl.].) *See also* City of Syracuse Local Law 11 of 1993 § 6(3)(a),(b).

5    (Dkt. No. 63, Attach. 3, at 7 [attaching page "38" of Davis Dep. Tr.].) *See also* City of Syracuse Local Law 11 of 1993 §§ 1, 4(2), 5(1).

6    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 5 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 5 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted, and in any event that fails show personal knowledge sufficient to controvert fact asserted].)

7    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 6 [Defs.' Rule 7.1 Statement, citing Paragraph 9 of Miner Declaration, which supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 6 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted, and in any event that fails show personal knowledge sufficient to controvert fact asserted].)

8    (Dkt. No. 63, Attach. 8, at ¶¶ 10–11 [Miner Decl.].)

9  (Dkt. No. 63, Attach. 8, at ¶ 10 [Miner Decl.].)

10  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 9 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 9 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

11  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 10 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 10 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

12  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 11 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 11 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Tr. of Hrg. of Jan. 24, 2011 at 16–17, 70 (N.D.N.Y. filed Feb. 9, 2011).

13  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 12 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 12 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

14  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 13 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 13 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

15  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 14 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 14 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Tr. of Hrg. of Jan. 24, 2011 at 16–17, 70 (N.D.N.Y. filed Feb. 9, 2011).

16  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 15 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 15 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

17  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 16 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 16 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

18  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 17 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 17 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

19  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 18 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 18 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

20  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 19 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 19 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

21  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 20 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 20 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

22  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 21 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 21 [Plf.'s Rule 7.1 Response, failing to cite record evidence

2015 WL 4508362
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Margaret P. YETMAN, Plaintiff,
v.
CAPITAL DIST. TRANSP. AUTH., a/
k/a Capital Dist. Transit Auth.; and David
A. Palmer, Individually, Defendants.

No. 1:12–CV–1670 (GTS/CFH).
|
Signed July 23, 2015.

**Attorneys and Law Firms**

Gleason Dunn Walsh & O'Shea, Daniel A. Jacobs, Esq., Ronald G. Dunn, Esq., of Counsel, Albany, NY, for Plaintiff.

Jackson Lewis P.C., Clemente J. Parente, Esq., Kristi M. Rich Winters, Esq., of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this employment civil rights action filed by Margaret P. Yetman ("Plaintiff") against the Capital District Transportation Authority and David A. Palmer ("Defendants"), is Defendants' motion for summary judgment. (Dkt. No. 38.) For the reasons set forth below, Defendants' motion is granted.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Amended Complaint**

Plaintiff filed her original Complaint in this action on November 9, 2012. (Dkt. No. 1.) She filed an Amended Complaint on January 22, 2013. (Dkt. No. 13.)

Generally, Plaintiff's Amended Complaint alleges that, during her employment as a bus driver between November of 2007 and July of 2010, Defendants interfered with her employment and retaliated against her, based on her taking leave to undergo treatment for her own health conditions, and to provide care and support (as a single parent) for her children's

serious health conditions and/or disabilities, resulting in her constructive discharge. (*Id.*)

Based on these factual allegations, Plaintiff's Complaint asserts four claims against Defendants: (1) a claim that Defendants unlawfully interfered with, restrained and/or denied Plaintiff's rights in violation of the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2611 *et seq.;* (2) a claim that Defendants discriminated against Plaintiff based on her children's disabilities in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12111 *et seq.;* (3) a claim that Defendant Capital District Transportation Authority ("CDTA") discriminated against Plaintiff based on her children's disabilities in violation the New York Human Rights Law ("Human Rights Law"), New York Executive Law § 296; and (4) a claim that Defendant Palmer is individually liable under the Human Rights Law. (*Id.*)

Familiarity with these claims, and the factual allegations supporting them, is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id.*)

**B. Parties' Briefing on Defendants' Motion for Summary Judgment**

**1. Defendants' Memorandum of Law in Chief**

Generally, in their memorandum of law, Defendants argue that they are entitled to judgment as a matter of law based on the current record for four reasons. (Dkt. No. 38, Part 6 [Defs.' Memo. of Law] .) First, Defendant argues, Plaintiff's FMLA interference and retaliation claims fail as a matter of law for the following reasons: (a) as an initial matter, Plaintiff's FMLA claims fail because all of those claims (even those arising under her failure to be rehired) are barred by the governing limitations period of two years, given that a three-year limitations period is reserved for "willful" or reckless conduct, none of which occurred here; (b) in the alternative, Plaintiff's FMLA interference claim fails because she was afforded all rights to which she was entitled under the FMLA; and (c) moreover, Plaintiff's FMLA retaliation claim fails because she cannot establish that she suffered an adverse employment action as a result of her exercise of her FMLA rights. (*Id.*)

 **\*2** Second, Defendant argues, Plaintiff's disability discrimination claims fail as a matter of law for the following reasons: (a) as an initial matter, the majority of Plaintiff's

disability claims fail because they are time barred; (b) in the alternative, Plaintiff's written warnings and resignation do not constitute adverse employment actions; (c) moreover, Plaintiff was not disabled at the time of any alleged adverse employment actions; (d) furthermore, Plaintiff was not subject to an adverse employment action because of her disability; and (e) finally, there is no admissible record establishing that the legitimate nondiscriminatory reason for CDTA's employment decisions were a pretext for disability discrimination. (*Id.*)

Third, Defendant argues, Plaintiff's association disability discrimination claims fail as a matter of law for the following reasons: (a) as an initial matter, the Human Rights Law does not prohibit association disability discrimination; and (b) turning to Plaintiff's association disability discrimination claim under the ADA, that claim fails because she cannot establish that she suffered an adverse employment action, nor can she establish that any such adverse employment action was caused by her children's alleged disabilities. (*Id.*)

Fourth, Defendant argues, as a matter of law, Plaintiff's claim for individual liability against Defendant Palmer fails as a matter of law because Plaintiff cannot establish that Defendant Palmer either was an "employer" under the Human Rights Law or aided and abetted violations of the Human Rights Law. (*Id.*)

**2. Plaintiff's Opposition Memorandum of Law**

Generally, in opposition to Defendants' motion, Plaintiff asserts two arguments. (Dkt. No. 41, Attach. 1 [Plf.'s Opp'n Memo. of Law] .) First, Plaintiff argues, there are triable issues of fact as to whether Defendants constructively discharged Plaintiff in violation of the FMLA for the following reasons: (a) Defendant Palmer is an "employer" under the FMLA; (b) Defendants failed to timely designate Plaintiff's FMLA leave; (c) Defendants directly penalized Plaintiff for, and discouraged her from taking, FMLA protected leave; (d) Plaintiff's constructive discharge claims are timely, because record evidence of Defendants' continuous course of interference with, and retaliation for, Plaintiff's exercise of her FMLA rights between November 15, 2007, and her resignation on July 6, 2010, reveals a reckless disregard for her FMLA rights, warranting a three-year, not two-year, limitations period; and (e) Plaintiff was constructively discharged from CDTA employment. (*Id.*)

Second, Plaintiff argues, there are triable issues of fact as to whether Defendants refused to rehire Plaintiff in violation of

the FMLA, ADA and Human Rights Law for the following reasons: (a) Defendants refused to rehire Plaintiff because Defendant Palmer considered her history of FMLA protected leave to be a "negative factor," in violation of the FMLA; and (b) Defendants refused to rehire Plaintiff because they misbelieved that her and her son Walter's disabilities would distract her from performing her job as a CDTA bus driver. (*Id.*)

**3. Defendants' Reply Memorandum of Law**

**\*3** Generally, in their reply memorandum of law, Defendants assert two arguments. (Dkt. No. 47, Attach. 3 [Defs.' Memo. of Law].) First, Defendants argue, there is no genuine dispute of material fact precluding summary judgment as to Plaintiff's claim of constructive discharge in violation of the FMLA for the following reasons: (a) Plaintiff's FMLA claims are time barred, because (i) there is no admissible record evidence establishing that Defendant CDTA's conduct was reckless (especially given the evidence that Defendant CDTA approved Plaintiff's requests for FMLA leave of which it received sufficient notice for several years prior to her voluntary resignation), and (ii) there is no admissible record evidence establishing that Defendant Palmer was an "employer" as defined by the FMLA; (b) Plaintiff's FMLA interference claim must be dismissed for the alternative reason that she did not provide additional notice of her intention to take FMLA leave and, even if she did, she was afforded all of the rights to which she was entitled under the FMLA; (c) moreover, Plaintiff's FMLA retaliation claim must be dismissed for the alternative reason that she was not constructively discharged nor subjected to any other adverse employment action as a result of her exercise of her FMLA right. (*Id.*)

Second, Defendant argues, there is no question of fact precluding summary judgment as to Plaintiff's claim of failure to rehire in violation of the FMLA, ADA and Human Rights Law for the following reasons: (a) because of Plaintiff's reliance on inadmissible evidence such as double hearsay, there is no admissible record evidence establishing that Plaintiff's prior FMLA leave was a "negative factor" in Defendant Palmer's decision not to rehire her, which was caused by her overall work record, her attendance, her failure to report an incident on her bus, and personal issues between her and a supervisor other than Defendant Palmer; and (b) there is no admissible record evidence establishing that Defendants refused to rehire her because of her perceived disability or her son's alleged disability. (*Id.*)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 423 of 482

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

## C. Statement of Undisputed Material Facts

The following material facts have been asserted and supported by Defendants in their Statement of Material Facts, and not denied in a matching numbered paragraph with a supporting record citation by Plaintiff in her response thereto, and thus admitted pursuant to Local Rule 7.1 of the Local Rules of Practice for this Court, as explained below in Part II.A. of this Decision and Order. (*Compare* Dkt. No. 38, Attach. 5 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 41, at Part B [Plf.'s Rule 7.1 Response].)

### 1. Plaintiff's Employment with CDTA

1. Plaintiff worked as a part-time driver for CDTA's Special Transit Available by Request ("STAR") Program from June 2000 until she resigned in November 2000.

2. CDTA rehired Plaintiff as a Bus Operator in November 2004.

3. Bus Operators, including Plaintiff, were covered by a Collective Bargaining Agreement ("CBA").

**\*4** 4. David Palmer was Plaintiff's supervisor. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 4 [Defs.' Rule 7.1 Statement, citing record evidence that establishes above-stated fact] *with* Dkt. No. 41, at ¶ B.4 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

5. When she came back to CDTA in 2004, Plaintiff received a copy of CDTA's employee handbook which contained its policies on Attendance, FMLA and Preventing Harassment in the Workplace. Page 26 of the handbook, which is subtitled "*OPERATING POLICY ON THE FAMILY AND MEDIAL LEAVE ACT* " states as follows, in pertinent part:

**FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave to "eligible" employees for certain family and medical reasons.**

...

Unpaid leave must be granted for any of the following reasons:

...

• *to care for the employee's ... son or daughter ... who has a serious health condition; or*

• *for a serious health condition that makes the employee unable to perform the employee's job.*

**[T]he employee may be required to provide advance leave notice and medical certification. Taking of leave may be denied if requirements are not met.**

• *The employee ordinarily must provide 30 days advance notice when the leave is "foreseeable."*

• *An employer may require medical certification to support a request for leave because of a serious health condition, and may require second or third opinions and a fitness for duty report to return to work.*

...

If you have any questions about FMLA or would like to see the CDTA FMLA procedure manual, please contact your immediate supervisor or the Human Resources Department.

(*Compare* Dkt. No. 38, Attach. 5, at ¶ 5 [Defs.' Rule 7.1 Statement, citing record evidence that establishes above-stated fact] *with* Dkt. No. 41, at ¶ B.5 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

6. In addition, at some point when Keith Strait was a union representative from 2007 to 2009, an FMLA notice was posted in the "crew room" of CDTA's garage in Schenectady, although Plaintiff did not see it there during that time. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 6 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 41, at ¶ B.6 [Plf.'s Rule 7.1 Response, denying fact but failing to support denial with accurate record citation, but a citation to record evidence in which she states that she concludes that "[t]here was nothing ever posted in Schenectady" because "I never saw it" "when I was working there," which evinces a lack of personal knowledge that is insufficient to create a genuine dispute of material fact].)

7. On November 7, 2007, Plaintiff was terminated after she did not report an incident on her bus within 24 hours, as is usually required by CDTA's policies and procedures, because she left work early to attend to her son's medical condition and as a result was not focused on the requirement to report the incident. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 7 [Defs.' Rule 7.1 Statement, citing record evidence that establishes

above-stated facts] *with* Dkt. No. 41, at ¶ B.7 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated facts].)

**\*5**  8. After filing a grievance contesting the termination, Plaintiff was reinstated on December 15, 2007.

### 2. CDTA's Attendance Policies and Procedures

9. Given the important services that CDTA provides to the public, CDTA depends on its employees to have regular, dependable attendance habits.

10. Pursuant to CDTA's Attendance Discipline Policy, "[s]ubstandard attendance will be defined as an employee having more than two (2) deviations per calendar month or more than twelve (12) occurrences in a twelve month period (rolling calendar)."

11. The Policy defines a "deviation" as "missed time due to lateness, illness, or any unexcused absence from work resulting in lost time."

12. An employee with substandard attendance will be subject to progressive discipline, including "(1) Verbal Warning (2) Written Warning (3) 1 Day Administrative Suspension (4) 5 Day Administrative Suspension & Final Warning (5) Termination."

13. Further, a "miss" or "pattern of attendance deviations may accelerate or compress the corrective action steps."

14. Pursuant to CDTA's Station Rules—General, if an operator does not notify the dispatcher in person or by personal phone call "10 minutes prior to scheduled report time" it will be marked as a "miss."

15. According to the training that Defendant Palmer received from CDTA employees, approved FMLA leave is not considered in CDTA's disciplinary process for attendance. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 15 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 41, at ¶ B.15 [Plf.'s Rule 7.1 Response, denying fact but failing to cite record evidence that controverts above-stated fact].)

16. Plaintiff was at least constructively aware of CDTA's policies and procedures on attendance. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 16 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations]

*with* Dkt. No. 41, at ¶ B.16 [Plf.'s Rule 7.1 Response, denying fact but failing to cite record evidence that controverts above-stated fact.)

17. When Plaintiff called in, she always had to give the dispatcher a reason for her absence.

18. As of at least December 2009, if an employee was calling in and the absence was for approved FMLA leave, all the employee needed to tell the dispatcher was "FMLA" and it would be recorded as such.

19. By December 2009, Plaintiff was aware that, if her absence was covered under the FMLA, she would need to call and designate it as "FMLA."

### 3. Plaintiff's Requests for FMLA Leave

20. During her employment, Plaintiff made numerous requests for FMLA leave for her daughter Dorothy Yetman's ovarian cysts and for her son Walter Yetman's autism, seizure disorder and aggressive behavior.

21. In each case that Plaintiff made a request for FMLA leave, and CDTA had documents for the request, CDTA approved the request. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 21 [Defs.' Rule 7.1 Statement, asserting facts and supporting assertion with accurate record citation] *with* Dkt. No. 41, at ¶ B.21 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated facts].)

**\*6**  22. Plaintiff admitted that sometimes she would call in and tell the dispatcher that it was a "sick day" instead of FMLA because she was embarrassed and did not want it to look like she was always taking time off for her children.

23. She alleges that she would then bring documentation in to prove the absence should be treated as FMLA.

24. Plaintiff also believed that, when she called in and said the reason for her absence was "family emergency," the dispatcher should have assumed it related to her FMLA leave.

#### a. Plaintiff's Requests for FMLA Leave for Her Own Medical Conditions

25. In November 2007, Plaintiff made a request for FMLA leave for a radical hysterectomy in connection with her cervical cancer diagnosis.

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 425 of 482

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

26. CDTA approved Plaintiff's FMLA leave from November 15, 2007, to January 15, 2008.

27. In April 2008, Plaintiff made a second request for FMLA leave for her medical condition of morbid obesity, which required abdominal surgery.

28. Plaintiff was granted additional FMLA leave from March 20, 2008, through April 21, 2008.

29. In May 2008, Plaintiff made a third request for FMLA leave.

30. Plaintiff was granted additional FMLA leave for her medical condition from May 7, 2008, through June 16, 2008.

31. Plaintiff never made any subsequent requests for FMLA leave relating to either of her medical conditions. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 31 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 41, at ¶ B.31 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated facts].)

### b. Plaintiff's Requests for FMLA Leave for Her Daughter Dorothy Yetman's Ovarian Cysts

32. In March 2007, Plaintiff requested intermittent FMLA leave to care for her daughter Dorothy's ovarian cysts.

33. Plaintiff was granted intermittent FMLA leave to care for her daughter Dorothy's ovarian cysts beginning on March 12, 2007.

34. No specific end date was given.

### c. Plaintiff's Requests for FMLA Leave for Her Son Walter Yetman's Autism, Seizure Disorder and Aggressive Behavior

35. Plaintiff first requested intermittent FMLA leave to care for her son Walter's autism, seizure disorder and aggressive behavior in March 2007.

36. Plaintiff was granted intermittent FMLA leave to care for her son Walter's conditions as necessary.

37. Plaintiff was informed that she needed to provide recertification.

38. In January 2009, Plaintiff again requested intermittent FMLA leave to care for her son Walter's autism, seizure disorder, and aggressive behavior.

39. CDTA granted Plaintiff's request for intermittent FMLA leave beginning January 6, 2009.

40. While there was no specific end date given for this leave, Plaintiff was informed that she needed to provide periodic reports to CDTA and recertification.

41. In December 2009, Plaintiff's son Walter began living at Eagleton, a residential school in Great Barrington, New York, and Plaintiff saw him only twice a month between December 2009 and July 2010.

### 4. Plaintiff's Receipt of Discipline for Her Excessive Absenteeism

*7 42. Plaintiff admits that there were times when she was absent from work and it was not related to her FMLA leave.

43. Plaintiff had attendance issues throughout her employment and had received written warnings and a one-day administrative suspension for her attendance in 2006.

44. Plaintiff claims that Defendant Palmer would come in and look at her as if to say, "Oh you came in today," and made comments to her about her attendance, including "Why can't you make it to work."

45. Plaintiff also claims that her co-workers would give her looks and make comments under their breath that she was always taking off for her kids and they would have to do her work.

46. Plaintiff admits that she never complained about this conduct pursuant to CDTA's Policy Statement on Preventing Harassment in the Workplace.

47. On March 10, 2009, Plaintiff received a written warning for her attendance issues.

48. According to the written warning, Plaintiff had "in excess of 12 deviations in the last 12 months" and also had a "pattern of absence by marking off six Fridays in the last 12 month period and by extending [her] scheduled days off on six occasions."

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 426 of 482

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

49. Also in the written warning, Plaintiff was warned that, if she did not improve her attendance, she would be subject to "increased disciplinary action including suspension and/or termination of [her] employment."

50. After speaking to Defendant Palmer about the written warning, Plaintiff just accepted the warning and did not speak with her union representative about it. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 50 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 41, at ¶ B.50 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact.])

51. Despite receiving a written warning, Plaintiff did not improve her attendance.

52. On August 12, 2009, Plaintiff was issued a one-day administrative suspension because she had 12 deviations in the past 12 months, two of which were misses.

53. Plaintiff was also given a copy of CDTA's Attendance Discipline Policy and Operating Policy Statement on Attendance, with the intent of ensuring that she was aware of CDTA's policies on attendance.

54. Plaintiff signed the suspension letter and initialed that she "acknowledge[d] and agree[d] with the actions taken and [understood] the consequences that will result from future violations."

55. Plaintiff was also informed that, if she disagreed with the suspension, she had the right to pursue it under Article 29 of the CBA.

56. When Plaintiff's attendance did not improve, she was issued a five-day administrative suspension and final warning on March 16, 2010.

57. The final warning stated that Plaintiff had four attendance deviations in the past 12 months and also had a measurable pattern of attendance issues, extending her weekend on four occasions.

58. Plaintiff was further warned that, if she did not make an immediate improvement in her attendance, she would be subject to termination.

**\*8** 59. Plaintiff signed the final written warning and acknowledged that, if she disagreed with the final written warning, she had the right to pursue it under the CBA.

60. Plaintiff never filed a grievance disputing the progressive discipline she received.

### 5. Plaintiff's Resignation

61. On June 26, 2010, Plaintiff failed to call the dispatcher on time and thus was considered a miss.

62. In her deposition, Plaintiff admitted that "it was ultimately [her] fault" and that she did not call in on time because she had an issue with her daughter Dorothy, which she does not claim entitled her to FMLA leave.

63. Nevertheless, Plaintiff still provided Defendant Palmer with phone records of the time of her call.

64. Defendant Palmer asked to meet with Plaintiff because there was a disagreement over the time of her call.

65. The phone records that Plaintiff provided did not coincide with CDTA's phone records. As a result, when Plaintiff could not access her phone records online in Defendant Palmer's office, he asked her to provide an official phone record from her service provider.

66. Thereafter, Plaintiff submitted a resignation letter to Defendant Palmer dated July 5, 2010, resigning effective July 6, 2010.

67. In her resignation letter, Plaintiff stated that she decided to resign because "[t]he constant stress of me possibly losing my job because of an autistic child and other family and legal issues, has been overwhelming."

### 6. Plaintiff's Applications for Reemployment

68. After Plaintiff's resignation, Defendant Palmer made the decision to state "NO" under "Eligible for Rehire" in CDTA's Human Resource Payroll Change Form.

69. Defendant Palmer made this decision based on Plaintiff's overall work record, her attendance, her failure to report the incident on her bus, and the personal issues, including "significant animosity," between her and another supervisor, Christine Plott. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 69 [Defs.' Rule 7.1 Statement, asserting fact and supporting

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 427 of 482

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

assertion with accurate record citation] *with* Dkt. No. 41, at ¶ B.69 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

70. In December 2010, Plaintiff submitted an application for Bus Operator and, in June 2011, she submitted applications for Service Technician (Cleaner) and Customer Service Operator/Call Taker.

71. When Defendant Palmer was contacted by Human Resources about hiring Plaintiff, he told them that she was not eligible for rehire.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing a Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed.R.Civ.P. 56(a),(c),(e).

**\*9** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.*[1] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[2] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[3]

Of course, when a non-movant has failed to respond to a movant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Rather, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the movant. *Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.; N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the movant's motion does is lighten the movant's burden on its motion.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to be admitted, to the extent that those facts are supported by evidence in the record, where the nonmoving party has willfully failed to properly respond to that statement.[4]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[5] Stated

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 428 of 482

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at *1, n. 1 (N.D.N.Y. Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL2473509, at *2 & n. 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B. Standards Governing Plaintiff's Claims

**\*10** Because the parties have (in their memoranda of law) indicated their understanding of the correct legal standards governing Plaintiff's claims and Defendants' defenses, the Court will not repeat those standards in this Decision and Order, which (again) is intended primarily for the review of the parties.

### III. ANALYSIS

After carefully considering the matter, the Court grants Defendants' motion for each of the alternative reasons stated in Defendants' memoranda of law. *See, supra,* Part I.B. of this Decision and Order. To those reasons the Court adds four points.

First, in response to at least 31 paragraphs of facts asserted by Defendants in their Rule 7.1 Statement, Plaintiff denies certain "implications" purportedly contained therein. (*See, e.g.,* Dkt. No. 41, at ¶¶ 5, 10, 11, 12, 13, 17, 18, 19, 22, 24, 26, 28, 30, 33, 36, 37, 39, 40, 41, 42, 43, 46, 51, 53, 54, 55, 56, 58, 59, 61, and 67.) Of course, "arguing over the possible implications stemming from an otherwise undisputed fact does not render that fact in dispute." *Blakes v. Illinois Bell Tel. Co.,* 11–CV–0336, 2015 WL 135028, at *1 (N.D.Ill. Jan.9, 2015). This is because the summary judgment procedure is based on the *assertion* of facts and their disputation, not the *implication* of facts and their disputation. *See, e.g.,* Fed.R.Civ.P. 56(e) (setting forth consequences "[i]f a party fails to properly support an *assertion of fact* or fails to properly address another party's *assertion of fact* ") (emphasis added); N.D.N.Y. L.R. 7.1(a)(3) (requiring that facts be "set forth," "listed" and "assert[ed]"); *cf. Habben v. City of*

*Fort Dodge,* 472 F.Supp.2d 1142, 1147, n. 2 (N.D.Iowa 2007) ("Even if it were proper for the plaintiff to object to 'implications,' the defendants' statement cannot give rise to the 'implication' that the plaintiff finds objectionable, because the defendants' statement does not address the plaintiff's hiring at all ."). As a result, to the extent Plaintiff responds to Defendants' properly supported factual assertions solely by denying "implications" contained therein, the Court deems the factual assertions admitted.

Second, in response to facts asserted in at least 29 paragraphs contained in Defendants' Rule 7.1 Statement, Plaintiff attempts to incorporate by reference record citations contained in a 34–page outline that precedes her Rule 7.1 Response. (*See, e.g.,* Dkt. No. 41, at ¶¶ 9, 10, 11, 12, 17, 18, 21, 22, 24, 26, 28, 30, 36, 37, 42, 43, 48, 49, 51, 52, 54, 56, 57, 61, 62, 66, 67, 69 and 70.) This unusual practice violates the spirit, if not the letter, of Local Rule 7.1, which requires that "[e]ach denial ... set forth a specific citation to the record where the factual issue arises," not a citation to a portion of an outline that in turn contains many factual assertions and record citations, some of which are completely immaterial to the fact originally asserted in the Rule 7.1 Statement. N.D.N.Y. L.R. 7.1.(a)(3). Nonetheless, out of solicitude to Plaintiff as a civil rights litigant, the Court has tracked down the record cites in the outline and carefully reviewed the evidence cited therein. However, it does not save her claims from dismissal.

**\*11** Third, Plaintiff's timeliness argument hinges on, *inter alia,* whether Defendant CDTA possessed "actual knowledge" of the legal requirement that it grant her FMLA leave. *See, supra,* Part I.B.2. of this Decision and Order. (*See also* Dkt. No. 41, Attach. 1, at 24 [attaching page "18" of Plf.'s Opp'n Memo. of Law].) Plaintiff argues that such actual knowledge existed because (1) Defendants "knew the law of [the] FMLA" and (2) Defendants "were well aware of [Plaintiff's] and her children's medical conditions and need for leave (including FMLA leave) to care for those conditions between November 15, 2007 and January 6, 20[10]." (Dkt. No. 41, Attach. 1, at 225 [attaching page "18" and "19" of Plf.'s Opp'n Memo. of Law].) The problem is that the record evidence cited by Plaintiff establishes not recklessness but due care by Defendant CDTA for Plaintiff's rights under the FMLA. At the very most, to the extent that Defendant CDTA received certain communications from Plaintiff in the past that could reasonably be construed as transforming other communications from her in the future as FMLA requests, and to the extant that Defendant CDTA did not treat

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 429 of 482

those transformed communications as FMLA requests, the evidence suggests only ordinary negligence.[6]

Fourth, even if the Court were to find a genuine dispute of fact regarding whether there was *ever* an FMLA notice posted in the "crew room" of CDTA's garage in Schenectady, the Court would find such a dispute to be immaterial to Defendants' motion. This is because, even if Plaintiff had a private right of action for a failure to post an FMLA notice (which she does not),[7] it is undisputed that, when Plaintiff came back to CDTA in 2004, she received a copy of CDTA's employee handbook which contained, *inter alia,* its Operating Policy on the Family and Medical Leave Act. *See* ⚑*Geromanos v. Columbia Univ.,* 322 F.Supp.2d 420, 430 (S.D.N.Y.2004) (finding that plaintiff failed to make out an FMLA claim for interference based on lack of notice because, inter alia, "it appears plaintiff did have notice of [defendant's] policy concerning FMLA leave, which appears in [defendant's] online employee handbook"). In the alternative, the Court finds that Plaintiff has not shown that any lack of notice

failure somehow affected her leave. *See* ⚑*Geromanos,* 322 F.Supp.2d at 430–31 ("[T]he right to notice under the act is not an independent right giving rise to suit where failure to notify in no way affected the employee's leave.").

For all of these reasons, the Court grants Defendants' motion for summary judgment.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 38) is granted.

The Clerk is directed to issue a Judgment for Defendants and close this action.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4508362

---

## Footnotes

1    ⚠*Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.2009) (Suddaby, J.) (citing cases).

2    ⚠*Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases).

3    ⚠*Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases).

4    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

5    *See, e.g., Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02–CV–0745, ⚑2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

6    It should be noted that, according to Plaintiff's own deposition testimony, her daughter Dorothy's pregnancy (which Anthony Bonaquisto was advised presented "some issues," and which Randy Fitch was advised was "high risk") did not even start until "sometime in January–February of 2010."

7    *See Gilmore v. Univ. of Rochester Strong Mem'l Div.,* 654 F.Supp.2d 141, 147 (W.D.N.Y.2009) ("[I]t is well settled that an employee has no private right of action where an employer has failed to post the [required FMLA] notice."); *Cinelli v. Oppenheim–Ephratah Cent. Sch. Dist.,* 07–CV–0235, 2008 WL 111174, at *5 n. 14 (N.D.N.Y. Jan.7, 2008) (DiBianco, M.J.) (noting that "the FMLA provides a statutory penalty for employers who fail to willfully fail to post notice of the pertinent FMLA provisions," and "itself[ ] does not impose a private right of action by the employee") (emphasis removed).

---

**End of Document**                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

that controverts fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Tr. of Hrg. of Jan. 24, 2011 at 31–37 (N.D.N.Y. filed Feb. 9, 2011).

23 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 22 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 22 [Plf.'s Rule 7.1 Response, citing record evidence that does not regard the awareness of McGinty and Doyle on October 28 but their awareness of October *29* when McGinty called Plaintiff's office and was told by her secretary that she was out on maternity leave].)

24 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 23 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 23 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

25 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 24 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 24 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

26 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 25 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 25 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

27 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 26 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 26 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

28 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 27 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 27 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

29 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 28 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 28 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

30 (Dkt. No. 67, at ¶ 15 [Plf.'s Decl.]; Dkt. No. 67, Attach. 4, at 5 [attaching page "33" of transcript of January 2010 hearing in *Paulk* ]; *cf.* Dkt. No. 63, Attach. 11, at 9 [Ex. B to Perez–Williams Decl., attaching letter from Plaintiff to Perez–Williams dated Dec. 3, 2010 stating that Plaintiff had informed Brickwedde that she "had not seen any subpoena"].)

31 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 30 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 30 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

32 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 31 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 26 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

33 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 32 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 32 [Plf.'s Rule 7.1 Response, citing to record evidence that fails to controvert fact asserted].)

34 (*Compare* Dkt. No. 63, Attach. 1, at ¶ 33 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 33 [Plf.'s Rule 7.1 Response, citing to record evidence that fails to controvert fact asserted].)

35   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 34 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 34 [Plf.'s Rule 7.1 Response, merely denying knowledge of fact asserted, and/or impugning judgment of McGinty, neither of which suffices to controvert fact asserted].)

36   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 35 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 35 [Plf.'s Rule 7.1 Response, merely denying knowledge of fact asserted, which fails to controvert that fact].)

37   (Dkt. No. 63, Attach. 7, at ¶¶ 14, 21 [McGinty Decl.]; *cf.* Dkt. No. 67 [Plf.'s Decl., merely denying personal knowledge of the CRB's receipt of such a request in 2008].)

38   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 39 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 39 [Plf.'s Rule 7.1 Response, merely denying knowledge of fact asserted, which fails to controvert that fact].)

39   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 40 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 40 [Plf.'s Rule 7.1 Response, merely denying knowledge of fact asserted, which fails to controvert that fact].)

40   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 42 [Defs.' Rule 7.1 Statement, citing to record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 42 [Plf.'s Rule 7 .1 Response, merely denying knowledge of fact asserted, which fails to controvert that fact].) *See also Paulk v. Lester,* 06–CV–1343, Plf.'s Memo. of Law (N.D.N.Y. filed Nov. 8, 2010).

41   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 43 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 43 [Plf.'s Rule 7.1 Response, citing to record evidence that fails to controvert fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Plf.'s Supplemental Affirm. (N.D.N.Y. filed Nov. 16, 2010).

42   (Dkt. No. 63, Attach. 7, at ¶ 18 [McGinty Decl.]; Dkt. No. 63, Attach. 10, at ¶ 8 [Perez–Williams Decl.]; *cf.* Dkt. No. 67, Attach. 10 [Plf.'s Rule 7.1 Response, citing record evidence that does not controvert fact asserted].)

43   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 46 [Defs.' Rule 7.1 Statement, citing to record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 46 [Plf.'s Rule 7 .1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

44   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 47 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 47 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

45   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 48 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 48 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

46   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 49 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 49 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

47   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 50 [Defs.' Rule 7.1 Statement, citing to record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 50 [Plf.'s Rule 7 .1 Response, citing record evidence that fails to controvert facts asserted].)

Devito v. Smithkline Beecham Corp., Not Reported in F.Supp.2d (2004)

Nov. 29, 2004.

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, E.D.N.Y., October 26, 2022

2004 WL 3691343

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION

d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.

|

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant, Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion .......................................................................... 4

A. Standard for Admissibility of Expert Evidence ........................................... 6

1. Deborah L. Sweeney ...................................................................... 9

a. Qualified? ............................................................................. 9

2. Kevin W. George, M.D. ................................................................... 10

3. James T. O'Donnell ....................................................................... 13

a. General Causation ...................................................................... 14

i. Qualified? ............................................................................. 14

ii. Reliability of Testimony? ............................................................. 17

b. Specific Causation ..................................................................... 19

c. Warnings ............................................................................... 19

i. Qualified? ............................................................................. 20

ii. Reliability of Testimony? ............................................................. 22

II. Summary Judgment Motion .......................................................................................... 24

### Introduction

 **\*1** "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST,, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd ., No. 00–CV–821S, 2004 WL 2202580, at \*4 (W.D.N.Y. Sept. 29, 2004)* (granting defense motion to preclude testimony

of plaintiff's expert and declining to consider his report on summary judgment motion).

### I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both* general causation," *i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

 **\*2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T.

O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' " because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts* than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at *2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications.' " *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or

technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id.* (citing 📙 *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test.' " *Id.* (quoting 📙 *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing 📙 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 2271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing 📙 *Kumho,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " 📙 *Amorgianos,* 303 F.3d at 265 (quoting 📙 *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]' " *Id.* at 266 (quoting 📙 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

#### 1. Deborah L. Sweeney

##### a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney[2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response

amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D .N.Y. May 27, 2003) (granting motion to preclude where plaintiff defaulted); *see also* ⚠ *Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

#### 2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time

of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

**\*5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff

DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label* to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way, ...,* of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See* ⚑ *Munafo v. Metropolitan Transportation Authority,* Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at \*19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly

he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp .,* No. CV 94–4009, 1998 WL 623589, at \*19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis." ')

### 3. James T. O'Donnell

**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine— general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

### a. General Causation

Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

### i. Qualified?

This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In 🚩*Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. 🚩*Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured

by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24– 25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25– 26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

**\*7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research

whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967 F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

ii. Reliability of Testimony?

**\*8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only (1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

b. Specific Causation
It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

c. Warnings

**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

i. Qualified?

O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See* Nora Beverages, 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of

having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See* Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

**\*10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See* Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done

any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See Robertson v. Norton,* 148 F.3d 905, 907 (8 th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at *4 (internal quotation marks and citations omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*

### ii. Reliability of Testimony?

**\*11** Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10 th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmacologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/ addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil]

causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert." ' *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

**\*12** For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.

### II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's

claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3691343

---

## Footnotes

1   The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation,* 296 F.Supp.2d 1374 (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel") had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2   During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3   O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on

the other hand, is the profession of preparing and dispensing drugs." *Newton,* 243 F.Supp.2d at 677, n. 1. It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,

v.

BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION* [1]

PITMAN, United States Magistrate Judge.

**\*1** TO THE HONORABLE BARBARA S. JONES, United States District Judge,

## I. *Introduction*

By notice of motion dated March 4, 2010 (Docket Item 11), defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke plaintiff's *in forma pauperis* ("IFP") status on the ground that plaintiff has previously had at least three Section 1983 actions dismissed as frivolous, malicious or failing to state a claim upon which relief could be granted, and has not shown that he is in imminent danger of serious physical injury. Defendant further seeks an order directing that the action be dismissed unless plaintiff pays the full filing fee within thirty (30) days. For the reasons set forth below, I respectfully recommend that defendant's motion be granted.

## II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New York State Department of Correctional Services, commenced this action on or about January 12, 2009 by submitting his complaint to the Court's Pro Se office. Plaintiff alleges, in pertinent part, that he has "a non-healing ulcer that is gane green [*sic* ]" and that defendant Bernstein "did not want to treat the ulcer right" (Complaint, dated March 3, 3009 (Docket Item 2) ("Compl."), at 3).

The action was originally commenced against two defendants —Dr. Bernstein and Dr. Finkelstein. The action was dismissed as to Dr. Finkelstein because the complaint contained no allegations whatsoever concerning Dr. Finkelstein (Order dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr. Bernstein—filed the current motion. Plaintiff failed to submit a response. Accordingly, on August 20, 2010, I issued an Order advising plaintiff that if he wished to oppose the motion, he must submit his opposition by September 15, 2010 and that after that date I would consider the motion fully submitted and ripe for decision (Order dated August 20, 2010 (Docket Item 15)). The only submission plaintiff has made in response to my Order is a multi-part form issued by the New York State Department of Correctional Services entitled "Disbursement or Refund Request." [2] By this form, plaintiff appears to request that the New York State Department of Correctional Services pay the filing fee for this action. The form is marked "Denied."

## III. *Analysis*

28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged. Although an indigent, incarcerated individual need not prepay the filing fee at the time at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir.2010). To prevent abuse of the judicial system by inmates, paragraph (g) of this provision denies incarcerated individuals the right to proceed without prepayment of the filing fee if they have repeatedly filed meritless actions, unless such an individual shows that he or she is in imminent danger of serious physical injury. *See* *Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> **\*2** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility,

brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

• In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson[3] v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at *1–*2.

• In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM)(DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had

been dismissed on the merits. 2008 WL 3836387 at *1, *7.

• In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM) (RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at *1–*2.

• Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

**\*3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009).[4]

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "need[s] to go back to a wound speci [a]list before the gane green [*sic* ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in

imminent danger of serious physical harm." *Merriweather v. Reynolds,* 586 F.Supp.2d 548, 552 (D.S.C.2008), *citing Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir.2003) and *White v. Colorado,* 157 F.3d 1226, 1231–32 (10th Cir.1998); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury"). Given the plaintiff's history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury. [5]

## IV. *Conclusion*

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's *in forma pauperis* status should, therefore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

## V. *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5185047

## Footnotes

1    At the time the action was originally filed, the Honorable Leonard B. Sand, United States District Judge, granted plaintiff's application for *in forma pauperis* status based on plaintiff's *ex parte* submission (Docket Item 1). Although the present application seeking to revoke plaintiff's *in forma pauperis* status is non-dispositive, I address it by way of a report and recommendation to eliminate any appearance of a conflict between the decision of a district judge and that of a magistrate judge.

2    Plaintiff sent this form directly to my chambers, and it has not been docketed by the Clerk of the Court. The form will be docketed at the time this Report and Recommendation is issued.

3    It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services ("DOCS") is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies

himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

4    Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the *Scoggy* action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

5    Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

> Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

*Nelson v. Scoggy, supra,* 2009 WL 5216955 at *4.

Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1906029

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Diane F. GOLDSTICK, Plaintiff,

v.

THE HARTFORD, INC., et ano., Defendants.

No. 00 Civ. 8577(LAK).

|

Aug. 19, 2002.

**Synopsis**

Defendants moved to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint. The District Court, Kaplan, J., held that statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative.

Motion granted in part.

West Headnotes (1)

**[1]**     **Summary Judgment** 🔑 Form and requisites

Plaintiff's statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative, the object of which was to "spin" the impact of the admissions plaintiff had been compelled to make; additionally, statement was 41 pages long, a manifest evasion of the page limitation. Local Civ. R. 56.1.

58 Cases that cite this headnote

**ORDER**

KAPLAN, J.

**\*1**   Defendants move to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint, on the ground that it fails to comply with Local Civ. R. 56.1 in that it goes beyond admitting or denying that the propositions of fact set forth in defendants' Rule 56.1 Statement in fact are undisputed and contains a great deal of extraneous, argumentative material, much allegedly based on inadmissible evidence.

"A proper 56.1 statement submitted by a non-movant should consist of a paragraph-by-paragraph response to the movant's 56.1 statement, much like an answer to a complaint. If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention. It is permissible for the non-movant to provide a separate statement, apart from this paragraph-by-paragraph response, in which it lists other facts it claims to be in dispute. However, this separate statement is *not* a substitute for the paragraph-by-paragraph response. The non-movant, particularly if represented by counsel, should not leave it to the Court to cull from this separate statement the pieces of evidence which would support the contentions of the non-movant asserted in its paragraph-by-paragraph response without citation.

*"Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions, and they should be neither the source nor the result of 'cut-and-paste' efforts with the memorandum of law. A rule 56.1 statement that contains the same turns of phrase, if not the identical whole paragraphs, as the memorandum of law is improper." *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP,) 1999 WL 459813, \*1 n. 3 (S.D.N.Y. June 29, 1999).

The plaintiff's Rule 56.1 Statement here does not comply with the rule. While in most cases it does admit or deny defendants' descriptions of the allegedly uncontested facts on a paragraph-by-paragraph basis, it adds argumentative and often lengthy narrative in almost every case the object of which is to "spin" the impact of the admissions plaintiff has been compelled to make. In consequence, the response to the 84 number assertions set forth in defendants' Rule 56.1 Statement is 41 pages long and, whether so intended or not, a manifest evasion of the page limitation on plaintiff's memorandum in opposition to the motion for summary judgment.

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 449 of 482

Accordingly, defendants' motion is granted to the extent that so much of plaintiff's responses as consists of anything more than (a) the admission or denial of the assertions set forth in defendants' Rule 56.1 Statement and the citations to the record, and (b) the section headed "additional facts" is stricken. It is denied in all other respects.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2002 WL 1906029

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 Wage & Hour Cas.2d (BNA) 179,902

48    (*Id.*)

49    (*Id.*)

50    (*Id.*)

51    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

52    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(a) [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(a) [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert facts asserted].)

53    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(b) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(b) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

54    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(c) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(c) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

55    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(d) [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(d) [Plf.'s Rule 7.1 Response, failing to either deny facts asserted or cite record evidence that controverts facts asserted].)

56    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(e) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(e) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

57    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(f) [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(f) [Plf.'s Rule 7.1 Response, failing to either deny facts asserted or cite record evidence that controverts facts asserted].)

58    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(g) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(g) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

59    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(h) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(h) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

60    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(i) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(i) [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

61    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(j) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(j) [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

2015 Wage & Hour Cas.2d (BNA) 179,902

62   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(k) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(k) [Plf.'s Rule 7.1 Response, failing to cite *any* record evidence].)

63   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(l) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(l) [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

64   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 53 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 53 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

65   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 54 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 54 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert facts asserted].)

66   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 55 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 55 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

67   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 56 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 56 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

68   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 57 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 57 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

69   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 58 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 58 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

70   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 59 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 59 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

71   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 60 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 60 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

72   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 61 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 61 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

73   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 62 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 62[Plf.'s Rule 7.1 Response, failing to cite any record evidence that controvert facts asserted].)

74   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 63 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 63 [Plf.'s Rule 7.1 Response, failing to cite any record evidence that controvert facts asserted].)

75   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 64 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 64 [Plf.'s Rule 7.1 Response, either admitting or denying knowledge of facts asserted].)

76   🔺*Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.209) (Suddaby, J.) (citing cases).

77   🔺*Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases). The Court notes that Plaintiff was served with such a notice in this case. (Dkt. No. 63, Attach.14.)

78   🔺*Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases).

79   Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

80   🔺*Cusamano,* 604 F.Supp.2d at 427 & n. 6 (citing cases).

81   This is because the rationale for conferring special solicitude to *pro se* litigants is that, as non-attorneys, they are inexperienced or unfamiliar with legal procedures or terminology. *See* John C. Rothermich, "Ethical and Procedural Implications of 'Ghostwriting' for *Pro Se* Litigants: Toward Increased Access to Civil Justice," 67 *Fordham L.Rev.* 2687, 2697 (Apr.1999) ("[T]he special leniency afforded *pro se* pleadings in the courts ... is designed to compensate for *pro se* litigants' lack of legal assistance.").

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 453 of 482

those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"). Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

2    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 7 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 7 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].)

3    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 8 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 8 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].)

4    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 9 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 9 [Plf.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting such denial].)

5    Plaintiff attempts to deny what he asserts is an "implication" of the fact asserted by Defendant (specifically, the implication that the term "disciplinary action" means "adequate disciplinary action"). (Dkt. No. 19, at ¶ 10 [Plf.'s Rule 7.1 Response].) This denial is ineffective for each of the two alternative reasons stated above in note 1 of this Decision and Order. First, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman*, 2015 WL 4508362, at *10; *cf. Baity*, 51 F. Supp. 3d at 418; *Goldstick*, 2002 WL 1906029, at *1. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

6    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 11 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 7 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].)

7    Plaintiff attempts to deny what he asserts is an "implication" of the fact asserted by Defendant. (Dkt. No. 19, at ¶ 12 [Plf.'s Rule 7.1 Response].) This denial is ineffective for each of the two alternative reasons stated above in note 1 of this Decision and Order. First, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

8    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 13 [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). *See* 🚩 *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with Local Rule 7.1[a][3] ). Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the words "may not be issued" also mean "may not be recommended"), which is insufficient to create a genuine dispute of material fact, or it attempts

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 454 of 482

to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

9    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 16 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 16 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].)

10    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 17 [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3).  *Aktas, 877 F. Supp. 2d at 5 n.3.* Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the words "cultural diversity training" means training that was more than "brief" and "cursory"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

11    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 18 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 18 [Plf.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting such denial].) Either Plaintiff's denial attempts to challenge what he perceives to be an implication of the term "reinforced" (specifically, the implication that the term means that the training was neither "cursory" nor "inadequate"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

12    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 19 [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3).  *Aktas, 877 F. Supp. 2d at 5 n.3.* Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the words "cultural diversity training" mean training that was "adequate"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

13    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 20 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 20 [Plf.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting such denial].) While Plaintiff asserts that his claims in "the lawsuit" were for racial discrimination, he does not identify which lawsuit he is referencing, nor does he cite record evidence that precludes the possibility that *other* allegations (i.e., allegations of sexual discrimination and retaliation) were made in the 1997 and 2004 actions. In any event, the allegations in the above-stated fact are listed in the disjunctive, rendering the above-stated fact true (given that Plaintiff's current action asserts claims of not only of racial discrimination but also of sexual discrimination and retaliation).

14    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 21 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing ¶ 17 of Rhinehart Aff., which establishes above-stated fact] *with* Dkt. No. 19, at ¶ 21 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact "in part".]) Plaintiff denies the fact asserted by Defendant "in part" on the ground that his "initial lawyer withdraw and black deputies were left without representation leaving them procedurally vulnerable." This partial denial is ineffective for each of two alternative reasons.

First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3).  *Aktas, 877 F. Supp. 2d at 5 n.3.* Second, either the partial denial attempts to challenge what Plaintiff perceives to be

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 455 of 482

an implication of the fact asserted (specifically, the implication that Plaintiff was at all times represented by counsel during the proceeding), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

15     (*Compare* Dkt. No. 13, Attach. 21, at ¶ 22 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing ¶ 17 instead of ¶ 18 of Rhinehart Aff., which cites record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 22 [Plf.'s Rule 7.1 Response, admitting variation of above-stated fact]; *see also Barksdale v. Onondaga Cty. Sheriff's Dep't,* 04-CV-0828, Am. Compl. at ¶¶ 97-107 [N.D.N.Y. filed Aug. 5, 2004] [supporting above-stated fact].)

16     (*Compare* Dkt. No. 13, Attach. 21, at ¶ 23 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing ¶ 18 instead of ¶ 19 of Rhinehart Aff., which establishes above-stated fact] *with* Dkt. No. 19, at ¶ 23 [Plf.'s Rule 7.1 Response, admitting variation of above-stated fact]; *see also Barksdale v. Onondaga Cty. Sheriff's Dep't,* 04-CV-0828, Am. Compl. at ¶¶ 34-39, 97-107 [N.D.N.Y. filed Aug. 5, 2004] [supporting above-stated fact].)

17     (*Compare* Dkt. No. 13, Attach. 21, at ¶ 27 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 27 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

18     (*Compare* Dkt. No. 13, Attach. 21, at ¶ 31 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 31 [Plf.'s Rule 7.1 Response, admitting above-stated fact "in part".) In addition to his admission of the fact asserted by Defendant "in part," Plaintiff states that, "even with reporting the incidents[,] to Plaintiff's knowledge there was no investigation into the events." Any partial denial by Plaintiff is ineffective for each of four alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). ⚑ *Aktas, 877 F. Supp. 2d at 5 n.3.* Third, either the response attempts to challenge what Plaintiff perceives to be an implication of the fact asserted (specifically, the implication that a "report" of the incident necessarily involves an "investigation" of the incident), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order. Fourth, in any event, in support of his additional factual assertion, Plaintiff cites a paragraph of his affidavit which is expressly qualified by a lack of personal knowledge. (Dkt. No. 18, Attach. 1, at ¶ 25.)

19     (*Compare* Dkt. No. 13, Attach. 21, at ¶ 33 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 33 [Plf.'s Rule 7.1 Response, admitting above-stated fact "in part".]) In addition to his admission of the fact asserted by Defendant "in part," Plaintiff states that "no effort was made to address the racial nature of the evidence which occurred concerning Plaintiff." Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). ⚑ *Aktas, 877 F. Supp. 2d at 5 n.3.* ⚑ *Aktas, 877 F. Supp. 2d at 5 n.3.* Third, either the response attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the "direct[ion]" by Sergeant Ames involved an "effort ... to address the racial nature of the events which occurred concerning Plaintiff"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute,

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 456 of 482

which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

20    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 34 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 34 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].) The Court notes that, in paragraph 26 of an affidavit sworn to on May 16, 2016, Plaintiff asserts that (1) after the mail incident occurred, "[t]he racial harassment continued" and the picture incident occurred, and (2) "White deputies in my unit ... [continue to] say things to me that [are] inappropriate," such as " ' 'Let me give you my dollar now' " (referencing the dollar in damages that he was awarded by a jury in his second employment civil rights action). (Dkt. No. 18, Attach. 1, at ¶ 26.) With regard to the first assertion, even read with the utmost of special liberality, the assertion means merely that the racial harassment continued until the picture incident occurred. With regard to the second assertion, for the sake of brevity, the Court will not address the issue of, without being accompanied by something else, the statement "Let me give you my dollar now" is racial harassment. More important is that, on page 18 of his deposition taken on November 25, 2015, in response to the question, "[The harassment continued] [f]rom the day after the judgment until present?" Plaintiff testified, "Well, now people pretty much stay—you get little comments, you know, but a long time in taking a toll." (Dkt. No. 13, Attach. 4, at 19 [attaching page "18" of Plf.'s Depo. Tr.].) Of course, as pointed out by Defendant, to the extent that Plaintiff attempts in his affidavit to contradict his deposition testimony, he may not do so. 🔖 *Mack v. United States,* 814 F.2d 120, 21 (2d Cir. 1987).

21    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 35 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 35 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact "in part"].) In addition to his denial of the variation of the fact asserted by Defendant "in part," Plaintiff states that "Plaintiff's shift had not started yet, and no order to him should have been made." Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). 🔖 *Aktas,* 877 F. Supp. 2d at 5 n.3. Second, either the response attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the order was made during Plaintiff's shift), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order. Third, Plaintiff's account of events in his affidavit contradict his own written report, in which he stated that Sgt. B gave Plaintiff the order "seconds after I had punched in...." (Dkt. No. 13, Attach. 11, at 2.) Moreover, even by Plaintiff's own account of events, after he received the order approximately five minutes before his shift started, he spent approximately three to five minutes finishing his conversation with his mother on his cell phone, and then (after spending some time trying to talk to Sgt. B) *still* refused to comply with the order. (Dkt. No. 13, Attach. 4, at 51-56 [attaching pages "50" through "55" of Plf.'s Depo. Tr.]; Dkt. No. 18, Attach. 1, at ¶ 56 [Plf.'s Affid.].) The Court notes that, to the extent that Plaintiff attempts in his affidavit to contradict his deposition testimony, he may not do so.

22    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 36 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 36 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence actually supporting a denial of above-stated fact].) Setting aside the lack of a citation to record evidence actually supporting a denial of the above-stated fact, the Court notes that the citations provided by Plaintiff are to portions of his affidavit that regard his assertion that the order was made before the start of his shift, which is ineffective for the reasons stated above in note 21 of this Decision and Order.

23    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 37 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 37 [Plf.'s Rule 7.1 Response,

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 457 of 482

denying variation of the above-stated fact but failing to cite record evidence actually supporting denial].) Setting aside the lack of a citation to record evidence actually supporting a denial of the variation of the above-stated fact, the Court notes that the citations provided by Plaintiff are to portions of his affidavit that regard his assertion that the order was made before the start of his shift, which is ineffective for the reasons stated above in note 21 of this Decision and Order.

24    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 38 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 38 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact and indeed citing record evidence that supports above-stated fact].)

25    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 39 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 38 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact and indeed citing record evidence that supports above-stated fact].)

26    Plaintiff attempts to deny what he asserts is an "implication" of the fact asserted by Defendant (specifically, the implication that the word "accusations" means "new accusations"). (Dkt. No. 19, at ¶ 40 [Plf.'s Rule 7.1 Response].) This denial is ineffective for each of the two alternative reasons stated above in note 1 of this Decision and Order. First, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman*, 2015 WL 4508362, at *10. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

27    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 41 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 33 [Plf.'s Rule 7.1 Response, admitting variation of above-stated fact "in part"].) Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a) (3). ⚑ *Aktas*, 877 F. Supp. 2d at 5 n.3. ⚑ *Aktas*, 877 F. Supp. 2d at 5 n.3. Third, even if Plaintiff's response could be construed as a partial denial of a specific fact, it fails to cite record evidence actually supporting a denial of the above-stated fact and indeed cites record evidence that supports the above-stated fact. The Court notes that, to the extent that Plaintiff attempts in his affidavit to contradict his deposition testimony, he may not do so.

28    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 42 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 42 [Plf.'s Rule 7.1 Response, denying part of a variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact and indeed citing record evidence that supports above-stated fact].) Setting aside the lack of a citation to record evidence actually supporting a denial of part of the above-stated fact, the Court notes that Plaintiff does not expressly deny the remainder of the fact asserted by Defendant, as required under Local Rule 7.1(a)(3).

29    After expressly admitting the fact asserted by Defendant, Plaintiff attempts to assert another fact. (Dkt. No. 19, at ¶ 44 [Plf.'s Rule 7.1 Response].) The fact asserted by Defendant will be deemed admitted. *Washington*, 2009 WL 1585947, at *1 n.2; *CA, Inc.*, 2015 WL 1611993, at *2 n.3. The additional fact that Plaintiff attempts to assert will be ignored for each of two alternative reasons stated above in note 1 of this Decision and Order. First, to the extent that it attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, an implication the that writing and submission of the report was wholly without instruction from Lt. Raus), that attempt is insufficient to create a genuine dispute of material fact for

trial under Local Rule 7.1. *Yetman*, 2015 WL 4508362, at *10. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

30    (*Compare* Dkt. No. 13, Attach. 46, at ¶ 7 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 46 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].)

31    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 49[i] [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). 🚩 *Aktas*, 877 F. Supp. 2d 1, 5 n.3. Second, even if Plaintiff's response could be construed as a partial denial of a specific fact, it fails to cite record evidence actually supporting such a denial and indeed cites record evidence that supports the above-stated fact.

32    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 49[iii] [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 49[iii] [Plf.'s Rule 7.1 Response, admitting variation of above-stated fact "in part"].) In addition to his admission of a variation of the fact asserted by Defendant "in part," Plaintiff states, "Plaintiff did report this incident." Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). 🚩 *Aktas*, 877 F. Supp. 2d at 5 n.3. Third, to the extent Plaintiff asserts that he eventually complained about this incident a year after the incident, that assertion is taken into account in the variation adopted by the Court.

33    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 49[v] [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 49[iv] [Plf.'s Rule 7.1 Response, admitting variation of above-stated fact "in part"].) Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). 🚩 *Aktas*, 877 F. Supp. 2d at 5 n.3. Third, even if Plaintiff's response could be construed as a partial denial of a specific fact, it fails to cite record evidence actually supporting such a denial and indeed cites record evidence that supports the above-stated fact.

34    After expressly admitting the fact asserted by Defendant, Plaintiff attempts to assert another fact. (Dkt. No. 19, at ¶ 50 [Plf.'s Rule 7.1 Response].) The fact asserted by Defendant will be deemed admitted. *Washington*, 2009 WL 1585947, at *1 n.2; *CA, Inc.*, 2015 WL 1611993, at *2 n.3. Setting aside that the additional fact that Plaintiff attempts to assert follows an express admission, the additional fact will be ignored for each of two alternative reasons. First, to the extent that it attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the word "investigated" means "investigated adequately"), the attempt is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman*, 2015 WL 4508362, at *10. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

35    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 51 [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of three alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). 🚩 *Aktas*, 877 F. Supp. 2d 1, 5 n.3. Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 459 of 482

(specifically, the implication that the words "interviewing both Plaintiff and Sgt. B as well as several other members of the Transport Unit" means that Plaintiff sat in on the interviews of the other persons referenced, and the implication that the sentence somehow means that Plaintiff's fellow deputies were *not* "set on a mission by Lt. Raus to sabotage him"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order. Third, the record evidence cited by Plaintiff supports, *at most*, the second fact asserted by him, not the first.

36    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 52 [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). 🔖 *Aktas, 877 F. Supp. 2d 1, 5 n.3.* Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that "strongly denied" means "correctly denied"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

37    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 56 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 56 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].) The Court notes that the record evidence cited by Plaintiff appears to challenge what he perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the word "addressed" means "addressed to Plaintiff's satisfaction"). As stated above in note 1 of this Decision and Order, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman,* 2015 WL 4508362, at *10.

38    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 57 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 57 [Plf.'s Rule 7.1 Response, denying part of variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact and indeed citing record evidence that supports above-stated fact].)

39    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 59 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 59 [Plf.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting such denial].) The Court notes that the record evidence cited by Plaintiff appears to attempt to assert additional material facts that he contends are in dispute. As stated above in note 1 of this Decision and Order, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

40    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 60 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 60 [Plf.'s Rule 7.1 Response, denying perceived implication of part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].) Plaintiff's response denies what he perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the word "investigated" means "adequately investigated"). As stated in note 1 of this Decision and Order, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman,* 2015 WL 4508362, at *10. Moreover, the Court notes that the record evidence cited by Plaintiff does not actually support his assertion that the investigation was not adequate, but supports an assertion that the *discipline* was not adequate (a fact that was never asserted by Defendant).

41    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 61 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 61 [Plf.'s Rule 7.1

Response, denying part of variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].) The Court notes that the affidavit cited by Plaintiff in his response speculates that Sgt. Marshall "must have watched" the prior portion(s) of the video in which the racial slur was also repeated. (Dkt. No. 18, Attach. 1, at ¶ 72 [Plf.'s Affid., stating that Sgt. Marshall "must have watched the entire thing"].) However, that testimony, which is based on a lack of personal knowledge, is inadmissible.

42  (*Compare* Dkt. No. 13, Attach. 21, at ¶ 62 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 62 [Plf.'s Rule 7.1 Response, admitting above-stated fact "in part"].) Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). *Aktas*, 877 F. Supp. 2d at 5 n.3. Third, the record evidence cited by Plaintiff does not actually controvert the fact that Sgt. Marshall addressed the incident; rather, it appears to challenge the timeliness and adequacy of Sgt. Marshall's response. However, Plaintiff's challenge to the timeliness of Sgt. Marshall's response is not based on personal knowledge but mere speculation, as discussed above in note 41 of this Decision and Order. Moreover, his challenge to the adequacy of Sgt. Marshall's response is a challenge to what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the word "addressed" means "adequately addressed"). As stated above in note 1 of this Decision and Order, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1, and any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

43  Plaintiff attempts to deny what he perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the words "was issued a supervisor's memorandum" means "was adequately disciplined"). (Dkt. No. 19, at ¶ 63 [Plf.'s Rule 7.1 Response].) This denial is ineffective for each of the two alternative reasons stated above in note 1 of this Decision and Order. First, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman*, 2015 WL 4508362, at *10. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

44  (*Compare* Dkt. No. 13, Attach. 21, at ¶ 64 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 64 [Plf.'s Rule 7.1 Response, denying part of variation of above-stated fact but failing to cite record evidence that controverts above-stated fact].)

45  As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

46  *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

47  Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

48  *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 461 of 482

arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, ⌐ 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

49    (Dkt. No. 18, Attach. 1, at ¶ 11 [Plf.'s Affid.].)

50    (Dkt. No. 18, Attach. 1, ¶¶ 6, 20, 21 [Plf.'s Affid.].)

51    (Dkt. No. 18, Attach. 1, at ¶¶ 6, 74 [Plf.'s Affid.].)

52    (Dkt. No. 18, Attach. 1, ¶¶ 20-23, 75 [Plf.'s Affid.].) Indeed, the Court notes that Plaintiff admits that such sexual jokes are made while both males and females are present, and that on one occasion a female deputy overheard one of the sexual jokes. (Dkt. No. 18, Attach. 1, at ¶ 75 [Plf.'s Affid.].)

53    (Dkt. No. 18, Attach. 1, ¶¶ 6, 8, 10 [Plf.'s Affid.]; *cf.* Dkt. No. 13, Attach. 4, at 68 [attaching page "67" of Plf.'s Depo. Tr., stating the "first time" he was given the "polish handshake" was "[b]ack in 2008, 2009" by Deputy A].)

54    (Dkt. No. 18, Attach. 1, ¶¶ 6, 8 [Plf.'s Affid.].)

55    (Dkt. No. 18, Attach. 1, ¶¶ 6, 10, 12 [Plf.'s Affid.].)

56    The Court notes that this misconduct was not alleged in Plaintiff's Complaint; and, despite being asked for in Defendant's interrogatory responses, it was not asserted in Plaintiff's interrogatory responses. (*See generally* Dkt. No. 1 [Plf.'s Compl.]; Dkt. No. 13, Attach. 6, at 3 [Plf.'s Interrogatory Response Nos. 3, 7].) However, it was subsequently asserted during Plaintiff's deposition. (*See, e.g.,* Dkt. No. 13, Attach. 4, at 22, 33, 67-69, 123, 143 and 152 [attaching pages "21," "32," "66," "67," "68," "122," "142," and "151" of Plf.'s Depo. Tr.].) While the Court disapproves of such a litigation practice, it will not preclude this late-blossoming deposition testimony absent a motion to preclude it.

57    (Dkt. No. 18, Attach. 1, ¶ 27 [Plf.'s Affid.].)

58    (Dkt. No. 18, Attach. 1, at ¶¶ 6, 10 [Plf.'s Affid.].) The Court renders this finding with some reservation, because Plaintiff's witnessing of the almost-daily misconduct by Deputy A was not alleged in Plaintiff's Complaint; and, despite being asked for in Defendant's interrogatories, it was not asserted in Plaintiff's interrogatory responses. (*See generally* Dkt. No. 1 [Plf.'s Compl.]; Dkt. No. 13, Attach. 6, at 3 [Plf.'s Interrogatory Response Nos. 3, 7].) Nor has Plaintiff pointed to any page of his deposition transcript in which he testified that he witnesses Deputy A give other deputies the "polish handshake" on an almost-daily basis. Rather, he testified in his deposition that he witnessed *Deputy B* engage in such conduct. (Dkt. No. 13, Attach. 4, at 33 [attaching page "32" of Plf.'s Depo. Tr.].) Moreover, he testified that the experience of witnessing such conduct did not bother Plaintiff: "I witnessed [Deputy B] touch other people.... But as long as it wasn't happening to me I was okay." (Dkt. No. 13, Attach. 4, at 33 [attaching page "32" of Plf.'s Depo. Tr.].) However, the Court reads Plaintiff's deposition testimony as referring to his experience of witnessing other deputies receiving a "polish handshake" from Deputy B, *before* Plaintiff himself received a "polish handshake" from Deputy A. Again, while the Court disapproves of the practice of adducing late-blossoming affidavit testimony, the Court will not preclude this particular piece of testimony under the circumstances absent a motion to preclude it.

59    (Dkt. No. 18, Attach. 1, ¶ 27 [Plf.'s Affid.].)

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 462 of 482

60    (Dkt. No. 18, Attach. 1, at ¶¶ 49-51 [Plf.'s Affid.]; Dkt. No. 13, Attach. 11, at 2 [attaching Ex. C-1 to Caiella Affid.]; Dkt. No. 13, Attach. 11, at 7 [attaching Ex. C-4 to Caiella Affid.].)

61    (Dkt. No. 18, Attach. 1, at ¶ 51 [Plf.'s Affid.].)

62    (Dkt. No. 18, Attach. 1, at ¶ 64 [Plf.'s Affid.].)

63    (Dkt. No. 13, Attach. 16, at 4-5 [Ex. H to Caiella Affid.].)

64    (Dkt. No. 18, Attach. 1, at ¶ 65 [Plf.'s Affid.].)

65    (Dkt. No. 18, Attach. 1, at ¶¶ 6, 10 [Plf.'s Affid.].)

66    The Court notes that, while Plaintiff asserts that witnessing the alleged misconduct re-victimizes him, the last time that he received a so-called "polish handshake" was, by his own account, in 2000-2001 (or perhaps 2008-2009).

67    The Court notes that Plaintiff acknowledges that, after he filed the above-described report (of which he does not have a copy), the conduct stopped happening to him. (Dkt. No. 13, Attach. 4, at 71-72 [attaching pages "70" and "71" of Plf.'s Depo. Tr.].)

68    (Dkt. No. 18, Attach. 1, at ¶ 10 [Plf.'s Affid.].)

69    The Court notes that Plaintiff acknowledges that, in 2007-2008, in response to being told by Deputy W to "scratch" his balls, Plaintiff grabbed Deputy W's groin and pulled. (Dkt. No. 18, Attach. 1, ¶ 18 [Plf.'s Affid.].) This fact would appear to make it even less reasonable to hold Defendant liable for failing to intuit Plaintiff's feeling of vicarious victimization.

70    (Dkt. No. 18, Attach. 1, at ¶¶ 25-26 [Plf.'s Affid.].)

71    (Dkt. No. 18, Attach. 1, at ¶¶ 25-26 [Plf.'s Affid.]; Dkt. No. 13, Attach. 4, at 171, 173, 175 [attaching pages "169," "171" and "173" of Plf.'s Depo. Tr.].)

72    (Dkt. No. 18, Attach. 1, at ¶¶ 43-46 [Plf.'s Affid.]; Dkt. No. 13, Attach. 4, at 198-99 [attaching pages "196" and "197" of Plf.'s Depo. Tr.].)

73    (Dkt. No. 18, Attach. 1, at ¶¶ 53-55 [Plf.'s Affid.]; Dkt. No. 13, Attach. 4, at 38-39 [attaching pages "36" and "37" of Plf.'s Depo. Tr.].)

74    (Dkt. No. 18, Attach. 1, at ¶¶ 49-51 [Plf.'s Affid.]; Dkt. No. 13, Attach. 11, at 2 [attaching Ex. C-1 to Caiella Affid.]; Dkt. No. 13, Attach. 11, at 7 [attaching Ex. C-4 to Caiella Affid.]; Dkt. No. 13, Attach. 4, at 99 [attaching page "97" of Plf.'s Depo. Tr.].)

75    (Dkt. No. 18, Attach. 1, at ¶ 63 [Plf.'s Affid.]; Dkt. No. 13, Attach. 4, at 201-03 [attaching pages "199" through "201" of Plf.'s Depo. Tr.].)

76    (Dkt. No. 18, Attach. 1, at ¶ 51 [Plf.'s Affid.].)

77    (Dkt. No. 18, Attach. 1, at ¶¶ 56-61 [Plf.'s Affid.].)

78    (Dkt. No. 13, Attach. 16, at 4-5 [Ex. H to Caiella Affid.].)

79    (Dkt. No. 18, Attach. 1, at ¶ 65 [Plf.'s Affid.].)

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 463 of 482

80   (Dkt. No. 18, Attach. 1, at ¶ 70 [Plf.'s Affid.].)

81   (Dkt. No. 18, Attach. 1, at ¶ 19 [Plf.'s Affid.].)

82   (Dkt. No. 18, Attach. 1, at ¶ 48 [Plf.'s Affid.]; Dkt. No. 13, Attach. 4, at 37-38 [attaching pages "35" and "36" of Plf.'s Depo. Tr.].)

83   *See, supra,* Fact Nos. 45, 50, 51, 53-55, 58, 60 in Part I.B. of this Decision and Order. (*See also* Dkt. No. 13, Attach. 10 [Exs. B-1 through B-14 to Caiella Affid.]; Dkt. No. 13, Attach. 11 [Exs. C-1 through C-18 to Caiella Affid.]; Dkt. No. 13, Attach. 12 [Ex. D to Caiella Affid.]; Dkt. No. 13, Attach. 13 [Ex. E to Caiella Affid.]; Dkt. No. 13, Attach. 14 [Ex. F to Caiella Affid.]; Dkt. No. 13, Attach. 15 [Ex. G to Caiella Affid.]; Dkt. No. 13, Attach. 16 [Ex. H to Caiella Affid.]; Dkt. No. 13, Attach. 17 [Ex. I to Caiella Affid.]; Dkt. No. 13, Attach. 18 [Ex. J to Caiella Affid.].)

84   *See, supra,* Fact Nos. 32, 33, 47, 55, 56, 62, 63 in Part I.B. of this Decision and Order.

85   The Court notes that *all* claims must be liberally construed. Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). It is only claims by *pro se* litigants (or civil rights litigants) that must be *extra-liberally* construed, that is, construed with special solicitude or special leniency. *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir. 2003); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir. 1999); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir. 1994).

86   *See Hochroth v. William Penn Life Ins. Co. of New York*, 03-CV-7286, 2003 WL 22990105, at *2 (S.D.N.Y. Dec. 19, 2003) ("It is well established that the plaintiff is the 'master of his complaint' and may characterize his causes of action as he pleases.").

87   *See, supra,* note 49 of this Decision and Order.

88   This conclusion is especially reasonable when one considers Plaintiff's experience of suffering the consequences, in a prior action before the undersigned, of failing to assert a claim of sexual harassment in his EEOC complaint. *Willis v. Onondaga Cty. Sheriff's Dep't*, 04-CV-0828, Minute Entry for Day 1 of Jury Trial (N.D.N.Y. filed Feb. 22, 2010).

---

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 43,794

request to be transferred to a different position. Accordingly, Plaintiff cannot complain about this change when she was the one who requested it. *See* 🚩 *Tepperwein*, 663 F.3d at 571 (noting that "the switch to the night shift was not materially adverse because, as his own testimony makes clear, [plaintiff] requested it"); *Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 399 (S.D.N.Y. 2011) (holding that "Plaintiff's allegation that he was excluded from management meetings, when considered in context, does not constitute an adverse employment action"); *Hepburn v. City of Torrington*, 02-CV-1252, 2004 WL 1771590, at *5 (D.Conn. Aug. 4, 2004) (holding that the exclusion of the plaintiff, who was not a captain or lieutenant, from a captains' meeting was not an adverse employment action); 🚩 *Watson v. Paulson*, 578 F. Supp. 2d 554, 565 (S.D.N.Y. 2008) (holding that excluding secretary from a staff meeting did not impact the performance of her duties or result in a material change in the terms and conditions of her employment); *cf.* 🚩 *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006) (concluding at the summary judgment stage that the plaintiff's exclusion from managerial meetings constituted an adverse employment action where plaintiff had demonstrated that such exclusion indicated a significant change in his responsibilities).

**\*15** Similarly, with respect to Plaintiff's argument regarding the CDC site visit, that argument is equally unpersuasive when viewed in light of the undisputed facts. The Court reaches this conclusion for two reasons. First, Plaintiff's argument that she was not involved in the planning of the visit is controverted by an e-mail sent to her by Dr. Kuhles, which specifically requested Plaintiff to "develop a plan with [her] recommendations on how to respond to the proposed agenda" for the CDC visit. (Dkt. No. 64, Attach. 1 [Ex. "A" HRI-0000898].) Dr. Kuhles also requested that Plaintiff provide him with a "copy of the results/conclusions from the last site visit that was conducted." (*Id.*, at Ex. "A" HRI-0000434-HRI-0000441.) In response, Plaintiff prepared a one-page proposed agenda for the site visit in response to the CDC's specifications, and provided it to Dr. Kuhles and Dr. Zansky. (*Id.*, at Ex. "A" HRI-0007318.) Accordingly, Plaintiff was clearly involved with the planning of the site visit.

Second, as discussed above in Point I.B. of this Decision and Order, Dr. Kuhles asked Plaintiff to prepare and give a presentation during the site visit on the hepatitis quality improvement initiative. Plaintiff expressed concerns to Dr. Zansky about her experience with the initiative and indicated

that she was not comfortable presenting on this topic. When this fact was brought to Dr. Kuhles' attention, he agreed with Plaintiff and decided that she should develop a presentation utilizing the SWOT framework for the future of hepatitis and public health instead. (Dkt. No. 45, Attach. 8 [Ex. "H" HRI-0000940].) It is apparent from the record that Plaintiff was not happy with this topic either. (*Id.* [Ex. "H" HRI-0005154].) However, the Court does not find that giving Plaintiff this assignment, after she had requested a new one, amounts to adverse action.

Furthermore, the undisputed facts do not suggest that Plaintiff was excluded from participating in the site visit. In addition to being asked to make a presentation to the CDC, Dr. Kuhles emphasized prior to the visit that, "[l]ike others on the team, [Plaintiff] should be present throughout the site visit." (Dkt. No. 45, Attach. 8 [Ex. "H" HRI-0000940].) Despite being given a little more than a week to work on the presentation, Plaintiff waited until "Sunday evening around 8pm, through 2am" to try and complete the assignment. (*Id.* [Ex. "H" HRI-0005154].) The following day, which was the first day of the CDC site visit, Plaintiff missed the introduction portion of the visit to participate in a previously scheduled training for the QI project. (*Id.* [Ex. "H" HRI-0007439, HRI-0008753].) Thereafter, Plaintiff took time to try and complete her presentation before joining the site visit at 1 pm. (*Id.* [Ex. "H" HRI-0005154].) However, Plaintiff was forced to leave the visit at 3 pm due to a family emergency. (*Id.*) As discussed previously, it was ultimately determined by Dr. Zansky that Plaintiff's presentation was not satisfactory and she did not end up presenting. Instead of presenting, Plaintiff attended other portions of the site visit after Dr. Zansky encouraged her to come. (*Id.* [Ex. "H" HRI-0005155].)

Based upon these facts, it is evident that the only portion of the site visit that Plaintiff missed as a result of any action attributable to HRI was due to the QI training, which required her to miss only the introductions that were scheduled on the first day. Plaintiff has failed to demonstrate how this was retaliatory or disadvantaged her in any way.

Finally, with respect to Plaintiff's argument regarding the CSTE conference, at first glance there appears to be conflicting evidence as to whether Plaintiff was ultimately given permission to attend. Despite her request (along with requests submitted by several other employees) being initially denied, Dr. Kuhles and Dr. Zansky stated that travel authorization was later procured and Plaintiff was informed that she could attend the conference. (Dkt. No. 49, ¶¶ 62-65

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 465 of 482

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 43,794

[Kuhles Aff.]; Dkt. No. 48, ¶ 92 [Zansky Aff.].) The one caveat was that Plaintiff return to New York in time to attend a QI training beginning on June 5, 2012, which was during the latter part of the CSTE conference. (*Id.*) Despite testifying at her deposition to the contrary (Dkt. No. 45, Attach. 7, at 138:9-14 [Rizzo Dep.]), Plaintiff's personal notes, dated May 8, 2012, appear to corroborate that she was allowed to attend the conference. (Dkt. No. 45, Attach. 9 [Ex. "I" HRI-P02870].) Specifically, with reference to the CSTE conference, Plaintiff's notes state that "[s]uddenly a QI Leadership that week. *I can go* [to the conference]*, but be back Tues*[9] *AM.*" (*Id.*) (emphasis added).

**\*16**  The Supreme Court has instructed that, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *accord*, *Vega v. Rell*, 611 F. App'x 22, 25-26 (2d Cir. 2015); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (holding that summary judgment properly granted to defendants where plaintiff "relies almost entirely on her own testimony," which was contradicted by "contemporaneous letters and meeting notes"); *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (explaining that district court could resolve issues of credibility on motion for summary judgment in narrow circumstances where [1] the testimony of non-movant is largely unsubstantiated by any other direct evidence, and [2] that testimony is so incomplete and/or replete with inconsistencies and improbabilities that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant). The affidavits filed by Dr. Kuhles and Dr. Zansky, coupled with Plaintiff's contemporaneous notes, establish that Plaintiff was aware that she had received permission to go to the conference. Therefore, there is no admissible record evidence of retaliation regarding the CSTE conference.

Nor does the temporal proximity of the events regarding Plaintiff's FMLA leave support her argument that she was retaliated against. It is well established that "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).[10]  Plaintiff returned from her first FMLA leave on September 13, 2010. The unit manager meeting that Plaintiff alleges she was excluded from occurred on November 18, 2010. "[D]istrict courts in this Circuit have consistently held that a passage of two months between the protected activity and the adverse employment action seems to be the dividing line." *Ruhling v. Tribune Co.*, 04-CV-2430, 2007 WL 28283, at \*23 (E.D.N.Y. Jan. 3, 2007); *see also Hussein v. Hotel Emps. & Rest. Union, Local 6*, 108 F. Supp.2d 360, 367 (S.D.N.Y. 2000) (holding that "the passage of more than two months defeats any retaliatory motive"); *Doner-Hedrick v. N.Y. Inst. of Tech.*, 874 F. Supp. 2d 227, 246 (S.D.N.Y. 2012) (noting that, "[i]n general, periods greater than two months defeat an inference of causation"). Here, the delay was more than two months.

Similarly, Plaintiff returned from her second FMLA leave on August 16, 2011. The May 2012 CDC site visit occurred approximately nine months later, and the CSTE conference held in June, 2012, occurred approximately ten months later. Accordingly, temporal proximity does not support retaliatory intent with respect to these events.

Finally, even if Plaintiff were able to set forth a prima facie case of retaliation, HRI has presented a legitimate, nondiscriminatory reason for Plaintiff's dismissal from employment. Specifically, the end of grant funding for a particular program or position and corporate restructuring are legitimate, nondiscriminatory reasons for eliminating a previously funded position. *See Tarshis v. The Riese Org.*, 211 F.3d 30, 37 (2d Cir. 2000) (stating that "restructuring that results in an elimination of jobs often is a legitimate reason for dismissing an employee"); *Garcia v. Henry St. Settlement*, 501 F. Supp. 2d 531, 540 (S.D.N.Y. 2007) (holding that "the non-renewal of the grant that funded [plaintiff's] department" was a legitimate, nondiscriminatory explanation); *Spence v. Fayette Cty.*, 07-CV-1711, 2009 WL 961118, at \*4 (W.D. Pa. Apr. 8, 2009) (employer's loss of grant funding was a legitimate, nondiscriminatory reason for terminating employee).

**\*17**  For all of these reasons, Plaintiff's retaliation claims are dismissed.

### D. Whether Plaintiff's FMLA Interference Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth below.

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 43,794

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "An employee may bring an interference claim against the employer when 'the employer in some manner impeded the employee's exercise of [the] right[s] afforded substantive protection under the FMLA.' "*Bowman v. CSX Transp., Inc.*, 22 F. Supp. 3d 181, 188 (N.D.N.Y. 2014) (Sharpe, C.J.) (quoting *Nichik v. N.Y.C. Auth.*, 10-CV-5260, 2013 WL 142372, at *12-13 [E.D.N.Y. Jan. 11, 2013]). "To state a prima facie claim for interference under the FMLA, [plaintiff] must allege: (1) he is an eligible employee; (2) [plaintiff's employer] qualifies as an employer under the FMLA; (3) he was entitled to take leave under the FMLA; (4) he gave notice to the defendant of his intention to take leave; and (5) [plaintiff's employer] denied him benefits to which he was entitled under the FMLA." *Bowman*, 22 F. Supp. 3d at 188-89.

Plaintiff argues that her request for FMLA leave was frustrated when, after giving Dr. Cherry an acknowledgment form that she would be requesting FMLA leave, Dr. Cherry engaged in a series of e-mail conversations with Dr. Kilby and a representative in the human resources office in an attempt to "limit, curtail, and interfere with" Plaintiff's request. (Dkt. No. 60, at 6-8 [Pl.'s Opp'n Mem. of Law].) In addition, Plaintiff argues that, two days after she requested FMLA leave, Dr. Cherry retaliated against her by subjecting her to a counseling session regarding her "unprofessional behavior." (*Id.* at 8-9.) Plaintiff also notes that she received the counseling memorandum that summarized the session the day she returned from her first FMLA leave, presumably to upset her. (*Id.* at 10.)

The Court is unpersuaded by Plaintiff's arguments because she has admitted that (1) the only accommodation that she requested was FMLA leave, and (2) that HRI granted every request she made. (Dkt. No. 57, ¶¶ 33, 36 [Pl.'s Rule 7.1 Response].) Therefore, Plaintiff cannot establish the fifth element of her claim: that HRI denied her benefits to which she was entitled under the FMLA. Accordingly, conversations that Dr. Cherry may have had with the human resources department or Dr. Kilby (his supervisor) regarding Plaintiff's request are of no moment.

Furthermore, the undisputed evidence demonstrates that the counseling session to which Plaintiff was subjected was not in any way related to Plaintiff's FMLA leave, but was conducted to address Plaintiff's verbal altercation with her supervisor regarding the fox incident. Indeed, Plaintiff has admitted that she attributed the counseling session to "her request for a reprieve from non-hepatitis-related duties," not her FMLA leave. (Dkt. No. 57, ¶ 109 [Pl.'s Rule 7.1 Response].) Finally, it is well settled in this Circuit that counseling is not considered a form of discipline and, as a result, does not amount to an adverse employment action. *Tepperwien*, 663 F.3d at 570 (holding that, "in the context of the issuance of a 'counseling memo,' that 'criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action' ") (quoting *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 [2d Cir. 2001]). Plaintiff has also admitted that CSEA, Plaintiff's union, does not include counseling as a form of discipline. (Dkt. No. 57, ¶ 104 [Pl.'s Rule 7.1 Response].) Nor does HRI view counseling as a form of discipline. (*See* Dkt. No. 42, Attach. 6 [e-mail from human resources to Plaintiff explaining that "counseling is intended to be a constructive device aimed at modifying behavior. It is instructional and not punitive. Counseling is not discipline."].)

**\*18** Therefore, Plaintiff's subjective feelings that HRI attempted to interfere with her FMLA leave is insufficient to raise a triable issue of fact with respect to her FMLA interference claim. *See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 208 (S.D.N.Y. 2009) (holding that plaintiff's "unsupported 'feeling' that defendants terminated him in retaliation for filing FMLA leave because that was interfering with his work or because 'they were annoyed becuase they perceived that [his] FMLA leave inconvenienced them' " was insufficient to raise an issue of triable fact); *McCaskill v. ShopRite Supermarket* 13-CV-0238, 2015 WL 419658, at *8 (N.D.N.Y. Jan. 30, 2015) (Sannes, J.) (holding that "plaintiff has demonstrated nothing more than his own subjective belief and feeling that he was discriminated against, which is not enough to make out a prima facie discrimination case") (internal quotations omitted). For all of these reasons, Plaintiff's FMLA interference claim is dismissed.

### E. Whether Plaintiff's ADA and NYSHRL [11] Disability Discrimination Claims Should Be Dismissed
After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth below.

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 43,794

Plaintiff argues that HRI failed to provide her with a reasonable accommodation for her disability as required by the ADA. (Dkt. No. 60, at 4-5 [Pl.'s Opp'n Mem. of Law].) "A plaintiff suing under the ADA for disability discrimination bears the burden of establishing a prima facie case." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 183-84 (2d Cir. 2006). "A plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing each of the following: '(1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96-97 (2d Cir. 2009) (quoting *Graves*, 457 F.3d at 184). As discussed in the preceding section, Plaintiff has admitted that the only accommodation that she requested was FMLA leave and that HRI granted every request she made. Accordingly, Plaintiff cannot establish the fourth element of this claim, and any claim based upon a failure to accommodate is therefore dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 38) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's cross-motion to strike (Dkt. No. 58) is **DENIED**.

The Clerk of the Court is directed to enter judgment in favor of the Defendant and close this case.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 632546, 2016 Wage & Hour Cas.2d (BNA) 43,794

# Footnotes

1    (Dkt. No. 57, ¶¶ 5-8, 10-18, 22, 24-25, 27-30, 34, 37-57, 60-69, 72-77, 86-88, 91-95, 97-98, 100-03, 105-06, 111-12, 114, 118-19, 121-22, 129, 137-39, 142, 147, 149-150, 156, 158-166, 176, 180, 183-84, 188-193, 196-97, 199-202, 205, 211.)

2    (Dkt. No. 57, ¶¶ 130-33, 135-36, 140-41, 151, 157, 175, 178, 182.)

3    (Dkt. No. 57, ¶¶ 85, 96-98, 100-03, 105, 114, 137-39, 161, 166, 176, 178, 197, 199, 201, 205.)

4    *See also Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts). To the extent that Plaintiff desired to set forth any additional material facts that she contends are in dispute, she was required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs (which she did not).

5    (Dkt. No. 57, ¶¶ 5-6, 10-18, 22, 25, 27-30, 34-35, 37-57, 60-69, 72-77, 85-88, 91-98, 100-03, 105-06, 111-12, 114, 118-122, 129, 132, 137-140, 142, 147, 149-150, 158-166, 176, 178, 180, 182-86, 188-190, 192-93, 196, 200, 202.)

6    The Court begins its analysis by considering Plaintiff's cross-motion due to Defendant's heavy reliance upon the affidavits and exhibits at issue in support of its summary judgment motion.

7    Courts have also held that, in order to make out a prima facie case under the FMLA, a plaintiff must establish that "[1] he exercised rights protected under the FMLA; [2] he was qualified for his position; [3] he suffered an adverse employment action; and [4] the adverse employment action occurred under circumstances giving

Rizzo v. Health Research, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 43,794

rise to an inference of retaliatory intent." 🚩 *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). With regard to a prima facie case under the ADA and NYSHRL, courts have held that a plaintiff must establish that "[1] the employee was engaged in an activity protected by the ADA, [2] the employer was aware of that activity, [3] an employment action adverse to the plaintiff occurred, and [4] there existed a causal connection between the protected activity and the adverse employment action." 🚩 *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999); *see also White v. Pacifica Found.*, 973 F. Supp. 2d 363, 384 (S.D.N.Y. 2013) (applying these elements to a NYSHRL claim).

8    Plaintiff does not argue, nor is there evidence to suggest, that Plaintiff's transfer constituted a materially adverse employment action. *See* 🚩 *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000) (holding that "a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career," equating to demotion).

9    The Court takes judicial notice of the fact that June 5, 2012, was a Tuesday.

10    The Court notes that, temporal proximity, in and of itself, is insufficient to prove pretext. *See* 🚩 *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) (holding that "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage"); 🚩 *El Sayed*, 627 F.3d at 933 (holding that, without more, "temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext"). However, for purposes of thoroughness, the Court will consider this issue.

11    "A claim of disability discrimination under the NYSHRL is governed by the same legal standards as govern federal ADA claims." *Morse v. JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 292 (E.D.N.Y. 2013). "Thus, to the extent that [a plaintiff] brings a state-law disability-discrimination claim, it survives or fails on the same basis as [plaintiff's] ADA claim." 🚩 *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006).

---

End of Document                                             © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   17

Lewis, 518 U.S. at 353–54. "Depriving someone of an arguable (though not yet established) claim inflicts actual injury because it deprives [the plaintiff] of something of value —arguable claims are settled, bought, and sold. Depriving someone of a frivolous claim, on the other hand, deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions." Id. at 353 n.3.

Plaintiff does not explain how the video footage might have changed the state court's conclusion that the exclusion of witnesses and documentary evidence from his hearing was constitutional. Am. Compl. at 90, ¶ 136(D). Therefore, he does not plausibly allege that Bernier "hindered" his case in state court. Lewis, 518 U.S. at 353–54. And the conversation Plaintiff describes in his Amended Complaint did not even "arguably" support his claim that Gutwine was unconstitutionally biased. Id. Accordingly, even if Bernier withheld the video of that conversation, she did not violate Plaintiff's right to access the courts.

### 6. Eighth Amendment Medical Indifference Claim Against Michele Byno

**\*16** Plaintiff's proposed Amended Complaint would also revive his Eighth Amendment claim that by withholding Plaintiff's mental health medication ("Romeron and Celexa") from October 14 to 30, 2014, Byno was deliberately indifferent to the "substantial risk of serious harm" posed by Plaintiff's depression. Obj. at 13; Am. Compl. at 39–43, ¶¶ 81–83.

In its November Order, the Court concluded that withholding Plaintiff's depression medication for sixteen days plausibly posed a "substantial risk of serious harm," but that Plaintiff had "not pleaded facts suggesting that Byno was aware that withholding ... medication would result in [such] an excessive risk to Plaintiff's health or that [she] acted with the necessary culpable state of mind." Nov. Order at 21. Now, Plaintiff alleges that he told Byno at his Upstate intake on May 3, 2014 "about his previous suicide attempts before arriving at Upstate," had "actually ... just arrived from Downstate C.F. mental health observation cell for trying to hang himself," and that he "felt homicidal and suicidal." Am. Compl. at 41, ¶ 83(A)(2). After Heath Baker and Marinelli allegedly discontinued Plaintiff's medical health medication in June 2014, Plaintiff attempted suicide again, and on September 1, 2014, he told Byno that "my mental health meds being discontinued ... was a factor for me trying to kill myself." Id.

¶ 83(A)(4). Moreover, although Byno had stopped supplying Plaintiff's pills and told him on October 16, 2014 that they had been "discontinued," she told prison administrators that he "ha[d] been receiving [his] medication on a regular basis" during the same period. Am. Compl. at 39–40, ¶¶ 82, 83(A) (5)–(6); see also Dkt. No. 28-3 at 31 ("Exhibit N") (letter from New York Office of Mental Health stating that "nursing" staff at Upstate so indicated).

Byno's awareness of Plaintiff's recent history of suicide attempts when Plaintiff was denied medication, and dissimulation to hide the sixteen-day gap in Plaintiff's medication in October 2014, would provide plausible grounds to infer that she possessed the culpable mental state required to violate the Eighth Amendment. Therefore, Plaintiff's Eighth Amendment claim against her is not futile.

### 7. Eighth and First Amendment Claims Against Heath Baker

#### i. Shingles

Plaintiff asserts that in misdiagnosing Plaintiff's shingles as "stretch marks" in October 2014 and failing to treat them, nurse Heath Baker "was deliberately indifferent to Plaintiff['s] serious medical needs" in retaliation for Plaintiff's filing grievances, which violated his First and Eighth Amendment rights. Obj. at 12–13 (citing Am. Compl. ¶¶ 77–80 and numerous exhibits).

Plaintiff alleges that "around May 19, 2014," Baker learned that Plaintiff filed grievances against him on May 10, 13, and 14 for allegedly denying Plaintiff medical treatment. Am. Compl. at 36–38, ¶¶ 80(F)(2)–(5), (10); Dkt. No. 28-3 at 12–13 ("Exhibit E") (grievance review letter stating that Baker "saw the grievant at sick call on 5/7/14, 5/12/14, 5/14/14, and 5/20/14"). [7] Burton, 664 F. Supp. 2d at 367 (noting that grievances are protected activities. As explained earlier, grievances are protected activities, and courts have found it "plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor."

Id. at 367. Therefore, Plaintiff's allegations against Baker regarding his shingles satisfy the first two elements of a retaliation claim.

White v. Marinelli, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 470 of 482

**\*17** However, Plaintiff's allegations do not suggest that Baker intentionally mis-diagnosed his shingles because of the grievance filed five months earlier. True, a "plaintiff can establish a causal connection that suggests retaliation by showing that [the] protected activity was close in time to the adverse action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009). But to support an inference of retaliatory intent on its own, without other evidence, "the [temporal] proximity must be 'very close.' " Dhar v. City of New York, 655 F. App'x 864, 866 (2d Cir. 2016) (citing Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ); compare Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85–86 (2d Cir. 1990) (holding that there was insufficient evidence of a "causal nexus" when the only evidence was temporal and there was a three-and-a-half-month lapse between the complaint and the alleged adverse action) with Espinal, 558 F.3d at 122, 129 (finding lapse of six months supported retaliation claim, where facts suggested that officers "waited to exact their retaliation at an opportune time" to beat plaintiff, and told him that "this is what happens to [i]nmates when they submit law suits against us"). And there is reason to demand a particularly close proximity in this case, where Plaintiff admits that Baker examined the rash but asserts that he mis-diagnosed it. "Determinations made by medical providers within their discretion are given a 'presumption of correctness' when it concerns the care and safety of patients." Banks v. Annucci, 48 F. Supp. 3d 394, 409 (N.D.N.Y. 2014). The fact that Baker's alleged mis-diagnosis came five months after the grievance is insufficient to raise a "reasonable expectation" that Plaintiff will discover evidence to overcome that presumption and establish retaliatory intent. Twombly, 550 U.S. at 556. Therefore, the First Amendment retaliation claim against Baker is futile.

Given that same "presumption of correctness," Banks, 48 F. Supp. 3d at 409, the facts in the proposed Amended Complaint also fail to show that Baker "consciously disregard[ed] a substantial risk of serious harm" to Plaintiff's health, Farmer, 511 U.S. at 839, or even that Plaintiff was denied adequate care, so as to violate the Eighth Amendment. Salahuddin, 467 F.3d at 279. Even if Baker misdiagnosed Plaintiff's shingles symptoms, Plaintiff concedes that prison medical staff treated the virus after four days, Am. Compl. at 33, ¶ 78, and provides no facts suggesting "that the delay ... caused or exacerbated the infection, caused him extreme pain, or caused any permanent harm," Frith, 203 F. Supp. 3d at 390. As with his infected bite, Plaintiff's general statements that the shingles caused "unbearable pain," Am. Comp. at 33, ¶ 80, in those four days are insufficient. Gomez, 649 F. App'x at 96; Frith, 203 F. Supp. 3d at 389. Accordingly, any Eighth Amendment claim based on Baker's delayed treatment for Plaintiff's shingles would fail.

### ii. Mental Health

The Objections also reference claims that in May and June, 2014, Baker was deliberately indifferent to Plaintiff's mental health needs. Obj. at 10–11; see also Nov. Order at 19–21. The Court previously found that the mental health-related allegations would survive sua sponte screening if they were not time-barred. Nov. Order at 19. Defendants do not object to the Magistrate Judge's finding that the proposed Amended Complaint sets forth a potential basis to toll the statute of limitations with respect to those claims. Therefore, the Court adopts that finding.

### iii. Rash, Acne, Fungus

Plaintiff also alleges that Baker ignored conditions in "May and June," which may refer to Plaintiff's facial acne, a rash on his thigh, and/or a foot fungus. Obj. at 12; see also Nov. Order at 22. However, he points to no allegations in the Amended Complaint that would show that his acne, rash, or fungus constituted "serious medical conditions," as required to support an Eighth Amendment violation. Nov. Order at 22 (citing Thompson v. Carlsen, No. 08-CV-965, 2010 WL 3584409, at \*6 (N.D.N.Y. Aug. 16, 2010) ). The facts do not indicate that they were " ' condition[s] of urgency' that may result in 'degeneration' or 'extreme pain,' " meaning that they do not state an Eighth Amendment claim. Chance, 143 F.3d at 702 (citation omitted). Moreover, although Plaintiff refers to Baker's actions in "May and June," 2014, Plaintiff asserts that Baker decided that the acne, fungus, and rash did not require treatment on May 14, 2014, around five days before Baker learned of Plaintiff's grievances against him. Am. Compl. ¶¶ 80(F)(10). Thus, based on those allegations, Baker's decisions concerning those physical conditions were not First Amendment retaliation, either. As such, they fail to state a claim for relief.

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 471 of 482

White v. Marinelli, Not Reported in Fed. Supp. (2019)

### 8. Supervisory Liability Claims

#### i. Nancy Smith

**\*18** Plaintiff claims that Nancy Smith violated his First and Eighth Amendment rights by failing to correct Baker's retaliatory indifference to Plaintiff's acne, rash, fungus, and shingles. Specifically, Plaintiff asserts that Smith, like Baker, was "deliberate[ly] [indifferent] to Plaintiff['s] serious medical needs in retaliation for filing multiple grievances." Am. Compl. at 35, ¶ 80(F).

To state an Eighth Amendment claim based on a supervisor's acquiescence in subordinates' unconstitutional conduct alleged in a grievance, Plaintiff's claim must meet the same elements as it would against a line officer; the Amended Complaint must show that the supervisor "knew of and disregarded and excessive risk to [Plaintiff's] heath or safety." Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015), rev'd on other grounds, Ziglar v. Abbasi, 137 S. Ct. 1843 (2017); see also Zenon v. Downey, No. 18-CV-458, 2018 WL 6702851, at *7 (N.D.N.Y. Dec. 20, 2018) (discussing supervisory liability in light of Iqbal and Turkman). In addition, the "constitutional violation complained of in [the] grievance must [have been] 'ongoing' ... such that the 'supervisory official who review[ed] the grievance [could] remedy [it] directly.' " Burton, 664 F. Supp. 2d at 360. (citations omitted). " 'Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate,' because the violation is not 'ongoing and the defendant has [no] opportunity to stop the violation after being informed of it.' " Id. at 361 (citation omitted).

As discussed, the failure to treat the skin conditions and fungus, and the delay in treating the shingles, did not pose a "substantial risk of serious harm" to Plaintiff's health. Chance, 143 F.3d at 703. Moreover, Plaintiff does not allege that his conditions persisted beyond Smith's review of his grievance regarding Baker. Burton, 664 F. Supp. 2d at 360. In any event, "[i]t is well established that supervisory officials are generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment." Graham v. Wright, No. 01-CV-9613, 2003 WL 22126764, at *1 (S.D.N.Y. Sept. 12, 2003) (citation omitted). Accordingly, Plaintiff's proposed claims against Nancy Smith based on the acne, rash, fungus, and shingles are futile.

As to the retaliation claim, Plaintiff does not list any grievance he filed against Nancy Smith; his only factual allegation against her asserts that she investigated Plaintiff's June 9, 2014 grievance against Baker concerning his rash and foot fungus before that grievance was denied. Dkt. No. 28-3 at 24–25 ("Exhibit K"). [8] Plaintiff does not provide any reason to believe she retaliated against him for that complaint. See R. & R. at 15 (citing cases dismissing claims that corrections officers retaliated based on complaints against other officers on similar facts); cf. Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) (granting summary judgment against such a claim even though defendant took alleged adverse action three days after Plaintiff filed grievance against another officer). Therefore, Plaintiff First Amendment retaliation claim against Smith also fails.

#### ii. Donald Uhler

**\*19** Plaintiff also fails to resuscitate his claim that Uhler violated the Eighth Amendment by permitting inmate Reeder to "kick and bang" on Plaintiff's cell in 2016. Nov. Order at 40.

In his Amended Complaint, Plaintiff states that Reeder was "written up for kicking his door" in July 2014. Am. Compl. At 60, ¶ 104(A). Plaintiff also sent the IGRC a grievance on September 18, 2014, stating that "for the past four months" Reeder had been "bang[ing] all day and night depriving [him] of sleep and peace of mind," and requesting a transfer. Ex. S; Am. Compl. at 60, ¶ 104(B). The IGRC denied the request, and Uhler affirmed. Dkt. No. 28-3 at 45 ("Exhibit U"); see also Am. Compl. ¶ 104(B)–(C). On January 5, 2016, Plaintiff filed another grievance reporting that Reeder was "kicking and banging" again. Id. ¶ 103. The IGRC also denied that grievance and, on January 31, 2016, Plaintiff again appealed to Uhler. Id. On February 8, Corrections Officer Todd Manly came to Plaintiff's cell to investigate and heard Reeder's banging. Id. However, on March 4, 2016, Uhler affirmed the denial of the request for a transfer, finding (incorrectly) that there was "no evidence of inmate Reeder banging." Id. ¶ 104; see also Nov. Order at 40.

These allegations still fail to establish that Uhler violated Plaintiff's Eighth Amendment rights. Like the original

Complaint, the Amended Complaint still does not allege that Reeder continued to deprive Plaintiff of sleep after Uhler reviewed his grievance in March 2016. Nov. Order at 40. Plaintiff does not contradict his earlier statement that Reeder's banging stopped depriving him of sleep on January 27, 2016. Compl. at 32, ¶ 89. Thus, the Court cannot infer that Uhler had a reasonable opportunity to remedy the unconstitutional conditions after he reviewed Plaintiff's appeal between January 31 and March 4, 2016. Am. Compl. at 50–60, ¶¶ 103–04.

Plaintiff argues that Uhler should have prevented Plaintiff from being placed next to Reeder in the first place because of the complaints concerning Reeder in 2014, "15 months prior" to the 2016 incident. Am. Comp. at 61, ¶ 104(C). Perhaps Uhler should have remembered those 2014 complaints, foreseen that Reeder would resume his behavior, and predicted that Plaintiff would lose sleep if placed next to Reeder again. At most, however, Uhler's lack of foresight constitutes negligence—not the criminal recklessness required to state a claim under the Eighth Amendment. 🚩 Farmer, 511 U.S. at 835, 839.

Plaintiff does not direct the Court to any other factual allegations suggesting that Uhler knew of and disregarded an excessive risk to his health or safety. 🚩 Turkmen, 789 F.3d at 250. Accordingly, his claims against Uhler are futile.

### 9. Sexual Harassment Claims Against Nelson

Plaintiff attempts to reallege that Nelson's comments at his cell on April 21, 2016—attempting to induce him to expose his penis—violated the Eighth Amendment. "There has been no case" in the Second Circuit "in which a plaintiff ha[s] established an actionable [Eighth Amendment] claim of sexual harassment ... without having physical contact with the alleged perpetrator, or without, at the very least, alleging egregious sexual conduct." 🚩 Holland v. City of New York, 197 F. Supp. 3d 529, 547 (S.D.N.Y. 2016). Plaintiff argues that Nelson's remarks are "egregious" because there were "many incidents of sexual misconduct, including forceful sexual activity ... unsolicited touching, and sexual comments" at Upstate, "where sexual assaults of prisoners was well known but inadequately addressed." Obj. at 14. As described earlier, the incidents of unprovoked physical violence against Plaintiff, such as the alleged 2014 sexual assault by Mr. Gokey and other officers, would violate the Eighth Amendment on their own. 🚩 Crawford, 796 F.3d at

257–59. However, Plaintiff does not allege that Nelson was aware of any of these incidents. And even if she was, her alleged remarks on April 21, 2016 would not state a claim. Unlike the physical abuse alleged in Crawford and Boddie, Nelson's alleged verbal harassment, though degrading to Plaintiff, does not constitute "severe and repetitive sexual abuse" and, therefore, is not sufficiently serious to be "cruel and unusual punishment." 🚩 Crawford, 796 F.3d at 256–57; see also 🚩 Morales v. Mackalm, 278 F.3d 126, 132 (2d Cir. 2002) (affirming dismissal of Eighth Amendment claim where female prison employee asked plaintiff "to have sex with her and to masturbate in front of her and other female staffers").

### 10. New Claims in Amended Complaint

**\*20** Plaintiff also seeks to add several claims in his Amended Complaint that do not appear to have been asserted in his Complaint. See Am. Compl. at 222–36, ¶¶ 289–36. Neither the parties, nor the Court, nor the Magistrate Judge has addressed whether these claims are plausible. The Court need not address them here. Plaintiff may attempt to assert them in his revised Amended Complaint, subject to review by the Magistrate Judge under the standard in 🚩 Foman, 371 U.S. at 182, and, if necessary, appeal to this Court.

Nevertheless, given the age of this case and the fact that discovery has not yet commenced, Plaintiff's revised Amended Complaint, which will be due thirty days from the filing of this Memorandum-Decision and Order, will be his last opportunity to amend the Complaint without showing good cause for allowing him to do so. Further motions to amend will not be freely granted.

### C. Motion to Show Cause

Plaintiff also filed a motion asserting that defendants Smith, Waterson, Nelson, and Bernier, should be deemed to have consented to Plaintiff's Motion to Amend and/or should be sanctioned because they served Plaintiff their Opposition to the Motion to Amend several days late. Dkt. No. 35 at 21–25 ("Motion to Show Cause"). [9] He asserts that although the response was due on October 19, 2018, Defendants did not send it to him until October 22, and he did not receive it until October 25, 2018. Id. at 24.

The Motion to Show Cause is denied. Courts may excuse a late filing " 'after the time has expired if the party failed to

act because of excusable neglect.' " S&R Dev. Estates LLC v. Town of Greenburgh, No. 16-CV-8043, 2017 WL 44854, at *2 (S.D.N.Y. Jan. 4, 2017). Four factors are considered in evaluating excusable neglect: " '[1] the danger of prejudice to the [non-movant], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith.' " Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 366 (2d Cir. 2003) (alterations in original) (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993) ). Plaintiff does not allege that the delay in service prejudiced him—and the Court finds that it did not. He did not move to file a reply to Defendants' Opposition, even though he had approximately six weeks to do so before the Magistrate Judge issued the Report-Recommendation. L.R. 7.1(b)(2). The short delay in serving the Opposition did not delay judicial proceedings, and there is no evidence that Defendants acted in bad faith; they did not stand to gain from the short delay in service. While Defendants have not argued that they were tardy for reasons outside their control, the Court finds that the other factors weigh against levying sanctions on Defendants or deeming the Motion to Amend unopposed.

That said, Defendants are reminded that they must serve all papers on Plaintiff before the applicable filing deadlines. L.R. 7.1(b). Plaintiff should bring any future failures to comply with this rule to the Court's attention.

**V. CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 34) is **ADOPTED in part and MODIFIED in part** as described in this Memorandum-Decision and Order; and it is further

**\*21 ORDERED**, that the Motion to Dismiss (Dkt. No. 19) is **DENIED** with respect to Plaintiff's Eighth Amendment conditions-of-confinement claim against Randel Smith and his First Amendment retaliation claim against Nelson, but **GRANTED** with respect to the Eighth Amendment medical indifference claim against Waterson; and it is further

**ORDERED**, that the Motion to Amend (Dkt. No. 28) is **DENIED without prejudice**. Plaintiff may renew his Motion to Amend with a revised proposed amended complaint that

alleges **only** the following claims: (1) the First Amendment retaliation claim against Tracy Nelson, Denise Bernier, and Roxanne LeClerc; (2) the Eighth Amendment deliberate medical indifference claims against Sergeants Luc Maynard and Patrick Baker, Officer Richard Winston, mental health worker John Marinelli, Nurse Heath Baker, and Lieutenant Robert Barkman, and nurse Michele Byno based on Plaintiff's mental health needs; (3) the Eighth Amendment conditions of confinement claims against (a) Maynard, Winston, Officer Adam Gallagher, Officer Brian Fournier, and Sergeant Richard Scott based on unsanitary conditions in Cell 13 in May 2014; (b) Sergeants Michael Eddy and Laura Gokey, Marinelli, and Randel Smith for keeping him in Cell 15 next to inmate Reeder, resulting in sleep deprivation, in May 2014; and (c) Sergeant Randel Smith for placing him in Cell 18 next to inmate Reeder in December 2015; (4) the Eighth Amendment excessive force claims against Michael Gokey, Sarah Tompkins, and the unidentified Doe guards who participated in the September 2014 and 2015 assaults on Plaintiff; (5) the First Amendment retaliation claims against (a) Tompkins and her Doe accomplices regarding the 2015 assault and false disciplinary report; and (b) Laura Gokey and Randel Smith regarding inmate Reeder; (6) the Fourteenth Amendment due process claims against Eric Gutwine and Plaintiff's Jane Doe inmate assistant regarding his December 2015 disciplinary hearing; and (7) any other claims that the Court has not already dismissed; and it is further

**ORDERED**, that Plaintiff shall file any such renewed motion to amend his complaint within thirty days of the filing date of this Memorandum-Decision and Order; and it is further

**ORDERED**, that any such renewed motion to amend will be Plaintiff's final opportunity to amend his Complaint without a showing of good cause; and it is further

**ORDERED**, that Plaintiff's Motion to Show Cause (Dkt. No. 35 at 21–25) is **DENIED**; and it is further

**ORDERED**, that this case continues to be referred to Magistrate Judge Andrew Baxter for full pretrial and report-recommendations concerning dispositive motions.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1090802

White v. Marinelli, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 474 of 482

## Footnotes

1    Because the Court is also addressing the Motion to Amend in this Memorandum-Decision and Order, for efficiency, it cites to the facts in the proposed Amended Complaint. With respect to the Eighth Amendment claim against Waterson, the facts in the Amended Complaint mirror the allegations in Plaintiff's original Complaint unless otherwise noted.

2    Compare 🔶 Gomez v. Cty. of Westchester, 649 F. App'x 93, 96 (2d Cir. 2016) (one-day delay in providing pain medication for "extreme tooth pain" did not support Eighth Amendment claim) and Bilal v. New York State Dep't of Corr., No. 09-CV-8433, 2010 WL 2506988, at *11 (S.D.N.Y. June 21, 2010), aff'd, 494 F. App'x 143 (2d Cir. 2012) (dismissing claim based on allegations that plaintiff suffered "extreme" back and head pain for a "few hours" without pain medication, where the delay did not worsen his condition); with 🚩 Chance, 143 F.3d at 702–03 (six-month delay in treatment for dental condition that developed into infection and extreme pain stated claim) and 🔶 Archer, 733 F.2d at 16 (holding that beating that caused the pregnant plaintiff "vaginal bleeding" and "cramps" causing "extreme pain" during twelve-day delay in treatment, precipitating a miscarriage, stated claim).

3    Nelson allegedly destroyed footage of LeClerc "telling Plaintiff that [his] sex offense referral was for grievances and complaints," "of a nurse telling Plaintiff that a doctor at Greenhaven [Correctional Facility] knew about an infection but failed to treat Plaintiff," Compl. at ¶ 164(D), and of the mouse biting Plaintiff and his subsequent conversation with nurses, id. at 47–48, ¶ 124. Bernier allegedly withheld footage of a conversation between Plaintiff and a hearing officer, Gutwine, during Plaintiff's December 2015 disciplinary hearing. Id. at 33, ¶ 91.

4    Any legal argument should be limited to indicating which legal claims his factual allegations are intended to support. Plaintiff will have the opportunity to submit a more detailed legal analysis, with citations to caselaw, if Defendants file another motion to dismiss or for judgment in their favor.

5    The Court will not set a page limit for the amended complaint, but advises Plaintiff that it does not appear that his surviving claims should require him to use more than the approximately seventy pages he used in his original Complaint.

6    Although the claims regarding Gokey accrued two weeks before the September 24, 2014 time-bar, Plaintiff's September 8, 2014 grievance may have tolled the limitations period. R. & R. at 21 (citing 🚩 Gonzales v. Hasty, 651 F.3d 318, 324 (2d Cir. 2011) ).

7    Plaintiff believes that Baker learned about another grievance Plaintiff filed against Baker in September 2014. Am. Compl. at 38, ¶ 80(F)(12). He cites a letter stating that "RN Baker assessed the grievant on 9/10/14 for claims of sexual assault by staff." Am. Compl. at 38, ¶ 80(F)(12) (citing Dkt. No. 28-3 at 29) ("Exhibit M"). The fact that the writers knew this information, which was presumably available in Plaintiff's medical records, does not suggest that they informed Baker of Plaintiff's grievance.

8    The grievance also complained that Baker was giving Plaintiff "the wrong mental health pills." Ex. K at 25. But as indicated earlier, the Court previously concluded that those claims would survive sua sponte review if shown to be timely and will allow Plaintiff to amend his complaint to seek to establish their timeliness. Nov. Order at 19; R. & R. at 21.

9    Although Plaintiff asserts that he submitted the Motion to Show Cause to the Magistrate Judge on October 29, 2018, Obj. at 17; Mot. to Show Cause at 21, the motion was not electronically filed until Plaintiff submitted a copy with his Objections. Docket.

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 475 of 482

White v. Marinelli, Not Reported in Fed. Supp. (2019)

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Thousand v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 882053
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert THOUSAND, Plaintiff,
v.
Anthony ANNUCCI; et al., Defendants.

9:17-CV-0940 (GTS/CFH)
|
Signed 02/13/2018

**Attorneys and Law Firms**

Robert Thousand, Dannemora, NY, pro se.


**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

## I. INTRODUCTION

**\*1** Pro se plaintiff Robert Thousand commenced this civil rights action pursuant to 42 U.S.C. § 1983 ("Section 1983") in August 2017. *See* Dkt. No. 1 ("Compl."). [1] Plaintiff did not pay the filing fee for this action and sought leave to proceed in forma pauperis.

Upon review in accordance with 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A, the Court determined that plaintiff's complaint, failed to allege facts to support a case or controversy which he has standing to pursue, as is required by Article III of the United States Constitution and was, therefore, subject to dismissal for failure to state a claim upon which relief could be granted. Dkt. No. 7 (the "November Order") at 6-8. [2] In light of his pro se status, plaintiff was afforded the opportunity to file an amended complaint. *Id.* at 8-10. [3]

Plaintiff duly filed an amended complaint which is before this Court for review. Dkt. No. 9 ("Am. Compl.").


## II. DISCUSSION

In his amended complaint, plaintiff restates the facts regarding the disciplinary policies and procedures promulgated by the New York Department of Corrections and Community Supervision ("DOCCS") and his claims that the practice followed by DOCCS and the New York courts of classifying certain "witness violations" as regulatory, and remitting those matters for a new hearing violates inmates' rights protected under the Due Process Clause of the Fourteenth Amendment. *See* Am. Compl. at 4-15. [4] While acknowledging that DOCCS regulations afford inmates additional protections not mandated by the Constitution, plaintiff nevertheless contends that "all witness violations during prison disciplinary proceedings are, in fact, of a 'Constitutional' dimension; not a regulatory one." *Id.* at 9. Plaintiff maintains that the exclusive remedy for "witness violations" is expungement. *Id.* at 15 & n.1 ("The issue in the complaint is solely the unconstitutionality of remitting [ ] these hearings for a second hearing when the initial reversal was due to a witness violation; that all witness issues are of a "Constitutional" dimension and not of a "Regulatory" one."). [5]

**\*2** Under the heading "Plaintiff's Injury-in-Fact," plaintiff has provided facts in his amended complaint intended to demonstrate his standing to pursue this action. Am. Compl. at 13-15. Plaintiff states that in February 2014, he was unable to obtain the testimony of a requested witness who refused to testify at a Tier III hearing (the "February 2014 Hearing") convened to consider misbehavior charges against plaintiff. *Id.* Plaintiff further states that he was found guilty of misbehavior and sanctioned with a period of confinement in the Special Housing Unit ("SHU"). *Id.* at 13. On April 14, 2014, the disciplinary determination was administratively reversed due to the hearing officer's failure to properly investigate the witness's refusal to testify; the matter was remitted for a new hearing. *Id.* [6] Based upon the foregoing, plaintiff seeks a declaratory judgment and injunctive relief against defendants DOCCS Acting Commissioner Annucci, DOCCS Director of Special Housing/Inmate Discipline Rodriguez, and New York Governor Cuomo in their official capacities prohibiting the remittal of disciplinary proceedings for a new hearing where a "witness violation" has been established. *Id.* at 17.

Upon review, the Court finds that plaintiff has alleged facts which support, at this preliminary stage of the proceedings, a case or controversy involving his constitutional due process rights which he has standing to pursue. Thus, the Court must next determine whether plaintiff has alleged facts sufficient to plausibly suggest that he enjoyed a protected Fourteenth Amendment liberty interest in the February 2014 Hearing. "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in

**Thousand v. Annucci, Not Reported in Fed. Supp. (2018)**

Case 9:21-cv-00901-DNH-ML    Document 152    Filed 07/20/23    Page 477 of 482

relation to the ordinary incidents of prison life.' " *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin*. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000). [7] Thus, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (see *Colon*, 215 F.3d at 232 n.5), the Second Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *Colon*, 215 F.3d at 231. [8]

Here, because plaintiff has not disclosed the duration of his SHU confinement, [9] nor has he alleged facts which even suggest that the conditions under which he was confined were unduly harsh or otherwise atypical for purposes of *Sandin*, the amended complaint affords no basis upon which the Court could find that he has a protected liberty interest in the February 2014 Hearing for purposes of the Fourteenth Amendment. [10]

**\*3** For the reasons set forth above, and in the November Order, this action is dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

### III. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that the amended complaint (Dkt. No. 9) fails to state a claim for the violation of plaintiff's constitutional rights upon which this Court may grant relief and this action is therefore **DISMISSED without prejudice** in accordance with 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1); and it is further

**ORDERED** that the Clerk shall enter judgment accordingly; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 882053

---

### Footnotes

1    Plaintiff has filed two other civil rights actions in this District. *See Thousand v. Corrigan*, No. 9:15-CV-1025 (MAD/ATB) (Judgment in favor of defendants entered Oct. 13, 2017); *Thousand v. King*, No. 9:17-CV-1003 (BKS/TWD) (pending).

2    More specifically, the Court concluded that plaintiff had not demonstrated that he has suffered an "injury in fact" which will be likely redressable by a favorable decision in this action because plaintiff did not provide facts regarding (i) the date(s) on which he was subjected to disciplinary charges, (ii) denied the testimony of requested witnesses (either by the hearing officer or because the inmate refused to testify and the circumstances of that refusal were not properly investigated), (iii) found guilty, and (iv) received an administrative determination of a claimed "witness violation" reversing the hearing disposition and remitting the matter for a new hearing (rather than expunging the record). November Order at 6-8. The Court noted, moreover, that plaintiff would have to demonstrate that he enjoyed a protected Fourteenth Amendment liberty interest in any such disciplinary proceeding in accordance with *Sandin v. Conner*, 515 U.S. 472 (1995), in order to state a cognizable Fourteenth Amendment claim for the violation of his due process rights. *Id.* at 8.

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 478 of 482

Thousand v. Annucci, Not Reported in Fed. Supp. (2018)

3    Plaintiff was granted leave to proceed in forma pauperis and without prepayment of the filing fee. November Order at 9.

4    The DOCCS regulations are set forth in DOCCS Directive 4932. Plaintiff refers to DOCCS Directive 4932 in his pleadings as "Chapter V."

5    In *Texeira v. Fischer*, 22 N.Y.S.3d 148 (2015), the New York Court of Appeals declined to rule that expungement of the disciplinary disposition from the inmate's prison records was the exclusive remedy for the violation of an inmate's right to obtain witness testimony at a disciplinary hearing. The Court of Appeals reasoned that because "[u]nder *Wolff [v. McDonnell*, 418 U.S. 539 (1974) ], refusal to provide a witness is not an automatic due process violation," and because DOCCS regulations provide additional protections to inmates not mandated by *Wolff*, it is "possible to satisfy *Wolff* and yet not comply with the regulations." *Id.* As a result, where the record demonstrated that the DOCCS regulation had not been complied with, but it was not possible to determine whether the inmate's constitutional rights had been violated, the Court affirmed the lower court's remittal of the matter for a new hearing. *Id.* at 151. Here, because the Court concludes for the reasons set forth below that plaintiff has not demonstrated that he enjoyed a protected liberty interest in the February 2014 Hearing, the merits of plaintiff's due process claim need not and will not be addressed.

6    Plaintiff was found guilty at the second hearing and was again subjected to "due process violations." Am. Compl. at 14. However, plaintiff specifically disavows any intention to assert claims "arising out of the second hearing." *Id.* at 14-15.

7    For example, segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. *Sandin*, 515 U.S. at 485-86. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.*

8    "Under the 'normal conditions of SHU confinement in New York [state prison],' the prisoner is: placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited." *Palmer v. Richards*, 364 F.3d 60, 66 n.3 (2d Cir. 2004) (citation omitted).

9    In light of plaintiff's statement that the February 2014 Hearing was reversed on April 14, 2014, it appears that the duration of his SHU confinement was significantly less than 101 days.

10   The Court notes, moreover, that any due process claims arising out of the February 2014 Hearing appear to be time-barred. The "applicable statute of limitations for § 1983 actions arising in New York requires claims to be brought within three years." *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995). A Section 1983 cause of action accrues "when the plaintiff knows or should know of the injury that is the basis of the cause of action." *Covington v. City of New York*, 916 F. Supp. 282, 285 (S.D.N.Y. 1996) (citing *Woods v. Candela*, 13 F.3d 574, 575 (2d Cir. 1994)). "Thus, in determining when the statute begins to run, the " 'proper focus is on the time of the [wrongful] act, not the point at which the consequences of the act become painful.' " *Covington*, 916 F. Supp. at 285 (citations omitted). It appears that plaintiff's claims

Thousand v. Annucci, Not Reported in Fed. Supp. (2018)

Case 9:21-cv-00901-DNH-ML   Document 152   Filed 07/20/23   Page 479 of 482

arose, at the latest on April 14, 2014. Plaintiff's complaint was signed on August 22, 2017 and received for filing by the Clerk of this Court on August 25, 2017.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

the Court's Order, and which alleges that Defendant Artus did not help Plaintiff after receiving one or more writings from Plaintiff) appears consistent with Plaintiff's sworn original Complaint (which specifically alleges that, during the time in question, there was a grievance program available at Clinton C.F.). (*Compare* Dkt. No. 9, ¶ 1 [Plf.'s Am. Compl.] *with* Dkt. No. 1, ¶ 4.a. [Plf.'s Compl.].)

36    *See, e.g., Wilkinson v. Banks,* 02-CV-0361, 2007 WL 2693636, at *7-8 (W.D.N.Y. Sept.10, 2007) (granting defendants' motion for summary judgment after, *inter alia,* [1] noting that defendants had, through an affidavit of Thomas Eagen, adduced evidence indicating the existence of DOCS' Inmate Grievance Program, and [2] finding that plaintiff had adduced no evidence suggesting that the Program was not available to him during the time in question). Indeed, some authority exists suggesting that this is the sort of fact of which a court might take judicial notice. *See Wegman v. Grimmke,* 03-CV-2345, 2004 WL 2202642, at *4 (W.D.N.Y. Sept.30, 2004) (granting defendants' motion for summary judgment after, *inter alia,* [1] appearing to take judicial notice of the existence of DOCS' Inmate Grievance Program, and [2] finding that plaintiff had adduced no evidence suggesting that the Program was not available to him during the time in question).

37    (*See* Dkt. No. 32, Part 3, ¶ 1-2 [Affid. of Def. Eagen, swearing that, *inter alia,* he is the "Director of the Inmate Grievance Program of the New York State Department of Correctional Services," that he is the "custodian of the records maintained by the Central Office Review Committee," and that the Committee's computer database contains records of all appeals received from "the facility Inmate Grievance Program Offices" since 1990].)

38    Indeed, in his original Complaint, which (again) was verified, Plaintiff asserts facts indicating that the highest level of DOCS staff to which he appealed any Inmate Grievance Resolution Committee decision was the office of the Clinton C.F. Superintendent. (Dkt. No. 1, ¶ 4.c.(i) [Plf.'s Verified Compl.].)

39    As the Second Circuit has held, "separate SHU sentences should be aggregated for purposes of the *Sandlin* inquiry when they constitute a *sustained* period of confinement." *Giano v. Selsky,* 238 F.3d 223, 226 (2d Cir.2001) [internal quotations and citations omitted; emphasis added].

40    *See Giano,* 238 F.3d at 226 (aggregating 670 days in administrative segregation at Attica C.F. to 92 days in administrative segregation at Clinton C.F., which segregation *immediately followed* the prior segregation, where it was clear that the subsequent segregation was "simply a continuation" of the prior segregation because "the two periods of confinement were based on the same administrative rationale and ... the conditions of Giano's confinement were ... identical at both facilities"); *Sealey v. Giltner,* 197 F.3d 578, 580, 587-88 (2d Cir.1999) (taking 83-day sentence in SHU imposed by Defendant Giltner at April 16 disciplinary hearing, and aggregating it to 18-day sentence in SHU that plaintiff had served *immediately prior* to April 16 disciplinary hearing, but not aggregating it to sentence that resulted from a subsequent disciplinary hearing conducted by a *different hearing officer* ); *cf. Sims v. Artuz,* 230 F.3d 14, 18-19, 23-24 (2d Cir.2000) (leaving it to district court to explore whether to aggregate any of the 60-day to 360-day sentences from seven disciplinary hearings that occurred within a four-and-one-half-month period, where all of those sentences were contiguous, two of them were administered by the same disciplinary hearing officer, and two others were also administered by the same disciplinary hearing officer).

41    *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606, (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

42    *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

43    *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr.12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

44    *Collins,* 423 F.Supp.2d at 415-16 (quoting *Lewis,* 518 U.S. at 355).

45    *Id.*

46    **Northern District of New York:** *See Flemming v. Goord,* 06-CV-0562, 2007 WL 3036845, at *2 (N.D.N.Y. Oct.16, 2007) (Mordue, C.J., adopting Report-Recommendation by Homer, M.J.); *Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *13-14 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting Report-Recommendation of Lowe, M.J.); *Gamble v. Monette,* 06-CV-0136, 2007 WL 2089697, at *1-4 (N.D.N.Y. July 20, 2007) (Kahn, J., adopting Report-Recommendation of DiBianco, M.J.); *Pettus v. Brown,* 06-CV-0152, 2007 WL 1791120, at *2-3 (N.D.N.Y. June 19, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.); *Gill v. Pidlypchak,* 02-CV-1460, 2006 WL 3751340, at *5 (N.D.N.Y. Dec.19, 2006) (Scullin, J.); *Polanco v. Burge,* 05-CV-0651, 2006 WL 2806574, at *2 (N.D.N.Y. Sept.28, 2006) (Kahn, J., adopting Report-Recommendation by Homer, M.J.).

      **Western District of New York:** *See Polanco v. Hopkins,* 03-CV-6661, 2007 WL 914023, at *3-6 (W.D.N.Y. Mar.23, 2007).

      **Eastern District of New York:** *See McFadden v. Parpan,* 16 F.Supp.2d 246, 247 (E.D.N.Y.1998); *see also Rolle v. Nassau County Correctional Facility,* 01-CV-2414, Order, at 2 (E.D.N.Y. filed Nov. 17, 2004) ("A court may revoke the *in forma pauperis* status it previously bestowed upon a [plaintiff], where that status is later determined to be 'improvident' ") [citation omitted], *accord, Rolle v. Kurtzrock,* 03-CV-1789, Order (E.D.N.Y. filed June 17, 2004).

      **District of Connecticut:** *See Demos v. John Doe,* 118 F.Supp.2d 172, 174 (D.Conn.2000).

47    I note that, *after* Plaintiff's *in forma pauperis* status was (improvidently) granted in this case on July 7, 2005, he earned at least **four** more "strikes," for purposes of 28 U.S.C. § 1915(g). *See Taylor v. Second Dept. Appellate Div.,* 05-CV-4791 (E.D.N.Y.) (Dearie, C.J.) (dismissing Plaintiff's Complaint for failure to state a claim on October 17, 2005); *Taylor v. Gemill,* 05-CV-6093 (E.D.N.Y.) (Dearie, C.J.) (dismissing Plaintiff's Complaint for failure to state a claim on January 17, 2006) *Taylor v. Artis,* 05-CV-1569 (N.D.N.Y.) (Sharpe, J.) (dismissing Plaintiff's Complaint for failure to state a claim on May 10, 2006); *Taylor v. Bisceglia,* 06-CV-0277 (N.D.N.Y.) (Mordue, C.J.) (dismissing Plaintiff's Amended Complaint for failure to state a claim on May 10, 2007); *see also Taylor v. Bennett,* 05-CV-10709 (S.D.N.Y.) (Berman, J.) (granting defendants' "motion to dismiss" Plaintiff's Amended Complaint on January 24, 2007, but not indicating grounds for dismissal).

48    28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 561 (2d Cir.2002) (examining plaintiff's allegations in order to determine if plaintiff's case fell within the exception to the three strikes rule for prisoners in "imminent danger of serious physical injury").

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 144945

## Footnotes

1    Plaintiff initially brought the action against "Correction Officer John Doe," as he was unable to identify Defendant Steck. Following discovery, the caption was amended to specifically name defendant Steck. Dkt. # 23.

2    This factual statement is taken from the plaintiff's deposition testimony (Dkt.# 33, att.3, Exh. A), the declaration of defendant Rademacher with exhibits (Dkt.# 33, att.4), the declaration of defendant Steck (Dkt.# 33, att.5), the declaration of RN Rita Pawlak with exhibits (Dkt.# 33, att.6), and the plaintiff's declaration (Dkt.# 35).

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.